**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANTON PERAIRE-BUENO, and JAMES
PERAIRE-BUENO,

      Defendants.

---

Case No.:  1:24-cr-00293-JGLC

**DEFENDANTS' REPLY IN SUPPORT OF
<u>JOINT MOTIONS TO DISMISS THE INDICTMENT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

I.   MOTION TO DISMISS (1): THE INDICTMENT VIOLATES DUE PROCESS. ................. 2

    A.   The Government Does Not Dispute That This Prosecution Is a Novel Application of
        the Wire Fraud Statute. ................................................................................................ 3

    B.   The Court Should Grant the Peraire-Buenos' Motion to Dismiss Before Trial. .......... 5

    C.   The Indictment Fails the Fair Notice Standard set in *Lanier*. ...................................... 7

II.  MOTION TO DISMISS (2): THE INDICTMENT FAILS TO STATE THE ESSENTIAL
    ELEMENTS OF THE WIRE FRAUD CHARGES. ........................................................... 13

    A.   The Failure to Allege an Essential Element Requires Dismissal of an  Indictment. .. 15

    B.   The Indictment Does Not Allege a Misrepresentation. ............................................... 18

    C.   The Indictment Fails to Allege the Deprivation of a Traditionally Recognized,
        Enforceable Property Right............................................................................................ 26

    D.   The Indictment Does Not Allege an Intent to Defraud................................................ 29

III. MOTION TO DISMISS (3): THE INDICTMENT IS UNCONSTITUTIONALLY
    VAGUE............................................................................................................................... 30

CONCLUSION.................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Ciminelli v. United States*, 598 U.S. 306 (2023)....................................................................16, 28

*Kelly v. United States*, 590 U.S. 391 (2020) ..................................................................................28

*Loughrin v. United States*, 573 U.S. 351 (2014)........................................................................24, 26

*Maynard v. Cartwright*, 486 U.S. 356 (1988)....................................................................................6

*Neder v. United States*, 527 U.S. 1 (1999)........................................................................................15

*Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002) ..........................................................................9

*Russell v. United States*, 369 U.S. 749 (1962) ................................................................................31

*United States v. Abrams*, 543 F. Supp. 1184 (S.D.N.Y. 1982)......................................................30

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012)..................................................................17

*United States v. Alkaabi*, 223 F. Supp. 2d 583 (D.N.J. 2002) ................................................17, 28

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) ......................................................24, 25, 26

*United States v. Botti*, 711 F.3d 299 (2d Cir. 2013)..........................................................................7

*United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992) ........................................................28

*United States v. Carroll*, 2015 WL 2251206 (N.D. Cal. May 13, 2015)......................................17

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ..............................................................21, 22

*United States v. Chime*, 2011 WL 3420717 (N.D. Ohio Aug. 4, 2011) ........................................16

*United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974) ..................................................................31

*United States v. DeFilippo*, 685 F. Supp. 3d 129 (D. Conn. 2023) ..................................................5

*United States v. Eisenberg*, 2023 WL 8720295 (S.D.N.Y. Dec. 18, 2023)................................6, 7

*United States v. Elie*, 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) ................................................16

*United States v. Evans*, 844 F.2d 36 (2d Cir. 1988)........................................................................28

*United States v. Fanta*, 2005 WL 3455755 (S.D.N.Y. Dec. 16, 2005)........................................19

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008)............................................................14, 15

*United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004) ................................................5

*United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023) ....................................................17

*United States v. Harriss*, 347 U.S. 612 (1954) ....................................................................12

*United States v. Heicklen*, 858 F. Supp. 2d 256 (S.D.N.Y. 2012) ....................................17

*United States v. Henry*, 29 F.3d 112 (3d Cir. 1994) ......................................................27, 28

*United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020) ........................................................11

*United States v. Jabar*, 19 F.4th 66 (2d Cir. 2021) ............................................................29

*United States v. Khalil*, 2014 WL 1599943 (E.D.N.Y. Apr. 21, 2014) ..........................19

*United States v. Kinzler*, 55 F.3d 70 (2d Cir. 1995) ..............................................................9

*United States v. Kurtz*, 2008 WL 1820903 (W.D.N.Y. Apr. 21, 2008) ....................18, 29

*United States v. Lanier*, 520 U.S. 259 (1997) ........................................................7, 8, 11

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990) ..............................................6

*United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993) ..............................................................6

*United States v. Palma*, 58 F.4th 246 (6th Cir. 2023) ..................................................25, 26

*United States v. Phillips*, 690 F. Supp. 3d 336 (S.D.N.Y. 2023) ..............................19, 20

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ..............................................13, 19, 20, 31

*United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) ........................................................15

*United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009) ............................5, 17, 18

*United States v. Raniere*, 384 F. Supp. 3d 282 (E.D.N.Y. 2019) ..............................16, 31

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ..........................................................31

*United States v. Roberts*, 363 F.3d 118 (2d Cir. 2004) ..................................................6, 12

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ..........................................................6

*United States v. Saathoff*, 708 F. Supp. 2d 1020 (S.D. Cal. 2010) ....................................5

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ..........................................................29

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ..............................................16, 29, 30

iv

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ............................................16, 31

*United States v. Telink, Inc.*, 702 F. Supp. 805 (S.D. Cal. 1988) ................................31

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014)..................................9

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) ...........................................6

*United States v. Ward*, 2001 WL 1160168 (E.D. Pa. Sept. 5, 2001) .............................5

*Van Loon v. Dep't of Treasury*, 122 F.4th 549 (5th Cir. 2024) .....................................12

## STATUTE AND RULE

26 U.S.C. § 7206 ...............................................................................................31

Fed. R. of Crim. P. 7(c).....................................................................................31

Defendants Anton Peraire-Bueno and James Peraire-Bueno respectfully submit this reply in support of their motions to dismiss the Indictment: (1) Motion to Dismiss the Indictment for Failure to Provide Fair Notice; (2) Motion to Dismiss the Indictment for Failure to Allege Essential Elements; and (3) Motion to Dismiss the Indictment as Unconstitutionally Vague.  ECF 49.

## INTRODUCTION

The government's Opposition (ECF 61) to the Peraire-Buenos' motions to dismiss is an exercise in delay and deflection.  The government urges the Court to overlook the many serious failings the Peraire-Buenos have identified with this prosecution and the Indictment as going only to the government's proof at trial.  In its effort to avoid this Court's scrutiny, the government ignores the most troubling aspects of this admittedly novel Indictment and only tepidly defends its deficient factual allegations concerning the core elements of the charged offenses.  To the extent the government engages at all with the Peraire-Buenos' arguments, it mischaracterizes them or else resists the clear implications of the Indictment's allegations.

This Court, however, need not postpone its critical evaluation of the Indictment.  The Fifth and Sixth Amendments to the United States Constitution and the Federal Rules of Criminal Procedure set clear baselines that any indictment must meet.  When assessed against these long-established standards, the Indictment flunks the tests several times over.

***First***, the Indictment must be dismissed because, as the government effectively concedes, this novel prosecution seeks to apply the wire fraud statute in an unprecedented manner.  The government's glib response that "[s]ome case has to be the first," Opp'n 41-42, defies the Due Process Clause's requirement that a criminal statute, or prior judicial decisions construing it, provide fair notice to defendants charged in any case—even the "first"—that their conduct could be criminal.  The government cannot identify even one other judicial decision or prosecution

1

concerning remotely analogous conduct.  Absent fair notice, this misguided test case is unconstitutional.

**_Second_**, the Indictment's failure to allege the essential elements of wire fraud separately requires dismissal.  The government repeatedly invokes the Indictment's length and leans on its conclusory labels like "False" and "Lure," while retreating from its factual allegations and their logical implications.  But, taking the Indictment at its word (as the Court must), the allegations do not add up to the charged offenses.

**_Third_**, the Indictment's superficial allegations going to the core of the charged offenses leave the Peraire-Buenos unable to adequately prepare their defense.  The Opposition's evasion on these critical issues underscores the degree to which the government's refusal to explain the legal and factual basis for this novel prosecution prejudices the Peraire-Buenos' Sixth Amendment rights.

Each of the three motions provides a sufficient ground to dismiss the Indictment.  The Court should grant them.

