P6HDPerO

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                 24 Cr. 00293 (JGLC)

5  ANTON PERAIRE-BUENO, ET AL.,

6                            Argument
           Defendants.
7  ------------------------------x

8
                                New York, N.Y.
9                                June 17, 2025
                                10:00 a.m.
10

11  Before:

12                HON. JESSICA G. L. CLARKE,

13                                U.S. District Judge

14                     APPEARANCES

15  JAY CLAYTON
        United States Attorney for the
16        Southern District of New York
  DANIELLE KUDLA
17  RUSHMI BHASKARAN
  JERRY JIA-WEI FANG
18        Assistant United States Attorney

19  DANIEL NATHAN MARX
  WILLIAM FICK
20        Attorneys for Defendant Anton Peraire-Bueno

21  KATHERINE A. TREFZ
  PATRICK LOOBY
22  JONATHAN BACH
        Attorneys for Defendant James Peraire-Bueno

23

24

25

P6HDPerO

1    APPEARANCES, Continued:

2

3    JEFFREY EHRLICH ALBERTS
     AARON WILTSE
4         Attorneys for Non-party One

5    Also Present:

6    Michael Garland, Paralegal (USA Office)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Case called)

2              THE COURT:  Counsel, please state your name, starting

3       with the government.

4              MS. KUDLA:  Good morning, your Honor.  On behalf of

5       the government, AUSAs Danielle Kudla, Rushmi Bhaskaran, and

6       Jerry Fang.  And we're also joined at counsel table today by

7       paralegal specialist Michael Gartland.

8              Then I'll allow Non-party One's counsel to introduce

9       themselves.

10             THE COURT:  Good morning to you all.

11             MR. FANG:  Good morning, your Honor.

12             MR. ALBERTS:  Good morning, your Honor.  Jeffrey

13      Alberts and Aaron Wiltse, from Pryor Cashman, representing the

14      party identified in the record as Non-party One.

15             MR. WILTSE:  Good morning, your Honor.

16             THE COURT:  Good morning to you both.

17             MR. MARX:  Good morning, your Honor.  Daniel Marx and

18      William Fick for Anton Peraire-Bueno, who is here in court.

19             THE COURT:  Good morning.

20             MS. TREFZ:  Good morning, your Honor.  Katherine Trefz

21      and Patrick Looby, and we are also joined by Jonathan Bach, who

22      is our co-counsel.

23             THE COURT:  Good morning to you all as well.

24             Let me summarize briefly where we are on the agenda

25      today.  So we were last together in April for the defendants'

1  arraignment on the superseding indictment, which charged the

2  defendants with wire fraud, conspiracy to commit wire fraud,

3  conspiracy to commit money laundering, and conspiracy to

4  receive stolen property.

5      At the time, defendants had moved to dismiss the prior

6  indictment that included the same charges except for the

7  conspiracy to receive stolen property charge.  So at that last

8  conference, we set a new briefing schedule to allow the

9  defendants to move to dismiss the added charge, and after the

10 conference and after the defendants filed their renewed motion

11 to dismiss, the government decided not to proceed on the

12 receiving stolen property charge, which is, again, Count Four,

13 and has asked the Court to deny that portion of the defendants'

14 motion as moot.

15     The defendants ask me to grant that portion of their

16 motion as unopposed, so we will get to that.  The portion of

17 defendants' motion seeking to dismiss the other charges in the

18 indictment remains pending.

19     After our April conference, I granted defendants'

20 motion for a *Franks* hearing, granted a motion by defendants to

21 serve a Rule 17(c) pretrial subpoena, and granted, in part,

22 defendants' request for a bill of particulars.  Since that

23 time, Non-party One has appeared in this action to move to

24 quash the pretrial subpoena.  Also, the government moved for

25 reconsideration of my order granting the *Franks* hearing.

1    Based on the government's motion, I adjourned the

2    *Franks* hearing indefinitely and converted today's hearing to an

3    oral argument on three motions:  First, the defendants' motion

4    to dismiss; second, the government's motion for

5    reconsideration; and, third, Non-party One's motion to quash.

6    So, before we get to argument, I just want to address

7    why I adjourned the *Franks* hearing.  So I ordered oral argument

8    here, because the government's motion for reconsideration did

9    highlight an issue that I mentioned in the order granting the

10   defendants' motion that I think does warrant further

11   exploration before moving forward with the hearing, and that is

12   the fact that defendants concede that the affidavit, at a

13   minimum, would still include allegations that the

14   Peraire-Buenos reordered, or, what the government says,

15   entirely removed transactions from the proposed block.  Again,

16   this is referenced in paragraph 17 of the agent's affidavit.

17   So I want the parties to address this issue further

18   with respect to materiality.  To be clear, I do not find

19   persuasive many of the government arguments on reconsideration,

20   including that there was something improper about me ordering

21   this hearing while giving the government an opportunity to

22   fully argue and for me to ultimately determine materiality

23   after the hearing.  As stated in the defendants' opposition to

24   reconsideration, this decision was done for the government's

25   benefit, when they failed to fully address this issue in their

1    briefing or at our last conference.

2           I'm also aware of judges taking the same approach,

3    including simply ordering a hearing without explanation.  See,

4    for example, *United States v. Sarshar*, case no. 21 CR 202, at

5    ECF nos. 66 and 70.  Nonetheless, I agree that it might not be

6    a good use of anyone's time if the statements about reordering

7    or altering were sufficient for probable cause.

8           I am also not persuaded by the government's arguments

9    that a hearing should not be granted because it could impact

10   the agent's professional reputation.  The statement was made

11   without citation.  The government does not explain how this

12   would affect the agent professionally, and it's not clear to me

13   how simply having a hearing with the agent testifying,

14   something he's likely to do at trial, will negatively impact

15   his career.  To the extent he was found to have made purposeful

16   material misstatements, any impact on his reputation would be

17   warranted.  Of course, the concerns about professional

18   reputation of an agent do not outweigh the constitutional

19   rights of the Peraire-Buenos in this criminal prosecution.

20          I'll also note that the government's motion violated

21   local rules for page limits, which was particularly egregious

22   here when they submitted a nearly 15-page, single spaced reply,

23   10 pages over the limit, and which defendants have not had a

24   chance to respond to.  See Local Criminal Rule 49.1(b).

25          The government also made several arguments in their

P6HDPerO

1   reply on their motion for reconsideration with respect to

2   materiality that don't clearly appear in their earlier briefing

3   and were not raised at oral argument, including some of the

4   evidence of Pereira-Buenos' post exploit conduct alone was

5   sufficient to establish probable cause. So I want to give the

6   defendants an opportunity to respond to that today.

7        So, for today, argument with respect to the motion for

8   reconsideration, you all are free to make arguments that you

9   want, although I'm most interested in the issue of materiality,

10  and I'd caution the government to avoid spending time making

11  arguments about the professional reputation of the agent or

12  about any requirement about what must be decided before

13  granting a hearing.

14       It also appears to me that the issues involving

15  materiality, with respect to the *Franks* issue, dovetail with

16  the motion to dismiss. In particular, it's not clear to me the

17  government's theory on how the indictment adequately alleges

18  material misrepresentation under the wire fraud statute, and

19  that question intersects with what remains in the unchallenged

20  portion of the agent's declaration.

21       So, for that reason, I think it makes sense to start

22  with the motion to dismiss, so we will start there. I'll hear

23  from defense counsel first, and then from the government

24  regarding this motion. Then I will hear from both sides on the

25  *Franks* reconsideration issue. Then we will get to Non-party

P6HDPerO

1    One's motion to quash.  All right?

2           So, who is arguing with respect to the motion to

3    dismiss?

4           MR. LOOBY:  I am, your Honor.

5           THE COURT:  Thank you.

6           MR. LOOBY:  With the Court's permission, may I use the

7    podium?  It's easier for me.

8           THE COURT:  You may.

9           MR. LOOBY:  Thank you.

10          Good morning, your Honor.  Patrick Looby.  I represent

11   defendant James Peraire-Bueno, and I will be presenting

12   argument on defendants' joint motions to dismiss.

13          As the Court knows, there are three motions pending

14   related to Counts One through Three of the indictment:  The

15   first motion, motion to dismiss for lack of fair notice, and

16   then motions two and three that relate to failure of the

17   indictment to allege essential elements and essential facts

18   respectively.  Unless your Honor has a different preference,

19   I'll briefly address motion to dismiss one, and then I think

20   motions to dismiss two and three can be covered together.

21          THE COURT:  All right.

22          MR. LOOBY:  So, for motion to dismiss one, due process

23   requires, to find crimes with sufficient definiteness, that

24   ordinary people can know where the lines are.  This is the fair

25   notice or reasonable warning standard, and is also referred to

1    as an "as applied" basis challenge, the sources of the Court's

2    analysis of the statutory text to cases construing it as

3    applied to the facts alleged in the indictment.

4            In *Lanier*, the Supreme Court analogized the inquiry to

5    qualified immunity in the civil context.  In that context,

6    there doesn't need to be a prior case that is exactly factually

7    analogous.  It's okay for cases to build incrementally on prior

8    case law.  But a completely novel and unexpected application of

9    an old statute, like the wire fraud statute, to a remarkable

10   set of facts, is a constitutional violation.

11           In facts, courts routinely dismiss indictments at the

12   indictment stage where there's no prior precedent embracing the

13   government's theory, and we've cited several of those in the

14   briefing, including the *Giffen* case here in the Southern

15   District, the *Matthews* case in the Second Circuit reviewing a

16   pretrial dismissal, and the *Saathoff* case in the Southern

17   District of California, amongst them.

18           So, we're here on this motion because this is unlike

19   any wire fraud case that this Court or any court has ever seen.

20   The government, in its opposition, essentially doesn't dispute

21   this novelty, and it doesn't identify any analogous case

22   applying the wire fraud statute to similar transactions.

23           Now, I don't want this to get lost just because it's

24   undisputed in the motions or the government didn't engage, but

25   there are four unique aspects, and I won't rehash them all from

1  the motion, but just very briefly, your Honor, first -- and

2  this relates to motions to dismiss two and three, and we can

3  address them in more detail when we discuss those motions, but

4  this is a case without a false statement.  The government has

5  identified two computer code programming steps and labeled them

6  statements and labeled them false.  We don't believe that those

7  are sufficiently pled false statements that can support a wire

8  fraud case, but even if they were, there would be no dispute

9  that they're entirely novel.

10        At bottom, this case appears to relate to the

11  implicit -- either implicit representations or implicit

12  expectation in the roles and expectations on very specific

13  players on the Ethereum network.  It concerns what validators

14  can and cannot do.

15        And that leads to my second point.  There are no laws,

16  there are no regulations, and there are no Ethereum rules

17  alleged in the indictment or elsewhere available against

18  reordering transactions before a block is added to the

19  blockchain.  If that rule is announced in this criminal case,

20  it will be for the first time.

21        Third --

22        THE COURT:  If --

23        MR. LOOBY:  Yes.

24        THE COURT:  As I understand the government's

25  allegations, it's that it was a violation of the MEV-Boost

1    protocol.

2           What's your response to that?  If that's the standard

3    here, if that's their theory, why isn't that sufficient?

4           MR. LOOBY:  Well, that wouldn't be sufficient to

5    support a wire fraud under Counts Two and Three, because it

6    still requires a false representation.  But if the government

7    is proceeding on a theory that protocols were violated, then

8    that still would turn on the parties' expectations of what are

9    the protocols, what do they say.  And with -- absent a promise,

10   a specific promise not to reorder, we're still, at bottom,

11   asking what are validators able to do under the protocol.

12          And the MEV-Boost protocol, like the Ethereum

13   protocol, doesn't have a rule against reordering.  The

14   government has not identified one in the indictment.  It has

15   not identified one in its pleadings.  And so that would still

16   be an unprecedented application of the wire fraud statute,

17   regardless of whether or not the focus is MEV-Boost, or

18   Ethereum more broadly.

19          This leads me to my third point, which is the Ethereum

20   network is of course a decentralized cryptocurrency blockchain.

21   There's no central authority governing it, and there's no

22   government regulations.  Instead, economic incentives guide

23   parties' behavior.  This is relevant to the fair notice

24   inquiry, because it bears on an objective understanding of

25   whether or not actions that are taken on that network could be

1    the subject of criminal liability.

2           And, fourth, this case marks an abrupt shift in the

3    government's prior non-enforcement practice with regard to both

4    sandwich attacks, which, as we've explained in our brief, are

5    techniques that may or may not be criminal in other contexts,

6    but that the government has not charged on the Ethereum

7    blockchain and the government has also not sought to

8    criminalize to thwart sandwich attacks, which are publicly

9    discussed in the Ethereum network and out there in the open.

10          So, this case, for all reasons, is a quite surprising

11   and unexpected application of the wire fraud statute.  And I'd

12   just like to briefly touch on a couple of the points the

13   government did make in its opposition.

14          One is that this motion is premature.  The government

15   lacks support for that argument.  Courts routinely dismiss

16   indictments on "as applied" vagueness challenges before trial.

17   And the Second Circuit has repeatedly reviewed those.

18   Sometimes it reverses those.  Sometimes it affirms.  But it has

19   never commented that it was inappropriate for the Court to

20   entertain the motion based on the facts alleged in the

21   indictment.

22          Indeed, as we identified for the Court in our

23   supplemental authority letter, the Second Circuit requires

24   defendants to file "as applied" vagueness challenges at the

25   indictment stage or risk forfeiture of arguments and

P6HDPerO

1    application of the plain error standard on appeal.  It would

2    make no sense for the Second Circuit to require defendants to

3    file, essentially, placeholder motions that would be

4    inappropriate for the Court to rule on, only to have to renew

5    them based on the trial record.

6              THE COURT:  The idea that this is a trustless system,

7    doesn't that get into facts that need to be sort of now aired

8    out at trial?

9              MR. LOOBY:  I believe, because there is no precedent

10   that is remotely analogous, where there are fraud allegations

11   alleging the exploitation of a vulnerability on the Ethereum

12   blockchain, or using a cryptocurrency transaction as bait in

13   the way that is alleged in the indictment, that the facts in

14   the indictment alone are sufficient for the Court to rule on

15   the notice, on the notice motion.

16             On the notice motion, the Court can also take notice

17   of, you know, facts outside of the indictment.  But if the

18   Court were inclined to limit its analysis to just the facts as

19   alleged in the indictment, then the novelty of this case is

20   both readily apparent and essentially undisputed.

21             THE COURT:  In terms of taking notice of facts outside

22   of the indictment, you mean judicial notice or you're saying I

23   can just consider whatever I want to consider, and, if so, what

24   is that based on?

25             MR. LOOBY:  Yes.  I believe that the Court can

1    consider -- can either take judicial notice or can look to

2    secondary sources to guide its analysis as well.  The

3    touchstones of the fair notice inquiry are the statutory texts

4    and the cases.  We believe the extra context we provided in the

5    motion is informative to the fair notice argument, in addition

6    to those sources.  But the Court could rule based on the fact

7    that the statute and the cases construing it did not provide

8    any notice and the government has not identified any analogous

9    case, whether it's in the cryptocurrency space or on a

10   traditional market, as the analysis would require.

11        THE COURT:  How close do the facts need to be if

12   that's -- you know, your argument that there are no similar

13   cases, but as Judge Failla determined in *United States v.*

14   *Storm*, citing Second Circuit precedent, just because a case is

15   a matter of first impression doesn't mean there's a lack of

16   fair notice.  So where's the line I'm supposed to draw here?

17        MR. LOOBY:  As I understand Judge Failla's order, the

18   first step of her analysis was to look at the statutory text,

19   and she said, look, this covers the money transmitting and

20   other allegations pretty plainly, and because of that, she

21   wasn't troubled by the lack of precedent.  But the government

22   in that case had provided at least three examples of cases that

23   the Court mentions in her order, where analogous business

24   practices, while not exactly on point, were determined to fall

25   under the money transmitting definition of the offenses charged

1    in that case.

2              And, here, the government hasn't taken that additional

3    step.  They have essentially just replied that, you know, some

4    case has to be first, and that there doesn't need to be a case

5    exactly on all fours.  And we don't dispute that.

6              And to answer your Honor's question more directly,

7    it's difficult to answer in the abstract what would be close

8    enough.  But we have seen, and the government has cited no case

9    in which an exploitation of a vulnerability in a software code

10   that is publicly available to everybody, and this is alleged in

11   the indictment, was determined to be fraud.  And we have not

12   identified any case in which a transaction pending in the

13   mempool or pending on a traditional financial market, that

14   caused an alleged victim to trade around it, was somehow

15   deceptive without a statement regarding that transaction.

16             And, again, we've identified no case where simply the

17   reordering of transactions is determined to be misleading.

18   And, you know, we cited the *Finnerty* case in our reply, and I

19   think that that's an interesting case.  So that case is

20   involving the practice of inter-positioning, whereby an

21   equities trader would place trades of his own in between trades

22   of his clients.  And the defendant was indicted on a wire fraud

23   theory -- or a securities fraud theory, rather.  And Judge

24   Chin, as the district court judge, granted judgment of

25   acquittal and the Second Circuit affirmed.  And the Second

1    Circuit, said, without an affirmative false statement, this

2    defendant would not interposition the trades, regardless of

3    whether or not it seemed underhanded or unexpected and

4    regardless, including in that case, that there were rules in

5    the exchange that prohibited that type of behavior.  Without an

6    affirmative representation from the defendant, it wasn't wire

7    fraud.

8           And I think that's really where we are.  We have cases

9    that would stand for the proposition that this isn't wire

10   fraud.  And, on the other hand, we have no cases that look even

11   remotely like it.

12          THE COURT:  On that last case you just mentioned, was

13   a motion to dismiss filed?

14          MR. LOOBY:  I believe there may have been a motion to

15   dismiss, yes.

16          THE COURT:  That was apparently denied?

17          MR. LOOBY:  Yes.

18          THE COURT:  But on the ground that that -- the

19   indictment failed to allege a material misstatement?

20          MR. LOOBY:  I'm not sure of that, your Honor.  I can

21   look that up at a break.

22          THE COURT:  All right.

23          MR. LOOBY:  But to go back to the premature point, I

24   think, like, the government has cited two cases where the

25   Court -- in *Eisenberg* the Court had essentially deferred,

1    saying, look, it looks like the parties are really disputing

2    what the allegations are saying, and here, for the purposes of

3    this motion, we are not.  We think the novelty of this and

4    departure of prior case law is so stark on the basis of the

5    indictment the Court has all of the information that it needs

6    at this time.

7          And then just one final point, your Honor, and that is

8    that the fair notice inquiry is an objective standard, and I

9    have a United States Supreme Court citation that I'd like to

10   bring in, *Bouie v. City of Columbia*, 378 U.S. 347, 1964.  And

11   in that case, which is cited in one of the -- a case we cite in

12   our brief, the *Ward* case, the Supreme Court clearly holds that

13   the subjective understanding of the particular defendants is

14   irrelevant to the objective fair notice inquiry.

15         And I raised that point because of the government's

16   reliance on certain post alleged exploited Google searches and

17   other behavior that it says provide subjective notice.  That's

18   both irrelevant under the standard and also irrelevant for the

19   reason it occurs too late, because the relevant time period for

20   fair notice would be at the time the actions are contemplated

21   or when they occur.

22         So, unless your Honor has further questions on motion

23   to dismiss one, I can proceed to motions to dismiss two and

24   three, and these can be discussed together.  So motion to

25   dismiss two challenges the indictment for failure to allege

1  essential elements as a violation of the Fifth Amendment

2  indictment guarantee.  Motion three is premised on the rule

3  that the indictment must allege just more than the bare

4  element.  It has to allege the essential facts as well.  And

5  failure to do so violates the Fifth Amendment and the Sixth

6  Amendment notice requirement.

7          And I like to think of these two notice motions as two

8  bars the government has to meet.  Even if the Court were to

9  determine the government has alleged a false statement by

10  simply labeling these statements and labeling them false, the

11  government's failure to put meat on the bones and elaborate on

12  theory still would require dismissal under motion to dismiss

13  three.

