Court Exhibit 32
147
PAFVPER3

ROBERT MILLER,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state your full name for the record, spelling out your last name slowly.

THE WITNESS: Robert Miller, R-O-B-E-R-T, M-I-L-L-E-R.

THE DEPUTY CLERK: Thank you. Please be seated.

DIRECT EXAMINATION

BY MR. FANG:

Q. Good afternoon, Mr. Miller.

A. Good afternoon.

Q. Where do you work?

A. Flashbots.

Q. And, Mr. Miller, what is Flashbots?

A. A infrastructure company in crypto.

Q. And what products, if any, does Flashbots develop?

A. MEV-Boost, among other products that are crypto infrastructure.

Q. And is that MEV-Boost M-E-V boost?

A. Yes.

Q. And we'll come back to MEV-Boost in a second in greater detail. But, for now, what type of a product is MEV-Boost?

A. MEV-Boost is software that Ethereum validators run to outsource the ordering of their blocks in order to make more money.

Q. Mr. Miller, what is your current title at Flashbots?

A. I lead the product and engineering team. I'm also a steward.
Q. What is a steward?
A. It's our version of mission-driven servant leadership.
Q. How long have you worked for Flashbots?
A. About four and a half years.
Q. How long have you served in your current role on the product and engineering team?
A. About four years.
Q. And at a high level, what are your roles and responsibilities as the lead of the product and engineering team?
A. I set overall direction, priorities, I manage the team leads, and I set culture as well.
Q. Now, you mentioned MEV-Boost. When did you start working on MEV-Boost?
A. The company started to work on MEV-Boost in late 2021/early 2022.
Q. And at a high level, what was your role with respect to MEV-Boost?
A. I oversaw the development, testing, and adoption of MEV-Boost.
Q. Did there come a time when you learned about an issue with the MEV-Boost software?
A. Yes.

Q. Approximately when did that issue occur?
A. Early April 2023.
Q. How did you learn about that issue that occurred in early April 2023?
A. I woke up one morning, I looked at my phone, and I had many messages from folks in the community and Flashbots team telling me there had been an incident. People had lost money, and I needed to get on urgently, get on the phone urgently.
Q. And what did you learn about that incident at a high level?
A. There had been a bug in one of the important pieces of software in the MEV-Boost ecosystem that had caused users to lose money.
Q. At that time, did you learn approximately how much money had been lost?
A. At the time we thought somewhere between 15, $20 million, as I remember.
Q. Mr. Miller, you mentioned the term "bug." What's a bug?
A. A bug would be when software doesn't work in the intended way.
Q. And who exploited that software at a high level?
A. The party that exploited the software at a high level was a Ethereum validator; so it was one party that used the software that had a bug.
Q. And is the Ethereum validator the same party that you mentioned that outsources ordering?

A. Yes.

Q. And just to be clear, what did you learn, again, at a high level, about what software was exploited?

A. What did I learn at a high level about what software was exploited. There was a bug in one of the important code bases called the MEV-Boost relay, where the MEV-Boost relay was checking to see that the right validator was communicating with the relay, but not that the validator was communicating kind of the correct -- the correct content that they should be communicating. They weren't communicating the right way.

So we checked to see was this the right person communicating with us, not necessarily was this the right thing that they are communicating. And, as a result, the relay in question revealed block contents in a context when they shouldn't have because the contents that the validator had communicated were not actually something that could be included on the Ethereum chain.

Q. And, rest assured, we'll come back to that, all of that later as well.

What, if anything, Mr. Miller, did Flashbots do in response to the incident?

A. Flashbots helped organize meetings of people to investigate and talk about the incident. We investigated what happened and tried to find a root cause. We created an update to the software to patch the bug. And we rolled out that update and

kind of worked with other parties to roll the update out to their software that they were running as well.
Q. And what role, if any, did you specifically have in Flashbots's response?
A. I oversaw the overall response.
Q. Did there come a time when the perpetrators of this incident reached out to you?
A. Yes.
Q. How did they reach out?
A. Over email.
Q. Did they identify themselves?
A. They identified themselves as a pseudonym, Low Carb Crusader, but not with their real identities.
Q. Approximately how long after the incident did they reach out?
A. A few weeks. I don't remember the exact number of days, but a few weeks.
Q. At a high level, what, if anything, were they asking you to do?
A. They had asked me to talk about the incident in a neutral way, so to not describe it as an exploit, and to refer to them in a neutral way as well.

So, at the time, the incident had received quite a bit of attention in the community. It was a lot of money. And so people were referring to them in a way that seemed in a

negative light, and they wanted to be named in a more neutral light, like Low Carb Crusader, the name that they used. So they wanted to be -- the incident to be talked about neutral and them sort of receiving a neutral name.

And in return for me talking about the incident in a neutral way and them having a neutral name, they were willing to disclose details of what they called another strategy that could have the same effect as the incident in early April did.

Q. Ultimately, did you agree to their proposal, Mr. Miller?

A. Yes.

Q. Did Low Carb Crusader ever reveal its true identity?

A. No.

Q. Mr. Miller, do you know James and Anton Peraire-Bueno?

A. Yes.

Q. Were you in communication with them after the exploit?

A. Yes.

Q. Regarding what, at a high level?

A. James and Anton were users of Flashbots and Flashbots's products. They ran arbitrage bots, and they were quite good at doing so also. So as the person responsible for Flashbots's product and engineering team, I talked to them as users of our products and about the market, about crypto more broadly.

Q. And did either of them ever mention any involvement with Low Carb Crusader?

A. No.

Q. Mr. Miller, are you testifying today pursuant to a trial subpoena?

A. I have been subpoenaed by the prosecution, as well as the defense. Both.

Q. All right. I want to talk a little bit about your background.

Where did you grow up?

A. Minnesota mostly.

Q. What higher education, if any, do you have?

A. I have a bachelor's degree.

Q. What did you study?

A. Economics mostly.

Q. Briefly summarize your professional experience before joining Flashbots.

A. I worked at a trading firm, Roth trading firm, doing algorithmic trading, so trying to programmatically buy and sell assets first. I did a series of healthcare start-ups. And then I worked at another crypto infrastructure company before Flashbots.

At the same time that I was doing that, I ran M-E-V searching bots. I'm sure we'll talk about it a little bit more. In particular, I ran arbitrage bots that tried to buy assets for low prices and sell them at higher prices on top of Ethereum.

Q. Now, you mentioned the term M-E-V. What is M-E-V?

A. M-E-V stands for maximal extractable value. It's a term within the crypto industry that is meant to represent the money that could be made from having the right transaction at the right place, at the right time.

So an example of this is arbitrage, where you are buying assets for a low price and selling them for a higher price and making money by doing so.

Q. Mr. Miller, how did you end up working at Flashbots?

A. I was an early user, as a person that ran an arbitrage bot. And I was a early community member, so I was in the Discord and the chats talking quite a bit. And I had relevant professional and technical expertise, and so it made a lot of sense for me to join the company.

Q. When you say you were in the Discord and chats, what do you mean by that?

A. Discord is a messaging platform that is commonly used within the cryptocurrency industry.

Q. But what are the Discord chats or the Discord and the chats?

A. So, as an example, Flashbots, where I work, has a Discord chat. And what that means is it's a group chat specific to Flashbots where people who are interested in Flashbots and our products in the industry can come and talk. So I was frequently there talking about Flashbots, M-E-V, and the broader crypto industry.

Q. By the way, what types of assets were your arb bots buying and selling?
A. Assets on top of the Ethereum blockchain.
Q. Is arb bot short for something?
A. Arbitrage bot.
Q. Just briefly, what's a bot?
A. It's a program that -- in this context, a program that is designed to take some actions to make money. So in the context of me running an arbitrage bot, that means a program that's looking for buying assets at a low price and selling them at higher prices.
Q. Now, Mr. Miller, shifting gears slightly, did this early April 2023 incident that you investigated involve crypto?
A. Yes.
Q. What is crypto?
A. It is shorthand for cryptocurrency.
Q. And what is cryptocurrency?
A. Cryptocurrency refers broadly to the field of trying to build currencies that don't rely on a single centralized party, like a government or a bank and, instead, rely on technology, on cryptography, economics, to manage a currency in a decentralized way, at a very high level.
An example of this would be the Bitcoin cryptocurrency, that's the most well-known. There is also the Ethereum cryptocurrency, which is the second largest, where I

primarily have done work.

Q. In general, where is a cryptocurrency transaction recorded?

A. Cryptocurrency transactions are recorded on what's called a blockchain. This is a ledger of data that is managed by a decentralized network of computers around the world. So instead of a single party managing this ledger, it's many computers around the world.

Q. And are there any particular attributes about blockchains that are notable?

A. They don't rely on a single party. So the idea is not to rely on a bank or a single government. Anyone can deploy or deploy applications on top of them or interact with them. Those are some that stand out to me immediately.

Q. Mr. Miller, what cryptocurrency platform did this April 2023 incident principally involve?

A. Ethereum.

Q. Now, in the course of your work at Flashbots, have you become familiar with the Ethereum Network?

A. Yes.

Q. And at a very high level, what is the Ethereum Network?

A. The Ethereum Network is a specific cryptocurrency. It's -- you can think of it like Bitcoin, but its primary innovation was to allow people to deploy applications, which we call smart contracts, in Ethereum, to deploy applications on top of Ethereum that other people could interact with.

Q. And do these applications include ones where users can buy and sell cryptocurrency?

A. Yes.

Q. How are transactions recorded on the Ethereum Network?

A. Transactions are added to a database that is managed by many parties around the world, a decentralized database called a blockchain. It's an append-only database; in theory, you can only add to this database.

Q. What experience, just at a high level, do you have with the Ethereum Network?

A. I have been a user of the Ethereum Network. I have run arbitrage bots on top of the Ethereum Network, and I've developed products and infrastructure at Flashbots for the Ethereum Network.

Q. Based on your work at Flashbots, have you become familiar with how cryptocurrency transactions are conducted on Ethereum?

A. Yes.

Q. At a high level, in 2023 or so, how would somebody submit a cryptocurrency transaction to be published on the Ethereum Network?

A. In 2023?

Q. Yes.

A. There's two primary ways you would submit a transaction. One is you can submit the transaction to what we call the mempool. The mempool is a kind of waiting room for

transactions. Because transactions are not immediately included, they take a little bit of time, a couple seconds, to be included. So you submit your transaction to the mempool. This is a kind of waiting room; it's supposed to be decentralized, so it's managed by many computers around the world. And the transaction gets passed around by many computers around the world.

That then means that anyone can look into the mempool and see your transaction while it's in the waiting room before it's included on the chain. So that's one way you can send transactions.

The other way you can send transactions is by submitting them privately to specialized infrastructure called block builders — we haven't talked about those yet — that are in the specific business of ordering transactions and creating blocks.

So the unique thing about that is it doesn't go to the public waiting room called the mempool; it goes directly to a block builder instead, where it's kept private from the public.

Q. So just staying with the Ethereum Network generally, what happens after a transaction goes to the mempool?

A. What happens when a transaction goes to the Ethereum mempool. So there are many computers in the Ethereum Network. And they are all running the mempool in some way, or most of them are. And when a transaction goes to the mempool, the computer that receives it then passes it on to its peers, other computers in the Ethereum Network. And when the next computer in the Ethereum Network receives a transaction, it passes it on to the other people that it is peered with. And so transactions are kind of shared across this distributed decentralized network of computers that make up the Ethereum Network.

Q. How do those transactions make it on to the blockchain?

A. One of their computers in the Ethereum Network is a special party called a validator. The validator plays the job -- it kind of plays two roles here which are related.

So one role is to take transactions, order them, and create a block. So to create kind of a list of transactions. We call that block building.

The second role is to then take a block and to select it for inclusion on the chain to, we call it, proposing the next block on the chain. So the validator will look at the mempool, receive a bunch of transactions, build a block, and then propose that for inclusion on the chain.

Q. And just to be clear, in the Ethereum Network generally, these two roles, are they played by the validator?

A. So that is a design of the Ethereum Network. It gets nuanced with MEV-Boost, of course, since MEV-Boost changes how these roles work in some ways.

Q. We'll get to MEV-Boost in a second.

But just in general on Ethereum, just again remind the jury what are the roles that a validator plays.

A. Without MEV-Boost, the validators play two roles. One, to order transactions in a block; we call that block building. And two, to select a block for inclusion on the network; we call that block proposing.

Q. I want to talk a little bit about blocks as well.

Is there typically only one transaction or more than one transaction in a block?

A. More than one transaction.

Q. And how many blocks can be added to the blockchain at a time?

A. One.

Q. Was that the case in 2023?

A. Yes.

Q. Now, in 2023, how did the Ethereum Network determine who gets to propose the block?

A. There's something that we call a consensus mechanism. It's a process where — where is the right place to start for this question. So something called a consensus mechanism. This is the process by which the Ethereum chain chooses who gets to

propose a block next.

To start, to be considered for proposing a block, you need to be a user that sets aside what we call stakes, and stakes 32 units of the Ethereum cryptocurrency. So once you've done that, you are a validator. And the Ethereum Network randomly chooses from all people who are validators, who proposes what blocks and when.

Q. And does this consensus mechanism involving staking have a particular name?

A. It's called proof of stake.

Q. And what was the amount of money that someone had to stake in April 2023 to be a validator?

A. 32 ETH, which at the time is tens of thousands of dollars.

Q. So what financial benefit, if any, would a validator receive for proposing blocks?

A. They would receive first a reward that the Ethereum protocol gives you for proposing a block, which is based on a reward. They then receive fees for including transactions. Each transaction is associated with a fee or it pays a fee. And then third, they receive some extra rewards for including certain transactions in certain orders.

Q. And that last benefit that you mentioned, is there a term for that?

A. That is M-E-V.

Q. Is that the same MEV or M-E-V that you discussed earlier?

A. Yes.

Q. Okay. So I want to talk about how MEV-Boost fits into all of this.

Mr. Miller, can you just remind the jury what your role was with respect to MEV-Boost?

A. I oversaw the development, testing, and adoption of MEV-Boost.

Q. And, again, at a high level, what is MEV-Boost?

A. MEV-Boost is software that Ethereum validators can run that lets them outsource the ordering of blocks in blocks that they are proposing -- sorry. Lets them outsource the ordering of transactions in blocks they are proposing to make more money.

Q. So remind the jury, in Ethereum generally, what are the roles that a validator has?

A. Two roles. One, to order transactions in a block; we call that block building. You can outsource that with MEV-Boost. And two, selecting the next block for inclusion on the chain, which is called block proposing.

Q. Earlier, Mr. Miller, I believe you mentioned that MEV-Boost sort of changed some of the roles that a validator would play. How is the role of a validator different in a MEV-Boost world versus the Ethereum Network generally?

A. The Ethereum Network, generally, validators play these two roles: They order transactions and they select a block for inclusion.

With MEV-Boost, validators outsource the ordering transactions, they outsource block building to a marketplace full of specialized actors. So they are no longer ordering transactions, they are only selecting the next block for inclusion or block proposing.

Q. What benefits does a validator get from running MEV-Boost?

A. Figuring out the right ordering of the right transaction in a block is a very hard problem. It takes a lot of expertise and infrastructure. And by outsourcing this to specialized parties who are only doing this job, you can make a lot more money. So you make more money by running MEV-Boost and outsourcing your block ordering.

Q. Do validators have to pay to use MEV-Boost?

A. No.

Q. And if I were a validator, where would I go to get the MEV-Boost software?

A. Flashbots hosts the MEV-Boost software in a open source repository of code on our GitHub page.

Q. What's GitHub?

A. GitHub is a service that you can host code for other people to interact, view, etc.

Q. Is there anything else in the GitHub code repository?

A. A couple other things.

One important one is that we have a read-me page. So this is a description of the code base that people are shown

when they come to the MEV-Boost GitHub page. It says, at a high level, what MEV-Boost is, how it works, how to install the software and use it.

Q. And, again, is that read me something that's publicly available?

A. Yes.

Q. I want to talk a little bit about the development of MEV-Boost.

Was there a team at Flashbots that developed MEV-Boost?

A. Yes.

Q. Who was on the team?

A. We had engineers on the team, we had a person doing operations, a person doing adoption, and myself.

Q. And how did you work with that team to develop MEV-Boost?

A. I helped them set priorities, figure out what the overall plan was. When they had problems, I helped them solve them or figure out what to do about the problems. I was -- I helped figure out the overall design, to some extent. I worked a lot on adoption, trying to convince people to use the software.

Q. Who were you trying to convince to use the software?

A. People who ran a lot of Ethereum validators.

Q. And what did that process look like, the adoption process?

A. We would talk to people who ran a lot of Ethereum validators or were planning to, and we would try to tell them

why did we design the software, what are its benefits, how does it work. We would answer their questions. And we also importantly ran this testing process where they had an opportunity to use MEV-Boost before it went into production, before it was kind of live with real money, so to speak, to see if it worked for their infrastructure and get firsthand experience and get comfortable with it. So I did a lot of that process and oversaw the testing.

Q. And, Mr. Miller, what percentage of validators were using MEV-Boost in April 2023, approximately?

A. About 95 percent.

Q. Now, in your capacity overseeing the development, testing, and adoption of MEV-Boost, are you familiar with its design and operation?

A. Yes.

Q. Mr. Miller, in advance of your testimony, were you asked to review certain demonstratives regarding MEV-Boost's design and operation?

A. Yes.

Q. Who prepared those demonstratives?

A. The government.

Q. Were you provided the opportunity to make revisions to those demonstratives to make sure they're accurate?

A. Yes, they asked for feedback.

Q. And did you, in fact, make revisions or suggest revisions

to those demonstratives?
A. I did give them feedback that was acted on.
Q. And after you provided feedback, are those demonstratives accurate?
A. Yes.
Q. So, Mr. Miller, I'm showing you what's marked for identification as Government Exhibit 508. Just let me know when you see that on your screen.
A. I have got it now.
Q. Okay. Are these the demonstratives that you were asked to review?
A. It's one of them, yeah.

MR. FANG: Your Honor, the government requests permission to publish Government Exhibit 508 as an illustrative aid to Mr. Miller's testimony.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: Okay.

Q. So starting with the first slide, just directing your attention to the purple box, does that say builder. Can you just orient the jury and remind them what the builder's role is.
A. The builder is a specialized party that orders transactions in a block to maximize the money that the validator makes.
Q. And what is it that the builder ultimately produces?

A. A block.
Q. And before we get there, where does a builder get transactions from?
A. So a builder will first get transactions from this waiting room that I've told you about called the mempool. That's in the top left. The builder will also be sent transactions directly sometimes. And the builder importantly gets transactions from M-E-V searchers in what we call bundles.
Q. And what is a searcher, by the way?
A. The searcher is a specialized actor; it's a person or a firm that runs software that searches for M-E-V. So they are searching for opportunities to make money by having the right transaction at the right place at the right time. An example of this that we talked about today is arbitrage bots.
Q. And, Mr. Miller, I think you also mentioned a bundle. What is a bundle?
A. A bundle is an ordered list of transactions that are supposed to be included all or nothing. So if a single transaction fails, none of them are included. And, again, they are supposed to be included in a really specific order.
Q. And who specifies that order?
A. M-E-V searchers specify the order in bundles.
Q. Was that the case in April 2023?
A. Yes.

MR. FANG: Ms. Kerest, if we can go to slide 2,

please.

Q. All right. So after the builder builds a block, what does it do under the MEV-Boost system?

A. The builder sends the block to another actor in the MEV-Boost system called the relay.

Q. And just remind the jury where you see relay on the screen and what a relay is.

A. The relay is in the middle of the screen. It has kind of orange, I suppose, color, orange or brown. It says "relay." And the relay is party in MEV-Boost that helps block builders and validators work together.

Q. Why is it really necessary under the MEV-Boost system?

A. So block builders are -- they have the job of creating blocks. And to do so, they need to find the most profitable ordering of transactions. And they receive bundles of transactions or specific transactions that are really sensitive, and they need to be included in really specific orders. And if they are included in a different ordering than is intended, the sender of those transactions could lose money. And so it's very sensitive who has access to those transactions before they are actually confirmed and included on the Ethereum chain.

Now, the challenge with this is that those transactions are worth quite a bit of money. But the people that send them don't want to share them with the whole world

because you don't know who you can trust necessarily. This poses an issue for Ethereum because there are many validators, and we want those validators to make roughly the same amount of money.

But a block builder or a party with a sensitive transaction doesn't know if they can trust every validator because you don't know if that validator is going to do something with your transactions that you don't intend. So the job of a relay is to help the block builder and validator work together when they may not trust each other, when the builder may not trust that the validator isn't going to mess with the ordering and the validator also doesn't necessarily know the builder. So the validator may not trust the builder is telling the truth, or may not trust that the builder is producing accurate blocks. The relay's job is to kind of solve this trust problem between these two parties.

Q. And we'll talk a little bit more about all that later as well. But, for now, Mr. Miller, are there relays normally in the block-building process without MEV-Boost?

A. Not without MEV-Boost.

Q. What role, if any, did Flashbots have in developing relays?

A. We developed the idea of relays, the overall design of MEV-Boost, and then we developed a open source piece of code that we ran as the number one relay for a while. And other people could take, modify, and run their own relays. And other

people did take that, modify it, and run their own relays.
Q. What was the name of that software code that you mentioned?
A. MEV-Boost-relay.

MR. FANG: Ms. Kerest, if we can go to slide 3, please.

Q. Okay, Mr. Miller. I'd like to turn your attention first to the yellow box that says "validator," and then there's a box that says "MEV-Boost" above it. Do you see those?
A. Yes.
Q. What is a MEV-Boost validator?
A. You could say that it's a validator that is running the MEV-Boost software.
Q. And, again, what does running the MEV-Boost software mean for the validator?
A. It means a few things.

So, first, you have taken the MEV-Boost software from the Flashbots GitHub or another place that it's hosted, and you're running it on your machine. It's kind of part of your operation.

Second, you have registered. So the demonstrative here shows the step of registering, where a validator needs to tell relays to expect it to be asking the relay for a block in the future. A validator is telling the relays, Hey, I am outsourcing block ordering when it's my turn to propose a block. And you need to do that too because validators need to

specify some important information about their blocks. They need to tell people where they want to be paid, as an example.

Q. So if a validator is running MEV-Boost, would a MEV-Boost relay know that that validator is using MEV-Boost?

A. To be precise, the validator will register and, by doing so, it gives it some information. And it tells the relay, When it's my slot in the future, I'm going to be asking you for a block.

The relay doesn't necessarily know what software the validator is running, but by the validator registering with the relay, it is telling the relay to expect to interact with it in a specific way in the future. But you can't know what software the validator is running necessarily.

Q. Now, directing your attention to that box that says MEV-Boost, why is that box between the validator and the relay?

A. Because -- or what I infer by that is that the validator is running the MEV-Boost software which enables the validator to communicate with relays. It's what is doing the communication with relays.

Q. And, Mr. Miller, I think you said the word "slot" as well. What's a slot?

A. A slot is a window of time where the validator is responsible -- a single validator is responsible for selecting and proposing a block for inclusion on the chain.

Q. And when you say "selecting and proposing a block," what do

you mean by that?
A. A validator needs to effectively say, This is the block that is going to be next on the Ethereum chain; or, This is the block that I want to be next on the Ethereum chain. That's what selecting and proposing means. Said in more words, the validator does this by providing a signature of some data for a unique block.
Q. And just to clarify, does selecting and proposing include any of the building functions?
A. Not with MEV-Boost, no.
MR. FANG: Ms. Kerest, if we could go to slide 4, please.
Q. Mr. Miller, what does "wait for allocated slot" mean here?
A. So the validator has registered. They have said, When it is my turn for a slot, I am going to ask you for a block. But the validator then needs to wait for its turn to propose a block. So the validator knows ahead of time, At this time in the future, I am going to be the party that selects the block.
And here, the box indicates that they are waiting until it is their turn to propose a block.
Q. And, by the way, can there be more than one slot at a time?
A. There's one slot at a time.
Q. Remind the jury just generally how a validator is selected for a slot.
A. So there's a pool of people who are running Ethereum

validators. And Ethereum has some way of randomly selecting which validators are proposing slots in what order. So there's kind of a view ahead of the future for the next number of slots, you know, that this specific validator is going to be proposing at this point in the future.

MR. FANG: Ms. Kerest, if we could go to slide 5, please.

Q. Mr. Miller, do you see a reference to "get header"?

A. Yes.

Q. Okay. So what happens in that step?

A. The validator is asking the relay for the most profitable block header that it has seen so far. So it's asking the relay for some information about the block that we call the header. It's going to be a unique identifier. But it doesn't see or it's not asking for the transaction contents at this point.

Q. Is there a specific term for the transaction contents in a block?

A. We generally call that the block body.

Q. So I will also use the term "block header" and "block body." Will you understand what I mean by that?

A. Yeah.

Q. Mr. Miller, just generally describe for the jury what a block header looks like.

A. A block header is a unique identifier of a specific block. It's a standardized piece of data. And a lot of the fields

make sense to a computer, but they wouldn't necessarily make sense to a human. So they are cryptographic fields; they are letters and numbers generally.

MR. FANG: Ms. Kerest, if we can go to slide 6, please.

Q. Okay. So after the validator's MEV-Boost software asks the relay for a header, what happens with the "get header" response step?

A. The relay will receive the "get header" request from the validator and it responds with the most profitable block header, or it responds with the block header of the most profitable block that the relay had seen from a block builder at the time that it received a "get header" request.

Q. To be clear, is a relay looking at just one block or multiple?

A. The relay looks at multiple blocks. And it keeps a list of what was the most profitable block for the validator that I have seen at any given time.

Q. And what does MEV-Boost do when it gets that "get header" response?

A. MEV-Boost will receive all these "get header" responses from different relays, so the validator is talking to many relays. It will receive those and it will select the most profitable block header that it's seen from any relay. So you may receive multiple headers from multiple relays. The

validator selects only one of those, which is the most profitable out of what it's seen.
Q. And at this stage, is the relay sending anything back to the validator about the transaction contents of the block?
A. No.
MR. FANG: Ms. Kerest, if we can go to slide 7, please.
Q. What does the validator's MEV-Boost software do after it gets the most profitable block header?
A. So the MEV-Boost software run by the validator takes the most profitable block header that it's seen from relays, and it works with other software that the validator is running to construct another piece of data. Essentially, it takes the block header from the relay and it adds a couple more fields to make another piece of data. And it provides a signature over that.
Q. Is that what the reference to "sign the header" refers to?
A. Yes.
Q. What are some of the fields in the block header that the validator signs?
A. You can see examples of them here, but a couple of them are the parent root, the state root, proposer index.
Q. When you say "here," is there any particular box that you're looking at?
A. Yes. On the demonstrative there is a big yellow box with

gray and white text. It starts with message and it ends with proposer slashings.

MR. FANG: And, Ms. Kerest, if you can just draw a red box around "parent root" and "state root."

Q. Mr. Miller, is that what you're referring to in the blue-ish box?

A. Yes.

Q. Now, can the validator who is using MEV-Boost see the transaction contents at any time before it signs the header?

A. No.

Q. And is a MEV-Boost validator designed to play any building role with respect to the block?

A. No.

Q. Is the MEV-Boost system designed to let validators see the block contents before a signature?

A. No.

Q. Why not?

A. Because, again, to make really good blocks, you need to have transactions in really specific and often sensitive orderings. And you may not trust the validator, since you don't know who they are as a person that's sending those transactions.

And so we have what we call a commit and reveal scheme, where the validator needs to first commit to a block by proposing it with its signature before the contents of the

block are revealed. Because after the contents of the block had been revealed, that block can be sent off for consideration on the chain, and the proposer has kind of selected it to be their block for that slot.

Q. And does this reflect MEV-Boost's design as of April 2nd, 2023?

A. Yes.

(Continued on next page)

MR. FANG: Ms. Kerest, if we can go to slide 8, please.

Q. So after the validator signs the block header, what does it do?

A. The validator takes the signed block header above other fields and returns it back to the replay.

Q. And, again, what does it mean for a validator to send a signed block header back to the relay?

A. The validator communicates with the relay on a standardized programming interface, and it provides the signed header and a couple of other things to the relay.

Q. But what does sending that signed block header to the relay signify again?

A. That signifies the validator's commitment that this is the block that they have selected for a given slot. It is their proposal for the slot that they are responsible for selecting a block in.

Q. Why do you describe it as a commitment?

A. It's a term within the cryptocurrency industry, first. And the reason why we use that is because, by providing a signature for this block, there is now a financial penalty for the validator in the Ethereum network if they provide another signature, if they propose another block, within that slot.

Q. And, again, is what we're looking at the MEV-Boost system?

A. We are looking at the MEV-Boost system.

MR. FANG: Ms. Kerest, if we can go to slide 9, please.

Q. So after the validator sends the signed block header to the relay, what does the relay do?

A. The relay validated the signature that the validator provided — so it's validated as correct — so it checked that the correct validator had signed the right -- signed the block header, and that's what validate signature here means.

Q. As of April 2nd, 2023, was the relay checking the validity of the block header that the validator sent?

A. Not on April 2nd, 2023.

MR. FANG: Ms. Kerest, if we can go to slide 10.

Q. So after the relay validates that the right validator signed the block header, what does it do?

A. The relay returns the transaction contents with the associated block.

MR. FANG: Ms. Kerest, if we can go to slide 11, please.

Q. After the relay reveals the block contents to the validator, what happens next?

A. The validator and the relay both share the block with the Ethereum network. It's then off to another part of the process for inclusion on the actual Ethereum chain.

Q. Do you see a reference to consensus nodes?

A. Yes.

Q. What are consensus nodes, by the way?
A. They are a special part of the Ethereum network. It's a particular software that people on the Ethereum network run.
Q. And, at this stage, can the validators see the transaction contents of the block?
A. Yes.
Q. Before we take this down, do the steps that we've talked about in this chart reflect how blocks get proposed by a validator using MEV-Boost or an Ethereum validator more generally?
A. A validator using MEV-Boost.

MR. FANG: We can take this down.

THE COURT: Mr. Fang, is now a good time for a break?

MR. FANG: Yes, your Honor.

THE COURT: All right.

Why don't we take our afternoon break now. It's 3:07. Please be back and ready to go in the jury room. My prior instructions apply. Do not talk or discuss this case with anyone. Don't do any research on this case or read anything about it in the news. Don't post anything on any website or social media. And, finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

I'll see you all back in 15 minutes.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Mr. Fang, you may proceed.

BY MR. FANG:

Q. Now, Mr. Miller, before the break, you had mentioned commit and reveal.

Do you recall?

A. Yes.

Q. What data was the relay relying on before revealing the block contents?

A. The signed header from the validator.

Q. Remind the jury specifically what the relay was checking for before releasing the block contents to the validator.

A. That the correct validator had signed the header, that it was the correct validator.

Q. Now, Mr. Miller, what financial compensation, again, does the validator, under MEV-Boost, get out of proposing a block?

A. They make money, first, just by proposing a block; second, from the fees from transactions that are included in blocks they propose; and, third, from any of the -- from including specific transactions in specific orders.

Q. Does the validator split any of these financial rewards associated with proposing the block with any of the other roles in the MEV-Boost system?

A. In some blocks, they split the rewards with block builders.

Q. How, if at all, does a validator indicate how it gets paid?
A. When the validator registers at a relay, they provide an address that they want to be paid at.
Q. Based on your experience as a product manager for MEV-Boost, are you familiar with how much, in financial rewards, a typical block generates?
A. It's a small thing, but just to note that I lead the product and engineering team as opposed to being a product manager, but I am generally familiar with the financial rewards a typical block generates.
Q. And how much does a typical block generate, approximately?
A. A 100th of an ETH is what I think.
Q. And what is that understanding based on?
A. My knowledge of Ethereum, given I build products and infrastructure for Ethereum.

MR. FANG: May I approach, your Honor?

THE COURT: You may.

BY MR. FANG:
Q. So, Mr. Miller, I've just handed you a flash drive that contains something marked as Government Exhibit 502.

Prior to your testimony, did you review the contents of that drive?
A. Yes.
Q. And what does it contain?
A. I believe this contains -- well, should I pull it up on my

screen, is that the ask, or are you asking what I remember it contains?

Q. Well, Mr. Miller, do you remember plugging that flash drive into a computer and reviewing its contents?

A. This morning, yeah.

Q. And what was on the drive?

A. A video that had been constructed by the government, I think.

Q. And what does the video show?

A. As I recall, the end-to-end process of how a block is constructed in MEV-Boost, starting with a block builder, going to a relay, the validator interacting with a relay to get a header, signing it, returning it. So the end-to-end process of MEV-Boost.

Q. Does it accurately illustrate how a block gets constructed and published using MEV-Boost?

A. Yes.

MR. FANG: Your Honor, the government requests permission to play Government Exhibit 502, and we'll offer it at the end, as well.

THE COURT: Any objection?

MR. LOOBY: No objection to its use as a demonstrative, other than ECF 136.

THE COURT: All right. You may play it.

MR. FANG: Ms. Kerest, if you can please play

Government Exhibit 502 through 16 seconds in.

(Video played)

BY MR. FANG:

Q. Mr. Miller, just remind the jury what the mempool is.

A. It's like a waiting room for transactions. So, it's a public place where transactions are sent before they are included in the Ethereum blockchain. And, again, it's a public place, so people can look into it.

Q. What do the dots here represent?

A. These represent different transactions in the mempool.

MR. FANG: Ms. Kerest, please continue playing through 20 seconds in.

(Video played)

Q. Again, Mr. Miller, remind the jury what a searcher is.

A. A searcher is a specialized actor. They run software that searches for opportunities to capture any of the -- or opportunities where they can have a transaction that makes money by doing something on the chain, like buying assets for a low price and selling them for a higher price.

One piece of context here that's relevant for the video is oftentimes they will watch the mempool, or the waiting room, for transactions because they will see other things that people are doing on the chain, and in anticipation of those, try to place transactions to make money themselves. So, as an example, if someone was going to make a large trade on the

chain, an MEV searcher, they might place a trade right behind a large trade that they saw in the mempool because they know they can buy assets at a low price and sell them at a higher end, and capture an arbitrage profit.

MR. FANG: Ms. Kerest, if you can continue playing through 34 seconds in.

(Video played)

Q. Now, again, Mr. Miller, what's a bundle?

A. A bundle is an ordered list of transactions that MEV searchers construct that are -- by default, included all or nothing.

Q. And did you see the reference to buy, buy, sell?

A. Yes.

Q. Does every bundle need to have a buy, buy, sell order?

A. No.

Q. Is there any specific set of transactions that has to be included in a bundle?

A. No. It can be any transaction. Buy, buy, sell is just one example here of what it could be.

Q. Can there be multiple bundles in a block?

A. Yes.

MR. FANG: Ms. Kerest, can you please continue playing through 43 seconds in.

(Video played)

Q. Mr. Miller, can you explain for the jury what is depicted

in this segment that we just saw?

A. A block builder is this actor within MEV-Boost. They're responsible for taking transactions, ordering them in a block, and creating a block. So this segment was the block builder receiving bundles of transactions and other transactions, and creating a block with them, including the bundle that we just saw before, in the order that it was specified.

MR. FANG: Ms. Kerest, please continue playing through 56 seconds in.

(Video played)

Q. Mr. Miller, remind the jury what the block header is.

A. So blocks are made up of two parts, generally. First, the header that has some unique identifying information about a block, among other things, but that's the important part. That's cryptographic information, so it makes sense to a computer, not so much to a human. It's letters and numbers, generally. And then the block body, that's the actual transactions in a block where the actual transactions people are making trades or doing other things on the chain are. So the header is just the kind of identifying information, some other stuff, not the transactions in a block.

MR. FANG: Ms. Kerest, please continue playing through one minute and five seconds in.

(Video played)

Q. All right. Mr. Miller, what does this segment of the

animation illustrate?
A. The builder created a block, and then the builder sends it to the relay, where the relay has processed it, and it's the most profitable block at that time.
Q. And, again, does the relay receive the block header?
A. The relay receives the header and the body. It has the whole block, everything.

MR. FANG: Ms. Kerest, please continue playing through a minute, 25 seconds.

(Video played)

Q. Mr. Miller, what does this segment of the animation illustrate?
A. What I think this illustrates is the relay taking the block header and removing the contents, so it's only sharing the header, not the contents or the block body with the transactions itself, and providing it to the validator after the validator has asked for the header.
Q. Again, why does the relay hide the transaction contents from the validator?
A. Because it wants a commitment from the validator that a particular block has been proposed before it reveals the block body with the associated transaction contents. And that's necessary to kind of solve these trust problems that exist within the MEV-Boost and broader cryptocurrency ecosystem.
Q. What specific problem are you referring to?

A. To parties that have really sensitive transaction ordering, you want to be placed — your transactions are to be placed — in a really particular way where you may be afraid that someone else might take your trade, they might see you're making a really profitable trade and get in front of you to steal your trade, so to speak, or copy it, so that someone else gets your really profitable trade instead of you.

So if you have sensitive ordering, you are going to care a lot about what has access to it before it's included on a block. And there are many, many, many Ethereum validators. You don't always know — oftentimes you don't know — who runs these Ethereum validators; and as a party with sensitive transaction ordering, you may not — you probably don't — trust those validators. And so you want this commitment from a validator that they're going to include a particular block with a particular ordering before your transaction contents are revealed, because you don't know who the validator is, you don't necessarily trust them, and you really care about specific orderings of transactions.

Q. Again, is the video that we're looking at depicting how blocks are proposed using MEV-Boost?

A. With MEV-Boost, yeah.

MR. FANG: Ms. Kerest, if you can continue playing through a minute 35 seconds.

(Video played)

Q. So, Mr. Miller, what does this segment of the animation illustrate?

A. The relay returned the block header to the validator, and then the validator takes that header, it adds a couple more fields, including the parent root and state root, and it signs that, so the header and these other fields, it provides a signature, which in effect is committing to that block, it's proposing the block.

Q. And, Mr. Miller, are there other fields, by the way, that are in the block header, aside from just parent root and state root?

A. Yes. Parent root and state root are just two of several other fields -- or, sorry, many fields that are in this block header.

Q. What information is the parent root meant to convey?

A. It's a unique identifier of the previous block that this block is building on top of.

Q. At a high level, what's the information that the state root conveys?

A. A snapshot of the state — so some information on the Ethereum chain at that time.

Q. Who fills in the parent root and state root?

A. The validator.

Q. And how are the parent and state roots determined, at a high level?

A. They have really specific meanings in the Ethereum cryptocurrency, in the Ethereum protocol. They are determined through these programmatic functions that are baked into the software that the validator is running, generally.

Q. Does each block have a unique parent root?

A. Yes.

Q. Does each block have a unique state root?

A. Yes.

MR. FANG: Ms. Kerest, please continue playing Government Exhibit 502, through a minute 45.

(Video played)

Q. Mr. Miller, what does this segment of the animation illustrate?

A. The relay checks the signature from the validator to see if it was from the correct validator. And then it once it sees it's from the correct validator, it goes and it grabs the transaction contents associated with that signed header.

MR. FANG: Ms. Kerest, please continue playing Government Exhibit 502 through two minutes in.

(Video played)

Q. Mr. Miller, what does this segment of the animation illustrate?

A. So the relay validated the signature and it grabs the block contents associated with that signed header, and it creates a full block with that. And now that it has the signature, it

returns the block to the validator. And after that, both the relay and the validator send that block to the broader Ethereum network for inclusion on the chain.

Q. Is the web of green dots the same web of green dots that you saw in Government Exhibit 508?

A. Yeah. We looked at it earlier.

MR. FANG: Ms. Kerest, please continue playing to the end of Government Exhibit 502.

(Video played)

Q. Mr. Miller, what does this final segment of this animation illustrate?

A. So what it illustrates is that this block now is included on the Ethereum chain. So it builds on a previous block, and within that block, we could see the bundle in the specific ordering — buy, buy, sell — that was originally sent to the block builder being included in that order as well as the other transactions that were included in the block.

MR. FANG: With the Court's permission, we would request to play Government Exhibit 502 from start to finish all in one go.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: You may.

(Video played)

MR. FANG: Okay. We can take this animation down.

Q. Mr. Miller, did the animation we looked at accurately describe how MEV-Boost was designed to function, as of April 2, 2023?

A. At a high level, yeah.

Q. And you testified earlier as to certain trust issues between parties on the Ethereum network.

Can you explain how MEV-Boost was designed to address that issue?

A. So, again, there are people who have really sensitive transactions, they want to be included in a specific way or you may -- you know, you may want privacy on your transaction because it's included, because you don't want someone to copy you. And the problem is that there are many, many, many Ethereum validators and you don't always know their identities, but you want all validators to be able to make about the same amount of money by being a validator and proposing blocks. So you have these really valuable transactions that are sensitive, on one side, and you have validators that you want to have access to those transactions, on the other, to make blocks of those transactions because you want everybody to make about the same amount of money.

So how do we address this problem? It's by creating a marketplace where validators can outsource the ordering of transactions in their block, and they -- we solve this trust issue by having the validator commit to what block they're

including without ever seeing the contents of the block.
Q. How does the relay fit into MEV-Boost's design to address this issue?
A. The relay works to enable the block builder and the validator to work together. So it accepts blocks from block builders, and it makes sure that those blocks are correct and makes sure that they are profitable, it keeps a record of how profitable blocks are or the most profitable block that it has seen. That's on one side. On the other side, it interacts with the validator, and it keeps block contents private until the validator has signed the header to propose a particular block for inclusion on that slot, and only then does it reveal the block body with the associated transaction contents.
Q. Mr. Miller, did Flashbots make information about its design and functioning publicly available?
A. "About its design," MEV-Boost's design?
Q. About MEV-Boost's design, yes.
A. Yes.
Q. Where?
A. As an example, we have a blog, we wrote about how our infrastructure and products would change with changes on Ethereum, how they would change with MEV-Boost. We would talk about it in other public contents, like our documentation page. We have information about the products and open-source software that we write in a centralized place, where we document all

that information, called the Flashbots Docs. Those are two examples.

Q. Is information about how MEV-Boost works available on the GitHub page that you previously mentioned as well?

A. Yes, that has some information on how MEV-Boost works as well.

MR. FANG: Ms. Kerest, please pull up for the witness Government Exhibits 3204, 3232, and 3406A.

Q. Mr. Miller, prior to your testimony, did you review these government exhibits?

A. Yes.

Q. And are these exhibits screen captures of Flashbots' GitHub pages and Flashbots Docs pages for MEV-Boost?

A. Yes.

MR. FANG: The government offers Government Exhibits 3232, 3204, and 3406A.

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted]

[redacted] [redacted]

THE COURT: These are for the effect on listener, correct, Mr. Fang?

MR. FANG: Yes, your Honor.

THE COURT: All right. They are conditionally admitted for that purpose.

(Government's Exhibits 3232, 3204, and 3406A received in evidence)

MR. FANG: And, your Honor, I believe Government Exhibit 3204 was preadmitted.

THE COURT: One moment, please.

(Pause)

MR. LOOBY: We had no objection to that, if that resolves it.

THE COURT: Thank you. That's correct.

MR. FANG: At this time, your Honor, the government would like to read a stipulation.

THE COURT: You may.

And let me just explain to the jury what a stipulation is.

A stipulation is an agreement where there is no dispute about certain facts. The parties may stipulate, or agree, to those facts; and, here, the parties have stipulated to certain facts that Mr. Fang is going to read. You must treat these facts as having been proven for the purpose of this case.

MR. FANG: Government Exhibit S712 states that:

It is hereby stipulated and agreed, by and between the

United States of America and Anton Peraire-Bueno and James Peraire-Bueno, by and through their attorneys, that:

The Wayback Machine makes it possible to see websites as they appeared in the past because it archives copies of websites at various points in time. Visitors to the Wayback Machine can search archives by uniform record locator, or URL, i.e., a website address. If archived records for a URL are available, the visitor will be presented with a display of available dates for that web page.

The government exhibits set forth in Attachment A are true and correct copies of the corresponding publicly accessible web pages listed in Attachment A, as they appeared on the dates listed in Attachment A. The government exhibits set forth in Attachment A were kept and maintained by the internet archive through a service known as the Wayback Machine. The website field in Attachment A accurately identifies the website address of the archived web page record. The date field in Attachment A accurately identifies the date of the archived web page record.

It is further stipulated and agreed that this stipulation — namely, Government Exhibit S712 — may be received into evidence as a government exhibit at trial.

And, Ms. Kerest, if we can briefly pull up attachment A to this stipulation, I'll just read into the record the government exhibits that are covered by Attachment A.

These exhibits include: Government Exhibits 3201, 3202, 3203, 3204, 3205, 3206, 3207, 3208, 3209, 3210, 3211, 3212, 3213, 3214, 3215, 3216, 3217, 3218, 3219, 3220, 3221, 3222, 3223, 3224, 3225, 3226, 3227, 3228, 3229, 3232, 3233, 3234, 3235.

At this time, the government offers Government Exhibit S712.

THE COURT: It is admitted.

(Government's Exhibit S712 received in evidence)

BY MR. FANG:

Q. So I want to show you what's marked for identification as -- or what's conditionally admitted as Government Exhibit 3232.

MR. FANG: Ms. Kerest, if you can publish that to the jury.

Ms. Kerest, if you can pull up the title at the very top left of the page.

Q. Mr. Miller, what does this title -- what's the title of this document?

A. "MEV-Boost."

(Continued on next page)

BY MR. FANG:
Q. And is this the public GitHub repository for MEV-Boost that you mentioned earlier?
A. Yes.
Q. Now, on the second page, do you see a reference to read me -- or, actually, it's on the first page halfway down. Do you see a reference to "readme.md"?
A. Yes.
Q. What's a read me?
A. It's a page that's often included in repositories of code that provides an introduction to the code: What it is, how to use it, and usually other useful information as well.
Q. And, again, who maintains this repository?
A. This is a Flashbots repository.
MR. FANG: Ms. Kerest, please enlarge the chart under the header "How does MEV-Boost work."
Q. Mr. Miller, what does this flow chart generally depict?
A. It generally depicts the different actors in the MEV-Boost system and some information flows between them. And it breaks the validator down into three different parts of software that the validator is running.
Q. Is the information in this chart generally captured in Government Exhibit 508, the slides we went through?
A. Yes. Generally.
Q. And, again, is the information on this page available to

the public?

A. Yes.

MR. FANG: We can take this down.

Let's also pull up Government Exhibit 3406-A and publish that to the jury.

Q. Mr. Miller, what is this diagram?

A. This is a diagram that was on MEV-Boost's GitHub page that we were just looking at. And it describes different actions and information flow between the validator's consensus client, the MEV-Boost software, and relays.

Q. And is the information in this diagram also generally captured in the slides we reviewed in Government Exhibit 508?

[redacted] [redacted]

[redacted] [redacted] [redacted]

A. Yes.

MR. FANG: Okay. We can take this government exhibit down.

Q. Mr. Miller, earlier you testified that searchers could submit bundles. Can you remind the jury what a bundle is.

A. A bundle is an ordered list of transactions that by default are included all or nothing.

Q. And how would searchers specify that list?

A. Searchers construct the list of transactions that they want to be included in the specific order that they want it

included. And then they submit them to a special programming interface that a block builder is running.

Q. And who developed that programming interface?

A. Flashbots did.

Q. Approximately when did Flashbots develop that coding interface based on your role and knowledge as Flashbots steward?

A. The fourth quarter of 2020 or the first quarter of 2021, it's in that range.

Q. Was that before or after MEV-Boost was developed?

A. That was before MEV-Boost was developed.

Q. How, if at all, did a bundle change from late 2020 or early 2021 to April 2023?

A. The core of the bundle has always been including an ordered list of transactions in the order that they are specified, all or nothing. And over time, we allowed people to provide kind of extra features and exceptions on top of that. But the core feature of -- included this list of transactions in this order did not change over that time.

Q. Mr. Miller, I'd like to show you what's been marked for identification as Government Exhibit 3002-A.

What is this document?

A. This is a change that was made to the Flashbots docs. So we hosted the content behind our documentation on our products and our open source software on GitHub. And what you're

looking at is one specific change that was proposed and included.

Q. So, Mr. Miller, just for purposes of identification, is this a Flashbots page?

A. It's a GitHub page of ours, yeah.

MR. FANG: Government offers Government Exhibit 3002-A.

[redacted]

(Government's Exhibit 3002-A received in evidence)

THE COURT: You may proceed.

MR. FANG: Permission to publish, your Honor.

THE COURT: You may.

Q. Directing your attention to the top --

MR. FANG: Ms. Kerest, if you can enlarge the title of this or the header of this document.

Q. Mr. Miller, what is Flashbots docs again?

A. We hosted public documentation on how our products and some open source software, like MEV-Boost, and how they worked; information about them on a documentation page called the Flashbots docs. And the underlying content for that was managed on our GitHub, which is what this page is.

Q. Based on your role as the product and engineering lead,

have you become familiar with the content on Flashbots's GitHub page?

A. Generally, yes.

Q. Is there a date associated with these changes to Flashbots docs?

A. This was proposed and changed on August 23rd, 2021.

Q. And just remind the jury, did the core feature of a bundle stay the same between August 2021 and 2023?

A. Yes.

MR. FANG: Let's turn to page 2, please.

Ms. Kerest, if you can enlarge lines 5 through 9.

Q. Mr. Miller, do you see a reference to "ETH send bundle"?

A. Yes.

Q. What is that?

A. "ETH send bundle" is the name for the special programming interface that we created for MEV searchers to send bundles.

Q. Do you see a reference to miner?

A. Yes.

Q. Are there still miners under the current Ethereum protocol?

A. No.

Q. Okay. And, again, just very briefly, what is a miner?

A. A miner was the equivalent of an Ethereum validator in a previous version of Ethereum. So Ethereum upgraded, it changed from miners to validators. You can think of it as like an earlier iteration of a validator for our purposes.

Q. And who developed the ETH send bundle programming interface?

A. Flashbots did.

Q. What was this interface designed to do?

A. Allow searchers to send ordered lists of transactions that are included, all or nothing.

Q. What interface, if any, does a searcher use to send a bundle under MEV-Boost?

A. ETH underscore send bundle.

Q. Is that the same interface that we're seeing here?

A. Yes.

Q. And, again, who is the searcher sending the bundle to under MEV-Boost?

A. The block builder.

MR. FANG: Let's turn to page 8, please, under the header "Definitions."

Q. Directing your attention to the definition for MEV bundle or bundle, which appears around line 33.

Mr. Miller, do you see any specification that requires bundles to be executed together or not at all?

A. Yes.

Q. Can you read that.

A. "A list of transactions that must be executed together and in the same order as provided in the bundle."

MR. FANG: Okay. We can take Government Exhibit

3002-A down.

Q. Now, Mr. Miller, I believe you also testified earlier that Flashbots developed software for MEV-Boost relays. Can you remind the jury where that software is maintained.

A. We maintain a open source version of a relay on our GitHub; it's called MEV-boost-relay.

Q. And is that the same software as MEV-Boost?

A. No.

Q. How did those two pieces of software differ?

A. MEV-Boost is the software that validators run. It enables them to communicate with other people who run software like the MEV-Boost relay code base that we maintain or other versions of it that they may have modified, they may have run their own or created their own. So the relay code base is a separate code base; it's not run by the validator. The validator runs MEV-Boost.

Q. So who runs the MEV-Boost relay software?

A. Infrastructure providers generally.

Q. What do you mean by "infrastructure providers"?

A. As an example, Flashbots runs a MEV-Boost relay. There was another popular MEV-Boost relay called the Ultrasound Relay, and another one called bloXroute. These are all companies that run infrastructure in Ethereum, and they make their business off of that generally.

Q. Why did Flashbots share its open source code for the relay?

A. We wanted a open and competitive market where there are many different parties running relays, not just ourselves. So we wanted to kickstart the competition in the market.

Q. Were the bloXroute and Ultrasound relays in operation in April 2023?

A. Yes.

Q. Showing you what's in evidence as Government Exhibit 3204.

Mr. Miller --

MR. FANG: Oh, and if we can also publish Government Exhibit 3204 for the jury.

THE COURT: You may.

Q. Mr. Miller, is this document on the Flashbots docs website that you previously mentioned?

A. Yes, it is.

Q. What's the title of this document?

A. "MEV-boost-specifications."

Q. Do you see a reference to Builder API under the header "MEV-boost-specifications"?

A. Yes.

Q. What is the Builder API at a high level?

A. It's a standardized way for Ethereum validators to communicate with MEV-Boost and with relays. Relays and block builders, I'll add.

Q. So sorry. Just to be clear, what does the Builder API facilitate interactions between?

A. Today it facilitates interactions between the validator and the relay. And it's called the Builder API, which is kind of confusing, because in the future, we hope to do away with the role of the relay and have the validator directly interact with the builder. So it's a forward-looking name; but, today, the Builder API enables the validator and the relay to work together.

Q. What about in 2023, what parties was the Builder API facilitating interactions between?

A. The validator and the relay.

Q. Showing you what's marked for identification --

MR. FANG: Oh, and we can take Government Exhibit 3204 down.

Q. Mr. Miller, I'd like to show you what's marked for identification as Government Exhibit 3219.

Is this the Builder API that we just discussed?

A. Yes.

MR. FANG: Government offers Government Exhibit 3219.

MR. FANG: Your Honor, we're offering this for its effect on the listener. And we're happy to offer it subject to connection at a later time.

THE COURT: All right. I will conditionally admit it.

(Government's Exhibit 3219 received in evidence)

MR. FANG: Permission to publish Government Exhibit 3219.

THE COURT: You may.

Q. Mr. Miller, just to take a step back, what's an API?

A. A standardized way to interact with a program.

Q. And is this a Flashbots document?

A. It's not.

Q. Have you seen this document prior to your testimony?

A. Yes.

Q. In what context?

A. In my context as the lead for product and engineering for Flashbots. We engaged with this document to develop MEV-Boost.

Q. How does this document relate to MEV-Boost?

A. MEV-Boost relies on these APIs to do its job of enabling validators to outsource ordering within blocks.

Q. Let me direct your attention to page 3.

MR. FANG: Ms. Kerest, if you can red-box -- or, actually, enlarge all the way to "execute payload header."

Q. Mr. Miller, what does this interface do?

A. This is the interface that validators call to get a block header from a relay.

Q. And in a MEV-Boost world, who sends this interface?

A. The validator calls the relay with this interface.

MR. FANG: And, Ms. Kerest, if you can please

highlight or blow up the first sentence that says "requests a builder node."

Q. Mr. Miller, what does it mean for the builder node to produce a valid execution payload header which can be integrated into a blinded beacon block and signed?

[redacted]

A. So this API was made to be forward-compatible with a version of Ethereum in the future, where we do away with the relay, but here it's referring to what is now the relay as the builder node. And what this means is that this is the interface that is requesting in MEV-Boost a relay in the future of builder node to provide it a block header, which then the validator can use, add a couple more fields, to produce their block proposal, the thing that they signed to select a block for inclusion on the chain.

Q. Do you see a reference to "blinded beacon block"?

A. Yes.

Q. What is a blinded beacon block?

A. A blinded beacon block is a data structure. It's a standardized form. You can think of it as that a validator fills out. It includes the block header. But it's called "blinded" because it does not include the transaction contents associated with that header.

MR. FANG: And, Ms. Kerest, if we can go to the next page, the first black boxes under "responses." And if you can enlarge that black box, please.

Q. Do you see something that says "version bellatrix"?

A. Yes.

Q. What does "bellatrix" mean?

A. It's a specific version of the Ethereum protocol.

Q. And does this also appear to be an interface?

A. Yes.

Q. What's the purpose of this interface?

A. This is what a block header looks like that the relay returns to the validator.

Q. And under the MEV-Boost environment, who fills in the information in this form?

A. The block builder first fills in the information in this form. And then the relay takes the header and provides it to the validator.

MR. FANG: Okay. Let's go to page 5, please.

Q. The second black box under "submit a signed blinded block and get unblinded execution payload."

Mr. Miller, what does this interface depict?

A. This is how validators return a signed blinded block is what we call it. So the thing that the validator is signing to propose a block to relays in order to get the transaction contents associated with the block that they've just signed.

Q. Can you read the first sentence, Mr. Miller, starting with "submits a."

A. Well, there's two sentences that starts with "submit a," so do you want the one on the top or the one below it?

Q. The one below the green box that says "post."

MR. FANG: And, Ms. Kerest, if you can just highlight that.

A. So that says: "Submits a signed blinded beacon block to the builder, binding the proposer to the block."

Q. What does it mean that the proposer is bound to the block?

A. What it means is that the proposer, by providing their signature, is making a commitment to that block that is enforceable with financial penalties if they sign another block in that slot. That's why we say the proposer is bound to the block, because there's kind of an enforceable guarantee backed by financial incentives.

Q. And, again, the word "proposer" in this context, what does it mean?

A. Here it means a validator that has selected and included a block.

MR. FANG: Ms. Kerest, if you can highlight the second sentence, starting with "The builder is now able," all the way to "them" on the second line.

Q. Mr. Miller, if you can just read that highlighted sentence.

A. "The builder is now able to unblind the transactions in

execution payload header without the possibility of the validator modifying them."

Q. And what is execution payload header?

A. That is the block header that the relay first returns to the validator.

THE COURT: Mr. Fang, we are right at 4:30. If you can wrap up this line of questioning.

MR. FANG: Yes, your Honor.

Q. Why can't the validator modify the block at this point?

A. What this is referring to is that the validator has signed a particular block. They've provided their signature. And that signature is associated with a specific unique block. And so once you provided that signature, there is no way for you to renege on it or to modify the transaction contents associated with what you've just signed.

MR. FANG: Your Honor, I think this is a good time for us to stop for today.

THE COURT: Thank you, Mr. Fang.

All right. So we are going to break for the evening. I will see you all again. We will begin testimony promptly at 10 in the morning. Please be here with enough time to get through security and be ready in the jury room about 15 minutes before then.

And remember that my prior instructions apply: Do not discuss this case with anyone, don't do any research on this

case or read anything about it in the news. And don't post anything on any website or social media.

Finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

Thank you all for your attention today.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

Defendants. Trial

------------------------------x

New York, N.Y.
October 16, 2025
9:45 a.m.

Before:

HON. JESSICA G. L. CLARKE,

District Judge
- And A Jury -

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
Assistant United States Attorneys

FICK & MARX LLP
Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
-and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH

Also Present: Helena Kerest, Paralegal Specialist (USAO)
David Naguib, Paralegal Specialist (USAO)

(Jury present)

THE COURT: Please be seated.

Good morning to you, all. Thank you, again, for being on time. I really appreciate it. We are going to continue with testimony today.

Mr. Fang.

MR. FANG: I believe Mr. Miller is in the courtroom.

THE COURT: Mr. Miller, please step down to the witness stand.

You may proceed.

ROBERT MILLER, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. FANG:

Q. Mr. Miller, before we pick back up, I just want to go over a couple of concepts that you testified about yesterday.

A. Okay.

MR. FANG: Ms. Kerest, can you please publish Government Exhibit 508, slide 11.

Q. Mr. Miller, to reorient the jury, what does this slide depict?

A. At a high level, this depicts different actors and some interactions between them in the MEV-Boost system.

Q. And what are some of these actors?

A. Searchers, builders, relays, and the validator.

Q. Are there people behind these different actors?

A. Yes; people or companies.

Q. And these interactions between these different actors, are there people behind those interactions?

A. Yes, ultimately.

Q. Now, you said yesterday that MEV-Boost allows the validator to outsource the building of the block to the block-builder.

What do you mean by "outsource"?

A. So the validator has two jobs in general. One is they order transactions in a block, where they build a block, and the second is they select a block for inclusion on the chain next — that's proposing a block. MEV-Boost allows them to outsource, and by that, I mean to delegate to another party, to enable another party, to order the transactions in a block on their behalf because these other parties are specialized and they're better at ordering transactions in a block than the validator is. So they make more money by doing so.

Q. Who makes more money?

A. The validator.

Q. And who is the other party?

A. The block builder.

Q. And so, just to be clear, under the MEV-Boost system, are those two different parties?

A. Yes.

Q. Does the MEV-Boost validator choose which builder it receives a block from?

A. No.
Q. Does the MEV-Boost validator have any role in choosing the contents of the block that the builder puts together?
A. It signs a header, but it doesn't see the contents of the block before it signs the header.
Q. So, what role, if any, does the MEV-Boost validator have in terms of selecting transactions to put in the block?
A. The MEV-Boost validator is outsourcing that role, so they don't play a role in choosing the transactions that go into a block.
Q. Remind us — what makes a validator a MEV-Boost validator?
A. They run the MEV-Boost software.
Q. And, again, how do they start interacting with the MEV-Boost ecosystem?
A. You would download MEV-Boost. So, people typically did that from our GitHub page, where we host code. And the first thing that you do is to register with relays along some information that's useful for relays and block filters, like where validators want to be paid, the address that they should be paid at.
Q. And, again, who introduced the concept of a relay?
A. Flashbots did.
Q. Is that essentially a MEV-Boost creation?
A. Yes. In this context, at least. Sometimes people -- relay is a general word, and so there are other relays, but they mean

different things in different contexts.
Q. But, here, and yesterday, when you were discussing the concept of relays, was that in reference specifically to a MEV-Boost relay?
A. Yes.
Q. Now, Mr. Miller, you also testified that the searcher submits bundles to builders that can be all or nothing.
What did you mean by all or nothing?
A. What I mean by that is that searchers submit these ordered lists of transactions, and each transaction needs to succeed, and if any transaction within the ordered list fails, none of the transactions are included.
There is a feature where you could say, hey, it's okay for this transaction to fail, but by default, that feature is not on. So by default, the intended behavior is all transactions specified in the ordered list need to succeed. If any of them fail, none of them are included.
Q. Again, who chooses what to put in the bundles?
A. The MEV searcher chooses what to put in the bundles.
Q. Who chooses the conditions, such as all or nothing?
A. Well, all or nothing is the default, and the MEV searcher would use a feature to specify if it was fine for one of their transactions to fail and still be included. I think that's what you meant.
Q. Well, in the MEV-Boost system, does the validator play any

role in choosing what goes in the bundles?

A. No.

Q. Can a searcher choose which builder to send bundles to?

A. Yes.

MR. FANG: Ms. Kerest, if we can please go to page 9.

Q. And, again, Mr. Miller, this is Government Exhibit 508, page 9.

A. Right.

Q. Can you remind the jury what happens at the validate signature step in the MEV-Boost system?

A. So, the validator has used MEV-Boost to get a block header from a relay, and they take that block header, they add a couple of other fields to it, and they create a signature. And that signature is them saying, I want to propose this specific block for my slot, and they return that back to the relay. Then the relay performs some checks to see, did the right validator sign this block, and is this what we would expect the signature to be.

Q. What do you mean when you say, is this what we would expect the signature to be?

A. As an example -- what's the right way to explain this?

If the validator returned something that wasn't a block header, as an example, the relay would not have anything to do because they weren't interacting with it in the way the relay expected.

Q. When you say when the relay expected, is that something that is according to the design of the MEV-Boost system?

A. Yes. So, there is a standardized programming interface for how relays receive signatures and signed block headers from validators, and it needs to have a certain shape, it needs to have certain fields. So the relay was validating this is of the shape that I expected to, and it's a signature over the fields that I expect.

Q. I think you testified just now that the MEV-Boost validator also adds a couple of fields.

Again, remind a jury what a couple of these fields are?

A. As an example, parent root, state root, I think the slot number is in there, too.

Q. I wanted to talk a little about the parent and state root. You testified that the parent and state roots have a particular meaning yesterday.

What did you mean by particular meaning?

A. What I mean by particular meaning is that the parent and state root are really specific things. There are functions and definitions for what they should be for a given block and a specific answer for what they should be for a specific block. There's sort of a right answer for that block, for what those fields should be.

Q. Is that right answer something that can be calculated?

A. Yes. The validator software calculates what those fields are automatically, typically.

Q. And who is supposed to input the parent and state roots?

A. The validator.

Q. Now, according to MEV-Boost's design, when does the validator fill in the parent and state?

A. The validator takes the block header that they receive from the relay, and they add in the parent and state root for the block.

Q. Do they do that before or after they submit the signed block header?

A. They do that after receiving the header from the relay and before submitting a signed header back to the relay.

Q. At this stage --

MR. FANG: And, Ms. Kerest, if we can please go to -- well, I think this slide is fine.

Q. Mr. Miller, at this stage in the process, does the validator see the transaction contents?

A. Not yet, no.

Q. Mr. Miller, does the relay need the right answer in the parent and state root to perform its function under the MEV-Boost system?

A. The relay's functions are, first, to make sure that the validator is providing a signature before it is revealing the block. And once that signature -- because it's looking for a

commitment from the validator that this is a block that's going to be included on the chain. Block builders only want their block contents in the transactions revealed in the case that there is that commitment. And, so, if there is not the correct parent or state root, that means that the commitment is not valid, of sorts, because that block cannot be included on the chain, those transactions actually can't be executed.

Q. Why can't those transactions be executed?

A. Since the parent and state root would not be correct, that means that the block couldn't be included on the Ethereum network.

Q. And, again, just remind the jury what the parent root is intended to convey.

A. It's a unique identifier of what the previous block is.

Q. And remind the jury what the state root is intended to convey.

A. The parent root, also — just to return to that — you can think of the -- it refers to the previous block. So the previous block is the parent, and this is the child block. That's why it's called parent root.

The state root is meant to convey a unique snapshot of Ethereum's state, so some information about Ethereum at a particular point, with a particular set of information.

MR. FANG: Ms. Kerest, we can take this down.

Q. Okay, Mr. Miller. Let's pick back up where we left off

yesterday afternoon.

MR. FANG: And, Ms. Kerest, if you can please pull up Government Exhibit 3219 again.

Q. Mr. Miller, we left off on page 5, the second sentence.

A. Starting -- you mean the one starting with "the builder is"?

Q. That's correct.

MR. FANG: Ms. Kerest, if you can highlight that second sentence again.

Q. Remind the jury why a validator can't modify the block after it has committed to the block.

A. When the validator creates a signature, they are creating a signature that's associated with a specific unique block. And if the validator were to modify the transactions in that block in any way, it would change the block, and there would be a different kind of unique identifier with the block. But the validator has already created a signature for a specific block, and in doing so, they have proposed a specific block, with a unique set of information, to be included on the chain. They can't take that back. That signature is out there. The relay has it now, the builder has it, the network has it. So there's no way for them to undo or modify that block after they have provided a signature for that specific unique block.

Q. To put a finer point on it, based on the way that MEV-Boost was designed and intended to operate, is a MEV-Boost validator

supposed to reorder a block that has been signed?

[redacted]

THE WITNESS: That's not the intended behavior, no.

BY MR. FANG:

Q. And, again, based on MEV-Boost's intent or the way it was intended to operate and designed to operate, is a MEV-Boost validator supposed to add transactions to the block?

A. No.

Q. Is it supposed to remove transactions from the block?

A. No.

Q. What features of MEV-Boost's design were intended to prevent those kinds of modifications by a validator?

A. The question is, just to repeat it back so that helps my thinking, what features of MEV-Boost's design were intended to prevent those kind of modifications by a validator, right?

Q. Correct.

A. I think at the core of it is the commit-and-reveal scheme. By that, what I mean is that relays seek a commitment, a proposal, of a block from the validator before they reveal the block contents back to the validator.

MR. FANG: We can take this down. I'm sorry, let's put that exhibit back up. I think we're on page 5 of Government Exhibit 3219.

And let's call out the black box on this page.

Q. Mr. Miller, what is depicted in this black box?

A. This is what the information that the validator sends back to the relay when they are providing a signed block header, it looks like.

Q. And, again, are there people behind the validator and relay roles?

A. There are people behind the validator and relay roles.

Q. Do you see the reference to parent root?

MR. FANG: And, Ms. Kerest, I'll ask you to highlight that for Mr. Miller.

THE WITNESS: Yes.

BY MR. FANG:

Q. Do you see a reference to state root?

A. Yes.

Q. What is depicted here, generally, how a parent and state root looks?

A. Generally. This is an example. They generally look like this.

Q. Is the parent root the same or different for each block?

A. Different.

Q. Is the state root the same or different for each block?

A. Different.

Q. And, again, at this stage, when the validator is filling in these fields, can it see the transaction data in the block?

A. No.

Q. And when it sends back the signed block header, what is the validator signifying?

A. Their block proposal. So they're selecting this block for inclusion on the chain.

MR. FANG: Ms. Kerest, we can take this down.

Ms. Kerest, if we can display on the ELMO, just for Mr. Miller in particular --

Q. Mr. Miller, you should see on your screen what's been marked for identification as Defense Exhibit 5002.

Do you see that?

A. Yes.

Q. What is this document?

A. I'm not sure because I didn't make it, but it has a bunch of relevant concepts to MEV-Boost and Ethereum.

MR. FANG: May we publish Defense Exhibit 5002 to the jury, your Honor?

MR. FANG: Ms. Kerest, if we can publish Defense Exhibit 5002 to the jury.

(Defendants' Exhibit 5002 received in evidence)

BY MR. FANG:

Q. Mr. Miller, again, did you create this document?

A. No.

Q. Is this a Flashbots document?

A. No.

Q. Does this document accurately portray how blocks are proposed using MEV-Boost?

A. I wouldn't say so.

Q. So, let's just start with the different actors in the MEV-Boost system that you mentioned.

Is there any actor who's missing?

A. The block builder.

Q. Just remind the jury what role the block builder plays in the MEV-Boost system.

A. The validator outsources the ordering of transactions in a block to the block builder.

Q. When you say "the ordering of transactions," what do you mean by that?

A. Every block has a bunch of transactions, and you need to decide what transaction goes first, second, third, fourth, et cetera. So when I say ordering, I mean placing transactions in bundles, which are ordered lists of transactions, in a particular order, deciding who is first, second, you know, et cetera.

Q. Again, is that essentially building the block?
A. Yes.
Q. What role, if any, does a validator running MEV-Boost have with building a block?
A. They outsource the building of the block, so they're proposing the block only instead in MEV-Boost.
Q. So, starting with the top left box, do you see a reference to mempool, where my finger is pointing?
A. Yes.
Q. Is this box an accurate depiction of how blocks are built under MEV-Boost?
A. The validator, even though it's outsourcing ordering to a block builder, still has access to a mempool, so this box seems fine to me.
Q. But --
A. The mempool is inherently a public waiting room.
Q. When a validator uses MEV-Boost and outsources the block, does it have the ability to add transactions from the mempool?
A. No. So I wouldn't object to the box — mempool — being there, because the validator has a mempool, the mempool is public — it's kind of the point — but the validator in MEV-Boost does not use their mempool to build a block. They're outsourcing the building of a block to a specialized actor called the block builder.
Q. And, again, if the validator is running MEV-Boost, where

does it get the block from?

A. From the relay.

Q. Okay. So, let's pause here for a second.

MR. FANG: I'd like to mark this exhibit for identification as Government Exhibit 5002.

Q. So, Mr. Miller --

BY MR. FANG:

Q. Mr. Miller, I'm going to cross out the line between the mempool and the validator.

Does that more accurately depict how blocks are proposed using MEV-Boost?

A. I would agree with that to the extent that the line is supposed to mean that the mempool is used in the building of the block by a validator because the validator is outsourcing

that job in MEV-Boost.

Q. So I'd like to direct your attention to the bottom left box, where it says "Own Trades."

Do you see that?

A. Yes.

Q. Is this box an accurate depiction of how blocks are built under MEV-Boost?

A. I don't really know. Part of the purpose of MEV-Boost is to prevent validators from needing to be very sophisticated, from needing to be a trading firm themselves, in order to be competitive. So, we do that by allowing them to outsource ordering and not, by extension, being able to get really good blocks by having other people build them and not needing to find trades themselves. So, generally, I think this box doesn't make sense either.

Q. So I'm also going to cross out the line between "Own Trades" and the validator.

Does that more accurately depict how MEV-Boost works?

A. Yes.

Q. Going to the bottom right box, where it says "Proprietary Order Flow," what do you understand "proprietary order flow" to mean?

A. To me, I understand this to mean MEV searchers and their bundles, so people who want transactions included in their specific orders, and it also refers to other users who want to

submit their transactions directly instead of to the block builder, as an example, instead of to the public mempool, where they have some need for privacy.

Q. Does a validator running MEV-Boost get trades directly from a proprietary order flow, as you've described it?

A. No.

Q. Why not?

A. Again, MEV-Boost was created to allow any validator, of any sophistication, whether you were, you know, just a casual user or staker of Ethereum, to receive the most valuable block possible by outsourcing block ordering to a specialized actor. The reason for that is that it's really challenging to figure out what the best ordering of transactions is, and it can also be challenging to develop relationships that you need in order to get people to send you sensitive transaction flow, which I think is what is meant by proprietary order flow here.

So the purpose of MEV-Boost was to allow people to outsource their ordering so another specialized actor could do those functions on behalf of validators and they wouldn't need to do that to be competitive themselves. And that would make the barriers to entry lower to be a competitive validator.

Q. And, again, what is this other party that the validator is outsourcing to?

A. The block builder.

Q. Again, is the block builder anywhere on this slide?

A. Not that I see.

Q. So I am going to cross out the line between proprietary order flow and validator.

Does that more accurately depict how blocks get proposed to the blockchain under MEV-Boost?

A. In my eyes, yes.

Q. Now, remind the jury, how does the MEV-Boost validator get a block to propose?

A. The MEV-Boost validator asks relays for a block header, and the relay is responsible for giving the validator the most profitable block header it has seen at that time.

Q. If a validator is using MEV-Boost, is it designed to alter the block that it receives?

A. That's not the intended behavior, no.

Q. Why not?

A. Why not? Because the point of MEV-Boost is to have validators outsourcing ordering to specialized actors, and to remove the need from any of these searchers, block builders, et cetera, from having to trust or think a lot about the validator and what they would do to the contents of the block. So you're supposed to keep the block contents private until it is committed to, and then you would be able to block. And the system relies on this assumption of privacy in order to have an efficient and fair market.

Q. Just to put a finer point on it, Mr. Miller, if a validator

can't see the transactions in a block, can it add to the block?
A. No.
Q. Why not?
A. Because you need to know what came -- what else is included in the block, to add something to a block. Without that knowledge, you might try to add something to a block, and it could be incorrect or an invalid transaction, as an example.
Q. Do you know all of this based on your experience developing MEV-Boost?
A. Yes. And my experience developing products for Ethereum.

MR. FANG: The government offers the corrected version of Defense Exhibit 5002 as Government Exhibit 5002.

[redacted]

It is admitted, without the characterization of that it is correct.

MR. MARX: Thank you, your Honor.

(Government's Exhibit 5002 received in evidence)

MR. FANG: We can take this down.

BY MR. FANG:
Q. Mr. Miller, I want to go back to a morning of early April 2023.
A. Okay.
Q. Can you remind the jury what you learned that morning

regarding MEV-Boost?

A. Can I remind the jury of what I learned that morning in early April 2023? Yes. So, I woke up, and I was told that there had been an incident with MEV-Boost, and people had lost a lot of money and I needed to get online urgently.

Q. Who were these people who were trying to get a hold of you?

A. People from Flashbots.

Q. Now, you mentioned yesterday that there was a bug in the system.

What did you mean by that?

A. We maintained this open source code base called MEV-Boost Relay, and we operated it in production, and other people had taken it and modified it and they ran it themselves. And in the MEV-Boost Relay code base, the relay, when it received a signed block header from the validator, was checking to see if the signed header came from the right validator and if it was correct in some ways, but not if the block header itself was valid and correct. And, so, in this particular case, the validator had set the parent root and state root to equal zero, which made the block invalid, it couldn't be included on the Ethereum chain, but the relay was not checking to see if the block itself was valid, it was just checking to see if the signature was correct as it expected.

So the relay then checked to see if the signature was valid, didn't see that the block header was valid, and it

revealed the block contents, although the block itself couldn't actually be included on the chain.

Q. So, we'll unpack all of that in a moment.

Was the bug -- did somebody take action with respect to the bug?

A. Yes.

Q. Was that the validator that you referred to?

A. Yes.

Q. At a high level, what, if anything, did Flashbots do in response to this incident?

A. We investigated the incident. We got together groups of people to talk about it, investigate it, figure out the root cause. We created an update to the code, where the bug was, in order to make sure it didn't happen again in the future. We worked with other relays in order to roll this out. And we investigated follow-on issues that we discovered in the course of addressing this incident. There were a couple of things.

Q. Mr. Miller, what role, if any, did you play in this response?

A. I oversaw the overall response.

Q. And who else was involved in this response?

A. People from Flashbots, so engineers, some of Flashbots' other leadership, there were members of the Ethereum Foundation, there were people from the Ultrasound Relay — that was the relay that actually had the bug exploited that

day — and there were prominent security researchers and white hats in the community that helped us find out the root cause and come up with a patch.

Q. You mentioned a couple of terms. First, you said "white hat."

What does a white hat mean?

[redacted] [redacted]

[redacted] [redacted]

BY MR. FANG:

Q. As you --

A. Thank you.

MR. FANG: I'm happy to reask the question, your Honor?

THE COURT: You may.

BY MR. FANG:

Q. As you used the term "white hat," what does that mean?

A. I don't have a formal security background — I didn't go to school for this or anything like that — but I can speak as someone that has helped out in a bunch of white-hat rescues generally. I just want to give that prelude and context to calibrate my answer.

What I understand white hat to mean, in the context of crypto, is someone that tries to make use of bugs or vulnerabilities in software in order to save user funds in advance of an adversary doing so instead.

Q. You also mentioned "Ethereum Foundation."
What is that?
A. The Ethereum Foundation is a nonprofit foundation that created Ethereum itself and sees itself as a sort of steward of the overall space and helps to perform research on Ethereum, as well as set roadmaps, get people together, et cetera.
Q. Why did Flashbots loop in people from the Ethereum Foundation for this response?
A. There were people with the Ethereum Foundation that were involved with the Ultrasound Relay — that was the first thing. So, one, two people, in particular, from the Ethereum Foundation that day also worked with the Ultrasound Relay. I did both. And the other thing was that in the course of following up with this incident, we were worried that there were broader implications for the Ethereum network that it kind of caused us to think harder about. So, we wanted to talk to people who were more experts in Ethereum's consensus and deep matters of how it works in order to follow up and investigate on what might be further issues with Ethereum itself.
Q. Now, you mentioned Ultrasound, as well.
Can you just remind the jury why Ultrasound was looped in on this response?
A. Ultrasound was another MEV-Boost Relay. We knew them well and worked with them. And their relay was the relay that had actually had the bug and the exploit on that day. So they had

logs, they had data, things like that, that were relevant to understanding the incident.

Q. And did you personally confirm, at a high level, the details of the investigation?

A. Yes. So, when I had woken up, I believe that the engineers, security researchers, and Ethereum Foundation folks had already kind of figured out what the root cause was. I reviewed that with them and reviewed some of their work in order to verify my understanding of what the bug was that day and make sure that made sense to me.

Q. At a high level, what are some of the materials that you reviewed in the course of this investigation?

A. The block header itself, where the parent root and state root were set to equal zero; the code of MEV-Boost Relay code base; and some of the logs from the Ultrasound Relay are things that I remember; and a description that was compiled by engineers, security researchers, some of the people in the community as kind of step-by-step of what the incident was, too.

BY MR. FANG:

Q. Mr. Miller, did you eventually determine how this exploit

occurred?
A. The Flashbots team and others did, yes.
Q. Were you a part of that group?
A. I reviewed their work, yeah.
Q. Okay. I want to direct your attention again to Government Exhibit 508.

MR. FANG: And let's go to slide 7.

Yes, thank you.

Q. Mr. Miller, using slide 7, can you explain to the jury what Flashbots learned about how the exploit or this incident occurred?
A. So where the slide is at, in the process of MEV-Boost here, is that the validator has asked for a block header from the relay. And the validator then takes this block header, and they add a couple of fields to it in order to sign it, to make their proposal for what block should be included on the chain. And in the incident that day, what the validator did was they set the parent root and the state root equal to zero, when the parent root and state root should actually be something else, since they have these particular meanings. That is where we are within the process on this slide.
Q. And, Mr. Miller, do you see a reference to a parent and state root in a block header on this slide?
A. Yes.
Q. Can you use your touch screen to blow it up in a box, or

just make some marking next to it?

A. I can certainly try. I don't know. It's my first time operating one of these.

Does that show for up for everybody?

Q. Mr. Miller, based on your participation in this investigation, what effect did setting the parent and state roots to zero have on the block header?

THE WITNESS: I'm still learning the ropes, so I appreciate that.

What effect it had was that the block was now not a valid block. So, the relay received the signed block header, and it checked to see, did it come from the right party and does it generally have the shape that I expect, is it generally -- you know, does it have the right fields, so to speak, or does it have the right -- does it have a parent root, does it have a state root, but the relay was not checking to see was the parent root and state root correct.

So, the relay validated the signature and revealed the block contents back to the validator, but this meant that when the relay went to publish the block to the broader Ethereum network, that block was rejected since the parent root and

state root were not correct. So that block could not actually be included on the chain; it wasn't a valid proposal from the validator.

MR. FANG: Ms. Kerest, let's go to slide 8, please.

BY MR. FANG:

Q. Again, just to take a step back, what did the validator involved in the incident do at this step?

A. The validator set the parent root and state root to equal zero and signed the block header, and then provided it back to the relay.

Q. Again, what does signing a block header and sending a block header to the relay mean in the MEV-Boost context?

A. In the MEV-Boost context, that represents a block proposal. So it's the validator saying, this is the block that I am selecting for inclusion on the chain next.

MR. FANG: Let's go to slide 9, please.

Q. Mr. Miller, based on your participation in the investigation of this April 2023 incident, what did the relay do at this step with respect to the block header?

A. It validated the signature. It did not check to see if the block header was correct.

MR. FANG: Let's go to slide 10.

Q. Based on your participation in this investigation, what did the relay do at this step?

A. It returned the block body or the transactions in the block.

Q. And, again, based on your participation in the investigation, what did the perpetrators of the incident do next with this information?

A. They used the block body of the invalid block to construct a new block.

Q. When you say "the block body," what do you mean by that?

A. The transactions in the block.

Q. Based on your investigation, what, if anything, happened next, after they constructed the second block?

A. They constructed the second block, and they created a valid proposal for that block to be included on the chain. So that second block is, ultimately, what was included on the chain.

Q. Based on your participation in this investigation, did you learn what effect that valid second block had?

A. Yes.

But are you looking for an effect on something in particular?

Q. Well, what happened with respect to that -- well, let me

rephrase.

Earlier, you testified that this incident caused other users to lose money.

What users are you referring to?

A. There are bot operators that were submitting bundles of transactions to block builders — those users.

Q. What effect, if any, did this second valid block have on those users?

A. It caused them to lose millions of dollars.

MR. FANG: Ms. Kerest, we can take this down.

Q. Mr. Miller, has Flashbots had security vulnerabilities before?

A. Unfortunately, yes.

Q. And can you explain for the jury what a security vulnerability is?

A. A way that you can make a code -- or how I would define it — again, given I don't have a formal security background, but I'm generally aware — I would define a security vulnerability as a way that you can make a code base act in an unintended manner in order to harm users or make some money.

Q. Is your awareness based on your experience developing MEV-Boost?

A. Yes. And products for Ethereum.

BY MR. FANG:

Q. Mr. Miller, what, if anything, was notable about this early April 2023 incident?

A. The scale, for one. It was a lot of money, 20, 25 million dollars, in that ballpark.

Q. Was there anything else?

A. There hadn't been an incident with validators in the MEV-Boost software in the past.

(Continued on next page)

BY MR. FANG:

Q. Now, did there come a time when Flashbots publicly disclosed its findings regarding this April 2023 incident?

A. Yes.

Q. Do you recall when this April 2023 incident occurred, the date?

A. Depends on your time zone. It's either April 2nd or April 3rd, I think.

Q. Do you know what the date would be in Eastern time?

A. I think April 2nd.

Q. When did Flashbots publicly disclose its findings regarding this April 2nd incident?

A. April 3rd or 4th.

Q. What involvement did you have in this public disclosure?

A. I wrote the public disclosure.

Q. I'd like to show you what's marked for identification as Government Exhibit 3302.

Mr. Miller, what is this document?

A. This is the postmortem — so the disclosure — that I wrote that details what happened on that day. And it also talks about a related issue that we found.

MR. FANG: I believe Government Exhibit 3302 is in evidence. May we publish this to the jury, your Honor.

MR. LOOBY: No objection other than -- nothing -- no new objections.

THE COURT: Thank you. You may.

BY MR. FANG:

Q. Mr. Miller, in the first line -- well, why don't we start with just what the title of this document is.

What's the header?

A. "Postmortem: April 3rd, 2023 MEV-Boost relay incident and related timing issue."

Q. And do you see a reference to Bert Mate?

A. Yes.

Q. Who is Bert Mate?

A. That is me.

Q. First line, Mr. Miller, can you remind the jury what the Ultrasound Relay is.

A. The Ultrasound Relay was another MEV-Boost relay. They had taken the open source version of MEV-Boost relay that we've been talking about, Flashbots made, and modified it. And they were running it in production at the time of the incident.

MR. FANG: And if we can just blow up that first paragraph, please.

Q. Mr. Miller, do you see a reference to a malicious proposer?

A. Yes.

Q. What's a proposer again in the MEV-Boost context?

A. It refers to a validator that's only performing one of their two roles. So, again, validators build blocks or they have two jobs; generally, they can order transactions in a

block or build them, and then they select a block for inclusion in the chain we're proposing. So here you can think of that as synonymous with validator.

Q. And, again, in the MEV-Boost context, which role of the two was the validator playing?

A. Proposing.

Q. Why did you call this April 2nd or April 3rd, depending on time zone, incident an exploit by a malicious proposer?

[redacted]

A. I called it an exploit because there was a bug in the software that caused an unintended behavior that caused users to lose a lot of money to the gain of the person that used the bug; to the gain of the person that set off the events of the day.

Q. When you say "unintended behavior" or "caused unintended behavior," what do you mean by that?

A. What I mean by that is that the unintended behavior here was that the relay was not checking to see if signed blocks that were returned to it by validators were correct. So the relay is supposed to look for a commitment from the validator before reviewing block contents. It wasn't looking to see if the commitment was valid.

And so here, the proposer got the relay to reveal the block contents when it really wasn't intended to work that way,

since the intention was to have a commitment to including a valid Ethereum block before the contents of those block were revealed.

Q. And how did they cause the relay to do that?

A. By setting the parent and state root equal to zero.

Q. When you say "vulnerability" in the second line —

MR. FANG: Ms. Kerest, if we can highlight that.

Q. — what is a vulnerability?

A. A bug in software. So it's a way to make the software do something that's not intended.

Q. And, again, what was the vulnerability here?

A. That the relay was not checking to see if the block header that had been signed by the validator was correct.

Q. Based on your investigation, was the block header actually correct?

A. It was not correct.

[redacted]

Q. Based on your investigation, what effect did that incorrect block header have?

A. The relay did not check to see whether the block header was correct. So it returned the block body, the transactions in the block, to the proposer. And then the relay went to publish the block to send it off for consideration for inclusion on Ethereum. That block was not valid. So it was rejected by the

broader Ethereum Network because it wasn't a correct block.

Q. Now, I'd like to turn your attention to the third paragraph.

MR. FANG: Ms. Kerest, if you can just blow up the first sentence in that third paragraph starting with "MEV-Boost works."

Q. Mr. Miller, do you see a reference to commit and reveal scheme?

A. Yes.

Q. And, again, just remind the jury what you mean when you say that.

A. Commit and reveal schemes are processes that we use in the crypto industry, where one party is committing to something before the contents of something else are revealed.

So, here, the validator is committing to a particular block as what they are selecting for inclusion before the block body and its transactions are revealed.

MR. FANG: And we can take down this blowup.

Q. Mr. Miller, I don't believe I got an answer to a question that I previously asked, which is: Based on your investigation, was the block header that was initially used in this April 2nd incident correct?

[redacted]

[redacted]

THE WITNESS: Thank you.

A. It was not correct.

MR. FANG: We can take this down.

Q. Mr. Miller, can you remind the jury what a slot is.

A. A slot is a window of time for a validator to propose a block.

Q. How are slots usually identified?

A. Are you asking how validators are chosen for a slot or how they are identified, as in how you would tell one slot from another, if that makes sense, or what a slot looks like? What's the question?

Q. Totally fair. I'll rephrase.

How do you distinguish a slot from another slot?

A. Slots have numbers. There's a unique number per slot.

Q. Sitting here today, do you remember what slot the exploit occurred in?

A. I think 6137846.

Q. Are you sure?

A. Not 100 percent.

Q. Okay. That's fine.

A. But I kind of wanted to try it in case I'm right. My mom would be proud of me.

Q. Mr. Miller, was the slot number recorded in the postmortem that you wrote?

A. Yes.

Q. And was the slot number fresher in your memory when you

wrote that postmortem?
A. Yes.
Q. Does that postmortem accurately reflect your knowledge?
A. Yes.

MR. FANG: All right. Ms. Kerest, if we can pull up just on the witness's screen what's marked as Government Exhibit 3302-U.

Q. Mr. Miller, do you see that on your screen?
A. I see 3302-U, yeah.
Q. Is this the postmortem that you wrote?
A. Yes.
Q. I'd like to direct your attention to the ninth bullet point under "timeline."

MR. FANG: Ms. Kerest, if you can highlight that, please.

Q. Mr. Miller, does the bullet that's blown up accurately record the slot number that the exploit occurred in?
A. Yes.

MR. FANG: Your Honor, the government asks that Mr. Miller be permitted to read the ninth bullet point into the record as a past recollection recorded under Rule 803(5).

THE COURT: Any objection?

MR. LOOBY: No objection.

Q. Mr. Miller, please go ahead and just read the bullet.
A. "The attacker used the block to construct a block that

drained the sandwich bots and proposed it in slot 6137846."

I got it right.

MR. FANG: We can take this down.

Your Honor, at this time the government intends to read another stipulation.

THE COURT: Just to remind the jury what a stipulation is, a stipulation is an agreement where there's no dispute about certain facts. The parties may stipulate or agree to those facts. You must treat these facts as having been proven for the purpose of this case.

MR. FANG: Before I read the stip, the government offers Government Exhibit S-704, which is the stip I'm about to read.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-704 received in evidence)

MR. FANG: May we publish to the jury?

Oh, I think it's up. Okay.

Government Exhibit S-704 states: It is hereby stipulated and agreed by and between the parties through counsel that the records set forth in Government Exhibits 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through Q, 5006-A through Q, 5007-A through Q, 5008-A through H, 5009-A through H, 5010-A through D, 5011-A

through H, 5012-AA through BD, 5013-A through H, 5014-AA through AD, 5014-AF through DC, and 5015-A through H consists of true and correct copies of publicly available blockchain records from blockchain explorer websites containing data from and relating to the Ethereum blockchain.

On the second page: It is further stipulated and agreed that Government Exhibits 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through Q, 5006-A through Q, 5007-A through Q, and all of these exhibits mentioned in that paragraph that I've mentioned constitute authentic records of a regularly conducted activity made at the time by a person with knowledge and maintained in the regular course of that activity pursuant to Rules 803(6), 901, and 902 of the Federal Rules of Evidence; and that this stipulation may be received and admitted as an exhibit at trial.

At this time the government also offers the government exhibits set forth in paragraph 1 of stipulation Government Exhibit S-704.

THE COURT: Any objection?

MR. MARX: No objection, your Honor.

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibits S-704, 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through

Q, 5006-A through Q, 5007-A through Q, 5008-A through H, 5009-A through H, 5010-A through D, 5011-A through H, 5012-AA through BD, 5013-A through H, 5014-AA through AD, 5014-AF through DC, and 5015-A through H received in evidence)

MR. FANG: Your Honor, at this time I'm about to move on to a new topic, and so perhaps it would be appropriate for the mid-morning break.

THE COURT: Yes.

All right. We are going to take a break this morning. Please be back and ready to go at 11:35.

My prior instructions apply: Do not discuss this case with anyone, don't do any research on this case or read anything about it, don't post anything on any website or social media and, finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

(Jury not present)

(Jury present)

THE COURT: If you all in the back row are having difficulty seeing the witness, you all can move down one chair.

All right. Mr. Miller, you may come back down.

MR. FANG: Ms. Kerest, can you please publish what is in evidence as Government Exhibit 5012-BD. And if you can just

enlarge the part where the text appears.

BY MR. FANG:

Q. Mr. Miller, what is this document?

A. This document is a screenshot of a service called Beacon Chain.

Q. And as part of your work at Flashbots, are you familiar with Beacon Chain?

A. Generally, yeah.

Q. Generally, what does it contain?

A. Information about Ethereum's consensus layer.

Q. And does what is reflected in Government Exhibit 5012-BD reflect what your investigation of the April 2nd exploit found?

A. That's the exhibit we're looking at, right?

Q. Yes.

A. Yes, it does.

[redacted]

MR. FANG: Ms. Kerest, if you can enlarge header 1 slot and header 2 slot.

Q. Mr. Miller, do you see the same string of numbers following header 1 slot and header 2 slot?

A. Yes, I do.

Q. Is that the slot number that this exploit occurred in?

A. Yes.

MR. FANG: Ms. Kerest, if you can enlarge header 1,

state root; and header 1, parent root.

Q. Mr. Miller, can you remind the jury what Flashbots determined on how the exploit occurred?

A. The validator got a block header from the relay. And when it was adding the parent root and state root, it said it equaled to zero instead of what the expected values were.

MR. FANG: We can take the enlargement down.

Q. Mr. Miller, what did your investigation reveal as to the number of blocks that were proposed in the exploit slot?

A. There were two proposed blocks. One of them was not correct.

Q. What do you mean when you say one of them was not correct?

A. One of them had the parent and state root equal to zero, and so it couldn't actually be included and executed on the Ethereum chain.

Q. What, if anything, did your investigation reveal as to whether the second block was correct?

A. It was correct. So that was included and executed on the Ethereum blockchain.

Q. Mr. Miller, does header 2 appear to relate to that second block?

A. Yes.

THE WITNESS: Thank you.

Q. And, Mr. Miller, what, if anything, happened to the validator based on your investigation?

A. When the validator proposes two blocks for a given slot, there's a financial penalty that we call slashing. So the proposer was slashed, which means they lost some money. They were penalized within the Ethereum system.

Q. What was the slashing penalty in April 2023?

A. One ETH.

Q. Before we take this down, Mr. Miller, based on your investigation, how did the block header fields for the two blocks differ?

A. The header fields for the first block have the parent and state root set to zero. So you see it on the screen, zero X and then many zeros. The header fields for the second header had the parent and the state root set to the fields that we would normally expect, the correct fields. So they are cryptographic hashes, and that means computers can make sense of this, but we can't. They are letters and numbers.

Q. And are those cryptographic hashes being sent to any particular party?

A. Can you anchor it in a specific context? There's multiple

things that I could --
Q. You mentioned that the parent and state roots are cryptographic hashes. Ultimately, are those hashes going to somebody?
A. Well, these are hashes that are meant to uniquely identify some information for the blocks. And they have a specific meaning in the Ethereum context.
The first are used by the relay -- they should be used by the relay to see is this block correct. But then, second, they are published to the broader Ethereum Network where computers on the network will check these hashes, see if they are what they expect them to be, to make sure that these are valid blocks within the Ethereum Network.
Q. Mr. Miller, I think a little bit earlier you said that the slashing penalty in April 2023 was one ETH. Do you have a ballpark as to how much that is in dollars?
A. A few thousand dollars in 2023.
MR. FANG: We can take this down.
Q. From your work at Flashbots, are you familiar with the term "honest validator"?
[redacted]
A. Yes, generally.
Q. How do you use that term?
A. In cryptocurrency systems, we -- there are rules for how

the different computers in the network are supposed to interact and the different actions that actors must take and they should take. And to call an actor honest in the context of crypto is to say that they are performing the actions that they must and should take according to the specification.

So in this context, Ethereum has a specification that's set out for how validators must and should act. And "honest" means that they are doing the things that they should according to the specification.

Q. What does an honest MEV-Boost validator mean?

A. In the context of what we've been talking about, a validator that signs one block or proposes one block, rather, and does it within the time window that it's allocated.

Q. What do you understand it to mean for a MEV-Boost validator to act dishonestly?

A. Again, this refers back, I think, to the idea of honesty within cryptocurrency systems or distributed systems.

In this context, that would mean a validator that is not taking the expected or intended behavior according to the specification, so specifically here proposing two blocks in a slot.

Q. And just back up a little bit.

What is a distributed system at a high level?

A. It's been a while since I gave these definitions, so bear with me.

A distributed system at a high level is a general field of trying to make systems that don't rely on a single computer. So you distribute the system across many different computers instead of having a single party like a government or a bank or a tech company manage the whole thing.

Q. Does MEV-Boost operate in a distributed system?

A. Yes, Ethereum. Ethereum is a distributed system.

Q. What actions, if any, did Flashbots take regarding the validator involved in this April 2nd exploit?

A. We operated a relay. And we briefly implemented a blacklist at our relay for the validator in question. So that would prevent them from interacting with our relay.

Q. How common was it for Flashbots to blacklist validators?

A. It's the only time we've done that.

Q. And why did Flashbots blacklist the validator for the April 2nd exploit?

A. We were worried there were going to be follow-on incidents, essentially.

Q. What do you mean by "follow-on incidents"?

A. In the course of investigating the vulnerability that was exploited on April 2nd, we realized that there were related issues that a motivated attacker could make use of; they could exploit other bugs in the system, essentially. And so we were worried that since the attacker had successfully pulled you off one thing, they might do other things, since we were aware that

there were several other issues in the system that came about as a part of our investigation. So we took preemptive action to prevent their known validator identities from interacting with our relay to try to prevent them from attacking the system further.

Q. And is that the blacklist that you're referring to?

A. Yes.

Q. Remind the jury what actions, if any, Flashbots took to fix the actual vulnerability.

A. We created a patch that updated the code to prevent the bug from happening again. And we updated our relay and we worked with other relays to update their code too.

Q. At a high level, what did the patch do?

A. So it made sure that the relay successfully published a block to the Ethereum Network before returning it to the validator. And what that would mean is by successfully publishing a block, you know that it was correct, that it had all of the fields that it should, that the fields were correctly constructed, and then that block could actually be considered for inclusion on the network. And we did that before we returned the block body to the validator so we were sure that they gave us the correct block with the correctly constructed block header.

Q. And just explain to the jury or for the jury what a correctly constructed block header means.

A. Blocks on Ethereum have specific structure, specific fields, and those fields have specific values. And so here I mean a block that had the fields it should with the values that it should.

And in contrast, setting the parent root and the state root equal to zero were not the values that you should expect in those fields, and that caused the Ethereum Network to reject that block.

So a correctly constructed block here means a block header that has the fields that it should with the values it should that is accepted by the Ethereum Network.

Q. Where, if at all, did Flashbots make the patch accessible?

A. On our GitHub page, the code repository for MEV-Boost replay.

Q. And, again, is that publicly accessible?

A. Yes.

Q. Now, Mr. Miller, just shifting gears.

After the April 2nd exploit, did there come a time when the perpetrators of the exploit reached out to you?

A. Yes.

Q. Remind the jury how they identified themselves.

A. They identified themselves as Low Carb Crusader.

Q. Showing you what's marked for identification as Government Exhibit 3306. Mr. Miller, what is this document?

A. This is an email chain between the perpetrators as Low Carb

Crusader and myself, as well as two other people that they sent an email to.

MR. FANG: Government offers Government Exhibit 3306.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit 3306 received in evidence)

MR. FANG: May we publish for the jury?

THE COURT: You may.

Q. Okay. So, Mr. Miller, let's just orient the jury. What is the subject line of this email chain?

A. "Urgent. Block equivocation."

Q. And where does the earliest email, earliest-in-time email in this chain appear?

A. At the top.

Q. Who sent this first email?

A. Low Carb Crusader.

Q. And who were the recipients?

A. First, myself. Then this security researcher who's very well-known and respected in the space called Sam; Samczsun is the full name this refers to. That's sam@paradigm.xyz. Then myself, bert.c.miller@gmail.com. And finally, Justin Drake, who works at the Ethereum Foundation and was affiliated with the Ultrasound Relay. And I will add for context that Samczsun helped us investigate the incident originally.

Q. So, Mr. Miller, when was this first email sent?

A. April 21st, 2023.

Q. Approximately how long after the exploit was that?

A. Twenty-one minus two, so 19; 19 days approximately.

Q. At the time you received this email, did you know the identity of Low Carb Crusader?

A. No, I did not.

MR. FANG: Your Honor, at this time I'd like to read from another stipulation.

THE COURT: You may.

MR. FANG: It's marked as Government Exhibit S-708.

Before I read it, government offers Government Exhibit S-708.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-708 received in evidence)

MR. FANG: Publish that to the jury.

Government Exhibit S-708 states that: It is stipulated and agreed between the parties through counsel that Proton Mail is an end-to-end encrypted email service. End-to-end encryption ensures that only the sender and intended recipient can read a message, which makes the message content inaccessible by the email service provider or other third parties. Proton Mail is based in Switzerland.

The Proton Mail email address low.carb.crusader@proton.me was used and controlled by Anton Peraire-Bueno and James Peraire-Bueno.

On the second page: It is further stipulated and agreed that this stipulation may be received into evidence as a government exhibit at trial.

MR. FANG: Now, Ms. Kerest, let's go back to Government Exhibit 3306, that first email.

Q. I'd like to direct your attention to Low Carb Crusader statement "I am responsible for the equivocated block last week."

What is an equivocated block?

A. "Equivocation" refers to signing two blocks in a slot. So an equivocated block means a block that you first sign, and that would be the equivocated block, and then you signed something else after that. So this is referring, I believe, to the block that was signed with the parent root and state root equal to zero.

Q. And, again, just remind the jury, in each slot, how many blocks can be published?

A. There's only one block for a slot. In theory, you could publish multiple, that's why there is equivocation. But the protocol only has one block per slot.

Q. How many blocks can be actually published on chain for each slot?

A. Only one block can be included on chain per slot.

Q. What's the difference that you're drawing between including and publishing?

A. Well, in the incident, they published two blocks. One of them was just not valid, and the other one that was valid was actually included. I'm drawing the distinction between them publishing two blocks, which they can publish three, in theory, if they wanted. You should only publish one, that's the intended behavior of the protocol and what was actually included. You can only actually include one thing. You can theoretically publish multiple things, although you are penalized for doing that. Does that make sense?

(Continued on next page)

BY MR. FANG:

Q.  Yes.

        And is that intended behavior applicable to block

proposal under MEV-Boost?

A.  Yes.

Q.  Was Low Carb Crusader's description of their actions as

equivocation completely accurate to you?

A.  It missed the important detail that one of the blocks was

not just equivocated, but has the parent and state root set to

zero.

Q.  And why does that matter?

A.  Because that caused the relay to act in a way that we

didn't intend.  The relay is intended to receive a commitment

to a block that's going to be included on the chain, and only

then reveal the block body in the transaction contents.  So, to

me, it was an important detail of the day, and block

equivocation doesn't fully capture all of the events.

Q.  I'd like to direct your attention to the next sentence.  "I

have a message about block equivocation that I think you would

find useful."

        Mr. Miller, when you received this email, what did you

understand Low Carb Crusader to be saying?

A.  What I understood was they were saying they had another way

to pull off a similar incident as what had happened on

April 2nd.

Q. So, do you see where they -- or Low Carb Crusader says, "I could send it to security@flashbots.net"?
A. Yes, I see that.
Q. What is security@flashbots.net?
A. We had a program where people could disclose security vulnerabilities or bugs in our software to us at an email called security@flashbots.net.
Q. When you say "security vulnerabilities," what do you mean by that?
A. Ways to get the software that we use in our products or our open source software, like MEV-Boost, to do things that they're not intended to.
Q. Does that also include other Flashbots software products?
A. Yes, it does.
Q. Would that include MEV-Boost's relay?
A. Yes.
Q. Do you see where Low Carb Crusader writes, "I am not looking for a bug bounty"?
A. I see that, yeah.
Q. What's a bug bounty?
A. A bug bounty refers to this practice of when you disclose a bug in software to the team that maintains that software, they will give you money in return, a bounty in return, for disclosing it. And it's meant to incentivize and reward people for responsibly disclosing bugs.

Q. Did Flashbots have a bug bounty?
A. Yes.
Q. In April 2023, how much could a user receive for disclosing a security vulnerability to Flashbots?
A. It depended on the code base. So we had different bug bounties, different tiers, for different products in open source code that we had, as I remember, but you could receive up to tens of thousands of dollars, I think, if it was something really critical and important that you disclosed.
Q. Would you consider the April 2nd exploit to be critical?
A. I think we would have classified it as critical, yeah.
Q. Why?
A. It undermined the relay's ability to do its job, which is to facilitate this commit and reveal, and it led to the loss of user funds.
Q. What was your understanding of what Low Carb Crusader was saying in this email?
A. First, they were responsible for the incident on April 2nd. Second, they had a way to pull off something similar that didn't rely on a software bug in the same way that April 2nd did. And, third, they were looking to disclose it to me, Justin Drake, and Samczsun. That's all I've got to say.
Q. And, Mr. Miller, by the way, do you have a Flashbots official email address?
A. Yes, I do.

Q. Is the email address that you see here your professional business address?

A. That is my personal email, not my professional one.

Q. How common is it for you to learn of security vulnerabilities through your personal email?

A. Not common.

Q. What was your reaction to receiving this email?

A. It was surprising. There are many things about it that were strange to me, and it also worried me slightly.

Q. What was strange about it?

A. For one, somebody who had just pulled off a major exploit, used a major bug in software that we maintained, was now reaching out to us. That's strange. Why are they doing that?

For another, it's sent to three people — myself, Samczsun, and Justin Drake. I get why you might send it to me, because Flashbots maintained the open source relay. I can sort of make sense for Justin Drake, because he was the Ultrasound Relay guy. Samczsun doesn't work at Flashbots, he doesn't work at Ultrasound, he's not an Ethereum Foundation guy. Why is he on there? It's strange. Typically, you disclose security vulnerabilities to the party that maintains a particular repository, and then you allow them to decide who to involve, but they sent it to three people.

Third, they are looking to disclose something that clearly has important implications for us, but they're making

sure upfront to say that there's not a bug in the relay and they're not looking for a bug bounty. So, the whole thing is just on very strange terms. I hadn't experienced something like this before.

Q. Mr. Miller, again, can you just remind the jury who Samczsun is?

A. He is a very well respected security researcher and white hat in the Ethereum space, and he helped us in the initial response to the incident on April 2nd.

Q. You also testified that you were worried when you received this email.

Why was that?

A. Well, we had a motivated person that had pulled off an attack on one of the relays in the ecosystem on a code base that was based off a software that we maintained in the MEV-Boost Relay, and here is that person allegedly saying they have a message about a similar strategy and sort of implying that they could pull off the same thing, if they wanted, in a different way. And it was a huge headache, and it took a lot of time and effort to respond to the first incident, and so I was worried that they had knowledge on how to pull off something similar and that they might actually do this at some point in the future, because the whole thing was kind of strange. I don't know what their intentions or motivations were.

Q. I'd like to turn your attention past this email to Low Carb Crusader's next email on the second page.

MR. FANG: Ms. Kerest, if we can blow up the email at 6:19 p.m.

Q. Mr. Miller, just to be clear, did Low Carb Crusader disclose any vulnerability before you received this email?

A. No.

Q. Mr. Miller, can you read the first sentence, starting with "it has saddened."

A. "It has saddened me to see the situation reported as a 'relay exploit.'"

Q. What reporting did you understand Low Carb Crusader to be referring to?

A. Popular discourse around the incident and probably the postmortem that I wrote, as well.

Q. By the way, was the postmortem public?

A. Yes, it was.

Q. Where was it posted?

A. On a website that Flashbots maintains called the Flashbots forum or Flashbots Collective.

Q. Again, why did you refer to this incident as an exploit?

A. It was a bug in our software that caused the relay to do something that it wasn't intended to, and users lost money as a result.

Q. In the rest of the paragraph, that first paragraph, what

did you understand Low Carb Crusader to be saying?

A. In just the first paragraph?

Q. The first paragraph, yes.

A. In just the first paragraph, they are saying that the reporting — so, people who were discussing this or maybe even the report that I wrote, the postmortem — misses that there are ways that you could have achieved the same effect on April 2nd without making use of the exact bug that they did of setting the parent root and the state root equal to zero.

Q. Based on your participation in investigating this exploit, did Low Carb Crusader, in fact, conduct the exploit by making use of the bug in the relay?

A. Yes.

Q. What was your reaction to Low Carb Crusader's saying that the strategy was possible even without exploiting a bug?

A. It's complicated. And they had exploited the bug, so, in some ways, it -- I'm not exactly sure what they're trying to say by telling me that strategy would have been possible if they had not set the parent and state root equal to zero. And we became aware, in following up on the incident, of a number of follow-on issues where you could have pulled off similar things to similar effects without setting the parent and state root equal to zero. And so I knew that to be true, but, of course, my reaction was, you know, that is still a very important detail for the day.

Q. Did you know about these other potential strategies before April 2nd?
A. In general, there's a class of attacks in Ethereum that we would call equivocation attacks where proposers propose multiple different blocks, and I was generally aware of that before April 2nd, yes.
Q. Does an equivocation attack always involve the use of exploiting a bug?
A. No.
Q. Now, turning your attention to the next paragraph, starting with that first sentence "I am ready" --
A. You mean "I am ready"?
Q. Yes.
Mr. Miller, if you can just read the first sentence in that second paragraph that's being highlighted right now.
A. Okay.
"I am ready to describe the details that would make this strategy still possible today."
Q. What was your understanding of what Low Carb Crusader was offering to do?
A. They would disclose a way to pull off something that was substantially similar on April 2nd to me, Samczsun, and Justin Drake. In return, we needed to make the strategy and our mitigations for it public as soon as possible, we needed to refer to the relay exploit as a, quote-unquote, noncritical

part of the strategy and event of the day, and we needed to refer to them in a neutral way, like Low Carb Crusader, instead of a negative way, like relay exploiter.

Q. Do you agree that the relay exploit was a noncritical part of the strategy?

A. It is certainly possible that they could have pulled off a similar thing with an equivocation attack that didn't use the bug that it did. I cannot ignore, however, the fact that the bug was exploited on that day, and it was an important part of the incident on that day.

Q. And, again, why was it an important part of the incident?

A. Because it meant that the relay did not have an actual commitment from the validator when it was performing its part of the commit and reveal. So, the purpose of the relay, again, is to help the builder and the validator work together. The relay is supposed to keep the builder and its block contents, the transactions in the block, private until it gets a commitment from the validator. And, here, the commitment that the relay got from the validator was not a correct one, it wasn't something that could actually be included on the chain, and so the contents of the block were revealed even though there wasn't an actual commitment.

Q. Mr. Miller, do you see a reference, in the second line from the bottom, to "sandwich the ripper"?

A. Yes.

Q. What's your understanding of what "sandwich the ripper" refers to?
A. When the incident happened, there were a number of names that were thrown around for what to call the perpetrators of the incident, one of which at the time was sandwich the ripper.
Q. How did you view Low Carb Crusader's proposal?
A. I was worried, as the person who led the product engineering team at Flashbots and as a person who cared about Ethereum, that there would be more attacks. It took a lot of time and effort from us, it destabilized Ethereum, it was a big headache in general. And I thought it was a strange proposal, but there seemed to me, and to the people I had consulted on our team, to be a little downside to me agreeing to the proposal because I could always just state that this was the request on behalf of Low Carb Crusader, that they requested that I refer to them in a neutral way in return for disclosing these details, and people would read between the lines, effectively.

So if I agreed to the proposal, I would receive details of a strategy that might cause a big headache for me and my team and the rest of Ethereum, and I wanted to prevent that. And there wasn't all that much downside to me because I felt like it would be apparent to folks that would read on why I made the decisions that I did and agreed to the proposal.

BY MR. FANG:

Q. Mr. Miller, when you said that people would be able to read between the lines, what did you mean by that?

A. That in disclosing the strategy that Low Carb Crusader gave me, if I said Low Carb Crusader has disclosed the strategy in return for being named Low Carb Crusader, then people would understand that I was doing that pragmatically and that I still viewed them as an attacker on the day of April 2nd. I was doing it out of pragmatism, to get a disclosure of a strategy that might cause us, our users, the Ethereum community, more headaches.

Q. Is that why you ultimately agreed to Low Carb Crusader's proposal?

A. Yes.

Q. Did there come a time when you actually did publicly disclose this alternate strategy?

A. Yes.

Q. And, to be clear, was the strategy ever used, to your knowledge?

A. Not to my knowledge.

Q. At this time, I'd like to show you what's marked for identification as Government Exhibit 3301.

MR. FANG: And we can take this exhibit down. Thank

you.

Q. Mr. Miller, what's this document?

A. This is the public disclosure that I wrote that had the details of the strategy that Low Carb Crusader revealed to me.

MR. FANG: The government offers Government Exhibit 3301.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit 3301 received in evidence)

BY MR. FANG:

Q. Mr. Miller, I'd like to just show you the first page, and specifically that bolded line at the bottom of the first paragraph.

Can you read that?

A. "Flashbots relay logs confirm that the strategy was never used in production."

Q. What's a relay log?

A. There, it refers to information that we would store, or data that we stored, on how the relay that we operated as a product was operating — so useful information that would help us understand what it was doing at what time and how people were interacting with it.

Q. And, again, just to orient the jury, who wrote this document?

A. I wrote this document.

Q. What did you mean when you wrote "Flashbots relay logs confirm that the strategy was never used in production"?

A. My team looked at the logs for evidence that the strategy that Low Carb Crusader had disclosed to me and whether that strategy had actually ever been used, and we were not able to find any logs that it was used in our production relay. So, we could say with confidence that the strategy was never used in production, at least on the Flashbots relay.

Q. Just to be clear, is the strategy that you were disclosing a different strategy than what actually happened on April 2nd?

A. Yes.

MR. FANG: Take this down.

Your Honor, I'm about to move on to a separate topic, if now is an appropriate time to take a break for lunch?

THE COURT: For lunch? Yes, it's almost 12:30, so why don't we do that.

We'll take our break for lunch now, and we will return, please, you all be ready in the jury room at 1:30. Just a reminder again that my prior instructions apply. Do not discuss this case with anyone, don't do any research or read anything about it in the news, don't post anything about it on any website or social media, and remember to keep an open mind.

All right. I will see you all after lunch.

(Continued on next page)

(Jury present)

THE COURT: I hope you all had a nice lunch. We're going to now continue with testimony.

And Mr. Miller can come back to the witness stand.

BY MR. FANG:

Q. Mr. Miller, after April 2023, did there come a time when Low Carb Crusader came back on your radar?

A. Yes.

Q. How so?

[redacted]

A. A couple months after the incident, as I remember, Low Carb Crusader on the blockchain staked a bunch of ETH. They wanted to run or they were running more validators, and that caught my attention.

Q. When you say "a bunch of ETH," what do you mean?

A. They had a lot of money. And they were staking, I believe, in the range of millions of dollars worth of the money that they had in order to run more Ethereum validators.

Q. How did you learn about that?

A. I was sent a tweet by someone on my team that detailed this and showed it on the blockchain, the Ethereum blockchain.

Q. What was your reaction to that?

A. That was surprising to me; and it made me worry that there might be further attacks and incidents in the future. Since Low Carb Crusader had used a validator in the past to attack the relay, perhaps they were gathering more validators to attack the relay again.

Q. I'd like to show you what's marked for identification as Government Exhibit 3307.

Mr. Miller, what is that document on your screen?

A. The document on the screen is me sending Low Carb Crusader an email.

MR. FANG: Government offers Government Exhibit 3307.

[redacted]

[redacted]

It is admitted and you may publish.

(Government's Exhibit 3307 received in evidence)

MR. FANG: Thank you, your Honor.

Q. Mr. Miller, what's the date of this email?

A. June 29th, 2023.

Q. Approximately how long was that after the exploit?

A. A few months.

Q. What's the subject line of this email?

A. "Thanks for the disclosure."

Q. Who's the sender?

A. I am the sender.

Q. And who is the recipient?

A. Low Carb Crusader.

Q. Why did you send this email?

A. I had seen them stake ETH and to start out to run a lot of validators. And I was worried that they might take action against our relay or another relay in the ecosystem.

And when the incident happened, it was a big headache for me. It was very stressful. So I sent them the email to see if I could preempt any action that they might be taking. It previously disclosed a strategy that could have done substantially the similar thing. Perhaps, instead of them carrying something out, they were willing to just disclose it to me again. So I wanted to open the door to see if that was

the case because that would save me a lot of time and stress, and perhaps our users also.

Q. And, Mr. Miller, remind the jury how you perceived the April 2023 emails from Low Carb Crusader.

A. In general?

Q. Yes, when you received those emails.

A. It was strange, that was first. And second, it was worrying to me because it was from a person that had proven that they were sophisticated, they were motivated, and they could pull off attacks on the relay, effectively telling me that they could do it again. So that worried me. It felt like an implicit threat in some ways.

Q. Mr. Miller, did you receive any response from Low Carb Crusader to this June 2023 email?

A. No.

Q. Did you have any communications with Low Carb Crusader after June 29th, 2023?

A. No.

MR. FANG: We can take this down.

Q. Mr. Miller, have you met Anton Peraire-Bueno and James Peraire-Bueno before?

A. Yes, I have.

Q. How did you meet them?

A. I was an MEV searcher in the early days of Flashbots, so I ran arbitrage bots. And I was talking in the Flashbots Discord

where they were also participants in the Discord; they also ran arbitrage bots. So I met them through the Flashbots Discord.

Q. And approximately when did you meet them?

A. Early 2021.

Q. Remind the jury what an MEV searcher is.

A. It's a special actor that searches for MEV. Put another way, they search for opportunities to make money by having the right transaction at the right place at the right time, like buying assets at a low price, selling them at a high price.

Q. Mr. Miller, how did you learn Anton and James Peraire-Bueno's names?

A. I don't exactly remember, but I have a loose recollection that we had a call with them. They were top users of Flashbots in the early days. They ran an arbitrage bot and they were quite good at it. So people from my team — myself included — scheduled a call with them to talk about MEV and the market.

And I believe in that call — but this is kind of loose, so appropriate caveats — that they showed up and revealed their names. I don't remember on purpose or not, but I think that's when I became aware of their actual names.

Q. How would you describe your relationship with Anton and James Peraire-Bueno?

A. I lead product and engineering at Flashbots for a company that makes infrastructure for MEV. So it's my job to know searchers, be friendly with them, to talk to them about the

market, to talk to them about their strategies, their needs, etc., to best inform what products and offerings we can make. So I talked to them frequently about MEV, about the market, about different things that are going on in crypto.

Q. How would you usually communicate with them?

A. Discord, so a messaging service.

MR. FANG: At this time the government would like to read another stipulation which is marked as Government Exhibit S-714.

THE COURT: You may.

MR. FANG: First, government offers Government Exhibit S-714.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-714 received in evidence)

MR. FANG: Ms. Kerest, if you can publish that to the jury.

Government Exhibit S-714 states that: It is hereby stipulated and agreed between the parties through counsel that the government exhibits set forth in attachment A are true and correct copies of chat records maintained by Discord, Inc., an electronic communications provider, for the Discord accounts registered to user names snoopy6353#0, curiousrabbit#0, and deleted_user_3159d48c1bad.

The government exhibits set forth in attachment A were contained in records provided by Discord, Inc. in response to a search warrant. The chat participant field accurately identifies the Discord user names of the chat participants relating to each government exhibit as listed in attachment A. The date field accurately lists the date of each Discord chat listed in attachment A.

Government exhibits bearing the suffix "-A" or other letters consist of true and correct copies of attachments to the Discord chats associated with the government exhibit bearing the same number. The table below is a true and correct list of Discord account user names, the account user, the user's email address associated with each Discord account user name and the date each Discord account was created.

The Discord account associated with deleted_user_3159d48c1bad#0 included in the government exhibits set forth in Exhibit A was used by James Peraire-Bueno. The Discord account associated with display name Snoopy included in Government Exhibits 6010 and 6723 was used by James Peraire-Bueno.

It is further stipulated and agreed that this stipulation may be received into evidence as a government exhibit at trial.

If we can turn to attachment A, please.

The government exhibits covered by Government Exhibit

S-714 are Government Exhibits 3001, 3002, 3002-A, 3005, 3005-A, 3006, 3007, 3009, 3010, 3011, and 3012.

We can take this down.

BY MR. FANG:

Q. Mr. Miller, remind the jury what white hatting is.

A. Again, I've general knowledge, since I have helped with a bunch of white hat rescues, but I'm not a security expert, I don't have formal training in that, so this is general knowledge. Just a caveat.

But white hatting in the context of crypto means trying to make use of security vulnerabilities to rescue and give back user funds before an adversary could take them.

Q. And do white hat users typically act, in your experience, for profit?

A. There's a range of different ways that people do white hatting. The industry norm is to be effectively tipped ten percent of the money that you help save. But there are a bunch of people who just do it because they want to do some good or to help people out; there are some people that do it for profit.

Generally, the people who are really, really good are not doing it for profit because they could be making more money doing something else.

Q. Have you ever talked with Anton and James Peraire-Bueno about white hatting before April 2nd, 2023?

A. Yes, I think so.

Q. Why?

A. I helped with the Flashbots white hat group. And since people knew me as the head of product and engineering and a leader at Flashbots, they would turn to me if there were security incidents with their protocols, if they needed help rescuing users' funds.

So on one case I had asked the brothers to help me with a white hat rescue where I needed specialized technical infrastructure and knowledge that they had. In another case, there was a moment in the future where we knew that a lot of users would receive effectively money — we call it an air drop in crypto. There is a popular asset that was going to launch in the future, and you knew ahead of time which accounts would receive money.

There are a lot of people that turn to Flashbots and our white hat group for help because their passwords have been compromised. And they knew that a hacker had access to their password as well, so they turned to us to help make sure that when their money became available, they could be the party that would ultimately get that money instead of a hacker.

And pulling this off and sort of saving money in this way is very technically sophisticated. And so I turned to the brothers for advice and help on executing on this white hat rescue. There were a bunch of people who were looking for our

 help in saving their money effectively.

Q. So, Mr. Miller, just shifting gears, did there come a time when you learned who allegedly conducted the April 2nd exploit?

A. When the indictment dropped.

Q. Is that the indictment in this case?

A. Yes.

Q. And what reaction, if any, did you have to learning the identity of the alleged exploiters?

[redacted]

A. My first --

Q. Go ahead.

A. My first reaction was one of surprise. I did not expect the brothers to be the perpetrators. I was also disappointed because the brothers were young, they're very talented, they were very good at what they did. They didn't need the money. And it seemed like a very stupid thing, in my estimation, to do. At the very least, it's complicated. We are here today talking about it, right?

So I was disappointed in them because I felt like they did something very dumb that may greatly impact their future. And I felt deceived as well because in the course of all of this, they had not told me they were Low Carb Crusader, and not told me they had intended to do this. And I had talked to them after the incident as well.

Q. And just to clarify that last point, Mr. Miller, what communications after the exploit did you have with Anton and James Peraire-Bueno?

A. I had messaged them on Discord about the normal things that we talked about: The market, crypto, what's going on in MEV, their strategies, you know, etc.

Q. Did Anton Peraire-Bueno ever indicate to you that he was Low Carb Crusader?

A. No.

Q. Did James Peraire-Bueno?

A. No.

Q. Now, Mr. Miller, I'd like to show you what's marked as Government Exhibit 3010.

Are these messages that you had with the defendants?

A. They look like it, yeah.

Q. How do you know that?

A. Well, it has my Discord name at the top.

MR. FANG: Government offers Government Exhibit 3010.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit 3010 received in evidence)

MR. FANG: Go ahead and publish that to the jury and show page 2.

Q. Mr. Miller, what is the date of these messages?

A. April 3rd, 2023.

Q. How long after the exploit was that?

A. Very recent; hours after.

Q. Do you see your user name in this thread?

A. Yes.

Q. And do you recognize the other user name that you currently see on this page?

A. The other user name being Curious Rabbit?

Q. Yes.

A. Yes.

Q. Turning your attention to page 2. Mr. Miller, do you remember -- well, first of all, do you see a third user at the bottom of the page, snoopy6353?

A. Yes.

Q. Who are snoopy6353 and Curious Rabbit?

A. James and Anton.

Q. Do you remember what you were asking them to do that day?

A. There had been a smart contract. Seemed like a puzzle to me, and I was asking them for help with capturing some MEV.

Q. Did this have anything to do with the April 2nd exploit?

A. No.

Q. Can you read the last four messages on this page, including the user name and then the content of the message?

A. So snoopy6353#0 says: Gm gm. Lots to wake up to. Uh re: Full blocks we couldn't have done it anyways, lmao. Have been

lazy and waiting for reth.

Q. When you saw these messages, what did you understand "gm gm" to be?

A. It stands for good morning in crypto.

Q. Is that a crypto-specific term?

A. I don't know. I think it started in crypto, but maybe it has exited crypto only. But it's certainly popular in crypto.

Q. And, again, what's the date on these messages?

A. April 3rd, 2023.

Q. Did either James or Anton Peraire-Bueno ever mention anything about the exploit the day before in these messages?

A. No. Well, here, Snoopy is saying: Lots to wake up to, which I assume is an inadvertent reference to the exploit. But it's not like they directly mentioned it to me or their involvement, if that's what the question is.

Q. Do you know one way or the other what he was referring to?

A. The only thing of note that I can remember happened that morning, so I assume that is what he is referring to. But, you know, I can't speak for him.

[redacted]

(In open court)

THE COURT: Mr. Fang, before you proceed, let me just let the jury know that from time to time it may be necessary for me to speak to the lawyers out of your hearing, as we just did right now.

The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Please do understand that while you are waiting, we are working. I will do what I can to limit the number and length of these conferences. And I would invite you, to the extent we have these conferences, to stand up and stretch if you would like to do that. And I may from time to time call a short recess if I believe there's a lengthy issue that we need to discuss.

Mr. Fang, you may proceed.

MR. FANG: Thank you.

BY MR. FANG:

Q. Ms. Kerest, before we take this exhibit down, Mr. Miller, I'd just like to direct your attention to the third message: "Full blocks we couldn't have done it anyways lmao."

Do you see that?

A. Yes.

Q. What was your understanding of what that message means?

A. What I think my understanding was is that they wouldn't have been able to construct a full block; they didn't have the capability to do so.

MR. FANG: We can take this down.

Q. Mr. Miller, do you also -- I want to go back to your testimony on white hatting. And just to be clear, in your experience, does a white hat typically involve the return of funds?

[redacted]

A. Yes.

Q. Now, Mr. Miller, I'd like to show you what's marked for identification as Defense Exhibit 1024.

Do you recognize this document?

A. Yes.

Q. What is it?

A. This is a screenshot of the GitHub page for MEV-Boost.

Q. Is that the same GitHub page that you mentioned earlier?

A. Yes, it is. Well, we talked about multiple, but I mentioned MEV-Boost's GitHub page at some point earlier.

MR. FANG: Government offers Defense Exhibit 1024.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: This is admitted.

(Defendants' Exhibit 1024 received in evidence)

MR. FANG: Ms. Kerest, if you can display -- if you can publish that for the jury, and also display a section that says MIT. You may have to scroll down a couple pages. If you can just blow up the bottom portion of that page under readme.

Q. Mr. Miller, are you generally familiar with this language?

A. It's been a long time since I've read it, but I generally am familiar, yes.

Q. Did you draft this language?

A. No.

Q. Are you a lawyer?

A. I am not a lawyer.

Q. Do you see the reference to MIT license?

MR. FANG: And, Ms. Kerest, if we can just highlight that.

Q. What do you understand MIT license to refer to?

A. When you publish software, when you create software, you are creating intellectual property. And you have rights to those intellectual property.

So when -- this is my understanding: When other people want to use that intellectual property, you need to give them a license and tell them the conditions under which they can use that, such as to create their own version, to fork off, to modify and make changes to your intellectual property. So the MIT license is a popular license that is used in software engineering.

Q. Is it specific to MEV-Boost?

A. MEV-Boost appears to have the MIT license, but it is not a MEV-Boost-specific license.

Q. Is the language specific to Flashbots?

A. No.

Q. Sitting here today, do you know whether James and Anton Peraire-Bueno ever read this language?

A. I don't.

Q. And aside from people at Flashbots, do you know whether any other particular person or business ever read it?

A. Couldn't tell you. I don't know.

Q. Mr. Miller, you testified that you've read this language in the past, right?

A. At some point.

 MR. FANG: One moment, your Honor.

(Counsel conferred)

MR. FANG: No further questions.

THE COURT: Thank you, Mr. Fang.

Mr. Looby.

MR. LOOBY: Thank you, your Honor.

MR. MARX: Can we just take a moment to shift down?

THE COURT: You may.

THE WITNESS: If this is an appropriate time, do you mind if I use the rest room?

THE COURT: The witness has just indicated a bathroom break is needed. So why don't we take a 15-minute break.

You all should be ready and back in the jury room and ready to go at 2:30. My prior instructions apply.

(Jury present)

THE COURT: Mr. Looby.

MR. LOOBY: Thank you, your Honor.

And one housekeeping matter before I begin.

May I approach the bench to bring the hard copy binders to your Honor?

THE COURT: You may.

And, Mr. Miller, please step down.

CROSS-EXAMINATION

BY MR. LOOBY:

Q. Good afternoon, Mr. Miller.

A. Good afternoon.

Q. My name is Patrick Looby, and I represent James Peraire-Bueno.

We've never met before; is that correct?

A. We've never met before, Mr. Looby.

Q. And I'll be assisted today by my colleague Joseph Bayerl, who will be helping me with the exhibits. And I'm going to refer to him as "Joe" because that's how I know him.

MR. LOOBY: Joe, if we could start with Government Exhibit 3307, which is in evidence.

A. Will this also be on my screen or should I find this --

Q. Yes, Mr. Miller, it will be on your screen. Every document that I reference -- actually, this one will not be in your binder because it's a government exhibit. But, for the most part, the exhibits that I talk about today will be in the hard copy binders as well. And you're free to use either format that you would like and to take as much time to look at the documents.

A. Okay. Thanks for explaining that.

Q. Mr. Miller, you had testified on direct regarding this June 29th, 2023 email that you had sent to Low Carb Crusader --

THE COURT: Mr. Looby, should this document be published for the witness and the jury?

MR. LOOBY: Yes, it should be published for the witness and the jury, and it's previously admitted.

Q. You had testified on direct regarding this June 29th, 2023 email that you had sent to Low Carb Crusader; correct?

A. Yes.

Q. And you had explained how you had observed the validators that were at issue in the April 2nd event as staking some ETH; correct?

[redacted]

MR. LOOBY: I'll restate it.

Q. And the context for this was that you had observed the

validators staking some ETH?
A. There was someone on my team that made a tweet that was observing the address, the entity behind the April 2nd incident staking ETH, yeah.
Q. And you testified that that gave you some concern, is that fair to say?
A. Yeah.
Q. But nothing ever occurred in relation to that staking; correct?
A. Not with the Flashbots relay or another relay that I know.
Q. So you're not aware of any other incident that you were concerned about?
A. No.

MR. LOOBY: Thank you, Joe. You can take that down.

I'd also like to quickly pull up Government Exhibit 3010, which is in evidence. And I would seek permission to publish that for the jury and the witness.

THE COURT: You may.

MR. LOOBY: If we could go to page 2.

Q. Mr. Miller, this was a chat that occurred between you and the Peraire-Buenos on April 3rd, 2023; correct?
A. Yes.
Q. And you had initiated the chat by reaching out to the Peraire-Buenos on Discord; correct?
A. Yes, that's what it appears.

Q. And you say that you think you found some MEV and you need their help to extract it; is that correct?
A. Yes.
Q. And "MEV" is maximal extractable value; correct?
A. Yup.
Q. And a bit later on, you say that there is 5.5 ETH worth of MEV that could be extracted.
MR. LOOBY: And, Joe, if you could highlight that portion.
Q. Do you see that, Mr. Miller?
A. Yes.
Q. And do you see the time stamp of your first message on April 3rd at the top of the chain at 11:27 a.m.?
A. Yes, GMT+0.
Q. And so this is in the morning of April 3rd; correct?
A. Yes.
Q. And this is the day after the events that you testified about on direct; correct?
A. Correct.
Q. And this is during the time when you and your team are addressing the issue and trying to figure out what happened; correct?
A. Depends on exactly what you mean by "during." There were starts and stops at times. So I don't know if this was a moment in which we had taken a break or something of the sort.

Q. You could have taken a break to send a message?

A. Yeah, seems feasible to me.

Q. And you are reaching out to the Peraire-Buenos regarding MEV opportunity during this time; correct?

A. Correct.

MR. LOOBY: Joe, if we could take that down.

Q. Now, Flashbots operates its own relay; correct?

A. Correct.

Q. And that relay is called the Flashbots MEV-Boost relay; correct?

A. Yes. We also just refer to it as the Flashbots relay sometimes. It's kind of interchangeable.

Q. And the Flashbots relay was active on April 2nd, 2023; correct?

A. Yes, it was active on April 2nd, 2023.

Q. And the Flashbots relay remains active today; correct?

A. Yes, it is also active today.

Q. And the relay for the block at issue in this case was not the Flashbots relay; correct?

A. Correct, it was not the Flashbots relay.

Q. And it was operated by a group called Ultrasound; correct?

A. Yeah.

Q. And Ultrasound and Flashbots, they are not the same entity; correct?

A. They are not the same entity.

Q. You don't work for Ultrasound?
A. I do not work for Ultrasound.
Q. You've never worked for Ultrasound?
A. I've never worked for Ultrasound.
Q. Flashbots does not maintain records for the Ultrasound Relay; correct?
A. No, we don't maintain records for the Ultrasound Relay.
The caveat to that may be that they might have shared records with us that might be in our Slack somewhere at some point. So it depends what you mean by "maintain records." And if that counts, just to provide a caveat.
Q. And you testified on direct about relay logs; correct?
A. Yes, I did.
Q. And you testified how at Flashbots, Flashbots has access to the relay logs for the Flashbots relay; correct?
A. That is correct.
Q. But Flashbots wouldn't have regular access to the relay logs for the Ultrasound Relay; correct?
A. We would not have regular access to the Ultrasound Relay's logs, right.
Q. You testified on direct that the Ultrasound Relay was running modified relay software; correct?
A. Yes, they took the MEV-Boost relay software, made modifications to it, and they were running that.
Q. And you can't verify exactly what was modified about the

Ultrasound Relay code; correct?
A. Correct. We were friendly with them and they were interested in contributing to the code base; and so they talked about their modifications with us. But it is true that I can't verify what they were running.
Q. And the Flashbots MEV-Boost relay code, that's open source; correct?
A. Yeah.
Q. Meaning anybody can go online and download it?
A. Yes.
Q. And anybody can go online, download it, and make modifications; correct?
A. Yes.
Q. And they can modify it to add additional features to their relay; correct?
A. Correct, they can.
Q. Now, to keep things clear, the MEV-Boost software that you discussed on direct, that is something different than the Flashbots MEV-Boost relay code; correct?
A. Yes, the MEV-Boost software is different from the Flashbots MEV-Boost relay software code.
Q. And MEV-Boost, the software, that is a program that validators can run to interact with relays; correct?
A. Yes, and it's typically what they do run.
Q. But an Ethereum validator can interact with relays without

running the MEV-Boost software; correct?
A. It's theoretically possible, yeah.
Q. And an Ethereum validator could create its own software to interact with the relay; correct?
A. Correct.
MR. LOOBY: Joe, if you could please pull up what is in evidence at Government Exhibit 508, page 11.
And I request permission to publish for the witness and the jury.
THE COURT: You may.
Q. Mr. Miller, do you recognize this slide as one that you had discussed on direct examination?
A. We've been talking about it a lot, yeah.
Q. It's getting familiar for the jury, too, I'm sure, by this point.
And I'd like to focus on the arrows in between the relay and the validator, and specifically the box there that says "MEV-Boost"; correct? Do you see that?
A. The box does say "MEV-Boost," yeah.
Q. And here, the term MEV-Boost, that's referring to the MEV-Boost software program, not the relay code; correct?
A. That's what I understand, yeah.
Q. But as we just discussed, validators do not have to run the MEV-Boost software to interact with the relay; correct?
A. It's not a requirement.

Q. And you do not know whether the Peraire-Buenos were running a modified version of MEV-Boost on April 2nd, 2023?

A. Let me repeat the question back to you so I'm sure I understand. You asked: You do not know whether the brothers were running a modified version of MEV-Boost on April 2nd; is that right?

Q. That's right.

But let me actually try to ask you a different question, which is: You don't know whether the Peraire-Buenos were running -- even running MEV-Boost on April 2nd, 2023; correct?

A. I think you can infer that they weren't running MEV-Boost, because MEV-Boost typically won't set the parent and state root in the way that that day happened, or the parent and state root wouldn't be set to zero. So I think you can infer that they were not running MEV-Boost, but I can't affirmatively tell you exactly what they were running.

Q. And you do not know how many relays the Peraire-Buenos' validator interacted with on April 2nd, 2023; correct?

A. I don't know.

Q. And on direct examination, you had said that the Peraire-Buenos' strategy involved having their validator fill out some fields on the blinded beacon block with certain values, is that generally accurate?

A. Generally, yeah.

Q. And you don't know how the Peraire-Buenos' software did or did not populate those fields; correct?
A. That is true. You can observe the block headers that they published that day, but I don't know what the software did.
Q. And Flashbots ran a builder for a period of time; correct?
A. Yes, we did.
Q. But the Flashbots builder was not the builder who handled the transactions at issue in this case; correct?
A. Well, it wasn't the builder that produced the block at issue where the parent and state root ended up being set to zero. But we may have received the same transactions at our builder, just to draw a nuance. Certainly our builder did not produce the same block. We could have received the same transaction, I don't remember.
Q. So sitting here today, you do not know if your builder received the block at issue?
A. Our builder doesn't receive blocks, so I can tell you that for sure. But I don't know whether or not our builder received the transactions at issue.
Q. Thank you for the clarification.
A. Of course.
Q. You do not know what software the builder OS -- well, let me start. The builder at issue is sometimes referred to as OS69 -- OX69?
A. I know what you're talking about. We actually call it

builder OX69 or builder 69. So I don't think I've ever heard OX69, but I know generally what you're speaking of.
Q. I prefer to refer to it as OX69 rather than builder 69. And you'll understand what I mean when I say that; correct?
A. Yes.
Q. You do not know what software that builder was running on April 2nd, 2023; correct?
A. Correct.
Q. And it could have been running modified software as well; correct?
A. Most certainly was.
Q. On direct examination, you talked a bit about the Ethereum protocol; correct?
A. I did.
Q. And you talked about the Ethereum consensus mechanism; correct?
A. Yeah, a bit.
Q. Broadly speaking, that's the part of the protocol that concerns how Ethereum users reach agreement on the validity of transactions and the order of blocks on the chain; correct?
[redacted]
A. Yes. I am not a -- not formally trained in consensus mechanisms or something like that, so I don't have a super sharp answer for you. But your description of a consensus

mechanism sounds broadly right to me.

Q. And I'm picking up from your comment that you don't hold yourself out as an expert on the Ethereum protocol; correct?

A. On Ethereum generally I think I'm an expert; but consensus is an art in a field of its own that's specific with a lot of nuances. People go to school for this, people make careers out of being consensus people specifically. And I don't hold myself as an expert in consensus.

Does the nuance make sense to you?

Q. It does. I have one clarifying question for you.

The consensus concept, that covers how users like validators add blocks to the chain; correct?

A. That's one part of consensus, certainly.

Q. And another part of the consensus mechanism are things like slashing penalties; correct?

A. Correct.

Q. Now, other people at Flashbots handled issues relating to the Ethereum consensus specifications; correct?

A. Yeah, generally other people would do that.

Q. I'd like to discuss just a few basis principles relating to the blockchain in Ethereum so that we have a similar vocabulary for our discussion. Is that all right?

A. Sounds great.

Q. Okay. Well, first, at its most basic level, a blockchain is a digital ledger that records transactions; correct?

A. Seems consistent, yeah.
Q. And Ethereum is what is called a decentralized blockchain?
A. Yes.
Q. In a decentralized blockchain, there is no central point of authority with control over the chain; correct?
A. That's the idea, yeah.
Q. The network is instead made up of thousands of independent computers around the world called nodes; correct?
A. Yeah.
Q. It is often said that Ethereum is permissionless; is that correct?
[redacted]
A. Yes, that is often said.
Q. That means that anybody can access Ethereum; correct?
A. Yeah, that's the idea.
Q. And that means that anybody can place a transaction on Ethereum; correct?
A. Correct.
Q. And anybody can create a validator as well, right?
A. Yeah. There are rules for creating a validator. So you need to stake 32 ETHs. Not everybody has that is one nuance.
Same thing for transactions. Also there are rules for what transactions are valid or not. But given you follow the protocol rules, then, yes.

Q. And we'll talk about the steps of becoming a validator a little bit on. But my question was a little bit more simple, which is that anybody can become a validator; correct?
A. Yeah, in theory.
Q. And it's often said that Ethereum is trustless or trust-minimizing; correct?
[redacted]
A. Yes.
Q. These terms mean that, at least in theory, users don't need to know one another to interact on Ethereum; correct?
A. Yes, at least in theory, that's the goal.
Q. And users don't need to place trust in a central authority, right?
A. That's the goal.
Q. Now, we talked a little bit earlier about the term "consensus mechanism." That process is sometimes referred to as determining the canonical chain; correct?
A. Yeah. You know your stuff.
Q. Thank you, Mr. Miller. It's been a learning experience for me, as I hope it is for the jury as well.
In other words, just to help everybody's understanding in the room, it is the process of determining the version of the blockchain that all the users can agree is the true and correct version of the chain.

A. I would agree with that.

Q. And that mechanism, it's very important to the functioning of a decentralized blockchain; correct?

A. Yes, very important.

Q. Because without it, people wouldn't know what transactions were recorded in the chain; correct?

A. Yes.

Q. And they wouldn't know in what order; correct?

A. Correct.

Q. And that could result in confusion; correct?

A. Yeah.

Q. Now, this might seem simple, but I think it's worth repeating. The agreement on the state of the blockchain is the consensus in the term "consensus mechanism"; correct?

A. Yes.

Q. And I believe on direct you testified that Ethereum currently has what's called a proof-of-stake consensus mechanism?

A. I think I did, yeah. Said a lot of things, so...

Q. Through that mechanism, users called validators are randomly selected to propose a block during a given time slot; correct?

A. Correct.

Q. For that slot, under the Ethereum protocol, the validator can add any block to the chain that it wants.

A. That is its prerogative as a validator in its role of proposing.

Q. And that prerogative includes the right to determine the final order of transactions in the block that it proposes as well; correct?

A. It's one of the jobs of a validator, to order transactions in a block, yeah.

Q. Now, the validator has that role to add a block only during a given time slot; correct?

A. During their slot.

Q. Yeah. And the slot on Ethereum, it lasts for 12 seconds?

A. Yeah.

Q. So this process of a validator adding a block to the blockchain, it happens pretty quick; is that correct?

A. Depends on if you think 12 seconds is a long time or a short time. In our industry, sometimes milliseconds matter. And so I'm not sure, if you ask our engineers, they would say that's a short period of time. But certainly for a regular person it is.

Q. Thank you, Mr. Miller.

Now, there's a separate group of validators that review the block that the proposing validator proposes to add to the chain; is that right?

A. Yes, that is right.

Q. And these other validators, their role is to check to see

that the block is valid and they vote on it; correct?

[redacted]

A. Yes. And their related role is also to check the time in which the proposer has proposed a block too.

Q. But one of their roles in voting is to check that the transactions are valid; correct?

A. Yes, that's a part of making sure that the block overall is valid.

[redacted]

Q. I believe the answer to that is that this question would be the same regardless. And so I will ask the question that testing validators will reject a block if it has invalid transactions; correct?

A. Yes.

Q. And that is true whether or not the block has been proposed using the MEV-Boost system; correct?

A. Yes.

Q. That's just a general way that the consensus mechanism on Ethereum works; correct?

A. Yes. The Ethereum consensus mechanism will reject invalid blocks of any kind, whether or not they originate from MEV-Boost or not.

Q. Because MEV-Boost doesn't have its own consensus mechanism; correct?

A. MEV-Boost works off of Ethereum, so it doesn't have its own.

Q. After the vote by the voting validators, the block goes final; correct?

A. Could you repeat the question? I'm not sure I heard the first part.

Q. Sure. At some point after the voting validators approve the block, the block goes final; correct?

A. "The block goes final" is not a term of art that I understand. But I think I generally know what you mean. Are you talking about block finalization?

Q. I am, Mr. Miller. And thank you.

There is a step where the block becomes final that is referred to as block finalization; correct?

A. Yes.

Q. And at that point it is added to the blockchain; correct?

A. This gets into Ethereum's consensus. So there -- you're testing the limits of my knowledge here, so this is fun.

Blocks are confirmed and included on the Ethereum chain. And there's a point at which in the future they

 finalize batches of blocks that have previously been confirmed is my understanding. So I would include -- or I would consider a block included on the chain before it is finalized. But there is some level of security and assurance that you get when finalization happens. Does that make sense, the nuance that I'm drawing?

Q. That does make sense.

And on these and other topics, I'm trying to keep it digestible, but I appreciate your attention to detail.

And one consequence of the block going final is that the transactions within it, they can't be modified; correct?

A. You get the highest level of certainty over the transactions not being modified because the blocks have the highest level of Ethereum's security, so to speak. Again, there's nuances where I would consider blocks that have been confirmed and voted on by Ethereum validators before already included. And it's very unusual for ordering to be altered at that point too.

Q. And if something were to happen to those transactions after that point, it would be something that could be publicly seen on the blockchain; correct?

A. After what point?

Q. After the block goes final, if there is a scenario where the transactions could be changed, that would be evident on the blockchain; correct?

A. Well, I don't know that the question makes sense. Because block finalization, my understanding is that then the transactions -- the blocks can't be modified at all, that's kind of why they call it finalization. So this is the limits of my knowledge. Maybe it's possible in the Ethereum consensus protocol, but I'm not even sure that that is possible.

Q. Now, Mr. Miller, running an Ethereum validator is an economic activity; correct?

A. Yes. You make money, it costs money, so it makes sense to call it that to me.

Q. And Ethereum validators are motivated to make money?

[redacted]

A. Generally, there are people who run them, you know, as alterius; they are not necessarily in it for the money, they do it because they want to support the Ethereum Network. But generally people are motivated by making money.

Q. And Ethereum utilizes economic incentives to influence validator behavior; correct?

A. Yes, as a matter of principle.

Q. Ethereum validators, they can earn rewards for adding blocks to the blockchain; correct?

A. Correct.

Q. And other users, they can pay validators to have their transactions placed on the block that the validator is going to

propose; correct?
A. Correct. Yeah, those are transaction fees.
Q. Now, there is a separate way that validators can make money called MEV; correct?
A. Yes.
Q. And we'll talk more about MEV in a bit.
Together, these positive economic incentives, they encourage validators to take certain actions; correct?
A. Correct.
Q. They do so by making it profitable to be a validator?
A. Generally, yeah.
Q. Ethereum also utilizes economic penalties to influence validator behavior; correct?
A. Correct.
Q. And as you mentioned earlier, validators must stake 32 ETH for the right to become a validator; correct?
A. Correct.
Q. The value of ETH, it fluctuates on a daily basis; is that right?
A. Yes.
Q. But I believe you testified yesterday that, in the ballpark, 32 ETH was tens of thousands of dollars in April of 2023. Does that sound correct?
A. I think so, yeah.
Q. Now, that staked ETH -- actually, so just to be clear, ETH

is a form of cryptocurrency; correct?
A. Yes.
Q. And it's the native cryptocurrency on Ethereum?
A. Yes.
Q. Hence the name.
A. Yes.
Q. And that ETH, it can be confiscated or slashed in preset amounts based on certain validator behaviors; correct?
A. I don't know about the use of the word "confiscated." That kind of implies to me that someone is taking it, someone else is gaining it, like there's the ETH police force or something like that. And that doesn't resonate with me. I'm not sure that's correct. The rest of your statement I agree with.
Q. But you would agree that the validator would lose the slashed ETH; correct?
A. Yes.
Q. Okay. And the staking and slashing features, these are necessary because there is no way of verifying who is a validator on Ethereum; correct?
[redacted]
Q. Now, Mr. Miller, beside you in the smaller binder is a set

of materials. One of them is labeled DX 3506-001.

A. Sorry, DX 3506-001?

Q. Correct. It should be the first tab.

A. Okay.

Q. And, Mr. Miller, before your testimony today, you had met with the government on several occasions; correct?

A. Yes.

Q. And you had been asked and answered questions about the facts of this case; correct?

A. Generally.

Q. And do you recall attending a meeting on December 21, 2023 with the government prosecutors in this case?

A. It seems possible to me. I don't recall specific instances or specific dates, but that ballpark makes sense to me.

Q. Mr. Miller, if you could look at --

MR. LOOBY: And, Joe, to see if we can pull up this so we can do a zoom-in for the witness.

BY MR. LOOBY:

Q. All right. So, Mr. Miller, you're generally familiar with the slashing and staking process that we've been discussing here today?

A. At a high level, yeah.

Q. And you had discussed that process on direct examination as well?

A. Yes.

Q. And are you generally familiar with the way that the Ethereum protocol uses economic incentives to guide validator behavior?

A. Can you repeat the question.
Q. Yes, Mr. Miller.
You are familiar with the way that the Ethereum Network utilizes economic incentives to influence validator behavior; correct?
A. Generally, yeah.
Q. The staking and slashing features of the Ethereum protocol, they are necessary because there is no way of verifying who is a validator; correct?
A. A validator has a cryptographic identity, so they have kind of a -- I don't know how to put it in a simple way. They have a mathematical identity that they are associated with. That doesn't change. But certainly you can't always put a face and a name, a real name, to that cryptographic identity, yeah.
Q. Thank you.
And the network can't assume that a validator will fulfill its role correctly; correct?
A. Correct.
Q. Now, one way a validator can have their staked ETH slashed is for signing multiple blocks for a given slot; correct?
A. Correct.
Q. And signing multiple blocks for a single slot is called equivocation; correct?
A. Yes.
Q. The Ethereum protocol, it penalizes equivocation by

validators through slashing; correct?
A. Correct.
Q. But aside from those penalties, under the Ethereum protocol, there is no limitation on the validator's ability to equivocate; correct?
A. You mean the number of times they can equivocate, their ability to equivocate?
Q. Their ability to equivocate at least once in a given slot.
A. There's no limitation, yes.
Q. And in April 2023, a validator would be slashed one ETH if they equivocated; correct?
A. That's what I remember, a validator in question being slashed, yeah.
Q. And what would you get -- what would you estimate the value of one ETH would be in 2023?
A. A few thousand dollars.
Q. Now, the size of the slashing penalty, that is something that's set by the Ethereum protocol; correct?
A. Correct.
Q. And the amount of the slashing penalty, it could be changed by amending the protocol; correct?
A. Correct.
Q. And there is a process by which the Ethereum protocol can be amended, right?
A. Correct.

Q. Since April 2nd, 2023, the protocol has not been amended to increase the magnitude of the slashing penalty; correct?
A. I don't know. I don't think so. But I don't have full certainty.
Q. Now, there are many, many validators operating on Ethereum; correct?
A. Many, many, yeah.
Q. There are approximately one million validators active on Ethereum today?
A. Seems right. I don't know.
Q. But you would expect at least 500,000 who are active?
A. Yes. I remember when MEV-Boost launched, it was approximately 400,000. So at least 500,000 now makes rational sense to me, but I don't know the exact number.
Q. Now, you testified on direct that there was a prior version of Ethereum where the role of proposing blocks was done by a user called a miner; correct?
A. Yeah. Correct.
Q. And that is the role that is currently performed by validators; correct?
A. Yes.
Q. Without getting into the weeds of this topic, because I know they are weedsy, the moment where this role changed is called the merge; is that right?
A. That is right, yeah.

Q. And that change occurred in September 2022; correct?
A. Sounds right, yeah.
Q. And that effectively created the role of the validator; correct?
A. Yes, as it is in proof of stake.
Q. So that occurred just a few months before the events at issue in this case; is that right?
A. April to September, yeah.
Q. Now, back in the old Ethereum, there were about 20 or so miners who together contributed the majority of the blocks in the blockchain; is that correct?
A. Yeah, seems right. It was pretty concentrated.
Q. And --

THE COURT: Mr. Looby, because we took a break earlier today, I just want to give the jurors a chance to stand up and stretch, because we won't have another opportunity to do another break. So if you all want to stand up and stretch, you should feel free to do so. I will do so as well.

Thank you for the indulgence.

Mr. Looby, you may proceed.

MR. LOOBY: Of course, your Honor.

BY MR. LOOBY:
Q. And, Mr. Miller, you are familiar with the concept of miners through your work at Flashbots; correct?
A. Yes, I am familiar with miners.

Q. Because you have worked at Flashbots since before the merge; correct?
A. Correct.
Q. Okay. And back in the old Ethereum, there were about 20 miners who together contributed the majority of blocks on the blockchain; correct?
A. That seems right. It was pretty concentrated, so you might even be able to lower the number. But I don't know the exact number. And it depends on what you mean by majority, if it's 50 percent, 75 percent. But that seems right.
Q. It was a relatively small number of miners contributing a large proportion of the blocks on the chain; correct?
A. Yes, that is correct.
Q. And that's in contrast to Ethereum today, where there are many, many validators who are proposing blocks; correct?
A. Yes.
Q. And the miners were generally run by established firms; is that correct?
A. Yes, generally.
Q. And other users, they knew who the miners were, right?
A. What do you mean by "other users" here? Because I don't think every Ethereum user would know who the miner was.
Q. Let me rephrase that. Thank you, Mr. Miller.
Sophisticated users of the Ethereum Network would know who the miners were; correct?

A. I think they could know who miners were. I don't think they all knew who miners were.

Q. It would be possible to find out who the miners were if you cared to know; correct?

A. Yes.

Q. Now, pre-merge, if a searcher submitted a bundle of transactions directly to a miner, there was a risk the Ethereum miner might unbundle the transactions; is that correct?

A. There was that risk, yeah.

Q. But since there were only around 20 Ethereum miners that contributed most of the blocks as we discussed, the searchers could generally assume that the miners wouldn't do that, right?

A. It did happen. So I think searchers took precautions to do so; and you needed to be aware of the possibility of doing so.

Q. But for the majority of bundles that were submitted, that didn't occur, correct, during this time period; correct?

A. For the majority of bundles that were submitted, that did not occur.

[redacted]

Q. Mr. Miller, you are familiar with the economic incentives that were at play in the pre-merge Ethereum; correct?

A. Generally.

Q. And that includes the economic incentives that would have motivated miner behavior; correct?

A. Generally.

Q. And that includes the economic incentives that may have discouraged miners from unbundling as a general matter; correct?

A. As a general matter.

Q. And a miner who unbundled, they would risk losing future opportunities to make money; correct?

[redacted]

A. Yes, I think you could say so.

Q. Because the searchers wouldn't continue sending the bundles to the miner; correct?

A. Typically, searchers sent bundles to Flashbots, and Flashbots sent bundles on to miners. And so searchers did not dictate where their bundles went exactly.

Q. Mr. Miller, we were discussing earlier how you had met with government attorneys in this case on several occasions; correct?

A. Correct.

Q. And you met with them in June of 2025; is that correct?

A. Seems right. I don't remember specific dates.

Q. And you told them in that meeting that the searchers generally could trust that the miners weren't going to make -- take MEV or trade on private bundles sent to miners, but there were still no guarantees. Do you recall?

A. Don't recall that specifically. Are you looking at a specific document that I should pull up?

Q. Yes, that is in your small binder again. And also, Joe will pull it up on your screen as well. And that's DX 3506-004.

MR. LOOBY: And, Joe, this is for the witness only and the Court and counsel.

Q. And the relevant portion, although you can take your time to familiarize yourself with the document overall, I will draw your attention to page 3 when you have a moment.

A. Okay. I'll take a moment to read the nine pages.

(Pause)

(Continued on next page)

BY MR. LOOBY:
A. Okay, I've skimmed through the document. I didn't read it all in depth, but I skimmed through a bunch of it.
You wanted to bring my attention specifically to page 3, if I recall?
Q. Yes, to page 3.
MR. LOOBY: And, Joe, could you highlight the relevant paragraph.
[redacted]
BY MR. LOOBY:
Q. Can you read the highlighted paragraph to yourself.
(Pause)
A. Okay.
MR. LOOBY: Joe, if you could take the document down.
Q. Does that refresh your recollection that you spoke with government prosecutors about miner -- the incentives regarding miners in the pre-merge Ethereum?
A. I remember talking to the government about it generally, but I don't remember the specific things that I said.

BY MR. LOOBY:

Q. Has your recollection been refreshed regarding this topic of discussion with the prosecutors at this meeting?

A. I remember talking about that topic. I don't remember the specific things that I said.

Q. Now, in the post-merge Ethereum, there are too many validators for users to assume that validators will not unbundle transactions, correct?

A. Also, should I close the binder?

Q. Oh, yes, sorry. I didn't see that you had it open. Thank you, Mr. Miller.

A. No, that's okay.

So you're asking, in the post-merge Ethereum, there are too many validators for users to assume that validators will not unbundle transactions, correct?

Q. Correct.

A. Yes, correct.

Q. And this is sometimes referred to as the concept that

searchers can't trust the validators; is that right?
A. Yes, I would say that.
Q. Now, Mr. Miller, you testified on direct about proposer-builder separation.
Do you recall that?
A. I don't mean to be difficult. We talked about proposing and building. I don't think that term has been introduced, but we generally talked about the ideas behind that, yeah.
Q. Well, proposer-builder separation is a concept whereby the role of the block proposer and the block builder on Ethereum would be split across two different users, correct?
A. Correct, yeah.
Q. And proposer-builder separation is sometimes referred to as PBS; is that right?
A. That is right, yeah.
Q. Can we refer to it that way today?
A. If that's what you would like, yeah.
Q. Now, under the Ethereum protocol, the validator currently is assigned the role of block builder and block proposer, correct?
A. Those are the two roles of the validator, yeah.
Q. And they're both assigned to the validator under the Ethereum protocol, correct?
A. Yeah, as of today.
Q. Under PBS, a separate user called a builder would do the

first part; it would pick the transactions to include in a potential block and in what order to put them, correct?

A. Yes. The block builder would be responsible for ordering transactions in a block under PBS.

Q. Under PBS, the proposer or validator's role would be limited to proposing a block to be added to the blockchain, correct?

A. That is correct.

Q. Now, PBS is not yet part of the Ethereum protocol, correct?

A. MEV-Boost is software that enables PBS, although we have not added PBS natively into the Ethereum protocol itself. You need the extra MEV-Boost software and a bunch of extra software beyond Ethereum itself. There's the idea that we talk about sometimes of enshrining PBS, which is to say, taking this thing that exists today with MEV-Boost and enshrining it into Ethereum. So, it's kind of semantics, but it depends on exactly what you mean by PBS. I think, generally, we say we have PBS in Ethereum today.

Q. But PBS has not yet been enshrined in the protocol, as you've just explained that term, correct?

A. It hasn't been enshrined in the protocol.

Q. And there have been proposals for PBS to become enshrined in the protocol, correct?

A. Yes.

Q. And those PBS enshrinement proposals, they've never been

adopted, correct?
A. I think one might be scheduled for inclusion now, depending on what you mean adopted, but they're not live right now.
Q. The protocol has never been amended to enshrine the PBS concepts, correct?
A. I agree with that, yeah.
Q. Picking up on something that you said in your answer earlier, the MEV-Boost software, it was conceived of as an initial step before PBS could be enshrined in the protocol, correct?
A. Yes.
Q. In other words, it's a temporary solution that could be in place until PBS is enshrined?
A. I agree with that, yeah.
Q. And the MEV-Boost software runs alongside the Ethereum like -- the Ethereum protocol like a sidecar; is that correct?
A. We do call it a sidecar, yeah.
Q. And you are familiar with the technical meaning of that term?
A. If you use it, it would make sense to me. I don't know that I could give you a very precise definition of it.
Q. Generally speaking, would you agree it is a program that runs alongside another application, without modifying that application's code?
A. It might change how the other application works because

maybe you hit a different path in the code. That's one nuance.

Q. But the underlying code of the application on which the sidecar is running wouldn't need to be modified for the sidecar to be operational, correct?

A. The underlying code would stay the same. It might just operate differently now that you have the sidecar.

Q. The role of the relay that you discussed on direct, that, similarly, too, was seen as a temporary solution, correct?

A. Correct.

Q. Eventually, if PBS is made part of the Ethereum protocol, the relay wouldn't even be needed; is that right?

[redacted]

THE WITNESS: That is the goal. We have learned, since setting that out as a goal, that it is complicated and the relay might stay around anyway, but it is certainly the goal to remove the need for the relay.

BY MR. LOOBY:

Q. So, I'd like to discuss some of the users relevant to MEV-Boost software, starting with the searchers.

Searchers, they are sophisticated users, correct?

A. Yes.

Q. And searchers scan the mempool using MEV bots, correct?

A. You could say so, yeah.

Q. These MEV bots, they run computer programs to automatically determine attractive profit opportunities, correct?
A. You could say so, yeah.

BY MR. LOOBY:
Q. So, you have observed instances where an MEV bot made bad trades and threw away millions of dollars, correct?
A. It depends on what you mean by bad trades here.
Q. Let me rephrase that.
You have observed instances where an MEV bot went off the rails and threw away millions, correct?

THE WITNESS: It sounds like you're referring to something specific.
BY MR. LOOBY:
Q. Would it help you to see a document to refresh your recollection?
A. Sure.
MR. LOOBY: Joe, if you could please pull up DX 1008

for the witness and counsel and the Court only.

THE WITNESS: Is this in my large binder?

BY MR. LOOBY:

Q. It's in the large binder. It's a shorter document, so you might find the screen adequate, but you are welcome to also look at the hard copy, as well. It's up to you.

(Continued on next page)

(In open court)

THE COURT: Thank you, all, for your patience.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you.

BY MR. LOOBY:

Q. Mr. Miller, without looking at your binder, do you recall publicly commenting on an instance where a MEV bot went off the rails and made bad trades and threw away millions of dollars?

A. I've heard about a lot of MEV-related things. It does not seem out of the realm of possibility. I would not be able to tell you the specifics off the top of my head.

Q. And would it help to recall the specifics to look at a document?

A. That would help me, if you want to ask me about those specifics.

Q. Thank you.

So, Mr. Miller, if you could please consult your binder at DX 1008. And it's also on the screen, but, Mr. Miller, again, it's a multipage document, and you are free to review it in its entirety, if you would like.

A. Okay. I'm going to review the whole thing.

(Pause)

A. Okay. I've had a chance to review it.

Q. Does that refresh your recollection that you had publicly commented on an instance where you observed that an MEV bot

went off the rails, and that caused it to make extremely bad trades and throw away millions of dollars?

A. Yes.

Q. And it's possible for an MEV bot to do this because the bots are preprogrammed to operate without human intervention, correct?

A. Generally, yes.

MR. LOOBY: Thank you, Joe.

Q. Now, searchers don't use the MEV-Boost software when they scan the mempool for profit opportunities, correct?

A. Searchers do not use MEV-Boost to search the mempool for opportunities, that's right.

Q. Searchers don't use the MEV-Boost software at all; is that correct?

A. It depends on what you mean by use. They certainly rely on MEV-Boost infrastructure to land their transactions.

Q. But a searcher doesn't run the MEV-Boost software in order to scan the mempool, correct?

A. That is correct, yeah.

Q. And a searcher does not run the MEV-Boost software to select a potential bundle of transactions to send to the builder, correct?

A. That is correct, yeah.

Q. Okay. We mentioned the term a couple of times, but now I want to talk a little bit more about MEV.

MEV, again, it is maximal extractible value, correct?
A. Yes. That's MEV.
Q. And MEV is the value that could result from a transaction ordering on a blockchain, correct?
A. Yes.
Q. And you can think of MEV as one way that traders on Ethereum make money, correct?
A. It is one way that traders on Ethereum make money, it's not only trading, so that's a subset, but, yes, that is one way that traders make money on Ethereum, certainly.
Q. And MEV does not come from Flashbots, correct?
A. Restate the question for me, because that could mean multiple things.
Q. Sure.
MEV is a feature of a decentralized system, like Ethereum, correct?
A. Yes.
Q. Somebody in that system gets to decide the order of transactions on the block, correct?
A. There are some systems where they're probabilistic, but, in general, the ordering is decided somehow.
Q. And on Ethereum, it's not probabilistic, it is the proof of stake consensus mechanism that we discussed earlier, correct?
A. Yes, that's correct.
Q. And that person gets to extract the MEV, correct?

A. It depends exactly what you mean by extract. The idea behind MEV-Boost is that the validator, who has these two roles of building and proposing, they may not have the sophistication necessary to extract MEV themselves, so they outsource that to somebody else who has that sophistication. So, it really depends on what you mean by extract there.

Q. Well, the MEV is downstream of the ability to place orders -- to control the order of transactions on the block, correct?

[redacted]

Yes, I would agree with that.

BY MR. LOOBY:

Q. Now, there are three main types of MEV strategies; is that right?

A. You'd have to list them out for me to agree with you or not.

Q. Arbitrage, liquidations, and sandwiching; is that correct?

A. Yes. There's other stuff. It's sort of unclear how large that other stuff can be relative, but, in general, I would agree, yeah.

Q. Are you referring to the long-tail MEV strategies when you say other stuff?

A. Yes, or it might be -- some people consider nonatomic arbitrage a different category. I haven't talked to you enough to understand exactly what you mean by arbitrage, so...

Q. Well, let's start with arbitrage, then.

Arbitrage, generally, is the process of buying an asset in one market and selling it in another for a higher price to profit from the price difference, correct?

A. Yeah, I would agree with that.

Q. And on Ethereum, there are a number of decentralized exchanges where users can make trades, correct?

A. Correct.

Q. And differences in the prices of crypto assets across these different exchanges can lead to arbitrage opportunities, right?

A. Yeah, that is right.

Q. MEV bots that seek arbitrage opportunities are preprogrammed to seek out trades that profit in this way, correct?

A. You said MEV bots that seek out arbitrage opportunities are preprogrammed to seek out trades in this way; that's your question?

Q. Yes.

A. Yes, I agree with that.

Q. And these are sometimes called arb bots?

A. Yes, that's the shorthand.

Q. The next major category of MEV is called liquidations; is

that right?
A. Mm-hmm.
Q. I'm not going to ask you any questions about --
THE COURT: Just to clarify, was that a yes to that last question?
THE WITNESS: That was a yes.
BY MR. LOOBY:
Q. I will skip to the third major category of MEV opportunities, which is called sandwiching, correct?
A. Yes.
Q. And this strategy is often called sandwich attacks?
A. People do commonly refer to it as sandwich attacks, yeah.
Q. And sandwich attacks are not the same thing as arbitrage, correct?
A. They are not the same thing as arbitrage.
Q. And searchers who engage in sandwich attacks, they do so through MEV bots, correct?
A. Yes.
Q. And these are sometimes referred to as sandwich bots, correct?
A. Yep, that's correct.
Q. A sandwich bot will identify a transaction that is pending in the mempool, and then it places trades around it in a bundle, correct?
A. Yes, like a sandwich. That's why it's called a sandwich

bot.

Q. That's very clever.

First, the first piece of bread is the front run trade?

A. Yes.

Q. And then in the middle of the sandwich is the middle trade that the bot found in the mempool, correct?

A. Generally, yeah.

Q. And next comes the back run, or the sell trade, correct?

A. Yes.

Q. And each of these three trades in the sandwich bundle are actually trades with something called a liquidity pool, correct?

A. Yes.

Q. So, the sandwich bot and the other trader who placed the trade whose trade is in the middle of the sandwich, they're not trading with one another, correct?

A. I haven't thought about this in a little bit, but I feel like it's a little nuanced. I'm not sure if I should get involved in nuance with the jury, but I think you could think the -- you might be able to think of them as trading with one another because they're both trading against the same liquidity pool. So, in some way, they are trading -- they're trading from the same source of liquidity, the first trade affects it, then the middle trade, their trade, executes, and it's affected

by the first one. The first person puts assets in, the second person is affected by it -- I'd have to think about it a little bit, but I don't know that's the most precise thing. I'm also not sure it entirely matters.

Q. Each trade individually trades with the liquidity pool, correct?

A. Yes.

Q. A result of a sandwich attack is that the trade in the middle, it executes at a more disadvantageous price than it otherwise would have, correct?

A. That is true, yes.

Q. The middle trade is sometimes referred to as the sandwich attack's victim; is that correct?

[redacted]

THE WITNESS: Yes.

BY MR. LOOBY:

Q. Now, I want to clarify, not all searchers are sandwichers, correct?

A. That is true, not all searchers are sandwichers.

Q. Just a subset of searchers engage in sandwich attacks, correct?

A. Yes, that is correct.

Q. And you testified on direct that you have acted as a searcher before, correct?

A. That is correct.

Q. You were focused on arbitrage opportunities, right?

A. Generally, yeah.

Q. But you have built a sandwich bot before, correct?

A. I prototyped it, yep.

Q. But you've never operated it to perform a sandwich attack, correct?

A. No. As the person responsible for Flashbots' products and engineering, I wanted to better understand the market, but I never operated a sandwich bot for profit.

Q. Why not?

A. I wanted to stick to arbitrage.

Q. Why?

A. I don't remember the exact reasons.

Q. Now, sandwich attacks are not prohibited in Ethereum, correct?

A. They're not prohibited in Ethereum.

Q. Sandwich attacking is just part of the MEV landscape, correct?

A. Yes.

BY MR. LOOBY:

Q. Mr. Miller, as part of your responsibilities at Flashbots, have you taken it upon yourself to become knowledgeable of the MEV market?
A. I would think so.
Q. So you are familiar, in a general sense, with the amount of money that is available in that market for MEV extraction?
A. Yes. I don't know if I would be able to cite to you very specific statistics and certain time frames, but I have a feeling for it, sure.
Q. Would you agree that it is billions, in the billions of dollars?
A. I don't know, I don't know. It depends. This is -- it depends on the scope of the market, too.

Are you just talking about Ethereum?
Q. I am talking about Ethereum.
A. It depends on the year. I think there are years where it has crossed over a billion dollars, yes, but I don't know what it is most recently.
Q. MEV opportunities, they can be worth many, many times the block reward or other incentives provided under the Ethereum protocol, correct?
A. Yes.
Q. And MEV bots can make billions of dollars in a single transaction, correct?
A. That has happened before.

Q. MEV extraction on Ethereum, it occurs in a really adversarial environment, correct?
A. Generally, crypto is a very adversarial environment, that's true.
Q. And the searchers compete with one another for the MEV opportunities, correct?
A. That's true.
Q. When there is a source of MEV, you can assume that users are going to go find it and try to extract it, correct?
A. I think eventually, yeah.
Q. This competition for MEV on Ethereum has been called the MEV game?
A. I'm not sure I know. It doesn't sound wrong to me, but I don't think it's super commonly used.
Q. You have referred to it as the MEV game before?
A. I don't know.
Q. Do you not recall, sitting here today, whether you have referred to it as the MEV game before?
A. I don't recall.
Q. Would seeing a document help refresh your recollection?
A. Sure.
Q. Mr. Miller, this document is going to be in the manila folder that should have accompanied the binders up there.
A. I've got two binders, but I don't have a manila folder, unless it's hiding in a binder.

Q. I can give it to you.

MR. LOOBY: Your Honor, with your permission, may I approach?

THE COURT: You may approach.

THE WITNESS: Thank you.

BY MR. LOOBY:

Q. Now, Mr. Miller, in your role as a Flashbots steward, you will occasionally make public comments from time to time about topics, including MEV, correct?

A. Yes, that's true.

Q. In May of 2021, did you give a talk entitled "How To Make $1 Million Per Month"?

A. Maybe. I don't know. I remember doing something along those lines, which was intentionally provocative, but I don't know that that was the exact title of the talk.

BY MR. LOOBY:

Q. Mr. Miller, if you could take a look at the document in your folder titled 4000B.

4001B.

A. 4001 -- 4001B?

Q. Correct.

A. Okay.

Q. And please just read that single paragraph to yourself.

(Pause)

A. Okay.

Q. And, Mr. Miller, you can put that document to the side.

Does that refresh your recollection that you discussed publicly the MEV games?

A. Not really, no.

Q. Would you agree that the MEV strategies are very complex?

A. Yes.

Q. And MEV strategies are constantly evolving?

A. That is also true.

Q. And sandwich bots have encouraged counterstrategies, correct?

A. What do you mean by "counterstrategies"?

Q. Strategies that attempt to thwart sandwich attacks, correct?

A. Are you talking about a general effort, or are you talking about other MEV strategies?

Q. I'm talking about -- without using specific examples, but just there is a phenomenon on Ethereum where sandwich attacks have encouraged strategies to thwart them, correct?

A. Well, as an example, Flashbots has been trying to make products that prevent sandwich attacks.

Is this what you're referring to?

Q. I am referring to other traders developing strategies to thwart sandwich attacks.

A. It depends on what you mean by thwart in this context.

Q. Other strategies to capture the MEV that sandwich attackers are after, would you agree that there have been counterstrategies in the Ethereum network in that regard?

A. I think definitionally, by the way that you framed the question that there are other MEV searchers attempting to capture the opportunities that sandwich bots are after, that would imply that they are sandwich bots themselves. They're competing for the same opportunities with sandwich bots. And then it doesn't make sense, to me, to call those a counterstrategy. So the question doesn't entirely make sense to me.

BY MR. LOOBY:

Q. Now, in addition to those three MEV strategies that we talked about — arbitrage, liquidations, and sandwiching — there is a fourth category that has been called long-tail MEV,

correct?
A. That is true.
Q. And you have described these strategies in public writings as bespoke MEV strategies?
A. I don't specifically remember that, but I wouldn't be surprised.

BY MR. LOOBY:
Q. These long-tail MEV strategies, they are less obvious than arbitrage and sandwiching, correct?
A. Yes. Definitionally, long tail means they're less common, less obvious.
Q. And to capture these long-tail MEV strategies, you need to study the protocols, correct?
A. Yes. Because there needs to be something that, you know, allows you to make money by having a transaction in the right place, so you need to study something in order to capture that, I think I would agree with that.
Q. To capture these long-tail MEV opportunities, you need to be looking where other people aren't looking, correct?
A. I don't know if that's definitionally true. Two people might be looking at the same uncommon opportunity.

Q. But if it was commonly known, you would expect that the MEV opportunity would be sought out and obtained, correct?
A. Well, I mean, I don't mean to be difficult, so I'm sorry about that, but I think, either way, you're sort of implying people are seeking them out and finding them. It's just a matter of the scale of whether it's a few people or a lot of people.
Q. But, generally, these are more obscure strategies, correct?
A. Yes.
Q. Less popular, correct?
A. Yes.
Q. And some of these strategies might be characterized as exploits?
A. It depends on your definition of MEV and your definition of exploits.
Q. You have publicly stated that exploits are equal to MEV extraction, correct?
A. Since MEV is the value that you can make from having the right transaction at the right place at the right time, and exploits oftentimes involve a lot of money, it makes sense to consider exploits a part of MEV.
Q. Now, in addition to searchers, there are separate users relevant to MEV-Boost called builders, correct?
A. Yes.
Q. And a searcher can send a proposed bundle of transactions

to a builder, correct?
A. Yes.
Q. And the builders accept the proposed bundles from multiple searchers, correct?
A. Yes.
Q. And we talked about this earlier, but Flashbots at one point operated a builder, correct?
A. Flashbots did operate a builder.
Q. In theory, anyone could make one, correct?
A. In theory, yes.
Q. And use their own custom version of code to do so, correct?
A. Yes. Anyone could make one, use their own custom version of code.
Q. And there are only a few builders that are active on Ethereum, correct?
A. It's not a very large number; yeah.
Q. The searcher who passes their proposed bundle off to a builder is competing against other searchers, correct?
A. The searcher who passes their proposed bundle off to a builder is competing against other searchers, yes.
Q. And the builder will, in effect, run an auction to see which searcher is willing to pay the most to have their bundle in the block that the builder constructs, correct?
A. Yes, that is true.
Q. In other words, a searcher who has selected a bundle of

transactions is not guaranteed that the bundle will ultimately land on the blockchain, correct?

A. Yes, a searcher does not have a guarantee that their bundle will land on the chain when they send it to a builder.

Q. And the builders are also competing with other builders to propose the most profitable block in a given slot, correct?

A. Yeah, that is true.

Q. And the more profitable the block, the more money the builder stands to make, correct?

A. Yes. In general.

Q. Now, as part of its interaction with the builder, the searcher will express a preference for what transactions to include in the block and in what order, correct?

A. Yes.

Q. But nothing in the Ethereum protocol says that any bundle must go through in the order the searcher prefers, correct?

A. That is true. Bundles are an idea and a feature that we developed on top of the Ethereum protocol, but it is not native to the Ethereum protocol itself.

Q. That's another way of saying that the concept of a bundle of transactions isn't part of the Ethereum protocol, correct?

A. Yes.

Q. Rather, the way it works is that the builder separately guarantees the order of transactions to the searcher, correct?

A. Could you phrase that a different way for me?

Q. Yes.

So in PBS or in MEV-Boost, the builder is guaranteeing the order of transactions to the searcher, correct?

A. By guaranteeing the order of certain transactions to the searcher, you mean guaranteeing them the order of their bundle; is that right?

Q. That's what I'm asking, yes.

A. Okay.

That is true.

Q. And the builders guarantee to the searcher, it's not cryptographic, it's based on incentives, correct?

A. Yes.

Q. The builder has the ability to unbundle the bundle that is sent from the searcher, correct?

A. Theoretically, yes.

Q. But if a builder did unbundle, the searcher would not want to use that builder again, correct?

A. That is correct, yeah.

Q. And the builder would then, in effect, lose a customer, correct?

A. Yes, that is true.

Q. In the --

A. Probably many customers, since people talk, they observe, this has happened. So, not just one customer, one nuance. Sorry.

Q. And people talk, and they would be able to identify who that builder was, correct?
A. Generally, yeah, I think so.
Q. And as we discussed earlier, there are only a couple of builders, correct?
[redacted]
THE WITNESS: Yes. There aren't that many.
BY MR. LOOBY:
Q. But these economic incentives, they generally keep builders from unbundling?
A. Generally, yes.
Q. Even with these incentives, Flashbots has advised that it is important for searchers to choose builders that they trust, correct?
A. That is true.
Q. And that trust is more important the more money the searcher's strategy puts at risk, correct?
A. I would agree with that.
Q. And this risk might inhibit searchers from even trying certain strategies, correct?
A. That seems theoretically possible, yeah.
Q. You have publicly wondered, or stated that you wondered, about what kind of strategies would be unlocked if there was a

truly trustless and private building infrastructure, correct?
A. I don't specifically remember, but that seems like something I might wonder in public, yeah.
Q. It's a thought that you have wondered?
A. I don't specifically recall the instance, but it's in the general area of the stuff that I have wondered in the past.
Q. And the reason the searchers might hold back on some of these strategies is that they're not willing to trust the builder or other users to take their MEV opportunity, correct?
A. Okay, that was a complicated sentence. Can you repeat that back to me?
Q. Yeah.
So the reason the searchers may not engage in some of the strategies that you've wondered about is that it would put their MEV strategy at risk from being copied, essentially?
A. Copied or some other way that you might have a negative impact if the builder did something adverse, yes.
Q. Now, we've been talking about the role that builders play in the process for adding blocks to the chain. And just to confirm, builders don't actually run the MEV-Boost software, correct?
A. Validators run the MEV-Boost software; builders do not.
Q. I'd like to ask some questions about relays.
Yesterday, you testified that for a validator to get a block from a relay, the validator first needs to register with

the relay; is that correct?
A. Yeah.
MR. LOOBY: Okay. Joe, if we could please pull up what is in evidence as GX 3219, which was admitted yesterday.
And with the Court's permission, I would publish it for --
THE COURT: You may publish.
BY MR. LOOBY:
Q. Now, Mr. Miller, do you recall discussing this document with the government on direct examination?
A. Yes, I do.
Q. And these are the Builder API specifications, correct?
A. Correct.
Q. I'm going to draw your attention to the first page, next to the word, the big bolded word, "Builder." It says, "Set of endpoints to interact with an external block builder."
Do you see that?
A. Mm-hmm, I do.
Q. What's an endpoint?
A. A particular computer address that you can interact with in a standardized way. I don't know the formal definition, but that gets the idea across, I think.
Q. And in this context, that address is what a validator's client software would call in order to register their relay, correct?

A. Sorry, what address?

Q. The endpoint.

A. Yes. This is the endpoint that a validator would call to register a relayer. In this context, it's talking about block builder, but I gave you the nuance of the differences before, I think.

Q. Do you see on the screen the colored icon "Post"?

A. Yes.

Q. And then to the right of that are some backslash addresses, it seems, or like a folder structure.

Do you see that?

A. I do see that.

Q. And then it says, "Register or update a validator's block building preferences."

Do you see that?

A. Yep.

Q. And below that is another sentence that says essentially the same thing, and then adds, "and gas limit."

Do you see that?

A. Well, it says, "Register a validator's preferred fee recipient and gas limit." It's slightly different.

Q. It's slightly different.

MR. LOOBY: If we could go to the next page, Joe, that I would like to highlight.

Q. Is this an example of the information that the validator

provides to the relay in the registration step?

A. It seems like it, yeah.

Q. So, the first piece of data there on that first line — I know it's a little bit small — it says the word fee recipient address, correct?

A. Correct.

Q. And I believe you previously said that builders pay validators if the validator proposes the builder's block under MEV-Boost, correct?

A. Yes.

Q. And the relay will use the data in the fee recipient field here to tell the builder where to send the payment to the validator in that instance, correct?

A. The relay will use the data and the fee recipient field here to tell the builder where to send the payment to the validator, yes, that's correct.

Q. The next line item is "Gas limit."

Do you see that?

A. Yes.

Q. In this field, the validator is telling the relay the maximum size of the block it will accept; is that correct?

A. It depends on exactly what you mean by size. There's multiple things size could mean.

Q. Well, what information is the gas limit field relevant to?

A. Every transaction on Ethereum takes up a certain amount of

computing power, it takes up a certain amount of effort from a computer to process it. And the gas limit is the maximum amount of computing power, so to speak, or effort, that can be put into this block.

Q. Thank you.

The next field is "Timestamp."

Do you see that?

A. Yes.

Q. And that is a field that allows the relay to keep track of all the registrations it has received from the validator, correct?

A. I would have to go back and look. I don't remember exactly.

Q. The next field is "Pub Key."

Do you see that?

A. Yes.

Q. And that stands for public key?

A. Yes.

Q. And that's a value that relays and builders can use to identify a validator, correct?

A. That seems right.

Q. And the last field is called a signature.

Do you see that?

A. I do see that.

Q. And this is an example of a cryptographic signature that

you have discussed in your testimony, correct?
A. That is an example of a cryptographic signature, yes.
Q. What that signature is doing here is establishing that the right validator sent this information, and that the information hasn't been changed since it was sent to the relay, correct?
A. It is establishing that -- yes, I agree with that.
Q. And it's possible to register with a relay and to never ask the relay for a block header, correct?
A. That is possible, yeah. Unusual, but possible.
Q. So, there is nothing in this registration message that requires a validator to accept a block from a relay, correct?
A. Correct, yes.

MR. LOOBY: Joe, you can take that document down. I'm going to move on.

THE COURT: Mr. Looby, if you are moving on, we are very close to 4:30., so now might be a good time to wrap up?

MR. LOOBY: Yes, that's appropriate.

THE COURT: All right.

Thank you, all, for your attention today. A reminder to please be here on time, as you all have been doing, so that we can get started at 10:00 in the morning. Please remember that my prior instructions apply. Do not discuss this case with anyone. Don't do any research on this case. Don't read any press about this case. And, finally, remember to keep an open mind. Thank you.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

Defendants. Trial

------------------------------x

New York, N.Y.
October 17, 2025
9:50 a.m.

Before:

HON. JESSICA G. L. CLARKE,

District Judge
-and a jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
Assistant United States Attorneys

FICK & MARX LLP
Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
-and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH

Also Present: Helena Kerest, Paralegal Specialist (USAO)
David Naguib, Paralegal Specialist (USAO)

(Jury present)

THE COURT: Good morning to you all. I hope you had a nice evening. And thank you all again for being here on time again today. And apologies for the slight delay; we had a little tech issue, but it's been resolved.

Thank you all. We appreciate it.

Moving forward with testimony.

Mr. Looby. And, Mr. Miller, you can step down to the witness stand.

ROBERT MILLER,

called as a witness by the Government,

having been previously duly sworn, testified as follows:

CROSS-EXAMINATION (continued)

BY MR. LOOBY:

Q. Good morning, Mr. Miller.

A. Good morning.

Q. You testified on direct examination that the relay accepts blocks from block builders, and it makes sure that those blocks are correct, and makes sure that they are profitable; is that accurate?

A. Generally.

Q. The Flashbots MEV-Boost relay does that; correct?

A. Correct.

Q. But not all relays do that; correct?

A. That is the job of a relay. At times relays will have bugs, and there are relays that have different features than the MEV-Boost relay does.

Q. And is one of those features called optimistic relaying, Mr. Miller?

A. Yes, that is one of those features.

Q. And this term refers to the process by which relays forward

blocks from the builder to the validator without first checking that the block is valid; is that correct?

A. You're getting right to it, Mr. Looby.

Yes, that is correct.

Q. And this approach is optimistic because it is based on the hope that the block is valid; correct?

A. What do you mean by "hope" in this context? Because optimistic relaying is a little nuanced.

Q. And we can jump right into the nuance.

In order for a builder to use an optimistic relay, the builder has to stake some ETH; correct?

A. That is my understanding of the feature of optimistic relaying, yes, or one part of that feature.

Q. And the optimistic relaying in that sense relies on economic incentives because the builder will be penalized if they send a bad block; correct?

A. That is correct. That's how that feature works in my understanding.

Q. And so if the builder sends an invalid block body to the relay, the relay can financially penalize the builder if the validator later uses that block; correct?

A. Yes, that's the idea behind the feature. They may also be penalized even if the validator doesn't use the block. I forget.

Q. Okay. And a relay that is programmed to operate

optimistically, it can accept blocks from the builder later in the proposing time slot; correct?

A. Yes.

Q. And those blocks later in the time slot, they are more likely to have higher MEV in them; correct?

A. Correct.

Q. And, thus, they have a higher chance of making it on the chain through the MEV-Boost system; correct?

A. I would agree with that.

Q. So it's in the builder's interest to connect with the relay who is engaging in optimistic relaying?

A. If you are confident in your ability to produce good blocks, yes.

Q. And I'm picking up in that answer that there is a chance that the block that the optimistic relay ultimately sends to the validator is invalid for some reason; correct?

A. Correct.

Q. And there have been times where invalid blocks have made it through the MEV-Boost system because the optimistic relay wasn't checking if they were valid; correct?

A. Correct.

Q. Mr. Miller, the Ultrasound Relay engages in optimistic relaying; correct?

A. Yes, that is correct.

Q. And because of the way optimistic relaying works, as we

just discussed, there was no guarantee that the Ultrasound Relay had simulated and verified that the block that it optimistically relayed to the Peraire-Buenos' validator was valid; correct?

A. That implicitly is making the assumption that the block was optimistically relayed, and I don't know if it was or not.

Q. But because the Ultrasound Relay has the optimistic relaying feature, there is a possibility that that feature was utilized with the block at issue in this case; correct?

A. There's a possibility that the block header that the relay gave the validator in question was using the optimistic relaying feature.

Q. And if that is the case, then the Ultrasound Relay would not have checked to see if the block was valid before sending it along to the Peraire-Buenos' validator; correct?

A. In what part of the process are you talking about? Because there's multiple points where they give blocks to the proposer.

Q. I am talking about before the relay sends the blinded block header to the validator.

A. Yes, there's the possibility that the relay did not check whether or not the block was correct if the builder in question was using optimistic relaying.

Q. Mr. Miller, yesterday you discussed on direct examination that a validator can ask a relay for the most profitable block header; correct?

A. Yes.

Q. And the validator does this by calling the get header end point on the Builder API; correct?

A. Yes.

Q. And the get header end point, that is public; correct?

A. Yes.

Q. So that means that anybody can call a relay's get header end point, and the relay will return a block header; correct?

A. That is correct.

Q. And there are situations in which a user who is not a validator might call a relay's get header end point; correct?

A. That is correct.

Q. For example, a builder might want to know what is the most competitive block in that moment; correct?

A. Correct.

Q. And one relay may call this end point to see if its blocks are competitive with another relay's blocks; correct?

A. Correct. I don't know if people were doing that in April of 2023; but, in general, I would agree.

Q. And when a user calls the get header end point, the user is simply collecting information; correct?

[redacted]

[redacted]

A. The question is when a user calls get header, they are simply collecting information?

Q. Correct.

A. That's the question?

Well, it depends. I'm not sure what the user is calling it for, but they are just getting information from the relay. I can't really speak to what the user is doing.

Q. And to be clear, when the user calls the get header end point, the relay doesn't know who is requesting the block header; correct?

A. Relays have started to develop capabilities to figure out who is requesting the block header. As an example, the validator may have registered with a certain IP address. And then you can check for the IP address of who's getting the header, so you could identify the validator that way. But I don't know when this practice started.

Q. So you don't know if that practice was in place in April of 2023?

A. I don't know.

Q. Now, Mr. Miller, on direct you talked about the digital signature that the validator uses in its interactions with the relay; correct?

A. Generally, yeah.

Q. And the relay cryptographically validates that the signature belongs to the correct validator; correct?

A. Yes, that's my understanding.

Q. The relay is making sure that the proposer is the correct

proposer for the slot; correct?
A. Yes.
Q. So, in other words, the relay is checking that the signature is for the right validator for the given slot who signed the block; correct?
A. Yes.
Q. And prior to April 3rd, 2023, once the relay verified that the signature was from the correct validator, it would then send the block with the full body to that validator; correct?
A. Yes.
Q. And the Peraire-Buenos' validator signature correctly identified their validator; correct?
A. Yes.
[redacted]
A. Yes.
Q. We know this because the relay released the block to the validator; correct?
A. That was a finding in the postmortem, yeah.
Q. And that would not have happened if the Peraire-Buenos' validator's signature had been invalid; correct?
[redacted]
A. If their signature was not from the right validator, it

wouldn't have happened.
Q. Now, the fact that the Peraire-Buenos' signature correctly identified their validator made it possible for their validator to later be slashed; correct?
A. Let me think about the technical details one second.
I think so, yeah.
Q. And that's because the fact of the signature is on the public blockchain identifying who the validator was who signed that blinded block; correct?
A. Repeat the question for me one time.
Q. Yes. So --
A. Complicated question, right.
Q. I know it's a complicated question.
The fact that the Peraire-Buenos' signature correctly identified them, their validator made it possible to be slashed because that signature was publicly viewable on the blockchain; correct?
A. If you want to be very precise, I don't know that that's strictly true. Because the signature was not on chain before they got slashed, if you see what I mean. The signature was off chain. And you needed to take those, input it into the chain in order to slash them. And I think a very precise reading of your question, the answer would be no.
Q. But the signature was public even if it wasn't on the chain; correct?

A. Public in what sense? Like, I'm not sure that the first header that the validator gave was public.

Q. The way I --

A. The second one certainly was.

Q. So the Peraire-Buenos' validator was later slashed; correct?

A. Yes.

Q. And in order to accomplish that slashing, the validator who later proposed the block that included the slashing needed to include the signature of the Peraire-Buenos' validator; correct?

[redacted]

A. Both signatures, yes.

Q. Correct.

Including the signature on the block that was ultimately not published to the blockchain; correct?

A. To be precise, the block header. Not too difficult, just trying to be precise. I'm sorry.

Q. I appreciate it.

Now, there is a field on the block header called fee recipient; correct?

A. I think so, yeah.

Q. And are you generally familiar with the function of that field?

A. Yes, I would say so.
Q. And that field is typically populated with the address of a wallet to receive validator fees; correct?
A. Correct.
Q. And those fees are the ones that the validator earns for proposing a block; correct?
A. Correct. There's some nuance with the block builder sometimes, so just setting that -- or putting a flag to that. But, generally, yes, I think this is correct.
Q. And is the nuance that the block builder gets paid first and then essentially reimburses the validator?
A. Yes. Sometimes the block builder will set the fee address to equal their own wallet, and then pay the validator's fee address in a separate transaction. That's the nuance.
Q. In your investigation into the April 2nd, 2023 event, you observed that this field was not populated with a valid wallet address to receive the fees; correct?
A. I don't remember.
Q. Mr. Miller, you have -- as we discussed yesterday, you have met with government attorneys over the past year or so on several occasion; correct?
A. Correct.
Q. And the first meeting of which occurred in 2023; correct?
A. Seems directionally correct, but I don't remember specific dates.

Q. And isn't it true that you told the government attorneys fee recipient :0x00000 and so on, also highly unusual because that is not a valid wallet address to receive fees. Is that true that you said that?
A. Don't remember exacts.
Q. Would it help you to look at a document to refresh your recollection as to whether you said that in the meeting with the government attorneys?
A. Sure.
MR. LOOBY: Joe, if you could please pull up for the witness, counsel, and Court only DX 3506-001.
Q. And, Mr. Miller, before you get started reading, this also would be in the smaller binder of the two, in case that is your preferred way of reviewing this. I think it's a multi-page document. And you are welcome to read the whole thing or we can direct you to the relevant portion.
A. Remind me the number of the exhibit.
Q. Yes. No problem. That is DX 3506-001.
A. Okay. I will take a second to read these notes.
Q. And just so you know where we're going, the relevant portion is at page 9.
A. Thank you.
(Pause)
A. Okay.
[redacted]

Q. Does it refresh your recollection that you talked about the fee recipient field in the block header with the government during that meeting?
A. I had many meetings with the government. I don't remember exactly what I talked about at exactly what meeting. It makes sense to me that it might have come up.
Q. And sitting here today, do you remember that as part of your investigation, you observed that the fee recipient field was set to zeros?
A. I have a loose recollection that it's a part of the postmortem. I don't specifically remember this portion of the investigation.
Q. And if the fee recipient field is set to a string of zeros, the validator would not get paid any rewards or fees for proposing that block; correct?
A. That is correct.
Q. Now, Mr. Miller, MEV-Boost relies on certain trust assumptions between users; correct?

A. Yes.
Q. And Flashbots has publicized online the way in which these trust assumptions work; correct?
A. Probably, yeah.
Q. In 2022, Flashbots conducted a security audit of the MEV-Boost system; correct?
A. We had someone else conduct the security audit, but there was a security audit performed on MEV-Boost; correct.
Q. And this audit was done in advance of the event called The Merge that we discussed yesterday?
A. That seems likely to me, yeah.
Q. And the results of that audit were released to the community; correct?
A. Correct.
MR. LOOBY: Joe, if you could please pull up DX 304 for the witness, counsel, and the Court only.
Q. Mr. Miller, do you recognize this as the security audit for the MEV-Boost system?
A. It's been a while since I've looked at this, but I do. Generally, it looks like it.
MR. LOOBY: We move to admit DX 304.
[redacted]

(In open court)

(Defendant's Exhibit 304 received in evidence)

THE COURT: The evidence that you are about to see is being admitted for a limited purpose. You must consider this evidence only for that limited purpose and no other. This document is not being admitted for the truth of what is stated in the document. And you may not consider it as evidence of what is stated in the document, but, instead, for the limited purpose of what effect this document and what notice it gives to a reasonable person using the MEV-Boost system.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you.

And, Joe, if you could go down to the section of trust assumptions.

May we please publish it to the jury?

THE COURT: You may.

BY MR. LOOBY:

Q. Mr. Miller, do you see the heading "Trust Assumptions"?

A. I do see that heading.

Q. And the first sentence is: Proof of stake Ethereum roadmap presents a trustless proposer/builder separation protocol.

Correct?

A. Yes, I see that.

Q. And then it says: In the meantime, the current system will depend on trust assumptions of different actors. Correct?

A. Of the different actors, yes.

Q. And then there is a list of what the various users will assume, do you see that?

A. There's a list of a bunch of assumptions, yeah.

Q. Let's discuss some of those assumptions.

Under the MEV-Boost system, the validators have to trust the relays; correct?

A. Yes.

Q. The validators have to trust that relays will ultimately release the block to them; correct?

A. Correct.

Q. Validators have to trust that the relays will accurately state the value of the block to the validator; correct?

A. Yes, that's correct.

Q. Now, builders. The builders also have to trust the relays; correct?

A. Yes.

Q. For example, the builder trusts the relay to correctly inform the validator as to the potential payment for proposing that builder's block; correct?

A. Yes. But you're not reading off this, are you, or am I missing this?

 Q. Not directly. Those are the categories.
A. Okay.
Q. And the builder is also trusting the relay not to reorder the transactions on the block; correct?
A. That is correct.
Q. Now, this list here, it doesn't include searchers; correct?
A. Sorry. I'm reading for references of searchers.
No, I don't see any reference to searchers.
Q. But searchers also have trust assumptions here that we've talked about yesterday, isn't that right?
A. Searchers have trust assumptions in the MEV-Boost system. But as we just established, they are not listed here.
Q. And so without reference to the document, searchers have to trust builders; correct?
A. Correct.
Q. The builder, in theory, could censor the searcher's transactions; correct?
A. In theory, yeah.
Q. And just at a high level, that means the builder could reject the searcher's transactions, correct?
A. Yes.
Q. And the builder also could unbundle bundles of transactions sent to it from the searcher; correct?
A. It's theoretically possible.
Q. It is the long-term economic incentives that typically keep

the builder from doing that; correct?

A. I would agree with that.

Q. Now, looking at this trust assumptions list here, it doesn't say that the relays trust the validator; correct?

A. It says relays assume validators will send periodically registration information. Arguable whether that's an assumption of trust or not.

Q. But you would agree that, as a general matter, relays do not trust validators with the contents of the block; correct?

A. In the MEV-Boost system, relays are not trusting validators with the contents of the block, yes. The relay has the contents of the block, the block body.

Q. And the builders don't have any trust assumptions with respect to the validators; correct?

A. Let me think about that for one second.

I think that is arguable, actually. I'm not sure that's correct.

Q. Looking at this trust assumptions document, there is no disclosed trust assumption that the builder has with respect to the validator; correct?

A. There's nothing on this document, that's correct.

Q. This document says that the builders will assume that the relays will not share their blocks with any other relayers and builders; correct?

A. Builders will assume relayers will not share their blocks

with other relayers or builders, I do see that, yes.

Q. And the builders assume that the relayers will verify the validator's commit to a specific blockhash; correct?

A. Yes. Correct.

Q. And the process that you described on direct examination by which the contents of the block, so the transactions in the block are not revealed to the validator until the validator signs the blinded block header, that process is necessary because nobody trusts the validator with that information; correct?

A. That is one of the ideas behind the system, yes. Or it's necessary so to minimize trust, I think would be maybe how I would phrase it.

Q. Mr. Miller, you are generally familiar with the economic incentives at issue in the MEV-Boost system; correct?

A. I would say so.

Q. And the validator, if it could see the order of transactions on the block, it could be motivated to reorder them; correct?

A. Yes.
Q. Now, you testified yesterday about the concept of an honest validator; correct?
A. Correct.
Q. And you were asked about what does an honest MEV-Boost validator mean; correct?
A. I think so, yeah.
Q. And you answered that it is a validator that signs one block or proposes one block and does it within the time window that's allocated. Is that accurate?
A. You have the transcript, not me. So I believe that I started that answer by giving the general kind of definition of what an honest validator was, and that's a specific instance of how you might deviate from -- sorry, that's a specific instance of honest behavior. That's my recollection.
Q. Yes. And that is essentially the applied definition in the context that we're talking about; correct?
A. Correct.
Q. Okay. And you were asked: What do you understand it to mean for an MEV-Boost validator to act dishonestly? Do you remember that?
A. Yes.
Q. And your answer included the following: That would mean a validator that is not taking the expected or intended behavior according to the specification. So specifically here proposing

two blocks in a slot.

Do you agree with that definition?

A. Are you asking if I said it or if I agree with the definition?

Q. Do you recall giving that answer yesterday?

A. Yes.

Q. Okay. Now, that definition of honesty, that's different than how that term might be used in everyday life; correct?

A. Here, honesty is a term of art within the distributed systems setting. It is not honesty in the moral sense, but honesty as in is this actor doing what we might expect within a distributed system, according to how the mechanisms of the distributed system are set up to enable parties to work together. So I think that is the nuance that you're drawing.

Q. Yes. Thank you, Mr. Miller.

And you testified on direct about your role in designing MEV-Boost; correct?

A. I think so, yeah.

Q. At a high level, that's what you testified about.

A. Yup.

Q. And when designing a product like MEV-Boost --

MR. LOOBY: Joe, you can take this down. Thank you.
Q. When designing a product like MEV-Boost, you have to assume that self-motivated users in an adversarial environment like Ethereum will act rationally and not honestly, as you have defined the term; correct?
A. As a general principle, that is the setting in which we're creating products.
Q. And so, in other words, you can't assume that users will interact with a piece of technology only in the way the technology's creators intended; correct?

A. Correct.
Q. In the Ethereum context, this fact requires a design principle called being MEV aware; correct?
A. Correct.
Q. And that means that designers have to take into account the MEV incentives that the protocol design creates; correct?
A. I would generally agree with that.
Q. And when designing the product, you would assume that people will try to capture the MEV if they can?
A. Generally, yes, I would agree with that.
Q. And it is important for you to build your product with that assumption in mind; correct?
A. I would agree with that, too.

Q. Mr. Miller, on direct examination, you mentioned the term "commit reveal scheme." Do you recall?
A. Yeah, I do.
Q. And that concept relates to the field of cryptoeconomics; is that right?
A. It's definitely used in cryptoeconomics, that is right.
Q. Now, cryptoeconomic solutions are a way for a decentralized system to use economic incentives to influence user behavior; correct?
A. In cryptography, yes, that's the crypto part of cryptoeconomic.
Q. Thank you, Mr. Miller.

And slashing penalties under the Ethereum protocol are a form of cryptoeconomic consequences; correct?
A. Yes, that is correct.
Q. And the MEV-Boost system relies in part on cryptoeconomic incentives; correct?
A. In part, yes.
Q. And one of the reasons why cryptoeconomics is challenging in the MEV ecosystem is because the distribution of the typical MEV awards in a block is very uneven, would you agree with that?
A. I would agree with that.
Q. Okay. And what that means is that the average value of a block going through the MEV-Boost system is somewhere between

.1 and .2 ETH; correct?
A. What time frame are you talking about?
Q. I believe that you testified -- well, so the relevant time period would be 2023 for this question. But I will rephrase the question for you, which is: The average value of a block going through the MEV-Boost system is generally a fraction of an ETH; is that correct?
A. Some fraction of an ETH. It varies by time.
Q. But there are a small number of blocks that have MEV that is worth much more; correct?
A. Yes, that is correct.
Q. And in those exceptional cases, there are incentives to deviate from the intended use; correct?

A. As a matter of principles, things get more complicated when the numbers get really high, that's for sure.
Q. In fact, cryptoeconomics breaks down at these limits; correct?

A. What do you mean by "breaks down" and what do you mean by "limits"?

Court Exhibit 32 456
PAHVPER1 Miller - Cross

Q. Mr. Miller, would you agree that cryptoeconomics can break down at these limits?

A. As a matter of general principle, yes.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

BY MR. LOOBY:

Q. Now, rather than assume anything about validator behavior, the MEV-Boost system sought to harness the economic incentives of the Ethereum protocol, correct?

A. Rather than assume anything about the validator's behavior, the MEV-Boost system sought to harness the economic incentives of the protocol; was that the question?

Q. Spot on, Mr. Miller.

A. Thank you.

I believe that the goal was to try to minimize trust. I don't know that we ever thought that we could completely get away with having no trust assumptions on the validator.

Q. The MEV-Boost system relies, in part, on the Ethereum slashing penalty that we discussed earlier, correct?

A. In part, yes.

Q. As we discussed, the validator has to provide a valid signature to the relay to see the contents of the block in the MEV-Boost system, correct?

A. Yes, that is true.

Q. And the relay will send that signed block out to other nodes in the network, correct?

A. Yes.

Q. So, if the validator wants to propose its own block for the same slot, it will have signed two blocks, correct?

A. You're specifically talking about the context where a

validator has already signed a header that has given it to -- given to the validator by the relay, right?
Q. That's right, that's the premise.
A. And then you're saying the validator could sign another header; that is the question?
Q. Yes.
A. Yes, the validator could sign another header, that's true.
Q. And in that circumstance, the validator will have, in effect, signed two blocks for one slot, correct?
A. Yes, that is correct.
Q. And the validator will get slashed for doing that?
A. Yes.
Q. But, as we discussed yesterday, there is no limitation on a validator's ability to equivocate to sign two blocks for a given slot at least once in that slot, correct?
A. Yes, there is no limit to the validator's ability to equivocate at least once. So they could sign two headers for a slot.
Q. And this fact, that the validator could always sign two blocks, it was publicly disclosed on Flashbots documents that were made available online, correct?
A. I don't exactly remember. It seems probable to me.
MR. LOOBY: Joe, if you could please pull up DX 321A for the witness, counsel, and the Court only.
THE WITNESS: Is this the small or the large binder?

BY MR. LOOBY:

Q. This is the large binder. And it's 321A, and it will be towards the front.

A. Okay.

(Pause)

A. Okay. Is there a part of this you want to talk about?

Q. First, I'm going to ask you a question, Mr. Miller, which is: Do you recognize this as a document that was made available on the Flashbots website?

A. Yes.

MR. LOOBY: Move to admit DX 321A.

[redacted] [redacted]

[redacted] [redacted]

THE COURT: [redacted]

It is admitted, and this document is also being admitted for a limited purpose. It is not admitted for the truth of what is stated in the document, but, instead, for notice to a reasonable person using the MEV-Boost system.

(Defendants' Exhibit 321A received in evidence)

MR. LOOBY: May we publish, your Honor?

THE COURT: You may.

BY MR. LOOBY:

Q. Now, the title of this document is "MEV-Boost In A Nutshell."

Do you see that?

A. I do see that, yeah.

MR. LOOBY: Joe, if you could please direct the witness' attention to page 5.

Q. Or, Mr. Miller, you can follow along in your binder.

A. Okay.

Q. There is a section for frequently asked questions.

Do you see that?

A. Yes.

Q. And one of the frequently asked questions is: I am a solo validator. Will I be able to run MEV-Boost?

Do you see that?

A. I do see that.

Q. The answer is to that question is yes, correct?

A. The answer is yes.

Q. And the answer elaborates that the most significant change for MEV in Ethereum's proof of stake is that with MEV-Boost, now validators can be permissionless.

Do you see that?

I don't think we have the right clip up.

A. You do not.

Q. But we will get there.

A. Yes, I see that.

Q. It goes on to say -- to describe the relay role, essentially; would you agree?

A. Yes, I would agree.

Q. Towards the bottom of that clip, which we might have to extend a little bit, there is the sentence that reads: Once the validator signs the header, the relay sends the block payload to the proposer. If at this moment the validator decides to propose a different block, they will have signed two blocks and will be slashed.

Do you see that, Mr. Miller?

A. I do see that, yeah.

Q. So this document, it revealed that the validator could decide to propose a different block, even after receiving and signing the block from the relay, correct?

A. I agree that's implicit in this document, yep.

MR. LOOBY: Joe, you can take that down.

And, Joe, if you could please pull back up DX 304, which is admitted in evidence.

And with the Court's permission, we would republish to the jury?

THE COURT: You may.

BY MR. LOOBY:

Q. Mr. Miller, this is the security audit that we were talking about before, correct?

A. Yes.

Q. If I could direct your attention to the Appendix A on page 4 of the document.

A. One second?

(Pause)

A. Okay.

Q. And Appendix A is proposing some improvements to the draft specification for MEV-Boost, correct?

A. It says that it is -- it's listing considerations for further refinement and improvements, yes.

Q. So, in other words, ways that the software could be improved before the merge, correct?

A. I don't know if this is in the context of before the merge, but in general, yes.

Q. If you want to just go back to the first page of the document, and there's a date on the top.

A. Yes.

Q. And that date is June 20, 2022?

A. Yes.

Q. So that's a few months before the merge, correct?

A. That is a few months before the merge. My caveat was that I don't know that the implication was that these things should be handled before the merge as opposed to generally. There's been no contention that the document was before the merge.

Does that nuance make sense?

Q. Fair.

To go back down to the Appendix A, specification improvements, it is noting that the audit was of the MEV-Boost software, correct?

A. Yes, that's correct.

Q. I know I've asked this before, but the MEV-Boost software, that is the piece of software that validators can use to interact with relays, correct?

A. Yes.

Q. And that is different than the MEV-Boost Relay code, correct?

A. Yes, that is true.

Q. And, here, it is saying that although the audit was of the MEV-Boost software, there were some security considerations that were discovered for either the builder or the relay software.

Do you see that?

A. Yes.

Q. I want to talk about the first one, which is called relayer assigned beacon block validation.

Do you see that?

A. I do see that.

Q. And the first sentence there is that, to be slashed, a validator would need to sign two competing blocks for the block of the slot they are in charge of producing, correct?

A. Correct, that's what it says.

Q. It's a mouthful.

And the second sentence proposes a change to the specification to make sure that the relay is checking the

correct slot and proposer index.

Do you see that?

A. Yes.

Q. And these are the fields that are needed to identify the validator to be slashed, correct?

A. I'm not sure what strictly is necessary to identify the validator to be slashed, actually.

Q. Was the relay code changed to check these values?

A. I don't know off the top of my head.

MR. LOOBY: Joe, you can take this one down.

And, Joe, if you could please pull up, for the witness, Court, and counsel only, DX 309.

Q. Mr. Miller, can you let me know once you have reviewed the document.

A. Yes, I will read it now.

(Pause)

A. Okay.

Q. Mr. Miller, do you recognize this as a page on the Flashbots website concerning MEV-Boost?

A. It is our docs, yes.

MR. LOOBY: Move to admit DX 309.

[redacted]

THE COURT: [redacted] Again, this document is being admitted not for the truth of what is stated in the document, but for notice to a reasonable person using the MEV-Boost

system.

(Defendants' Exhibit 309 received in evidence)

MR. LOOBY: May we publish, your Honor?

THE COURT: You may.

BY MR. LOOBY:

Q. And, Mr. Miller, specifically, this is a FAQ section of the Flashbots docs, correct?

A. It looks like it, yeah.

Q. I want to draw your attention to the question midway down of what prevents block proposers from stealing MEV from submitted builders' blocks.

Do you see that?

A. I do see that.

Q. The answer to that question is slashing penalties, period, correct?

A. Well, there's a lot more that comes after that, too, but that's the first two words, yeah.

Q. And the answer goes on to say that once a proposer signs a block with a header, they are bound by this choice or risk being slashed due to equivocation, correct?

A. That is what the document says.

Q. Okay. And the document also says that, should a validator wish to steal MEV from a builder, they would need to sign a second block, including the exploited MEV, which would result in a slashing penalty.

Is that the correct reading?

A. That is what it says, yes.

Q. And this captures the same concept that we had discussed in the other document, correct?

A. Which document? I'm sorry.

Q. The MEV-Boost in a nutshell document that we reviewed about two documents ago.

A. Yes. I believe so.

Q. Now, the answer goes on to say that this penalty is significant enough to discourage this behavior, allowing the builder to reveal the blinded transactions without the possibility of the proposer tampering with them or stealing MEV.

Do you see that?

A. I do see that.

Q. But that's not always the case, correct?

A. It is -- well, I think it's always the case that they're "discouraged," being the operative word here, but the proposer may not be discouraged enough.

MR. LOOBY: Your Honor, now might be a time for the morning break.

THE COURT: That sounds good.

All right. It is 11:20. Please be back and ready to go in the jury room at 11:35. My prior instructions apply. Do not discuss this case with anyone. Do not do any research on

this case. Do not read anything about this case. And remember to keep an open mind.

I'll see you all in 15 minutes.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Thank you, all. That break took a little longer than expected, but I appreciate your patience.

Do we have Mr. Miller?

Please step down, Mr. Miller.

Mr. Looby, you may proceed.

BY MR. LOOBY:

Q. Mr. Miller, on Wednesday, on direct examination, you testified about the programming interface that enabled searchers to submit bundles to miners, correct?

A. Yes.

Q. And that interface is called eth_sendBundle, correct?

A. Yes, eth, underscore, sendBundle.

MR. LOOBY: And, Joe, if you could please bring up Government Exhibit 3002A, which is in evidence.

And with the Court's permission, publish it for the jury?

THE COURT: You may.

BY MR. LOOBY:

Q. All right, Mr. Miller. I would like to direct your attention to page 2 of the document.

A. Can you bring it up on the screen? I don't have it. Or you can tell me which binder it is in. I can do that, too.

Q. Yes. I think it will be -- it should be on the screen now.

A. Yes, it's on the screen now.
Q. On direct examination, you explained that eth_sendBundle is an interface that Flashbots developed so that searchers can submit bundles to miners, correct?
A. Correct.
Q. And there is -- what is being shown on the document now is line 9 of the specification, correct?
A. Correct.
Q. And that line reads: Send a bundle of transactions to the miner. The bundle has to be executed at the beginning of the block (before any other transactions), with bundled transactions executed exactly in the same order as provided in the bundle.

Do you see that sentence?
A. Yes, I see that.
Q. Now, Mr. Fang had asked you about this particular sentence on direct examination, correct?
A. I think so. There's been a lot of questions. But I remember talking about the document.
Q. Fair.

Now, this specification describes the interface as it existed back in the pre-merge Ethereum, before MEV-Boost existed, correct?
A. Yes, this is pre-merge specification before MEV-Boost.
Q. Now, post-merge, there are no miners in the system,

correct?

A. Post-merge, there are no miners in the system.

Q. But you testified on direct that the core features of eth_sendBundle still applied in 2023, correct?

A. Yes.

Q. But the difference is that in 2023, eth_sendBundle was an interface for interactions between the searcher and the builder, correct?

A. Yes. Here, this is talking about sending bundles to miners, and in 2023, searchers sent bundles to block builders.

Q. In 2023, a builder is different from a validator, correct?

A. Yes, that is correct.

Q. So, when a searcher is using this eth_sendBundle interface, it is telling the builder what order it wants the certain transactions to be executed in, correct?

A. Broadly, yeah.

Q. Now, when a validator receives the execution payload from the relay, the validator can't be certain what the bundle boundaries are between transactions in a block, correct?

A. What do you mean by "bundle boundaries" here?

Q. I mean that when the validator receives the execution payload from the relay, the validator can't be certain which transactions were in a bundle submitted by the searcher, correct?

A. The payload or the payload header?

Q. The payload.
A. The validator cannot be certain which transactions were in a bundle from a searcher, that is true, yes.
Q. Now, Mr. Miller, you have explained that your role at Flashbots is as a steward, correct?
A. It's one of the titles that I have. I also lead the product and engineering team. I'm a board member.
Q. Part of your role is to advocate for Flashbots and its products?
A. I would say so.
Q. And another part of your role is to get to know sophisticated users, like searchers who are running MEV bots, correct?
A. Yes, that is correct.
Q. In fact, that's how you originally came to know James and Anton, correct?
A. Yeah.
Q. Now, Twitter, or X, as it's now called, is a social media website that is popular with cryptocurrency users, correct?
A. That is correct.
Q. And as part of your role as steward at Flashbots, do you use Twitter to engage with the public about Flashbots products?
A. Yes, either in my role as a steward or the person leading the project and engineering team — I'm not sure it matters — but I do use Twitter quite a bit.

Q. And you use your Twitter account to discuss interesting MEV strategies that you learn about, correct?
A. Yes, from time to time.
Q. You often post the details about types of strategies that different searchers use, correct?
A. Yes, I've been known to do that.
Q. Do you recall yesterday that we discussed sandwich bots and sandwich attacks?
A. We were discussing that yesterday.

BY MR. LOOBY:
Q. Now, Mr. Miller, I'd like to flash forward to the period of after April 3rd, 2023.

The events of April 3rd, 2023, it made you spot a bunch of different problems with the MEV-Boost Relay code, correct?
A. Yes, and Ethereum, as well.
Q. But you and your team didn't find all of them, correct?
A. Some of them were found by other teams we were working with, correct.

Q. And, in fact, the Peraire-Buenos disclosed a further one to you, correct?

A. That is correct.

Q. And you testified on direct examination about an email you received in April 2023 from an account called Low Carb Crusader, correct?

A. Yep, we were talking about that.

MR. LOOBY: And, Joe, if you could please pull up GX 3306, which is already in evidence.

And with the Court's permission, publish it to the jury?

THE COURT: You may publish.

BY MR. LOOBY:

Q. And starting with the email on the top, which is the earliest one in the chain here, Low Carb Crusader reaches out to you and says: I have a message about block equivocation I think you would find useful.

Do you see that?

A. I do see that.

Q. And then later that day, Low Carb Crusader wrote to you again, correct?

A. Perhaps you could go down in the email chain so I can be sure and we can just read.

(Pause)

Q. And after you've read through it, I'll ask you some

questions.

A. I'm sorry, I wasn't reading through it yet.

Q. And the relevant portion is on your screen, as well, if that's easier for you, but you are welcome to use the binder, as always.

A. Cheers. Thank you.

(Pause)

A. Okay. I have reread this message.

Q. And Low Carb wrote to you that it was sad -- it has saddened me to see the situation reported as a relay exploit, correct?

A. That's the first sentence, yes.

Q. And then Low Carb offered to disclose details of a second version of the strategy that was still possible, even after your previous modifications to the code, correct?

A. That is correct.

Q. And he asked that you refer to him using a more neutral name, like Low Carb Crusader, instead of something like Sandwich The Ripper, correct?

A. That is correct.

Q. And at the time, you thought that this request was interesting, correct?

A. I certainly thought it was interesting.

Q. And you thought this request was funny?

A. There is a sense of absurdity to it, is how I would

characterize it.

Q. Now, you respond on April 22nd asking if the strategy Low Carb had in mind was already covered by some other blog post. And I will have Joe help guide us to that portion.

Mr. Miller, do you see there that you are asking Low Carb Crusader whether or not the strategy is covered by a particular blog post that you are linking to in the email?

A. Yes.

Q. And Low Carb Crusader said that, you know, if you had already thought -- I'll wait until it pulls up. And Low Carb Crusader responds: This strategy is not covered in the blog post or any other writings I have seen.

Do you see that?

A. Yes, I do see that.

Q. And he says that if you find that this strategy does not work, then no further action is necessary, correct?

A. That is what the email says.

Q. And he says that he's disclosing it as a goodwill gesture, and only asking for the transparency requested in the previous email in return, correct?

A. That is the final sentence, yes.

Q. And you accepted Low Carb Crusader's proposal, correct?

A. I did accept it in the next email.

Q. In the further email in which Low Carb Crusader responds to you, he disclosed a -- or Low Carb disclosed a rather detailed

explanation of the strategy, correct?

A. If you say so, yes.

Q. And you determined that that strategy would have allowed the validator to do something similar to what happened on April 2nd?

A. I worked with some other people, and that was our determination, yes.

Q. And that strategy, if successful, could have made the validator a lot of money, potentially?

THE WITNESS: There is some nuance to that.

BY MR. LOOBY:

Q. If the strategy had been successful, the validator would have been able to extract MEV, correct?

A. Correct.

Q. Now, after your exchange with Low Carb Crusader, you wrote a further post that was published online, disclosing the strategy that Low Carb Crusader had shared with you, correct?

A. That is correct.

MR. LOOBY: Joe, if you could please pull up GX 3301, which is in evidence.

And with the Court's permission, publish to the jury?

THE COURT: You may publish.

BY MR. LOOBY:

Q. Mr. Miller, if I could direct your attention the first paragraph.

A. Sure.

Q. And in this paragraph, you are disclosing the way in which Low Carb Crusader's request and disclosure had come about, correct?

A. Let me read it.

Q. Take your time.

(Pause)

A. Okay. You want to repeat the question, if you don't mind?

Q. Yes.

So, in this first paragraph, you are disclosing the circumstances under which Low Carb Crusader had requested the change in the terminology for how they would be described, correct?

A. I agree with that, yeah.

Q. And you note that Low Carb Crusader, in return, disclosed details of a unique block equivocation strategy, correct?

A. Yes, that is in there.

Q. And, to your knowledge, that strategy was never used, correct?

A. That was what the disclosure found, yes.

Q. And Flashbots ultimately issued a patch to prevent this strategy, correct?

A. Yes. There's a mitigation section below that we can read, if that is of interest.

Q. I don't think we need to get into the details.

But, just generally, there was a mitigation procedure to fix the code, correct?

A. That's what I remember, yeah.

Q. On direct, you said that you thought what Low Carb Crusader did on April 2nd, 2023, was an exploit, correct?

A. That's how it's described in the postmortem.

MR. LOOBY: Thank you, your Honor. No further questions for James Peraire-Bueno.

THE COURT: Thank you.

Mr. Marx?

MR. MARX: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. MARX:

Q. Good morning, Mr. Miller.

A. Good morning -- Mr. Marx?

Q. Yes.

And we've never met before; is that right?

A. Not to my knowledge, no.

Q. Not to mine either. Well, thank you for coming back for a third day.

I want to take you back all the way to the beginning of your testimony with the video that you were shown early on in your direct examination.

Do you remember that?

A. I do remember being shown a video, yeah.

Q. And did you make that video?

A. I did not make the video.

Q. Do you know who did?

A. The government.

Q. And when Mr. Fang showed you the government's video, after he was done, he asked you whether it accurately described how MEV-Boost was designed to function as of April 2nd, 2023.

Do you remember that?

A. As a part of direct testimony or in general?

Q. Correct -- as part of your testimony, he asked you the question whether it accurately depicted how MEV-Boost was

supposed to operate as of April 2nd, 2023?

A. I've been asked a lot of questions that sounds about right, but I don't remember the specific wording and all of that.

Q. And I'm not really focusing on the specific wording, just that he asked you to vouch for its accuracy, and you answered, at a high level, yeah, it seemed accurate?

Is that --

A. It seems right, yeah.

Q. I want to come down from that high level for a second and talk to you about some of the details in that video and see what you have to say about them.

MR. MARX: Joe, could we pull up Government Exhibit 502, and we're going to do 502-13.

This is already in evidence, your Honor. May we publish it?

THE COURT: You may.

MR. MARX: Thank you.

BY MR. MARX:

Q. So starting at the beginning, Mr. Miller, this is an image of what's supposed to be the mempool; is that right?

A. That's what it looks like to me.

Q. Okay. And sometimes that's called the public memory pool; is that right?

A. You can call it that, yeah.

(Continued on next page)

BY MR. MARX:

Q. And in this image, as you understand it, for each blue dot in the mempool, there's a user of the Ethereum Network who has signed and submitted a transaction into the mempool; is that right?

A. They may not all be unique users, but I understood them to be transactions in the mempool, yeah.

Q. That some user may have put one in or may have put many in, but a user for each of these dots has signed and submitted these transactions into the mempool; is that right?

A. That was the inference that I made, yes.

Q. And after a user — just take one particular dot as an example. After a user has signed and submitted a transaction into the mempool, that transaction can't be changed, right?

A. There's a way that you can cancel transactions. I don't know if that nuance is what you are referring to.

Q. No. You can play with the nonce, is that what you're thinking?

A. To cancel a transaction, you don't play with the nonce.

Q. Okay. So there's a way to essentially put in another transaction to try to replace the one you already submitted, is that kind of a fair high-level summary?

A. Yes, those are some details.

Q. And the details, trust me, are not relevant to my questions. I'm just asking, the initial transaction that's

signed and submitted into the mempool, that initial transaction, even if it can somehow be canceled, can't be altered in any way by the user who signed it; is that right?

A. That sounds right to me, yeah. Once you provided a signature for a transaction, you can't modify/take back that signature, etc.

Q. And at this point in the video, and just staying with one dot as an example, the transaction hasn't yet been added to the blockchains; is that right?

A. No, it's in the public kind of waiting room that we call the mempool is my inference.

Q. Thank you. You anticipated my next question, which was that you called this sort of a version of a waiting room for transactions that have not yet landed on chain, is that fair?

A. That's how I've been referring to it, yeah.

Q. Okay. Thank you.

MR. MARX: Joe, could we now go to 5:02:24, please.

This is 24 seconds into the video.

Q. Now, in this next moment in the government's video, here, do you understand this to be representing that a searcher has taken one of these transactions out of the mempool and is now going to do something with it?

A. That was what I understood this to be showing, yes.

Q. And that searcher in this image, as you understand it, is a bot, right?

A. Yes, it's a person who's running some sort of program.
Q. When you say "a person," it's not like there's a person sitting at a computer picking out that transaction. Someone has coded a bot to do this function; is that right?
A. Right. Someone, a company — I guess people are behind companies too, but someone has created a program, we call those bots, that is performing this programmatically. It's not like you or I are sitting there and taking stuff out by hand or something of the sort.
Q. And that bot that's created does things automatically once you hit run, essentially, right?
A. Typically, that's how these things work, yes.
Q. And it does things very fast. I think yesterday you said sometimes even less than seconds.
A. Speed matters a lot, yeah.
Q. Some of these things happen in milliseconds?
A. Some of these things happen in milliseconds.
Q. Now, the blue dot here in this image, that's one of the -- we use the word "user." That's one of the user's transactions that was in the mempool, right?
A. I don't know.
Q. Well, is that how you understand this image?
A. I don't know. I don't think that there's a direct correlation between the dots before and here. You could understand it in multiple different ways. And this is only one

bit of the overall video, as well.

Q. Absolutely. I'm just showing you little bits at the time to make sure we all understand it.

But as you understand this image — and I know you didn't create the video — does the buy transaction here in this image belong to the searcher or is that something the searcher has taken in order to do something else with?

A. My guess and inference, as the person that didn't make this video, so I am open-minded to being wrong about it, of course, is that this transaction is not from a user in the mempool, it's from the searcher instead.

Q. That the searcher just created this transaction?

A. That would be my guess, my inference.

Q. It's possible, however, for a searcher to pull a transaction out of the mempool and then do other things with that, is that also right?

A. Yes.

Q. Okay. So the searcher has those options; it can create its own or take another user's transaction from the mempool?

A. I would agree with that.

Q. Now, if the searcher takes someone else's transaction out of the mempool, does that person have any way to know that the searcher is doing that?

A. Not while it is happening typically. It is theoretically possible that they have a way of knowing, but it is not typical that they would know.

Q. And there's no sort of like typical mechanism in this system where the searcher reaches out to that user and says, Hey, I just took your transaction out of the mempool and I'm going to do something with it?

A. Not in the mempool, no.

MR. MARX: Joe, one second forward to 5:02:25, please.

Q. So here, in the video, these two new dots emerge out of the searcher. Do you understand this to be representing at this point, with this blue dot already in its possession, the searcher is creating two additional transactions?

A. You know what would be really helpful is if we could just watch the section of the video; because right now it's a little snapshot of a moment.

Q. Sure.

A. And it's a little hard to tell the context.

Q. Sure.

MR. MARX: Joe, can you just go to 5:02. And let's just watch from the start through this point in the video, around 25 seconds.

I was trying to spare everyone my inability to hit stop at the wrong time, but I'm happy to show you the video from the start, Mr. Miller.

A. I'll forgive you if you don't stop it at the right time.
Q. It will be Joe.
A. I won't forgive Joe. Joe is on the hook.
Q. Yes. Good luck to everyone.

(Video played)

A. Maybe you could play it five more seconds. This is kind of an awkward place to stop within the video.
Q. Fair enough. How about right there? Because I have some questions as it continues.
A. I think that's fair to stop at, yeah.
Q. Great. Okay.

So at this point, do you understand what we're seeing in the video — recognizing you didn't make it — as the searcher has taken a transaction from the mempool — that's the blue one we saw at the beginning, created two new green transactions — those are the other dots, and added those together in this three-transaction image?
A. Yes, it's a lot more clear in totality.
Q. And even though --

MR. MARX: And let's go to -- you can just hit "play" maybe, if we're already in the video. Let's go to second 31, but stop right at 31, Joe.

(Video played)

A. He's got it.
Q. Nailed it.

Okay. So now we're looking at the three trades, right: Green, blue, green; buy/buy/sell. Do you see that on your screen?

A. I do see buy/buy/sell, yeah.

Q. Now, if we assume — and I know you said it would be possible for a searcher to -- well, let's try this for a second. You said it would be possible for a searcher to have made all of these transactions; is that right?

A. I don't know that that was exactly what I said.

Q. Okay. Well, the original blue dot, you said the searcher could have made that; they didn't necessarily have to take that from the mempool, right?

A. I did say it was possible for them to have made that transaction, yeah.

Q. Okay. But can we agree at this point based on the video — and now that we watched it from the beginning again in context — seems pretty clear the blue buy was a transaction that belonged to someone else the searcher took out of the mempool?

A. Yeah. When you just have the blue dot alone, the context is not very clear. But I think we could agree with the inference that it came from the mempool now.

Q. Fair enough.

And there's been a lot of super-technical discussion over the past three days, so we're going back to basics here.

So now we have two transactions the searcher has created, and the one transaction that originally came from some other user in the mempool, all right, on the screen; is that right?

A. That's my inference, yup.

Q. And the first transaction at the top, the green buy, that's how a searcher, if it wanted to, would front-run the user's buy trade; is that right?

A. That's my inference, yes.

Q. Because the buy is saying, I want to do the same thing as the blue user, but I want to do it first.

A. That is my inference, yes.

Q. And in the bottom dot, the sell dot is how the searcher here in this scenario would back-run the other user who had put a transaction into the mempool; is that right?

A. That's how I understand it.

Q. Now, neither of us made the video. And at this point in the video, the green box that said "searcher" has disappeared from the screen. But would you agree with me at this point the searcher is doing all of this; the searcher is packaging together these three transactions into a bundle?

A. I think that was what was shown in general. I'm not sure where it is in the process; perhaps it's traveling to the block builder now. You'd have to go for a couple more seconds to see exactly where we are.

 Q. Oh, we are going to get there.

A. I figured as much.

Q. But at this point we're in the searcher world, is that fair to say?

A. You would have to play the next five seconds. I don't know if we've crossed the boundary into the builder or not.

Q. Let's do it. Well, I think I'm going to -- I may have made a false promise. I'm going to stop just before then.

MR. MARX: But let's go to 34, Joe.

Q. I want to ask you one other question about this.

(Video played)

Q. Now, here in the video, the three transactions, the front run, the user's trade, and the back run have been put together, and the government has labeled that a bundle. Do you see that?

A. That's what we call these things.

Q. Okay. And this is, I think you testified, an example of a bundle; is that right?

A. It is an example of a bundle.

Q. But this particular sequence of transactions, this particular type of bundle, a buy/buy/sell, that's not just anyone bundle, that's a sandwich attack, right?

A. You could call it that.

Q. You'd call it that, wouldn't you?

A. Generally, yes.

Q. And in this bundle now that's been created by the searcher

who's a sandwich attacker, the green transactions belong to that sandwich attacker; but the blue transactions still belongs to the user who put it in the mempool, right?

A. Yes. It's still the user's transaction from the mempool. That hasn't changed.

Q. And in the jargon of the Ethereum Network, that blue user, who's now in the middle of this sandwich, is known as the victim of the sandwich attack; is that right?

A. People will call it that, yes.

Q. And when Mr. Fang showed you this video and discussed this aspect of bundling, do you remember him using the word "sandwich"?

A. I wouldn't be surprised. I don't remember the particulars.

MR. MARX: Joe, could we go another couple seconds to 36, please.

(Video played)

Q. Okay. Now, in this part of the video, while the bundle is swooshing — and we don't have the audio, but there is a swoosh sound — this represents -- or tell me whether you understand it to represent that the bundle is now being sent from the searcher to the builder?

A. That is what I think I understood from this. You'd have to play it a few more seconds to see the block builder for me to

give you full confidence on that.

Q. Okay. We'll get there, I promise, in a second.

Now, just as a general matter, based on your knowledge of the MEV-Boost system — and we'll see it in the video in a second — the sandwich bot that created this bundle, you know, whatever the video shows, it doesn't send that bundle to the validator, right?

A. It does not send that bundle to the validator, that's correct.

Q. And it doesn't send it to the relay directly, right?

A. It doesn't send it to the relay directly.

Q. So at this point in the video, all we're really seeing is the interaction between the searcher bot and the builder; is that right?

A. That seems reasonable.

Q. And at this point in the video, the searcher has put together a bundle that it hopes the builder will include in a block that it builds that may eventually land up on chain; is that right?

A. The question is that at this point in the video, the searcher has put together a bundle that it hopes the builder will include on chain, that's the question?

Q. If I could be even a little more technical with you, Mr. Miller.

A. Okay.

Q. It hopes that the builder will include this bundle in the builder's block, and that that block will eventually end up on chain.

A. Yes.

Q. But there's no guarantee that the searcher will get what it hopes for, and that this bundle will end up in the builder's block, and that that block will end up on chain; isn't that right?

A. There is no guarantee.

MR. MARX: Could we go ahead to 41, please.

(Video played)

Q. So at this point, we're now seeing not just the sandwich attack bundle that came from that one searcher we started with, but now we're seeing bundles coming from many different places, and presumably those are from different searchers operating in this ecosystem. Is that what you understand this to be showing?

A. Seems like a fine inference.

Q. And one might look at this image and think that when these come into the builder, the only thing the builder is getting in order to create blocks are bundles from searchers; is that right?

A. If you understood all of these things to be bundles, then, yes.

Q. Well, let's just take a look. I mean, you can just kind of

quickly scan around the screen. As far as I can tell, there's one, two, three, four, five, six, seven groups of circles representing trades coming into the center; and as far as you understand it, based on the video we've watched so far, each of those is a bundle, right?

A. I think that's a reasonable assumption.

Q. And this doesn't show, for example, any individual trades coming in to the builder who might use those to make a block?

A. Not sure what the intent was, I didn't make it. But you could certainly read this as there were a bunch of bundles coming into a block.

Q. But it doesn't show that individual trades also might come into a block?

A. Can't speak for what it was intended to show.

Q. That wouldn't be fair. I'm not asking you to try to get in the mind of the person who made the video, because I know you said it was the government, but you don't know who made the video. I'm just asking what it shows.

Do you see anything representing here, as you understand this video, which you just said you only said was, at a high level, accurate, do you see anything here that suggests individual trades, things that are not bundles, come into this block-building process?

A. It looks like there are multiple bundles coming into the process; it doesn't look like there are any individual

transactions that's represented by a single circle.

MR. MARX: Let's keep going. Could you just go a couple of seconds until they all meet in the middle.

(Video played)

MR. MARX: Perfect.

Q. Now, Mr. Miller, do you understand at this point the video is showing we now have the block that the builder has assembled?

A. Yes.

Q. And if you just watch this video -- well, let me just ask you the question aside from the video for a second.

When a builder makes a block out of bundles, the builder doesn't have to use any particular bundle that it's got from a searcher, right?

A. It doesn't need to use any particular bundle, that's correct.

Q. And it certainly doesn't need to use every single bundle it receives from any searcher, right?

A. It doesn't need to use every single bundler, that's correct.

Q. The builder gets to choose what to put in the block that the builder creates?

A. The builder does get to choose what to put in the block.

Q. And that can include individual transactions taken directly out of the mempool without dealing with the searcher at all?

A. Correct.

Q. And those would be the blue dots we saw at the very beginning before they were the meat of a sandwich attack?

A. Some of them may not be within bundles from sandwich attacks, that's true. But they could make their way into the block anyway.

Q. And, now, from whatever the source the builder is working from, whatever source it's taking these little dots from, transactions, what it's trying to do is to maximize the value for the validator; is that right?

A. Generally, yeah.

Q. It's trying to find the block, the combination of transactions, that will produce the most MEV for the validator; is that right?

A. It is trying to find the block that produces the most value for the validator.

Q. Because that increases the chances that the builder will win this auction and get its block into the block that the validator ultimately proposes to the chain, is that fair to say?

A. I think that is fair to say.

MR. MARX: Could we go to 45, please. Just two more seconds.

(Video played)

Q. Now, here at this point in the video, whoever made it added

this label "proposed block," right. And I want to ask you about that, because I know you're very careful about the language, and it's important, because the details matter in this case.

But "proposing," that has a technical meaning in your world, in the MEV-Boost world and in the Ethereum Network; is that right?

A. Yes.

Q. And the validator who is randomly selected for a particular slot in the Ethereum process, that's the proposing validator; is that right?

A. You could call it the proposing validator, yes.

Q. And that's because they propose a new block to the blockchain; is that right?

A. Yes, they do propose a new block to the blockchain.

Q. And that step in the process — I know we're kind of jumping ahead. I'm not asking you based on the video only. But when the validator, the proposing validator, proposes a block to the blockchain, to the network, that's after all that interaction back and forth in the MEV-Boost system between the validator and the relay; is that right?

A. In the MEV-Boost system, that is right, yes.

Q. But at this point in the video, we've now got 45 seconds in, the relay hasn't even appeared yet; is that right? We haven't seen that yet?

A. I don't think so.
Q. So at this point, we have a builder who's assembled a block; is that right?
A. Yes.
Q. But it's not really accurate to call that a proposed block because in your world, where this language matters, the proposed block is the one that the validator sends out to the network; is that right?
A. If you're looking to the strict technical term, yes. The other way you could read it is this is the block for consideration from the builder or the block that they have created in the looser sense. But in a strict technical sense, this is not the proposed block that the validator would propose.
Q. Thank you. I appreciate that.
A. That's what I'm here for.
Q. Absolutely.

Let's shift gears for one second. I want to show you another diagram. This one is -- it was originally labeled DX 5002 and then relabeled GX 5002.

MR. MARX: Your Honor, it's in evidence. May we publish it?

THE COURT: You may.

MR. MARX: One moment, your Honor. You know what? I'm going to call an audible, Mr. Miller, and we're going to do

this the old-fashioned way. And we'll get back to the computer in a second.

Ms. Tran, do I need to press any buttons in order to switch to the Elmo?

THE DEPUTY CLERK: Just flip the camera.

MR. MARX: Flip the camera. There we go.

Okay. There we go.

THE COURT: And you may publish it.

MR. MARX: Testing my abilities here.

Joe, is that something you can help with? How do I show this to everybody?

THE COURT: It's published.

MR. MARX: Oh, okay. Thank you. Sorry.

BY MR. MARX:

Q. Great. All right.

Mr. Miller, can you now see what was originally labeled DX 5002 and was then relabeled Government Exhibit 5002?

A. Yes.

Q. And you testified yesterday that you didn't create this document; is that right?

A. I did testify that yesterday.

Q. And you also testified Flashbots didn't create this document?

A. Yes, I think so.

Q. Do you know who made this document?

A. Don't know.
Q. Do you know why they made the document?
A. Nope.
Q. Do you know what this document is meant to represent?
A. No.
Q. Were you in court with the rest of us on the first day of the trial during the defense's opening statements?
A. I was not in court.
Q. When was the first time that you saw this document?
A. The morning of the first day, I believe.
Q. The morning --
A. Yes.
Q. The morning just before you testified?
A. Yes.
Q. And who showed it to you?
A. The prosecution.
Q. So the prosecution, before you took the stand in this case, showed you this document and asked you a bunch of questions about it?
A. Yes.
Q. Now, I wasn't there at that meeting, so let's jump ahead to the afternoon when you were here with all of us testifying.

At that point, when Mr. Fang showed you this document, he asked you a few times if it accurately represents how blocks are proposed using MEV-Boost, do you remember that?

A. Correct.

Q. And I promise this is not a trick question, but does this document anywhere on it say "MEV-Boost"?

A. I don't see it saying "MEV-Boost."

Q. And do you know whether whoever made this document intended it to represent the MEV-Boost system?

A. I don't know what their intentions were.

Q. And you went through an exercise, do you recall, with Mr. Fang on your direct examination where he went through and drew these series of red X's on these documents as a way to signify it wouldn't accurately represent how the MEV-Boost system works; is that right?

A. We went through the document, he drew a bunch of X's, asked me a bunch of questions.

Q. I want to go back over some of that material and just make sure things are clear.

So let's put aside MEV-Boost for a moment, okay, and let's just talk about Ethereum.

In Ethereum, if you look at the middle of this document, there's something called a proposing validator, we were just talking about that a minute ago, right?

A. That's correct.

Q. And the validator is the one who proposes blocks to the network; is that right?
A. Yes.
Q. And that is what this appears to show with the validator, and then there's something, looks like a block, and it's headed down to the blockchain at the bottom. Is that what this appears to represent?
A. Not sure what the middle is, candidly. I don't know that I would call that a block.
Q. Okay. It may be a very nontechnical graphical representation of something, but so be it.
Now, you start with the proposing validator in the middle. And if we're just talking about Ethereum, right, the proposing validator chooses what to put in the block that it wants to propose to the network, right?
A. As a general matter, validators do have the job of ordering transactions in a block, that's right.
Q. Right. Because you said when you're not doing PBS, the validator in Ethereum is both building and proposing, right?
A. Those are their roles; they can outsource building using MEV-Boost, of course.
Q. Okay. We'll get to that in a second.
But if they haven't done that, as I said, leave MEV-Boost aside for a second, if we're just talking about Ethereum, one place that a proposing validator can get

transactions to build a block within the Ethereum Network is the mempool; is that right?
A. That is correct.
MR. MARX: So, Joe, would you mind pulling up -- getting rid of that red X and pulling up 5002-1.
Q. Okay. You see, Mr. Miller, that image now on your screen?
A. I see an image on my screen.
Q. Okay. That's the same image; we've just gotten rid of that red X between the proposing validator and the mempool, is that fair?
A. Same image, no X on the mempool at least.
Q. Let's get to the next one. We're going to go counter-clockwise. The next one says "own trades," right. So if you assume for me that that means the proposing validators own trades, trades the validator makes up itself, is that a source that the proposing validator can use to build blocks within the Ethereum system, putting MEV-Boost aside?
A. It is something they could use, yes. It's possible.
MR. MARX: Joe, could we get rid of that red X and pull up 5002-2.
[redacted]



BY MR. MARX:

Q.  So we're now down to the last of the red X's.  This is the

one between the proposing validator and proprietary order flow.

And I know this one may be kind of the post complicated or

subtle.

        So I just want to kind of, at a high level, ask you

whether if you were a validator, you know, with a large pool,

whether it would be possible to use proprietary order flow, private transactions, to create a block, say like LITO or something like that.

A. One point of clarification also as you had the exchange was the first time I saw this document might have been the previous day, too, not the morning of, but the previous day. As you understand, I've seen many documents.

Q. Yes.

A. And been asked many questions.

Q. Fair enough. I promise you that one-day difference won't make a difference to us here, but thank you.

A. I appreciate that. I just wanted to try to belabor in being precise.

Your question is if it is possible for a large pool like LITO to receive proprietary order flow, is that right?

Q. Yes.

A. Theoretically possible, yes.

MR. MARX: So, Joe, can we go to dash three and remove that red X.

Q. Mr. Miller, do you have that on your screen?

A. No red X's.

Q. Back to where we started. Gone full circle.

And now I want to ask you about MEV-Boost, which you mentioned when we started this bit of our conversation. Because here, the proposing validator at the center, right, if

you look to the top right, there's a dotted line that goes to a relay; is that right?
A. There is a dotted line that says "relay" at the end of it in a box.
Q. And in the MEV-Boost system, one thing a validator can do is to call a relay to get a block and use that method for building a block to propose to the network; is that right?
A. Yes, that's the typical behavior, too.
Q. Okay. So within the Ethereum system, a proposing validator can use a relay as a source of transactions, but it doesn't have to?
A. That wouldn't be the intended behavior of MEV-Boost. It is certainly possible.
Q. Okay. I'm sorry. I appreciate that. In my own mind, I went back to just thinking about Ethereum, right.
So the relationship between the proposing validator and the relay, that's about MEV-Boost; that sort of represents the MEV-Boost option, is that fair to say?
A. The relationship between the proposing validator and the relay represents MEV-Boost. That's at least one interaction within MEV-Boost, I agree with that, yeah.
Q. I'm glad you mentioned that. Because one of the things that Mr. Fang pointed out about this document to you is, in the MEV-Boost system, the actors -- there are more actors than just the proposing validator and a relay, right?

A. Correct.

Q. So, for example, in this document, if you wanted to be even more detailed about it, you could keep going out to the top right past the relay and add the builder; is that right?

A. And then searchers thereafter also.

Q. You could keep going, right?

A. Yeah.

Q. And, similarly, if you wanted to be super-detailed and add a lot more to this document, if you're talking about the Ethereum Network generally, you could draw a line from the proposing validator to the mempool and out to the users who put transactions into the mempool, right?

A. If you wanted to add that level of detail, that would be correct, I think.

Q. But none of those things are on this document, right?

A. None of those things are on this document.

Q. Now, the proposing validator here I think we already established has the option to use MEV-Boost if it wants, right?

A. Yes.

Q. But even if the proposing validator has gone to the process of downloading the MEV-Boost software, it doesn't necessarily have to use MEV-Boost and call a block from the relay, right?

A. Even if they downloaded the MEV-Boost software, they don't need to use MEV-Boost. That's not a requirement.

Q. And, similarly, even if that proposing validator has

registered with the MEV-Boost relay or registered with any relay, it doesn't need to use the MEV-Boost system to get a block, it can still use these other alternatives?

A. Correct.

Q. So just to summarize — if you give me one moment to shuffle my papers — would you agree with me, Mr. Miller, that the proposing validator has multiple sources of transactions that it can pull from?

A. In theory.

Q. And would you agree with me that one of those sources is transactions that are pending in what's called the public mempool?

A. Yes.

Q. And would you agree with me that one of those sources are private transaction requests from other users?

A. In theory. It is not standard, however.

Q. And would you agree with me that one of those sources is the validator's own transactions?

A. One of those sources are the validator's own transactions. Yes, the validator could include their own transactions in the block.

Q. And the last source that we've talked about so far today is that the validator can get transactions from one of the relays that operate on the Ethereum Network?

A. In theory, yes.

Q. It's up to the validator which one of those sources to choose?

A. It is possible in the Ethereum protocol.

Q. It's also possible in the Ethereum protocol for the validator to put nothing at all on the block, right?

A. I think you can include an empty -- I think you could create an empty block, not have any transactions at all, but I might be wrong on that detail.

Q. Well, it's certainly possible just to put a couple transactions on a block; is that right?

A. That is true, yeah, you can just put a couple.

Q. It's also possible to only put your own transactions in a block?

A. Certainly.

Q. Can also just put yours and your friend's in a block, right?

A. Sure.

Q. And it's also possible to put many, many transactions in the block the proposing validator creates?

A. Yes.

MR. MARX: Noticing the time, I think this would be a perfect point to take a break. I'm going to shift to a couple other topics, but I don't expect for this to go on very long.

THE COURT: Great. Thank you, Mr. Marx.

All right. We are going to take our break for lunch.

Please be back and ready to go in the jury room at around 1:50. It's 12:50 now. Thank you all for your attention. My prior instructions apply. See you soon.

(Jury present)

THE COURT: Please be seated.

Hope you all had a nice lunch. We are going to continue with testimony.

Mr. Miller, you can step down.

Mr. Marx.

MR. MARX: Thank you, your Honor.

ROBERT MILLER,

CROSS-EXAMINATION CONTINUED

BY MR. MARX:

Q. Welcome back, Mr. Marx.

A. Welcome back yourself.

MR. MARX: Joe, if you wouldn't mind putting up on the screen for everyone Government Exhibit 3306, which is already in evidence.

THE COURT: You may publish.

MR. MARX: Thank you, your Honor.

THE WITNESS: 3306?

BY MR. MARX:

Q. Yes. It should come up on your screen in a minute.

A. Okay.
Q. Do you see that document, Mr. Miller?
A. I see it.
Q. This is the email that came in from Low Carb Crusader in April of 2023.
Do you remember that?
A. It's the first email, among some others, yep.
Q. And in your testimony, when Mr. Fang was asking you about this document, you commented that it was strange that this came into your personal email account.
Do you remember that?
A. Yes.
Q. But, at this point, your personal email address, that wasn't exactly a state secret; is that fair to say?
A. I wouldn't consider it a state secret, Mr. Marx, no.
Q. In fact, you have your own website, bertcmiller.com, right?
A. I do have my own website, bertcmiller.com.
Q. And back in the spring of 2023, you had your Gmail address on your website?
A. I don't know. It seems reasonable, though.
Q. Would it help you to take a look at the website back in 2023 to see that your personal email was on there?
A. Sure.
MR. MARX: May I approach, your Honor?
THE COURT: You may.

 (Pause)

THE WITNESS: Okay.

BY MR. MARX:

Q. I have to take the document back from you, I'm sorry.

A. Okay.

I don't get to keep that one?

Q. No.

Having looked at the document now, Mr. Miller, do you remember whether or not you put your email address on your website?

A. My email is on my website, or was.

Q. So, fair to say it was pretty easy to find?

A. If you found my website, you would be able to find my email.

Q. And at that time, in the spring of 2023, you were, I think you testified on the first day of your direct, leading the adoption of MEV-Boost for Flashbots; is that right?

A. I had led the adoption for MEV-Boost for Flashbots. At that point, I don't know if we had ongoing efforts.

Q. But you were a pretty sort of prominent face publicly of the MEV-Boost adoption for Flashbots?

A. My mom thinks so, at least.

Q. Okay. Well, we're going to get back to your mom in one second.

The other two people who are on this email are

Justin Drake, right?
A. Yes.
Q. And you testified he's with the Ethereum Foundation and Ultrasound?
A. Yes.
Q. And Samczsun — we're going to talk about him in a minute, too — and he's at Paradigm; is that right?
A. Yes. As well as, I think, also considering himself an independent security researcher, too, but he is also at Paradigm.
Q. Here's the question that would make your mom proud; it might make you a little uncomfortable.
But you and Justin Drake and Samczsun, it's fair to say, are fairly prominent members of this community in the Ethereum world?
A. My mother taught me never to speak too highly of myself, but you might say that, sure.
Q. Thank you.
And in addition to your personal email, you also use a Proton email from time to time, right?
A. I believe I have a Proton email, or I have had a Proton email.
Q. Do you remember ever using that email to communicate with Snoopy and Curious Rabbit?
A. I don't remember.

MR. MARX: Joe, can we just skip to the next one, Government Exhibit 3307.

This is already also in evidence, your Honor. If we can publish?

THE COURT: You may publish.

MR. MARX: Thank you.

BY MR. MARX:

Q. So this document, Government Exhibit 3307, this is the email from you back to Low Carb Crusader, now in June of 2023.

Do you remember this document?

A. Correct.

Q. When you reached back out to Low Carb Crusader a few months later, you sent him an email from your Gmail account, right?

A. Yes.

Q. So you didn't use a Flashbots account?

A. Didn't use a Flashbots account.

Q. Or the security at Flashbots account?

A. I don't think I could send emails from security@flashbots.

MR. MARX: You can take that document down.

Q. Now, Mr. Miller, would you agree with me that when you saw the incident on April 2nd, 2023, that it seemed pretty obvious to you that something like this could happen?

A. The question is — to repeat it back to you — would I agree with you that when I saw the incident on April 2nd, it seemed pretty obvious to me that something like this could happen?

I think if it was obvious, we would have fixed the problem before we had one. No?

Q. I'm not allowed to answer any questions.

So, I guess let me just put it this way: Yes or no, would you agree with me that it was pretty obvious to you, once you saw this incident happen and conducted your investigation, that something like this would happen?

[redacted]

THE WITNESS: I think that once I knew the details, it was clear that something like this could happen.

BY MR. MARX:

Q. Would you also agree with me that, at that point, you thought there really weren't many people knowledgeable enough about consensus layer P2P and MEV to do what the Low Carb Crusaders had done?

A. I would agree with that, yeah.

Q. Would you also agree with me that the MEV-Boost industry is brutally competitive?

A. It's been characterized that way. Yeah, I would agree with that.

Q. Has it been characterized by you that way?

A. Almost certainly, it sounds like something I would say at some point.

Q. And would you also agree with me that searchers, relays,

and builders fight literally over milliseconds in this MEV-Boost world?

A. That's correct, yes. Speed really matters.

MR. MARX: Now, your Honor -- let me ask a couple of more questions first.

Q. I think we already established, Mr. Miller, that you're a Twitter user, an X user?

A. I am an X user, yeah.

Q. I'm going to ask you about when it was still Twitter, so I'm going to say Twitter.

But at the time, so say around 2023/2024, you were a fairly regular user of Twitter; is that fair to say?

A. Sure.

Q. And from time to time -- and you would post under the name @bertcmiller?

A. I would post under Bert C. Miller.

Q. And you wrote those tweets, right?

A. Yes.

Q. No one else was tweeting under @bertcmiller?

A. No one else was tweeting under @bertcmiller. Sometimes we might write tweets as the company or had people review things, especially when it was relevant to Flashbots, is one nuance for you.

Q. And under your @bertcmiller handle, you tweeted from time to time about the incident that's the center of this case; is

that right?

A. I believe that I tweeted about it, yes. I don't know if you would characterize it as time to time. I don't think there were that many tweets about it. But I have tweeted about it, yes.

Q. Sitting here today, are you able to testify fully and accurately about the tweet that you posted about the incident in this case on March 30th of 2024?

A. Maybe you could show me a tweet, if you're referring to something specific.

Q. Well, this is -- this may sound a little silly to you, but in the Ethereum world, there are rules that we need to follow, and so my first question is: Sitting here today, could you fully and accurately testify for the jury about the tweet you sent on March 30, 2024, about your thoughts about the incident in this case?

A. You know, Mr. Marx, I've sent thousands of tweets, and I don't remember all of them, and so if you are going to ask me about a specific one, and if I can fully and accurately testify about that, I think you're going to need to show me a document.

Q. I think that's probably right.

So, my next question is: When you sent that tweet, even though you couldn't fully and accurately describe its contents now, it's fair to say you would have wanted it to be accurate, right?

A. I don't know that I would agree with the characterization, because I don't know what tweet you're talking about.

Q. Well, if you were to post something about your thoughts about this incident, you would want it to accurately reflect your thoughts about the incident; is that fair to say?

A. I think I endeavor to be accurate in my tweets, that is correct.

(Continued on next page)

(In open court)

BY MR. MARX:

Q. I apologize for the delay, Mr. Miller.

Picking up where we left off, with regard to this interaction between you and Low Carb Crusader, Mr. Fang asked you whether Low Carb Crusader had ever revealed its identity to you.

Do you remember that?

A. Yes.

Q. Did you ever ask them who they were?

A. I didn't ask them who they were.

Q. And is it common for people in the crypto community to use pseudonyms?

A. Yes.

[redacted] [redacted]

[redacted] [redacted]

BY MR. MARX:

Q. In fact, the first person to tweet about the incident in this case on April 2nd, 2023, was someone who goes by the name Punk #3155; is that right?

A. It could be.

Q. Well, in fact, in the postmortem document, Government Exhibit 3302, you actually thanked Punk #3155 as the person who first discovered this event, right?

A. If you're going to refer to an exhibit, could you bring it

up, please?

MR. MARX: May I approach, your Honor?

THE COURT: You may.

MR. MARX: So the record is clear, I'm showing Mr. Miller an unredacted copy, only for Mr. Miller. This is the dash U copy.

(Pause)

THE WITNESS: I do see the --

BY MR. MARX:

Q. I'm sorry, again, I have to follow the rules.

If you've had a chance to look at that, I'll take it back from you, and I'll ask you: Having looked at the document, Mr. Miller, do you remember thanking someone named Punk #3155?

BY MR. MARX:

Q. Without reference to the document, Mr. Miller, do you remember thanking Punk #3155?

A. Yes.

Q. Do you also remember thanking Samczsun?

A. Yes.

Q. And Samczsun isn't a person's real name; is that right?
A. I think it's their pseudonym, but I actually don't know. I don't think it's their real name. That would kind of defeat the purpose.
Q. It's probably a pseudonym, but who knows, really, right?
A. That's true.
Q. And Samczsun, when this person uses that name publicly, writes it all as one word, Samczsun, no spaces, right?
A. I think so, yes.
Q. And when the alleged victims in this case reached out to, among other people, you and Justin Drake and others, they also used a pseudonym, right?
A. That is correct.
Q. In fact, in some of those Telegram chats, they went as capital D, lower case D, lower case D, lower case D, lower case D, ampersand, capital A; is that right?
A. I don't remember.
Q. But you remember they didn't use their real names?
A. I do remember they didn't use their real names, that's correct.
Q. And from time to time, you've also used pseudonyms within the crypto community?
A. I have also used pseudonyms.
Q. There was a time early on when you went by MEV Intern?
A. Yes.

Q. And then later, you turned that into MEV Senpai; is that right — s-e-n-p-a-i, I believe?
A. Yes.
Q. And what's a senpai?
A. It's a playful term for someone that's skilled.
Q. So this is kind of like a little joke, right, to have a pseudonym, you started out as the intern, and you became someone who was skilled; is that fair to say?
[redacted]
THE WITNESS: I'm sorry, can you repeat the question?
BY MR. MARX:
Q. You were just using the names, the pseudonyms, in discussions in this community, as kind of a playful joke, you went from an intern to someone who's skilled and knowledgeable?
A. Yes.
Q. And so that's kind of like calling yourself, say, Snoopy or Curious Rabbit or something like that?
[redacted]
THE WITNESS: You could say so.
MR. MARX: Thank you, Mr. Miller.
I have no further questions, your Honor.
THE COURT: Thank you.

Mr. Fang.

REDIRECT EXAMINATION

BY MR. FANG:

Q. Mr. Miller, on cross, you were asked a bunch of questions on what roles validators have in the Ethereum protocol.

Do you remember?

A. I remember I was asked questions about what role validators have on the Ethereum network.

Q. Just remind the jury, what roles does an Ethereum validator generally have?

A. The two roles are to order transactions within a block, first — we call that block building — and, second, to select a block for inclusion on the network — that's block-proposing.

Q. Is the role of a validator different if it's using MEV-Boost?

A. Yes. If it's using MEV-Boost, it is outsourcing the block ordering to a specialized market of block builders.

Q. Does that mean that the MEV-Boost validator is giving the building role up to another party?

A. Yes. When using MEV-Boost, you give it up to another party, effectively.

Q. And, essentially, does that mean that the MEV-Boost validator is not involved in building the block?

[redacted]

THE WITNESS: Thank you.

Yes.

BY MR. FANG:

Q. Under MEV-Boost, fair to say that block builders and proposers are different parties?

A. Yes.

Q. To be clear, was the April 2nd exploit that we've been talking about conducted by a MEV-Boost validator?

BY MR. FANG:

Q. Mr. Miller, was the April 2nd exploit conducted by a MEV-Boost validator or a general Ethereum validator?

THE WITNESS: Was the April 2nd exploit conducted by a MEV-boost validator or a general Ethereum validator; that's the question, correct?

Q. Yes.

A. Well, the validator was interacting with MEV-Boost relays. It's calling a bunch of standardized interfaces that you use within the MEV-Boost ecosystem, and it's also an Ethereum validator. A caveat here is that it is also true that it's not

clear what software the validator was running, whether or not they were running MEV-Boost specifically. So, those are a couple of data points. I think you could say that they're a MEV-Boost validator since they're using MEV-Boost relays and standardized endpoints within the MEV-Boost ecosystem. At the same time, it's unclear if they were using actual MEV-Boost software, if that nuance makes sense.

Q. Understood, Mr. Miller.

Just based on your investigation, is it fair to say that the MEV-Boost validator was operating within the MEV-Boost ecosystem?

[redacted]

BY MR. FANG:

Q. Mr. Miller, I'll move on and show Government Exhibit 5002.

Mr. Miller, do you remember being asked questions about this chart?

A. We marked it up; yep.

Q. And by "marked it up," are you referring to the Xs that appear on this chart?

A. Yes, after you asked me questions about it.

Q. Do you remember on cross-examination how Mr. Marx also asked you questions and removed certain Xs?

A. Yes. I do remember.

Q. When he removed those, was it your understanding that he

was discussing Ethereum generally versus the MEV-Boost ecosystem?

A. I think his point was that if you anchored this in Ethereum generally, then you could interpret it differently, and so it was my understanding he was talking about Ethereum generally and not MEV-Boost.

Q. And, Mr. Miller, if a validator is not using MEV-Boost, would it get transactions from the relay?

A. No.

Q. And, again, did the April 2nd exploit happen on just the Ethereum network generally or involving the MEV-Boost ecosystem?

A. It involved the MEV-Boost ecosystem. It interacted with MEV-Boost relays, block builders, you know, standardized endpoints within the MEV-Boost system, et cetera.

Q. And, again, you testified, I believe, that a MEV-Boost validator just proposes a block, right?

[redacted]

THE WITNESS: Correct.

[redacted]

THE WITNESS: Maybe you could restate the question?

BY MR. FANG:

Q. Mr. Miller, you testified, I believe, that a MEV-Boost validator just proposes a block, right?

A. Yes. They outsource the ordering of transactions in a block to a block builder, so they're reduced to their one role of proposing.

Q. And where does a MEV-Boost validator get the block from?

A. From relays.

Q. Now, on cross, you were also asked a bunch of questions about how economic incentives on Ethereum enable users to trust each other.

Do you remember that?

A. The question is, on cross, I was asked about economic incentives enabling Ethereum users to trust each other and if I remember that, right?

Q. Yes.

A. After three days of testimony, I have to repeat things a little bit to make sure I'm understanding, so please bear with me.

Q. Understood.

A. Generally, yeah, we talked about those things.

Q. And, Mr. Miller, does MEV-Boost also have design features to enable the different MEV-Boost actors to trust each other?

A. MEV-Boost is designed to try to get parties to work together in contexts where they may not normally trust each other, so the builder is able to work with the validator because both of them mutually trust the relay, as an example. That's one way I can interpret your question to be correct.
Q. Are there any other features that enable, say, the validator and the relay to trust each other?
A. The validator and the relay? Well, the validator checks to see that the -- sorry, the relay checks to see that the validator has given them a commitment, as an example, and that helps them work together.
Q. Remind the jury what a commitment is in this context?
A. Here, what I'm talking about is the block proposal from the validator, so it's them choosing a particular block, creating a signature associated with that block to select it for inclusion on the chain, and we call that a commitment because it is backed by economic incentives.
Q. How does that commitment relate to the reveal part of the commit-reveal framework that we've been discussing?
A. It relates to the commit-reveal framework because it is the thing that the relay is looking for from the validator before revealing the block body or the transaction contents in a block. So that is the commitment in the commit-reveal scheme here.
Q. And, again, Mr. Miller, who makes that commitment?

A. The validator is making that commitment.
Q. Is that a validator that's using MEV-Boost?
A. Yes.
Q. And is this feature of the MEV-Boost software hiding the transaction contents until the validator signs to commit something that Flashbots publicized?
A. Yes.
Q. Remind the jury — who fills in the parent and state roots in the signed block header that we've been talking about that goes from the validator to the relay?
A. The validator fills in that information.
Q. Does the builder fill that information in?
A. Not the parent root and the state root, no.
Q. Mr. Miller, you were also asked various questions on cross about the Ethereum slashing penalty.
Do you remember that?
A. Yes, I do remember.
Q. And I believe you had also testified that a validator can be slashed for proposing two blocks.
Do you remember that?
A. Yes.
Q. Fair to say that the concern for proposing two blocks is that a validator can steal MEV?
[redacted]

[redacted]

[redacted] [redacted]

THE WITNESS: Can you repeat the question for me?

BY MR. FANG:

Q. Certainly.

Mr. Miller, is it fair to say that a concern from proposing two blocks is that a validator could steal MEV?

A. Yes, a concern from proposing two blocks is that validators could steal MEV.

Q. By the way, I believe you were also asked questions about MEV-stealing on cross-examination.

Do you remember that?

A. We touched on that and related concepts, yes.

Q. Just very briefly, can you explain to the jury what MEV-stealing means?

A. What I think this would typically refer to is the idea that someone out there has created a valuable transaction, something that's going to make them money. As an example, you found a great trade, somewhere you can buy assets at a low price, sell them at a high price, but if you -- if that trade is publicly known, then someone might copy your trade and send it in themselves because they could make money instead of you.

Q. And, Mr. Miller, just remind the jury — what is the Ethereum slash amount?

A. In April 2023, it was one ETH. I'm not exactly sure what it is right now, though.

Q. Based on your knowledge working at Flashbots, can you remind the jury how much MEV is generated by the average block?

A. These days, something like a hundredth of an ETH, I think.

Q. Was that the case in 2023, as well?

A. I don't remember. It was probably a little bit higher. ETH has not been as popular as of late.

BY MR. FANG:

Q. Mr. Miller, how does the slash amount generally compare to the amount of MEV that can be stolen from a block?

A. Generally, the slashing amount is larger than the amount of MEV in a block.

Q. Based on your experience at Flashbots, what's your understanding of why the slashing penalty is higher than the average amount of MEV that can be generated by a block?

A. Well -- so slashing penalty is set as a part of the

Ethereum protocol, in general, to discourage validators from signing two blocks, right? And I actually don't know why it is one ETH specifically. It's an interesting question. It certainly does discourage proposers from signing two blocks to steal MEV because the MEV value for the average block is lower than one ETH, but I'm not sure those things are actually related to each other. I don't know why it's one ETH necessarily.

Q. Mr. Miller, on cross, you were also shown a number of Flashbots public documents regarding MEV-Boost.

Do you remember that?

A. Yes.

Q. So let's start with Defense Exhibit 304.

MR. FANG: If, Ms. Kerest, you can pull that up.

Q. Mr. Miller, is this the MEV-Boost security assessment from June 2022?

A. Yes, it looks like it.

THE COURT: Mr. Fang, do you intend for this document to be published to the jury?

MR. FANG: Yes. Apologies.

If we could go ahead and publish that to the jury?

THE COURT: You may.

BY MR. FANG:

Q. So, again, Mr. Miller, is this the MEV-Boost security assessment from June 2022?

A. Yes.
Q. And is this document available to MEV-Boost users?
A. It's public, so MEV-Boost users could find it.
Q. I want to focus on page 1, specifically the section that says "Validator Clients."

MR. FANG: And, Ms. Kerest, if you can enlarge that, please. It's the third bullet point.

Q. That states: Validators register themselves to relayers through MEV-Boost, ask for specific block headers of the slots they propose, and sign the block header so that the builder can unblind the block contents, to include these contents on the proposed block.

Mr. Miller, is this consistent with the commit-and-reveal procedure that you outlined to the jury?
A. Yes. So the commit is asking for a specific block header for the slot they will propose in signing that, and then the reveal is unblinding the block contents, to include these contents on the proposed block.
Q. Was that commit-and-reveal procedure in place in April 2023?
A. Yes.

MR. FANG: Ms. Kerest, if you can please go to the page on trust assumptions.

Q. Mr. Miller, do you also remember being asked various questions about trust assumptions?

A. Yes, I remember this.
Q. Do you also remember that this document was admitted for its notice to MEV-Boost users generally?
A. Sorry, repeat the question for me one more time?
Q. Is this document available to MEV-Boost users generally? Just remind the jury.
A. Yes.
Q. Is there any discussion in this section or in the audit report, generally, that a validator may change a parent and state root to zero?
A. I would have to reread the security audit, but I don't think so. It's certainly not in this section.
Q. Is there any discussion, to your recollection, regarding a validator sending false data fields?
A. No, not to my recollection.
[redacted]
MR. FANG: We can go ahead and take this down.
Q. Mr. Miller, I'd like to show you what's marked for identification as Government Exhibit 3202.
MR. FANG: Just for the witness, the Court, and counsel.
Q. Mr. Miller, is this another publicly available document that Flashbots made available to MEV-Boost users?
A. Yes. It's a document on our blog.
MR. FANG: The government offers Government

Exhibit 3202.

[redacted]

THE COURT: All right. I will admit it for a limited purpose. Again, this document is not being admitted for the truth of what is stated in the document, but for notice to a reasonable person using the MEV-Boost system.

(Government's Exhibit 3202 received in evidence)

MR. FANG: Let's publish to the jury.

Ms. Kerest, if you can just call out the first three paragraphs.

And if you can highlight the sentence that says: The solution is a technique called proposer-builder separation, in which validators can outsource the building of blocks to specialized parties called block builders.

BY MR. FANG:

Q. And, here, Mr. Miller, proposer is just a validator, right?

A. In the proof-of-stake context, yes.

MR. FANG: We can go ahead and take this down.

Q. Mr. Miller, on cross, you were asked some questions about Flashbots operating as a block builder, right?

A. I think so, yeah.

Q. And as a block builder, does Flashbots receive transaction bundles from cryptocurrency traders?

A. Yes, we do.

Q. Would it be technically feasible to unbundle those transactions?

A. It would be technically feasible for us to unbundle those transactions, yes -- well, in the past, yes; now, no longer, actually — one nuance.

BY MR. FANG:

Q. Mr. Miller, yesterday, on cross, you were asked a bunch of questions about MEV trading strategies, as well.

Do you remember that?

A. I think so, yeah.

Q. Do you remember being asked on cross whether an exploit could be considered a part of MEV extraction?

A. Yes, I remember that exchange.

Q. Do you remember testifying that exploits sometimes involve a lot of money, so it makes sense to consider exploits a part of MEV?

A. I said something to that effect; the exact words might change. I'm not sure, but something to that effect, yes.

Q. Do you remember what you meant by that?

A. Well, so the academic definition of MEV is the maximum

amount of value that you could extract if you had control over transaction ordering. So, it doesn't say anything about -- so just in the abstract, right, out of any possible transaction could you include in order to make money? Exploits are often ways that attackers make quite a bit of money, and so by the strict academic definition of MEV as the maximum in a value that you could make from transaction ordering, it makes sense to include exploits within that definition.

It doesn't say anything about sort of the desirability or what people should do, but it is a sort of academic definition, if that makes sense.

Q. Sure.

Would you consider the April 2nd exploit just a trading strategy?

A. I think that misses -- no, I wouldn't.

Q. Why not?

A. It misses a broader part of the picture and other events from April 2nd that were, in my opinion, material to the incident.

Q. What do you mean by that?

A. Well, there was a bug in the MEV-Boost Relay that needed to be triggered that caused unintended use, and none of that has anything to do with cryptocurrency trading.

Q. Mr. Miller, do you also remember being asked questions about an alternative strategy that Low Carb Crusader disclosed

after the April 2nd exploit?
A. Yes, I think so.
Q. Remind the jury — was that strategy ever used?
A. We looked at our logs for the Flashbots relay, and we found no evidence of it being used.
Q. Did the alternative strategy disclosed by Low Carb Crusader involve the use of any zeros in parent and state roots?
A. No.
Q. Now, Mr. Miller — just remind the jury — how did you find out about the April 2nd exploit?
A. I woke up in the morning, and I had texts from a bunch of people telling me there had been an incident, some money had been lost, and I needed to get online urgently.
Q. Ultimately, was Flashbots leadership involved in this response?
A. Yes, including me.
Q. Remind the jury — was Ethereum Foundation?
A. Yes.
Q. Were there security researchers, as well?
A. Yes.
Q. Prior to April 2nd, 2023, how often was Flashbots leadership all involved in a response?
A. Very rarely, very rarely.

MR. FANG: I'd like to publish Government Exhibit 3306 in evidence?

THE COURT: You may.

BY MR. MARX:

Q. Mr. Miller, I believe on cross you were asked if the email that you received from Low Carb Crusader was funny.

Do you remember that?

A. They asked me something to that effect, yeah.

Q. I believe you said that it had a certain absurdity to it, right?

A. That is correct.

Q. Why did you say that?

A. Let me think for a second to see if I can put it in a concise way.

(Pause)

A. I think it felt it had a feeling of absurdity, to me, because the whole situation feels a little unreal. I mean, even this moment, right now, feels a little unreal. But certainly reading that email feels a little unreal. It was software that I had helped develop, somehow people had lost tens of millions of dollars from it, and now I was being anonymously communicated with by somebody going by a cartoonish name Low Carb Crusader. That feels a little surreal, a little absurd, to me.

MR. FANG: Ms. Kerest, if we can go a couple of pages into this document where there's an email that says: I'm disclosing it as a goodwill gesture.

Perfect.

And, Ms. Kerest, if you can blow up that middle email for the jury.

Q. Mr. Miller, do you remember being asked questions on cross about this email?

A. I think so, yeah.

Q. Okay. So just to pause on this section, had the exploiters just made millions of dollars from the exploit?

A. Yes. Well, a couple of weeks before, but, yeah.

Q. And to continue, do you see where it says, and only asking for the transparency requested in the previous email?

A. Yes.

Q. At this time, did you know the identity of this Proton mail account's user?

A. Not the real names.

Q. Did the Proton mail user ever reveal their identity?

A. No.

Q. And the same month, in April 2023, were you also in communication with Anton and James Peraire-Bueno using their known user names?

A. Yes.

Q. Did they ever take responsibility for the exploit using their known user names?

A. No.

Q. Now, Mr. Miller, I just want to show you, very briefly,

Government Exhibit 3208.

Is this a document that Flashbots made publicly available regarding how MEV-Boost works?

A. Yes. It has some information about how MEV-Boost works, and it was publicly available on our docs website.

MR. FANG: The government offers Government Exhibit 3208.

[redacted]

THE COURT: Again, it will be admitted. It is admitted for a limited purpose — not for the truth of the document, but for notice to a reasonable person using the MEV-Boost system.

(Government's Exhibit 3208 received in evidence)

BY MR. FANG:

Q. Mr. Miller, just very briefly, was this a document that was available to MEV-Boost users in April 2023?

A. Yes.

MR. FANG: Okay. We can take this down.

Q. You said on cross that — switching gears — you said on cross that there were at least 400,000 validators on Ethereum in April 2023.

Do you remember that?

A. Yes.

Q. Just remind the jury — what percentage of validators were

using MEV-Boost in April 2023?

A. 95 percent.

Q. And, again, how many times has Flashbots ever blacklisted a validator?

A. Only once.

Q. Which validator was that?

A. The validators that were controlled by the perpetrator of the April 2nd incident.

MR. FANG: Just a moment, your Honor?

(Pause)

MR. FANG: No further questions, your Honor.

THE COURT: Anything further with this witness?

MR. LOOBY: None for James Peraire-Bueno.

MR. MARX: And nothing for Anton Peraire-Bueno. Thank you, your Honor.

THE COURT: Thank you, Mr. Miller. You can step down.

(Witness excused)

MR. LOOBY: Your Honor, the defense called Dr. Brett Hemenway Falk.

BRETT HEMENWAY FALK,

called as a witness by the Defendants,

having been duly sworn, testified as follows:

MR. LOOBY: Your Honor, may I approach the witness and the bench?

THE COURT: You may.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. LOOBY:

Q. Good morning, Professor Falk.

A. Good morning.

Q. What do you do for a living?
A. I'm faculty in the computer science department at the University of Pennsylvania.
Q. And, Professor Falk, if I could ask you to lean into the speaker of the microphone.
A. Sorry. Sure.
Q. Thank you.
How long have you been at Penn?
A. I started there in 2013, so about 12 and a half years.
Q. And what is your title?
A. I'm an adjunct assistant professor.
Q. Where were you before Penn?
A. I had a postdoc in the math department at the University of Michigan.
Q. And what were you studying at the University of Michigan?
A. There my research was on cryptography.
Q. Professor Falk, what is cryptography?
A. Well, cryptography is a broad field. It's generally about privacy and security. My background is in math; so I was designing algorithms for private and secure communication and computation.
Q. And do you have a graduate degree in math?
A. Yes, I do.
Q. From where?
A. I have a Ph.D. in math from UCLA; but although I was in the

math department, my research there was also focused on cryptography.

Q. What is your current area of research focus?

A. These days I primarily focus on blockchain technology; although I do still do a little bit of research on this sort of underlying cryptographic primitives.

Q. Does your research require you to spend a lot of time on Ethereum?

A. Yeah. So I spend a lot of time on Ethereum. I run to Ethereum validators in my office to collect data. I scraped millions of transactions from exchanges like Uniswap, from lending protocols like Aave. I've scraped transactions from all kinds of different blockchains. And then we look for interesting patterns and write papers about them.

Q. You anticipated my question. But what do you do with all that data that you're scraping from Ethereum?

A. Yeah, we -- we generally look at different things. Usually we start out by trying to, sort of, identify what's going on; and then look for -- basically, sometimes we have been looking a lot at different economic incentive mechanisms. So the blockchain space is kind of cool because all of the transactions are public and people are experimenting with a lot of different economic incentives to get people to do things. So economists are really interested in, sort of, how people respond to these incentives. So I write papers with people in

the business school about -- essentially about like the incentives in different blockchain protocols.

Q. And have you published these papers?

A. Yeah, I've published a number of papers on blockchain technology.

Q. As part of your work, Professor Falk, are you sometimes asked to speak on these areas of your research?

A. Yes. So I go to academic conferences, and I go to the ones that are focused on cryptography and on blockchains. So I give talks usually about the papers that I've written.

Q. Have you testified as an expert witness before?

A. I testified as an expert witness once before, but it was a civil trial, and it was an arbitration, so there was no jury.

Q. Without disclosing any confidential information, on what topics, broadly, did you testify in that case?

A. Yeah. So that was a case, there was a guy who was a Coinbase customer and he had an account on Coinbase. And he had bought some Aave tokens on Coinbase; he had sent them to his self-custody wallet. He had played around in DeFi for a little bit. And, in doing so, he had traded them for A Aave tokens, which is a different token. So Aave is A-A-V-E. There's another token that's lower case "a" Aave, three A's.

And he had sent these A Aave tokens back to Coinbase; and Coinbase did not credit his account. And he was suing Coinbase to try to get those tokens back.

Q. And on what topics was your testimony focused specifically?

A. Yeah. So Coinbase was saying it did not have the technical capability to send these tokens back to him. And I was asked to testify about, essentially, how you would transfer a token like A Aave or any what are called these erc 20 tokens, these are standardized token formats. So how you transfer tokens on Ethereum and what it would take to do that.

Q. Professor Falk, have you worked as a consultant for companies on blockchain security issues?

A. Yeah, I do a fair amount of consulting in the blockchain space, usually about cryptography and security. So for companies that are designing some system that uses blockchain technology and they have to manage their keys or set up their security architecture, and I help them with that.

Q. Professor Falk, do you teach any classes on blockchain technologies?

A. Yeah. So I teach a course exclusively on blockchains in the MCIT online program, it's the Masters and Commuters and Information Technology program in the engineering department at Penn.

Q. What are some topics you cover in that course?

A. So we started out broad and talk about blockchains in general, sort of, why they were created. Consensus mechanisms. And then we focus mostly on the Ethereum blockchain. And so we learn about tokens on Ethereum and smart contracts on Ethereum

and exchanges like Uniswap. And we look at MEV. And then bridging from Ethereum to other blockchains.

Q. So through your academic and other work, have you become familiar with Ethereum?

A. Yes, I am very familiar with Ethereum.

Q. And, Professor Falk, I'll just ask you to lean into your microphone a little bit and speak slowly for the benefit of the court reporters as well. I've been counseled by them in that direction.

A. Sure.

Q. And it's to everybody's benefit.

And through your academic and other work, Professor Falk, have you become familiar with MEV?

A. Yes, I have.

Q. And through your academic and other work, have you become familiar with MEV-Boost?

A. Yes, I'm familiar with MEV-Boost.

Q. And through your academic and other work, have you become familiar with the issues relating to protocol design on decentralized blockchains?

A. Yes.

MR. LOOBY: Your Honor, I move to qualify Dr. Falk as an expert under Rule 702.

THE COURT: Any objection?

MR. LEVANDER: No, no new ones, your Honor.

 THE COURT: Thank you. It's granted.

Q. Professor Falk, in your work as an expert witness, are you typically paid for your time?

A. I have only done this once before, but, yes.

Q. What is your hourly rate?

A. I'm billing sort of what I bill in general crypto consulting, and in this case it's $800 an hour.

Q. And about how many hours have you worked on this case?

A. I think about 150.

Q. Is your pay dependent on the outcome of the case?

A. No, I'm just paid an hourly fee. And there are no contingencies based on anything.

Q. Is your pay dependent on the testimony that you give here today?

A. No, my fee is just an hourly fee.

Q. Broadly, Professor Falk, what were you asked to do in this case?

A. So I was asked to give my opinions about the design of Ethereum and Ethereum block production, and the norms and the incentives in the Ethereum space.

Q. And in coming to your opinions, did you have any meetings with the defense team?

A. Yes, I met with defense counsel.

Q. And what did you understand was the purpose of those meetings?

A. One is to talk to me about what I was being asked to do here. I have never testified in front of a jury before. And I was asked to write disclosures. And they said what I should say in a disclosure and, sort of, how I should structure that. And to talk about the case in general.

Q. You anticipated those questions, but did those meetings include reviewing a draft of that disclosure that the defense made to the government?

A. Yeah. So after I was asked to write this disclosure, I wrote a disclosure; and I walked through it with defense counsel.

Q. And did defense counsel suggest any edits to your draft disclosure?

A. Yeah, they suggested minor edits in helping me get things into a language that was more appropriate for a legal setting.

Q. Did any of those edits change your opinions in any way?

A. No, the opinions in the disclosure were my own opinions.

Q. And in preparing for your testimony today, did you also meet with lawyers for the defense team?

A. Yes, I did.

Q. Did any of those meetings change the substance of your opinions in any way?

A. No, these opinions are my own opinions.

Q. And as part of your work in this case, did you review certain materials related to the case?

A. Yes, I did.
Q. Could you let us know some categories of the materials that you reviewed.
A. Yeah. Well, most of the materials I reviewed were public. So initially I looked at the indictment, and then I spent some time -- I was already very familiar with Ethereum and MEV-Boost; but then I spent a lot of time, sort of, digging deeper into the code for Ethereum consensus clients and the documentation for MEV-Boost. And I looked at the block in question and the transactions in question. And these were all, sort of, public, because the blockchain is public, and this code is all open-source.
Q. Were you present for parts of this trial here in the courtroom?
A. Yeah, I came and I listened to part of Bert Miller's testimony.
Q. Were you present for part of opening statements as well?
A. Yeah, I read part of opening statements.
Q. And did you review any trial transcripts of the proceedings in this trial?
A. Yeah. I didn't catch the end of Bert Miller's testimony, so I was given transcripts of the second part of Bert Miller's testimony.
Q. In the disclosure that we talked about just now, was there a list of materials included that were relevant to your

opinions in this case?

A. Yeah. So the disclosure, sort of like an academic paper, had a lot of references and it cited various papers. And those were papers that I reviewed and relied on when I was writing my opinions.

Q. If a document appears on that list, are you vouching for its complete accuracy?

A. No, those are documents that I read and that I relied on, but they are not necessarily documents that I fully endorse in every possible way.

Q. So I take it that a document's appearance on that list doesn't mean you agree with every sentence in the document?

A. No, it does not.

Q. Okay. Did you ever discuss the substance of your testimony that you will give here today with James and Anton?

A. No, I did not.

Q. Did you ever discuss the substance of this case with any other defense witness?

A. No, I did not.

Q. Before your retention in connection with this matter, were you familiar with the trading strategy called omakase that occurred on April 2nd, 2023?

A. Yeah. I wasn't familiar with the name "omakase," but I was a researcher in the Ethereum space, and this was big news; so I heard about it immediately, I think probably from Bert Miller's

postmortem. So I knew about it and read about it in April 2023.

Q. And through your study of certain of the materials that you had mentioned before, did you come to form certain opinions about that strategy?

A. Yeah. So I had opinions about this strategy long before I was approached by defense counsel.

Q. And at a high level, what are some of the topics on which you've reached opinions related to this case?

A. Sort of on what happened and what the roles of the participants were, and what the norms and expectations were in the Ethereum space.

Q. And we'll go through some of those topics one at a time.

So we've been talking a lot about the Ethereum blockchain in this trial and the jurors are now practically experts themselves. So we can keep this limited to just the points that matter. And you can hold me to that, everyone.

And what are some primary features of the Ethereum blockchain?

A. So usually we talk about Ethereum as decentralized and permissionless. And it's a decentralized ledger.

Q. Let's break those down.

What does it mean for the Ethereum blockchain to be decentralized?

A. So it means that the software running Ethereum is not run

on a single computer or even computers in like a single data center or in a single company; that it's run on computers that are spread out all over the world, run by different people.

Q. And is there a central authority that runs the Ethereum blockchain?

A. No, there's no central authority in the Ethereum blockchain; it's just a distributed system where anyone can run an Ethereum node.

Q. What does it mean for the Ethereum blockchain to be permissionless?

A. Yeah. So blockchains are often divided into two categories of permissioned and permissionless. And permissionless blockchains means that anyone can become a validator without asking permission from anyone. So Ethereum is permissionless because anyone can join.

Q. And what is a consequence of that feature of the Ethereum blockchain?

A. So because you don't know who the actors are in Ethereum, you generally cannot trust all of the people running these computers.

Q. How do you trade with somebody on Ethereum if you don't trust them?

A. Yeah. So there's a combination of essentially cryptographic and economic enforcement.

So one thing that's nice about Ethereum is that

Ethereum allows you to write smart contracts; and these are public and they are deterministic.

So if I wanted to trade with somebody, and I presumably don't know them, because you don't know most people on Ethereum, if I said I wanted to trade ETH for some other token, like USDC, if I sent them ETH, I would expect them to just run away with my ETH and give me nothing. And if they sent me USDC first, they would expect me to run away with the USDC and give them nothing.

So if we wanted to trade, we could write a smart contract that's on the Ethereum blockchain that waits for me to give it ETH and waits for my counterparty to give it USDC. And once it has both, it will make the swap for us. And if it only receives one, if only I send an ETH, then I can reclaim my ETH in a day or something.

And because the contract is completely public, we can both see how it works. And because it's deterministic, we know exactly that it's always going to work in the same way.

And so this, sort of, public and deterministic property allows me to trade with people that I don't know and don't necessarily trust.

Q. Did you review certain slides in preparation for your testimony today?

A. Yes, I did.

Q. And do you know who created those slides?

A. I believe defense counsel.

Q. Were you given the chance to comment on them?

A. Yes, I was.

MR. LOOBY: Joe, if you could please pull up for the witness, Court, and counsel only DX 5010.

Q. And Professor Falk, it should be on your screen. Also, every exhibit that we're looking at today is in that thin binder that I handed up. So once you've had a chance to look at that, could you let me know if you recognize this document.

A. Yes, I recognize it.

Q. And what are these?

A. This is a representation of the Ethereum blockchain.

Q. Before the content, are these the slides that you had reviewed?

A. Oh, sorry. These are the slides, yes.

Q. Okay.

MR. LOOBY: Your Honor, I move to publish DX 5010 as a demonstrative, and then we can defer discussion on its further admissibility, along with the other demonstratives.

THE COURT: Any objection?

MR. LEVANDER: No objection as a demonstrative.

THE COURT: All right.

You may publish as a demonstrative.

Mr. Looby, we are a little bit past 11:15. Why don't we take our morning break now.

So we are going to take our mid-morning break.

My prior instructions apply: Do not discuss this case with anyone, do not do any research on this case, do not read anything about this case, and please remember to keep an open mind. I will see you back here around 11:30.

(Jury not present)

(Jury present)

THE COURT: Please be seated.

Let's bring Dr. Falk back down to the witness stand.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you.

Joe, if you could please pull up 5010 and go to the first slide. And with the Court's permission, I would publish and then I will periodically be publishing slides throughout the discussion.

THE COURT: All right. This is a DX 5010?

MR. LOOBY: Correct, for demonstrative purposes.

BY MR. LOOBY:

Q. Professor Falk, what do you understand this to be a picture of this?

A. This is a representation of the Ethereum blockchain.

Q. Is the concept of decentralization that you mentioned earlier captured here?

A. Yeah. So this is supposed to represent there are lots of individual nodes that are run on separate computers. And each node connects to some other set of nodes, not to every other one, but to some subset.

Q. What are the blue circles?

A. So I believe these are meant to represent Ethereum validators, so validators who have staked money and are participating in the validator lottery.

Q. And what are the gray circles?

A. So on Ethereum, you can also run the validator software without staking. And then you are never chosen to produce blocks, but you are participating in the protocol in that new blocks are sent to you once they've been created and mempool transactions are sent to you.

So this is more what I do, since I'm interested in data collection. So I run what here would be represented as these small gray nodes so that I can see mempool transactions when they come out, and I can grab blocks right when they come out, and I can look at historical blocks on my own computer.

Q. You mentioned earlier the concept of a ledger. What do you mean by that in this context?

A. Yeah. So blockchains are often called distributed ledgers. And you can think of it as a ledger, as a list of transactions.

And really that's all Ethereum is, is a way of storing a list of transactions.

MR. LOOBY: Joe, if you could please go to page 2 of this exhibit.

Q. Professor Falk, what do you understand this to be a picture of?

A. So this is a representation of the blockchain itself.

Q. What is the box all the way on the left?

A. So on the left this is supposed to identify a block of transactions. So in the blockchain there's a chain of blocks that are in a linear order. And within each block there are transactions.

Q. And what is depicted to the right on the slide?

A. That's a screenshot from a block explorer. This is from Etherscan, which is the most popular block explorer. It's a website that allows you to view blockchain transactions. Because blockchain transactions are public, anybody can run a node and get these transactions. But it's sometimes hard to browse through them; so Etherscan makes nice pretty web pages that are automatically generated based on blockchain transactions.

Q. Can anybody go online and review these blockchain transactions?

A. Yeah. So Etherscan is public. It's really widely used in this space. It's sort of the first place you go if you want to

look at a transaction, see what happened.

MR. LOOBY: Joe, we can take this demonstrative counsel.

Q. Professor Falk, who are the validators on Ethereum?

A. So on Ethereum, because it's permissionless, anybody who stakes 32 ETH can become a validator.

Q. What is the validator's role on Ethereum?

A. So validators have two roles. There's a lottery at every slot, so every 12 seconds one validator is chosen to be what's called like the slot leader or the block producer. And they get to produce a block for that slot if they want. And then the other validators are then called attesting validators; and their role is to come to consensus about the block that was produced by the slot leader.

Q. Let's start with the proposing validator role. Under the Ethereum protocol, how does the proposing validator decide what goes into a block?

A. So the proposing validator has complete autonomy to decide; they can put any transactions they want in a block. They can propose an empty block, they can propose no block at all, they can take transactions from wherever they want.

Q. Why does Ethereum have this feature?

A. This feature is not just part of Ethereum; this is true of pretty much every blockchain, of which there are dozens, if not hundreds. That's because, sort of, at the time the blockchain

is designed, you don't know what transactions will be available or what incentives people might have. And so it would be basically impossible to come up with rules of saying, You have to put transactions in this order, when you have no idea who's going to be making the transactions and what transactions they are going to be, and what smart contracts are going to exist. So the system stays very flexible by saying, Every 12 seconds, we elect somebody; and they can put the transactions in that they want.

Q. How does the ordering of transactions matter on Ethereum?

A. So it matters in a lot of ways.

So in the early days of Ethereum, when there wasn't much MEV, it still mattered because you could think of suppose I have some account balance. If I have ten ETH and I sign a transaction to send ten ETH to you and ten ETH to you, I can't -- both of those transactions can't go through because I only have ten ETH. But they are both sort of valid; I do have ten ETH, and I signed both of them. So which one is valid and which one is going to be rejected? Well, the first one is valid; and the second one is going to be rejected. And the validator chooses which one is first and which one is second.

Q. Is there another way in which transaction ordering matters on Ethereum?

A. Yeah. So in this case we've heard a lot about MEV. And so MEV you can also think of like -- the simplest example of MEV

is arbitrage. So you imagine there is a decentralized exchange, like Uniswap, that's at some point selling ETH below market prices. So here's this exchange. You could go and you could buy ETH. And you could make a profit by buying at this lower price and selling it high someplace else.

But it only has so much ETH.

So the first person who can come and buy it from this exchange is going to make that money. And the second person who comes is not. And everybody wants to make this free money from this arbitrage trade. And who gets to make the arbitrage trade, well, the validator is the one who gets to decide. They can make it themself or they can ask people to pay them for the right to make this arbitrage trade. But somebody has to decide, and in Ethereum it's the validator.

Q. Is that aspect of the validator's role profitable for the validator?

A. Yeah. So that's expected to be profitable. And MEV originally stood for "miner extractable value," when validators were called miners, because it was expected that that was a profit that would go to the block producer.

Q. Is this feature of the profit going to the block producer, is that ununique in Ethereum?

A. No, that's true in pretty much every blockchain. Almost every decentralized permissionless blockchain has this design, that the proposing validator gets complete autonomy of how to

choose the order of transactions.

Q. How does someone become a validator?

A. On Ethereum, you stake 32 ETH; and then you run some validator software.

Q. Can anybody stake the ETH and become a validator?

A. Yeah, so that's what we say it's permissionless. Anybody can stake 32 ETH; there's no identity checks or anything like that.

Q. Do you have to agree to any terms of use to become an Ethereum validator?

A. No, there are no terms of use; and there's no one who can even, sort of, present you with terms of use. It's a decentralized system.

Q. Do you have to promise to behave in any certain way to become an Ethereum validator?

A. No, there's no promises. And, again, there's no one who you could even reasonably make this promise to.

Q. Professor Falk, you mentioned a testing role validator role earlier. Just for clarification, what is that role?

A. Well, in Ethereum and in almost every blockchain, there's what's called a consensus mechanism. And this comes about because the proposing validator might propose one block, but they might propose two blocks. And if they propose two blocks, you only want to add one of those two blocks to the chain. And so the attesting validators, their role is to ensure that no

more than one block gets added to the chain. Because proposing validator might be incentivized to produce one block and send it to somebody, or produce a different block and send it to somebody else. And they could do this for their own motives. And you want to only add one block.

So the attesting validators are there to ensure that no more than one block is ever added to the chain in a given slot.

Q. Does the testing validator role implicitly recognize the validator might propose more than one block per slot?

A. Yeah. So the consensus mechanism — in this case, Ethereum's consensus mechanism, which is what the attesting validators are doing, right — is a huge area of research. It was kind of a core differentiating feature of all these blockchains of how they went to consensus.

But it's all predicated on the idea that the proposing validator might propose two blocks or three blocks or as many blocks as it wants; and you can never stop them from doing that. So you need a way of saying, If they propose multiple blocks, how do we select which one to add to the chain?

Q. Okay. So those are the two roles of the validator. And I want to talk a little bit about the mechanics of being a proposing validator.

MR. LOOBY: And it might be helpful if, Joe, you could please pull up 5010, but now at slide 3, and to publish that

for the jury.

These slides have some nifty animation, but in the interest of time, I'm just going to get to the state of the slide.

Q. Professor Falk, in general, what are some sources of transactions from which a validator could pull to construct a block.

A. Yeah. So this slide shows a few of them. There's the mempool; and this is essentially built into almost every Ethereum client. It's a public space where people gossip transactions around. Proposing validators can also create their own trades; they can sign transactions and put them in a block. Some proposing validators have deals with people to get proprietary order flow; they may either be buying transactions that they want to extract MEV from, or they may be getting paid to insert other people's transactions in specific places or, they can query a relay and ask for a block of transactions.

Q. Under the Ethereum protocol, does the validator who queries the relay have to use the block that the relay gives it?

A. No, not at all. The relay isn't even a core part of the Ethereum protocol. But even under normal operation of a relay, you would probably call multiple relays. And you can't -- you probably wouldn't use multiple blocks.

But, beyond that, the default Ethereum consensus client, so there's open-source software you can run. The most

popular software is called Lighthouse. If you run lighthouse, it has a setting where you can build your own block from transactions in the mempool and query a relay. And then the software compares which one is more profitable for you and publishes that one.

Q. Professor Falk, we'll talk more about MEV-Boost in a bit. But I have just a couple questions for you while this slide is up.

Do you understand this slide to be depicting the so-called MEV-Boost ecosystem?

A. So the MEV-Boost ecosystem I guess is kind of vague and big. But this is a relay probably as conceptualized by Flashbots, yeah.

Q. And what do you understand this slide to generally be representing?

A. So this is representing sort of how an Ethereum validator would get transactions, put them in a block, and sign that block and send it to attesting validators to get added to the chain.

Q. Does the existence of MEV-Boost change the availability of these other sources of transactions for the validator in any way?

A. No, not at all. And as I was saying, sort of the default operation of a lot of validator clients is to basically look for transactions that are the most profitable either from the

mempool or from a relay or from anywhere else.

MR. LOOBY: Joe, we can take that down.

Q. We've used the word "Ethereum protocol" in our discussion this morning. This might be a basic question, but what is the Ethereum protocol?

A. Yeah. So that's a broad question. But, basically, the Ethereum protocol you can think of as the guidelines for how these different nodes can all communicate with each other. Remember there's, you know, probably millions of different computers, and they all have to send messages back and forth. And so sort of how you should structure these messages, what messages you should expect at certain times, and how to behave when you receive various messages.

Q. Are these features of the protocol publicly available?

A. Yeah. So the entire Ethereum protocol is public. All of the documentation is public. And then there are a number of what we call, like, software clients, so just sort of off-the-shelf software that you can download if you want to run an Ethereum node. And there's a handful of different open-source software clients. You can just take them as is, or you can modify them. Or because the protocol is open, if you want to take the time, you could write your own client, but it's complicated.

Q. Does the Ethereum protocol set rules by which users must abide?

A. No, there aren't really rules as such. There's this software that you can run, and you can modify it if you want.

Q. Do Ethereum users have to agree to follow the Ethereum protocol in order to use it?

A. No, there's not any kind of agreement like that. And there's, again, sort of, no way you could make that agreement. There's no one you could agree to.

Q. Professor Falk, there's also been talk in this trial about something called the Builder API. Again, another broad question, but what is an API?

A. Yeah. So an API stands for application programming interface. So you want to think of it as an interface. If you have two computers and you want them to talk to each other, and you want to talk -- you want them to talk to each other automatically, if you have some application.

So like in my work, I use APIs all the time, which is suppose I want to grab some blockchain data; I want to get price data from some token. There will be some server somewhere that has aggravated price data. And they will have an API that I can read and say, Call this end point if you want this type of data. And if you call this end point if you want this type of data, and I then write programs that can repeatedly call these APIs.

Q. Is API documentation helpful to you in your work in that regard?

 A. Yeah. I use it all the time because I want to know how I should query the data. My computers are kind of brittle, and so I have to query in exactly the right way. And then when I get a response of price data or whatever data I'm asking for, it's going to come back in some specific format. And I need to know how to parse that format and read it and extract the useful stuff for myself. So I read APIs all the time.

MR. LOOBY: Joe, if you could please pull up DX 3219, which is in evidence. And with the Court's permission, we would publish.

THE COURT: You may.

Q. Professor Falk, are you familiar with this document?

A. Yes, I am.

Q. What is it?

A. So this is an archived version of the Builder API.

Q. Do you see the sentence at the top, it's the first sentence in the document that says the API -- this API specification for external builder nodes.

A. Yeah.

Q. What does that tell you about the purpose of this document?

A. Yeah. So this is a little bit confusing, because this also serves as the Flashbots relay API. If you go to the Flashbots website and you ask for the relay API, it takes you here. But there's hope that in the future, you would not need a relay. People haven't figured out how to do that exactly. But for

right now, the sort of Builder API is the relay API. But it's how you would query information from the relay or from a builder in the future.

Q. So when looking at this document, can we -- when we see the word "builder," can we just swap in the word "relay"?

A. Yeah. You can think of this as -- this is also currently serving as the relay API. So you would go to this document. If you wanted to write a program to query a relay and get information back, you would use this as a reference.

MR. LOOBY: Joe, if you could zoom out a little bit.

Q. Professor Falk, I want to talk generally about the way that this document is structured. Can you explain for us how it's structured?

A. Yeah. So you want to think of like the relay as a computer somewhere that's running; it's a server. And you're going to want to make some queries to this server. And you may want to query different things. And the different areas here are called end points. And so we see this, like, post button. This is what's called a post end point where you post some data to this end point and you get something back. And usually a server will have lots and lots of different end points.

So, again, sort of in my work, I'm often interested in price data. And they might have an end point to get price data for a specific token, or they might have an end point to get price data for a specific exchange. So then I would get, you

know, all of the trades in the last hour from some exchange, or they might have an end point that allows me to get, you know, token information like who created it, but not price data. And they'd have end points for all these different things, where I could query different types of data from the same server.

Q. So on this document, is the teal box that says "post" and the information that immediately follows it, is that the end point?

A. Yeah. So that is what's called -- in this case it's the registration end point.

Q. Underneath that end point we see some text. What is that?

A. Yeah. So in these documentation, these are, sort of, auto-generated; they are software that, sort of, formats them all the same. So all the API documentation looks the same for Flashbots and for, you know, most of the price APIs I use.

So they have the end point name which shows you where you are asking for this data. Underneath, there's a little description of, sort of, why you would want to use this end point. So, again, sort of, with my example of price data, they might say, like, If you hit the token end point, it will say, you know, Get data about this token, you know, including creation time or something. And if I could have price end point, it might say, Get information about the hourly price of this.

So there's a description underneath that tells you why

you would want to query this end point.

Q. How is that information useful to you when you're using an API?

A. It's crucial, if I want to write some code, to query. I need to know, sort of, which end point I want to talk to.

MR. LOOBY: And, Joe, if you could please turn to the next page.

Q. Professor Falk, under the heading "Request Body" then we see a black box. Can you explain what we're looking at here.

A. Yeah. So, again, the point of this documentation is to tell you how to interact with this server somewhere. And so I need to make a request. In this case, I'm sending some data, and you've got to put it in exactly the right format. So this document will tell you exactly the format you should -- how you should format your data when you send it to this API.

MR. LOOBY: And, Joe, if you could scroll down to capture the next one. No, go up a little bit. Yeah. There we are. Thank you, Joe.

Q. Professor Falk, what is this portion of the document?

A. So after the request side, there's the response side, where it will tell you, Okay, here's the responses you should expect to get, and the exact format of the responses. Because you need to know how it's going to respond, how it's going to say -- you know, if you make a bad request, what it's going to say; if you make a good request, how it's going to structure

the information it's giving you back.

MR. LOOBY: Joe, if you could zoom out and go to page 3.

Q. Okay. Do you see the blue box that says "Get"?

A. Yeah. So this would be another end point on the relay or the builder. And so this is the end point you would query if you wanted to get an execution payload header from the relay.

Q. And does this portion of the document and the fields that follow, does it follow the same general format as the first end point that we looked at?

A. Yeah. So it has the end point, which is slash ETH v1 builder header, whatever. And this is very much like a URL. So if you look up like the address of some relay, if you go to, like, flashbotsrelay.flashbots.io, and then you add this thing at the end, ETH v1 builder, you go there with your website -- with your Internet Explorer or whatever browser you use, it will give you a response like this. Like it's just the address on the server.

And here we see the parameters that you have to put in. Here you see a slot number, a parent hash, and a public key. So these are the parameters you give to this end point.

MR. LOOBY: Joe, if you could scroll down.

It's tough to do.

Q. Professor Falk, do you see the black boxes with formatted messages here?

A. Yeah. And so here this shows the response type. The first end point, the registration end point, the responses were kind of minimal; because if you register, you don't really get an interesting response.

But here you are asking for a block header. And so it says here is exactly the format we will give you the header in. And so if I were writing a program to interact with a relay, I would need to know the exact format that I'm going to receive the header in.

MR. LOOBY: Joe, if you could please zoom out and go to page 5.

Q. Professor Falk, do you see the teal box that says "post"?

A. Yup. So this is another end point on the relay.

Q. What does this one do?

A. So, again, this is now where you can send a signed blinded block to the relay and, in response, get back the full payload, sort of the list of all transactions from the relay.

Q. Is this something a validator can do?

A. Yeah. So a validator can call this end point if it wants, yes.

Q. Does this portion of the document follow the same format as the other portions that we looked at?

A. Yeah. So it gives a brief description of sort of why you would call this end point; and then it spends a lot of time talking about, Here is the exact format, you make your request,

and here is the format you get your response in.
Q. And that written description immediately under the end point, does that impose any obligations on a validator?
A. No. I mean in this API documentation, these descriptions are meant to help you figure out which end point you're supposed to be calling.
Q. Professor Falk, the second sentence in that narrative portion says the builder is now able to unblind the transactions in execution payload header without the possibility of the validator modifying them. Do you see that?
A. Yes, I do.
Q. Again, what is the purpose of this narrative field?
A. That's really just, sort of, again, a description of what's happening here, like, why you would be calling this. But in this case, it's sort of a very, sort of, casual short description because it should say that the builder can unblind the transactions in the execution payload header. And if the validator proposes another block, they will be slashed.
Q. Are these instructions for the validator?
A. No, these are, sort of, hints to somebody who's writing code to interact with the relay about which end point they should query.
Q. Does this impose any obligations on the validator?
A. No, that's not how APIs work. The API documentation is there to help you figure out how to interact with this relay,

but it's not a terms of service or anything like that.

Q. And I think you hit on this before, but is this highlighted sentence, is it even a complete description of what a validator can or can't do after it signs the block from the relay?

A. It's not a complete description. But, again, these little descriptions here are not meant to be complete; they are sort of hints to somebody who is writing code about which end point to choose.

If you wanted to be very generous, you could say it's sort of accurate in the sense that once you sign an execution payload header, you can't unsign it. So you cannot modify that block; but, of course, you can always propose another one.

Q. And this little narrative description, does it contain that additional idea that you could always propose another block?

A. No, it does not.

Q. Is that surprising to you?

A. No, I mean that's not sort of within the scope of API documentation.

MR. LOOBY: Joe, you can pull that down.

Q. How are validators expected to behave on Ethereum?

A. It's generally expected that validators are profit maximizers; that they're validating in order to make money.

Q. Why is that the expectation for Ethereum validators?

A. Because there's not really another reason you would want to be a validator. I mean, that's how Ethereum was designed.

Q. So I take is being a validator a form of economic activity?
A. Yes, it is.
Q. We've heard the term "honest validator" in this trial. Does "honesty" have a special meaning in this setting?
A. Yes. So before I worked in the blockchain space, I just did pure cryptography, and I designed a lot of, sort of, cryptographic protocols.

And when you design a multi-party cryptographic protocol, and then you want to analyze its security, you want to divide the types of agents in this protocol into different categories for analysis. And so we use terms like "honest" or sometimes it's synonymous with "altruistic." You say, Some group will be honest or altruistic, and some group will be rational, and some group will be byzantine or malicious. And these are, sort of, terms of art that you use when you are doing a mathematical analysis of cryptographic protocol.
Q. Are these academic terms?
A. Yeah. So you'll find them in basically every academic paper about -- one place where I work is in secure multi-party computation; but you also find it in all of the rigorous analyses of different blockchain consensus protocols.
Q. I want to walk through some of the different groupings of types of users that you mentioned.

What would it mean to be an altruistic user of a blockchain technology?

A. So the, sort of, honest or altruistic type is the one who's always going to blindly follow the, sort of, protocol as it's written, whether or not it's in their economic interest.
Q. What would it mean to be a rational user of decentralized blockchain technology?
A. So a rational type is someone who is profit maximizing, sort of, to contrast them to the honest or altruistic type.
Q. I think you mentioned the third category had two different terms, malicious or byzantine; is that right?
A. Yes.
Q. Now, "byzantine," that's a strange one, at least to me. Do you know why that term was used?
A. Yeah. So in one of the original papers that designed consensus mechanisms, they sort of came up with a thought experiment where you had a bunch of generals who were surrounding a city, and they were all trying to decide whether they are going to attack or not. And this framework of this thought experiment was in Byzantium. And so this paper got called The Byzantine General's Problem. And somehow in computer science the name for people who can behave arbitrarily got called byzantine. Sometimes we call it malicious, but often people will talk about byzantine actors.
Q. And, again, these are all terms of art?
A. Yeah. So these things -- even "byzantine" has a sort of fairly rigorous technical meaning that cryptographers would

understand if you want to talk about a consensus protocol.

Q. Are these terms specific to Ethereum?

A. No, no. They came out long before Ethereum, and they're used, sort of, all through cryptography and decentralized systems.

Q. Is there an expectation that all actors in Ethereum will be of the honest type?

A. No, there's not. There never is in any of these decentralized protocols.

Q. What is the assumption?

A. The assumption is in Ethereum that most users will be of the rational type. But, again, these types are sort of abstract concepts that we use for analysis, that we want to prove something that Ethereum will behave in this way as long as no more than a third of the agents are of the byzantine type or something like that.

Q. Is it possible for an Ethereum validator to pose as a certain type of user?

A. I mean, user abstract types that we use for mathematical analyses, there's not really a way you can pose as one type or another.

Q. Do validators have to agree to be one type or another before becoming Ethereum validators?

A. No, that's not a concept that people use, and there's no way to do that.

Q. Does this assumption of rationality factor into the design of Ethereum?

A. Yeah. So Ethereum is what we would call a cryptoeconomic protocol; it uses cryptography to enforce some things, and it uses economics to enforce some things. And the core design of Ethereum is assuming that most of the agents there are economic or rational actors.

Q. And are these assumptions of economic rationality, are they widely known and publicly discussed in this field?

A. Yeah, they're very widely known.

Q. Does honesty in this setting have anything to do with telling the truth?

A. No, it's not about telling the truth; it's just a category of agent in an analysis.

Q. Professor Falk, I'd like to ask you a little bit more about slashing that you had mentioned, economic incentives. What is the slashing penalty on Ethereum?

A. So on Ethereum, when you are the slot leader, when you've been chosen to propose a block, you have to sign that block, that way people know it came from you. But there's nothing in a signature that prevents you from signing another block. And so to disincentivize you from signing multiple blocks, Ethereum has a slashing penalty. And when you sign two blocks, that's called equivocation; and you'll be slashed one ETH for doing that.

Q. How does slashing work in practice?

A. Well, slashing is kind of nice because it's something that's -- it's very easy to observe because I can -- if a validator signs two blocks, you have evidence that they signed two blocks. You have two signatures. And I can show that to anybody. And so I don't have to say, Oh, I saw them sign two blocks and you trust me. I can just present, Here are two blocks that are signed by them, and I can convince anybody that happened. And, in particular, I can convince the blockchain itself. So I can submit these two signatures to -- essentially to the blockchain itself, and there's a mechanism then that slashes some of their stake.

Q. Is that mechanism part of the Ethereum protocol itself?

A. Yeah, that's part of the core Ethereum protocol.

Q. And does the Ethereum protocol prohibit validators from doing what you just defined as equivocation?

A. No, there's no way to prohibit that. So they impose this slashing penalty.

Q. Is this ability of an Ethereum validator to equivocate a known feature of the Ethereum protocol?

A. Yeah, it's widely known. And the whole design of slashing and equivocation penalties is based on the idea that validators may be incentivized to slash -- I mean to equivocate.

Q. And did anything about the slashing penalty change after omakase?

A. No, it did not.
Q. How is the amount of slashing set?
A. So that's essentially baked into the Ethereum protocol.
Q. Could it be raised?
A. It could be raised. Ethereum has changed multiple times.
Q. Has it been raised since April 2023?
A. It has never been raised, no.
Q. Is that one-ETH slashing penalty sufficient to discourage validator equivocation?
A. Under most circumstances, it is.
Q. In outlier cases, can that economic disincentive give way?
A. Yeah. If there's more money to be made by equivocating, then, of course, a rational validator would equivocate.
Q. I want to ask you about MEV-Boost. But before I do, does that term sometimes refer to different things?
A. Yes. So sometimes there's sort of the whole kind of MEV-Boost ecosystem that we talk about. But there's also a specific MEV-Boost client software, and sometimes it refers just to the specific client software.
Q. What type of user would run the MEV-Boost client software?
A. That's designed for validators.
Q. How does the MEV-Boost client software relate to the Ethereum protocol?
A. So sometimes it's called like a sidecar. So it is not an Ethereum validator client, you still have to run your Ethereum

validator client; and you can run this other piece of software next to your Ethereum validator client, and they can talk back and forth.

Q. Do validators need to run the MEV-Boost client in order to interact with a relay?

A. No. We saw this Builder API, which is the relay API. And the point of documentation like that is so that you could write your own software to connect to a relay. The MEV-Boost client is pre-written software that connects to the relay for you, so you don't have to write anything if you don't want. But the relay is open. The API is -- the documentation is there for you to write your own code. And lots of other people have done it. I already mentioned that Lighthouse, which is a common Ethereum client, already has code built in to connect to a relay.

Q. Do you know if the omakase validator used MEV-Boost?

A. I believe they did not.

Q. Turning to the MEV-Boost relay that you mentioned, is there something called the MEV-Boost relay?

A. Yeah. So there is a piece of software that's the, like, MEV-Boost relay code. And then there's a specific relay that is running that software that Flashbots is running, it's called the MEV-Boost relay.

Q. How does the relay, either Flashbots version or other versions, how does that relate to the Ethereum protocol?

A. So that's outside the Ethereum protocol. Anybody who wants to, can run a relay. And the Flashbots code is open source; you can just download it and run it. The relay specification is open; so if you don't like the Flashbots code, you can write your own code and run a relay.

Q. Do you know if the Flashbots relay was even involved in the trades at issue in this case?

A. I believe it was not.

MR. LOOBY: Joe, if you could pull up DX 5010, go back to page 3. We got it.

Q. Professor Falk, the box on the top right says "relay." Is this referring to a specific type of relay?

A. Yeah. I assume it's a relay following, sort of, the Flashbots spec.

Q. But is it necessarily the Flashbots relay?

A. No, it could be any relay.

Q. And there are multiple relays on the market?

A. There are multiple competing relays.

Q. And their software, can it be -- or their code, can it be customized?

A. Yeah, it can easily be customized.

Q. And we discussed this earlier, but a validator, it can call a relay for a block if it wants to?

A. Yes, it can.

Q. Once the validator calls the relay, does that limit the

possibility of taking transactions from the other sources on this chart?

A. No, not at all.

Q. Why would a validator query the relay in the first place?

A. In hopes of getting a block that would be more profitable for it than any block it could produce itself.

Q. If the relay's block is not the most profitable block for that validator, can the validator just make its own block?

A. Yeah, it can. And you would expect a rational validator to do that. And as I've mentioned, you know, the Lighthouse code does that for you by default.

Q. Does the validator opt into the MEV-Boost ecosystem when interacting with a relay?

A. No, there's no, sort of, way you opt into the MEV-Boost ecosystem; that's, sort of, a very vague concept anyway.

Q. Does the validator need to agree to any terms of use before interacting with the relay?

A. No, there's no terms of use to interact with a relay.

Q. Does the validator need to agree to do anything before interacting with the relay?

A. No, there are no agreements between the validator and the relay.

Q. Is there what's called a registration step though?

A. Yes, there is.

Q. What is the point of registration?

A. Yeah. So I've said that the point of querying a relay is to get some money. How do you get money? The block builder is going to pay you to take their block. In order for them to pay you, they need to know what address to pay you at. So before the builder builds a block, they have to know where you should get paid. And the point of registration is for you to tell the relay and the relay to tell the builder where you want to get paid.

Q. With whom does the validator register?

A. The validator registers with the relay.

Q. Does the validator register with MEV-Boost?

A. No, the validator registers with a specific relay. And if you want to register with more than one relay, you can. But the relays don't talk to each other; there's no, like, overarching MEV-Boost that you can register with.

Q. Does the validator register with Flashbots?

A. No, the validator does not register with Flashbots; they register with individual relays.

MR. LOOBY: Joe, if you could please pull up 3219 again. Everyone's favorite exhibit. Go to page 2.

Q. Professor Falk, is this the portion of the API document that we looked at before that relates to the registration step?

A. Yeah. So here we see the request body; so this is what you send to the relay when you want to register.

Q. And in the black box underneath "Request Body," there are

different lines, the first one being fee recipient. What are these?

A. Yeah. So this is saying what a validator would send to the relay. And it has two parts; it has the message part and the signature part. And the message has four subparts: It has a fee recipient; so this is the address where the validator wants to get paid. It has a gas limit. And in Ethereum, transaction complexity is measured in a unit called gas. And so every block has a gas size. And so gas limit is saying, I don't want the relay to give me blocks that have more than this gas in it. So I don't want blocks that are too big. It's like an upper limit on the block size you are willing to get. And there's a time stamp of, like, when you sent this request. And then your public key. "Pubkey" means like the public key of the validator who's sending this request.

Q. Do these fields in this message body have something in common?

A. Yeah. So they are all just registering the validator preferences.

Q. Is that preference for how the validator will get paid?

A. Yeah. So the key field here is the fee recipient of where the validator will get paid. The gas limit is just a way of saying, Please don't send me enormous blocks. The time stamp is just there so you can overwrite your preferences, right. So I may register with a relay and then realize, actually, I want

to get paid somewhere else and I want to send again. How will the relay know which one is the new one? Well, the one with the later time stamp is newer. So the time stamp is just a way of overwriting your old preferences.

Q. Why does the relay need this information?

A. Because the relay needs to give your fee preferences to the builder, so the builder can insert a payment transaction into the blocks it builds.

Q. Is this registration message a commitment for the validator to call the relay later on?

A. No, not at all. And it's very natural to register with a relay and not call it again.

Q. Is the registration message here a commitment for the validator to do anything at all in the future?

A. No, it's not a commitment to do anything; it's just a way to express their preferences to a relay.

Q. Now, this portion of the API document, this end point, does it govern what a validator can do if it does decide to call the relay?

A. No, not at all. That's not the point of API documentation.

MR. LOOBY: Joe, if we could go to page 3.

Q. Professor Falk, how does a validator request a block from the relay?

A. Yeah. So they call this get header end point, which we see here.

Q. Is that the blue box that says "Get"?
A. Yes, it is.
Q. And does this "Get" box, does it tell you something about the purpose of this?
A. Yeah. So we saw the last one was called a post end point, and this is a get end point. So you're really not sending it much information; it's really about getting information rather than sending information.
Q. And does this end point tell a user about the format of a request that it should send?
A. Yeah. So it says, If you want to query this end point, you should put the slot number inside those curly braces; and the parent hash, so the previous block, the parent of the block you're interested in; and then the pubkey of the current validator -- the public key of the current validator, yeah.
Q. Okay. So a user could essentially copy and paste this address, populate some of those fields that are in parentheticals, and hit enter?
A. Yeah. So if you prefix this with the address of the relay you like, like, you know, flashbots-relay.flashbots.net, and then slash ETH V1 builder header, and then you put in a slot number and a parent hash and a pubkey and the slashes, you could go there with, you know, Firefox or Internet Explorer and you'd get a response.
Q. Could I do it right now on my iPhone in this courtroom?

A. You could do it right now with your iPhone. You would have to know the current slot number, which I don't know off the top of my head; it changes every 12 seconds.

Q. Is all of that information that you would have to input, is that publicly available information?

A. Yeah, it's public information. It would be hard to, sort of, type that in because you'd have to find the pubkey. So it's meant to be called programmatically, but if you were fast, you could copy/paste it in and get it in your phone.

Q. I assure you I am not the right person for that job.

So what does a relay do in response to the get header command?

A. It sends back an execution payload header which -- in the format that's described below.

MR. LOOBY: Joe, if you could go down. Okay.

Q. And Professor Falk, help orient us, where is the message that comes back from --

A. So it's in this black box that says "example value."

Q. Does the relay send this same information in this box to anybody who asks for it?

A. Yeah. So it will send information in this format to anybody who asks. It will always respond in the same way, right. It doesn't ask who you are or who's querying it. This is an example response; so the actual parent hash will be different, but it will have a field called parent hash. And

the actual fee recipient will be different, but it will respond in the same way no matter who calls it. It doesn't ask for identification in any way.

Q. Does calling the get header command for the relay convey any information to the relay?

A. No, not at all. I mean, just, I guess, that you are interested in what this header is. But --

Q. If the party calling the get header is the validator, does calling this end point commit the validator to do anything with respect to the block?

A. No, not at all. And we've talked about that there's a very standard workflow where you would call get header and not like the fee that's being proposed, and then never do anything with it.

And this would happen a lot if you called multiple relays and one of them has a higher fee than the other, then you would not continue on with the relay that offered you the lower fee.

And, similarly, if you built your own block and you could make more money that way, you would essentially discard this header after you saw that the fee was insufficient.

MR. LOOBY: All right. Joe, you can pull that down.

Q. And just to orient us where we are in the point of the process, where the validator has registered, the relay has been called, and it has returned a message in the format along the

lines of what we just saw, what is that message sometimes called that we were looking at?
A. The response?
Q. Yes.
A. Sorry, can you repeat the question?
Q. Yes. Does the response from the relay have a name?
A. For the get header?
Q. No, the message that comes back from get header.
A. It's sometimes called the blinded block header or -- yeah.
Q. And what is the purpose of the blinded block header?
A. So it gives some information about the -- about the block that the builder has built. But it's called blinded because it only has the hash, essentially, of all the transactions in the block; it doesn't include the actual transactions, it just includes like the fingerprint of the transactions.
Q. And what would happen if you didn't have the relay in this situation?
A. So Flashbots built this relay because it was understood that both the builder and the validator are trying to extract MEV. And if the builder just handed a block to the validator, that the validator would extract all the MEV for themself.
Q. And what's the relay's role in this process then?
A. So the relay's role is to ensure that before the validator sees the underlying transactions, they signed this block header. And that ensures that if they ever sign another block

header, they will be slashed.

Q. And how does the relay accomplish that role as a technical matter?

A. So it receives the full block from the builder, and then it passes the blinded block to the validator. The validator can sign that blinded block header if it wants. It then checks the signature to make sure that it's a valid signature. And then it releases the block body to the validator.

Q. And you mentioned the slashing. Is that the same economic incentive that we were talking about before?

A. Yeah. So Flashbots doesn't have its own incentives built in; it's piggybacking off of the Ethereum incentives. So that's the same slashing for equivocation in Ethereum.

Q. If a validator signs another block after signing the relay's block, will it be slashed?

A. Yes.

Q. Will that slashing penalty work to discourage the validator?

A. Yeah. In most cases, that's enough to discourage a rational validator from proposing a second block.

Q. Is that true in all cases?

A. No. If there's more MEV to be extracted by proposing a second block, you would expect an economically rational validator to do that.

Q. Now, just one point of clarification, Professor Falk. Our

discussion of the relay's role thus far, has it concerned the relay as existed before April 2nd, 2023?

A. Yes.

Q. Did the relay's role change after April 2nd, 2023?

A. Yes, it did.

Q. How did it change?

A. So Flashbots modified the relay to wait to return the block body until after they had sent the signed block header to some set of attesting validators and gotten a response.

Q. And what did this change accomplish?

A. So this meant that a group of attesting validators had already seen this signed block header. And so they would be less likely to accept a second block that was signed by the validator.

Q. Did this change make it impossible for the validator to equivocate and sign another block?

A. No. I mean, you can always sign as many things as you want. If you're a validator, you have your signing key, you can sign as many blocks as you want. This change made it less likely that this second block would be accepted by the other validators, but it doesn't prevent you from signing more.

Q. Does that relate to the concept of economic incentives that we've been discussing?

A. Yeah. So now if you wanted to run a strategy like this, you have to take into account the fact that if you propose a

second block, you are going to get slashed with almost 100 percent probability; but your new block will only be added to the chain with a very low probability. And so now you have to weigh the low probability of some MEV gains against the, sort of, known probability of the slashing penalties.

Q. Now, going back to before April 2nd, 2023, was it the relay's role to publish a valid block to the network?

A. No, I think the incentive to publish the block is on the validator side because they're the one who stands to lose the most if the block is not published.

Q. And what is some evidence of that aspect of the relay's role?

A. The Ethereum incentives are designed to incentivize validators to publish blocks, and the relay is not supposed to be an economic actor.

Q. And remind the jury, who is ultimately responsible for publishing a block under the Ethereum protocol?

A. It's the validator.

Q. And was the relay's role publicly -- as you have just discussed it, was it publicly disclosed prior to April 2nd, 2023?

A. Yes, it was.

MR. LOOBY: Joe, if you could please pull up DX 321-A, which is in evidence. With the Court's permission, we would publish.

THE COURT: You may.

Q. While we're on page 1, Professor Falk, do you recognize this document?

A. Yes, this is an archived version of some Flashbots documentation.

MR. LOOBY: And, Joe, if we could please go to page 6, I believe. And, Joe, if you could highlight the sentence that starts with "Once," the two sentences there.

Q. And, Professor Falk, will you read those two sentences for us?

A. Yes. So it says: Once the validator signs the header, the relay sends the block payload to the proposer. If at this moment the validator decides to propose a different block, they will have signed two blocks and will be slashed.

Q. Is this paragraph talking about the relay's role prior to April 2nd, 2023?

A. Yes, it is.

Q. And what is it disclosing about that role?

A. So it's describing that the role of the relay is to ensure that if the validator proposes a different block, then they will incur this slashing penalty.

Q. Is the role of the relay to make it impossible for the validator to propose that second block?

A. No, there's no way to make it impossible. The validator can always propose another block. And so this is designed to

impose some economic penalties for proposing a different block.

Q. Now, this fact that the validator could always sign another block, this is publicly disclosed information?

A. Yeah, so this is publicly disclosed information. It's also sort of known to everybody in the cryptography space who kind of knows how signatures work, that you can always sign more stuff.

MR. LOOBY: Joe, if you could pull this down.

And then please pull up DX 309, which is also in evidence. And with the Court's permission, we would publish.

THE COURT: You may.

Q. Professor Falk, do you recognize this document?

A. Yeah, this is an archived version of the Flashbots FAQ.

MR. LOOBY: And, Joe, if you could go down to the question: What prevents block proposers from stealing MEV from submitted builders' blocks?

Q. Professor Falk, do you see that question?

A. Yes, I do.

Q. And what's the answer to that question?

A. It says: Slashing penalties.

Q. Okay. Does this publicly disclose the relay's role as you and I have discussed it today?

A. Yes, it does.

Q. What exactly is it disclosing about the role?

A. It's explaining that the relay's role is to ensure that if

a validator proposes another block, that it will be slashed.

Q. And, again, how does the relay fulfill that role as a technical matter?

A. So it requires the validator to sign one block header before releasing the payload.

Q. And does that existence of the signature relate to the slashing penalties that we discussed?

A. Yeah. So Ethereum, in order to slash a validator, you can't rely on somebody's claim that they were slashed; you need evidence that they equivocated. And the evidence is two signatures.

So the relay has gotten one signature from the validator. And that means that if the validator proposes another block, there will be two signatures, and that's evidence of slashing -- evidence of equivocation.

Q. And I want to draw your attention to the last paragraph -- the last sentence of this paragraph here, which I'll read this time, which is: This penalty is significant enough to discourage this behavior, allowing the builder to reveal the blinded transactions without the possibility of the proposer tampering with them or stealing MEV.

Do you see that?

A. Yes, I do.

Q. And what concept is this sentence capturing?

A. This is capturing the economic incentives here. They are

talking about a validator who's weighing the economic penalty or the economic cost of being slashed against the economic gains of extracting more MEV.

Q. And do you see the phrase here "stealing MEV"? What is your understanding of how that's used there this context?

A. Yeah. So that's a pretty standard terminology that the MEV space is very competitive and it's mostly zero sum game. And so when there are MEV opportunities and there are people fighting for it, usually one person says, I stole the MEV from somebody else. So there's a victim trader that's going to get sandwiched. Only one sandwich bot can sandwich them. And one sandwich bot is going to steal that opportunity from the other. Might say, like, if you're playing soccer, you steal the ball from somebody else because it's a competitive environment.

Q. And in this sentence it says: The penalty is significant enough to discourage this behavior. What is "this behavior"?

A. Equivocation; so publishing another block.

Q. And, again, is that sentence accurate in all cases?

A. No. If the MEV opportunity outweighs the slashing penalty, then this slashing penalty is not enough to discourage the behavior.

Q. And the sentence goes on to say: Without the possibility of the proposer tampering with them. Is that accurate?

A. No. So I mean -- well, it depends a little bit what you mean by "tampering." So once a block is signed, you cannot

modify that block. Of course, you can sign a new block. Some people might call that tampering, but, sort of, literally you didn't tamper with the original block. It's still there. If you want to think could you publish a new block, of course, you can do that.

MR. LOOBY: Joe, you can take that down.

Q. Professor Falk, are you familiar with something called a commit-reveal scheme?

A. Yes, I am. Commit-reveal schemes are very common in cryptography.

Q. Broadly speaking, what is a commit-reveal scheme?

A. So commit-reveal schemes were designed to allow essentially untrusted people to engage in some kind of, like, economic activity together. The original paper was called, like, coin flipping over the phone.

But the idea was suppose you wanted to say, like, bet with somebody. Suppose you want to play, like, rock/paper/scissors with somebody. And if I throw scissors and you wait to see what I throw, then you're going to win every time.

And now, if you're on two separate computers, right, how can I send, sort of, my action and then, like, know that you're not going to wait for me, right? Whoever goes second is going to win this game.

So we need some way where I can essentially, say,

throw scissors, and I commit to this in a way that commits me to it, but is hiding it from you.

And after I've committed, so what I'm going to do is, like, I'm going to write down my throw on a piece of paper and put it an envelope, and I'll put it out there. And then you can decide, you know, I'm going to throw paper. And once you've thrown paper, now I can open my commitment and you can be sure that I didn't change my value, right. I didn't change my value. And now we can play this game.

And so these commit-reveal schemes are crucial in this area where we want to, sort of, you know, gamble or play some games. But people are, you know, anonymous and they are at a distance from each other.

Q. When used in the blockchain context, what type of commitment is involved in this situation?

A. Yeah. So a cryptographic commit is like a formal cryptographic primitive that has these properties that it should be hiding, so it should, like, hide my choice. And it should be binding; so it should bind me to this choice.

(Continued on next page)

Q. And when the word commitment is used in cryptography, does it typically have this special meaning?
A. Yes, it does.
Q. Does the MEV-Boost relay implement a commit reveal scheme in the cryptographic sense?
A. No, it does not.
Q. Why?
A. Well, it's fundamentally very different. In the commit reveal scheme, the person who commits is the one who later reveals. And some people casually call the MEV-Boost relay kind of a commit reveal scheme because there's a point where the relay reveals the block body, so there's this sort of reveal step. And beforehand there's the step of signing the block header, which you could think of as like committing yourself to being slashed if you published another block. But that's not really how commit reveal schemes work in cryptography where the person who commits is also the person who reveals.
Q. When used in cryptography is this commitment, can it be properly conceived of as a commitment to do something in the future?
A. No. So a commitment is like a commitment to a value, to say, I can't change this value, but in cryptography, you can never commit to sort of do something in the future. That's like a human action. There's no cryptographic mechanism to say

I'm not going to do something in the future.

Q. In the context of the MEV-Boost relay and the validator, is the validator's commitment, so to speak, on the relay's block, does it prevent the validator from signing a different block?

A. No, not at all. So if you want to make this analogy to a commit reveal scheme and you want to say that this signature on the block header is a commitment, you cannot change that signature, so that's true. But it's not a cryptographic commitment because it's not hiding anything. And you can always sign something else. That's sort of the nature of digital signatures.

Q. In this context, has the validator committed to putting any particular block on the chain by signing it?

A. No.

Q. Why do we know that?

A. Because one is they just fundamentally have the ability to sign anything they want. Two is we just saw a bunch of Flashbots documentation, which described what would happen if they signed another thing, so we know Flashbots thought about this?

Q. In your answer now, what is the function of the validator's signature?

A. The validator's signature is to ensure that if they were to publish another block, they would get slashed.

Q. What function generally do digital signatures have in

Ethereum?

A. Yeah. So digital signatures are used all throughout Ethereum and through pretty much every other blockchain. You need them to know sort of where a message came from. As an Ethereum user, I want to make a transaction, I have to sign it, and that's so that everybody knows that it came from my account and that it wasn't tampered with along the way. If you change my transaction a little bit, then that signature won't be valid. And you'd know everybody along the way would want to change my transaction because if I sent a payment to somebody here, sent a payment to Patrick, pretty much everyone along the way would prefer that payment went to them. And if they tried to change that, that would make that signature invalid. So you need to know that signature has not been changed along the way.

And that goes for the validators too. When a validator proposes a block, they have to sign it, and that's when the other attesting validators know it came from the proposing validator. We would all like to propose a block because there's money in it. But I wasn't chosen as the slot leader because I didn't stake any ETH, and so I cannot sign a block. But if there were no signatures, of course, I would just propose all the blocks and take all the rewards.

Q. Does a validator's signature play a role in enforcing Ethereum's economic incentives?

A. Yes. So as I said before, like if a validator signs two

blocks, now there is sort of concrete evidence of equivocation, and you can write a little program. And Ethereum has this built in, that when you see two valid signatures on two blocks at the same height, then you can slash that validator.

THE COURT: Mr. Looby, we are right at 12:45. Do you want to wrap up?

MR. LOOBY: Yes. Two more questions, your Honor.

THE COURT: Thank you.

Q. Does a validator's signature have to be valid in order for a slashing to occur?

A. Yeah, absolutely. Again, I could make an invalid signature on somebody else's behalf. So in order for it to be actual evidence of equivocation, you need to know that both the signatures came from the proposing validator, so they both have to be valid signatures.

Q. When a validator signs two blocks or more in one slot -- for a block in one slot, is one signature more valid than the other?

A. No. They are both just valid signatures. Signatures are sort of binary. They are either valid or they are not.

THE COURT: Thank you, Mr. Looby.

We're going to take our lunch break. It's about 12:45. Please be back in the jury room and ready to go in an hour. My former instructions apply. Have a nice lunch, and I'll see you this afternoon.

(Jury not present)



Court Exhibit 32 3071
PB3RPER3 Falk - Direct

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300



Court Exhibit 32 3072
PB3RPER3

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300



(Jury present)

THE COURT: Please be seated. I hope you all had a nice lunch. We're going to continue with witness testimony. Professor Falk can come back down to the witness stand.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you. Joe, if you could kick things off for us by bringing up GX 319 and going to page 4.

BY MR. LOOBY:

Q. Professor Falk, this is the builder API document that we were discussing earlier, and there was one question that I neglected to ask you, which is: Do you see here the two fields parent hash and state root?

A. Yeah. So --

Q. Are they -- so let me ask the question. Are these two fields different than the parent root and the state root on the signed beacon block sent by the validator?

A. Yes, they are different. This is showing the response from the relay to the get header request. So these are the parent hash and state root that are filled in by the builder and sent through the relay. And then on the other side, so this is a block for the execution layer. The validator is going to produce a block for the consensus layer, and that block will have a parent root and a state root that are different fields.

MR. LOOBY: Thank you, Joe. You can take that down.

Q. Professor Falk, we talked about validators and relays, but who are some other players in the MEV-Boost ecosystem?

A. So there are searchers and builders.

Q. What's a searcher's role?

A. Searchers are people who search the mempool and other sources of transactions looking for MEV opportunities.

Q. What kind of an Ethereum user is a searcher?

A. Searchers tend to be pretty sophisticated because searching is very competitive.

Q. Are searchers engaged in MEV strategies?

A. Yeah. So that's the primary role of searchers is they come up with some MEV strategy, and we can think of like arbitrage. So if you have an idea that you want to make arbitrage profits, you can look for certain exchanges where you think there might be arbitrage opportunities. And then you would write some bots that scan on different exchanges, and when a transaction comes, that transaction might change the price on one exchange, and

then your bot would automatically make transactions to buy at a low price and sell at a high price.

Q. Mechanically how would a facilitator implement an arbitrage strategy like that?

A. So an arbitrage strategy is sort of clean, that you say, I want to buy at a low price. So if you notice a price discrepancy, I would buy at a low price and sell what I bought at a high price. On Ethereum, I can put both of those into a single multi-step transaction, and sign it and send it to block builder.

Q. And both the buy and sell trade in that strategy, do they belong to the searcher who is placing the trade?

A. Yes. So if I were building an arbitrage bot, I would be buying at a low price and I would be selling at a high price. So they are both my trades, so I can put them into a multistep transaction in Ethereum because they are both mine.

Q. So I think that answer gets at what I was going to ask you next, which is: When we use the word transactions, in this context that can mean something that contains more than one trade?

A. Yeah. So on Ethereum, a transaction is sort of the fundamental building block, but a transaction may not be just one trade. A transaction can be multi-steps. And so I can program a smart contract to do a whole bunch of things in a row, and when I call that smart contract and ask it to do

something, that one transaction might execute a whole bunch of things. It might say I want to borrow some ETH and then use that ETH to buy USDC and then use that USDC to buy some more ETH, and then I can use that ETH to repay the loan of the ETH I borrowed. And I can do that all in one complicated transaction if I preprogrammed a smart contract to do that for me.

Q. Is there a word for that type of multi-trade strategy within a single transaction?

A. Yeah. So Ethereum, a transaction, no matter how many steps it has, it either executes completely or fails. It reverts is the terminology we use. So if I make a multi-step trade and one part of it doesn't go through for some reason because I try to buy something that doesn't exist or I ask for a price that I can't get, the entire trade will fail. And that's really nice because it means on Ethereum, I can do what's called riskless arbitrage.

In the real world, I try to buy low and sell high. I might buy low and maybe the price has changed over here and I'm stuck with a thing I don't want. But on Ethereum I can put these into a single transaction where I buy low and sell high. If the sell fails, then the buy won't go through either. That is because on Ethereum transactions are called atomic. They are indivisible.

Q. Maybe it's from the name itself, but how did atomic strategies get their name?

A. This is from physics. The idea that we're all built of molecules. If you break the molecules down to atoms, at one point we thought atoms were sort of the smallest building block of matter, so we call transactions atomic when they can't be further subdivided.

Q. What is another common MEV strategy that searchers can employ on Ethereum?

A. So we talked a lot about sandwiching. So sandwiching is another common strategy.

Q. OK. How does a sandwich attack work at a high level?

A. Yeah. So the idea of a sandwich attack is that any time somebody buys a token from an exchange, they push the price up. So a sandwich bot will search the mempool or some other source of transactions for a victim who is buying a token, and they will place a front-run trade to inflate the price before the buy, and then they'll let the victim buy to inflate the price a little more. And the sandwich bot will back-run and sell the tokens they just bought, and they can sell them at a slightly inflated price because the victim in the middle inflated the price a little bit more.

Q. And that victim trade in the middle, is that a trade that the sandwiching bot itself places on the Ethereum network?

A. No. So that trade is not from a sandwich bot. That's a trade from some trader and some user, some other person.

Q. Does the victim's trade belong to the sandwich bot?

A. No. So the victim's trade is an Ethereum transaction that was signed by the victim, and the -- it's not from the sandwich bot.

Q. Are the series of transactions within a sandwich attack atomic?

A. No, in Ethereum, you can only have a single transaction as the atomic unit, and you cannot make the transactions from different people atomic. There's no way to bundle them together in Ethereum.

Q. Is the concept in a bundle even a concept under the Ethereum protocol?

A. So bundles are not a thing under Ethereum. They're just transactions and a transaction is always originated by a single person. You can't have a group of transactions from multiple people that are attached together in Ethereum.

Q. What does a sandwich attacker do with its bundle once it has identified the transactions it wants to include?

A. So Flashbots introduced the concept of a bundle, and so a searcher can create a bundle of transactions, like the front-run the victim and back-run. And they can send them to a builder, and they can request that the builder put them in a block all consecutively.

MR. LOOBY: Joe, if we can please pull up GX 3002-A, which is in evidence, and with the Court's permission, publish it for the jury.

THE COURT: You may.

Q. Professor Falk, do you recognize this document?

A. Yeah. So this is a page from the Flashbots documentation GitHub.

Q. What is this page relating to?

A. This is relating to, I think, the MEV-Geth specification.

MR. LOOBY: Let's go, Joe, if we can, to page 2 and focus on lines 9 through 17. Excellent. That's good enough.

Q. Professor Falk, what are we looking at here?

A. Yeah. So I think we've heard before, but basically before Flashbots built MEV-Boost, when Ethereum was still proof of work, they had a product called MEV-Geth. And MEV-Geth was a piece of software that an Ethereum miner could run. And there MEV-Geth allows searchers to send bundles to the miner.

Q. In MEV-Boost, who does the searcher send the bundles to?

A. So when Ethereum moved to proof of stake and Flashbots created this MEV-Boost protocol, and now there's a separate notion of the builder and the searcher sends a bundle to the builder.

Q. Does this transmission have a name?

A. Yeah. So the searcher would use this ETH send bundle request to send a bundle to the builder.

Q. And do we see that ETH send bundle around line five?

A. Yea. So here we see a description of this ETH send bundle command that the searcher can use to send a bundle to a

builder.

Q. Now, this document that we're looking at, does it function like the API that we discussed this morning?

A. Yeah, so this is like the API documentation, which says, here is a description of why you would use ETH send bundle, and then here are the fields that you would send if you want to send to a builder, which a builder is just going to be some computer somewhere, so you have to send it in the format it's expecting. And here is exactly what it's expecting when you call this ETH send bundle command.

Q. And does this document tell us the information about what searcher conveys to the builder?

A. Yeah. Yes, it does.

Q. What is it telling us?

A. So here we see you send a list of transactions that you want in your bundle. You send a block number, which is the block number you want your bundle to land in. You put a minimum and maximum timestamp, which is like basically the timestamp of the block, so it's just a time window when you hope that these would land. And the final thing is just these reverting transactions, which to say, I want this bundle to land all together, and it's OK if some of them fail. Or you could say, I want all of them -- I only want them if they all execute together, or you can say, I'm OK if some subset of them fail, and you can specify that in the transactions.

Q. Does all this information add up to the searcher's preferences regarding their bundle?

A. Yeah. So this is the command that the searcher uses to communicate their bundle preferences to the builder.

Q. Does the builder have to honor those preferences from the searcher?

A. No. So what we've heard before is that the builder and the searcher have what's called a trusted relationship, so there's no cryptography that's protecting their interaction. And it's basically reputation, so when you send -- when a searcher sends to a builder, the builder could, in principle, do whatever they want and unbundle and extract MEV for themself. They do not do that because there are very few builders and they have a reputation. And as soon as you started doing that, you would lose all your customers. Searchers would stop sending to you if you unbundle their transactions, and so builders are incentivized not to do that because they want to protect their reputation.

Q. How does that trust relationship between searchers and builders compare to the relationship between searchers and validators?

A. So validators in Ethereum are considered untrusted. There are over 1 million validators on Ethereum, and anyone can sign up to be a validator because it's a permission-less system. Right now there are two buildings who build over 85 percent or

so of blocks on Ethereum. So they have a sort of long-term reputation to uphold. If you are one of the two builders and somebody sends you a bundle and you start unbundling, you will lose all of your revenue.

Q. Does this request from the searcher to the builder ever get conveyed to the validator?

A. No. So this never gets conveyed to the validator. This is just a communication from the searcher to the builder, and there's no way for the builder to convey sort of bundle preferences to the validator.

Q. Does this request from the searcher to the builder even get conveyed to the relay?

A. No. So when the relay is in place, we see the searcher sends a bundle to the builder. The builder produces a block where there's no information about bundles, and they send that to the relay. So the relay sees nothing about bundles, and the relay sends a block to the validator. The validator also sees nothing about the underlying bundles.

Q. Does the message get sent to anybody but the builder?

A. No. This is just a message from the searcher to the builder.

MR. LOOBY: Joe, if we could please take this down exhibit and pull up DX 5010, this time on page 4 of the slide to show. There's more nifty animation, but we'll just get to the point.

Q. Professor Falk, what does this show?

A. This shows the sort of flow as transactions move from the mempool to searchers to builders to relays.

Q. All right. Let's start with the far left. What's going on over here in that third of the diagram?

A. So this is supposed to -- I sort of represent there are users who may be anybody. They could be people or institutions or bots. They send signed transactions to the mempool, and the transactions of the mempool are gossipped around between the Ethereum validators. And then there are sandwich bots who sort of scan the mempool looking for arbitrage opportunities or sandwich opportunities.

Q. And Professor Falk, each of the transactions that are floating in this mempool, they have a little thumbprint image on them. What does that represent?

A. In Ethereum, every transaction has to be signed by its creator. That way everybody knows who originated that transaction, so every transaction in the mempool is signed.

Q. Are all of these signed transactions in the mempool atomic as you have explained to the jury?

A. Yeah. So in Ethereum, every transaction is atomic. Like that is the atomic unit. There are no transactions that are not atomic, and there's no group of transactions that is atomic. Like the transaction is the atomic unit, and it's the only atomic unit.

Q. Moving to the middle, and we saw earlier there was an animation where this trio of transactions was taken out of the -- one of them was taken out of the mempool, and it was passed along this line, and now it's at the builder. Just to orient us.

Professor Falk, do you see the dotted red line around the three transactions in that portion of the slide?

A. Yes, I do.

Q. And what does the dotted red line represent?

A. That is, I think, supposed to represent a bundle; that the searcher put those three transactions together in a bundle when they sent them to the builder.

Q. And each of those transactions in that bundle, they each have an individual thumbprint on them. What does that represent?

A. Every transaction in Ethereum always has to be digitally signed, so all of these three transactions are also digitally signed.

Q. Is there a thumbprint on the bundle?

A. No, because the bundle is not a transaction. It's not a thing in the Ethereum. There's no signature around the bundle as a whole. There's just signatures on the individual transactions.

Q. Now, going further to the right, now we're at the relay. The dotted line is gone. Why?

A. When the builder sends a block to the relay, there's no longer bundle information. They just convey the block, and the block has transactions in it. But there are no bundle boundaries that the relay can see.

Q. Again, is this bundle atomic?

A. This bundle is not atomic. These transactions are the only atomic thing in Ethereum.

Q. And I know the validator is not on this screen, but when the block with the three transactions, if it were to make it to the validator, would the validator be able to see the bundle?

A. No, because the bundle is already gone by the time it gets to the relay, and the validator cannot see any bundles.

Q. While we're on the topic of sandwich attacks, what is the nature of the trading environment on Ethereum?

A. So MEV in general is extremely competitive. There's a lot of money, and it's available to whoever is sort of the fastest at getting it. And so it's super competitive and super adversarial.

Q. What type of users are sandwich attackers?

A. Sandwich attackers have to be very sophisticated. You have to understand the type of transactions you can sandwich, and you have to write sandwich bot code that can quickly identify these transactions and very quickly make these trades automatically.

Q. Is this big business?

A. Yeah, this is. There's lots of money in MEV. I think we've heard that on average there's maybe .1 ETH of MEV per block, and that's an average, but there's a block every 12 seconds. So there's 3,600 blocks every 12 hours, and 72 blocks every single day, so that's 7,200 ETH of MEV to be extracted every day. At prices of like $400,000 an ETH, it's like $2.8 million a day being extracted in MEV that's sort of available to whomever is able to capture it.

Q. And that's every day?

A. That's every day on average.

Q. Can just anybody compete in the MEV space?

A. So in principle anybody can compete. Ethereum is permission-less. Anybody can write code. When I teach about MEV, all the students are, wow, this is great. There's millions of dollars on the floor. Let's all write MEV bots. I usually try to discourage them because I mean, first in terms of sandwiching, it's not a sort of nice activity, but the space itself is also extremely competitive. Most of my students, I think, couldn't write code that could be competitive in this space, and it's also very risky. Sandwich bots usually lose money.

Q. Have sandwich bots attacks inspired countered strategies on the Ethereum network?

A. Yes. Sandwich bots regularly attack each other, and they are attacked by other people competing for the same MEV

opportunities. This is a zero-sum game among some really highly sophisticated actors. So they're always trying to essentially take MEV opportunities from each other.

Q. Professor Falk, does the mempool have a nickname?

A. Yes. So a lot of people call the mempool a dark forest. There was like a really influential blog post by a researcher named Dan Robinson who said if you're in mempool, it's like a dark forest. And that comes from -- there was a Netflix show called the "Three Body Problem" that came from a series of the books. In the sci-fi books, the second book was called "The Dark Forest," and the idea being why like don't we see other sentient beings in space, and it's because there are these apex predators in space as soon as you identify yourself, you are immediately killed. And so everybody who has identified themself has been destroyed, and the mempool is kind of like that. Once you put your transaction there, you should expect to be torn apart.

Q. And what does that tell us about the MEV ecosystem on Ethereum?

A. It's extremely competitive and extremely adversarial.

Q. Does this competition for MEV happen out in the public view?

A. It's fairly public that the MEV pool itself is public, and although you can't see individual sandwicher's strategies, once a block lands on the blockchain, then we said all Ethereum

transactions are public. And so you can see all the successful sandwiches. It's not super easy to see all of the failed sandwiches. So, again, for a sandwich opportunity, there's probably lots of bots that are trying to sandwich it, and only one of them can. It's fairly complicated to see all the failures because those don't actually execute, but yeah, it's pretty public.

Q. Do participants in MEV strategies take actions to enhance their privacy?

A. Yeah. So in most trading environments, you don't want your competitors to kind of know too much about your strategy or your identity, and so it's pretty common for people in the blockchain space in general to try to hide their identity especially for active traders.

Q. What are some ways that they can do that?

A. So Ethereum itself is what we call pseudonymous. So your name is not associated with anything but your address is, and so you can take basic steps to hide your addresses. You can use multiple different addresses and keep rotating what addresses you use. For individuals in the space, a lot of people use pseudonyms because they don't want people on the street to know that they have lots of crypto because that would expose them to physical attacks. People come in, break into their house, and try to steal their crypto wallets. To try to hide your transactions, you can use mixing services that try to

mix your money; that you can sort of take one address which you've used a lot, and get yourself a clean address with your money in it that people don't know is associated with you.

Q. I want to ask you a little more about pseudonyms. Are those used by prominent members of the Ethereum community?

A. Yeah, they're pretty common. I think we heard from Bert Miller's testimony that he went by MEV Senpai. And I heard actually podcasts with MEV Senpai. I didn't know it was Bert Miller until I actually heard his testimony.

Q. How about Samczsun? Is that a known pseudonym in the space?

A. Samczsun, I think, Bert Miller talked about him too. He is a prominent security researcher, so he writes -- whenever there's some kind of security incident, he writes some story about it. I've read tons of stuff by Samczsun. I have seen Zoom talks. In a Zoom talk, he covers his face with like an anime avatar and uses a voice modulator, so I don't know who he is, but he is very well known in that crypto space as Samczsun.

Q. How about Zachxbt?

A. He is a Twitter influencer. I don't know his real name, but he is super influential on Twitter about crypto stuff. He is actually so influential, people created a bot that is called AIxbt that is supposed to mimic him, and the bot now has half a million Twitter followers. So the copycat has half a million, and the bot recommends crypto tokens all the time. I wanted to

see if the bot was any good, so we scraped all of AIxbt's tweets and looked if his predictions were any good, and surprisingly they were pretty good.

Q. Professor Falk, the use of pseudonyms are not a way to guarantee anonymity, does it?

A. No, no. Pseudonyms are not a way to totally guarantee anonymity.

Q. We've been talking about Ethereum and MEV-Boost generally, and I'd like to ask you a few questions about omakase specifically. Are you familiar with the trading strategy with that name?

A. Yes, I am.

Q. In connection with omakase, we've heard testimony in this trial about allegedly bait transactions. Do you know what that term refers to in the context of this case?

A. Yes, I do.

Q. OK. And what are those?

A. So those are transactions that were created by the omakase bots. They were transit trades on Uniswap tools.

Q. And where were they when the sandwich bots encountered them?

A. They were in the public mempool.

Q. What information would be available to the bots when they encountered the trades there?

A. As I said, Ethereum is totally public, so the full

transactions are just available. Like there's everything about the transaction is in the transaction. There's no other information.

Q. How would a sandwich bot evaluate the transactions?

A. So because Ethereum is deterministic, usually the way bots would evaluate transactions is they would simulate them to see what they do because that's easier than actually -- as a human, you can kind of read the code in a transaction if you wanted to. If you want to do this automatically, it's hard to get a computer to read the code and tell you what it does. It's easier to just run the transaction and see what effect it has.

There's lots of tools for simulating Ethereum transactions. I use them all the time. I have my students use them all the time. As a sandwich bot, you can run a transaction and run it locally on your machine to see what effect it has.

Q. And does that simulation process involve making assumptions?

A. So a transaction doesn't execute alone. It executes in the whole context of Ethereum. And so when you make your stimulation environment, you have to guess what the environment is where you want to simulate this transaction.

Q. So what is one thing a bot could make an assumption about when running a simulation?

A. So you have to make -- given a transaction, I don't know

what block it's going to land in, and I don't know what -- say it's a transaction that trades on Uniswap. I don't necessarily know what the state of the Uniswap pool will be, how much money will be in the Uniswap pool at the time this transaction lands. And so I have to make some assumptions about what block it's going to land in and what are the state of other accounts it's going to interact with at that time.

Q. Can a bot run multiple simulations?

A. Yeah. You can run as many simulations as you want. Blocks happen every 12 seconds, and bots would typically run as many simulations as they can in the short time window that they have. Part of what makes this a competitive space is that you want to optimize your simulation environment so that you can simulate as much stuff as possible in the short time window you have.

Q. Will an Ethereum transaction behave exactly the same way if simulated under identical assumptions?

A. Yeah. As I said before, Ethereum is deterministic and this means like there's no randomness. There's nothing that can change. Ethereum transactions will always behave in the same way assuming that the things they are interacting with are in the same state as when they start.

Q. And is that true of the alleged bait transactions?

A. That's true of every Ethereum transaction, including the alleged bait transactions.

Q. By the way, Professor Falk, do you know whether or not those alleged bait transactions were added to the blockchain?
A. Yes, they were.
Q. What does that tell us about them?
A. That they were valid Ethereum transactions. They were put in blocks on the blockchain.
Q. OK. Moving along, I'd like to ask about and this is a little specific, but some fields on the signed blinded beacon block that the validator sends to the relay, if that's all right with you?
A. Sure.
Q. OK. We've heard about the parent root and the state root field. What is the role of the parent root field?
A. So the parent root is to give -- in a blockchain, the preceding block is the parent block, and so that gives information about what is the previous block in the chain.
Q. What about the state root?
A. And so Ethereum you can think of as what's called a state machine. It has millions of accounts on it, and these accounts have different balances. They could be different user accounts. The state root is a little fingerprint of the entire state of the blockchain at that given time.
Q. Was the relay even checking these two fields on April 2, 2023?
A. No. The relay did not check these fields at all.

Q. What does that tell us about the relay's role in the MEV-Boost system?

A. Well, we already saw documentation that said that the relay's role was to ensure that if a validator signed another block, that it would be slashed. These fields are not checked when you check for equivocation penalties, and they're not checked by the relay because they had nothing to do with slashing or equivocation.

Q. On April 2, 2023, was the relay checking the fields that were necessary to have a successful slashing?

A. Yeah. The relay was checking the fields that you needed to check if you wanted to get the validator slashed.

Q. Does the Ethereum protocol say anything about what a validator must put in the parent and state root fields on the signed blinded beacon block?

A. No, not at all. The validators are given complete control to do whatever they want. If they put various sort of mangled things in there, the other attesting validators will probably reject that block. But as a validator, you are allowed to put anything you want there, and in particular, if you put stuff in there that the other protesting validators reject, that's equivalent to you just not producing a block at all.

Q. Is there anything improper under the Ethereum protocol about a validator signing an invalid block?

A. No. There's nothing improper about that.

Q. Did the omakase validator sign the blinded beacon block header that it received from the relay?

A. Yes, it did.

Q. Was there a consequence for that?

A. Well, that meant when they signed another block, they were slashed.

Q. Was that signature by the omakase validator a promise not to publish another block to the chain?

A. No. That's not the way signatures work. That signature was basically to ensure that this specific block header came from this specific validator.

Q. Was the omakase validator's signature a representation regarding the accuracy of the parent and state root fields?

A. No. That's not the way cryptographic signatures work. In Ethereum or pretty much anywhere else, the signature is an assurance that this message came from this validator.

Q. Are you aware, Professor Falk, of allegations in this case that the bait transactions, so to speak, were not added in the sandwicher's proposed bundle order?

A. Yes.

Q. And was the block that the omakase validator received from the relay ever modified?

A. Well, again, this comes down to the word "modify," but once you've signed a block, you cannot modify that block. So in this case, the omakase validator produced a new block, but that

original block is still there and that original signature is still on the original block.

Q. And is that action of proposing a new block consistent with the validator's role under the Ethereum protocol?

A. As we have discussed, the validator can assign multiple blocks if it wants to.

MR. LOOBY: Joe, if you could please pull up GX 5012-AA, which is already in evidence, and with the Court's permission, we may publish.

THE COURT: You may publish.

Q. Professor Falk, do you recognize this document?

A. Yes. This is a screenshot of Etherscan, which is a public block explorer.

Q. What is it a screenshot of?

A. This is the block in question. This is the block that landed on the chain.

Q. So is this the block that the omakase validator proposed?

A. Yes. This is the block that the omakase validator proposed.

Q. Are the sandwich bot's trades on here?

A. Yes, there are.

Q. Can you identify some of those for us?

A. Yeah, I can. This is a list of transactions. It says there are 24 transactions totaled in this block. The way this is displayed is the bottom ones execute first, so you think of

this as executing bottom up. If you look at the top three here, those top three, the top one would be the sandwich bot back-run. And then the transaction from the omakase validator, and then the sandwich bots front-run is the third one down.

Q. OK. And is there anything to demarcate the bundle preferences of the searcher on the block?

A. No. As we've said before, by the time the block gets to relay and then to the validator, there are no bundles there. And Etherscan is just taking these blocks from the public Ethereum blockchain. So there are no bundle delineators on Etherscan either because they are just not on the chain.

Q. Let's start with the front-run trade, which I believe you said was the third one down in this sandwich bundle. Did that front-run trade go through as coded by the sandwich bots?

A. Well, in general, every transaction goes through as coded. You can't change a transaction. They all go through as coded, but, yeah, that one went through. It bought from the pool just as the sandwich bots intended.

Q. And same with the back-run transaction up above, did that go through as coded?

A. So this also depends on what you mean by "go through." We see that red exclamation point there. That means the transaction reverted, so that means the transaction was put on the chain exactly as the originator, in this case the sandwich bot, intended. But it means that the sandwich bot put in logic

into their transaction that they did not want to sell if they did not get a price that they liked, so they chose to revert their transaction rather than sell.

Q. Did anything the omakase validator do alter or modify either of these trades?

A. No. You can't modify other people's trades because they have a digital signature on them.

Q. With whom did the sandwich bot trade in the front-run trade?

A. We've heard these were all trades on Uniswap, and Uniswap is one of the most popular what we call decentralized exchanges. And the way Uniswap works is you trade with the pool that is called peer-to-pool model, as opposed to a peer-to-peer model, people trading with each other. Every trade with Uniswap, you trade with the pool of tokens that are held by Uniswap.

Q. Did the sandwich bots trade with the Peraire-Buenos?

A. No, they did not. They traded with the Uniswap pool.

MR. LOOBY: Joe, if you could pull that down, and instead pull up Government Exhibit 5012-AP, which is already in evidence. With the Court's permission, we will publish.

BY THE COURT: You may.

Q. Professor Falk, do you recognize this document?

A. Yes. This is an Etherscan page that shows the details of one of these transactions.

Q. And zooming in, do you recognize this as either a front-run or a back-run transaction?

A. This will be a front-run transaction.

Q. How much -- well, what is this transaction for?

A. So this is a trade on Uniswap V2 that trades ETH for this T token.

Q. How much ETH is being traded?

A. So here we can see they traded 2,766 ETH for 118 T tokens.

Q. OK. Beside the ETH in parentheses, we see a dollar amount. Do you see that?

A. Yes, I do.

Q. Is that dollar amount the value in 2023 or when this PDF was made?

A. That's the current value amount or dollar amount when this PDF was made. Etherscan sort of as a courtesy puts into parentheses the dollar amounts.

Q. Did you look into the value of that amount ETH, 2,766.89 ETH, back in April of 2023 in preparation for your testimony today?

A. Yes, I did.

Q. And about how much was that amount of ETH worth?

A. It was about $5 million worth of ETH.

Q. Now, in this transaction is it the T token that the sandwich bot is purchasing?

A. Yeah. So the sandwich bot is using ETH to buy T tokens.

Q. Did the sandwich bot purchase that T token from the Peraire-Buenos?

A. No. They purchased it from the Uniswap pool.

Q. Did anything the Peraire-Bueno's do affect the price that the sandwich bot paid for those T tokens?

A. No. The Uniswap pool automatically calculates the price, and other people can't affect that. So this trade went through with the pool, and the sandwich bot got the exact amount of T token that they expected.

Q. Do you know approximately how much the sandwich bot stood to profit if the sandwich attack strategy had succeeded?

A. I think it was about 600-some dollars. But in general you can think that the sandwich trading is a zero-sum gain. So all of the sandwich bot's profits come from the losses of the victim trader, and the victim trader's maximum loss is the total amount they're trading. So you can never -- you can kind of get an upper bound on the sandwich bot's profit by the size of the victim trade.

MR. LOOBY: And, Joe, if we could take this down and pull up DX 5010 and go to page 5.

Q. Professor Falk, what is this slide showing us?

A. This slide shows the size of the sandwich bots front-run trade against the size of the victim trade, which is also essentially the amount of profit they could make. Because if some sandwich had gone through, the victim trader would have

lost all of their money, their entire trade, which was about $676.

Q. I know that you have your Ph.D. in math, so I will ask you this. About how many times larger is that front-run trade in value than the potential profit?

A. So if we think of this as about $5 million, that's a five with six zeros. And if we think of it as $600, that's a six with two zeros, so that's like a four-zero difference. It's about 10,000 times bigger, but since five is less than six, it's a little less than that, so about 7,000 times bigger. So the sandwich bot was trading 7,000 times as much as they were expecting in profits.

Q. Did you do an analysis of the different amounts that the sandwich bot could have profited from this same sandwich attack using less money in the front-run?

A. Yes, I did.

MR. LOOBY: Joe, if you could turn to the next slide.

Q. And Professor Falk, big picture, what is this slide showing us?

A. As we've talked about before, you can simulate and you can simulate Ethereum transactions, and you can replay the blockchain in different orders if you want. So I do that a lot, so I was doing that here. You can put in a victim trade of the same amount and see what the profits would be at different front-runs or different sandwiches if they had gone

through in the block in question.

So on the left, we see the sandwich bots spend in reality, it was about $5 million, and their expected return if their sandwich had gone through, would be about $676.32. But --

Q. Professor Falk, looking at the Y axis here, does it jump from about $2,000 to about $5 million?

A. Yeah. This is sort of a problem with plotting, that if you just tried to plot this normally, the sandwich bots spend was so large that it couldn't see any of the other bars. So we had to make this kind of broken chart here. But you should imagine the sandwich bots bar being 7,000 times as tall as the blue bar.

Q. Let's move over one bar. What is this showing us?

A. So if you imagined a sandwich bot who had done a front-run trade but only front-run by .1 ETH, that would have cost them about $179 at current ETH prices. And using that much smaller sandwich, they would have extracted $676.17 from the victim. So they would have gotten 15 cents less in their return.

Q. And how does the amount that they put at risk in their front-run differ between that strategy on the left and immediately to the right?

A. Yeah. So in their actual trade, they traded thousands of times more. They traded their 2,700 ETH, and they could have traded .1 ETH and received approximately the same profit.

Q. Well, it's a couple cents less, right?
A. Yeah. It's about 15 cents less.
Q. And tell us about the other two bars on the right.
A. So they could have sandwiched it even less with .01 ETH, so about 18 bucks worth of ETH. And there they would have made almost $2 less profit, only $674.
Q. Across the top of the chart, is there a red line?
A. Yeah. So that's representing at the time, there was 1 ETH slashing penalty, and at the time, ETH was about $1,800. So this was the cost that a validator would have to pay if they wanted to produce another block. And so here, this is sort of for reference that if a sandwich bot had only front-run by .1 ETH, that would be well under the slashing penalty, and validators would not be incentivized to produce another block because they would stand to lose much more in the slashing penalty than they could possibly gain from the sandwich bot.
Q. And to be clear, Professor Faulk, the strategy that the sandwich bots in this case ran, that's the one on the far left, right?
A. Yes. The sandwich bots ran this crazy strategy where I assume they just wrote their optimizer to optimize every penny of their returns sort of irregardless of how much it cost them.
MR. LOOBY: All right. Joe, we can take this down.
Q. Professor Falk, remind the jury again -- we'll let you get a sip of water -- what is an equivocation?

A. An equivocation in Ethereum is when a validator signs two blocks at the same block height.

Q. Did omakase involve an equivocation?

A. Yes, it did.

Q. What was the result of the omakase validator's equivocation?

A. They were slashed.

Q. Why does the Ethereum protocol disincentivize signing two blocks for the same slot?

A. Because the Ethereum blockchain, you want to have one block at every slot, and so it's not good to have two blocks at the same slot. Then the rest of the attesting validators have to kind of clean that up.

Q. And will having two blocks for the same slot, does that pose problems for the Ethereum network?

A. So if the chain actually forked, that would be a big problem. The whole purpose of the consensus mechanism is to ensure that that doesn't happen, and that didn't happen here.

Q. Did omakase pose a risk of a fork?

A. No. In this case, it didn't pose any risk of a fork because one of the blocks everyone knew was going to be rejected by the attesting validators. So the whole sort of consensus process didn't really come even into play. There was really only one block that was valid.

Q. Did omakase pose any risk to Ethereum stability?

A. No, not at all.
Q. Did omakase violate any Ethereum protocol?
A. No.
Q. Was omakase consistent with the Ethereum protocol?
A. Yeah, the Ethereum protocol assumes validators will act in their economic interest and the omakase validator did.
Q. Did omakase fit into the competitive landscape for MEV strategies that exists on Ethereum?
A. Yes, it did.

MR. LOOBY: No further questions.

THE COURT: Thank you, Mr. Looby.

Mr. Levander.

MR. LEVANDER: May I approach, your Honor?

THE COURT: You may.

Mr. Levander you may proceed

MR. LEVANDER: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LEVANDER:

Q. Good afternoon, Professor Falk.
A. Hi.
Q. I want to talk about your day job. One of things you do is write and publish articles?
A. Yes.
Q. You read articles written by other academics in your field?
A. Yes, I do.

Q. You read articles by important blockchain organizations like the Ethereum Foundation?
A. Yes, I do.
Q. Staying up to date with other researchers in your field is an important part of your job, correct?
A. Yes, it is.
Q. And if you are going to write about a topic, one of the things you do is see who else has written about it?
A. Yeah.
Q. One of the things you've researched and written about is stable coins like USDC and USDT, correct?
A. Yes.
Q. USDT a stable coin issued by Tether?
A. Yes.
Q. If I refer to it as Tether, you know what I'm referring to?
A. Yes, I do.
Q. Fair to say that Tether is a popular cryptocurrency?
A. Yes, it is used by a lot of people.
Q. It's largely traded?
A. Yes, it is.
Q. The total value of all the USDT in supply is over $100 billion?
A. Yes, it is.
Q. And there's billions of dollars of Tether traded every day?
A. Yes, there is.

Q. Tether has existed for more than a decade, correct?

A. Probably around that. I don't know exactly when it was, but approximately.

Q. Some crypto assets can't be locked or frozen, correct?

A. Yes. That's correct.

Q. But stable coins such as USDC and USDT are controlled by smart contract and therefore can be frozen?

A. Well, all the tokens on Ethereum other than ETH itself are controlled by smart contracts.

A. And USDT and USDC are both tokens that can be frozen, correct?

A. Yes, they are.

Q. One method of freezing is called blacklisting, correct?

A. Yes, it is.

Q. And blacklisting involves a particular digital address being restricted from transferring tokens, correct?

A. Yes.

Q. A method for circumventing the blacklisting features of USDC and USDT is known as wrapping, correct?

A. So wrap tokens exist all around. If you wrap a token, then you've created a derivative token essentially, and that token may or may not have the blacklisting features of the underlying, yes.

Q. So token wrapping can take many forms, you're saying?

A. Yeah. It's used very widely.

Q. But the basic idea is to use another smart contract as an intermediary, correct?

A. Yeah. It's usually used in bridging. If I have token -- if I have USDC on Ethereum and I want to move it to another blockchain like Solana, I cannot actually move it myself. So I can essentially walk it on one side and get somebody to make me a derivative asset, like a wrapped asset, on the other side.

Q. So Professor Falk, for example, to circumvent blacklisting, a user can deposit USDC or another token into in the MakerDAO protocol in exchange for Dai tokens?

Q. I'll repeat the question for you.

To circumvent blacklisting, a user can deposit USDC or another token into the MakerDAO protocol in exchange for Dai tokens?

A. So MakerDAO is a decentralized protocol, and it does allow you to mint these Dai tokens, and you can put all kinds of collateral up to minute them. It does allow you to put USDC up as collateral to mint Dai, that's correct.

Q. And if you do that, from the perspective of the USDC contract, the MakerDAO protocol looks like the owner of the

USDC, correct?

A. Yeah. So on the blockchain, MakerDAO now owns the USDC, and they have given you some Dai, which is the token they create.

Q. Blacklistings tokens like Tether is primarily used to address unwanted user behavior, correct?

A. Yeah, I think primarily.

Q. As of October 2023, which is just the last date you updated this on your GitHub page, less than 1,000 Tether accounts had ever been blacklisted?

A. If you say so. I did make a GitHub page, which, at the time, listed how many Tether accounts were blacklisted, but I don't remember how many.

MR. LEVANDER: Ms. Kerest, can you pull up Government Exhibit 8052 and go to page 3.

MR. LOOBY: Do you have paper copies of these?

MR. LEVANDER: It will be on the screen.

Q. I direct your attention to the second line underneath where it says "freezing." Can you take that down, Ms. Kerest, once the witness has a chance to read it?

A. Should I read the whole thing or just this line that says "freezing."

Q. You can read the section that says "freezing."

A. OK. Yeah, that's short.

Q. Does that refresh your recollection that as of 2023, less

than 1,000 Tether accounts had ever been blacklisted?
A. Yep.
MR. LEVANDER: Ms. Kerest, can you pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8027.
Q. Professor Falk, this is an article titled "Equivocation Attacks in MEV-Boost and EPBS" by Francesco D'Amato and Mike Neuder that you relied on in formulating the opinions you've relied on in formulating your opinions you testified to in this case, correct?
A. Looks like it.
Q. And Professor D'Amato and Mike Neuder are both researchers with the Ethereum Foundation, correct?
A. I actually don't know Francesco, but I know Mike Neuder, yeah.
Q. And this article was published on Ethereum.org, correct?
A. That's what it looks like.
Q. Mike Neuder is a well-known researcher in your field?
A. Yes, he is.
Q. And Ethereum.org is the website maintained by the Ethereum Foundation and the Ethereum community, correct?
A. Yes, it is.
Q. The Ethereum Foundation is an important resource for information and research about the Ethereum blockchain?
A. Yes, it is.

Q. On your own website, you have a link to the Ethereum.org website, correct?

A. That seems likely.

Q. You list the Ethereum.org website as a good resource for the Ethereum blockchain?

A. Yes, it is.

Q. No, towards the top right of this page, it says the article was dated April 18, 2023, correct?

A. Yep.

Q. On the first page of this article you relied on, there's a section titled "April 2 Unbundling Attack." Did I read that that correctly?

MR. LOOBY: Are we just reading from a document not in evidence?

MR. LEVANDER: It's a document he relied on for his opinions.

THE COURT: Are you about to move it into evidence?

MR. LEVANDER: I'd be happy. So actually, your Honor under, 803(18) I would read it and not admit it. I think the foundation has been established that he has relied on this article and that the author is a well-known researcher in the field.

THE COURT: All right. You may do so.

MR. LEVANDER: Thank you, your Honor.

Q. OK. So on the first page, there's a second titled "April 2

Unbundling Attack." Did I read that correctly?

A. Yes.

Q. And if you look at the first sentence of that section, according to article you relied from Mike Neuder of the Ethereum Foundation, during the April 2nd unbundling attack, a malicious proposer exploited the MEV-Boost relay to unbundle a sandwiching searcher's transactions for a profit of over $20 million USD. Did I read that correctly?

A. Yes.

MR. LEVANDER: You can take that down. Thank you.

Q. You talked about how Ethereum's a proof of stake protocol, correct?

A. Yes, it is.

Q. Meaning that you stake ETH in order to become a validator, correct?

A. Yes, you do.

Q. So a validator could also be called a staker?

A. Sometimes, yes.

Q. Isn't it true that proof of stake enforces a subset of the protocol rules through the credible threat of destroying the capital owned by a misbehaving staker?

A. That sounds reasonable. It's kind of a complicated way of saying that.

Q. And historically this credible threat has served as an effective deterrent, you'd say?

A. Are you trying to say that there haven't been many equivocation penalties?

Q. Sure.

A. Yeah. There have not been that many equivocation penalties, that's correct.

Q. But on April 2, 2023, an attacker referred to as the Low Carb Crusader exploited a piece of infrastructure in the Ethereum protocol?

A. As we have been talking about on April 2, 2023, there was an equivocation, yes.

Q. In particular by tricking a relay the attacker accessed private transaction data, which the attacker exploited to $20 million USD of MEV, correct?

A. That's not how I would say it. There was no private transaction data. There were the transactions that they were given by the relay when they signed the block header, which is exactly how the relay was designed to the function.

Q. And in Ethereum specification, this behavior violated the rules and thus was subject to a slashing penalty of 1 ETH or $6,200 U.S. dollars in today's prices levied against the attacker's stake?

A. I wouldn't say they violated the rules. The rules say that if you equivocate, you get slashed.

Q. Well, Professor Falk, other academics in your field disagree with your description on those last two answers, isn't

that right?
A. I'm sure some people disagree.
Q. You're aware that Professor Weinberg from Princeton University and Michael Neuder, who we've talked about, from the Ethereum Foundation, have written about this event saying that on April 2, 2023, the Low Carb Crusader exploited a piece of infrastructure in the Ethereum protocol by tricking a server facilitating the block building auction?
A. They might have said that.
Q. And you are aware that they wrote that by tricking the relay, the attacker accessed private transaction data, which they exploited to $20 million USD of MEV?
A. They may have written that.
Q. And you are aware that they wrote in the Ethereum specification this behavior violated the rules and thus was subject to a slashing penalty of 1 ETH levied against the attacker's stake?
A. They might have written that.
Q. Are you familiar with the article that I'm talking about?
A. No, I'm not.
Q. You said part of your job is to conduct your own research and read articles written by others, correct?
A. Yes, it is.
Q. And one thing you do about -- before writing about a topic is seeing who else has written about it?

A. Yes.

Q. It's your testimony that before you came to testify here about the events of April 2, 2023, you didn't read what Professor Weinberg and Michael Neuder had to say about the April 2, 2023, exploit?

A. That's not my testimony. My testimony is that I don't remember this sentence that you just said.

Q. By the way, Professor Weinberg from Princeton University, you participated in a symposium hosted by him in February of 2022, correct?

A. I don't know if it was hosted by him, but we've been to some of the cyber conferences together because we're both in the same space.

MR. LEVANDER: Ms. Kerest, can you please pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8021.

Q. This is an article by Professor Weinberg from Princeton University and Michael Neuder of the Ethereum Foundation titled "Selfish Mining under General Stochastic Rewards." Do you see that?

A. Yes, I do.

Q. I actually want to come back to your own academic work, Professor Falk.
A. Sure.
Q. You've never written an article about MEV-Boost, correct?
A. No, I have not.
Q. You've never mentioned MEV-Boost in an article?
A. That seems possible.
Q. You've never written an article about sandwich trading?
A. I've never written an article about sandwich trading.
Q. You've never mentioned sandwich trading or sandwich attacks in an article?
A. That seems possible.
Q. You've never operated a trading bot before?
A. I've built arbitrage bots and I've -- but I've never operated them at any scale, no.

 Q. You are not a professional cryptocurrency trader?
A. No. Cryptocurrency is very volatile, and it's very adversarial. I'm an academic because it's a very stable place to be, and I don't kind of like the adversarial nature of the blockchain space.
Q. You don't submit 10,000 transaction bundles a day?
A. No, I do not.
Q. You've never operated a builder, correct?
A. I have built a builder that basically I ran my own note, and so I was collecting mempool transactions. And I worked with some people in the computer sciences department who had what they thought was like a cool idea for packing transactions, so we ran a bunch of simulations with this builder. But we didn't have any access to any private order flow, and it was clear we were outcompeted by the people who had a lot of relationships there. So we never actually ran it in production, but we spent a few months building out the builder basically.
Q. You've never operated a relay?
A. I've never operated a replay.
Q. You've never worked for Flashbots, correct?
A. I have never worked for Flashbots.
Q. And you've never overseen the creation of MEV-Boost?
A. I did not oversee the creation of MEV-Boost.
Q. You said you run two validators in your office, correct?

A. Yeah.
Q. Those are consensus notes, correct?
A. Now after proof of stake, you have to run both the consensus client and the execution client, so it runs both. I have two computers, and they both run both.
Q. And in order to actually propose a block, you would also need to stake 32 ETH and run the validator client, correct?
A. It's the same validator client, but I never staked.
Q. So the validators that you operate don't build or propose any blocks, correct?
A. So they don't build or propose any blocks, but it's the same client software.
Q. There have been over 23 million blocks added to the Ethereum blockchain, correct?
A. Yeah. That sounds right.
Q. You have not built or proposed a single one of them, correct?
A. I have not built or proposed a single one of them.
Q. And have you never interviewed the defendants themselves about the exploit, correct?
A. I have never interviewed the defendants themselves.
Q. So you said on direct that you were here for the start of the trial, correct?
A. Yes.
Q. And you listened to the opening statements?

A. Yeah. I came in part way through the opening statements, but yeah, I caught the end of the opening statements and the first part of Bert Miller's testimony.

Q. So you saw Bert Miller testify and be cross-examined?

A. I didn't see him be cross-examined. I got a transcript of that.

Q. You sat with Mr. Madura during Mr. Miller's testimony, correct?

A. So I met Mr. Madura for the first time when we both came to trial to see Bert Miller. I never met him before. We did sit in the same row, and he introduced himself to me, yes.

Q. The defense lawyers also sent you transcripts from the trial?

A. I think the only transcripts I saw were the transcripts of Bert Miller.

Q. You've been working with the defense closely throughout the trial?

A. I've worked with the defense throughout the trial, yeah.

Q. Before you wrote your expert disclosure for this case, defense counsel sent you a bunch of legal filings from this case, correct?

A. I think I mainly saw the public indictment.

MR. LEVANDER: Ms. Kerest, can you please pull up Government Exhibit 8001 and go to page 40 of that exhibit.

Q. Professor Falk, does that refresh your recollection that before you wrote your expert disclosure in this case, you relied on seven legal documents?

A. You put that up very fast. I did not have any chance to count.

MR. LEVANDER: Ms. Kerest, can you please put that document back up.

Q. Let me know when you're ready.

A. So yes, I see these, and this -- I do remember.

MR. LEVANDER: Ms. Kerest, can you take down the document before the witness answers, thank you.

A. Is there a reason I can't see?

Q. The Federal Rules of Evidence.

A. OK.

Q. I would love for it to still be up, but unfortunately it can't be.

A. OK.

Q. Does that refresh your recollection that there were seven legal documents that you relied on for your expert disclosure?

A. Yeah. I think that's copied out of my disclosure, yes.

Q. One of the things they sent you was a transcript of an oral argument between the government and the defense?
A. I think that's -- if it's an oral argument between the government and Chris Hoffmeister, I don't really know who that is, but yeah.
Q. So you --
A. I did see some interviews between the government and some people, yes.
Q. You were hired by the defense team back in May of this year, is that correct?
A. That sounds right, yes.
Q. They interviewed you before hiring you?
A. Yes.
Q. You were hired through a consulting firm, right?
A. Yes, Cornerstone Research.
Q. You only recently started working with Cornerstone?
A. This is the first time I've worked with Cornerstone.
Q. You're paid for your work here for the defendants, correct?
A. Yes, I am.
Q. You are billing at a rate of $800 an hour, you said?
A. Yes, I am.
Q. You have worked approximately 150 hours on this case so far?
A. Approximately, yeah.
Q. 800 times 150 hours is $120,000. Do I have that right,

Professor Falk?

A. Sounds right.

Q. And that's before the time you're billing for this trial?

A. That's what?

Q. That is before the time you are billing for your testimony today?

A. Yes.

Q. You are billing for your time right now, correct?

A. Yes, I am.

Q. Part of the time you spent working on this case involves calls and meetings with the defense lawyers, correct?

A. Yes. I have had calls and meetings with the defense lawyers.

Q. And one of the things you did in your meetings with the defense lawyers was prepare for your testimony, correct?

A. Yes.

Q. That included talking about questions that you'd be asked and answered today?

A. Yes. They would talk about questions they would ask me on direct, and they guessed about questions you might ask me on cross.

Q. And talking to them about the new things they wanted you to talk about since this trial started, correct?

A. As the trial has gone on and new topics have come up, they said they might want to ask me about new topics, yeah.

Q. I want to come back to builders.
A. Yes.
Q. It's fair to say that the role of a builder is complex and lucrative?
A. Yes, it is.
Q. The role of a block builder requires sophistication?
A. Yes.
Q. Only two builders build over 85 percent of the blocks on Ethereum?
A. Yes.
Q. By contrast, Ethereum has over 1 million validators?
A. That's correct.
Q. If someone were a builder, they would probably know that, correct?
A. You mean, could you be a builder by accident?
Q. It's not the kind of thing that you wouldn't remember one way or the other?
A. Yes.
Q. I want to talk about your opinions on economic incentives. So you said slashing penalties set the economic incentives for validators, correct?
A. Yes.
Q. And slashing is the penalty for equivocation?
A. Yes.
Q. You are not a trained economist right, Professor Falk?

 A. I am not a trained economist. I work with an economist on top gain theory.

Q. Let's talk about slashing. Is it fair to say in proof of stake systems like Ethereum to become a validator, you need to stake tokens by locking them in a smart contract?

A. Yes. So proof of stakes means you are locking them up in a contract, yeah.

Q. As of April 2023, that meant depositing to 32 ETH to be a validator, correct?

A. That's correct.

Q. That stake is held against a bond against the stake, correct?

A. That's one thing. The other thing you don't want anonymous people to flood the blockchain. So even if you weren't worried about anything like equivocation, individuals would be incentivized to create as many validators as they want. I could just spin up a million validators and then always win the validator lottery. So you need some sort of rate limiting to prevent what are called civil attacks. So by putting up 32 ETH, it means I can't just spin up as many validators as I have computers.

Q. So it's a stake that is held as a bond against misbehavior, and it also prevents people from flooding the network?

A. Yeah.

Q. If a validator engages in proveable misbehavior, then their

stake can be confiscated, correct?

A. So if they engage in equivocation, then there's a slashing penalty, yeah.

Q. That's my next question. That's called being slashed?

A. Yes.

Q. And that's the penalty Ethereum imposed on the defendants after the exploit, correct?

A. Yes, and that was automatically done by the Ethereum protocol, yeah.

Q. So I think you testified there's this 1 ETH penalty associated with slashing, correct?

A. Yeah.

Q. When Mr. Looby asked you about slashing, you explained that that was the penalty?

A. Yes.

Q. And that slashing penalty hasn't changed since before the defendants' exploit, correct?

A. I think I said it hasn't increased. There's a recent Ethereum hard cork where it got a little more complicated but mostly it just decreased.

Q. Now, when it comes to Ethereum, the economic mechanisms economic incentives structure pays for honesty and punishes bad actors, correct?

A. I would say that -- I mean, what do you mean by "pays for honesty"?

Q. In terms of economic incentives, the consensus mechanisms economic incentives structure pays for honesty and punishes bad actors.
A. How do you think it pays for honesty?
Q. It rewards it being an honest validator?
A. You get those rewards whenever you produce a block.
Q. Well, you do know that proposing multiple blocks for the same slot is an action that often signifies malicious intent according to the Ethereum network website, correct?
A. It might signify malicious intent, but it might not.
Q. And slashing not only results in a financial penalty, but also the forceful removal of a validator from the network, right?
A. Yeah. So when you get slashed, you are ejected from the validator pool, and so you have to -- your stake is locked for a little bit. So it basically prevents you from immediately reentering the validator lottery. But because the lottery is permission-less, once your stake is unlocked, you have 31 ETH back, and if you put more ETH in, you can just rejoin the system.
Q. So when Mr. Looby asked what the penalty for slashing was, you said 1 ETH financial penalty, but you didn't mention that it also results in the forceful removal of the validator from the network, correct?
A. Yes. So there's like an opportunity cost that this other

31 ETH is locked for some number, 30 days or something. And so if you want to think economically, there's an opportunity cost for not having that money and getting interest on it for a little bit, yeah.

MR. LEVANDER: Could we please pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8023.

MR. LOOBY: If I could just get paper copies of these as well? I know I've seen them in the courtroom.

MR. LEVANDER: May I approach, your Honor? I have a copy for you as well.

THE COURT: You may.

Q. This is a page from Ethereum.org, which is the Ethereum website that you relied on, correct?

A. I have relied on Ethereum.org, yep.

Q. This page is titled "Proof of Stake Rewards and Penalties," correct?

A. Yep.

Q. You actually relied on this very page for your supplement disclosure in this case, correct?

A. That seems possible.

Q. Do you not recall?

A. I don't specifically recall.

MR. LEVANDER: Ms. Kerest, could you please pull up for the Court, the witness, and the parties what has been

marked as Government Exhibit 8002. Go to page 6 and pull out footnotes 17 and 18.

Q. And Professor Falk, take as much time as you need to and let me know when you are there.

A. Just asking if I relied on this document?

Q. I'm going to ask you once you are done reading to refresh your recollection that is a document that you relied on?

A. Yes, I see it there.

MR. LEVANDER: Take down the exhibit, please. Thank you.

Q. Does that refresh your recollection that this Proof of Stake Rewards and Penalties page is one that relied upon from your supplement disclosure?

A. Yes.

MR. LEVANDER: OK. Could we please bring back up Government Exhibit 8023.

Q. You've testified today about rewards and penalties in the Ethereum proof of stake system, correct?

A. Yes.

Q. And there is a document that you've relied on as part of your disclosure?

A. Yes.

BY MR. LEVANDER:

Q. Let's take up the topic of this sentence for a little longer. So as we discussed, you say slashing penalties set the incentives for validator behavior, correct?

A. Yes.

Q. Now, you're a research assistant professor at the University of Pennsylvania, correct?

A. Yes.

Q. The university has a student handbook, correct?

A. Yes.

Q. The handbook has a code of student conduct?

A. That seems right.

Q. The code of student conduct describes a number of responsibilities of student citizenship?

A. Probably. I have never been a student at UPenn, so I haven't spent a lot of time with the handbook. But --

Q. Does it sound right that one of the responsibilities is compliance with the university's code of academic integrity?

A. That seems pretty likely, yeah.

Q. Another is not to engage in physical violence against another person?

A. That seems like a reasonable thing to want.

Q. Another is to refrain from stealing the property of the university or others?

A. That seems pretty reasonable too, yeah.

Q. And engaging in any of those acts can result in disciplinary action by the university, correct?

A. Yes.

Q. Among other sanctions, students can be suspended?

A. That seems likely, yeah.

Q. Students can be expelled?

A. That seems likely, yeah.

Q. Now, one of the forms of misbehavior that can get a validator slashed is equivocation, correct?
A. Yes.
Q. That's what the defendants here got slashed for?
A. Yes.
Q. Equivocation, you said, is signing two blocks within the same slot or block height, correct?
A. Correct.
Q. And malicious validators can fork the chain by equivocating?
A. So we said, again, the consensus mechanism makes it actually very hard to fork the chain even if you equivocate. And in this case, there was no issue of a fork anyway because one of the blocks was invalid.
Q. As a general matter, that type of behavior can destabilize the entire blockchain though?
A. Yeah. So blockchains were created partially to prevent these sort of the double spend attacks.
Q. I want to talk about your opinions about pseudonymity.
A. Yep.
Q. Fair to say that while every transaction on the Ethereum blockchain is recorded and visible on the blockchain, that visibility extends only to the address involved?
A. Yeah. So you can see the address of every transaction, but

you don't see like a human's name behind it.
Q. And that's not a physical address like 500 Pearl Street; it's just a string of letters or numbers identifying a wallet or smart contract.
A. Exactly. It's a wallet address, not a physical address.
Q. And although the blockchain records and displays the address it says received assets in a transaction, it does not record the identity of a person who controls those assets, correct?
A. So it doesn't record the like physical identity. It just records that this address is the controller because from the perspective of the blockchain, whoever can create signatures is the controller.
Q. And that's what is known as pseudonymity, correct?
A. We call that pseudonymity to distinguish it with anonymity where you're actually private. As a cryptographer, we used to spend a lot of time thinking about privacy protocols. And we think of pseudonymity as much weaker than anonymity because people can kind of see what is going on. And there's companies like Chainalysis whose whole business is built on looking at public blockchain data and identifying who's who.
Q. So you are saying that pseudonymity is less than full anonymity?
A. Yeah. So in the cryptography space, when you talk about anonymity, that's like actual privacy. And if you build a

system that only has pseudonymity, that's like a lower bar of privacy, yeah.

Q. So regardless, pseudonymity is still a challenge for dealing with bad actors in crypto space, correct?

A. Pseudonymity can be a challenge, yeah.

Q. It can make it difficult to detect market manipulation and fraud, correct?

A. It doesn't make it -- well, some market manipulation is very easy to see because a lot of market manipulation, you kind of don't care about who is doing the trades, just the fact that they are happening. So I've written papers about wash trading where people try to trade tokens back and forth to inflate their value. We don't make any attempt to figure who is trading these tokens back and forth, just that it's sort of illegitimate, sort of it's wash trading. It's not people who want these token. It's just used to inflate the price, so those kind of things you can see without knowing who is doing the trading.

(Continued on next page)

BY MR. LEVANDER:

Q. So just to be clear, yes or no, pseudonymity can make it difficult to detect market manipulation and fraud?

A. Sure, yeah. Sometimes it can.

Q. That's actually a key challenge for policymakers in the crypto space; correct?

A. Yeah, that's a challenge. There's always a tension -- I work in cryptography, and there's always a big tension between, sort of, privacy and law enforcement.

THE COURT: Mr. Levander, we're at 3:15. Do you want to ask -- is now a good time for a break or a few more questions?

MR. LEVANDER: It's a great time, your Honor.

THE COURT: All right.

We are going to take our afternoon break. It's 3:15 now. Please be back and ready to go in the jury room at 3:30. My prior instructions apply. Thank you.

(Jury not present)



Court Exhibit 32 3136
PB3VPER4 Falk - Cross

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300





Court Exhibit 32 3138
PB3VPER4 Falk - Cross

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300



(Jury present)

THE COURT: Professor Falk, can come back down to the witness stand.

Mr. Levander, you may proceed.

MR. LEVANDER: Thank, you your Honor.

BY MR. LEVANDER:

Q. Professor Falk, before validators can receive any bids from relays, they need to set up MEV-Boost; correct?

A. No, they don't.

Q. Now, Professor Falk, one of the sources that you cited in this case was a page called "Relay Fundamentals" from the Flashbots website; correct?

A. That seems likely.

Q. Do you not recall?

A. Not specifically.

MR. LEVANDER: Mr. Kerest, can you please pull up Government Exhibit 8001 and go to page 43. Could you pull out for the witness the last bullet under Flashbots.

A. I see it.

MR. LEVANDER: You can take that down, Ms. Kerest.

Thank you.

Q. Does that refresh your recollection that you relied on a page called "Relay Fundamentals" from Flashbots?

A. Yes.

Q. And you base your testimony on reliable sources; correct?

A. I did rely on these. I considered these sources when I made my disclosures and my testimony, yeah.

MR. LEVANDER: Okay. So I'd like to show the Court, the parties, and the witness what's been marked for identification as Government Exhibit 8013, and I do have a paper copy.

MR. LOOBY: Thank you, Mr. Levander.

MR. LEVANDER: Would your Honor like a paper copy as well?

THE COURT: Yes, please.

Q. Directing your attention to the third paragraph.

A. Yup.

Q.   Okay.  First of all, this is a document that you relied on

for your testimony today; correct?

A.   Yup.

Q.   And it's from Flashbots' page?

A.   Yup.

Q.   And it describes Flashbots' product MEV-Boost?

A.   Yup.

Q.   And it's called "Relay Fundamentals"?

A.   Yes.

Q.   It has a section called "What is a relay"?

A.   Yes.

Q.   You testified that before validators can receive any bids

from relays, they do not need to set up MEV-Boost; correct?

A.   If by "MEV-Boost" you mean the MEV-Boost client, that's

correct.

Q. I want to talk about your opinions about validators using MEV-Boost.

Actually, before we do that, so the jury is already familiar with Etherscan. But, Professor Falk, fair to say that Etherscan is not the only publicly available blockchain explorer?

A. That's right. There are many.

Q. Some blockchain explorers have additional features?

A. So they try to differentiate themselves by adding extra information, yes.

Q. Are you familiar with the Falcon blockchain explorer?

A. No, I'm not.

Q. Are you familiar with blockchain explorers that allow you to simulate how a transaction would execute if it occurred in a different block or in a different position in the same block?

A. I'm not familiar with those. I use -- basically, I use mostly Foundry, which is not a website; it's like software that you run and it gives you a lot more control. So I don't really ever use the, sort of, easy public ones.

Q. Would it be fair to say that MEV searchers, including sandwich bots, scan thousands of transactions in the mempool looking for profitable trading opportunities each day?

A. Yes.

Q. Or each block?

A. Yup.

Q. And those trading bots typically simulate potential trading strategies, meaning they execute the transactions locally in a test environment to see how the mempool transactions would behave under certain conditions?

A. Yes, that's my understanding of how most sandwich bots behave.

Q. So, for example, a sandwich bot could simulate how a mempool transaction would execute as part of a sandwich submitted by that bot to see if the mempool transaction presents a profitable trading opportunity?

A. They certainly could do that, yes.

Q. And a mempool transaction will always behave in the same way under the same conditions; correct?

A. Yes.

Q. And a mempool transaction can also be programmed to behave one way under certain conditions and another way under different conditions?

A. Yes. All transactions could be programmed to behave differently under different conditions, that's correct.

Q. One thing a mempool transaction can be programmed to do is check the balance of a token in a particular bot's account; correct?

A. Yes. You can program a contract to check balances, yes.

Q. And a mempool transaction can be programmed to act one way

if the balance of that token is greater than a certain amount, and a different way if the balance is less than that amount; correct?

A. Yes.

Q. Now, you said that you have tools that you can use to simulate transactions; correct?

A. Yes.

Q. So, for example, you could take the bait transactions that the defendants switched out of the block and simulate how those transactions would have executed in the relays block; correct?

A. Yes.

Q. You haven't simulated how the bait transactions would have executed in the exploit block, have you?

A. I believe I did.

Q. You did?

A. Yeah.

Q. So you know that the bait transactions would have executed differently in the middle of the sandwiches proposed for that block; correct?

A. Yes.

Q. You said this is your second time testifying as a paid witness; correct?

A. Yes, this is my second time testifying.

Q. At $8 an hour, $120,000 since May, it's fair to say you want to get hired to be a witness in other cases too, right?

A. I don't know. This has been a lot more time than I bargained for. And my family is not super excited that I'm in New York a lot. So I'm not so sure about that.

Q. Fair enough.

One of the things you did have to do for this case is list all of your prior testimony in your disclosure; correct?

A. Yes.

Q. And you disclosed that you testified once previously; correct?

A. Yeah.

Q. That was in the arbitration that we talked about?

A. Yes.

Q. At a high level, an arbitration is basically a trial; but instead of a judge and a jury, it's a panel of arbitrators?

A. I don't think there is even a panel. I think it was just the judge.

Q. It was just the one arbitrator in that case?

A. Yeah, I think so.

Q. In the expert disclosure that you signed and approved for this case, you said that you had testified subject to a nondisclosure agreement in the area of platform coding of an unsupported token for the claimant in a matter pending in an arbitration; correct?

A. That seems likely.

Q. You didn't disclose the name of the case that you testified

in; correct?

A. I don't know. I -- probably not, if they asked me not to.

Q. And you said that it was still pending in your expert disclosure; correct?

A. What do you mean still pending? The case had long resolved.

Q. But in your expert disclosure you said that it was still pending; correct?

A. I don't know. If I did, that was a mistake. That case was years ago.

Q. Do you not recall or do you not know?

A. Is there a difference?

Q. Technically, yes. It's something you never knew or something you currently don't remember, what you said in your expert disclosure?

A. Presumably I knew at one point, so I don't remember now.

Q. All right.

MR. LEVANDER: Ms. Kerest, could you please pull up Government Exhibit 8001 and go to page 39.

A. Yup. I see that.

MR. LEVANDER: You can take that down, Ms. Kerest.

Q. Does that refresh your recollection that in your expert disclosure you said that the matter was pending?

A. Yes.

Q. And, in fact, as I think you just said, the arbitration you

testified in was finished by the summer of 2022; correct?

A. Around that time probably, yeah.

Q. And both the case and your participation in it were public by November of 2022; correct?

A. I don't know how public they were. I got that text when I was asked to disclose previous things. I emailed the lawyers that I had asked -- to ask me to testify then. And I said, What am I supposed to say here? And they emailed me back, and I copy/pasted it. Since I'm not a lawyer, that seemed pretty reasonable.

Q. The final arbitration decision was filed publicly with a court in California by November 2022; correct?

A. I never looked up, but if you say so, I believe it.

Q. Did the defense in this case provide you with a copy of that final arbitration decision?

A. For this case, yes.

Q. Okay. So in the copy of that arbitration decision that the defense lawyers in this case provided you, did you see that it had been publicly filed by November of 2022?

A. I don't remember the date, but I saw that it had been publicly filed, yes.

Q. Now, in that prior testimony of yours, the prior case you were involved in, your client lost; correct?

A. That's correct. Although Coinbase had said they were unable to transfer these tokens back. And after they won the

case they immediately changed their platform and made it so they could transfer the tokens back. So I think the lawyers considered it sort of a win because even though they claim they couldn't, they actually did.

Q. The arbitrators in the case -- or the arbitrator, rather, specifically found that part of your testimony was not persuasive; correct?

A. Yeah. So in that case I was asked to testify about how tokens work and how Coinbase could send them back. And I did that.

There was also a part of the case where there was some confusion about the documentation. This was about these Aave tokens. And Coinbase had a page that said, We support Aave. And that meant they supported Aave tokens, but they did not support the A Aave tokens. And I was asked if I thought that was a little bit confusing, that they supported Aave.

Q. Professor Falk, with regard to that part of your testimony, the arbitrator specifically found that your testimony was not persuasive; correct?

A. So, yeah, I believe the arbitrator said that when I said that this part of the documentation was confusing, that she did not think that that was persuasive.

Q. And the arbitrator specifically said that you lacked foundation with regard to your credentials to render such opinion testimony, and what basis you had for reaching the

opinion conclusions offered; correct?

A. That sounds like something. So I did not have a basis for being an expert in the documentation of this, like, the advertising of Aave -- of Coinbase. So Coinbase had an advertisement that said, We support Aave. I said that was confusing. She said that that was not in my purview. But all of the testimony around tokens and how tokens work and how you transfer tokens, I don't think she had any issue with.

Q. So specifically the court credited your definition of what a private key is. But the court specifically found that your testimony was not persuasive and lacked foundation with regard to the other issue; correct? Yes or no?

A. It was about this very specific issue about whether I thought the Coinbase advertisement that they supported Aave was confusing.

Q. You testified earlier that you haven't interviewed the defendants about the exploit; correct?

A. That's correct.

Q. You weren't there with the defendants when they wrote their omakase validator code?

A. I was not.

Q. You weren't a participant in their Slack or Signal messages?

A. I was not.

Q. And you weren't there when they executed that code on April

2nd?

A. I was not.

MR. LEVANDER: Can I have one moment, your Honor?

THE COURT: You may.

(Counsel conferred)

MR. LEVANDER: No further questions, your Honor.

THE COURT: Thank you, Mr. Levander.

Mr. Looby, any redirect?

MR. LOOBY: Just a few questions, your Honor.

THE COURT: Thank you.

REDIRECT EXAMINATION

BY MR. LOOBY:

Q. Professor Falk, on cross-examination, were you asked about some websites and articles that you did not author?

A. Yes, I was.

Q. And were some of those websites or articles in your disclosure?

A. Yes, they were.

Q. And were some of those websites or articles not in your disclosure?

A. I think most of them were in the disclosure. I don't remember if any were not.

Q. For the ones that were in your disclosure, does the fact that you cited it in the disclosure signify that you agree with every sentence in the article?

A. No, it does not.

Q. For example, if an article or a website referred to something as an attack, but you cited that article or website in your disclosure, were you agreeing that that is a correct terminology for something?

A. No.

Q. How did you use these sources that were cited in your disclosure?

A. Well, these sources all had pieces of information that were interesting or relevant. But by citing them does not mean that I agree with every sentence or every word choice in the document.

MR. LOOBY: No further questions.

THE COURT: Thank you, Mr. Looby.

Anything further with this witness?

MR. LEVANDER: No, your Honor.

THE COURT: Thank you.

Professor Falk, you may step down.

THE WITNESS: Thank you.

(Witness excused)