PAEKPER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

      v.                        24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

           Defendants.         Trial

-------------------------------x

                                New York, N.Y.
                                October 14, 2025
                                9:30 a.m.

Before:

                HON. JESSICA G. L. CLARKE,

                              District Judge

                      APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
    Assistant United States Attorneys

FICK & MARX LLP
    Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

PAEKPER1

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
        Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
        -and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH


Also Present:    Helena Kerest, Paralegal Specialist (USAO)
                 David Naguib, Paralegal Specialist (USAO)

PAEKPER1

(In open court; jury pool not present)

THE COURT:  Good morning.  We are here in United States v. Peraire-Bueno.

Counsel, please state your appearances for the record, starting with the government.

MS. KUDLA:  Good morning, your Honor.  On behalf of the government, you have AUSAs Danielle Kudla, Jerry Fang, Ben Levander, Ryan Nees.  We're joined at counsel table by Paralegal Specialists David Naguib and Helena Kerest.

THE COURT:  Good morning to you all.

And for Anton Peraire-Bueno?

MR. FICK:  Good morning, your Honor.  William Fick and Daniel Marx, for Anton Peraire-Bueno, who is seated between us.

THE COURT:  Good morning.

MR. MARX:  Good morning.

MS. TREFZ:  Good morning, your Honor.  Katie Trefz, and Patrick Looby, for James Peraire-Bueno, who's present.  We also have in the well with us -- well, actually, Joe Bayerl is here with us, and Ikenna Ugboaja and Jonathan Bach.

THE COURT:  Good morning to you all.

So I understand that there are a few things for us to take up before we get the panel here.

I know that there are two issues that you all wanted to take up.  I also just want to read into the record the preadmitted exhibits.

Ms. Kudla, can you do that, please, the exhibits that were preadmitted?

MS. KUDLA:  Your Honor, I apologize for this.  I would ask if the Court would allow us to do that at a break.  I do not have the exhibit list with me at this moment.  And, also, certain of the preadmitted exhibits, the government may no longer be seeking to preadmit.

My plan on that, subject to the Court's discretion, would be that this evening, we would prepare the list, provide a written list to the Court, with those that we would be seeking preadmission for, and provide it for the court reporter, so, tomorrow, when we come in before opening statements, they can be read into the record.

THE COURT:  All right.

MS. KUDLA:  Is that okay?

THE COURT:  That's fine.

MS. KUDLA:  Thank you, your Honor.

THE COURT:  I assume no objection from the defense?

MS. TREFZ:  No objection.

THE COURT:  All right.

The two issues to take up:  There was a letter that I received at ECF No. 176 regarding a summary chart that the government would like to admit.

Mr. Levander, are you going to argue with respect to that issue?

PAEKPER1

MR. LEVANDER:  Your Honor, the parties have agreed that the government would file a three-page letter last night; the defense is going to file a three-page letter tonight or sometime today.  We are not expecting the summary witness to be called tomorrow, so I think the defense will have an opportunity to be heard on that before we take it up with the Court.

THE COURT:  All right.  That sounds good.  And we'll take that up in due course likely tomorrow morning, if you all are submitting something tonight.

Does that work for defense?

MS. TREFZ:  It works for us, your Honor.  We don't believe that that witness is coming for a little bit, so it's up to the Court and the government, frankly.

THE COURT:  All right.

The other issue that I had was with respect to the defense's demonstrative.

And, Ms. Trefz, are you going to speak with respect to that?

MS. TREFZ:  Yes, your Honor.  Per our agreement, we exchanged, or we provided, the government with our defense demonstratives that we plan to use in opening as illustrative aids only.  The government has told us it does not plan to use any visuals in opening, and we had a conferral yesterday evening.  We understand that the government has objections with

PAEKPER1

respect to certain of the slides.  I'm happy to walk through what each slide is doing in general.  As we explained to the government, we are not going to be -- we're not testifying, it's what the evidence will show, and our view is that this is a very complex, technological case.  We're surprised that the government doesn't want to use some kind of visual aids in opening to help guide the jury as to what evidence they may be seeing in the next couple of weeks.  And that's all we intend to do here.

So, just to take the slides in order, does the Court have them, or would it be useful for us to put them up?

THE COURT:  I have them up.

MS. TREFZ:  Okay.