## I.    <u>MOTION TO DISMISS (1)</u>: THE INDICTMENT VIOLATES DUE PROCESS.

The Peraire-Buenos have moved to dismiss the Indictment because the wire fraud statute, as applied to the alleged conduct, is void for vagueness under the Fifth Amendment's Due Process Clause.  Nothing in the text of the statute, previous judicial applications, or the government's previous attempts (or, in this case, lack thereof) to apply the statute "made it reasonably clear at the relevant time that that [their] conduct was criminal." Mot. 10 (quoting *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020)).

The Opposition effectively concedes that this prosecution is the first of its kind, as the Indictment itself trumpets.  Indict. ¶ 1.  The government does not identify a **_single case_** that would have put a reasonable person on notice that the alleged conduct may be considered criminal.  It

does not point to a single regulation, government announcement, or other activity that might serve a similar function. It does not dispute the many ways in which the Motion noted that the case is novel. *See* Mot. 12-19. The government embraces this novelty, claiming that "[s]ome case has to be the first," Opp'n 41-42, as if the only possible way for the United States of America to announce potential applications of criminal law in developing technologies is through a splashy test prosecution. Instead of articulating why a reasonable person would have been on notice that the alleged conduct may violate the wire fraud statute, as the Constitution requires, the government seeks to avoid that fundamental issue altogether by arguing that the Motion is not properly brought at this stage, or that the Indictment's allegations about the Peraire-Buenos' conduct after the alleged Exploit show that they were on notice that their conduct was criminal. Neither of these peripheral arguments has merit.

The Opposition confirms that this is a troubling case of economic regulation by prosecution. The Court should grant the Peraire-Buenos' first Motion to Dismiss the Indictment.

A.      **The Government Does Not Dispute That This Prosecution Is a Novel Application of the Wire Fraud Statute.**

The Motion detailed several ways in which this case is an unprecedented and surprising application of the wire fraud statute. At bottom, the allegations in this case amount to the government's first-ever announcement of its view of what constitutes the expectations of particular users of the Ethereum Network and what violates those expectations. As outlined in the Motion, this case is novel for a number of reasons, including: (1) the Ethereum Network is a "trustless," "decentralized," and "open-source" system where neither government regulation nor long-established rules have set the parameters of what particular users, like validators, may and may not do, Mot. 12; (2) the Ethereum Network and MEV-Boost program were at the relevant time "in flux" due to multiple updates, which "undermine[d] the very existence of any clear, stable, and

well-known 'rules' that the Peraire-Buenos supposedly violated," *id.* at 15-16; (3) the alleged

victims in this case engaged in market manipulation that has not been prosecuted, signaling that

the government does not pick sides in these types of adversarial trading activities, *id.* at 17-18; and

(4) the government has never previously prosecuted or declared illegal the other well-publicized

attempts to counter manipulative "sandwich trades" that bear resemblance to the alleged Exploit,

like the Salmonella strategy, *id.* at 18-19. These circumstances fatally undermine any claim that a

reasonable person would understand the alleged conduct to have been illegal.

The government does not address, let alone dispute, any of the above. Nor does the

government dispute the Peraire-Buenos' arguments as to why a reasonable person would not have

understood that the alleged Exploit was criminal under the wire fraud statute. And the government

fails to identify even a single case prosecuting fraud under remotely similar circumstances,

whether relating to cryptocurrency exchanges or traditional financial markets.

The government cannot make these arguments because the Indictment embraces the novel

premise upon which this prosecution rests. The Indictment does not allege that the Peraire-

Buenos' conduct violated any known rules or protocols issued by a federal, state or regulatory

agency or the Ethereum Network.[1] Rather, as the Indictment makes plain, the government's case

hinges on proving that the Peraire-Buenos violated the purported norms or implicit expectations

among users of the MEV-Boost program operating on the Ethereum blockchain. As noted below

in connection with the Peraire-Buenos' other motions to dismiss, the government cannot even

---

[1]    The Indictment cannot allege the violation of a federal rule because the federal government
thus far has not comprehensively regulated digital assets or the exchanges on which they are traded.
Although numerous pieces of legislation have been proposed in Congress, none have been enacted.
*See* Br. of *Amicus Curiae* U.S. Senator Cynthia M. Lummis 1, 11-14, *Coinbase, Inc. v. SEC*, No.
25-145 (2d Cir. Jan. 25, 2025). In the absence of clear rules, lawmakers have criticized what they
view as unconstitutional efforts to legislate through enforcement. *See, e.g.*, *id.* at 15-22 (arguing
that enforcement through a civil action violated separation of powers).

articulate this fraud theory in a way that covers the statute's essential elements or that provides a coherent story that the Peraire-Buenos can prepare to address.  *See* Parts II, III, *infra* (noting that the Indictment violates the Fifth and Sixth Amendments for these reasons).  In connection with this Motion, when challenged with explaining how the Peraire-Buenos had a reasonable warning that conduct supposedly violating the unwritten and unspoken expectations among users of the MEV-Boost program may be considered illegal under the wire fraud statute, the government simply refuses to engage.

**B.    The Court Should Grant the Peraire-Buenos' Motion to Dismiss Before Trial.**

Rather than engage with the merits of the Peraire-Buenos' Motion, the government's principal response is to urge delay because this Motion supposedly "is not properly brought at the motion to dismiss stage."  Opp'n 38.  This argument is entirely unsupported and should be rejected.

The government's claimed categorial rule does not exist.  There are many examples of courts deciding as-applied vagueness challenges at the indictment stage.  *See United States v. Giffen*, 326 F. Supp. 2d 497, 506-07 (S.D.N.Y. 2004) (granting pre-trial motion to dismiss honest services fraud charge for lack of fair notice); *see also, e.g.*, *United States v. DeFilippo*, 685 F. Supp. 3d 129, 139, 142 (D. Conn. 2023) (granting pre-trial motion to dismiss indictment for lack of fair notice); *United States v. Radley*, 659 F. Supp. 2d 803, 812 (S.D. Tex. 2009) (same); *United States v. Ward*, 2001 WL 1160168, at *1 (E.D. Pa. Sept. 5, 2001) (same).[2]

---

[2]     *United States v. Saathoff*, 708 F. Supp. 2d 1020 (S.D. Cal. 2010) (cited at Mot. 10-11), therefore stands in good company in resolving an as-applied challenge before trial.  *Contra* Opp'n 39 n.11 (suggesting that *Saathoff* is an outlier based on its thin subsequent citation history).  Nor is *Saathoff* "unique" in the other ways the government claims.  *Saathoff* did quote from a California Supreme Court case for background on the state laws supposedly violated in the course of the alleged honest services fraud scheme, *see* 708 F. Supp. 2d at 1029-30, 1035, but it based its vagueness holding on the statute and the indictment.  *See id.* at 1036 ("It is not evident from § 1346 or the indictment where the Defendants crossed over the federal line into criminal conduct.").

The government cites no binding precedent holding that a district court may only consider an as-applied vagueness challenge after trial. The defendants in *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003), raised their vagueness challenge for the first time on appeal, so the court had no reason to consider whether their as-applied challenge could have been decided prior to trial. *See* 354 F.3d at 129. Neither *Maynard v. Cartwright*, 486 U.S. 356 (1988), nor *United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993), held, or even suggested, that as-applied vagueness challenges must be brought after trial. *See Maynard*, 486 U.S. at 361-62 (explaining that the vagueness challenges under the Due Process Clause are distinct from those under the Eighth Amendment); *Nadi*, 996 F.2d at 550-51 (explaining that the defendants' vagueness challenge failed because their conduct was illegal even under their own, preferred reading of the statute at issue).[3]

The two district court cases that the government cites do little to advance its argument. The court in *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990), did not cite any caselaw or other authority explaining why it decided to postpone a decision on the defendant's as-applied challenge. In *United States v. Eisenberg*, 2023 WL 8720295, at *7 (S.D.N.Y. Dec. 18, 2023), the court noted that as-applied challenges are "often premature at the indictment stage," but did not hold that they must always be decided after trial. And in *Eisenberg*, the court viewed ruling on the defendant's vagueness motion as requiring it to pick sides between the parties' "diverg[ing]

---

[3]    The Second Circuit has previously reversed pre-trial decisions granting motions to dismiss for lack of fair notice. *See generally United States v. Roberts*, 363 F.3d 118 (2d Cir. 2004); *United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999). In reversing these decisions, however, the Second Circuit never suggested that the district courts should have waited to resolve the motions until after trial. In fact, in *Roberts*, which the government cites in its Opposition for a different proposition, *see* p. 12, *infra*, the district court held an evidentiary hearing on the vagueness motion that included expert testimony. *See* 363 F.3d at 121. The Second Circuit reviewed this extensive record and not once suggested that the trial court acted improperly in ruling pre-trial.

views on what [the defendant's] conduct was." *Id*. Here, for purposes of this Motion, the Peraire-Buenos accept as true the Indictment's allegations concerning their alleged conduct.