14          So I'd like to start, briefly, on some things not in

15  the motion, and then I'll proceed to the argument.  One, is

16  it's indicted as a false representation case.  The government

17  is not pursuing a misrepresentation case.

18          Second, and I don't think the government disputes this

19  from the arguments in its admission, but the indictment must

20  allege a false representation in a false representation case.

21  And we cite the *Radley* case out of the Southern District of

22  Texas for that proposition, for the indictment's failure to do

23  that, required pretrial dismissal.

24          And then the third point that is, essentially,

25  non-disputed is that the money laundering count in Count Three

1  would fall if the wire fraud counts fell.

2          Before addressing the particular alleged

3  misrepresentations, I just want to briefly respond to the

4  government argument that merely reciting the statute, the

5  statutory text is sufficient.  The *Curtis* case out of the Tenth

6  Circuit is the only case the parties have cited in a wire fraud

7  case, and it rejects that rule.  And courts -- and the

8  defendants have cited cases in their briefing where courts have

9  dismissed even lengthy speaking indictments that recite the

10  statute, notwithstanding the factual allegations on each of the

11  elements that we allege -- that we argue are missing, and

12  that's the misrepresentation.  That's the *Radley* case.

13          The traditional property element is the *Alkaabi* case

14  out of the District of New Jersey, and it collects many other

15  cases.  And the deception going to the benefit of the bargain,

16  that's the *Guertin* case out of the D.C. Circuit.

17          I'll start with the misrepresentation element, and

18  I'll start with the Lure transaction.  This kind of goes

19  without saying, but the Lure transaction is a cryptocurrency

20  transaction pending in the mempool.  It's not a statement, and

21  the indictment does not allege any meaning that it conveyed,

22  and it does not allege any falsity that it conveyed.

23          Paragraph 24 of the indictment contains the entirety

24  of the indictment's allegations with respect to the lure

25  transactions.  And, in that paragraph, it merely alleges that

1    the defendants proposed at least eight specific transactions

2    that would cause the victim traders to propose bundles that

3    included them, and that they did, in fact, cause the victim

4    traders to propose those bundles.  That's it.  That's the

5    entirety of the factual allegations of this alleged false

6    statement.

7            Now, in its opposition, the government floats a new

8    theory.  It argues that the lure transactions were misleading

9    because the defendants had no intention of executing them in

10   the victim traders' proposed bundles.  This doesn't work, first

11   and foremost, for the reason that it's not alleged in the

12   indictment.  Paragraph 24 does not allege that, and it's not

13   elsewhere alleged.  There's no allegation that even if the

14   defendants harbored an intent to reorder or to swap out

15   transactions, however you would phrase it, that that intent was

16   ever conveyed explicitly or implicitly to anybody, including

17   the victim traders.  And it's not wire fraud, as the *Finnerty*

18   case held, unless that contrary intent is conveyed.

19           Second, the new theory doesn't work for the additional

20   reason that it doesn't make a lot of sense, because what the

21   government is arguing is that every transaction pending in the

22   mempool comes with an implicit promise to be sandwiched, to be

23   sandwichable.  To say that, I am going to consent to a sandwich

24   trader to place the front run trade around me, and I am going

25   to do nothing to thwart that.  That would be an irrational

1    promise to make, a nonsensical promise to make, because

2    sandwich trading occurs at the expense of the trade in the

3    middle.  It's also a promise a retail trader could never make,

4    because it concerns contingent events over which they control.

5    So, in that context, even this alleged implicit meaning, is not

6    something that a searcher could ever draw from the mere

7    existence from a transaction pending in the mempool.

8         And the government's analogy to the spoofing cases I

9    think really drives home what the problem is with this new

10   theory.  So, as your Honor knows, in the spoofing cases there

11   is a buy-sell order that is placed, while at the same time the

12   trader harbors a secret intention to, like, sooner or later

13   withdraw that transaction from the market.  And the Seventh

14   Circuit has held that that conveyed an implicit kind of promise

15   that they wouldn't do that.  The Second Circuit, notably, has

16   not endorsed this implicit misrepresentation theory.

17        The *Finnerty* case has a discussion in its opinion that

18   would suggest in the Second Circuit there needs to be an

19   affirmative representation.  It ultimately did not reach that

20   issue in that case, because it didn't find it necessary, but

21   even if an implicit representation were legally sufficient

22   under the wire fraud statute, it's just not alleged in this

23   indictment.

24        We quoted the indictment in the *Chanu* case and it

25   clearly says, when the defendant trader placed this trade, it

1    conveyed the meaning that it would be available to be -- it

2    would be available on the market to be consummated.  At the

3    same time, he harbored the intent to withdraw.  That was

4    misleading, because it created a false message.  The indictment

5    here, it doesn't allege that.

6              THE COURT:  Isn't the other problem with it that in

7    the spoofing cases, the rules specifically prohibit traders

8    from intending to place orders that they intend to cancel?

9              MR. LOOBY:  Yes, your Honor.

10             THE COURT:  Is that present here?

11             MR. LOOBY:  That's very important, and, in fact,

12   that's the reason for Judge Subramanian's acquittal in the

13   *Eisenberg* case.  The reason that trade has that meaning and

14   everyone can understand is you're not allowed to place a trade

15   if you're going to withdraw it.  And those rules are alleged

16   and proven in the spoofing cases, in the commodities market,

17   and they're not alleged here, and they couldn't be proven here,

18   because there are no such rules in the Ethereum market.

19             THE COURT:  Is the question of whether the MEV-Boost

20   protocol is analogous to rules, rules like those that existed

21   in these spoofing cases, is that a question of fact to be

22   addressed at trial?

23             MR. LOOBY:  I don't believe so, your Honor, because

24   it's not alleged in the indictment.  And it's not alleged in

25   the indictment, and the analogy to the spoofing cases is wrong

1   both for the lack of rules and the failure of allegations in

2   the indictment.  And whether or not a protocol like this

3   shifting decentralized trading environment -- it's just a

4   completely different beast than like rules in a regulated

5   trading market that would prohibit that type of behavior.

6           So, unless your Honor has further questions on the

7   Lure transactions, I'll speak briefly on the alleged false

8   signature.  This has the same problem as the Lure transactions.

9   Again, it's not a statement and it's not alleged to be false.

10  Unlike the lure, the government doesn't allege an implicit

11  meaning or argue an implicit meaning in its opposition.

12  Instead, paragraph 26 contains the meaningful allegations

13  regarding the false signature, and it says that, in lieu of a

14  valid digital signature, the defendants conveyed a false

15  signature to the relay knowing that the information contained

16  in the false signature could not be verified for ultimate

17  publication to the blockchain.  Instead, this false signature

18  was designed to and did trick the relay to prematurely release

19  the full content of the proposed block to defendants.

20          Regarding the first allegation, that the information

21  could not be verified for ultimate publication to the

22  blockchain, it's not clear what that means, but it's not

23  alleged to be a false statement or a falsehood that is relayed

24  to the victims or to anybody.

25          And then the second allegation is just a conclusory

1    allegation regarding the consequence of the false signature and

2    not its actual falsehood.  So there's no meaning -- allegations

3    of the meaning of the false signature or why it's false.  And

4    we pointed out in our reply brief that if those conclusory

5    allegations are sufficient, where you can take something not

6    even sufficient, evidently even a statement, call it a

7    statement, and put the word "false" in front of it, and that

8    gets you beyond a motion to dismiss, that will lead to absurd

9    results.

10            So we use the example of the false crowbar of the bank

11   robber, and you could imagine many more.  You could imagine a

12   mugger who corners a tourist here in the city in an alleyway

13   and takes their wallet.  But you wouldn't call the false sucker

14   punch, you know, a false statement in aid of that alleged

15   taking to turn that into a fraud situation.  So there has to be

16   a limit.  There has to be some poor alleged falsity in the

17   indictment that is just missing here.

18            THE COURT:  Even if the false signature implied some

19   certification that they were going to do to make sure that

20   bundle was enacted the way it was proposed, that -- this idea

21   of an implied certification, isn't that also insufficient based

22   on *United States v. Eisenberg*, Judge Subramanian's decision on

23   the Rule 29 motion?

24            MR. LOOBY:  Yes, your Honor.  It would be insufficient

25   to support a wire fraud charge under Judge Subramanian's

1    reasoning, and, also, it's unclear, as I mentioned before, that

2    kind of implicit representation would even qualify as a

3    misrepresentation that could support a wire fraud charge in

4    this context.

5          And there's also an additional reason why the false

6    signature can't be the alleged misrepresentation that sustains

7    this indictment, and that's because it comes too late in the

8    sequence of events.  So this is our argument based on the

9    *Loughrin* case from the Supreme Court and the *Berroa* case in the

10   First Circuit.  Those two cases announce the naturally inducing

11   test.  The false statement must be the thing that naturally

12   induces either the victim or a custodian of the victim's

13   property to part with their money or property.

14         The false signature was not made to the alleged

15   victims.  It was allegedly made to the relay, to the extent

16   it's a statement at all.  But that occurred after the alleged

17   victims had preprogrammed their sandwich trades, and the

18   allegations in the indictment make clear that the losses here

19   occurred during the front run trades that occurred before any

20   alleged tampering or switching of the Lure transaction in the

21   middle of the block.  And the government, in fact, repeatedly

22   concedes in its opposition, at page 9, it says, "the Lure

23   caused the victims to both part with their money."  Page 16,

24   note four, "the Lure transactions induced the victim traders to

25   part with their money."  Page 25, parting with the money was "a

1  direct result of" the Lure transactions.

2      The Lure transactions don't count for all the reasons

3  we've discussed, and the allegations in the indictment, which

4  the opposition concedes, as it must, because that is what the

5  indictment says, precludes the false signature from sustaining

6  the indictment under the separate causation problem under

7  *Loughrin* and *Berroa*.

8      And so, unless your Honor has any further questions on

9  the signature, I'll just briefly touch upon the property, and

10  the 10 elements as well.  The government's theory that this is

11  a case about stolen cryptocurrency only works at a 30,000 foot

12  level and it only works if you ignore what the indictment

13  actually alleges.

14      Again, I'll redirect the Court to paragraph 24, which

15  I was just paraphrasing, is the one that alleges that the

16  victim traders traded away to the front run trade at a loss

17  before the alleged false signature or before the tampering,

18  and, essentially, those losses could not be recouped through

19  the later sell transaction.  What's missing from the indictment

20  is an allegation that the alleged victim traders had any

21  property right to their sandwich trade or to the bundle.

22      And at this point it's important to recognize that the

23  bundle includes transactions that don't belong to the alleged

24  victim trader.  It involved the lure transaction in this case,

25  but in any sandwich trade, it includes someone else's.

1          Now, the government's theory is that the victim

2     traders have a property right in the order of transactions in a

3     bundle that they propose that includes other people's property.

4     Then that runs head long into had a separate problem, which is

5     that's not a traditional property right under the wire fraud

6     statute.

7          THE COURT:  But isn't that their theory of the alleged

8     misrepresentation, not what the victim traders lost out on?

9          In other words, the Supreme Court case *Cowley* says

10    that the government must prove deception and that money or

11    property was the object of their fraud.  Doesn't the indictment

12    allege that the whole point of this was to defraud the victim

13    traders of cryptocurrency or money?

14          MR. LOOBY:  I think the indictment alleges that the

15    victim traders lost their cryptocurrency and money.  I think

16    even the indictment -- so even accepting if the indictment did

17    allege that, we cite characteristics in our motion that would

18    nonetheless hold that there are certain expectations in money

19    and property that are too uncertain, that they can't sustain a

20    fraud conviction.

21          So even if your intent is to deprive somebody of

22    market share, that was one of the cases that we cited, or

23    expected future profits, and the entire object of the

24    conspiracy was undisputed, was to do that, was to economically

25    harm the victim, was to take money out of their pocket, courts

1   have held, nonetheless, that if the expectation of that money

2   was too attenuated, that they didn't have a traditional claim

3   to it.

4           Another example in the cases in our briefing is the

5   right to specific debtor's property in a bankruptcy estate.  So

6   a scheme to sort of take that property out of the bankruptcy

7   estate is, of course, a scheme to take property that,

8   eventually, unless you -- if you didn't have the scheme, would

9   be going to the alleged victim.  But because the victim didn't

10  have a traditional bundle of sticks, traditional property right

11  interest in that property, it's simply not covered by the wire

12  fraud statute.

13          So we would say this case falls right along those

14  lines, because here we have a speculative trading strategy that

15  relies on a sequence of events over which the alleged victims

16  do not have control.  And they are hoping and they are

17  expecting that, by manipulating the price on the front end,

18  including the other traders' transaction in the middle, and

19  instantaneously selling back at a better price than they just

20  purchased it, that they're going to recoup their losses and

21  then some.  And they're going to trade at a loss in the first

22  instance and hope that that happens.  Unless the indictment can

23  allege that they had a traditional contractual property right

24  that would have existed at the time the wire fraud statute was

25  enacted, in that strategy succeeding, it cannot qualify under

1     the wire fraud statute.

2            Finally, your Honor, on the intent element, this is

3     based on the rule that not all deception counts under the wire

4     fraud statute.  The deception has to go to benefit of the

5     bargain.  And I'll cite *Jabar* case from Second Circuit, 19

6     F.4th 66, that the bargain is defined by the benefits

7     reasonably anticipated because of the misleading

8     representations.  Here, if benefit that the alleged victims did

9     not receive was their bundle was not included in the block,

10    there is no alleged promise from the defendants that that

11    bundle would end up on the block.  That's just not alleged.

12           And then just, finally, your Honor, on this point,

13    I'll briefly talk about the recent Supreme Court case in

14    *Kousisis*, which the intent -- so, in that case, the Supreme

15    Court held that there doesn't need to be an intent to cause

16    economic harm.  But under the traditional conceptions of fraud,

17    there still has to be an intent to harm.  And so any discrep --

18    and what the majority held is any discrepancy between the

19    anticipated benefits as promised and as delivered qualifies as

20    the type of deception under the -- qualifies under the wire

21    fraud statute, even if the victim is getting something of equal

22    economic value, so not out any money, but what they get is what

23    they weren't expecting.

24           But the key thing is that that case did not disturb

25    that there needs to be a deception and misrepresentation that

P6HDPerO

1  goes to that bargain.  There needs to be a promise to the

2  victim, or that is related to the victim in some other way,

3  that that is the bargain they are entering into.  And here

4  there is no alleged communication at all between the

5  Peraire-Buenos and the traders.  And, for that reason as well,

6  there's no alleged intent to defraud.

7          Thank you, your Honor.

8          THE COURT:  Thank you.

9          From the government?

10         MS. BHASKARAN:  Thank you, your Honor.  Rushmi

11  Bhaskaran for the government.

12         If the Court prefers, I can start first with the

13  motion to dismiss on the vagueness challenges, and then proceed

14  to the remaining arguments.

15         THE COURT:  All right.

16         MS. BHASKARAN:  And not to rehash everything that is

17  in the government's opposition, but the Court should not

18  dismiss the indictment at this stage out of vagueness concerns.

19  Much of the defendants' arguments about the vague -- about the

20  alleged vagueness of the indictment go to factual issues for

21  which there is no record.

22         You heard defense counsel talk about whether or not

23  there are rules that were at all relevant to the trial here.

24  The government submits that there are protocols that are

25  relevant here and that inform the expectations of the various

1    players who were involved in the crime.  That will come out

2    through testimony at trial.  The Court does not have that

3    record before it right now, and, as such, it is not -- it would

4    not be appropriate for the Court to make that determination

5    absent that factual record.

6              THE COURT:  But are there cases that say that

7    violating expectations of a protocol constitutes wire fraud?

8              MS. BHASKARAN:  Your Honor, respectfully, that is not

9    the crime that the government has alleged here, that the mere

10   fact that the defendants violated expectations of a protocol is

11   the sum total of why they committed wire fraud.  Wire fraud is

12   a course of conduct that is deceptive in order to obtain

13   property, and the government alleges that the defendants have

14   had a deceptive course of conduct that --

15             THE COURT:  But is it any deception or does it require

16   a material misrepresentation?

17             MS. BHASKARAN:  So, the wire fraud statute is broader

18   than just misrepresentations.  The wire fraud statute could

19   include a deceptive course of conduct.  The government submits

20   that our evidence would qualify as misrepresentations.

21   However, it is not limited to misrepresentations.

22             For example, the standard wire fraud instruction that

23   is given in this district goes to say that the deception need

24   not be spoken, it can be a defendant's course of conduct.

25             THE COURT:  But it has to be deceptive in some way.

P6HDPerO

1    MS. BHASKARAN:  It has to be deceptive in some way --

2    THE COURT:  So how is it deceptive and what cases do

3  you have that are analogous?

4    MS. BHASKARAN:  So, the government alleges that there

5  are two aspects to the defendants' deceptive conduct.  The

6  first were the Lure transactions.  The Lure transactions were

7  efforts by the defendants to induce the victims to trade and to

8  part with their money, and they were coded with the other

9  aspects of the deception, which is the false signature.  But

10  all of this is to say, and just to say at a high level, the

11  defendants tricked the victim traders to part with their money

12  and take that money through a separate form of deception, which

13  is the false signature.

14    There may not be any precisely analogous wire fraud

15  case in the crypto space, because the space is new, but that is

16  not required here.  And if you were to take the defendants'

17  arguments to its logical conclusion, it would be really hard

18  for the government to ever prosecute wire fraud in the

19  cryptocurrency context, because it is so new and because it is

20  so evolving.  But the concept that there is a fraud here where

21  there are lies to obtain money, that's just classic wire fraud.

22    THE COURT:  But where was the lie and where in the

23  indictment do you allege the lie happened?

24    MS. BHASKARAN:  So, your Honor, I would focus your

25  attention primarily, first, on the statutory allegations in the

P6HDPerO

indictment, which is all the Court needs in order to uphold

this indictment on a motion to dismiss.

So, to focus on paragraph 34, the statutory

allegations, and that statutory allegations for conspiracy to

commit wire fraud. And it says that the defendants knowingly

having devised and intended to devise a scheme and artifice to

defraud and for obtaining money and property by means of false

and fraudulent pretenses, representations and promises, would

and did transmit and cause to be transmitted by means of a

wire.

And it goes on later in that paragraph with a "to wit"

clause, that the defendants agreed to engage in a scheme to

defraud the victim traders by making material

misrepresentations, including, among other things, the Lure

transactions and the false signature.

Whether or not the false signature and the Lure

transactions amount to material misrepresentations is a

question of fact. The arguments that defense counsel just made

to the Court are arguments that should be made to the jury.

They are factual arguments that depend on a factual record.

That's not where we are here today.

THE COURT: What I assume the defendants would say to

that is they've accepted everything in the indictment as true,

and that accepting everything as true in the indictment, you do

not allege a material misstatement.

1      What is your response to that?

2           MS. BHASKARAN:  Respectfully, they have rejected the

3      factual assertions in the indictment and argued that they are

4      not true.  We submit that there are relevant MEV-Boost

5      protocols at play here.  They say they don't exist.  They say

6      the defendants have relinquished any right in their property at

7      the time that they entered into their transactions.  We dispute

8      that, and all of that will have air time at trial.  But it's

9      not appropriate to dismiss an indictment at this stage when

10     that is such an extraordinary remedy and there is no factual

11     record.

12          THE COURT:  I understand there are no similar

13     cryptocurrency schemes, but what is analogous to a wire fraud

14     charge where defendants allegedly violate a protocol or

15     software or anything analogous --

16          MS. BHASKARAN:  One space might be the spoofing

17     context, and going to a question that your Honor raised,

18     defense counsel -- and there are specific rules and regulations

19     at play here.  We would argue at trial that there are relevant

20     protocols at play here that inform what the defendants did.  So

21     while it may not be precisely on fours with the spoofing

22     context, there is an analogous situation there.