So, my understanding is that the first -- the government has an objection to the slides 2 and 3.  Slide 2 is images of what everybody agrees, including the government, are the avatars that the defendants used on the internet when they were communicating.  James went by Snoopy, and Anton went by Curious Rabbit.  These are the avatars that they used.  And so that's why that exhibit -- or that's why that demonstrative is there.

Slide 2 is a photo of the alleged coconspirators in this case.  It's James and Anton, Jad and Travis.  It's been disclosed to the government, it's on the defense's exhibit list, and we intend to -- to the extent there's a defense case,

PAEKPER1

we intend to admit it, but I don't think there's any dispute as to who those individuals are.  I confess, I don't really understand the government's objection to using these two things.  It sounded like, when we spoke yesterday, their concern is that we would somehow point out that because they used these adorable icons and because they are a group of young men who seemed like nice people, we would suggest that their future was in the jury's hands, which, by the way, it is, but that somehow they were -- the inference was that they would be, like, too attractive or something like that, and nobody would somehow say that that is a reason to find them not guilty, and that is a totally inappropriate argument, that we would never make.  We just -- this is a very complex case, and we're just trying to use illustrative aids to help talk the jury through the evidence that they will show.

THE COURT:  Why don't we stop with those two, and then I'll hear you on the others.

MS. TREFZ:  Sure.

THE COURT:  Ms. Kudla?

MS. KUDLA:  So, your Honor, I think Ms. Trefz hit on a key point.  To the extent that there is a defense case, opening statements are an opportunity with a narrow scope — to present to the jury what the evidence may show and provide some description of how to help organize that evidence as it comes in.

PAEKPER1

The description of argument is limited, much different, and I think we proposed to defense counsel some of these may very well be admissible during closing.  Our concern with 2 and 3 go not only to the fact that it's causing the jury to potentially draw an improper inference that should be limited during openings, but may be admissible by the time of closings, but the contrast of 2 and 3 with the victims of how they're depicted in slides 10 and 11 and 12.  So what we have here is the contrast of these Innocent Snoopy, Curious Rabbit, and these humanizing photos of the defendants.  By contrast, what you see then is comparing the victims of the case to, on page 10, robots that are nonhuman, and also, in 11, colored in red, as completely separate from the individuals that you will be hearing about.  And I think it is hard to square this concept of the idea that they will not be taking negative views or very limited negative views of sandwich trading limited in cross-examination to what we're seeing here.  What you're setting up is the idea that these are innocent, young individuals compared to these sandwich traders, who are bots, operating in a market that are taking advantage of prices of others.

And we believe that that is highly argumentative, and at this point in time, improper.  So after the evidence has come in, maybe that shifts, and these become appropriate at a later point in time, but for opening, the contrast that is

PAEKPER1

being drawn here is an improper and argumentative contrast for opening statements.

THE COURT: All right.

Ms. Trefz?

MS. TREFZ: That is an imagined contrast that is going to be made. We're not planning to say these are robots, and, therefore, like, you're never going to hear from anybody but a robot. That's clearly not true. These are -- the defendants are here, standing trial. This is all going to be what the evidence will show. I haven't heard a single, either last night or now — although maybe that wasn't planned to be done here — last night, I didn't hear a single concern about whether these depict accurately what the evidence will, in fact, show about how the technology worked, and we are certainly entitled, in opening, to preview what the evidence will show. We think this is an extremely complex case, and the jury will need some guidance as to what to pay attention to, or what we think that they should pay attention to, during this trial that is highly technical.

Again, I'm surprised that the government -- yeah.

THE COURT: As long as you're not making the inference, which it doesn't sound like you are, that the government is suggesting, I don't have a concern with respect to these demonstratives. So, I will permit it.

MS. TREFZ: Thank you, your Honor.

PAEKPER1

MS. KUDLA:  Your Honor, may we be heard on pages 6 through 11?

THE COURT:  Yes.

MS. KUDLA:  Because I think Ms. Trefz's arguments address 2 and 3.  4 and 5, there was no issue with those.

Those, we believe, there will be no dispute.  Those will be coming in in evidence.

I think 6 through 11 are ones that we would call the Court's attention to in particular here.  These are demonstratives for which there has been no indication that there is any witness who has adopted these demonstratives, or these slides, in any way, who will say -- and, also, these are animated, I would say, your Honor.  If you play it in the slide view, you'll see that they're animation slides.