There is no reason why this Motion cannot or should not be considered now—before the Peraire-Buenos are forced to defend themselves at trial. The Motion assumes the allegations in the Indictment are true. The government does not dispute the novelty of the prosecution, the changing norms in the Ethereum Network, and the lack of government regulation or intervention into conduct in any way akin to that alleged here. The government makes no attempt to identify a case that would have put a reasonable person on notice, prior to the alleged Exploit, that the alleged conduct might be considered criminal. The government does not even identify an analogue in traditional wire fraud circumstances. Yet the government contends that the Peraire-Buenos must stand trial before the Court may vindicate their rights under the Due Process Clause. The law does not require the Peraire-Buenos to suffer that injustice or this Court to expend its resources on a trial that should never have been held.

## C.    The Indictment Fails the Fair Notice Standard set in *Lanier*.

What little the government has to say in response to the Motion is plagued with error. The government misstates the relevant legal test and the Peraire-Buenos' arguments based on that test, and it raises irrelevant arguments regarding the Peraire-Buenos' alleged subjective knowledge. These arguments present no reason to deny the Motion.

***First***, the government contends that the text of the wire fraud statute "plainly" gave the Peraire-Buenos fair notice, but it makes no effort to explain how. Opp'n 41. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)). This conclusory argument should not be enough given courts' concern that the wire fraud statute can "be used to prosecute kinds of behavior that . . . cannot reasonably

be expected by the instigators to form the basis of a federal felony." Mot. 11 (quoting *United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997)). Nor does the government identify any precedent that it contends fairly discloses the alleged conduct to be within the scope of the wire fraud statute.

*Second*, the government misstates the Peraire-Buenos' fair notice argument. The government argues that the Due Process Clause does not require that there be "a factual situation that is fundamentally similar to the crime charged." Opp'n 41 (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)). But the Peraire-Buenos do not argue that the government must find an exact match; rather, the Peraire-Buenos contend that the government cannot satisfy the "reasonable warning" standard in *Lanier*. *See* Mot. 15 (noting that this case "has no obvious analogue to fraud or market manipulation cases in traditional or even digital markets"); *Lanier*, 520 U.S. at 269 (holding that prior judicial decisions must give "reasonable warning that" the defendant's conduct was unlawful). Again, the government has not identified *a single case* that constitutes a reasonable analogue that would have given an ordinary person reasonable warning that the alleged Exploit may violate the wire fraud statute.

*Third*, the government contends that the Peraire-Buenos' fair notice challenge fails because "[s]ome case has to be the first" when applying "longstanding criminal statutes to new technologies." Opp'n 42. In support, the government cites several cases for the proposition that prosecutions with novel features do not always violate the Due Process Clause. *Id.*

As an initial matter, the government's response misunderstands the Peraire-Buenos' argument. The Peraire-Buenos do not argue that every application of a criminal statute to new technologies violates the Due Process Clause—in fact, the Peraire-Buenos' brief identifies several prosecutions involving cryptocurrencies that were "based on theories of illegality that are akin to

8

well-established financial crimes committed in traditional financial markets," such as the cases against Samuel Bankman-Fried, Kristijian Krstic, and Avi Eisenberg. Mot. 14-15. In each of those cases, notwithstanding any issues relating to new technologies, the alleged conduct had a clear analogue to prior prosecutions that gave the defendants fair warning that their conduct was criminal. *Id.* The government does not identify such an analogue here alleging fraud based on supposed violations of the norms or unwritten expectations of users on the Ethereum Network or any other cryptocurrency platform.

The cases the government cites in support of its "someone has to go first" argument show that the government is overreaching here. In each of those cases, the defendant either engaged in conduct that any reasonable person would think was criminal or violated a statute that, on its terms, clearly applied to the alleged conduct. *See United States v. Kinzler*, 55 F.3d 70, 71, 74 (2d Cir. 1995) (denying fair notice challenge where the "clear language of the statute" gave the defendant "ample notice" that transferring money received from illegal prostitution through accounts in the names of "sham companies" constituted money laundering); *Ponnapula v. Spitzer*, 297 F.3d 172, 183-84 (2d Cir. 2002) (denying fair notice challenge to New York's larceny statute by a defendant who induced a bank to loan him "$1.9 million by signing a personal guaranty with the knowledge that his assets were insufficient to cover such a sizable loan"); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 565 (S.D.N.Y. 2014) (denying fair notice challenge to drug conspiracy charges where "[n]o person of ordinary intelligence could believe that" the defendant's conduct, which involved helping "narcotics traffickers [and] computer hackers to" sell their services online and the use of "murder-for-hire," was "somehow legal"). In each of these cases, the courts engaged in an analysis that the government fails to engage in here—assessing *why* the application of the statute to the particular set of facts was not novel or, even if novel in certain respects, was sufficiently

related to prior cases. For the reasons stated in the Motion, it was entirely unclear that the conduct alleged here could be considered criminal. *See* Mot. 11-19.

The government claims that the court in *United States v. Storm*, No. 1:23-cr-00430-KPF (S.D.N.Y.), recently denied a "nearly identical" fair notice argument. Opp'n 41. Not so. *Storm* concerned different alleged crimes, different alleged facts, and different defense arguments. In *Storm*, the defendant was charged with, among other things, conspiracy to commit money laundering in connection with his creation and operation of a cryptocurrency "mixing" service that he and his co-conspirators allegedly knew "was being used to launder criminal proceeds," including hundreds of millions of dollars' worth of ETH that was stolen by a North Korean hacking group. Indict. ¶¶ 50, 56-68, ECF 1. In his motion to dismiss, the defendant raised a brief as-applied vagueness challenge that was premised on the claim that the Indictment alleged only the "publication of code" without further involvement in the illegal activity. *See* Def.'s Mot. to Dismiss 2, 53-54, ECF 37-1. The court rejected that view of the Indictment, finding that it alleged that "he knowingly marketed [his company's services] as a means of allowing customers to conceal the nature and source of their unlawful activity" and that his business "fits the plain definition of a money transmitting outfit," such that the alleged conduct fell squarely under the charged statutes. Tr. 42, ECF 84. Because the defendant had "not shown that the alleged conduct [was] outside of or not within the statutes in question," the court was not troubled that there were "no judicial decisions" addressing whether the supposedly "constitutionally protected activity of providing code to users who wish to protect their financial privacy" was criminal. *Id.* at 44-45. The court's holding was buttressed by the fact that the defendant's service was "not meaningfully different from the cryptocurrency mixing services recognized as money transmitting businesses in" three recent cases. *Id.* at 22-23; *see also* U.S. Br. 76-77, ECF 53 (arguing that "the defendant's

alleged conduct is closely similar to other cryptocurrency businesses in which courts have rejected similar challenges to money laundering and unlicensed money transmitting charges").

*Storm* is thus like the Bankman-Fried case and others cited in the Motion where the only novelty was that otherwise familiar criminal conduct allegedly occurred in connection with a cryptocurrency business.  Here, the Indictment's allegations, taken as true, fall far outside the heartland of the prior cases charged under the wire fraud statute, which is why the government has failed to identify ***any*** case that is even reasonably analogous to this matter in either a traditional or cryptocurrency market.

___**Fourth**___, the government contends that the Indictment's notice problems are cured by its allegations concerning the Peraire-Buenos' subjective knowledge and later actions, which supposedly bear on their intent.  In particular, the government focuses on allegations that the Peraire-Buenos (1) took steps to "conceal their identity and participation" in the alleged Exploit, (2) ran online searches regarding the Ethereum-imposed penalties for misconduct by validators, (3) "took numerous steps over several months to off-ramp the fraud proceeds to traditional bank accounts," and (4) ran Google searches after the alleged Exploit regarding the statute of limitations for certain crimes and the possibility of extradition to a foreign country. Opp'n 39-40.  This argument lacks legal and factual support.