23          THE COURT:  But a rule is something everybody, once

24     they participate in, agreed to abide by.  How are protocols

25     similar to a rule, and how have you alleged that in the

1    indictment?

2           MS. BHASKARAN:  Well, I believe, your Honor, it's

3    alleged in paragraph 14 in the indictment, and, again, I don't

4    think this is necessary for the indictment to survive.

5           Paragraph 14, which is on page 5, at the bottom, we

6    allege that the relay will not release the transactions within

7    the proposed block to the validator until the validator has

8    confirmed through a digital signature that it will publish the

9    proposed block as structured by the builder.

10          So, your Honor, again, I think that there is going to

11   be testimony at trial about this very issue, and it may not be

12   exactly on all fours with spoofing and with the regulations

13   from regulators that are at issue here.  This is a different

14   space.  But the fact this is a different space doesn't mean

15   that fraud cannot occur in it.  And so for that reason, your

16   Honor, the vagueness challenge is not appropriate here.

17          I would now, your Honor, like to turn to some of the

18   additional arguments that defense counsel raised with respect

19   to the sufficiency of the indictment.  And I've alluded to some

20   of this already in my remarks, but, as the Court -- the

21   standard here for dismissal is extraordinarily high, and it's

22   an extraordinarily rare remedy, as the Second Circuit stated in

23   *United States v. Benjamin*, for an indictment to be dismissed.

24          The indictment need do little more than track the

25   statutory language.  That is black letter law of the Second

1    Circuit.  The Court could uphold this indictment solely on the

2    basis of the statutory allegations, including in paragraphs 34

3    and 36.  I might have miscited that, but the statutory

4    allegations for wire fraud and conspiracy to commit wire fraud

5    are sufficient for the Court to uphold the indictment.

6         Now, to address the additional argument defendants

7    made, they made arguments about the benefit of the bargain.

8    That benefit of the bargain argument is now foreclosed by the

9    Supreme Court's decision in *Kousisis*.  And, in addition, the

10   defendant made arguments about cognizable property interests

11   and whether there was one.  Again, it is alleged in the

12   statutory allegations of the indictment.  They are free to

13   argue at trial that the thing that was taken of the victims was

14   not property, or the relinquished their property, or they

15   abandoned their property.  Those are jury arguments.  But the

16   government has sufficiently alleged that the object of this

17   wire fraud scheme was to obtain the victim traders'

18   cryptocurrency, which is property.

19        And, your Honor, let me see -- if there are other

20   questions that you'd like me to address, I'm just going through

21   my notes to see if --

22        THE COURT:  Just getting back to the

23   misrepresentations here, the defendant made an argument that,

24   essentially, how can the transactions, the lure transactions

25   make any promises when the traders who typically make these

transactions are supposed to have no further role in the process? What's your response to that?

MS. BASHKARAN: Our response is they're looking at it too narrowly. The lure transactions are part of a broader deception scheme that includes the false signature, and it's actually all coded together, as the government's evidence will show at trial. The lure transactions were designed to bait the victim traders to trade, and they were immediately dumped with replaced with different transactions that allow the defendants to take the money.

You can't disaggregate the facts to their minute components. We look at the case as a whole, and the lure transactions are part and parcel of the second half of the defendants' scheme with respect to wire fraud, which is the false signature. You can't disaggregate them together.

THE COURT: What is your theory as to what the false signature represented? Is that a statement that -- are you saying they misrepresented, through the false signature, that they were going to validate the bundles as proposed? Is that your theory?

MS. BHASKARAN: That's part of the theory, too. The false signature also signified that they had validly signed the header when they had not. But, certainly --

THE COURT: What is the meaning of "validly signed the header?"

1          MS. BASHKARAN:  This gets into some technical details

2     and I might defer to my colleague in a moment, who could

3     probably speak to this better.  But the header has various

4     components to it.  It has a signature.  It has something called

5     a parent root.  It has some other aspects that are put into the

6     header, and they put false information into some of those

7     fields.

8          THE COURT:  False information, but were they making a

9     false representation?  In other words, were they falsely

10    representing that they were going to do something, and is that

11    an implicit promise to do or not to do something?

12         MS. BHASKARAN:  Well, yes, your Honor, for the reasons

13    we had just discussed, the false signature, the government

14    alleges, was a misrepresentation that they would publish the

15    block as is.

16         THE COURT:  It's a misrepresentation because it's

17    implied that, through this false signature, they were going to

18    propose the bundle as is?

19         MS. BHASKARAN:  Effectively, I think that's fair.

20    This is all happening through computer code, but yes.

21         THE COURT:  So my question as I proposed to the

22    defense is, why is that not insufficient based on *Eisenberg*,

23    citing *United States v. Conway*?

24         MS. BASHKARAN:  Because -- for two reasons.  First,

25    *Eisenberg*, when the case was dismissed, was on the posture of a

P6HDPerO

1    Rule 29 when Judge Subramanian had a full factual record.  And,

2    second, I think *Eisenberg* is factually distinct, because in

3    that case, I do not believe that there is actual testimony

4    about rules and protocols as you will see in this trial as to

5    how that made our particular representation false and

6    misleading.

7              THE COURT:  All right.  I think you addressed property

8    right and intent to defraud.

9              MS. BHASKARAN:  Yes, your Honor.

10             Your Honor, I think that there's a straight forward

11   answer to that, that the statutory allegation clearly set out

12   that the object of the defendants' fraud was to obtain the

13   victim's cryptocurrencies, and that is cognizable property.

14   The indictment also alleges that the defendants acted with the

15   requisite intent to commit wire fraud and conspiracy to commit

16   wire fraud.

17             THE COURT:  All right.  I meant to ask defense counsel

18   about Count Four, but you all have asked me to deny the motion

19   as moot.  The defendants have asked me to dismiss it as

20   unopposed.  What's the government's position with respect to

21   this?

22             MS. BHASKARAN:  Yes.  The government submits that the

23   Court should just deny the motion as moot.  We have not

24   articulated -- we have not argued the motion, and so there's no

25   motion before the Court -- there's no arguments before the

1    Court for the Court to adjudicate what the defendants have

2    argued, and, for that reason, because there is not a live

3    issue, the government is not proceeding on Count Four, there's

4    no motion for the Court to decide.

5              THE COURT:  Did the defendants not brief that issue?

6              MS. BHASKARAN:  The defendants briefed -- I apologize

7    if I misspoke.  The government did not brief Count Four.  We

8    have just elected not to proceed on that count.

9              THE COURT:  Right.  So they're saying, why can't it be

10   dismissed as unopposed, because you all did not oppose that

11   motion --

12             MS. BHASKARAN:  Can you just let me confer with my

13   colleagues?

14             Your Honor, I think it would be fine for the Court to

15   dismiss Count Four absent the government's -- because the

16   government is not proceeding without, you know, taking an

17   opinion on any of the defendants' arguments with respect to

18   Count Four.

19             THE COURT:  Understood.

20             All right.  Just one more.  I just want to get back

21   briefly, in terms of analogous cases, to this -- you've cited

22   the spoofing cases.  Is there anything else you would encourage

23   me to look to?

24             MS. BHASKARAN:  Sure.  The other case would be

25   *Eisenberg*, which Judge Subramanian upheld when it was in the

1  same posture as this one, and that, too, was a cryptocurrency

2  case.  And defendant made similar arguments in *Eisenberg* as

3  they're making here, and Judge Subramanian held for similar

4  reasons that it would be inappropriate to dismiss the

5  indictment at this stage given that the standard is so high and

6  all the government needs to do at this stage is to essentially

7  track the statutory elements.

8          THE COURT:  Okay.  Thank you.

9          Mr. Looby, any brief response?

10          MR. LOOBY:  Yes.  Very briefly, your Honor.

11          I'll start with the vagueness motion in motion to

12  dismiss one.  Again, I don't think I hear any dispute that this

13  was charged as a false representation case.  There was some

14  suggestion that false representation is not required, that it's

15  not the law.  And I would point the Court to the Fifth Circuit

16  decision we cite in our brief, the *Radley* case, 632 F.3d 177,

17  185.  And the Fifth Circuit has noted that, although the

18  language of the wire fraud statute does not require a material

19  misrepresentation, the Supreme Court has interpreted the

20  statute to call for one, and it did that in the *Netter* case.

21          And, in fact, the District Court in the *Radley* case

22  had dismissed an indictment that tracked the statutory

23  language, because the factual allegations, when you look

24  through all of them, the multiple paragraph long indictment,

25  there was no false statement, and that's where we are.

1         Again, going back to whether or not the mere existence

2    or allegations of protocols are sufficient, the protocols are

3    not alleged in this indictment.  But, more importantly, what is

4    not alleged is that the defendant ever agreed to be bound by

5    them.  The government is treating the word "protocol" like it's

6    a self-evident promise in that way.  I don't think that that's

7    how it normally is interpreted.  But the important point is

8    that that is not alleged in the indictment.

9         And then, finally, the governments invocation of the

10   *Eisenberg* case, we just note this was a case where the Court

11   determined the case should never have gone to a jury.  This is

12   a vagueness challenge based on the government's factual

13   allegations we accept as true.  We're not challenging them.

14   We're challenging legal conclusions.  There is a constitutional

15   harm in having to go through a trial that should never have

16   been held.

17        So I will just turn to the second and third motions to

18   dismiss.  And just starting with the argument that just merely

19   reciting the statute is sufficient, again, we note that the

20   government cites no Second Circuit case regarding the wire

21   fraud statute, and that's telling, because this is a broad and

22   notoriously vague statute that the courts have interpreted in

23   different ways over the years, in light of their vagueness

24   concerns.

25        So in the *Netter* case, it determined that a material

misrepresentation was a required element, even though perhaps
you could read the McNally, Simonelli, these are cases defining
the scope of what property rights fall under the statute.
Otherwise, it's a vague statute that poses both individual
liberties and federalism concerns.  So, in this instance,
merely reciting the wire fraud statute is insufficient.

And then I'll briefly touch upon the false signature.
I think your Honor's questions really got to the heart of it.
There needs to be an allegation of what promise was made and
why that was false.  And we've gone through the indictment many
times.  It's just not there.  There is no allegation that the
false signature was a promise to not rearrange the transactions
in the bundle.  There's not even an implicit one.  And it's
even unclear at this stage whether an implicit representation
is something that could sustain an indictment at this stage.
But even if it were, it can't fairly be read into this
indictment.

Thank you, your Honor.

THE COURT:  Thank you.

All right.  Let's turn to the *Franks* hearing
reconsideration motion.  I will hear from the defense first --
excuse me, I will hear from the government first with respect
to this.

MS. KUDLA:  Your Honor, before I begin, I think it
would be helpful to just make sure that the Court has a copy of

1    the corrected affidavit in front of you.

2           Do you have that?  If not -- just out of an abundance

3    of caution --

4           THE COURT:  I have a lot of paper here, but I'll take

5    it.  Thank you.

6           MS. KUDLA:  And then do you think your clerk wants

7    one?

8           THE COURT:  Yes.

9           MS. KUDLA:  Here you go.

10          Your Honor, when you look at the uncontested facts in

11   this affidavit, when viewed in their entirety, the totality of

12   the circumstances, they establish probable cause, a fair

13   probability that two things happened:  That there was a crime,

14   and that, secondly, evidence of that crime would be found on

15   the Google accounts.

16          I want to begin with the crime.  Law enforcement

17   interviewed a victim trader who reported a theft and described

18   exactly how that was done.  That we see in paragraph 16 of the

19   corrected affidavit.  Law enforcement then independently

20   interviewed a MEV-Boost software engineer who described the

21   same theft and described, with specificity, in particular with

22   the false signature, how that was done.  And that's paragraph

23   18.

24          What I want to call the Court's attention to here,

25   your Honor, is when you look at those two paragraphs, setting

1    aside the reordering versus altering challenge, which we

2    accept -- and I say strenuously -- accept only for the purposes

3    of this exercise, they are uncontested.  And then,

4    independently, there are public reports and public information

5    that corroborate what the victim trader had described and what

6    the MEV-Boost engineer also described that are uncontested.

7    And you see those in paragraphs 17(d), and you see them in

8    paragraphs (f) through (h).  None of those facts are contested.

9         So, your Honor, beginning with this as your starting

10   point, those uncontested facts, we can walk through them, and

11   if at any point, your Honor, you want to stop and pause at any

12   of this, just let me know and we can pull it up.

13        What they show is probable cause of a deceptive scheme

14   to obtain money or property.  And you hit the nail on the head

15   at the very beginning.  You had asked a question about, but

16   isn't this about MEV-Boost protocols, and isn't that a factual

17   distinction that is important; and, in fact, that is something

18   that is alleged in these paragraphs.  There was a particular

19   software at issue, the MEV-Boost software, and it was designed

20   to do two things:  To keep traders' proposed trades, one, in

21   order, and, two, to keep them private until a validator

22   committed to publishing the trade on the blockchain in a

23   particular order, as alleged in the affidavit relied upon by

24   the victim trader and the software engineer.  That's shown in

25   paragraphs 16(c) and (t), and paragraphs 18(a) and (b).

46

P6HDPerO

1      Why don't we just take, just as an example, let's go

2  to paragraph 18(a).  As sourced to the MEV-Boost engineer, in

3  paragraph (a), what the role of the relay is, one of those is

4  ensuring that the content of the proposed block remain private

5  until a validator commits to publishing the proposed block as

6  structured by the builder on the blockchain.  To ensure the

7  success of these processes, the relay will not release the

8  execution payload, the private transaction data to the

9  validator for validation and block publication until the

10  validator has confirmed through a digital signature that it

11  will publish the proposed block as structured by the builder to

12  the blockchain.

13      That shows up repeatedly in this affidavit.  And I

14  want to make a factual correction as well, your Honor.  In the

15  defendants' opposition to the motion to reconsider, they argued

16  incorrectly that the government conceded that a validator has

17  absolute discretion in ordering a block, and they cited to

18  paragraph 14(d).  Let's go there now.

19      Paragraph 14(d) is -- let me get the exact page number

20  for you.

21      THE COURT:  Seventeen?

22      MS. KUDLA:  Correct, your Honor.  But I want to go to

23  page 16, which shows the sourcing for that.

24      The sourcing for that talks about execution of

25  cryptocurrency transactions on decentralized exchanges

 1    generally.

 2         Do you see that at the beginning of page 16, paragraph

 3    14, beginning with "based on my review?"

 4         THE COURT:  Yes.

 5         MS. KUDLA:  Got it.  So, at the end of that, regarding

 6    the execution of cryptocurrency transactions on decentralized

 7    exchanges, it's talking about, in general, these are certain

 8    protocols in the Ethereum network.

 9         Where we talk about the MEV-Boost protocols and the

10    rules at issue for probable cause for the crime, where the

11    crime is alleged to have occurred, that begins in paragraph 15,

12    your Honor.  And there it specifically states on page 17,

13    regarding the MEV-Boost technology as relevant to this

14    investigation, and it goes on to list very specific roles for

15    each participant.  And, notably, in paragraph 15(c)(5), which

16    is also uncontested, it uses that same terminology that the

17    relay only releases this private information after confirming

18    through the signature that it will val -- the validator will

19    validate the contents of the block as proposed.  So --

20         THE COURT:  Let me stop you there.

21         MS. KUDLA:  Yes.

22         THE COURT:  Because there was also in the indictment

23    as well that the validator has the ability to reorder

24    transactions.  I remember defense counsel raising that as

25    contradictory of what's alleged here.  If the expectations are

1    that the validator include, exclude, reorder transactions, then

2    why is there any expectation of the victim traders that this

3    wouldn't happen later in the process?  So, I understand that's

4    more of a factual question that maybe goes to this factual

5    affidavit, but it raised that issue for me.

6           MS. KUDLA:  Your Honor, I want to touch on two things

7    for the motion to dismiss, so we can step out for a second.  On

8    a motion to dismiss standard, you have to accept the

9    allegations as true.  Paragraphs 14, 15 describe exactly that

10   in the indictment about the role of the relay in keeping this

11   information private and confidential until the validator has

12   confirmed.

13          THE COURT:  Right.  But accepting as true the

14   allegations in the indictment that the validators have the

15   ability to include, exclude, or reorder transactions, would be

16   doing that -- in other words, that appears to conflict with

17   what is later said about the MEV-Boost protocol.

18          MS. KUDLA:  Your Honor, I do not know where that

19   appears in the indictment.

20          THE COURT:  It's in paragraph 9.

21          MS. KUDLA:  Paragraph 9.

22          THE COURT:  I could be wrong about that.  I have it

23   written here somewhere.

24          MS. KUDLA:  Your Honor, I think I know where you're

25   going with this.  I think you are in paragraph 9.

1          THE COURT:  It's not paragraph 9.  Hold on.  It might

2     be 9 or 10, but I'm not -- I thought there was another

3     paragraph, and maybe defense counsel is aware of which

4     paragraph I'm referring to, but I recall reading that in the

5     indictment.

6          MR. MARX:  I believe you're referring to paragraph 10,

7     your Honor, which refers to reordering within the MEV-Boost

8     software.

9          THE COURT:  Yes.  Thank you.

10          MS. KUDLA:  So, your Honor, let me take a look to make

11     sure I understand.

12          Your Honor, I think what is important here is the last

13     sentence of paragraph 10, which talks about, without

14     coordinated block building protocols, competition among the

15     validators for MEV opportunities often causes the network

16     congestion and instability.

17          The information you are talking about, the discretion

18     given to validators, that is in the Ethereum consensus network

19     generally, and that discretion given to validators generally to

20     allow them to pick and choose transactions at leisure and

21     construct blocks is what caused the network congestion and

22     disorder on the Ethereum network.  That is what the facts at

23     trial will show, that the MEV-Boost system was designed to

24     protect.

25          And, again, in fact, I want you to think of MEV-Boost

1    similar to traffic rules.  You can imagine a field of cars

2    going in every direction.  It creates confusion.  It creates

3    chaos.  It creates inefficiency.  What MEV-Boost was designed

4    to do, what the protocols that are outlined in paragraphs 11

5    through 15 of the indictment and also outlined in paragraph 15

6    of the search warrant affidavit, was to add structure to that

7    confusion, to provide predictability through rules.

8         So when you drive, there's a double yellow line.  You

9    don't have to worry that someone's just going to cross randomly

10   and hit your car, that there is a traffic light that cars will

11   stop at, that there will be a stop sign.  That is the purpose

12   of the MEV-Boost software, and that's what the users using that

13   MEV-Boost software, including the validators, are expected to

14   behave with.

15        THE COURT:  In this case, both the victim traders and

16   the defendants were using MEV-Boost.

17        MS. KUDLA:  Correct.  And, in fact, you know that by

18   use of a relay, because the relay is an integral part of the

19   MEV-Boost software, because it's designed, your Honor, to allow

20   traders to know that their trade orders can be published to the

21   blockchain in an order, and that trade information will remain

22   private until the validator commits through the digital

23   signature that they are going to order those transactions as

24   promised.  You see that in the search warrant affidavit in

25   paragraph 15(c)(5).  You see that in paragraph 16(c) through

1    (d), uncontested.  And you see those in paragraphs 18(a)

2    through (b), all uncontested.

3            And, separately, the benefit that the validator gets

4    by subscribing to this system is it provides them with more

5    profitable opportunities as the validator.  So everybody gets

6    something out of this system, and that's what will be

7    established at trial, your Honor.

8            So I want to pause here and just ask if there's

9    further questions on that point before I go back to the search

10   warrant affidavit, because I don't want to confuse the standard

11   in any way, but --

12           THE COURT:  No.  Keep going.

13           MS. KUDLA:  Okay.  So, first of all, that's what the

14   search warrant affidavit identified.  It identified particular

15   rules and protocols here using MED-Boost software designed to

16   keep trades private and to allow traders to trade in a

17   particular order.