At this point in time, there is nothing to indicate that there is actually going to be evidence in the trial that will support the depiction of what is going on in these slides. And that is what is so concerning here.  There's no witness statements, 26.2 material, to suggest that anyone has been seeing these charts that they're going to put before the jury and will be adopting them as actual statements.

So, with respect to slides 2, 3, 4, and 5, there is no issue.  I think everybody knows that it's going to be a discussion of a decentralized network, it's the block at issue. And, certainly, slide 13, that refers to a signature, there

PAEKPER1

will be a discussion there.  But the concern here is that they're going to be putting facts before the jury that there's no evidence that there's actually coming in.  We don't know what the defense case will be.  And there is no indication that the argument being put before the jury will have any basis in fact.

THE COURT:  Ms. Trefz?

MS. TREFZ:  So, with each of these slides that we have made disclosures of witness testimony, expert testimony, that will support these particular slides, those are in the expert disclosures, number one.

Number two, these are fairly -- they should be noncontroversial and basic, like, background information about what the evidence will show about how this is working, including through the government's own witnesses.

So, let me -- can I take it one by one?

THE COURT:  Yes.  That seems to be the case with respect to the sandwich attack, and I will get back to Ms. Kudla with respect to that in a moment, but why don't you focus on 6, 10, and 11.

MS. TREFZ:  Sure.

So, 6, your Honor — and you can see it as it progresses through the animation — this slide shows the process of a validator proposing a block and getting it tested.  These are sources of transactions that a validator can use to form

PAEKPER1

its block.  It can form a block from a mempool, from mempool transactions, from its own trades, from proprietary order flow, or from a replay.  And it builds the block, it gets sent to the attesting validators, the validators attest or don't, and then if they do attest, it gets added to the blockchain.

THE COURT:  Who would be testifying with respect to this slide?

MS. TREFZ:  So, at least the information conveyed in the slide is disclosed in Mr. Falk's disclosure, but, also, we have reason to believe, from the 3500, that the government's own witnesses would agree that this is the process for proposing a block, and we have not heard anything that suggests this is not the process for proposing a block.  So that's 6.

You said to skip the sandwich attack ones?

THE COURT:  Yes.

MS. TREFZ:  And then slide 10 is an example of searchers who are also -- all searchers in these slides are identified as bots, and this is a demonstrative that shows basically how, under the kind of MEV-Boost approach, searchers search the mempool for transactions.  They add -- they may add a transaction behind, for example, if it's not a sandwich attack.  They may add a transaction behind, propose a bundle to send a bundle to a builder, and the builder may include that bundle in a block that is sent to the relay, and the relay also gets blocks from other builders.  That's all that's being shown

PAEKPER1

here.

THE COURT:  And, again, this would be testified to by your experts and the government's witnesses?

MS. TREFZ:  That's our view.  We see this as disclosed in Falk and Weinberg.  And we also believe that, again, this is essentially noncontroversial, and that the government's own witnesses would agree.  We actually think this is fairly similar to slides or demonstratives that the government has previewed for us, but that they don't intend to work in opening.

Slide 11 does the same thing, but with a sandwich bot instead, and it's denoted in a different color so that we can see the front run and back run.  And, again, as you go through, you can see the searcher is -- this is a sandwicher at this time, and it searches for a transaction in the mempool, it pulls it out, it makes it part of its bundle, front run/back run, it gives it to the filter, the filter gives it to the relay, the relay may also get it from one of the builders.

And then slide 12, in this case, this is -- the government's calls these the lure transactions.  In our -- in the evidence, it will also -- they will be what we call trigger transactions.  And, here, this is depicting the omakase validator, which is that teal robot in the middle, putting the alleged lure transactions, the trigger transactions, into the mempool, which is how it worked here.  I think Mr. Chan will

PAEKPER1

testify that that is how this worked, and it's just an illustrative to show that as we're talking through and previewing the evidence.

THE COURT:  Thank you.

Ms. Kudla?

MS. KUDLA:  Your Honor, I think it is difficult for the government to comment on what the portion of witnesses will say because we do not know what will be argued from these slides regarding how the system will work.  And I don't believe -- we wouldn't be here if the government's witnesses adopted the defense's experts testimony of how these systems worked.  So there's a fundamental inconsistency with that argument from the very beginning.

As to the witnesses who would be testifying to these slides, they've mentioned two witnesses — Falk and Weinberg. It is unclear what either Falk or Weinberg will testify in a defense case.  They have that opportunity to make it.