Whether the text of the statute or decisions applying it provide constitutional fair notice is an objective inquiry.  *See Lanier*, 520 U.S. at 269.  The government concedes this in its Opposition, when it quotes *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020), for the proposition that "the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of what conduct is prohibited."  Opp'n 34; *see also id.* at 38 (quoting *Cartrwright*, 486 U.S. at 361, for the proposition that the focus is on whether "reasonable persons would know that their conduct

is at risk"). *Roberts*, 363 F.3d 118, did not hold to the contrary. *Contra* Opp'n 39. The court in *Roberts* made clear that its denial of the defendants' fair notice challenge did not rest on "the government's proffer that the defendants actually believed what they were doing was illegal." 363 F.3d at 123; *see id.* ("[E]ven putting aside these considerations, the defendants' challenge fails on its own terms."). The government does not cite to any Second Circuit decision—and the defense is aware of none—that bases a denial of a fair notice challenge on allegations or evidence concerning a defendant's subjective beliefs about the legality of his conduct.

That said, it is worth noting how little good these allegations do for the government even if they were relevant. The Opposition first cites to allegations about steps to conceal the Peraire-Buenos' identity. *See* Opp'n 39. But anonymity is a well-recognized value and practice in cryptocurrency trading, and the Indictment could not credibly allege otherwise. *See Van Loon v. Dep't of Treasury*, 122 F.4th 549, 554-55, 559 (5th Cir. 2024). Likewise, the Indictment's allegation that Anton Peraire-Bueno ran searches "related to Ethereum validator penalties for misconduct" is irrelevant to whether the Peraire-Buenos believed their alleged conduct may be considered ***criminal under federal law***. Opp'n 40. The government's primary focus is even less relevant: it spends the majority of a page highlighting alleged actions like Google searches that occurred ***after*** the alleged Exploit. The government nowhere explains how conduct post-dating the alleged offense could show notice at an earlier time. *See United States v. Harriss*, 347 U.S. 612, 617 (1954) (due process "is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his ***contemplated conduct*** is forbidden by the statute" (emphasis added)).[4] The dubious nature of the government's arguments about post-Exploit Google searches

---

[4]    The government notes that this conduct allegedly occurred "even before their arrests," Opp'n 40, as if that timing matters. The relevant time for notice is prior to the ***conduct***.

12

becomes all the more clear when all of its examples on page 40 are considered together: if, after the alleged Exploit, the Peraire-Buenos were accused of crimes by individuals purporting to represent the alleged victims (but refusing to identify those victims, who insisted on remaining anonymous) or learned that funds were frozen at the behest of foreign law enforcement, the alleged post-Exploit Google searches take on an entirely innocent meaning of simple research and suggest the Peraire-Buenos were unaware of the potential criminality of their conduct before the alleged Exploit.  Even if the Peraire-Buenos' alleged subjective knowledge were relevant (and it is not), the cited allegations undermine the government's position.

II.     __MOTION TO DISMISS (2)__: **THE INDICTMENT FAILS TO STATE THE ESSENTIAL ELEMENTS OF THE WIRE FRAUD CHARGES.**

The Peraire-Buenos have moved to dismiss the Indictment for failure to allege essential elements of the wire fraud offenses: (1) a material misrepresentation or omission with a duty to disclose, (2) money or property as the object of the scheme, and (3) intent to defraud.  Mot. 21-29. The government does not dispute that these are essential elements of the wire fraud counts, and it concedes that the Indictment "does not allege that the defendants omitted information that the defendants had a duty to disclose."[5]  Opp'n 17 n.6.

Instead, it principally argues that the fraud charges[6] are sufficient merely because the Indictment "tracks the statutory language."  Opp'n 15.  The government offers only tepid defenses

---

[5]     In light of this concession, the Court at a minimum should dismiss the wire fraud counts insofar as they purport to rely on an omission theory.  *See United States v. Pirro*, 212 F.3d 86, 95 (2d Cir. 2000) (dismissing portion of count that insufficiently alleged an omission theory).

[6]     The government's Opposition does not distinguish between the conspiracy and substantive wire fraud charges in Counts One and Two, effectively conceding that the same analysis pertains to both.  *See* Mot. 21 n.17.  Nor does the government dispute that, should the Court dismiss the wire fraud counts, the money laundering count must also fall.  *See* Mot. 33; Opp'n 42 n.12.

of the sufficiency of the Indictment's factual allegations while repeatedly insisting that a more exacting review cannot occur until after trial. The government's arguments uniformly fail.

The Indictment purports to charge the Peraire-Buenos with wire fraud offenses. To the extent the Peraire-Buenos can discern, the government's theory appears to be that they offended— or, in the peculiar parlance of the Indictment, "manipulated and tampered with"—"the process and protocols by which transactions are validated and added to the Ethereum blockchain." Indict. ¶ 1. The Indictment claims that "the Ethereum Network is run through a decentralized network of participants across the world that operate based on a set of rules and protocols." *Id.* ¶ 7. But the Indictment nowhere alleges the content of those "rules and protocols." It does not allege that the Peraire-Buenos were aware of any such rules or protocols or agreed to be bound by them. And it does not allege that the Peraire-Buenos made any representations to the alleged victims (or anyone) that they would act according to any supposed rules or protocols. As a result, the government's theory is incompatible with the offenses it purports to charge, which is perhaps why the Indictment and Opposition repeatedly (and confusingly) refer to the alleged crime as a "theft" and the alleged victims' cryptocurrency as "stolen." Indict. ¶¶ 1, 17, 23, 26(c), 30; Opp'n 1, 2, 4, 9, 10, 12, 40, 50. According to the Opposition, that is "the crux of what the Indictment alleges—a theft." Opp'n 12.

Theft and fraud, however, are different crimes with distinct elements. *See United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008) ("Theft not accomplished by deception (*e.g.*, physically taking and carrying away another's property) is not fraud absent a fiduciary duty." (citation omitted)).[7] The crime of wire fraud has several, well-established elements. For example, it is

---

[7]    To be clear, the Peraire-Buenos have committed neither offense. And the Indictment alleges only fraud.

fundamental that fraud requires a false or misleading representation. The government does not contend otherwise, and the Indictment purports to charge a fraud-by-misrepresentation theory.[8] But a close and common-sense review of the Indictment's allegations shows that neither of the alleged actions it labels as misrepresentations are actual misrepresentations (they aren't even alleged to be representations in any real sense), and the Indictment's reliance on conclusory labels like "False" and "Lure" do not change that fact. *Cf. Finnerty*, 533 F.3d at 148-49 (vacating securities fraud conviction where the government argued that the defendant trader "stole from his public customers tens of times a day" but "identified no way in which [he] communicated anything to his customers, let alone anything false"). For the following reasons, the essential misrepresentation (and property and intent to defraud) elements are nowhere alleged in the Indictment. The Court should dismiss this inadequately charged case.

### A.    The Failure to Allege an Essential Element Requires Dismissal of an Indictment.

As an initial matter, the government is wrong that the Motion is "premature" or that it challenges "the sufficiency of" its anticipated evidence. Opp'n 11. The pleading failures that the Peraire-Buenos have identified require pre-trial dismissal.

The Court should reject the government's argument that the Indictment is sufficient because it recites the wire fraud statute. As the Peraire-Buenos have noted, merely quoting the statute is insufficient for offenses with "implicit" elements not adequately captured by the statutory text. *See* Mot. 20-21 (citing *Pirro*, 212 F.3d at 91-93). Decades of caselaw have clarified the elements subject to the motion in ways that are not readily apparent in the statute. *See Neder v.*

---

[8]    The government may not secure a conviction on any other theory. *See United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011) ("[W]hen a grand jury charges one specific theory of a scheme to defraud, the defendant may not be convicted based on another theory.").