18           The victim trader then described that he had submitted

19   trade requests using this software that should have been

20   executed in order, your Honor, A, B, C, or not at all.  You see

21   that uncontested in paragraph 16(c) and paragraph (d).

22           Instead, that middle transaction, the (b) transaction,

23   that was removed by the validator and replaced with a

24   completely different transaction.  That took the trader's

25   money.  That is what's reported to law enforcement uncontested,

1  paragraph 16(e) through (h).  Paragraph 17(d), replaced with

2  the tampered transactions.  Paragraph 17(f), replace.

3  Paragraph 17(g), specifically saying that, based on my

4  conversation with the victim trader, I'm going there now,

5  because this comes up frequently -- based on my trade, so the

6  result of the exploited victims front run trades were executed

7  even though the corrupt block did not contain what is now known

8  as the lure transactions.  The victims' background trades were

9  not successfully executed, because the value of that trade had

10  been captured by the tampered transactions, showing that the

11  middle transaction was removed, and it was completely replaced

12  with a new transaction.

13          As a result of that replace and switch, or reordering,

14  using the term that we should be using here, the victim trader

15  lost $14 million, and other traders lost $11 million.  That's

16  shown in paragraph 16(h).

17          And then, using the MEV-Boost software, the validator

18  was not supposed to reorder the transactions at all.  The

19  validator -- you see that in 16(d), the validator's bundles

20  remain private until the validator commits to publishing the

21  proposed block without any reordering to the list of the

22  reorder transactions.

23          Paragraph 18(a), the relay will not release the list

24  of private transactions to the validator until the validator

25  has confirmed through a digital signature that it will publish

1    the proposed block as structured.

2    These are reports to law enforcement about the theft

3    and how it occurred.  As a result, also uncontested, foreign

4    law enforcement froze a portion of the funds.  Paragraph 16,

5    note 7, and other Ethereum users penalized the validator for

6    its conduct in validating this particular block.  That is

7    uncontested, in paragraph 18(g).

8    Now, in a probable cause standard, looking at the

9    totality of facts, looking at all of the circumstances

10    surrounding it, and counter to its practical determination,

11    what is outlined here is a theft of money through some form of

12    deception or lies.  And it is uncontested now.  Now the

13    question is how do you get to the Google accounts.  That's the

14    next step in this analysis.

15    And it is essentially completely uncontested that the

16    $25 million obtained for the tech, the portion of it that was

17    not frozen, was found in the defendants' bank accounts, which

18    are registered to the Google accounts and have the recovery

19    accounts subject to Counts Five and Six.  That is all laid out

20    in uncontested tracing, your Honor, in paragraphs 23, which

21    trace the exploited proceeds to a series of different

22    transactions and bank accounts, paragraph 25, which discusses

23    the formation of Pine Needle, and the bank accounts as well,

24    and paragraph 29, discussing that these are recovery accounts

25    as well.

1    I would also like to point out at least one of these

2   accounts, subject to Count One, was directly linked to the

3   validator that conducted the corrupt block, and that was shown

4   in paragraphs 21 through 22, all uncontested.  And what's

5   noticeable here is the information shown here corroborated the

6   MEV-Boost software engineer, because the amount of money that

7   that validator sent back to the account controlled by the

8   defendants and linked to the subject accounts was 31(e).  It

9   was the exact amount of Ethereum that you would have received

10   if you had been slashed by Ethereum users for penalizing this

11   conduct.

12    So, all together, once again, these are all

13   uncontested paragraphs, not touched by any of the six alleged

14   falsities in any way.  When you look at these facts, what they

15   support is probable cause a crime occurred and probable cause

16   that evidence of that crime would be found in the Google

17   accounts that were asked to be searched.

18    Now, your Honor, I want to pause here and ask if the

19   Court has any specific questions, because I believe all of

20   these facts go to materiality.

21    THE COURT:  This was helpful, yes.

22    MS. KUDLA:  Okay.  I'm happy to review any of these

23   paragraphs in detail.  In particular, also paragraph 18 goes

24   into detail as to how the false signature operated.  Happy to

25   walk through that.  But with respect to materiality or before I

1   move any further, I want to address your concerns.

2            THE COURT:  Why don't you do that with respect to 18,

3   and then I will hear from defense.

4            MS. KUDLA:  Okay.  So paragraph 18 goes to the

5   misstatement itself.  And you had asked a number of times, with

6   respect to the motion to dismiss, what is going on here with

7   the false signature.  And the first misstatement itself, as

8   evidenced by what you see in 15(c)(5), as evidenced by what you

9   see in paragraph 16(d), with a promise and a digital signature,

10  with respect to 18, you also see that here.  And let's go -- I

11  want to call the Court's attention to the very paragraph,

12  18(a).

13           What this is doing is telling you what the relay

14  should be doing if everything is operating correctly, and if

15  you are using the MEV-Boost system, the relay's not going to

16  release the private transaction data until the validator

17  confirms, the validator commits, the validator commits through

18  digital signature it is going to be publishing the block as

19  published by the block builder.  That is in the normal course

20  of events.

21           Paragraph (b), this talks about, once again, in the

22  normal course of events, your Honor, what is happening at the

23  technical level between the relay and the validator.  But I

24  want to pause for a moment.  The moment the validator sends a

25  digital signature to a relay, as they did in this case, "I

1  promise to publish this block as structured by the block

2  builder," and they do not do that, that is a lie, that is a

3  misstatement, and that goes to the wire fraud.  And the wire

4  fraud is not complete, your Honor, until the defendants have

5  possession of the money in their wallets.  That does not occur

6  until after the false signature.

7           *United States v. Suise* is a Second Circuit case that

8  talks about when the wire fraud ends and the money laundering

9  beginnings.  And that does not occur until the block has

10  already been published to the blockchain.  This concept about

11  fraudulent inducement, *Kousisis* put an end to that.

12           This wire fraud is ongoing at the time that they are

13  sending the lie to the relay that they are committing to

14  publish this block as is.  But there are more lies within that

15  digital signature, and that's what I'm going to walk the Court

16  through.

17           Okay.  Paragraph (b) talks about how the relay and the

18  validator communicate.  They communicate in bits and pieces, if

19  all goes according to plan.  Now, you have to understand that

20  the ordered transactions list, this is important information

21  this is valuable information.  So the relay's not going to

22  release it until it gets a valid commitment.

23           So, what you see here is the relay will request a

24  validator's confirmation signature in the first instance by

25  sending the block header to a validator which contains basic

information about the proposed block.  It's just asking for

basic specifications and, importantly, from the validator's

perspective, what it tells the validator is how much money

you're going to get if you publish this to the block as

structured.  So it's telling Danielle Kudla, validator, you're

going to get $10 if you publish this as structured to the

blockchain.

       After reviewing the block header, a validator in the

next step will return the block header with certain -- what you

see here is, prior to the confirmation signature, a validator

will not have access to the otherwise private data.  In

addition to the digital signature, the block header also

contains data fields populated with information by the

validator, among others, that needs to go to other people in

the MEV-Boost process.

       And I want to call your attention to this, because

it's going to be relevant to the paragraphs we look at.  And I

also have a diagram.  But not only are they sending back a

digital signature, they are sending back fields that have block

specification information contained in it.  Think of it like

name, date of birth, address.  These fields have verifiable

meanings.  And once the relay gets this information, both the

signature and the fields completed, under normal circumstances,

at that point it has the commitment, validator Danielle has

agreed to publish the block as expected.  Now it can release

1    the private transaction data to you.

2           That's when they get the private trading data.  And,

3    at that time, the relay is sending out information to other

4    consensus users who act as gatekeepers to validate the next

5    block in the chain.  And think of the consensus users as like a

6    committee.  The majority of the committee have to vote yes or

7    no before that block will be published to the blockchain.  If

8    the committee votes no, it's not going to happen.

9           So, under normal circumstances, the validator has

10   provided valid information, they provided a valid signature.

11   The relay now starts emitting a signal with the structured

12   transactions, your Honor, A, B, C.  It goes forward to the

13   committee, yeah, yeah, A, A.  It's going forward.  And then at

14   that point, once the majority of committee members vote yes, it

15   gets publish to the block chain.

16          Now let's turn to paragraph D.  You'll see a picture

17   now.  This is a publicly available screenshot from the computer

18   code for the block header of the corrupt block.  This was all

19   sourced by the MEV-Boost software engineer.  And this is the

20   block header, and this is the information, the basic

21   specifications that need to be filled in by the validator and

22   sent back to the relay.

23          Do you see the parent root and state root?

24          THE COURT:  Yes.

25          MS. KUDLA:  Those should not be 0X0000.  But, instead,

1    that's what the defendants coded into the message, and the

2    reason they did that, your Honor, is because when they knew

3    they had found out through their research that the relay had a

4    vulnerability, when the relay value stated the signature --

5    think of it like an ID card.  It's a rectangle, and you have

6    fields on it.  The fields have verifiable meanings.  What the

7    relay was doing was just checking that the ID card was in the

8    shape of a rectangle.  It was not actually checking that the

9    fields were validly submitted.

10        So, when they put in 0000, the relay said "ID card,

11   rectangle, good to go," released the private transaction data,

12   and submitted to the other committee members transaction

13   information that the defendants knew would never be accepted by

14   the committee.  The committee would always vote no.

15        So you have falsities in two places.  You have a

16   falsity accepting back a digital signature in the first

17   instance, because they knew at the time they submitted that

18   digital signature, your Honor, they were not going to order

19   that block as structured by the block builder.  Secondly, it

20   contains false statements here that are verifiably false.

21        And you asked about the connection with *Conley* and

22   with *Eisenberg*, here, there are proven falsities that you can

23   point to.  The information contained in the parent and state

24   root was false, and it was false with the intent to take the

25   victims' money.  By submitting this signature, they turned the

1   clock off.  You have to understand, this entire crime was

2   committed within 12 seconds.

3           And, to Ms. Bhaskaran's point, trying to decouple the

4   pieces of this crime is impossible, because they are coded at

5   the very beginning to self execute one by one, and this false

6   signature, by putting it in, this turned the clock off.  It

7   gave them the time that they needed to take those transactions,

8   reorder them, using that term, but that's not what they did.

9   Everybody is in agreement that they removed the middle

10  transaction, who cares where it went, and they replaced it with

11  a tampered transaction.  You see that in paragraph 17(g) of the

12  affidavit.  It shows that there was a removal and a

13  replacement.

14          And then describing the effect of all of this, what I

15  just described to you, that's provided in paragraph 18(e),

16  totally uncontested.

17          THE COURT:  Just getting back to factually how this

18  worked, with respect to the transactions that they allegedly

19  knew would never be approved by the committee, were those --

20  what transactions were those?

21          MS. KUDLA:  Those were the victim traders' actual

22  bundles.  Oh, I'm sorry.  They were submitting back -- let's go

23  back to the paragraph 18(d).  They were submitting back the

24  parent root and the state root 0000.  That's what they knew the

25  committee would reject, because that has very specific

1    specifications as to the prior block and possibly future

2    blocks, and they knew that the committee would look at that and

3    say the data was insufficient, that there was a problem with

4    the data, and it couldn't be appended to the blockchain.

5           So, I didn't mean to confuse the Court.  They weren't

6    submitting transactions.

7           THE COURT:  Understood.

8           MS. KUDLA:  All right.  And, your Honor, I don't know

9    if it's helpful, could I show a diagram, too, if that's --

10          THE COURT:  Yes.

11          MS. KUDLA:  Mr. Gartland, do you mind putting up

12   the -- oh, sorry.  Hang on a minute.  I can --

13          THE COURT:  I think I cleared that.  I was trying to

14   clear the red that is appearing on the screen, and I think I

15   cleared it.

16          MS. KUDLA:  I think it was my finger that did it.

17          All right.  So, I want to be clear about one thing,

18   your Honor.  Everything shown here is contained in paragraph 18

19   of the affidavit.  And let's sort of orient the Court.  In the

20   first portion of this -- I want to start by saying we are in

21   the world of MEV-Boost software in this program, and that

22   includes the mempool, wasting pool for these trades.  It

23   includes victims or traders just looking for trades in that

24   mempool, it includes block builders, and then it goes to the

25   relay and the validator.

1    This diagram only relates to the later portion in the

2    process.  It is not relating to the prior steps.  So if you

3    have any questions there, let me know.

4    Starting, just to orient ourselves, on the diagram,

5    the dotted line, the blue dotted line on the far right, that's

6    the vertical, that is representing the transition from a

7    pending block into the published block.  So right there -- oh,

8    dear.  The published block, when we were talking about when

9    does the wire fraud end, it ends when it becomes that solid

10   color.

11   The committee members that we just talked about that

12   act as gatekeepers to vote yes on the next block, which is

13   shown in paragraph 18(b), that we'll look at these block

14   headers and determine whether or not it contains valid

15   information, those are the little computers we see at the

16   bottom.  Everything to the left is talking about the pending

17   block process, and that's where the crime is alleged to have

18   occurred, all during this pending process, not for publication

19   after.

20   Now, when we're looking at this, in the context of the

21   MEV-Boost protocol, I'm using gray to represent in step one a

22   block builder, a pending block coming in from the block

23   builder.  Let's use just three transactions.  Say the pending

24   block builder adhered to the victim's coded preferences, A, B,

25   C, that pending block in step one would go to the relay as A,

1  B, C.  The relay is not going to release that information to

2  the validator until it gets the digital signature.  And I'm

3  going to tell you how it works in the normal process visually,

4  and then we're going to look at what went wrong.

5        So, under one, the coded transactions now go to the

6  relay A, B, C.  Under two, what you see is a message from the

7  relay down to the validator containing just the basic "here's

8  how much money you're going to get," and block header

9  information, not the order transactions.  Validator can take a

10  look and say, I'm game for $10, I'm in for this, and it will

11  send back its digital signature in step three.  That digital

12  signature is what you see in paragraph (d).

13        The signature at the bottom, your Honor, why don't we

14  take a look -- it's probably helpful to look in tandem.

15        THE COURT:  Okay.

16        MS. KUDLA:  See that bottom red circle there, for

17  signature?

18        THE COURT:  Yes.

19        MS. KUDLA:  That's a valid public key.  So they

20  submitted the valid public key, but the false information came

21  in the parent and state root.  So, under normal circumstances,

22  the validator will submit a valid, public -- valid digital

23  signature that will contain both a valid public key and it will

24  contain valid block specifications.

25        Upon receipt of that commitment to publish the block

1    as proposed by the block builder, now the relay can release the

2    information in step four.  Now, once it does that, it starts to

3    send that signal out to the committee, your Honor, to say, here

4    is the next block.  It contains these block specifications and

5    it contains transactions as ordered, A, B, C.

6          What the validator did here is that they knew that

7    that gray signal would never be accepted by that committee on

8    the right, and when they got the information in step four,

9    that's when they reordered the transactions, using the term

10   "reordering," and by reordering -- let's go with the

11   uncontested facts as to what happened -- they removed B, and

12   they replaced it with something that was not in A, B, or C.

13   Instead, they replaced it with the inverse trade, that allowed

14   them to take the victims' money.

15         They took that new ordered transaction -- let's use A,

16   Z, C -- and they submitted in that red signal.  They know that

17   red single is actually going to be accepted, because it

18   contains transactions and it now contains the valid block

19   header specifications.  And what you see there is the committee

20   voting yes as it turns red.

21         At that point, now, the Ethereum consensus has voted

22   yes on this new block.  It gets published to the new

23   blockchain, and they have $25 million.  So that is what's

24   alleged there.

25         I'll take down the diagram unless the Court has

P6HDPerO

1    additional questions on that.

2         So, your Honor, I think the question that you had

3    asked me to address was specifically information contained in

4    paragraph 18, and that was my explanation there.  Before going

5    further, I want to ask if there are other particular questions?

6         THE COURT:  No.  This is helpful with respect to

7    materiality.

8         MS. KUDLA:  Okay.

9         THE COURT:  What remained in the agent's affidavit.

10        So, I'll hear from defense counsel now, unless there's

11   anything else you wanted to specifically address?

12        MS. KUDLA:  No, your Honor.  The only thing I would

13   ask is, almost like an appellate argument, if you wouldn't mind

14   if I reserve five minutes for rebuttal in the event --

15        THE COURT:  You may.

16        Just so everybody has a sense of the plan here, I will

17   hear from defense counsel; I'll give you an opportunity to

18   reply briefly; I think we'll probably take a little break; and

19   then we'll hear argument on the motion to quash.  All right?

20        MR. MARX:  Good morning, your Honor.

21        THE COURT:  Good morning.

22        MR. MARX:  Daniel Marx for the defendants on the

23   *Franks* motion.

24        We're here in sort of an interesting posture on the

25   government's motion to reconsider the Court's preliminary

1    decision just to hold an evidentiary hearing to hear from the

2    affiant.  And that elaborate presentation we just heard from

3    the government, while informative, I think probably is going to

4    be subject to significant dispute, and I would submit is

5    precisely what should be coming from the affiant at a hearing

6    under oath and subject to cross-examination, not as a matter of

7    attorney proffer.

8         But let me get into some of the details.  Of course

9    the government has argued in its motion to reconsider that you

10   misapplied the *Franks* framework.  That is clearly not the case.

11   You expressly found the defendants had made a substantial

12   preliminary showing.  You wrote that twice, at pages 3 and 4 of

13   your order.  We submit that was plainly correct.  It certainly

14   wasn't clear error, which is what is required for

15   reconsideration.

16        And I would add, because what we're doing here is

17   really just discussing whether or not to have a hearing, is

18   that because the Peraire-Buenos have made a substantial

19   preliminary showing as to the three prongs, falsity,

20   materiality, and intent, not that they have conclusively proven

21   any of those things or convinced your Honor to suppress, but

22   because they've made a substantial preliminary showing, the

23   Fourth Amendment requires a hearing.

24        That's what *Franks* says.  It uses the word "require."

25   And that's what the Second Circuit held in *Lauro*, when it

1    remanded for such a required hearing. But even if a hearing

2    weren't required, the notion that it's somehow error for your

3    Honor to proceed and get a more complete record directly from

4    the affiant, that's nowhere supported in Second Circuit law.

5         In fact, *Salome*, the case they like to cite from the

6    Second Circuit, simply says, if a substantial preliminary

7    showing has not been made, the Court need not hold a hearing.

8    Of course you don't have to, if no hearing is made, but that

9    doesn't make the inverse or the corollary true that it's

10   somehow error for the Court to hold a hearing if it's made such

11   a preliminary finding and it thinks the Court would benefit

12   from a more complete record directly from the affiant himself

13   and subject to cross-examination.

14        And Justice Gorsuch, we cite his Tenth Circuit opinion

15   in *Herrera*, says, this is exactly what district courts do.

16   They hold evidentiary hearings in order to get more extensive

17   information and a more complete record in order to make an

18   informed decision. And we would submit, there are many things

19   that are unusual about this case, not just the government's own

20   confessed novelty about it.

21        But even with respect to the *Franks* motion, this is a

22   very unusual situation, because typically what you see in a

23   *Franks* case, as I'm sure your Honor knows, is there's some

24   stray fact in the affidavit which turns out not to be true.

25   The affiant says the CI saw somebody coming out of an apartment

P6HDPerO

with a bunch of boxes, or they claim the undercover actually bought drugs from the target. And it's not really a challenge to go back and take that one fact out of the affidavit and say, okay, well, what's left, and is there still probable cause. And it's very often that there is, which is why *Franks* hearings are, as an empirical matter, relatively rare.

But this isn't that kind of a case. This is an extremely complex and challenging and novel set of facts. This is not a case where an affiant has sworn they saw people with heroin coming out of a stash house and they're question on what day it was, or how many times it happened, or who saw that. The question is whether there was any crime at all.