And that's why I think we're concerned by these. There's no indication in the expert disclosures that they have adopted these demonstratives in any way.  And the government, as the Court knows, does have demonstratives that we will be using with witnesses, but we have elected not to show them in opening because the witnesses have not adopted those demonstratives at this point in time, before --

THE COURT:  But this is just presenting what they

PAEKPER1

believe the witnesses will testify to, so this is just showing — and especially with respect to the sandwich attack and some of these other slides that appear noncontroversial — but, in any event, to just simply be what the defense believes the witnesses will testify to, even government witnesses.  So, I don't see what the issue is.

MS. KUDLA:  I think, your Honor, for the sandwich attack one, that, I think, everybody's more on a firm basis to say those are slides 7, 8, and 9, based on the nature of them. Well, the coloring, it looks like it's showing red, where the validator is in green, there's the subliminal message there, but, look --

THE COURT:  For what it's worth, it's orange on my screen.

MS. KUDLA:  Yes, exactly.

So, for what we've got there between 6 and 9, understandable, and I think everybody is in agreement, this will certainly be evidence that will be talked on on both sides.  I cannot, however, say the same thing regarding slides 6, 10, 11, and 12.  The government does not know what the defense will be presenting as their argument as these witnesses are going to say that the system operates in this way.  Quite frankly, I don't understand the demonstratives, and nor would we, because they're demonstratives, and they have to be explained by counsel, but that is the point.  I cannot say

PAEKPER1

that there is a government witness who will be testifying to this is how the system operates, consistent with these demonstratives, because none of our witnesses have seen these demonstratives or adopted them as statements.

And we have not seen any material that would indicate defense witnesses have done so, and nor do they have an obligation to put on a case.  So I think with respect to slides 6, and then 10 through 12, it's a different argument being made here.  They've never been disclosed to us in any type -- they're not marked defense exhibits, unlike our demonstratives, which are marked government exhibits and intending to be used, and I think that is the major challenge that we have with 6 and then 10 through 12.

THE COURT:  For 10 through 12 — and as Ms. Trefz described it — it appears to simply be their description of how this works from their perspective.  I actually don't see how it's different from how you all would describe how these transactions operate, setting aside the trigger transaction slide with 6, in particular, that seems less sort of parallel with anything that I've seen.

Is there something in particular in 6 that you think is misleading?

MS. KUDLA:  Your Honor, I think the issue that we have is, we do not know -- the focus of witness testimony at this trial will be that the validator is receiving information from

PAEKPER1

the relay, and the idea of the owned trades, proprietary order flow, these are concepts that are going to be raised by, I assume, the defense in their case in chief, and we don't -- so it's improper to be saying that government witnesses would be putting forward this evidence.  The other thing that is completely missing from these slides is our entire case is based on the fact that the validator is obtaining information from relay, which is a member of the MEV-Boost system.  Nowhere in this depiction of the evidence is there any mention of the trading software or the software at issue in this case.

So I think it is misleading to say that this is how the government witnesses will testify the system operated.  And that is one of the major concerns that we have with 6 and 10 through 12.

THE COURT:  Ms. Trefz?

MS. TREFZ:  The mention of a relay that's in 6, that's an example of how a validator gets a potential block of trades from relays that use some version of the MEV-Boost software, so just to put that there.

The other thing that I would just note is, we don't have to adopt the government's view of the evidence, and when we preview what we believe the evidence will show, we need to have a good-faith basis to say that this is what the evidence will show.  If it doesn't show this, or if we never use demonstratives with any witnesses, then Ms. Kudla can come

PAEKPER1

back, or whoever is going to do the closing can come back, and say, they told you it would say this, and the evidence didn't say that.  We have a good-faith basis to believe that this is actually how these systems work.  We are not going to be saying anything that we believe is inaccurate, and we believe that all of this information is amply disclosed in, frankly, the government's own witness testimony or 3500 material and our own expert disclosures.  We're certainly allowed to talk about what we believe the evidence will show — we do that in every case — and in this complex system, again, I'm not -- I don't understand why we wouldn't be able to say this is what we believe the evidence will show about how this will work.  Thank you.

THE COURT:  Thank you.

I will give it a little bit more thought, but I will come back to you all with respect to this demonstrative shortly.  Again, I see no issue with respect to 2, 3, 7, 8, 9. I do not see an issue with 10 and 11.  Those appear, again, to be uncontroversial, and based on even the facts from the government's perspective, I will look more closely at 6 and 12 and get back to you with respect to those demonstratives.