*United States*, 527 U.S. 1, 22 (1999) ("misrepresentation or concealment of a material fact");[9] *Ciminelli v. United States*, 598 U.S. 306, 314 (2023) ("traditionally recognized property interests"); *United States v. Starr*, 816 F.2d 94, 100 (2d Cir. 1987) ("Fraudulent intent," which is "defined . . . as requiring a contemplated harm to the victim"). The government cites no case holding that mere recitation of the wire fraud statute's generic text is sufficient to state all its essential elements.[10]

In any event, as the government repeatedly points out, *e.g.*, Opp'n 35, the Indictment does more than recite the statutory text. It purports to "set[] forth in considerable detail . . . the nature of the alleged false statements, the money and property at issue, as well as factual allegations regarding the defendants' fraudulent intent." Opp'n 14. For the reasons identified in the Motion and elaborated further below, these additional allegations do the government no good because they confirm that the Indictment fails to allege these essential elements.

---

[9]    While accepting that a material falsehood is an essential element of wire fraud, the government cites cases rejecting challenges to fraud indictments for failure to use the word "material" to argue that materiality can be inferred from an otherwise validly alleged scheme to defraud based on misrepresentations. *See* Opp'n 15 (citing *United States v. Klein*, 476 F.3d 111 (2d Cir. 2007), and *United States v. Chime*, 2011 WL 3420717 (N.D. Ohio Aug. 4, 2011)). These cases are irrelevant; the Peraire-Buenos challenge the Indictment's failure to charge any fraudulent misrepresentation, not its failure to say the word "material." *See* Mot. 23; pp. 18-26, *infra*.

[10]    Many of the cases the government cites in support of this argument concern notice challenges, not the failure to allege essential elements, and therefore have little relevance to this Motion. In any event, several of the government's cases undercut its statutory-text argument. The court in *Chime* noted that, in addition to reciting the wire fraud statute, the indictment "explicitly detail[ed] Defendants' alleged conduct," including the alleged misrepresentations. 2011 WL 3420717, at *2. *United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013), concerned an indictment's failure to name the victim of identity theft and distinguished that omission with cases charging false statements, where the supposed falsity must be more specifically alleged. *See id.* at 126-27; *see also United States v. Raniere*, 384 F. Supp. 3d 282, 298 (E.D.N.Y. 2019) (cited at Opp'n 17 n.5) ("Offenses that require specificity tend to be ones with a generic statutory definition."). Other cases the government cites are even further afield. *See, e.g.*, *United States v. Elie*, 2012 WL 383403, at *1-3 (S.D.N.Y. Feb. 7, 2012) (rejecting the defendant's factual arguments that the indictment was erroneous in certain respects).

16

These pleading failures do not go to the sufficiency of the government's proof. An Indictment's legal sufficiency is not judged by merely counting the pages, paragraphs, or words. *Contra* Opp'n 14 ("19-page, 43-paragraph Indictment"). Courts routinely dismiss even lengthy speaking indictments where their detailed allegations reveal a "fail[ure] to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012). In *Aleynikov*, the Second Circuit reversed the trial court's pre-trial denial of a motion to dismiss where the indictment's allegations of theft of "property" and "goods" in interstate commerce revealed that the property at issue—there, "computer source code"—fell outside the statute. *See id.*; *see also, e.g.*, *United States v. Carroll*, 2015 WL 2251206, at *1, *2 (N.D. Cal. May 13, 2015) (dismissing obstruction indictment that failed "to allege facts which, if proven, would constitute a violation" of the statute because it identified the destruction of property that did not qualify as a "tangible object"). The "question" the Peraire-Buenos' Motion presents is whether their "alleged activities, accepted as true, are prohibited by the statute"—which "squarely presents an issue of law determinable before trial." *United States v. Heicklen*, 858 F. Supp. 2d 256, 263, 276 (S.D.N.Y. 2012) (dismissing indictment).

Failure to allege each of the three essential wire fraud elements subject to the Motion warrants dismissal. *See, e.g.*, *Radley*, 659 F. Supp. 2d at 820 ("The absence of any allegations of misrepresentation is fatal to the government's wire fraud counts, and they must be dismissed."); *United States v. Alkaabi*, 223 F. Supp. 2d 583, 590 (D.N.J. 2002) (dismissing wire fraud indictment that failed to identify "a legally recognized traditional property interest" and citing the "ranks of other federal cases in which [mail and wire fraud] Indictments were dismissed" for the same reason); *United States v. Guertin*, 67 F.4th 445, 452 (D.C. Cir. 2023) ("Without some plausible allegation claiming that the State Department did not receive the benefit of the core employment

bargain, the indictment fails to allege a scheme to deprive the State Department of 'money or property.'"); *United States v. Kurtz*, 2008 WL 1820903, at *6 (W.D.N.Y. Apr. 21, 2008) (dismissing indictment for failure to allege that "the defendant's scheme depended on a misrepresentation of an essential element of the bargain").

### B.    The Indictment Does Not Allege a Misrepresentation.

The Indictment purports to allege a scheme to defraud based on misrepresentations.  Indict. ¶¶ 35, 36; *see* Opp'n 25 ("As alleged, the object of the defendants' fraud scheme was to obtain the Victim Traders' money via misrepresentations[.]").   But as a legal matter, neither the Lure Transactions nor the False Signature constitute "misrepresentations" under the wire fraud statute. Failure to allege a misrepresentation in a case charged on a misrepresentation theory requires dismissal.  *See Radley*, 659 F. Supp. 2d at 820.

### 1.    The "Lure Transactions"

As an initial matter, and to state the obvious, the Lure Transactions are not representations in any literal sense.  They are cryptocurrency transactions—proposed trades of one type of digital currency for another—pending in the mempool.  *See* Indict. ¶ 24.  The Indictment does not allege what information the Lure Transactions supposedly conveyed, let alone what was false about it. The government's Opposition does not argue otherwise; instead, it characterizes the very "content of the Lure Transactions" as a "factual dispute" that need not be revealed until trial.  Opp'n 18.

The government misunderstands the Peraire-Buenos' argument and the requirements of the Fifth Amendment.  Whether an alleged misrepresentation is, in fact, materially false may present a jury question.   But that is a different inquiry from whether an indictment alleges a misrepresentation.  *See Radley*, 659 F. Supp. 2d at 820.  An indictment that "does not state the essential elements of the crime" offends a defendant's Fifth Amendment's guarantee "that he is

being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him." *Pirro*, 212 F.3d at 92.

The government's cited cases illustrate this distinction. *See* Opp'n 18-19. Unlike here, the indictments in those cases alleged the factual contents of the statements and the truth that made the statements false.

For example, in *United States v. Phillips*, 690 F. Supp. 3d 336 (S.D.N.Y. 2023), the wire fraud allegations concerned two emails from employees of a hedge fund to contractual counterparties providing notice that a contractually defined "Barrier Event" had occurred. *See id.* at 274-76. The indictment alleged that these emails were misleading because they omitted the fact that the hedge fund's own manipulative trading had triggered the Barrier Event, and that the hedge fund had an affirmative duty, grounded in the contract, to disclose that fact. *See id.* at 291-92. The defendants argued they had no such duty, *see id.* at 291 ("The Indictment invents a duty that did not exist.") or, alternatively, that the duty did not require the level of disclosure of the government alleged, *see id.* (arguing that the fund "had no duty to report *how* the Barrier Event occurred, but rather *whether* it occurred"). The court noted that both sides "presented powerful arguments" based on the contract, but held that the close questions of whether the duty existed as alleged, and whether it was breached in the manner the government alleged, went to the sufficiency of the government's proof at trial. *Id.*[11] Contrast *Phillips* with *Pirro*. There, the indictment recited the

---

[11]    The government's other cases are inapposite in the same way as *Phillips*. In *United States v. Khalil*, 2014 WL 1599943 (E.D.N.Y. Apr. 21, 2014), *aff'd*, 692 F. App'x 14 (2d Cir. 2017), the indictment alleged two false statements—"that defendant was not related to [his brother], and that defendant did not know where one of [his brother's] clients was." *Id.* at *2. The defendant argued that the false statements were immaterial because they were irrelevant to the investigation and the government knew he was lying, *see id.* at *1, which the court determined were jury questions, *see id.* at *2-3. The defendant in *United States v. Fanta*, 2005 WL 3455755 (S.D.N.Y. Dec. 16, 2005), argued that his false statements in legal notices of appearance that he was a member in good standing of a non-existent court's bar "were not, in fact, false." *Id.* at *1.

statutory text and alleged a material omission but, unlike in *Phillips*, did not allege the duty supposedly breached. *Pirro*, 212 F.3d at 95. In other words, the indictment alleged a statement that it labeled as false or misleading but did not allege the facts that would make it false or misleading. The Second Circuit held that this incomplete falsity allegation was legally insufficient and dismissed the count in relevant part. *See id.*[12]

The Indictment here suffers from a similar flaw as in *Pirro*—the alleged false statement is at best incomplete with respect to the Lure Transactions where the Indictment is entirely silent as to what meaning they allegedly conveyed and how that meaning was false. The government's Opposition thus reaches outside the Indictment to give additional "content" to the Lure Transactions: according to the Opposition, the "Lure Transactions were misrepresentations because the defendants had no intention of executing them ***in the Victim Traders' proposed bundles***." Opp'n 16 (emphasis added). But the government cites no Indictment allegation that the Peraire-Buenos ever promised they would do so. If the government now contends that the Lure Transactions themselves conveyed that promise, that allegation is nowhere in the Indictment.