And I know the government likes to say that there's probable cause that there's both a crime and that there will be evidence of that crime in the Google files, but they kind of glossed over that first part. What the -- is there really evidence, without all of the false statements in the affidavit, left to persuade a magistrate that there really was a crime here that would involve overcoming the defendants' Fourth Amendment rights and allowing the admission of a huge volume of their digital information? And we submit there weren't.

We would add, and your Honor already noted this, that the only argument the government has ever given for not proceeding with a hearing is a suggestion that somehow it caused a manifest injustice to the agent, which I think your

1  Honor has already identified is not a very compelling reason

2  not to have a hearing.

3      If you go all the way back to Second Circuit case law,

4  to when they originally started using terms like a "heavy

5  burden" or "substantial burden" for this initial showing that

6  needs to be made, those cases start with cases like *Figueroa*,

7  now almost 30 years old.  And the cases are clear, and they're

8  reading *Franks* to say, the reason we set it up that way is

9  because we don't want to have frivolous motions and we don't

10 want to have pretrial delays.  Of course the irony is, rather

11 than having the hearing today, which we could have had, your

12 Honor got 25, 35, if my math is right, pages of single-spaced

13 briefing on a motion to consider, the none of which is going to

14 affect the trial date here, but it certainly used an inordinate

15 amount of the Court's time, which could have been used in these

16 couple of hours simply to get testimony from the affiant about

17 why he included so many false statements in his affidavit.

18      But certainly they have never made the argument -- I

19 haven't heard it today -- that going forward with the hearing

20 is somehow frivolous on our part, that this motion isn't

21 serious, that we haven't identified specific misrepresentations

22 and haven't made an adequate showing preliminarily that those

23 were material to the finding of probable cause.

24      So let me get back to the notion of why this is so

25 challenging in this case and what exactly *Franks* requires as

1  far as a corrected affidavit.  Now, finally, in the process, as

2  your Honor identified previously, there was no "corrected"

3  affidavit with the opposition to our motion, there was no

4  corrected affidavit presented at the hearing where you

5  originally heard argument about this.  Only in the motion to

6  reconsider do we now have this so-called corrected affidavit.

7        But that simply isn't good enough as a reason not to

8  hold a *Franks* hearing.  There are so many false statements in

9  the initial affidavit, and they're so central to the overall

10  presentation that we think it's critical to have testimony

11  under oath subject to cross-examination from the affiant, so

12  your Honor can have a complete record as to all three prongs of

13  the *Franks* standard, and that's because, as you know, the

14  original affidavit tells an inaccurate story that James and

15  Anton Peraire-Bueno were hackers who targeted more obscure

16  tokens; as users of the Ethereum network, they spoofed victims

17  with trades they didn't intend to execute; as validators on the

18  network, they altered trades that the victims had proposed; and

19  they tampered with the blockchain itself.

20        Now, let me pause here for a second and point out, the

21  government likes to have it both ways.  When they talk about

22  false statements in the affidavit, they want to really zoom in

23  and focus on them in isolation, but when they want to talk

24  about probable cause, they say, well, let's look at the

25  totality of circumstances.  What's fair for the goose is fair

1    for the gander.  However, that old fashioned expression goes.

2              You have to look at the totality in all circumstances,

3    and that's what makes it so challenging.  It's very hard, and

4    the government has a hard time to strip all of that false

5    material, all of that misleading presentation -- the betrayal,

6    the hacking offense, which did not happen, and the government

7    appears to concede now it did not happen -- out of the

8    affidavit and see what's still left.

9              And what's telling is today you heard a remarkable

10   amount of attorney testimony about the MEV-Boost system.

11   Right?  But if you look at the affidavit itself and you look at

12   the indictment, of course the *Franks* focuses on the affidavit,

13   but your Honor has noted the indictment is revealing as sort of

14   the state of the world and the government's view of the charges

15   here, that talks about tampering with the integrity of the

16   blockchain, in no uncertain terms.  This was a case that the

17   government presented as one in which these defendants brought

18   the entire system crashing down.  They were talking about the

19   Ethereum network.  They were talking about the blockchain.  By

20   the way, those were all false statements made to the

21   magistrate.

22             Now, in order to avoid having a hearing, in order to

23   avoid having their own agent testify about sworn statements he

24   made in an affidavit to get a search warrant, they say, no, no,

25   no, no; we're just talking about MEV-Boost and we're just

1    talking about certain protocols.  But the problem is the

2    affidavit doesn't clearly spell out -- and this gets back to

3    the issue of probable cause, whether there's a crime.  The

4    affidavit doesn't explain why it would be wire fraud, or a

5    violation of the Computer Fraud and Abuse Act, or any other

6    federal crime to act inconsistently with someone's view of the

7    MEV-Boost protocol.  Doing something clearly permitted by the

8    Ethereum network -- and they can dance around it as much as

9    they want, about general practice, how Ethereum works, and

10   specific practice of what was required in MEV-Boost software.

11   All of this is factual information that should be coming from a

12   witness, not an attorney from this podium.

13          But none of that establishes probable cause that there

14   was a crime, and it's remarkable, the extent to which they're

15   now trying to sort of come up with a way to explain some of

16   this stuff.  But let's go right to the heart of one of them.

17   Let's talk about the false statement.  Because we've all been

18   looking at this picture -- the false signature.  We've all been

19   looking at this picture in paragraph 18.  Part of the problem

20   for the government is it's a little like "out of the frying

21   pan, into the fire," because you asked a lot of very, very

22   focused questions on the motion to dismiss argument about how

23   exactly the false signature was a false representation or false

24   promise to do anything, and the answer you got on the argument

25   about the *Franks* motion in support of the government's motion

1  to reconsider is revealing in that, essentially, as I heard the

2  argument, is that there's nothing false in the signature at

3  all.

4          In fact, if you look at the diagram in paragraph 18,

5  the red circle at the bottom labeled "signature," there's

6  nothing identified as false about that.  That is a valid

7  cryptographic signature.  The affidavit says that.  The relay

8  wouldn't have responded if it wasn't a valid cryptographic

9  signature.  Our client could never have been slashed if it

10 wasn't a valid cryptographic signature.  There's no argument

11 that there's anything false about that.

12         Now, their new argument is that, at the top of that

13 page in that diagram, there's a separate field called "parent

14 root" and "state root" that was filled in with zeros when it

15 should have been something else.  That's not the signature and

16 still not an explanation of what's false, what's the promise

17 that's being made.  Putting a line of zeros in "parent root" or

18 "state root," I don't think your Honor has still gotten a clear

19 answer why that is a representation, much less a false

20 representation, much less a false representation that was part

21 of a deceptive scheme to obtain money and property that was not

22 already traded away by the sandwich attackers in their

23 fraudulent transactions, so --

24         THE COURT:  Isn't the falsity not in what is actually

25 in the signature, but in the misrepresentation that they were

74

P6HDPerO

1    going to publish the transaction as proposed?

2         MR. MARX:  I think that's what they want to say, but

3    if you look at that diagram, which is their smoking gun, where

4    is that representation?  It's nowhere.  There is a series of

5    zeros in two fields in a long bit of computer code, which has a

6    certain consequence for the relay, and other certain

7    consequences throughout other computer codes react to this

8    computer code -- none of this is people interacting with each

9    other, none of this is anyone saying anything to anyone else,

10   explicitly or implicitly.  It's not a representation at all,

11   and it's certainly not a false representation.

12        I welcome the government to point us, on that piece of

13   paper, in that diagram, to a line of code that is a promise

14   that the bundle, as bundled by the sandwich traders, would be

15   published by a validator to the chain without any alteration,

16   notwithstanding whatever appears to agree today that a

17   validator in the general world of Ethereum, has unlimited

18   authority to order and structure blocks however they wish.

19        THE COURT:  Isn't it true the block header -- excuse

20   me, the signature, in response to the block header -- in other

21   words, that you will get this amount for publishing this

22   transaction as is?

23        MR. MARX:  No.  It simply doesn't say that.  And the

24   affidavit doesn't explain how it says that.  There's nothing

25   self evident from the face of the image that they've presented

1    to your court that says that.  And to the extent you have any

2    question about whether that suggestion alone is enough, let's

3    have a hearing about that, and let's ask Agent Diaz how that

4    works in the context of MEV-Boost and Ethereum.  And, on a

5    complete record, your Honor can decide whether that's material

6    to a finding of probable cause or not, because we'd submit it's

7    not.

8            I'd also point out, again, I think I already said it,

9    it causes real problems for the government, which now seems to

10   be shifting its theory that it's not the signature itself

11   that's false, it's the inclusion of zeros in a state root field

12   in a separate bit of code that's false.  That's not in the

13   indictment.  That's not what this case was ever about.

14           This case was about a "false signature," which I would

15   submit is just pejorative labeling.  It's like if we were

16   talking in a civil case, like *Iqbal* and *Twombley*, you say this

17   is a classic conclusory allegation, there's no factual heft to

18   it, there's no meat on the bone, but there's nothing in the

19   indictment to go back to the motion to dismiss that says, that

20   was the false -- the material misrepresentation, the inclusion

21   of zeros in the parent and state root.

22           So, this is a whole new theory of the case, which

23   doesn't appear in the indictment, which is one of these

24   problems and why I think it's so good your Honor decided to

25   have both hearings today at the same time, because there's real

1    tension for the government that on the one hand wants to push

2    off everything about the indictment and say it's all for trial.

3    On the other hand, it wants to say we don't need an evidentiary

4    hearing, because just as attorneys we can tell you how it all

5    works now, because you don't have a factual record before you.

6    It can't be both, and the indictment, and the affidavit, and

7    the search warrants all need to be consistent and rely on a

8    consistent theory of the case.

9         Let me talk about some specific -- let me say one

10   other things about that.  What do you do under the *Franks*

11   process?  We all know this.  I don't think there's any dispute

12   about it.  The Second Circuit is very clear about it.  Put

13   aside commissions cases, because those get tricker, because

14   then you have to fill in gaps and what's allowed to be filled

15   in and what's not, what's contested.  But this is straight up.

16   The affidavit included a bunch of stuff that's not true.  We

17   say it's material.  They say it's not.  Your Honor had

18   previously said preliminarily at least it looks like it may be.

19        So, what do you do with an affidavit like that?  The

20   answer is simple.  You take a redaction pen, and you just mark

21   out everything that is improper.  You don't get to correct it.

22   You don't get to fix it.  You don't, as an attorney, get to

23   come up and give a very articulate and extravagant presentation

24   on behalf of your agent explaining how all this works and why

25   it would suggest a crime may have been committed.  You

1    literally just take out what shouldn't have been in the

2    affidavit and ask what's left.

3              Now, if you really want to do that in an orthodox way,

4    which we think you should, because that's what the Second

5    Circuit requires, we don't even get to the reordering question,

6    which is what your Honor really was focused on, because once we

7    get to the statement that James and Anton Peraire-Bueno altered

8    transactions, altered victims' transactions is false and they

9    haven't defended that statement, what you do, your Honor, is

10   just take it out.  You don't change it.  You don't use another

11   word.

12             The government has tried to take advantage of the fact

13   that what we said in our motion is, what it seems like the

14   charge is is that our clients reordered transactions, not that

15   they altered anything.  They clearly didn't alter it.  But they

16   don't get to fix that.  They don't get to cure it.  They don't

17   get to come up with different language or a different theory

18   than what the affidavit presented.  You just take all those

19   lines about altering transactions out.

20             And I point out, those were doubly false, because the

21   notion that the Peraire-Buenos altered victim transactions --

22   not only did they not alter any transaction, a claim the

23   government run away from, because no one was saying they

24   changed the price, or the timing, or the amount, or the tokens.

25   All anyone's ever talked about is the order within the bundles.

1    But they didn't change anything about the victims'

2    transactions.  All they did was change their own transactions.

3         So, again, none of this is in the affidavit, and they

4    don't get to insert it into the affidavit to fix the problem

5    that their affiant created.  But it appears what they're now

6    saying is, with this "remove and replace" theory, which is very

7    different than an "altered victims' transactions" theory, is

8    that the Peraire-Buenos themselves took one of their own

9    transactions and put a different one of their own transactions

10   as the meat of the sandwich.  At most, that's reordering their

11   own transactions, not any victim transactions.  It's certainly

12   not altering any victim transactions.

13        The other thing is this notion that the reordering

14   somehow by itself wasn't allowed, and so, thus, it must have

15   been a crime, or probable cause that a crime was committed,

16   there's a lot of -- and I think the government works very hard

17   to kind of massage out some of the wrinkles in the affidavit.

18   But one of the real challenges with this affidavit, when

19   stripped of its false statements, is there's a lot that seems

20   to kind of cut both ways.

21        So, on the one hand, in certain paragraphs they say,

22   well, in lieu of sending a valid signature, they sent a false

23   signature; but other times they say, the relay wouldn't respond

24   without a valid signature, which means here it must have been a

25   valid signature.  My point is, there are many places in which,

1    if you look at the affidavit, just on the paper, on the four

2    corners of it, it seems incoherent.  And I'm not sure there's

3    any Second Circuit law that tells the Court what to do when it

4    can't make heads or tails of the affidavit or fully understand

5    what it means.  But I would suggest, as a magistrate, sitting

6    and reading an affidavit, if you're not sure what it means or

7    if it's incoherent or internally contradictory, that should

8    raise little red flags about whether there's probable cause.

9    And for these purposes, there's absolutely a compelling reason

10   to have a hearing and get to the bottom of what this affidavit

11   actually said and alleged.  Because even with respect to the

12   signature, whether it was false or valid, whether some parts

13   were valid and other parts weren't, the affidavit says a lot of

14   different things and it's very hard to square them all.

15           There are a couple of other things the government

16   points to which I think are really not the focus, and, as your

17   Honor pointed out, you're really kind of focused on this

18   reordering question.  But there's a lot of kind of window

19   dressing around it, like, for example, the fact one of the

20   alleged victims reported a theft, as if that fact alone would

21   support probable cause, but of course it doesn't.  The

22   government doesn't cite any cases that suggest a tip about a

23   theft without more establishes probable cause to get warrants

24   from Google to go and search somebody's entire digital life.

25   That's not the law.

1    Probable cause requires that there be some reliable

2    basis.  You need to know who the tipster is.  You have to know

3    there's some basis to what they're saying.  You need some

4    corroboration in those contexts.  And, also, it's very

5    different if a tipster calls in and says, I just saw someone

6    shot outside my window.  Well, it's self-evident that a crime

7    may have been committed, and that might allow probable cause to

8    search a suspect's home or something like that.

9    It's very different when a crypto trader, in this case

10    a sandwich attack, claims, someone stole something from me; I'm

11    a victim of theft.  If everyone on Wall Street who lost at a

12    trade, made a bad trade, lost money, called the NYPD and said,

13    I was a victim of theft, if that's all that's required for

14    probable cause, none of us would have Fourth Amendment rights.

15    So that clearly can't be what the law is.  There needs to be

16    something more.  Here, there isn't.

17    And all the other things that follow up this victim

18    claiming they were the subject of a theft -- and let me point

19    out an irony.  Your Honor hasn't yet made a ruling I don't

20    think but the government's now acknowledged the theft claim

21    should be dismissed from the case, so there is no charge there

22    was a theft.  The Peraire-Buenos didn't deal directly with any

23    of the victim traders, they didn't steal anything directly from

24    them.  They obtained tokens from a liquidity pool into which

25    the sandwich attackers made very risky bets on a strategy that

1    didn't pay out.  But there was nothing stolen and there was no

2    theft, as that word would normally be used.

3         But here, for someone just to report, as a financial

4    trader, I lost money in a trade, does not self-evidently

5    establish probable cause that a wire fraud was committed.

6    Particularly, as Attorney Looby pointed out, how complicated

7    wire fraud is, and how hard the Supreme Court and the Second

8    Circuit have worked to sort identify its parameters.

9         And all the secondary consequences that flowed from

10   the alleged victim here claiming they were the victim of a

11   theft don't add anything to it.  So the fact that, at the

12   behest of the victim, a foreign government froze certain assets

13   doesn't prove a crime was committed.  The fact there was a

14   report by people connected with MEV-Boost that there was a

15   "exploit" -- by the way, not a crime, not wire fraud -- but,

16   again, based on reporting by these alleged victims, none of

17   this is additive to the basic core of facts that the Court had

18   in its possession.

19        And the other sort of cluster of facts that the

20   government presented and replies on -- and you heard about it

21   again today -- is a whole bunch of stuff which primarily goes

22   to the money laundering count, which, again, I think one of the

23   few things we all agree on is if there's no money fraud,

24   there's no wire fraud here, because the whole theory of money

25   laundering is you stole money, or you got money through fraud,

1    and moved it through the banking system.  But in the absence of

2    probable cause that there was a wire fraud, the fact that these

3    two individuals have bank accounts, that they moved from tokens

4    into liquid currency, that they moved from one bank account to

5    another, none of that is evidence of a crime.

6          So, when you really take the bullet points in the

7    affidavit, and they put it in -- I think it first appears

8    clearly in their motion for reconsideration, where they have

9    the two pages with 10 bullet points, it's really only two of

10   them, bullets seven and eight, which get to the heart of the

11   matter, which essentially say, these two individuals exploited

12   a vulnerability in a computer code to obtain money from these

13   victims by reordering transactions.  That alone, that statement

14   is not evidence for probable cause that a wire fraud has been

15   committed.  And absent probable cause of a crime, a search

16   warrant should never issue and people's Fourth Amendment rights

17   shouldn't be overridden.

18         And this gets to kind of the bigger picture, is the

19   whole story that was being told about an assault on the

20   Ethereum network or the blockchain itself has really been

21   reduced down today to not playing by the expected rules of the

22   MEV-Boost system, whatever those rules are.  They're not

23   necessarily spelled out in the affidavit.  They're clearly not

24   in the indictment.

25         But even the word "vulnerability," right, this entire

83

presentation is sort of like this pile of pejorative

adjectives.  Right?  You can call it a vulnerability, because

that makes it sound like something's being exploited.  You can

call it a lure transaction, a false statement, a corrupt block.

There are all these words.  But where are the actual facts

underlying these words?

        The reality is there's an aspect of the MEV-Boost

software -- by the way, it's doubly public.  Right?  And the

following two sentences -- number one, it's completely clear

the code is transparent and it's public and everyone knows how

it works.  Everyone knows that in addition to the digital

signature you need at the bottom of the page, there are certain

other fields that get filled in, some by default of the

software, some by the users, and everyone can see what the

consequences are of going down one path or the other, putting

in certain information or leaving certain information out.

        All public, and none that was hidden from the relay.

In other words, the diagram that they're showing you, which is

their smoking gun, it was sent to the relay with the zeros in

it.  There's no lie.  There's no misrepresentation.  Nothing's

being hidden.  It's all out in clear sight.

        And I know they want to step away from this notion

that they don't even need to allege that there's a material

false statement, which I think Attorney Looby's already

addressed, is -- that's just wrong under Supreme Court law and

1    Second Circuit law.  But even suggesting it in a vaguer or more

2    general sense, that there was a scheme or artifice to defraud,

3    in plain sight, with transparent code that everyone can read,

4    with a supposed false signature, that's open and plain to the

5    relay?

6            So, you know, the notion that those things alone would

7    have been enough to establish probable cause, we think is not

8    convincing.  But we don't need to convince you yet.  You don't

9    need to make a finding yet.  As you said at the beginning,

10   almost as a courtesy to the government, you sort of held off on

11   making a final conclusive determination as to materiality and

12   intent, although, again, as your Honor pointed out in your

13   order, given the number of false statements, there's some real

14   questions about whether or not Agent Diaz is acting

15   deliberately, or at least in reckless disregard of the truth.