Anything else for us to take up now?

MS. KUDLA:  Your Honor, just one outstanding point: We wanted to raise an issue with the Court concerning just the efficiency of moving forward in trial.  We've worked with

PAEKPER1

defense counsel to arrange for witnesses.  The government will provide 48 hours' notice of who the next witness will be, and we have agreed to exchange exhibits by 6:30 the day before, with an idea that counsel will notify us by 8:30 that night of any objections they have, we'll try to meet and confer, and raise the issues with the Court in advance.

The issue that we disagree on is the government has asked defense counsel for exhibits for which they intend to admit, affirmatively admit, through a government witness.  We have asked that they follow those same procedures and provide them by 6:30 the day before so we have an opportunity to review them and provide our appropriate evidentiary concerns before the Court hears them.

This is particularly concerning because the nature of the documents and communications in this case, your Honor, are lengthy communications, that contain vast amounts of inadmissible hearsay, there are 403 arguments, and if we do not have an understanding of what will be admitted through our own witnesses, what's going to happen is, on cross-examination, we'll be shown a document that's 40 pages, we can't review that, and then there will be a motion, very quickly, asking move to admit.  And at that point in time, it would be putting the government in an improper position of never seeing the document for which it's being shown to the witness in full, and not being able to have the opportunity to fully vet the

PAEKPER1

evidentiary objections at hand.

We do not think this rule applies to any document for which they're seeking to impeach the witness for, and we've made that clear. So, our request would be that these procedures to ensure that there is no break in the testimony, that all parties are able to say, if you're going to admit this, this portion needs to be appropriately redacted, go forth and conquer with that exhibit, that we be provided the same courtesy the evening before to receive those particular exhibits.

MR. FICK: Your Honor, our position of the cross-examination is different. First of all, the defense has disclosed scores of exhibits that we intend or may admit, whether in the case in chief or affirmatively, through cross-examination of witnesses. There's a very, very large body of exhibits which the government knows we intend to use or may use at some point. What we really should not be put in the position to do, however, is to preview for a particular witness what we might use on cross, because, number one, by doing that, we give them a potential roadmap to modify the direct.

Number two, we don't really know what the witnesses exactly are going to say on direct, and so it's sort of a moving target, as we listen to the direct examination, about what, among the many exhibits we have disclosed, we might use in that cross-examination.

PAEKPER1

And, third, the sort of line between impeachment and affirmative evidence can be rather fuzzy. And, again, it's certainly our intention to do whatever we can to flag in advance for the Court issues that may be contentious in our cross-examinations. And we've told the government this, that we'll try to sort of identify for the Court things where we expect, based on the prior litigation and the government's objections, there could be an issue, but it's really both unrealistic and unfair to expect the defense to say, you know, at 6:30 the night before, okay, here's what we're going to use on the cross of this witness, not knowing the scope of direct, not wanting to give them the opportunity to reshape their direct. It's just for those reasons, we think --

THE COURT: So, do you have a proposal instead?

MR. FICK: I think what we've done already attempts to address these issues.

Number one, we've given the government a lot of affirmative exhibits, and among those are some that will be used on cross.

Two, to the extent we recognize that things are likely to come up in advance on a particular witness, we will certainly engage with the government about that, and either write letters to the Court or come in in the morning and say, okay, here's what we foresee as potential contentious issues in this cross.

PAEKPER1

THE COURT:  And can you endeavor to do so by 6:30 the day before?

MR. FICK:  We will endeavor to do so.  But, again, I think -- and I mean that, of course.  We want the cross to be smooth, as well, right?  But, at the same time, there may well be occasions when, you know, a sidebar may be necessary.  But we certainly want to minimize -- it's in our interests, as well, to minimize the amount of disruption to our own cross.

So, with an understanding and an appreciation for wanting to be efficient, we also don't want to sort of give up the few sort of -- I guess you could even call them tactical advantages that the defendant has in presenting a criminal case.  And, so, I guess we just don't want to be sort of held to, absolutely, you must disclose everything you're going to use on cross the night before because we just don't know, but we do understand that we don't want to be disruptive, we don't want there to be disruption.

THE COURT:  All right.  I think if they are not held to a standard of it needs to be absolutely everything, but if there are particular exhibits that you know of that you are likely to use that are particularly lengthy communications or other documents where you anticipate that there is going to be an issue, raising that with the government by 6:30 so that any disputes can be resolved in the morning.