Nor does the government's new theory that the Lure Transactions conveyed some commitment about the order of future trades make sense in the broader context of the Indictment's allegations. The government posits that, at the moment a trader places a trade (Indict. ¶ 13(b)), that action implicitly conveys ***that trader's*** promise to a MEV Bot that a ***different user*** (the

---

[12] The government's discussion of *Pirro*, *see* Opp'n 35-36, selectively quotes the case's holding to suggest that it turned exclusively on the defendant's Sixth Amendment right to be "adequately informed of the nature of the accusation against him," and not the failure to allege an essential element. *Pirro* dismissed the indictment on both grounds. *See* 212 F.3d at 95 (citing both the Fifth and Sixth Amendments). For this reason, *Pirro* supports both the Peraire-Buenos' Motion to Dismiss the Indictment for Failure to Allege Essential Elements (Motion 2), and Motion to Dismiss the Indictment as Unconstitutionally Vague (Motion 3), which raise independent bases for dismissal grounded in the Fifth and Sixth Amendments, respectively.

validator) will publish a block to the chain containing that trade plus the MEV Bots' new sandwich trades in the precise bundled order that the MEV Bot later selects.  In other words, the mere placing of a trade supposedly conveys a promise to become a victim of a future sandwich attack.  That theory is illogical, for several reasons.  First, a trader would not agree to become a victim of a trading strategy that seeks to profit at his expense.  Second, a trader cannot make promises about contingent future events and the conduct of other unknown, anonymous, and profit-maximizing users.  Recall that the alleged victims were automated bots programmed to target the trades of unsuspecting traders on the Ethereum Network to extract a trading profit.  *See* Indict. ¶ 13.  They do so by selecting a pre-existing trade pending in the mempool, proposing frontrun and backrun trades of their own around it, and then releasing that proposed bundle of transactions to yet another user.  *Id.*  The trader who proposed the initial, pre-existing transaction is not alleged to have any further role in the process.  At the time he places the initial trade, the trader could not be aware of these future events nor would he have any ability to control them.  It therefore is not plausible that the Lure Transaction could convey a promise to the MEV Bots regarding those future events.

The government's analogy (at 16 n.4) to "spoofing" cases underscores the problems with its new gloss on the Lure Transactions.  In a spoofing case, a trader places a buy-sell order that "signals [his] intent to buy or sell" while, at the same time, harboring "a private intent to cancel [that transaction] in the hopes of financial gain."  *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022).  This analogy fails for several reasons.  First, the trades in *Chanu* occurred on regulated marketplaces where "rules prohibited such conduct."  *Id.* at 533.  Thus, while there could be situations where a trader would cancel a trade for legitimate reasons, *see id.* at 534, the message any given trade conveyed to other market participants was that the trade would ordinarily not be rescinded as part of a market manipulation scheme.  Here, the Indictment alleges no similar rules

governing the Ethereum Network.[13]  Second, the misrepresentation in a spoofing case concerns a trader's intent to fulfill the same trade he proposed at the moment he proposed it.  Here, the government's new theory posits a representation about what other Ethereum users would do with a proposed trade once it was placed in the mempool—contingent events over which a typical trader has no control.  Third, unlike the trades in *Chanu*, the Indictment does not allege that the Lure Transactions were cancelled; indeed, they were executed and added to the blockchain, as the government concedes.  Opp'n 50 n.16.  Fourth, and most critically for present purposes, the indictment in *Chanu* alleged the misleading message the trades supposedly conveyed to other traders, and explained why that message was misleading.  *See* Indict. ¶¶ 5, 7, 11, *United States v. Vorley et al.*, No. 18-cr-35 (N.D. Ill. July 24, 2018), ECF 12 (alleging that the trades "intended to create and communicate false and misleading information regarding supply or demand (*i.e.*, orders they did not intend to execute) in order to deceive other traders," specifically that it would signal "increased demand" and "higher prices," and that "such traders reacted to the false and misleading increase in supply or demand").  Here, by contrast, the government has articulated its new theory regarding the Lure Transactions for the first time in its Opposition.

Finally, the government's Opposition repeatedly asserts that the Lure Transactions (and the False Signature, discussed below) were an "integral part" or "necessary steps" of the alleged "fraud scheme."  *See, e.g.*, Opp'n 15, 16 n.4.  In other instances, it claims that the Lure Transactions (and False Signature) "perfectly positioned" the Peraire-Buenos "to . . . steal $25 million from the Victim Traders."  Opp'n 17.  These arguments conflate integrality, causation, or significance with

---

[13]    As discussed in connection with the Motion to Dismiss the Indictment for Lack of Fair Notice, the government cannot make this allegation because Ethereum is a trustless, decentralized platform that utilizes economic incentives to encourage behavior among profit-seeking users.  *See* Mot. 12-14.  And any such allegation would hit a sour note in a case where the government has intervened on behalf of market manipulators.  *See id.* at 16-17.

falsity, a confusion that permeates the government's Opposition.  Something can be "integral" to a fraud scheme without being a fraudulent representation.  A glossy invitation to an investment pitch that lists only the time and place of a meeting could be "integral" and a "necessary step" to a fraudulent scheme if the attendees are induced at the meeting to invest based on false representations.  But that doesn't make the invitation itself a false representation.  And slapping the conclusory label "Lure" in front of the word invitation in an indictment—*e.g.*, the "Lure Invitation"—would not adequately allege the essential misrepresentation element.  Likewise, access to a crowbar would leave a bank robber "perfectly positioned" to "steal" money from a bank safe he uses it to open.  But that wouldn't make the crowbar false or misleading, and a bank fraud indictment that identified the "False Crowbar" as the sole false representation in the alleged scheme would not withstand scrutiny.  The government's content-less allegations regarding the Lure Transaction (and False Signature, as discussed below) fare no better.

## 2.    The "False Signature"

The government's Opposition also fails to salvage the alleged "False Signature" as a viable misrepresentation.  The government does not even attempt to answer the core questions that the Peraire-Buenos posed—*i.e.*, "how a validator's signature could be false or what information a digital signature conveys."  Mot. 24.  Its only responses are two non-sequiturs.  First, that the False Signature was "essential to the success of the Exploit," Opp'n 19 n.7; *see also id.* at 23 (arguing that it "put the defendants in a position to steal the Victim Traders' cryptocurrency"), which fails for the reasons discussed above.  And second, that "defendants used . . . the False Signature to gain premature access to the Victim Traders' private transaction information."  *Id.* at 29.  Again,

however, the government confuses an alleged consequence with alleged falsity.[14]  Claiming that a "False Signature" caused a relay to release information does not allege that the signature was false or explain how.  On that critical topic, the Indictment baldly asserts the signature was "false," without more.

The government also misunderstands the Peraire-Buenos' separate argument, under *Loughrin v. United States*, 573 U.S. 351 (2014), that the False Signature cannot constitute a material misrepresentation.  Contrary to the government's argument, the Peraire-Buenos do not argue that the Indictment lacks an allegation that the False Signature "play[ed] a role" in the alleged fraud scheme.  Rather, the Peraire-Buenos argue that, as alleged, the False Signature "could not have 'induced' the alleged victims' MEV Bots to part with their cryptocurrencies because, according to the Indictment, they already traded those currencies away through their pre-programmed frontrun trades when the False Signature was allegedly conveyed."  Mot. 25.  This inducement requirement derives from the text of the wire fraud statute.  *See United States v. Berroa*, 856 F.3d 141, 149 (1st Cir. 2017).