16           And all we're deciding here now is whether it would be

17   useful to the Court, in order to have a hearing to hear

18   directly from the affiant and get actual evidence on the record

19   subject to cross-examination to inform your thinking about the

20   all three prongs of the *Franks* standard.  And I haven't heard

21   anything from the government that suggests that's an

22   inappropriate way to proceed or it would somehow be error if

23   you didn't do that.  And I think the Second Circuit and at

24   least one judge on the Supreme Court has said it's absolutely

25   within your discretion.  And we think you should stick to your

P6HDPerO

1    original decision, and we should have the hearing soon so as to

2    avoid any further delay.

3              THE COURT:  Thank you, Mr. Marx.

4              MS. KUDLA:  Thank you, your Honor.

5         I just want to address a couple of points very briefly

6    and any questions that your Honor may have.

7         What we did today was we walked through uncontested

8    statements, a clean affidavit, and what they laid out.  And

9    that was not just through a victim trader.  It was also through

10   the software engineer, the MEV-Boost engineer, and that also

11   included facts in the public record that corroborated those.

12        I call the Court's attention to footnote four, as

13   well, which also alerted the magistrate judge that statements

14   by the victim trader had been corroborated by other information

15   contained in grand jury subpoenas, including Coinbase records

16   and other information.  So this is not just relying wholesale,

17   your Honor, on unchallenged statements.

18        And the other point that I wanted to draw the Court's

19   attention to, to just make sure that we're clear here, Mr. Marx

20   repeatedly said "the government's new theory," this is "brand

21   new," but the warrant affidavit has said this from the very

22   beginning.  18(e), "by providing a valid public key, as seen in

23   the signature field, but setting the parent and state roots to

24   a series of zeros, as highlighted in one of the red circles

25   above, the false signature caused the relay to incorrectly

verify the block header that had been validly signed, but, in

fact, the proposed block had no chance to be approved for

publication to the blockchain.  The false signature caused the

relay to prematurely release the execution payload, including

the private trading transaction data, to the malicious

validator.  And once in possession of that, the malicious

validator reordered certain transactions in the proposed

block."

That theory was clearly articulated to the magistrate

judge.  There was no hiding that fact in any way.

The other point here is, once again, we strongly,

strongly contest that there is anything inappropriate as to

using the term "altered" as opposed to "reordering."  I want to

call the Court's attention here to the case law.  Everybody

agrees what happened.  There are uncontested facts that trade

A, B, C -- trade B was removed, and a totally different trade

came in.  That is clear and uncontested in multiple places, but

clear as day in 17(g).

As a result of the exploit, victim one's front run

trades were executed even though the corrupt block did not

contain that lure transaction, and the background trades were

not executed because of the tampered transactions.  What

Mr. Marx is arguing about is an interpretation of uncontested

facts.  He wants his interpretation to say X.  We want it to

say Y.  There is a mechanism for that, and it is called

1   "trial."

2              And, in fact, in *United States v. Reed*, the Southern

3   District of New York court articulated that very thing.  They

4   stated, you know, it is one thing to say an agent falsely

5   stated facts to a magistrate court.  It is totally different to

6   say that there are uncontested facts and the inferences from

7   those facts are disputed.  And that is what is going on with

8   basically every fact here.

9              What is being challenged, they're asking, first, in

10  the instance, your Honor, to do what the Supreme Court has

11  asked district courts and magistrate judges not to do, a hyper

12  technical dissection of the facts, as opposed to a totality of

13  circumstances, view each fact in isolation.  Anonymity, shell

14  companies, multiple private wallets, totally all fine, all

15  legal conduct.  And, also, let's look at this just like -- in

16  one separate transaction, but that's not what *Illinois v. Gates*

17  has governed.  That's not what *District of Columbia v. Wesby*

18  has governed.  They have, in fact, disavowed that divide and

19  conquer approach.  And, specifically, the Court should not

20  negate probable cause just because a fact can be interpreted

21  with an innocent explanation.  Almost no warrant would issue if

22  that were the case.

23             And I also want to just correct the record on another

24  point.  There has been constant argument here about the search

25  warrant affidavit in the indictment and mixing the standard.  I

P6HDPerO

1    want to be clear.  At the affidavit stage, the appropriate

2    standard is probable cause, a fair probability.  What has

3    been -- in *Illinois v. Gates*, the Supreme Court has said it

4    does not tend to fit well within principles of trial, proof

5    beyond a reasonable doubt, preponderance, or prima facie case.

6    It is a fluid assessment, a practical assessment.

7         What the grand jury here determines on probable cause

8    is completely different.  But, your Honor, this is a case

9    where, respectfully, at the time there were -- the search

10   warrant was being executed, there were certain statutes that

11   were under investigation.  That's totally appropriate.  Whether

12   or not that ends up in the search -- the indictment later on is

13   the valid process of investigation.

14        But this is a scenario, too, where there are very

15   minimal distinctions between the factual allegations in the

16   search warrant affidavit and in the indictment.  And I can

17   literally go through each one and show side by side

18   comparisons.  But I think that also speaks to a probable cause

19   determination here.

20        And the other point that I think would be just helpful

21   that I want to address for the Court very briefly, your Honor,

22   with respect to the six alleged falsities, the challenge here

23   is that we dispute that they are false, in fact, in any way,

24   and their subjective interpretations.  Whether or not tampering

25   with the blockchain process for pending trades, which is the

infrastructure for the published transactions, whether or not that affects the integrity of the blockchain, that's a subjective interpretation.

What is the agent going to testify about? Everybody agrees, everybody agrees all of these circumstances, the uncontested facts given in paragraphs 16 and 18 and confirmed in the uncontested paragraphs we showed in paragraph 17 -- he's just going to testify to those facts, and it's the interpretation of whether or not someone agrees that that affects the integrity of the blockchain? That is the very thing that *United States v. Reed* cautioned against. These are uncontested facts, and the interpretation of which does not make them false. That's not what a *Franks* hearing is designed to prevent.

And then in terms of the other ones, we have, you know -- debating here whether it's more obscure -- whether or not certain tokens at issue here, like AAVE or Shiba, are more obscure than other tokens, this is a qualifier, more obscure. And I'd like to call out one thing, too, in the reply. We noted that the term was used in the context of liquidity pools, which the search warrant made clear was a variable at play, and uncontested that it was. And the reply suggested if the agent had actually wanted to reference the fact that it was smaller liquidity pools, he should have done it in the affidavit.

Well, guess what? The affidavit in the very same

P6HDPerO

sentence says, "more obscure cryptocurrency tokens and smaller
liquidity pools." These were not facts that were hidden from
the magistrate court.

So those were the main points I wanted to address,
your Honor, but I also wanted to take the opportunity to
address any outstanding questions with respect to the search
warrant and also with respect to the motion to dismiss at all.
I'm happy to handle all of them.

THE COURT: All right. Well, let me ask you, just
getting back to the motion to dismiss, because I have concerns
about analogizing this case to spoofing cases, for reasons I've
stated previously.

MS. KUDLA: Yes.

THE COURT: I am aware of *Eisenberg*. I just want to
hear if there are any more cases that you think are analogous
to this one that demonstrate wire fraud.

MS. KUDLA: Your Honor, I think -- I'm going to
address that in two points. First, I do think the spoofing
cases are spot on. There you have the Seventh Circuit talking
about deceptive trades to get people to part with their money
that they had no intention of ever executing, and that's
exactly what we have alleged in this affidavit. You have bait
transactions directly linked to the tamper transactions. These
are a fraudulent intent.

And I just want to go to certain language in that.

1    This was *U.S. v. Fulton*.  It's a 2018 District of Connecticut

2    case, which was distinguishing *Bradley*.  And there they were

3    talking about deceptive trading practices, and they said the

4    improper focus is not on whether some parts are labeled

5    legitimate or unlawful but whether the conduct in context is

6    part and parcel of a scheme to defraud.

7             And that's what's being alleged here, that this is an

8    entire scheme to defraud, everything, part and parcel.  This is

9    an all or nothing scheme, your Honor.  The lure transactions

10   have to work, then they have to be dumped by the tampered

11   transactions.  They need the false signature.  It all works

12   together, and you cannot decouple them.  So, on the spoofing

13   cases, those are the most analogous to sending what has been

14   labeled as a quintessential half truth.

15            I want to speak to *Eisenberg* for a moment, because,

16   once again, the Court's well aware the procedural posture is

17   very different, and that was after all the evidence in the case

18   had been heard.  And what Judge Subramanian took issue with was

19   there was not testimony in the record that a user understood

20   that when you click "borrow," a consequence would have to be

21   that you have to pay it back.  Everybody just testified that

22   they understood that meant "liquidate."  We do not anticipate

23   the evidence at trial will show that.

24            The evidence at trial is designed to show, consistent

25   with victim trader and MEV-Boost software engineer's outlining

1    certain of these proposed facts in the affidavit, that there

2    was a promise, a commitment to publish the block as structured

3    by the block builder.  That is a factual issue at trial.

4        The other thing I'd like to call your Court's

5    attention to is another case.  So, the spoofing cases that I

6    think are just helpful for the Court is *United States v. Chanu*,

7    40 F.4th 528; *United States v. Corsica*, 866 F.3d 782; and

8    *United States v. Pacilio*, 85 F.4th 450.

9        But another case that is worth looking at, that's

10   relevant to the fair notice, that's relevant to just wire fraud

11   in general, is *Durand v. United States*, 161 U.S. 306 (1896).

12   What *Durand* was talking about is whether or not false promises

13   on future promises could constitute wire fraud, and what the

14   Supreme Court in 1896 found was that, future promises of

15   glittering promises of a lottery in the future held out to take

16   someone's money, when at the time you knew they were not true,

17   constituted quintessential wire fraud.

18       So while this case may present novel means for taking

19   money, the actual execution of it may be novel, this is

20   literally a tale as old as time.  It is a deceptive practice to

21   take someone's money, and that has been alleged in multiple

22   ways throughout the indictment and also in the search warrant

23   affidavit.  So I think, you know, this actually is quite simple

24   in the end.  So I would direct the Court there.

25       Any further questions?

1         THE COURT:  No.  That's helpful.

2         All right.  We are going to take --

3         MR. MARX:  Your Honor, if I may, just briefly?

4         On the *Franks* issue, there's just a couple things I

5    wanted to clarify.  Number one, one of the last things that

6    attorney Kudla said there is there'd be no point in having a

7    hearing, because all these facts are uncontested, which is a

8    word I want to come back to in a minute.

9         So, what's the agent going to testify about?  That's a

10   fundamental misunderstanding of the purpose of a *Franks*

11   hearing.  The reason why you have a *Franks* hearing is because

12   you've made a preliminary determination there are falsities in

13   the affidavit that were material to the magistrate's finding.

14   And now you have to ask, how did that happen and what was in

15   the agent's mind.  And so, as opposed to at this stage, when

16   you're looking at the corrected affidavit and taking out all

17   the false statements, the point of the hearing is to be able to

18   ask the agent directly how did you make these misstatements to

19   the magistrate?  Was it an honest mistake, or was it a

20   deliberate intent to mislead the magistrate, or at least a

21   reckless disregard.  But that's the purpose of it, not to have

22   him recite the things that are left in his corrected affidavit.

23        And with regard to the corrected affidavit, I would

24   just say, the government likes to use the word "uncontested."

25   First of all, there's a lot that's contested here, and I submit

1    the right way to get an uncontested record is for your Honor to

2    have an evidentiary hearing, not to have lawyers argue facts in

3    court.  But there's a lot contested.  But this isn't a summary

4    judgment hearing.  This is a motion for *Franks* hearing.  And

5    the only question is whether the affidavit, stripped of its

6    false statements, is sufficient to establish probable cause.

7            And I just want to point out as one sort of last

8    parting comment, I think emblematic of the extent of effort the

9    government has taken to try to fix the affidavit and correct it

10   and to put words in the agent's mouth that didn't exist, the

11   diagram itself that was shown today, that doesn't appear

12   anywhere in the affidavit.  In fact, the diagram in the

13   affidavit, which the government hasn't defended, was

14   manipulated and misleading and was one that was found on the

15   internet and changed to suggest certain things that the

16   government has now backed away from.

17           But the government doesn't get to try to fix its case.

18   The affidavit said what it said.  You take out what's left in

19   it.  And if your Honor is convinced preliminary that that may

20   have led the magistrate astray, then we need to hear from the

21   agent as to what his state of mind was.

22           THE COURT:  Thank you.

23           MS. KUDLA:  Your Honor, one point for the appellate

24   record.  Mr. Marx just mixed up diagrams.  I want to be clear,

25   the diagram shown in court today -- and I'll give it to the

P6HDPerO

1     Court to add to the record transcript -- relates to all the

2     facts contained in paragraph 18.  Mr. Marx referenced a

3     diagram.  That was a diagram contained in paragraph I think

4     15(c)(6).  We're not even remotely using that diagram.  We are

5     working on uncontested facts.  I just want to make clear that

6     the reference to diagrams are two separate things.

7              Thank you.

8              THE COURT:  Understood.  Thank you.

9              All right.  We are going to take a 15-minute break,

10    come back, and I'll hear argument on the motion to quash.

11             Thank you.

12             (Recess taken)

13             THE COURT:  Everybody please be seated.

14             We are now going to turn to the motion to quash.  I

15    just wanted to set a little bit of a time limit here, because

16    we only have until 2:00 to finish up with argument here.  I

17    don't anticipate it will take that long, but just to give you

18    all a sense, so why don't we limit it to about 15 minutes per

19    party, although I'm not sure the government will need that much

20    time with respect to this issue, so maybe 20 minutes.  For the

21    non-party one, 20 minutes, for the defense, and then whatever

22    time we have left for the government if you all have no

23    objection to that.

24             MR. FANG:  It's fine for the government, your Honor.

25             THE COURT:  Okay.  Great.

1      So, we'll hear from non-party one with respect to the

2  motion to quash.

3      MR. ALBERTS:  Good afternoon, your Honor.

4      THE COURT:  Good afternoon.

5      MR. ALBERTS:  Jeffrey Alberts, appearing on behalf of

6  non-party one with respect to the motion to quash.

7      So, rather than recapitulate our filings, because I

8  know we have limited time, I just want to start by making a

9  general observation about certain patterns that I think occur

10  throughout the different requests and the arguments that the

11  defendants have made here.

12      To start with, as the Court is well aware, the *Nixon*

13  factors, as they're applied in this circuit, are intended to

14  prevent the defendant from using a Rule 17(c) subpoena in order

15  to engage in discovery.  Rather, it's a tool for trial

16  preparation.  And the way the courts limit the ability to make

17  use of a Rule 17(c) subpoena is by applying the *Nixon*

18  standards.

19      So they have the obligation to affirmatively establish

20  that the documents that they are requesting are relevant,

21  admissible, and to identify them with specificity.  So, the two

22  things that the defendants repeatedly do in these requests and

23  in their brief in support of the request, to avoid that

24  obligation, are as follows:

25      First, with respect to relevance, they need to

1    establish that there is a fact that is a matter of consequence,

2    and then establish that the document that they're requesting

3    makes that fact of consequence more or less likely.  But the

4    way that they do that, the first step is to look at the

5    indictment, and they just find some word in the indictment or

6    some statement in the indictment, and they assume, if there's

7    an illusion to a fact or a use of a word that makes it a fact

8    of consequence, but that's obviously not how the law can work.

9         I'll try to give very simple examples here, because I

10   think this is, in some ways, a complex case, and it's good to

11   start with the simplest examples.  So if the allegation is some

12   victims are walking down the street to a sandwich shop and

13   defendants walked up and shot them, one could say, well, the

14   fact that they're going to a sandwich shop, that's mentioned,

15   so we need all of the evidence about whether you like

16   sandwiches, we need all of your credit card records where you

17   bought sandwiches, but a Court would look at that and say,

18   well, the word "sandwich" appears there, but that doesn't make

19   it relevant.

20        Similarly, the defendant might say, well, the word

21   "walking" is there, so we want all of the victim's home videos

22   in which he's ever recorded having walked.  Well, that would

23   make it more or less likely that he could walk, but that's not

24   really a fact of consequence in that action.  And that type of

25   maneuver is something that we'll see repeatedly as we go

1    through the specific requests.

2         The second thing that the defendants do here, and this

3    may be intentional or, frankly, may be inadvertent, because I

4    know a lot of lawyers aren't coders.  I personally am not a

5    coder, but they repeatedly make arguments about code that

6    suggests that code is some very different kind of

7    instrumentality, and they make arguments that would be

8    ludicrous with respect to any other kind of instrumentality.

9         So, some examples that were in our reply brief

10   include, you know, if you're driving a car -- and intent is

11   relevant as to whether you intended to run somebody over -- you

12   wouldn't say, well, we need to examine the car, and if we look

13   inside the car, intent's going to be -- we wouldn't say, well,

14   you need to serve a subpoena on General Motors and get all of

15   the specifications of the car, because the intent will somehow

16   be in the specifications of the car.  But with respect to code,

17   they repeatedly make these arguments that are disformed.  They

18   say, here's a fact of consequence.  The actions here were done

19   somehow using code.  Therefore, we need the code in order to

20   establish whatever that fact of relevance is.

21        And, frequently, they don't explain that at all, and

22   often, to somebody who's familiar with code, it would just be

23   complete nonsense.  They're just speculating, and they have no

24   idea whether what they're requesting would, in fact, make more

25   or less likely the fact that they're saying is of relevance.

1           So, with that background, I want to jump into the

2   specific request and explain why the defendants have failed to

3   meet the *Nixon* requirements for each of those requests.  So,

4   first, with respect to request number one, it's a request for

5   the entire source code for the MEV bot, and they don't really

6   explain why this would be relevant to the case but, instead,

7   they repeatedly kind of allude to the fact that the

8   expectations of either the victim traders or possibly other

9   people in the MEV-Boost ecosystem are relevant here.

10          But the only expectation that is in the portion of the

11  indictment that they cite is an expectation that a bundle that

12  is proposed will only be executed in the proposed order.  So

13  that's a very specific expectation.

14          So, the Court should then look and see, oh, have the

15  defendants explained how getting the entire MEV-Boost code will

16  somehow make more or less likely that the people who wrote that

17  code had that expectation?

18          So, the code's very complicated.  The codebase is

19  huge.  But just, you know, for the purpose of understanding why

20  this argument requires more detail than they've provided, just

21  imagine a very simple bot.  And so the bot would just say,

22  we're going to look at the MEV pool, and if there's a

23  particular token and it's higher than a certain price, then

24  propose a bundle and that would be the whole bundle.

25          How would having that bot show what the intent of the

1    coder was?  It wouldn't.  I mean, defendants have offered no

2    explanation whatsoever as to how looking at that written code

3    would show what coders intended to do.  And there's all kinds

4    of things that can be included in source code, and many of

5    these things would be incredibly, potentially devastating to

6    the victim if it was made public or if it was revealed that

7    other participants in the MEV-Boost ecosystem, just as the

8    defendants -- these include things like security precautions

9    taken, trading strategies that are taken.  This is information

10   that is valuable.  Some of it as simple as a private key to a

11   smart contract that, if it's turned over, they could then use

12   that private key to steal the cryptocurrency of non-party one.

13          THE COURT:  Setting aside relevance just on this issue

14   of the proprietary nature of this information, the defendants

15   have raised that there's a protective order here.  As I

16   understand it, you have some concerns about that.  But why

17   couldn't these be designated, and perhaps this requires an

18   amendment to the protective order, but designated attorney's

19   eyes only, plus the use of any expert, so it would not be

20   something that the defendant would have access to?  But the

21   attorneys -- I understand your point, the attorneys might not

22   know what to do with this information, but the attorneys and

23   the experts could look at this.

24          MR. ALBERTS:  Right.  Also, as a preliminary point,

25   your Honor is absolutely correct, it would require modifying

1   the current order in several ways.  But some hypothetical new

2   order could be entered that would limit it to attorneys' eyes

3   only.  But then they would immediately encounter the fact that,

4   probably like maybe you and I, these attorneys, although very

5   smart, probably can't read all of that code and analyze it and

6   make use of it.  So, presumably, they're going to call people

7   in that are familiar with the MEV-Boost ecosystem, and that's

8   exactly the group of people you don't want to be turning your

9   information over to, regardless of what they sign.