MS. KUDLA:  Your Honor, one additional way that can

PAEKPER1

maybe facilitate this and keep their element of surprise, in addition to the procedures that you've outlined, your Honor, one way is also to ensure that prior to cross beginning, hard copies of the documents that may be used for the witness are provided both to the witness, in a binder next to the witness, because this will be the first time that they are seeing multipage documents. So instead of just being brought up on the screen, they would have the opportunity to flip through those, and we don't have to waste time — at that point, they could easily go to the binder. And the same thing for the government and the Court, because the Court may not have that particular exhibit either.

So the hard copy documents would be provided, and I will be clear, the government will follow the same procedures on our cross-examinations, as well. But, that way, the hard copies are available prior to cross beginning for the witness, the government, and the Court, and then we would ask if documents are moved into evidence, that to keep the trial going smoothly, we would admit conditionally, but allow the government the opportunity that evening to review those documents, to raise any evidentiary objections under 403 and 802 grounds, because what will happen here is, you're going to have a move to admit a 30-page document that will contain a vast amount of inadmissible, party opponent, hearsay statements that need to be redacted.

PAEKPER1

And so that could be appropriately addressed — even if the Court allows the admission of the document because it's been authenticated, a portion is being used for cross-examination — we should have the opportunity that evening to propose the redactions.

MR. FICK:  So, I think with some caveats, I think there are some things that we can work with there.

First of all, though, I would note that to the extent we're going to be using on cross largely, or at least often, documents that have been disclosed as potential defense exhibits, the government has them, and if it's got problems or things that need to be redacted before they're used, they can let us know from the set that they have.

The second thing is — yes, we can endeavor to put together in advance exhibits that we expect we may use on cross, but, again, there's going to be some game-time changes here.  There may be something we need to add.  There are probably going to be many things that we will never use.  And so, in principle, the notion of preparing kind of a set of hard copies in advance is something we can work with, and we really do want it to go smoothly, but it's not going to be perfect, because, again, cross-examination is more like jazz than a minuet or symphony, right?  It's very improvisational at times, and so there are going to be changes.

THE COURT:  It seems like we have agreement with

PAEKPER1

respect to the binders, and, again, you all are not bound by that to the extent that there are additional exhibits that you all intend to use on cross, you are not limited to the binders, but, again, I hear counsel, and it sounds like you will do your best to address any issues that you anticipate and have the main exhibits in the binders.

With respect to the redactions, I think it's reasonable for them to be -- if these are 30-page documents, I think it's reasonable for them to be conditionally admitted, and we can deal with redactions on the back end. I don't think it's a good use of the government's time to be redacting exhibits that may not be used.

So why don't we just do it as Ms. Kudla proposed.

MR. FICK: That works, your Honor. Thank you.

THE COURT: All right.

Anything else for us to take up now?

MS. KUDLA: No, your Honor.

We'll confirm that -- I think you've got the vast majority of the stipulations. We're waiting on one final one, and we'll get that to the Court, but we'll prepare all of this for the Court, your Honor, in a list tonight.

THE COURT: Excellent. Thank you.

Anything else from the defense?

MS. TREFZ: No, your Honor. Thank you.

THE COURT: All right.

PAEKPER1

Let me get an update on where we are with the panel.

(Pause)

THE COURT:  I'm seeing a shaking of the head, so I think that means they're not ready yet.  Why don't we take a 15-minute break, and, hopefully, they will be ready.  At that point, if not, we will resume when they are.  Thank you.

(Voir dire ensued)

(Jury pool not present)

THE COURT:  Please be seated.

I just want to briefly address the defense's opening slides.  I've further considered the remaining slides, and I'm overruling any objection.  The defense is entitled to present their view of what the evidence will show.  Counsel has represented that they have a good-faith basis for these representations, even through the government's witnesses, and the mere fact that MEV-Boost isn't mentioned doesn't render the slides unduly prejudicial or argumentative.  Again, it's what the defense is choosing to emphasize in terms of how they view this case.

Is there anything else for us to discuss now?

Ms. Kudla?

MS. KUDLA:  No, your Honor.

THE COURT:  Anything from the defense?

MS. TREFZ:  No, your Honor.

MR. MARX:  No, your Honor.

PAEKPER1

THE COURT:  All right.  I will see you back at 1:30. Thank you.

(Luncheon recess; voir dire resumed)

* * *