Notwithstanding its protestations to the contrary, the government apparently agrees that the False Signature cannot satisfy the inducement requirement.  The government repeatedly concedes that it was the Lure Transactions, not the later-occurring False Signature, that allegedly "cause[d] the Victim Traders to part with their money and propose particular trading bundles."

---

[14]    The Opposition's repeated emphasis on this supposed "private trading information" is puzzling.  That "information" is the content of a potential block which, according to the Indictment, is information that is specifically constructed for and meant to be conveyed to the validator—*i.e.*, to the Peraire-Buenos.  *See* Indict. ¶ 13 (alleging that, after a validator affixes its "digital signature," the relay "releases the full content of the proposed block (i.e., the complete ordered transaction list) to the validator").  Indeed, the Indictment alleges that the validator's "critical" role includes "checking that new blocks are valid before they are added to the Ethereum blockchain," *id.* ¶ 8, which would require reviewing this supposedly private "trading information."

Opp'n 9; *see also*, *e.g.*, *id.* at 16 n.4 ("[T]he defendants used the Lure Transactions to induce the Victim Traders to part with their money[.]"); *id.* at 25 ("The Victim Traders parted with approximately $25 million in cryptocurrency as a direct result of the defendants' Lure Transactions."). This concession correctly recognizes what is plain from the Indictment's allegations. *See* Indict. ¶ 26. Whatever "role" the False Signature supposedly played in the alleged scheme, the Indictment's allegations foreclose a causal connection between it and the alleged victims' earlier decision to part with their money.

For this reason, the government's attempt to distinguish *Berroa* on its facts fails. According to the government, *Berroa* is inapposite because the misrepresentations there were made years before the alleged property deprivation, whereas the facts alleged here concern "nearly contemporaneous" transactions. Opp'n 22-23. The government ignores that the alleged misrepresentations in *Berroa* preceded the victims' decision to part with their money and, thus, conceivably could have played some role in inducing that downstream decision. *See Berroa*, 856 F.3d at 148. Even then, the link between the misrepresentations and the later inducement was too attenuated. *See id.* at 153. Here, as the government concedes, the alleged victims had already parted with their money before the False Signature was supposedly conveyed to the relay. In these circumstances, the problem is not that the connection between a misrepresentation and a later property loss is too "attenuated." There is no causal connection at all.

The government's reliance on *United States v. Palma*, 58 F.4th 246 (6th Cir. 2023), fails for the same reason. Like in *Berroa*, the alleged misrepresentation preceded the victims' decision to part with their money. *See* 58 F.4th at 248, 251. In *Palma*, the defendant was alleged to have participated in a scheme by a car manufacturer to deceive regulators regarding the fuel economy of motor vehicles so that it could induce customers to purchase them with fraudulent "best in class'

fuel economy ratings." *Id.* at 248. The defendant argued that the connection between the lies to

the regulators and the customers' purchases was too "attenuated." *Id.* at 250. The court disagreed

because the facts of the case presented a more plausible line connecting the earlier lies and the

later purchases. *See id.* at 251 ("[I]t is plausible that the scheme's goal was not merely to deceive

regulators but also to sell the resulting products to consumers."). Nothing in the *Palma* decision

suggests that a lie occurring ***after*** the decision to purchase would suffice.

The government's invocation of the so-called "convergence" requirement—*i.e.*, that, in the

Second Circuit, a misrepresentation need not be directed at the same party who suffers the property

loss—is also misplaced. As the First Circuit explained in *Berroa*, the convergence requirement

"is a distinct issue from the causal nexus required under *Loughrin*." 856 F.3d at 152. *Berroa*

explained that a lie to a third-party could satisfy the *Loughrin* test in at least two ways: it could be

conveyed to the victim to induce the decision to part with his money, or it could induce a third-

party custodian of the victim's property to turn it over to the defendant. *See id.* at 153-54. Where

a lie is made to a third-party, the sufficiency of the causal connection between the lie and the

property deprivation "will depend almost entirely on context." *Id.* at 153. In the "context" of this

case, there is no causal relationship between the alleged victims' decision to part with their money

and the later False Signature. That failure of causation has nothing to do with the fact that the

False Signature was allegedly conveyed to the relay and not the alleged victims themselves.

C.     **The Indictment Fails to Allege the Deprivation of a Traditionally Recognized, Enforceable Property Right.**

The Indictment fails to allege the deprivation of a traditionally recognized, enforceable

property right because, accepting its allegations as true, the alleged victims traded away the only

property they had a claim to—their existing cryptocurrency—for an expectation of profits flowing

from a series of future transactions and actions by other parties. *See* Indict. ¶ 24 (alleging that the

MEV Bots' loss occurred because they bought substantial amounts of particularly illiquid cryptocurrencies, whose price they "expected to increase"). Under the longstanding rule that a wire fraud charge does not cover these types of contingent "interests," *see* Mot. 26-27, the Indictment must be dismissed.

The government resists this conclusion only by fighting the allegations that it argues elsewhere the Court must accept as true. *E.g.*, Opp'n 4. The government insists that "[t]his is a case about stolen money belonging to the Victim Traders," *id.* at 25, but that is not what the Indictment alleges. The Indictment alleges that, through their frontrun trades, "the Victim Traders effectively bought substantial amounts of particularly illiquid cryptocurrencies . . . for approximately $25 million of various stablecoins." Indict. ¶ 24; *accord* Opp'n 25. The frontrun trades are not alleged to have involved the Peraire-Buenos; rather, the alleged victims sold their $25 million of cryptocurrency to the liquidity pools. *See* Opp'n 25 ("In effect, the Tampered Transactions drained the particular liquidity pools of all the cryptocurrency that ***the Victim Traders had deposited as a result of their frontrun trades***." (quoting Indict. ¶ 26) (emphasis added)). The Indictment does not allege that the alleged victims retained any legal or contractual claim to that $25 million once they had traded away those tokens to the liquidity pools in exchange for other cryptocurrencies.[15]

The government's erroneous contention that the $25 million the alleged victims traded away (plus the anticipated manipulative trading profits) still "belong[ed]" to the alleged victims even after their frontrun trades had been accomplished assumes that the alleged victims had a legal

---

[15]    The government's failure to grapple with the Indictment as written defeats its attempt to distinguish on their facts *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994), and the litany of cases recognizing that contingent property interests like those alleged here fall outside the wire fraud statute. *See* Opp'n 26-27 n.8.

right to have their bundle of transactions executed in the order proposed.  The Indictment alleges

no such legal right to (or property interest in) the order of later transactions.  Nor does the

Indictment allege that the Peraire-Buenos ever made any promises, explicit or implicit, to the MEV

Bots that the transactions would be included in the blockchain in the Bots' preferred order.[16]

        The Indictment cannot fairly be read to allege the deprivation of the novel type of property

right articulated in the Opposition.  But even if the Indictment had alleged this theory, it would be

invalid for the separate reason that the right to the order of transactions in a proposed block on the

blockchain is not a traditional property right cognizable under the wire fraud statute.  Courts will

dismiss indictments that allege interference with purported interests that are too far removed from

the traditional property rights recognized at the time of the wire fraud statute's enactment.  *See,*

*e.g.*, *Ciminelli*, 598 U.S. at 316 ("[t]he right to valuable economic information needed to make

discretionary economic decisions"); *Kelly v. United States*, 590 U.S. 391, 404 (2020)

(transportation agency's control over traffic lanes); *United States v. Evans*, 844 F.2d 36, 42 (2d

Cir. 1988) (United States' interest in regulating foreign resales of arms); *Henry*, 29 F.3d at 115

(competing banks' interest in a fair bidding process for contract award); *United States v.*

*Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) (manufacturer's interest in which markets its

goods later would be sold); *Alkaabi*, 223 F. Supp. 2d at 590 (testing service's interest in

maintaining integrity of its testing process).  The MEV-Boost program was introduced by a third

party (Flashbots) to the Ethereum Network in September 2022, seven months before the alleged

fraud.  *See* Mot. 5.  It is hard to conceive of a type of "interest" less traditional than the supposed

---

[16]    For this reason, the government's claimed concern that dismissal of this Indictment would render it powerless to charge Ponzi schemes or other schemes that depend on false promises of future returns is frivolous.  *See* Opp'n 24-25.

right to launch sandwich attacks on a new, decentralized, and rapidly evolving cryptocurrency exchange.