10          If you are somebody who runs this kind of bot, it

11  would allow whoever read that to, you know, have in their head

12  all kinds of information about proprietary strategies and

13  techniques that people in the secret system use, and, you know,

14  although some judges are very able to separate in their head

15  facts and make rulings on the law without considering the

16  facts, I think it's unlikely that some expert that is brought

17  in, who is very good at coding, would be like, I'm going to

18  look at all these facts, know all these proprietary details of

19  how you run this super sophisticated system, but I'll never use

20  that in any of my future conversations, or trade, et cetera.

21          And the victim shouldn't be required to subject

22  themselves to that.  It's incredibly invasive.  There's a high

23  degree of risk that they could be damaged, and there's a very,

24  very low showing of need for this information, whether in the

25  form of relevance or even in the form of admissibility.  It's

1    entirely speculative at this point.

2          With respect to the argument on the smart contract,

3    there are similar issues.  So, first of all, with respect to

4    the smart contract, there's already publicly available byte

5    code that's available.  So it's entirely possible for the

6    defendants to bring an expert that would be able to look at the

7    byte code that would show how the code operated.

8          They've said, well, maybe we would like to have the

9    source code, because it might have comments.  You know what

10   comments there are?  They're just a bunch of out-of-court

11   statements that are made by the people that are writing the

12   code, and defendants are just speculating, maybe these

13   out-of-court statements that were made by whoever wrote the

14   code will have some information that is somehow relevant to

15   this case.  But they don't explain how that is.  They don't say

16   why it would be reasonable to believe that.  And it's subject

17   to the same failings as they generally have engaged in with

18   respect to why they're entitled to have access to these

19   out-of-court communications, which they've made no showing as

20   to whether they are relevant.

21         And, finally, before I move on, I know I've indicated

22   that revealing the trading strategy could be potentially

23   damaging, but just so your Honor is aware, there's all kinds of

24   other information that is contained within the buy that is both

25   potentially devastating if the information got out to other

1    people that are familiar with the MEV ecosystem and don't

2    really seem relevant in this case.  So, I gave the example of

3    the trading strategies.  Obviously, anyone who engages in

4    trading knows it's very valuable to know how somebody else

5    trades.

6         Similarly, with respect to private keys, even with a

7    rudimentary familiarity with the Ethereum blockchain, if you

8    have a private key that allows you to control a smart contract

9    that is operating on the blockchain, that may allow you to

10   either take the cryptocurrency that is in that smart contract

11   or to make use of that other person's smart contract to take

12   actions on the Ethereum blockchain.

13        There's also other information that is referenced in

14   our brief, such as the IP addresses that are used by non-party

15   one.  And if somebody knows the IP address of a non-party, you

16   can make a denial of service attack on that IP address that

17   prevents that computer from engaging in a transaction, and then

18   you can engage in the transaction instead of the person using

19   that IP address.  So, in order to, you know, avoid putting a

20   victim at potentially existential risk, there are a number of

21   things like that that would have to be manually identified and

22   removed.

23        Finally, with respect to that process of identifying

24   the code that was running at that time, defendants have

25   speculated that non-party one may have some type of version

1   control that allows them to identify the different commits that

2   were running in all of these different files at a specific

3   point in time.  However, there are a couple of practical

4   problems.  If you try to reconstruct an entire bot code using

5   all of those different commits that are in the different files,

6   one is that it's often not possible to determine -- you can

7   determine what the most up-to-date commit was at right before

8   the transaction occurred, but you don't know whether, at the

9   time that the software ran, the most recent version was used.

10  It's sometimes the case that you use an earlier version.

11          In addition, you don't know if, at the time that the

12  software was deployed, there were configurations made at the

13  last second before the overall software's deployed, and, again,

14  that's something that happens in this environment.  And so if

15  either of those things were the case, what would be produced

16  would actually be some different set of codes that had all been

17  cobbled together but actually weren't the codes that were

18  ultimately deployed, and then were compiled into the byte code.

19          So there's tactical problems that would mean what

20  they're actually receiving is not even exactly what they're

21  arguing is relevant, setting aside the fact that they've

22  completely failed to identify any way in which this code would

23  actually make any of the facts that they've identified more or

24  less likely.

25          THE COURT:  Would it require you to recreate something

1    that doesn't presently exist?

2         MR. ALBERTS:  In a matter of speaking, yes.  It would

3    basically be saying, I need to go into all of these different

4    files, go through a process of identifying the commits that

5    have a certain date, assemble them all, and then figure -- like

6    make some type of decision about whether -- which one of the

7    commits that is prior to the date of execution was running at

8    that date, which is not necessarily recorded.

9         In addition, you wouldn't know whether or not there

10   had been a manual change to any of those things.  So you might

11   be able to pull all this together, but it wouldn't be the code

12   running on that date.  It would be some different code running

13   in a different way.

14        And to try to manually now figure out what -- the

15   alterations done on that day, is not -- that would be kind of

16   an act of discretion and speculation.  There's not an

17   independent record of that.  Like, this would be a somewhat

18   manual process.

19        I also want to point out that there's a separate

20   concern with over-breadth. I mean, they generally have

21   completely failed to identify how this entire bot source code,

22   for example, would make any fact more or less likely.  But, in

23   addition, many modules that are within this overall source code

24   aren't even arguably -- like, they concede they're not even

25   relevant.  So --

1        THE COURT:  Is your over-breadth argument also with

2   respect to their proposed -- because they propose narrowing

3   some of these requests.  Is your argument with respect to

4   over-breadth also applying to their proposed narrowing of the

5   request?

6        MR. ALBERTS:  Yes, because they offer these narrowed

7   requests that are very specific, but then they make no effort

8   whatsoever to explain why any of this narrowing would make a

9   specific fact more or less likely.

10       So, for example, they said any code that identifies

11  potential transactions in the mempool for a sandwich attack,

12  but how would identifying a potential transaction in the

13  mempool reveal whether they thought the bundle would be

14  executed in a certain proposed order, which they identified

15  have relevance.  And that was the example I gave at the

16  beginning.  Like, you may well have a very simple code or a

17  part of the code which says if the price is X, you run, but how

18  would having that in any way make it more or less likely that

19  when you proposed a bundle, you would think that it would

20  necessarily be executed in the order in which it was proposed?

21       And I don't in any way mean to suggest there wasn't

22  that expectation.  I'm just saying, looking at the code, they

23  don't explain why that would be a way to access the

24  information, or why the code would make that any more or less

25  likely.

P6HDPerO

1    I now want to talk briefly about requests four through

2   seven.

3    THE COURT:  Just to confirm, there's no longer any

4   dispute with respect to request three; is that correct?

5    Those are documents you've all agreed to produce.

6    MR. ALBERTS:  I think that's accurate.

7    So, my understanding is the defendants have clarified,

8   with respect to request number three, all they are looking for

9   is communications that took place contemporaneously with the

10   alleged exploit, not, for example, after-the-fact

11   communications, which are more what I'm going to be discussing

12   in the next section.

13    THE COURT:  Okay.

14    MR. ALBERTS:  So with respect to that, to the extent

15   my client has documents responsive to the subpoena, we're not

16   moving to quash that, but if I'm misunderstanding, let me know

17   and maybe we'll be arguing that later.

18    MS. TREFZ:  Your Honor, I can just clarify, we agree

19   with them.  I don't think there's a dispute.

20    THE COURT:  Thank you.

21    MR. ALBERTS:  Thank you.

22    So, with regard to requests four, three, and seven,

23   it's kind of difficult to get into the arguments about

24   relevance just because most of those arguments are submitted

25   under seal, so I'm going to rest on that argument, unless your

P6HDPerO

1    Honor has a specific question.

2              THE COURT:  Just, without getting into details, I

3    understand that there were privilege assertions made with

4    respect to certain portions of the communications.  Are you

5    asserting that those portions cannot be produced, because of

6    the privilege, or just because it otherwise doesn't meet the

7    *Nixon* factors?

8              MR. ALBERTS:  Just because it otherwise doesn't meet

9    the *Nixon* factors.  Talking about privilege in a privilege log

10   is a little unusual, because, as defendants point out, these

11   are documents that were voluntarily produced.  So a privilege

12   log is normally, I'm being compelled to do something, I'm

13   withholding for these reasons.  Whereas, this was a voluntary

14   production and an explanation why some of it wasn't produced.

15             THE COURT:  All right.  Was the privilege log itself

16   self produced -- I mean filed here?  I don't --

17             MS. TREFZ:  It was not filed.  I do have a copy of it

18   if the Court would like to see it, and I have copies for enough

19   people if it's useful.

20             THE COURT:  It would be.

21             All right.  Why don't we do this.

22             MR. ALBERTS:  But the primary argument we have with

23   respect to that is even they have received the -- it's their

24   burden to show that these out-of-court statements would be

25   potentially admissible and potentially relevant.  They've now

1    seen a bunch of the statements, the ones that weren't redacted,

2    and they've failed to identify any statements among those that,

3    A, make a fact of consequence more likely, and, B, would be

4    admissible.  And the admissibility argument that they did make

5    clearly fails.

6            Initially, they just said, here's some examples of

7    exceptions to the hearsay rule.  Maybe they apply.  Then later

8    they kind of abandoned all of them, except for the statement

9    against interest exception.  But, you know, as articulated in

10   our brief, they don't prove that any of those statements would

11   qualify for that exception, and those statements would not be

12   relevant.  So, if anything, their use of the unredacted portion

13   simply cuts against their argument that they should be able to

14   get an order compelling non-party one to produce the redacted

15   portions.

16           With regard to requests eight and nine, these

17   requests, they're not even arguably related to the incidents

18   that are identified in the indictment.  So, as I said before,

19   with respect to the other requests, they kind of quote out of

20   context some portion of the indictment and then they said --

21   they speculate, well, maybe code will be relevant to that.

22           With respect to these requests, they're asking for

23   documents concerning other MEV bots, not the MEV-Boost used

24   here, and general financial information, and the profitability

25   of non-party one doesn't make any fact of more or less

1   consequence.  People can be victims whether they are

2   impoverished or whether they're wealthy.  Their interest in

3   somehow trying to prejudice the jury about this being a wealthy

4   victim is not a proper reason to get access to these records.

5          Similarly, with the other MEV-Boosts, there's no

6   reason to think that the identity of all these other MEV bots

7   that were operating on the Ethereum blockchain or in the

8   mempool would somehow reveal anything that is, of course,

9   consequences.  The only thing that they've said is they focused

10  in, and they've done this a couple times with respect to

11  paragraph 13.  They note that the words "typical" and

12  "arbitrage" are both words that appear there, and then they

13  kind of say, well, it's a fact of consequence whether generally

14  these -- non-party one was engaged in typical arbitrage.  But

15  that's not at all what paragraph 13 says.

16         The only thing that paragraph 13 in any way discusses

17  with respect to the word "typical" is that what searches

18  typically propose is a bundle of transactions on the belief

19  that those three transactions will be executed exactly in the

20  proposed order.  And that has nothing to do with whether,

21  generally, the trading strategy that is employed by the

22  specific party in question is a matter that is of consequence

23  in this action.

24         And, more generally, I would just like to make the

25  point that were this to be a case in which defendants had,

1    like, stolen a key to a brokerage house, and they literally

2    broke in using their physical key, and they stole it, and then

3    they said, well, we think it's -- the expectations of people in

4    the brokerage house as to whether someone would come in with a

5    key are relevant, so what we need access to is every single key

6    that they have in their whole building, information about where

7    all the security guards stand, we want the identity of all the

8    security guards and all their trading information for any

9    future transactions, and their trading technology, because we

10   need to identify them, the Court would deny it as obviously

11   outrageous.

12        But they're pretending that because we're in an

13   environment of cryptocurrency and code, somehow they need all

14   of that propriety information in order to show they didn't

15   break in using a key.  That's completely improper, highly

16   prejudicial to my client, and utterly fails to meet any of the

17   *Nixon* requirements.

18             THE COURT:  Thank you.

19             MS. TREFZ:  Very different sizes of lawyers here.

20   Danielle and I are bringing it down.  Patrick and Jeff are

21   bringing it up.

22        Katie Trefz, your Honor, for the defendants on the

23   subpoena.

24        A few points.  Number one, just before I forget, let

25   me hand up the privilege log, and this includes the cover

1    letter to the privilege log as well.

2              THE COURT:  Thank you.

3              MS. TREFZ:  Thank you.

4              So, in general, our view is this is a subpoena that is

5    a good faith effort to obtain evidence pretrial, so that it can

6    be inspected and advanced for the purpose of the Peraire-Buenos

7    to see if they can use it, and whether they want to use it at

8    trial.  That's the instruction from *Bowman Dairy*, which is one

9    of the two Supreme Court cases.

10             And the subpoena asks for targeted information.  It's

11   tied directly to the allegations in the indictment.  I take

12   issue with the suggestion that this is all just some kind of

13   pretense to get their secret proprietary information.  We would

14   not be here if there weren't allegations in the indictment

15   about the code.

16             This is a -- we get to challenge the government's

17   proof of every element.  This is unlike what we've been talking

18   about for most of the morning.  This is a situation where all

19   of the facts -- essentially, we'll see which ones are actually

20   contested at trial, of course, but as of now, all of the facts

21   are contested.  And an attempt to negate the government's proof

22   on any element is not impeachment.  It's an effort to

23   affirmatively defend the case.

24             There's a lot of focus I think in the briefing both

25   from non-party one and the government about this being all

1    about the defendants' intent.  There are many other elements of

2    wire fraud, including -- we've heard discussion today from the

3    government about alleged expectations that were violated, how

4    the alleged victim transactions worked.  And in the indictment

5    itself, those are described as coded conditions.  And it all

6    happens through the computer code.

7            So let me also go through kind of the different

8    sections of the different sets of requests here.  Let me start

9    just briefly on the standard.  There are basically two Supreme

10   Court cases on Rule 17, *Bowman Dairy* and *Nixon*.  Otherwise, the

11   kind of just discussion of the requirements, just as have been

12   developed primarily through the district courts, it's a

13   case-by-case analysis.  *Nixon* specifically recognized that it

14   would be.

15           Because it's a fact specific inquiry, it's left to the

16   trial court to understand, you know, whether requests seek

17   relevant evidentiary material.  The cases really reflect that

18   case specific inquiry, and I think if you take all of the cases

19   that all of the parties and non-parties have cited, you see

20   this.

21           I think you see a few principles out of them.  One,

22   there's a concern that Rule 17 needs to be used as a good faith

23   effort to gather evidence for trial, not as a broad discovery

24   device.  This comes through in kind of two ways, a concern Rule

25   17 not be used as an end run around the government's Rule 16

1    discovery obligations.  That's really a concern about what the

2    government can seek from the government.

3            The second is that you see a concern that Rule 17 not

4    be used to turn criminal discovery into civil discovery.  It

5    can't be a fishing expedition.  You see this concern expressed

6    with courts, particularly with a broad, all documents request

7    covering long periods of time, all sorts of communications.

8            The *Nixon* standard is built around those concerns, and

9    it effectively is a double check on the parties that were

10   actually looking for material -- you know, good faith efforts

11   to get trial materials.  And so I think, with all of that in

12   mind, I think there's some discussion in the briefing on how

13   much one has to prove evidence is, in fact, admissible without

14   having the evidence in your hands.

15           And I think we would just point out that I think if

16   you look in the cases, starting with *Nixon*, but also in the

17   rest of the cases, this is a concept that is really about, is

18   it probably going to be admissible?  Is it -- are we really

19   looking for likely admissible material, as opposed to simply,

20   in particular, there's usually a big concern about witness

21   statements, you know, a summary of what a witness said.

22           So I think we've met all of these standards here, and

23   I would just note that, as thoughtful courts look to figure out

24   whether the standard has been met, they usually take into

25   account the broader circumstances, including the uncertainty

1    and fairness concerns that come with a defendant seeking

2    evidence as they exercise their discretion.  And you see that

3    reflected in *Nixon* itself, and so I just wanted to preface

4    that, because I think that there's some discussion in the

5    papers about that, especially on the -- in the kind of

6    pleadings that were filed on Friday night.

7            On the protective order, non-party one doesn't cite a

8    single case for the idea that retained experts, who have agreed

9    to abide by the provisions of a protective order, will ignore a

10   protective order for the limits on its use.  The whole premise

11   of their argument flies in the face of how protective orders

12   are regularly used in a case like this, and the American

13   judicial system generally, and the idea that anyone associated

14   with this case would use the information to hack them or

15   intentionally -- or some kind of inappropriate ruse to get them

16   to give up their proprietary information.  It's just

17   ridiculous.

18           THE COURT:  What about the argument that it's

19   different to compartmentalize, because it could be a

20   situation -- and this gets into technicalities that I perhaps

21   don't understand, but that you can't -- an expert looking at

22   some of this information, no matter what, couldn't put it out

23   of their head and not use the information in the future, as I

24   understand at least in part their argument to be.  That it's

25   difficult to -- even if they wanted to comply with the court

1  order, it's difficult to compartmentalize what you've learned

2  through looking at this information.

3       MS. TREFZ:  I think my first point and/or my first

4  response there would be that's not a problem that's unique to

5  this situation, and if the Court were to accept that as the

6  reason to not -- that a protective order is inadequate here,

7  that that would be true for tons of protective orders all

8  across the justice system, civil and criminal.

9       There are regularly "attorney's eyes only" and

10  "attorney's experts only" provisions in all sorts of cases,

11  trade secret cases that are kind of at the heart of this.  Here

12  we're talking about the defendant's ability to defend itself

13  against criminal charges, and there's no case that they have

14  cited when -- we haven't found one where a protective order has

15  been deemed inadequate to make that production.

16       I think turning, I guess, to the -- we would be fine

17  to modify the protective order.  We would need an expert to be

18  able to also look at the code, but we, you know, would also

19  just note that our clients are -- they're not accused of

20  hacking anything.  They are accused of using publicly available

21  code.

22       They're not allowed to trade at all right now pursuant

23  to their conditions of release, and, you know, whether on -- no

24  matter the system.  And I think that the suggestion that they

25  would, like, kind of are seeking this information so they can

1    use it, it's baseless and should be rejected.

2            THE COURT:  But I assume you have no objection to a

3    protective order that would allow you all, only you all and the

4    experts, to view this information.

5            MS. TREFZ:  We understand that that would be --

6    whether that's necessary, I disagree with, but, also, we would

7    certainly accept it for the purpose of getting this

8    information.

9            So, with respect to requests one and two, I think, you

10   know, we started with the indictment, not to pick out words but

11   to look at the allegations as to what the government is

12   planning to prove.  The coded allegations -- or the coded

13   conditions are alleged.  The government alleges that the victim

14   traders' proposed transactions had coded conditions that were

15   thwarted, that -- those coded conditions must appear in the

16   code, and so I think this is fairly like -- not to be -- I

17   don't mean to sound flippant about it, if I did

18   unintentionally, but it's a direct line between an allegation

19   and the code itself.

20           THE COURT:  But do they exist in the public part of

21   the code?

22           MS. TREFZ:  Not what we understand.

23           THE COURT:  All right.

24           MS. TREFZ:  It would be the first I'm hearing about

25   it, if true, and we would note the coded conditions, if they're

1    in the code, they must be proven with the code.  That's an

2    evidentiary issue, a 1002 issue.  I know there's some

3    discussion whether it can be proven through witness testimony.

4    I guess we'll see at a later stage whether that's appropriate,

5    but we would note that there's a 1002 issue there, too.