### D.    The Indictment Does Not Allege an Intent to Defraud.

The Indictment fails to allege an intent to defraud.  The facts it alleges, even if true, suggest that the alleged victims received exactly what they bargained for and that the Peraire-Buenos made no misrepresentation going to an essential element of that bargain.

The government first attacks this argument as premature because whether the alleged victims *in fact* received what they bargained for is a question for the jury.  Opp'n 28.  For the reasons discussed above, *see* pp. 17-18, *supra*, that is incorrect.  A wire-fraud indictment is "required to allege that the defendant contemplated actual harm that would befall victims due to his deception."  *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007).  And "[t]he harm contemplated must affect the very nature of the bargain itself."  *Starr*, 816 F.2d at 98.  The Court may therefore evaluate whether the allegations in the Indictment support an inference that the Peraire-Buenos contemplated that kind of harm and dismiss it if the answer is no.  *E.g., Kurtz*, 2008 WL 1820903, at *2-4 (dismissing mail and wire fraud charges, in part, for failure to sufficiently allege intent to defraud).

The Indictment's allegations on this score are insufficient.  According to the government, "the sequential execution of *all three* trades"—*i.e.*, the frontrun, Lure, and backrun transactions— was the benefit the victims bargained for.  Opp'n 28-29.  The Indictment, however, does not allege that this bargain was struck **with the Peraire-Buenos**.  A victims' bargain is defined by whatever "benefits [they] reasonably anticipated **because of the misleading representations**."  *United States v. Jabar*, 19 F.4th 66, 76-77 (2d Cir. 2021) (emphasis added).  But as noted above, the Indictment does not allege that the Peraire-Buenos made representations to the alleged victims' MEV Bots concerning the order of the trades—let alone that such representations caused the alleged victims

29

to trade away their cryptocurrency.  It suggests, instead, that the alleged victims knew that the transactions might not be published to the blockchain in their preferred order and included "coded conditions" in their bundles to address that contingency.  Indict. ¶ 24.  The Indictment does not allege that the Peraire-Buenos were privy to those coded conditions.

In other words, and contrary to the government's argument, the Indictment's factual allegations make clear that the alleged victims bargained only for their transactions to be executed *as programmed*.  *See United States v. Abrams*, 543 F. Supp. 1184, 1188 (S.D.N.Y. 1982) ("On a motion to dismiss, an indictment is to be read in a common sense manner.  This includes reading the indictment to include facts that are necessarily implied by the specific allegations made.").  The Indictment does not allege, and the government does not argue, that the Peraire-Buenos intended to deny the alleged victims of the benefit of that bargain.  *See* Indict. ¶ 26a, 26c.[17]

## III. <u>MOTION TO DISMISS (3)</u>: THE INDICTMENT IS UNCONSTITUTIONALLY VAGUE.

As an alternative to Motion to Dismiss 2, the Court should dismiss the Indictment as unconstitutionally vague under the Sixth Amendment.  Mot. 29-33.  Dismissal is appropriate on these grounds even if the Court were to find that the Indictment's conclusory factual allegations stated the essential elements discussed above.  *See id.* at 29-30.

---

[17]    In a last-ditch effort to satisfy the fraudulent intent requirement, the government points to allegations that the Peraire-Buenos took steps to conceal their identity.  Opp'n 32-33.  This is wholly irrelevant to the question whether they deprived or intended to deprive the alleged victims of the benefit of their bargain.  Indeed, the indictment in *Starr* likewise accused the defendants of having "buried' or concealed" a key element of their scheme "to avoid detection by postal employees."  816 F.2d at 96.  And yet the court did not regard such allegations as sufficient to infer fraudulent intent.  *Id.* at 101.  The same holds true here.

The government offers no meaningful response to the Motion other than to briefly restate (at 35) its arguments in opposition to Motion to Dismiss 2. These arguments fail for the reasons already discussed.

The government spends the remainder of the Opposition attempting to distinguish several cases the Peraire-Buenos cite as stating the undisputable proposition, codified in Federal Rule of Criminal Procedure 7(c), that the Indictment must state the essential facts constituting the offense charged. *See* Fed. R. Crim. P. 7(c). The government's claimed factual distinction—that *Russell v. United States*, 369 U.S. 749 (1962), and *Pirro* are inapposite because they "involved charges of criminal falsity"—is puzzling given that the Indictment purports to allege wire fraud through false statements. The government cites no Second Circuit case holding that wire fraud charges are reviewed less exactingly than charges alleging the "falsity" offenses in these other cases.[18] *Pirro*, in fact, involved a charge under an analogous statute criminalizing fraud and false statements to the IRS (26 U.S.C. § 7206). *See* 212 F.3d at 89. And *United States v. Curtis*, 506 F.2d 985 (10th Cir. 1974), dismissed a vague mail fraud indictment citing *Russell*. *See id.* at 991 ("While the facts were different, principles explicated and applied by *Russell* have controlling application here."); *accord, e.g.*, *United States v. Telink, Inc.*, 702 F. Supp. 805, 809 (S.D. Cal. 1988) (dismissing a vague wire fraud indictment).

---

[18]    As noted above, *see* p. 16 n.10, *supra*, *Stringer* concerned an indictment's failure to name the victim of identity theft and noted that crimes involving false statements have been held to require more specificity. The government cites only two cases in addition to *Stringer*. *See* Opp'n 37. Neither assists the government. *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), ruled on a constructive amendment argument and noted that the indictment in fact alleged the core facts that the defendant claimed differed from the proof at trial. *See id.* at 230. *Raniere*, 384 F. Supp. 3d 282, addressed the degree of specificity required for exemplary predicate acts to a RICO charge and not the substantive charges themselves. *See id.* at 305-06.

More significant is what the government ignores. The government does not point to allegations that answer any of the questions that the vague Indictment engenders. *See* Mot. 31-32 (posing several questions). The Opposition does not attempt to address what information the Lure Transactions "allegedly conveyed or how that information was supposedly false or misleading," or what it means for the False Signature to "trick the 'relay code,' if there is no allegation that the Peraire-Buenos gained unauthorized access to any computer system or altered any computer code." Mot. 31.[19] These questions go to the very core of this unprecedented prosecution, and the government should have ready answers. The government's conspicuous refusal to engage with them deprives the Peraire-Buenos of basic information necessary to prepare their defense. Because that hide-the-ball strategy violates the Sixth Amendment, the Court should dismiss the Indictment as unconstitutionally vague.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Indictment.

---

[19]     Where the government offers any further explanation of the meaning of the opaque Indictment, its theories make no sense and are nowhere found in the Indictment. *See* pp. 20-23, *supra* (discussing the government's argument relating to the Lure Transactions).

Date: January 31, 2025                    Respectfully submitted,


                                          By: */s/ Katherine Trefz*

                                          Katherine Trefz (*pro hac vice*)
                                          Daniel Shanahan (*pro hac vice*)
                                          Patrick J. Looby (*pro hac vice* pending)
                                          Williams & Connolly LLP
                                          680 Maine Avenue SW
                                          Washington, DC 20024
                                          Tel: (202) 434-5000
                                          ktrefz@wc.com
                                          dshanahan@wc.com
                                          plooby@wc.com

                                          Jonathan P. Bach
                                          Shapiro Arato Bach
                                          1140 Avenue of the Americas
                                          17th Floor
                                          New York, NY 10036
                                          Tel: 212-257-4897
                                          jbach@shapiroarato.com

                                          *Counsel for Defendant*
                                          *James Peraire-Bueno*


                                          By: */s/ Daniel N. Marx*

                                          Daniel N. Marx
                                          William W. Fick (*pro hac vice*)
                                          Fick & Marx LLP
                                          24 Federal Street, 4th Floor
                                          Boston, MA 02110
                                          Tel: 857-321-8360
                                          dmarx@fickmarx.com
                                          wfick@fickmarx.com

                                          *Counsel for Defendant*
                                          *Anton Peraire-Bueno*

33

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2025, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system which will send notification of such filing to

all counsel of record in this matter who are on the CM/ECF system.


*/s/ Katherine Trefz*
Katherine Trefz