6         We also would note that everything in this system, and

7    I think the government has made this point earlier, is

8    preprogrammed.  The government has made the point it all occurs

9    in 12 seconds.  The only way you can tell somebody's

10   expectations about what's going to happen in any given

11   transaction is what the computer was coded to do or say.

12        For example, the example of identifying a potential

13   transaction, we were talking earlier about what function the

14   lure transaction served in this alleged scheme.  The MEV bot's

15   identification of transactions to potentially sandwich is an

16   explanation for why the lure worked or didn't, as the

17   government alleges here.

18        The MEV-Boost, we understand, scans the mempool, runs

19   analysis, comes up with trades, directs the inclusion of trades

20   and smart contracts.  And then the smart contract

21   theoretically, the source code in particular, would contain

22   coded provisions where sandwiches or any other trader expressly

23   instructs what's going to happen in a transaction.

24        There is a point about the source code and comments I

25   think to the source code.  We believe the source code for this

1    non-party one, which is a company, would be a business record.

2    This suggestion it would be hearsay is a new argument that was

3    presented here, but my -- just our basis for admissibility on

4    both of these requests is that it's a business record.

5            I think there was a discussion about how could it

6    possibly be -- how could expectations possibly be relevant

7    here.  There's a suggestion in non-party one's briefing and

8    Mr. Alberts' presentation about the expectations of the traders

9    maybe aren't relevant in some way.  I think we've just talked

10   for quite a while about the government intends to prove that

11   expectations were thwarted.

12           So, that's what I wanted to say on requests one to

13   two, unless the Court has any questions.

14           THE COURT:  What's the distinction between one and

15   two?  I think I understand the basis for one, but I'm not sure

16   I understand the basis of the relevance for two.

17           MS. TREFZ:  So request one is about the MEV-Boost, and

18   request two is about the smart contract.  The smart contract,

19   my understanding, is the actual thing that direct the trades or

20   explains the trade that's going to happen, and the MEV-Boost is

21   what kind of analyzes and then I think puts the potential trade

22   into the smart contract.

23           THE COURT:  All right.  The coded conditions.

24           MS. TREFZ:  Yes.

25           THE COURT:  Does that fall under one or two?

P6HDPerO

1          MS. TREFZ:  We believe it falls under -- we believe it

2     likely falls under at least two, and that it may also fall

3     under one.

4          This is a little bit of a challenge, you know, because

5     the government doesn't explain where the coded conditions come

6     from, and so, you know, our goal is to make sure we have the

7     evidence that we need to defend against that claim.  And if it

8     doesn't exist in either spot, then that negates the

9     government's proof.

10          THE COURT:  All right.  We're running a little short

11     on time.

12          MS. TREFZ:  Yes.

13          THE COURT:  So for five to seven --

14          MS. TREFZ:  Yes.

15          THE COURT:  -- can you address why you aren't

16     prohibited from receiving these documents under Rule 17(h)?

17          MS. TREFZ:  Yes.  I think Rule 17(h) is primarily

18     focused on witness statements that you would take in a -- in

19     like a --

20          THE COURT:  An investigatory sense --

21          MS. TREFZ:  An investigation.  I'm not purporting to

22     quote all of the case law around it, but that's my sense of

23     what you see in the cases, as to what the issue is there.

24     Here, these are communications.

25          I did just want to briefly address, we did not abandon

1    our other potential, you know, admissible arguments.  We noted

2    that 803(3) and, in fact, non-hearsay approaches for

3    directives, questions, demands, threats, all of that, is not

4    for the truth.  Those are -- and we believe that we have it --

5    I'm happy, in a closed setting, to provide details as to which

6    exact -- as to examples non-party one is concerned about that

7    still --

8            THE COURT:  All right.  Why don't -- well, we'll get

9    there, but go ahead.

10           MS. TREFZ:  I think, finally, with request to requests

11   eight to nine, I think non-party one's concern -- the main

12   argument's about kind of interpretation of paragraph 13.  And I

13   think they call our interpretation "preposterous," or something

14   like that.  But, just, if we look at paragraph 13, what it says

15   is that, "a searcher is a trader who looks for arbitrage

16   opportunities using automated bots.  The searcher sends the

17   builder a proposed bundle.  The bundle typically consists of a

18   sandwich."

19           So we think it's pretty clear from paragraph 13 that

20   the government is alleging a typical trade in this circumstance

21   is a sandwich trade.  We disagree with that interpretation or

22   we disagree with that allegation, and we believe that it's --

23   that evidence related to what a typical search or bundle is,

24   whether non-party one is a typical searcher and whether this

25   alleged exploit was a threat to the blockchain, are all

1    explored by requests eight to nine.

2         There are indications in particular that non-party one

3    is not a typical actor in this space, and the information we're

4    requesting here will allow us to quantify the volume of the

5    sandwich trades done by non-party one as to others.  And we can

6    use publicly available information for the latter.

7         And then the place in that --

8         THE COURT:  Why is whether -- what they did, whether

9    that was typical or not, why is that relevant to any of the

10   charges here?

11        MS. TREFZ:  Well, we start with the indictment, which

12   alleges that these are typical transactions, and, you know, I'm

13   not entirely sure whether the government's case depends on

14   showing that non-party one was a typical actor in this

15   circumstance, but it's -- or in this environment, but it is

16   alleged in paragraph 13 of the indictment.

17        And then, also, to the extent that materiality and

18   expectations are an objective standard, then you could imagine

19   the subjective expectations and the characterization of them as

20   to whether they are typical and would reflect the objective,

21   you know, understandings of or expectations of the -- of the

22   environment would be kind of -- whether they're typical would I

23   think inform that.

24        That came out a little mangled, and I'm happy to try

25   again if it's useful.

1          THE COURT:  I think I understand where you're going.

2          Getting back to the statements and whether -- so

3     getting back to four or five to seven, just briefly.

4          MS. TREFZ:  Yes.  Yes.

5          THE COURT:  Addressing the argument that non-party one

6     counsel's made about whether the certain statements were

7     admissible, and you were saying you would address that in a

8     closed setting, are you referring to the statements that are

9     referenced in the brief that you already have access to and how

10    those are admissible?  Is that what you're referring to?

11         MS. TREFZ:  Yeah, that's an example.  But, I mean, I'm

12    happy to provide further examples if that's necessary.

13         THE COURT:  What would be helpful, I think, is if you

14    submit a letter -- I understand it would be under seal -- with

15    the statements that you already know of and that are outlined

16    in your brief, and the basis for admissibility of those

17    statements.

18         MS. TREFZ:  Sure.

19         The only last thing that I would say on that

20    particular set of requests is I think there was a broad attack

21    on relevance related to those requests.  And let me just

22    briefly say, the indictment alleges post-exploit actions are

23    relevant to show intent retrospectively.  We will likely end up

24    disputing that, but that's what the argument is.  And, also,

25    that they are potentially relevant for money laundering, if the

1   government is permitted to put on evidence related to intent in

2   that way, we get to contest and contextualize the government's

3   allegations regarding those actions and advance our own

4   narrative.

5          THE COURT:  But how are those statements that the

6   defendants were not parties to, how would that have informed

7   their post-exploit conduct?

8          MS. TREFZ:  Yes.  And let me just check my highlighted

9   version to make sure that I'm not speaking out of turn.  Give

10  me a moment.

11         Okay.  So, for example, the indictment alleges that

12  the Peraire-Buenos -- that the Peraire-Buenos refused to return

13  money, and they may argue that -- sorry.  So the government has

14  characterized actions taken by the Peraire-Buenos, including

15  the fact that they did not return the funds when asked to do so

16  by the sandwichers or other participants in the system, like an

17  alleged representative of the Ethereum network, are relevant to

18  the Peraire-Buenos' intent.  And I think, as we explained in

19  our brief, we believe that communications would be relevant to

20  explaining an alternative explanation for that conduct.

21         And I'm seeing that it's highlighted, but it's on page

22  16 of our brief --

23         THE COURT:  All right.

24         MS. TREFZ:  -- as an example.  I guess the other point

25  I would make is the fact that Tether froze and Ethereum flagged

1    as an exploit, we believe that communications could be relevant

2    to -- underlying the reason why those actions were taken.

3            And then, finally, if -- and, again, I'm just working

4    around the potential sealing issues here.  Finally, to the

5    extent the Court finds the relevant vagueness issues, the fair

6    notice issues need to wait until later, which is obviously not

7    what we've argued, and that a record should be developed with

8    respect to them, we would note that these communications are

9    relevant to that, including communications with third parties

10   about steps that they might need to take.  And -- yeah.

11           THE COURT:  All right.  Mr. Fang, are you arguing on

12   behalf of the government with respect to this?

13           MR. FANG:  Yes, your Honor.

14           Your Honor, I want to start with a few background

15   foundational points after hearing the presentation by the other

16   attorneys.

17           Of course, there's no dispute the defendants get to

18   challenge the government's proof at trial.  The question here

19   is whether Rule 17 is the proper procedural vehicle to do that.

20   And what *Nixon* makes clear, your Honor, is that it is, as

21   counsel for non-party one said, it is trial -- the purpose is

22   to obtain specific pieces of evidence that are themselves, at

23   the time the documents are sought, relevant and admissible at

24   trial.  That's the point of *Nixon*.  They're admissible at

25   trial.

1    And I agree with counsel for the defendants that, you

2 know, a lot of *Nixon's* concepts are fleshed out by the trial

3 courts, and that makes sense, because a lot of the litigation

4 as it relates to Rule 17 happens in district court.  So

5 district courts do have a body of case law that they have

6 developed, including in this circuit.  And the principles that

7 can be drawn from this are clear, your Honor.

8    Rule 17 is not meant to obtain leads as to the

9 existence of additional documentary evidence or to seek

10 information that simply relates to the defendants' case.

11 That's *Gross*.  It's insufficient to simply show that they are

12 potentially relevant or "may be admissible."  That's *RW Pro*

13 *Leasing Services*.  And *Jenkins* also establishes the

14 proposition, again, that potential relevance is not sufficient

15 to meet the *Nixon* standard.

16    What *Nixon* does require, as district courts have

17 reaffirmed, is that the party that's seeking the documents has

18 to specifically identify the material sought and show why they

19 are relevant and admissible.  That's *Brown*.  They have to meet

20 admissibility and relevance at the time they're sought.  And

21 that's *Cherry*.  And that the defendants bear the burden, and as

22 set forth more fully in the government's submission, the

23 defendants failed to meet that standard.

24    Now, with respect to request four, which, again, seeks

25 the redacted portions of hundreds of pages of a group chat

1  among non-party one and other victims, the defendants are not

2  on this chat, and I think your Honor correctly was attuned to

3  that fact, not only with respect to request four, but five

4  through seven as well.  And so what non-party one is discussing

5  with other individuals after the fact, after the exploit, is

6  not relevant to the defendants' fraudulent intent.  It

7  occurred, again, after the exploit had already occurred.

8      With respect to hearsay, your Honor, it's not simply

9  enough to say that these communications theoretically could go

10  to a victim's state of mind, because, again, that argument

11  proves too much.  Any declarative statement, any communication

12  theoretically could go to a victim's state of mind, but that

13  does not equal admissibility.

14      I think the point is that there's a fair amount of

15  speculation as to what is in the communications that are sought

16  in the requests four through seven, and that speculation shows

17  that there is a specificity problem.  And I would just note for

18  your Honor Judge Furman's decision in *United States v. Shu*

19  notes that, in that case, Judge Furman quashed a Rule 17

20  subpoena that sought all communications relating to a

21  particular topic, because there's no showing that all of those

22  communications are admissible.

23      The point is that Rule 17 is a procedural tool to

24  allow a party to say, there is a piece of evidence that is

25  itself admissible, that's relevant, and we are going to compel

the obtaining of that material.  So, at most, your Honor, from

a read of the defendants' brief, it sounds like requests four

through seven at most seek impeachment evidence.  For example,

any evidence of bias, evidence that the defendants may wish to

use to cross-examine.

But there are at least three problems with this

theory.  The first is there is a robust body of case law that

says that you can't use Rule 17 to get impeachment evidence

before trial.  That's problem number one.  Problem number two

is that Rules 608 and 613 of the Federal Rules of Evidence,

they limit the use of extrinsic evidence for impeachment, so

that in and itself raises an admissibility question in so far

as that evidence, that intrinsic piece of evidence can't be

admitted at trial.

Now, again, there is also a specificity issue here,

because just -- even if the Court were to accept the

proposition that requests four through seven may potentially

yield impeachment, again, that's not enough for *Nixon* under the

cases that apply *Nixon* in the circuit.

So, with respect to requests five through seven, your

Honor, again, I think my takeaway from defense counsel's

presentation is there's a lot of speculation about what could

be in these documents, but that's not relevant.  What the --

again, requests five through seven, what the victims are

talking about with other witnesses, with other entities after

1  the exploit is not -- is simply not relevant to the central

2  question here, which is the defendants' fraudulent intent.

3           Again, it bears noting that the defendants aren't on

4  these messages here either, so it's hard to imagine a basis for

5  relevance.  I think requests five through seven also run head

6  long into hearsay problems, and I think the fact that

7  defendants can articulate some theoretical reason why certain

8  communications may not be hearsay doesn't satisfy the standard

9  of needing to show, at the time the documents are sought, that

10  the material that you were seeking is itself admissible and

11  it's relevant.

12           I'd just like to quote very briefly from *Rich*, one of

13  the cases cited in the government's brief.  "A mere hope that

14  the documents, if produced, may contain evidence favorable to

15  the defendants' case will not suffice, because Rule 17 requires

16  a showing that the materials sought are currently admissible in

17  evidence."

18           And, again, as to requests five through seven, there's

19  also a specificity problem.  Page 10 of defendants' motion for

20  Rule 17 subpoena I think says, because it's unclear whether

21  non-party one produced complete communications, the subpoena is

22  seeking those now.  That level of speculation betrays the

23  exploratory and expeditionary nature of these requests here.

24           And so, your Honor, just a quick point in response to

25  the comments about defendants' post-exploit activity.  The

1    government is seeking or would likely seek to introduce

2    evidence of the defendants' post-exploit activity, because that

3    is probative as to the defendants' intent ex ante, and of

4    course that's an element of wire fraud the government bears the

5    burden of proving.  But it does not follow from that

6    proposition that the defendants' post-exploit activity is

7    probative as to their intent.  It does not follow that

8    statements, communications among victims after the fact that

9    defendants are not on would be relevant to the defendants'

10   conduct, which for all we know the victims may not even have

11   known about all these transfers of funds.

12            And I think there was also an argument that these

13   communications may be relevant as to the defendants' refusal to

14   return money, but, again, these aren't communications with the

15   defendants.  There's no indication that the defendants even saw

16   these communications, so there's no basis to believe that they

17   would be relevant as to the defendants' state of mind as to why

18   they didn't return the money.  If you didn't even see a

19   communication, some sort of -- for all we know, it's as if the

20   communications to the defendants never existed, when they were

21   making the decision as to whether they were to return the money

22   or not.  So we don't believe that's a basis for relevance

23   either.

24            THE COURT:  We're running out of time here, so I just

25   want you to address, for requests eight to nine, Ms. Trefz

raised it was unclear whether you all are relying on whether

the charges either sort of turn at all on whether the sandwich

attack trades are typical.  She explained that that was part of

the basis for requests eight and nine.

What's your response to that?

MR. FANG:  Your Honor, I don't think at this juncture

we're prepared to address what -- the full contours of what

that evidence would look like, but suffice to say, in terms of

presenting the government's case about the story of what

happened, it may be -- it would be necessary to, at a minimum,

explain what the transactions that are the subject of this case

are in terms of non-party one's transactions, the defendants'

transactions, everything that my colleagues mentioned today.

But, again, I think the transactions at issue --

THE COURT:  Not what the typical trades are.

MR. FANG:  That's right.  And I think a couple of

statements by the defendants are informative.  Page 11 of the

brief, it may be important to inform the jury about the scale

and nature of these trading activities.  That does not equal

relevance.

I think defense counsel also said, whether non-party

one is a sandwich trader is explored by requests eight and

nine.  That also, again, betrays the exploratory expeditionary

nature of the subpoena, which is simply not appropriate for

Rule 17.  And, in fact, the only conceivable purpose of seeking

1    non-party one's other trading activity and financial

2    wherewithal is, presumably, for the purposes of impeachment.

3    But, again, whatever minimal probative value that has, and we

4    would submit there is none, would simply be dwarfed by not only

5    the unfair prejudice to non-party one, but also the likelihood

6    of misleading and confusing the jury about the issues and the

7    conduct in this case.

8            This case, as defendants recognize, isn't a case where

9    a sandwich trader has been charged.  And so introducing sort of

10   what non-party one does with respect to its other trading

11   activities is simply not relevant to whether the defendants

12   executed and devised a scheme to defraud non-party one and

13   other victims.

14           And then, finally, your Honor, again, I think the

15   impeachment evidence just can't be sought prior to trial or

16   obtained prior to trial on a Rule 17 subpoena.  And so that's,

17   again, another independent reason to quash those requests.

18           Unless the Court has any questions, I'm happy to rest

19   on the government's submission.

20           THE COURT:  Thank you, Mr. Fang.

21           Very, very briefly.

22           MR. ALBERTS:  There's one point that I think is

23   incredibly important that I want to make.  That is, the

24   defendants have completely failed to articulate how the code

25   they're requesting would show the expectations that they say

1    they show.  They gave one example only, which is to say, the

2    code must be relevant, because the government alleged that

3    there were coded expectations.  That is a flat misreading of

4    the indictment, and it's indicative of the general misuse of

5    the concept of code by defendants.

6           What the indictment says is as follows.  The victim

7    traders' bundles included coded conditions.  They just

8    pretended, like the indictment said, that the code, the source

9    bot code including coded conditions.  That's false.  The

10   bundles are output.  The bot is a huge, complex system of code

11   that generated that output.  That would be like saying somebody

12   who trades on the stock market, if they send out a request to a

13   counterpart that says, execute the trade only if A, B, and C,

14   that information entitled them to obtain the entire set of

15   policies about trading of that trading company.  It's

16   completely false.

17          They completely mischaracterized the indictment.

18   They've made no showing whatsoever that there is a fact that is

19   of consequence that would be made more or less likely by

20   request one or request two.

21          The coded conditions come from request three, which is

22   the one that we don't oppose.

23          THE COURT:  All right.

24          MS. TREFZ:  Your Honor, I would only say that the

25   government has not suggested that requests one and two seek

1    information that is not relevant to the indictment, and this is

2    a case that the government has charged and we are defending.

3    So --

4         THE COURT:  All right.  Thank you.

5         So it's been a long but productive day I would say.

6    Thank you all for really excellent argument.  This has been

7    incredibly helpful.

8         It's going to take me a little bit of time to work

9    through all this, but I'm going to try my best to make a

10   decision quickly.  But I wouldn't expect anything in the next

11   two weeks, I would say.  So, I'm hoping not to do anything that

12   will impact the schedule here, and move as quickly as I can,

13   but it is going to take me some time to make a decision on all

14   these issues.  So, I will endeavor to do so as quickly as I can

15   given the complex and novel nature of this case.

16        Is there anything else for us to discuss now?

17        Mr. Fang?

18        MR. FANG:  No, your Honor.

19        THE COURT:  Counsel for defendants?

20        MR. MARX:  No, your Honor.  Thank you.

21        MS. TREFZ:  Just may we please do an under-seal

22   submission addressing the issues that you've identified, and by

23   when shall we do it?

24        THE COURT:  Yes.  Can you do so by Friday?

25        MS. TREFZ:  We will, if that's the Court's request.

P6HDPerO

1         THE COURT:  All right.  Let's do so by Friday.

2         MR. ALBERTS:  We would request the opportunity to

3    oppose that, also under seal.

4         THE COURT:  All right.  I will give you until the

5    24th.  All right.

6         MR. ALBERTS:  Thank you, your Honor.

7         THE COURT:  Thank you.  We are adjourned.

8         (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25