PB3RPER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                    24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

             Defendants.         Trial

------------------------------x

                           New York, N.Y.
                           November 3, 2025
                           9:30 a.m.

Before:

                HON. JESSICA G. L. CLARKE,

                         District Judge
                         -and a jury-

                    APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
JAMES A. LIGTENBERG
    Assistant United States Attorneys

FICK & MARX LLP
    Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

PB3RPER1

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
        Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
        -and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH


Also Present:   Helena Kerest, Paralegal Specialist (USAO)
                David Naguib, Paralegal Specialist (USAO)

(Trial resumed; jury not present)

THE COURT:  Please be seated.

Good morning to you all.  I don't think we are going to take up the jury instruction related issues until 4:30, so you all are obviously free to stay.  I'm not kicking you out, but my plan was to take that up at 4:30.  And just to be clear about where we left off, we left off at the knowledge that the transaction was meant to conceal under money laundering.  That was the last instruction that we were discussing.  I know that the defense had another proposed change with respect to language around an exploit, which I think I am also waiting on, so we can talk about that at 4:30.

MR. LOOBY:  We can talk about that at 4:30.

THE COURT:  All right.  And we'll go through the rest of the instructions then.

In terms of the schedule, where are we Ms. Trefz?

MS. TREFZ:  Your Honor, we have Mr. Shanz on this morning.  We expect that we will finish very quickly.  Then we expect to call Dr. Falk.  We frankly anticipate, though we don't know the length of the government's cross-examination, we anticipate finishing with Dr. Falk today.  If at that point, as we've informed the government, that will either be our last witness or if James or Anton chooses to testify, that will be that last point.  So whatever colloquy the Court needs to do with them, it may make sense after Dr. Falk is done to take a

PB3RPER1

break so we can do that. But that is the anticipated schedule.

THE COURT: Excellent. Thank you, Ms. Trefz.

In that case, assuming that we are done today, we'll deal with the jury instructions, finishing those up, this afternoon. Then I would be prepared to give the jury instructions at some point on Tuesday. Closings also would likely happen tomorrow, and the jury would start deliberating.

If we're pushed into some point Tuesday, I still think, depending on how much longer we have to go, we can still get those things done on Tuesday, but I guess we'll see and check in with the government in terms of their cross-examination later this afternoon.

MS. TREFZ: OK. Thank you, your Honor.

THE COURT: With respect to the arrest video, I see that the government filed at 1 a.m. this morning a ten-page single-spaced motion for reconsideration on the arrest video. I heard from multiple AUSAs on this motion, and I've already ruled. I'm not reconsidering that ruling. To the extent the government has concerns about any improper consideration of this video by the jury, I am prepared to give a limiting instruction that is something along of lines of:

You are about to view a video of the arrest of Anton Peraire-Bueno. All parties agree that the arrest was conducted lawfully, and you are not to consider the way the arrest was conducted in evaluating the guilt or innocence of either

PB3RPER1

defendant. Instead, this video is being admitted for the statements that Mr. Anton Peraire-Bueno made at the time of the arrest, and you should consider it solely for that purpose.

Is there any objection from the government, other than what you have already stated, with respect to that language?

MR. FANG: Your Honor, with respect to the instruction, we would also propose that the Court add language that the officers were also searching the residence pursuant to a judicially authorized warrant. We anticipate asking for an instruction as well and request a charge about the lawful obtaining of evidence. So the reason for the proposal is because it sounds like the Court's instruction is focused on the lawfulness of the arrest. We just want to make sure that the lawfulness of the search is covered.

THE COURT: So all parties agree that the search and arrest were conducted lawfully?

MR. LOOBY: No objection, your Honor.

MR. FANG: Your Honor, just to add one point with respect to the video. We understand the Court's ruling with respect to the four statements articulated in the defendants' letter. We would just ask that the video be shortened to focus on the four statements that the Court has ruled are admissible.

For example, I would just note that the first 30 seconds or so of the DX 4005-A is just officers silently walking around outside the hallway of Mr. Peraire-Bueno's

apartment. Obviously he didn't know they were there. They hadn't knocked around announced yet, so what he didn't know obviously can't go to his state of mind.

In addition, in between the sort of two sets of statements, there is approximately a minute or a minute and a half or so of just discussion about arrest procedures. Again, there's references to him asking for an attorney. We think that should the defense be permitted to play the video as the Court has ruled, it should just be limited to these statements.

MR. FICK: So candidly, it's a little bit late to be asking for further edits to the video which they've had since Friday. It's a very, very short snippet. The context is important for the jury to understand and weigh what Anton said, the tone he was using, etc. The gathering of the officers outside, there's nothing prejudicial about it, but it does indicate how many officers went in the door which might not otherwise be evident unless those first few seconds at the beginning were there.

Look, it's very short. It's not prejudicial. There's a passing reference to asking for an attorney, but there have been many of those in this case, and the Court is going to instruct on the lack of an advice of counsel or presence of counsel defense. None of this is prejudicial, and this little snippet of circumstance is part and parcel of the jury's evaluation of what he's thinking, what he's reacting to, and it

PB3RPER1

helps them weigh that information.

If the government wants more or something, I mean, we're happy to put in more, but like slicing and dicing the three minutes and 50 seconds that are here is just not practical at this point, and there's really no reason to do it.

THE COURT: Let me ask you: Is it possible to cut off parts of the beginning?

MR. FICK: We could start like just before they go in the door, I guess, but I'm not sure what that --

THE COURT: Why don't you just do that so that we are done with this issue.

All right. And I will give the instruction. So just, Mr. Marx, I believe you are playing this video, correct?

MR. MARX: I am, your Honor.

THE COURT: Just right before you are about to play it, I will read the instruction. So just give me a head's up and ask for the instruction and I will read it.

MR. MARX: Thank you, your Honor. And I'll take a quick look now to check whether it's four or five seconds at the beginning.

THE COURT: Thank you.

With respect to Professor Falk, I am permitting the supplemental opinions. First, the objections that the government raised to the substance of these opinions were already rejected in the prior order on the government's Daubert

PB3RPER1

motion.

Second, the procedural objection that the government raised is without merit. Rule 16 specifically permits and indeed requires an expert to supplement a disclosure, including during trial. Here there was good cause to permit the supplemental opinions now. They are based on theories that the government had not previously made clear until trial that they were pursuing, and only became clear shortly before and during trial.

For example, the fact that the term "honest validator" was mentioned in a few pages among thousands in discovery did not provide the defense notice. Indeed this theory was never mentioned during the three-hour hearing we had on this case in June. Instead the defense first learned of this theory at the earliest shortly before trial when the government disclosed its theories as part of the scheme to defraud jury discussion.

Furthermore, there was no prejudice to the government. The government has long taken the position, even after the defense's expert disclosures and even after I denied the government's Daubert motion, that they do not seek to retain expert witnesses here; that instead they were relying on percipient witnesses. It is not now credible to claim in the final moments of trial that they now need or want expert witnesses on these issues. So for those reasons, the government's motion is denied.

PB3RPER1

I have the defense's cell phone motion and the government's opposition at ECF 208 to discuss briefly.

For the defense, it appears you all have conceded the authenticity of all of these documents, and you did not object to any of their admissibility, so I don't see why this is an issue.

MR. FICK: Just to be clear, I understand where the Court is going. I just want to make sure the record is clear. We stipulated to the authenticity of the extraction from two cell phones that were identified just as cell phones. So we stipulated to the authenticity of derivative evidence essentially. We made no stipulation about the actual evidence of the phones themselves. We kind of expected that that was going to come in through a witness that would be able to do that authentication through the basic chain of custody, etc.

I understand that the government points to the Johnson case from EDNY where in similar circumstances an extraction was admitted even when the phone was not. I think there are ways to distinguish that on the facts and that it's not binding on this Court, and we'll preserve that issue for further review if necessary.

But our sort of point is it's a strange kind of metaphysical situation with derivative evidence has been admitted where the actual evidence has never been, and we think that that is sort of a break that renders the derivative

evidence sort of -- so that's our motion. But I sort of understand from the Court's comments where the Court is going.

THE COURT: So for the reasons stated in the government's motion, the defendants' motion is denied. Jury instructions, we'll take up at 4:30.

We have 15 minutes. Is there anything else for us to discuss now? Anything for the government?

MR. LEVANDER: Yes, your Honor.

THE COURT: Yes.

MR. LEVANDER: So in looking back at Mr. Madura's testimony from last week.

THE COURT: Yes.

MR. LEVANDER: The government would move to strike one question and answer in particular. There are a couple of places, in the government's opinion, that the defense crossed the lines that the Court set up in its Daubert ruling. In the interest of efficiency and time, I'm focusing on one. So as a reminder, the Court's ruling was that no expert would be permitted to testify over the lack of government regulation over Ethereum or what legal principles apply to Ethereum. No expert would be permitted to testify that economic incentives justified the alleged exploit or the defendants' conduct was justifiable or valuable to the development of Ethereum — that is an important one for this conversation — and no one was going to be able to say anything about Salmonella or arguments

that amount to the victim deserved this or the victim's conduct was unlawful. Also, the defendants moving money after the exploit being typical of large cryptocurrency holdings would also be out.

At —— let me get the docket cite —— I believe 271 -- it's 275:1 to 275:2 of the transcript, the question posed to the witness was: "To the extent that slashing counties provide economic incentives or disincentives for honest, as that term of art is used, behavior, what is the amount of slashing penalty? How does the amount of slashing penalty play into that consideration? And the answer was given.

The follow-up question was asked: So if the potential maximal value of the block is greater than the slashing penalty, would a rational validator potentially nevertheless try to extract the maximal extractible value?

We objected, speculation, Daubert. It was overruled, and the witness answered: A rational actor would take these things into account. I think that sort of questioning is exactly what your Honor said was not going to be allowed, that economic incentives justified what was done here, and so we would move to strike that.

Obviously another expert is going to testify today. I think I'll have three separate types of objections. If I object "Daubert," I'll be referencing the Court's prior ruling. If I object "Rule 16," which I don't expect to, it would be

because I think something is not noticed, and if I object "pursuant to one of the Rules 701 to 705," that would be because there was some new Daubert issue as opposed to an already decided one.

THE COURT: All right.

MR. LOOBY: Just very briefly, your Honor. Your Honor's ruling at the October 9 hearing, as I understood it, was that the expert witnesses are not permitted to testify about — this is at page 32 of the transcript hearing — the lack of government regulation over Ethereum and what legal provisions apply to Ethereum. I don't think that was implicated by Mr. Madura's testimony. Expert witnesses are also not permitted to testify that economic incentives justified the alleged exploit or that defendants' conduct was justifiable or valuable to the development of Ethereum.

The nuance here that I think is important is that the Court has permitted throughout this trial, and I think it's important evidence of materiality and whether there's an alleged misrepresentation here and people's expectations, testimony about economic incentives that govern and shape validator behavior generally, including whether or not a validator would propose a second block.

That testimony that Mr. Levander just quoted is, I think, inbounds within the Court's ruling, which is what incentives exist and don't exist generally to guide validator

PB3RPER1

behavior. Now, the government has alleged that there are certain aspects of the alleged exploit here that were fraudulent that crossed the line, and the expert witnesses, as I understand the Court's ruling, are not allowed to opine that any like particular -- that it's OK to misrepresent something or to do something otherwise illegal just because it is economically justified.

And to be sure, that's not our defense argument, and it's not something that the experts believe or that they will or have testified to. But it is their opinion that in this space there are very specific economic incentives that the ability to propose a second block is always the validator's prerogative, that that fact was disclosed, and that everybody in this environment understood that. And those facts about the kind of economic security that MEV-Boost did or didn't provide to these bundles, which we contest vigorously that the alleged victim traders had any right to, is all inbounds, as we understand it, under the Court's ruling.

What I've nervous about here is these objections that are at such a high level that they would preclude otherwise permissible expert testimony, because I do plan to explore with Professor Falk today about the ability of a validator to equivocate and to propose a second block regardless of the existence of MEV-Boost or any alleged commitment that the extracts from them. And indeed that is in accord with our

defense.

THE COURT: You can certainly elicit that testimony. I just want to look --

MR. LEVANDER: Your Honor, to be clear, Mr. Madura was on for hours last week and was asked questions even about whether something was a legitimate approach, and I have combed through the transcript. There's a single question where the comparison between the economic -- what the slashing penalty and what the defendants did is posed to him in a clear way that makes it seem like what the defendants did was justified by economic incentives. It's that that I think crosses the line.

THE COURT: I understand.

I think, to Mr. Looby's point, there has been a lot of testimony about economic incentives here that I don't think have crossed the line. I don't think that you all have even objected. I'm not sure if that's the case, but there have been questions to your witnesses, for example, about economic incentives that I recall, and as I recall, that evidence came in.

MR. LEVANDER: I'm not sure exactly what questions your Honor is referring to. Obviously the Court's gatekeeping role when it comes to expert testimony is very different than what Mr. Chen is being asked on cross-examination.

What the government is simply asking is economic incentive testimony can and will be elicited before Professor

PB3RPER1

Falk. It's the guardrails that the Court put up about not asking questions and not eliciting answers that would amount to economic incentives justified what the defendants did. I think that's a very important guardrail for the Court to not let the jury be wowed by expert testimony on this basically ultimate issue that the Court said is out of bounds.

Of course, the expert is going to be able to testify what he thinks the economic incentives are, and I'll be able to cross-examine about it. I think it's for the defense to argue to the jury later on that this was justified.

THE COURT: Understood.

MR. LOOBY: Right. And I think that that line would be crossed by a question of saying, like would you be justified by like -- I wasn't implicated in the question and the answer.

THE COURT: I think that is the issue, whether -- yes.

MR. LOOBY: I'm very concerned because we clearly have a different view of where that line is. I think it's further out, and I don't anticipate that the witness will say that. But I think he will say irrational -- I believe Professor Falk will testify consistent to that, which is based on a certain set of incentives, and especially if this is in response to the government's contention that there's some sort of obligation to act honestly.

And if that's defined as not proposing more than one block per slot, in fact, Dr. Falk's expert opinion in this case

PB3RPER1

is that the expectation is not that people will act honestly, that they will act rationally, and that's how this system is built. And part of that rational actions is that people expect that validators will equivocate and propose two blocks if it is in their economic interests. And those expectations about what a validator would do if permitted are like essential evidence about what the context of this was and what people understood the rules of the MEV game were.

And so I think the kind of question that would run afoul of the Court's ruling is a much more pointed one about whether or not anything goes in this space. If there are economic incentives, you can disregard other obligations. We're not going to argue that, and the experts wouldn't, I think, opine to that, and we won't ask questions that are intended to elicit that. But if we're talking about just what would a rational actor in this space do in different scenarios, I mean, the government has put at issue that there is some sort of obligation to act honestly that validators take on by being members of this community, and that acting honestly means not acting in your own economic interest in foregoing the opportunity to propose another block even the protocol lets them do that. And we disagree that that is not how this system is set up. We think it's not accurate. We think it's not truthful in terms of how this world worked, and we intend to rebut it.

PB3RPER1

THE COURT: All right. Mr. Marx.

MR. MARX: Your Honor, if I may just add, and I defer to Mr. Looby with regard to particular questions to Mr. Falk as we are conducting that examination, but as we think towards the quickly approaching closing arguments, I just want to make clear I think Mr. Levander, I understand his point, but I think he is misusing the concept of justification. Justification as a defense in a classic case, as in a murder case, it's an omission; I committed the homicide, but I was justified because I was acting in self-defense.

The defense in this case is not that James and Anton committed wire fraud, but they were justified in doing so because they were able to make money. The issue with economic incentives in this space were such that they had no intention to commit fraud and no reason to think that's what they were doing. It's an entirely different defense. It's not about justification, and I think that line is one that I think creates a real confusion if it's one that we were to focus on.

THE COURT: All right. I'm not going to strike it at this point, but I will give it some further consideration.

MR. LEVANDER: Thank you, your Honor.

THE COURT: All right. Anything else for us to discuss from the government?

MR. FANG: No, your Honor.

THE COURT: Anything else from the defense?

MS. TREFZ:  No, your Honor.

THE COURT:  All right.  It's almost 10:00.  So Ms. Tran, can you just check on the jury and see if they are ready?

We are going to take a five-minute break and then bring out the jury.

(Recess)

THE COURT:  Please bring out the jury.

(Jury present)

THE COURT:  Please be seated.  I hope you all had a nice weekend and enjoyed your extra hour of sleep.  I know I did.  We are back to our regular schedule this week, and we remain on track to finish on time.  We're going to continue with witness testimony now.  We can bring Mr. Shanz back to the witness stand.

PETER SHANZ,

    called as a witness by the Defendants,

    having been previously duly sworn, testified as follows:

DIRECT EXAMINATION (continued)

BY MR. MARX:

Q.  Good morning, Mr. Shanz.  Welcome back.

A.  Thank you.

Q.  So we can hit the ground running this morning, I left up there at the witness stand a document that has been marked for identification at the moment as DX 1206.  Do you see that?

A.  Yes, I do.

Q.  OK.  And do you recognize that as one of the Etherscan records you were asked to review in connection with your work as a summary witness?

A.  Yes.

MR. MARX:  Your Honor, I ask to admit DX 1206?

THE COURT:  Any objection?

MR. FANG:  No objection.

THE COURT:  It is admitted.  You may publish.

(Defendants' Exhibit DX 1206 received in evidence).

Q.  Mr. Shanz, the jury can now see DX 1206.  Is this one of the many, many Etherscan records in this case?

A.  Correct.

Q.  And do you see like all Etherscan records, it has a transaction hash starting with OXE1?

A.  I see that.

Q.  And this is a transaction that hit the blockchain on November 3 of 2022, do you see that?

A.  Yes.  Correct.

Q.  And in the interacted to line, it was a transaction that was done by a MEV bot.  Do you see that?

A.  Yes.

Q.  And can you tell us in this transaction, since you have some familiarity with reading these documents, how much the MEV bot paid in wrapped Ether in connection with this swap?

PB3RPER1                    Shanz - Direct

A.   Sure.   $3,513,043.52.

Q.   And Mr. Shanz, what does this document indicate the MEV bot

got in return for its roughly $3.5 million in wrapped Ether?

A.   $144.78.

Q.   Of what kind of token?

A.   Telcoin.

Q.   Do you know anything about the Telcoin crypto token?

A.   I do not.

Q.   Thank you, Mr. Shanz.   You can put aside DX 1206.

          In connection with your work as a summary witness,

were you also asked to look at certain messages sent about this

case?

A.   Yes.

Q.   OK.   Let me show you now a document that has been

identified as DX 1041-Q.   Do you see that?

A.   Yes.

          MR. MARX:   Your Honor, this is mostly for housekeeping

purposes.   I believe Mr. Chen was already asked about this

document, but it hasn't already been admitted into evidence.

Q.   Mr. Shanz, do you recognize this as one of the messages you

were asked to review concerning this case?

A.   Yes.

          MR. MARX:   Your Honor, I'd ask to admit into the

record DX 1041-Q.

          THE COURT:   Any objection.

MR. FANG:  No objection.

THE COURT:  It is admitted.

(Defendants' Exhibit 1041-Q received in evidence)

Q.  And this a tweet from someone named Zachxbt?

A.  Yes.

Q.  Do you know who that is?

A.  No.

Q.  What did Zachxbt tweet on April 3, 2023, the day after the trades at issue in this case?

A.  Justice for this based user.  They did nothing wrong.

Q.  Mr. Shanz, thank you.  Let me now show you a document that has been marked DX 226.  Do you see that on your screen?

A.  Yes.

Q.  Is this an email thread, and so we're going to start reading it from the bottom.  Do you see at the bottom here?

MR. MARX:  Oh, I'm sorry, your Honor.  May we admit DX 226 as one of the documents that Mr. Shanz has reviewed?

THE COURT:  Any objection?

MR. FANG:  No objection.

THE COURT:  It is admitted.

(Defendants' Exhibit 226 received in evidence)

MR. MARX:  Thank you, your Honor.

Q.  Do you have that on your screen now?

A.  Yes.  Thank you.

Q.  At the bottom, if we read up the thread, it starts with a

PB3RPER1                      Shanz - Direct

message on October 10.  It looks like this is all happening in 2023.  On October 10 where Low Carb Crusader sent a message here.  Do you see that?

A.  Yes.

Q.  And what were they asking?

A.  How long should I expect my ticket (423089) to take?

Q.  They signed it:  Thank you, LCC?

A.  Correct.

Q.  You do see just above that, they got a message back on October 18 of 2023 from Etherscan?

A.  Correct.

Q.  And just focusing on the highlighted parts, what does Etherscan reply to Low Carb Crusader?

A.  We labeled this tag based on the public tweet.  Could you please suggest a label that would be better described and justify the actions of the address.

Q.  And do you see that a couple of days later, at the top, Low Carb Crusader responded to Etherscan?

A.  Yes.

Q.  OK.  And the message itself has been redacted here, but what does the subject line of Low Carb Crusader's response say?

A.  It says, request removal of name tag (Etherscan).

Q.  Thank you, Mr. Shanz.

Let's move to the next document.  This is DX 403, another one of the communications I think you were asked to

review in this case?

A.  Yes.

MR. MARX:  Your Honor, I would move to admit DX 403.

THE COURT:  Any objection?

MR. FANG:  No, your Honor.

THE COURT:  It is admitted.

(Defendants' Exhibit 403 received in evidence)

Q.  Do you see that this is a letter from RSM US LLP?

A.  Yes.

Q.  Based on your experience being a paralegal for 30-plus years, do you know what RSM is?

A.  It's an accounting firm.

Q.  This appears to be a letter from RSM to Anton Peraire-Bueno?

A.  Yes.

Q.  In what capacity?

A.  As the authorized signer.

Q.  For what company?

A.  For Pine Needle Inc.

Q.  And read into the record, if you will, the first highlighted sentence of the engagement letter?

A.  We are pleased that you have chosen to engage RSM US LLP (we, our, or us) to provide certain tax services to Pine Needle Inc. and any affiliated persons described in Section 1 below (collectively referred to as you or your).

Q.  OK.  And this engage letter between RSM and Pine Needle was dated June 15 of 2023, is that correct?

A.  That's correct.

Q.  I will now show you, Mr. Shanz, what has been marked as DX 231.  Do you see that?

A.  Yes.

Q.  And do you see that that is an email exchange between RSM between Anton and James?

A.  Yes.

MR. MARX:  Thank you.  Your Honor, I'd ask to admit DX 231.

THE COURT:  Any objection.

MR. FANG:  No objection.

THE COURT:  It is admitted and you may publish.

(Defendants' Exhibit 231 received in evidence)

Q.  This appears to be an email from someone named Mario Sabatés who, judging from his email address, works at RSM US?

A.  Correct.

Q.  And he's writing this email to whom?

A.  To Anton and cc'ing James.

Q.  And the subject line refers to what company?

A.  Birch Bark.

Q.  And I think when you testified on Friday, you looked at banking records related to Birch Bark.  Do you remember that?

A.  Correct.  I remember that.

Q.   But you said you don't know much about the company itself, is that correct?

A.   That's correct.

Q.   Could you read into the record the first highlighted paragraph there of what Mario Sabatés from RSM wrote to Anton and James about Birch Bark on June 29 of 2023?

A.   Sure.  It says, "I did want to raise one important issue that may change your future plans.  On one of our last calls, you expressed the desire to calculate gain or loss on the trades by taking the difference between the fair market value of the token you disposed of (e.g. CRV) and your adjusted basis in the same token being disposed of.

"At the time, I said there may be a chance we could do that, but after speaking about this with a few other experts at firm, especially my colleague who was a former IRS former head of enforcement for their crypto division, I am afraid that is something we cannot do."

Q.   And then you can skip down to the final highlighted paragraph and just read for the jury the conclusion of Mr. Sabatés' email to Anton and James?

A.   "Accordingly, you'll have to recognize the gain from those sales during 2023.  We can discuss in further detail the implications of this on a call, if needed."

Q.   Thank you, Mr. Shanz.

         MR. MARX:  At this point, with your assistance, Joe,

can we switch from the ELMO over to the screen so that you can show Mr. Shanz DX 1058. Thank you.

Q. Mr. Shanz, do you have that on your screen now?

A. I do.

Q. And do you recognize DX 1058 as one of the Slack channel documents that you were asked to review?

A. Yes.

MR. MARX: Your Honor, I'd ask to admit DX 1058.

THE COURT: Any objection.

MR. FANG: No, your Honor.

THE COURT: It is admitted and you may publish.

MR. MARX: Thank you, your Honor.

(Defendants' Exhibit 1058 received in evidence)

Q. And I think you also testified on Friday that one of the things you were asked to look at in this case were all the Slack channels and documents in this case?

A. Correct.

Q. This is one of those documents. It's a single day from a single channel of the Slack messages related to in case, right?

A. Correct.

Q. And this is a chat from the omakase channel?

A. Yes.

Q. And it's dated October 5, 2023?

A. Yes.

Q. All right. Now, the part that Mr. Bayerl here has on the

screen are two Slack messages from Anton.  Could you read those into the record, please?

A.  Sure.  "Goal is to avoid significant amount of frozen funds at any point.  Having the tax liability but not the access is a very tough situation to deal with."

MR. MARX:  OK.  And Joe, if we could move to the next unredacted portion.  Thank you.

Q.  Mr. Shanz this message continues on the next page, do you see that?

A.  Yes.

Q.  And here Jad and James are participating in the conversation?

A.  Correct.

Q.  And I'll read Jad's message and then can you pick up with James?

A.  Sure.

Q.  Jad Elmourad writes:  Imagine at the end the bank freezes it instead.  Inserts a skull and crossbones emoji.  A smiley face with a tear is posted by Travis Chen.

A.  If a bank freezes it, that's fair play — will come with a court order, like it won't need to be frozen.  We're U.S. citizens/will comply with court orders.  We're just trying to avoid a witch hunt stemming from the sandwich's influence.

Q.  Thank you, Mr. Shanz.  Now, let's look at one of more of those Slack chats, and this is the last of these documents

we're going to read together.

MR. MARX:  I'm going to ask you, Joe, could you show DX 1051, please.

Q.  Do you have that on your screen, Mr. Shanz?

A.  Yes.

Q.  And do you recognize this as another one of the documents from the omakase Slack channel?

A.  Yes.

Q.  And this one is dated August 17, 2023?

A.  Yes.

MR. MARX:  Your Honor, I would ask to admit DX 1051.

THE COURT:  Any objection.

MR. FANG:  No objection.

THE COURT:  It is admitted and you may publish.

MR. MARX:  Thank you.

(Defendants' Exhibit 1051 received in evidence)

Q.  OK.  Mr. Shanz, do you have that up now?

A.  I do.

Q.  Great.  And the unredacted portion down at the bottom of the page, could you read into the record the questions that Travis Chen is posing to the group at, it looks like, 5:00 p.m. UTC on August 17 of 2023?

A.  Sure.  "Open questions for ETH sales decision:  1.  Other than (A) convenience (B) slippage, is there any reason we shouldn't realize ETH sales plus buyback every time there's a

loss?  2.  Should we do the same with BTC?  3.  Are we going to be able to sell off enough stables alone to cover taxes (I believe answer is no) If not, are we OK with the chance that we might need to sell some ETH if it gains again with short-term cap gains tax treatment (given if we buy, sell back now, one year from now is after April 15).

Q.  Thank you, Mr. Shanz.

Now, on Friday -- noting that Travis had some questions about the tax treatment here on Friday, do you recall questions about a summary chart we identified as Defense Exhibit 7003 that was a record from the tax payments from James' Chase account to the IRS?

A.  Yes.

Q.  I think I left a copy of that — it's already in evidence — up on the stand for you.

MR. MARX:  Joe, do you mind putting that up on the screen.

Q.  Do you see that, Mr. Shanz?

A.  Yes.

Q.  Do you recall that this was your summary of the total taxes paid to the IRS by James in 2023 and 2024 in connection with this case?

A.  Yes, that's correct.

Q.  And when and how much was the last payment to the IRS?

A.  The last payment to the IRS was made on April 15, 2024, in

the amount of $4,800,000.

MR. MARX:  Your Honor, may I approach?

THE COURT:  You may.

Q.  Mr. Shanz, one more thing before we're done.  I'm going to hand you a flash drive and ask you if you recognize that flash drive.

A.  Yes, I do.

Q.  How is it labeled?

A.  DX 4005-AA.

Q.  And A.  It's a messy ampersand.

A.  &A.

Q.  And do you know what is on that flash drive?

A.  Yes.

Q.  And what's on that flash drive?

A.  It is the video of the arrest of Anton.

Q.  And when did that arrest occur?

A.  In, I believe, September of 2023.

Q.  Maybe refer to your tax summary chart to jog your memory.  Remembering the last tax payment was on April 15 of 2024.

A.  May 15.

Q.  So exactly 30 days later?

A.  Yes, yes.  I'm sorry.  May 15.

Q.  And does that flash drive contain both the complete arrest video and a short excerpt of the beginning of the video?

A.  Yes, it does.

Q.   And it's your understanding when we're talking about the arrest video, we're talking about a body camera worn by one of the arresting officers?

A.   Yes.

Q.   Does the clip of the video fairly and accurately represent the entire video that you watched?

A.   Yes.

MR. MARX:  Your Honor, I would ask to admit DX 4005&A and ask to publish it to the jury.

THE COURT:  Any objection?

MR. FANG:  Subject to the same objections, your Honor.

THE COURT:  Thank you.  It's overruled.  It is admitted.

Before it's played, members of the jury, you are about to view a video of the arrest of Anton Peraire-Bueno.  All parties agree that the arrest and search were conducted lawfully, and you are not to consider the way the arrest was conducted in evaluating the guilt or innocence of either defendant.  Instead, this video is being admitted for the statements Mr. Anton Peraire-Bueno made at the time of the arrest, and you should consider it solely for that purpose.

Mr. Marx, you may proceed.

MR. MARX:  Thank you, your Honor, and with the Court's permission in order to be as focused as possible we'll start the video at 20 seconds and play to approximately four minutes

into the video.

THE COURT:  Thank you.

(Video played)

MR. MARX:  I have no further questions for Mr. Shanz at this time.

THE COURT:  Thank you, Mr. Marx.

Mr. Fang.

CROSS-EXAMINATION

BY MR. FANG:

Q.  Good morning, Mr. Shanz.

A.  Good morning.

Q.  I represent the government, and I just have a few questions for you this morning.

A.  OK.

Q.  Is that OK?

A.  Sure.

MR. FANG:  Ms. Kerest, can we pull up DX 7000.

Q.  Mr. Shanz, this is a summary chart that you created relating to two phone extractions, right?

A.  Correct.

Q.  One was an iPhone 14, right?

A.  Correct.

Q.  And that's Government Exhibit 6400?

A.  Correct.

Q.  The other was an iPhone 11, right?

A.   Correct.

Q.   And that's Government Exhibit 6000?

A.   Correct.

Q.   And these extractions are Cellebrite extractions, right?

A.   Correct.

Q.   You've worked as a parallel or case manager at Williams & Connolly for almost two decades, right?

A.   Correct.

Q.   That's the firm that's representing James Peraire-Bueno in this case?

A.   Yes.

Q.   And you said you've been a paralegal for 31 years, right?

A.   Yes.

Q.   Fair to say you've become quite familiar with Cellebrite over the years?

A.   No.

Q.   Well, fair to say that you've seen a few Cellebrite extractions?

A.   These were the first ones I've seen.

          MR. FANG:  So we'll come back to DX 7000, and Ms. Kerest, can you pull up DX 6400-A-1, please.

Q.   Mr. Shanz do you see DX 6400-A-1 on your screen?

A.   Yes.

Q.   That's an extraction summary, right?

A.   Correct.

PB3RPER1                    Shanz - Cross

Q.   And it appears to be for the iPhone 14 Pro, right?

A.   Yes.  Yep.  Sorry.

        MR. FANG:  Ms. Kerest, if you can highlight detected phone model.

A.   Yes.  That's for the iPhone 14 Pro.

Q.   And if we can highlight the device name, that says Anton Peraire-Bueno(2), correct?

A.   Yes.

Q.   And if we can highlight Apple ID, that says, AntonPeraireBueno2000@gmail.com, right?

A.   Yes, correct.

        MR. FANG:  Ms. Kerest, let's move DX 6400-A-1 to the right, please, and if we can pull up Government Exhibit S-701 on the left and highlight paragraph one, please.

Q.   And Mr. Shanz, on the left Government Exhibit S-701, that indicates that Antonperairebueno2000@gmail.com belongs to Anton Peraire-Bueno, right?

A.   Yeah.  It appears to, yeah.

        MR. FANG:  So let's take down Government Exhibit S-701 and bring up Defense Exhibit 7000, again, on the left.  And Ms. Kerest, I'd like you to scroll to the right half of DX 6400-A-1 and if you can zoom in and highlight searched items, please.

Q.   Mr. Shanz, you say in DX 7000 that the iPhone 14 contained 17,888 searched items, right?

PB3RPER1                    Shanz - Cross

A.   That's the information I was given, yes.

Q.   Given by defense counsel?

A.   Right, yes.

Q.   You didn't count all the search items by hand, did you?

A.   No.

Q.   You didn't otherwise verify that there were in fact 17,888 searched items, right?

A.   Well, the Cellebrite report said there were, so I took that as the answer.

Q.   Right.  So you relied on the Cellebrite extraction summary to accurately reflect what was on the phone, right?

A.   Correct.

Q.   You don't know what was in the 17,888 search items, right?

A.   No.

Q.   It could have been searches about the weather, right?

A.   I have no idea.

Q.   It could have been searches about restaurants?

A.   Yeah.

Q.   Could have been searches about restaurant reservations, right?

A.   Could have been.

Q.   Could have been searches about a whole bunch of things that may not be relevant to this case, right?

A.   I can't answer that.  I don't know.  I mean, when you say "a whole bunch," I can't say it's a whole bunch.  There could

have been searches that weren't related, but I don't know how many.

Q. Sure. By the way, out of these 17,888 search items, you don't know the dates of those searches, right?

A. No, not off the top of my head.

Q. So that number could have included searches before 2023, right?

A. I don't know.

Q. Well, it's possible that there could have been searches in 2022, correct?

A. I don't know.

Q. You don't know one way or the other?

A. Correct.

Q. Now, you also counted up the number of searches reflected in Government Exhibit 6419-A-M and B-M right under 17,888 on the left. Do you see that?

A. Correct.

Q. You don't know who picked those searches, right?

A. I don't.

Q. You don't know the content of those searches?

A. I don't.

Q. You don't know why those particular searches were picked right?

A. I do not.

          MR. FANG:  OK.  So I want to talk about the iPhone 11,

and Ms. Kerest if we can take down Defense Exhibit 6400-A-1 on the right and replace it with DX 6000-A-1, and again we'll start on the left-hand side of DX 6000-A-1.

Q.  Mr. Shanz, DX 6000-A-1 looks to be an extraction summary, right?

A.  Correct.

Q.  And more specifically, it's for the iPhone 11, right?

A.  Correct.

Q.  If we highlight detected phone model, is that what detected phone model says?

A.  It says iPhone 11.

Q.  And if we highlight device name, that says Anton Peraire-Bueno, correct?

A.  Correct.

Q.  Apple ID is also Antonperairebueno@gmail.com?

A.  Correct.

Q.  And, again, that's the same gmail account that the stipulation says belongs to Anton Peraire-Bueno, right?

A.  Correct.

        MR. FANG:  Ms. Kerest, if we can go to the right-hand side of DX 6000-A-1 and red box device notifications.

Q.  Mr. Shanz, you are saying that the iPhone 11 had 10,193 notifications, right?

A.  Correct.

Q.  You didn't count those by hand, right?

PB3RPER1                    Shanz - Cross

A. I did not.

Q. You did not otherwise verify that there were, in fact, 10,193 device notifications on the iPhone 11, right?

A. Correct.

Q. And that's because you relied on the Cellebrite summary to accurately reflect what was on that phone, right?

A. Correct.

Q. And out of those 10,000 or so device notifications, you don't know what phone app they relate to, right?

A. I don't.

Q. Right?

A. Correct.

Q. You don't know how many, for example, were from the weather app, right?

A. That's correct.

Q. Or Spotify?

A. That's correct.

Q. Or Facebook?

A. Correct.

Q. And the 485 notifications that you tallied up in Government Exhibit 6012-M were just Slack and Signal, right?

A. I don't know. I didn't analyze every single one.

Q. Well, you counted up the number of device notifications in 6012-M right?

A. Yes.

Q.   You don't recall that they were just Slack and Signal?

A.   I don't know.

Q.   You don't know who picked these 485 notifications, right?

A.   I do not know.

Q.   You don't know the content of these notifications either?

A.   Correct, I don't.

Q.   Mr. Shanz, you also don't know why these notifications in particular were picked, right?

A.   That's correct.

Q.   And with respect to DX 6000-A-1, you don't know what part of 10,193 device notifications were just Slack and Signal, right?

A.   That's correct.

          MR. FANG:  We can go ahead and take these down, and pull up DX 7001, please.

Q.   Just to orient the jury, Mr. Shanz, this is the summary chart that you created relating to the defendants' Google searches, right?

A.   Correct.

Q.   And you estimated that Anton's Google search history included approximately 187,215 searches between July 2022 and October 2023, right?

A.   Correct.

Q.   That's approximately 16 months, right?

A.   Yes.

PB3RPER1                    Shanz - Cross

Q.  So I'm not going to make you do the math that Mr. Marx is making you do, but is that fair to say that that comes out to over 10,000 searches per month?

A.  Yes.

Q.  Now, assuming 30 days per month, that averages to approximately 400 searches per day, right?

A.  Yes.

Q.  In any event, you don't know what Anton Peraire-Bueno was searching for, do you?

A.  I do not.

Q.  Could have been searches about any number of things, right?

A.  Correct.

Q.  Including things that may not be related to this case, correct?

A.  Correct.

Q.  You also counted up the searches reflected in Government Exhibit 3775-M.  Do you see that?

A.  Yes.

Q.  That's the 104 searches?

A.  Correct.

Q.  Now, you don't know who picked those searches, right?

A.  No, I don't.

Q.  You don't know the content of those searches either, right?

A.  No, I don't.

Q.  And you don't know why those searches were picked, right?

A.  No, I don't.

Q.  Now, with respect to James' Google search history, you estimated approximately 2,435 searches, right?

A.  Correct.

Q.  You don't know what James Peraire-Bueno was searching for either, do you?

A.  No, I do not.

Q.  And, again, it could have been searches about any number of things not relevant to this case?

A.  It could have been.

Q.  And you counted 39 searches in Government Exhibit 3800, right?

A.  I counted 46.

Q.  Forty-six, my apologies.

    You don't know who picked the searches, do you?

A.  I don't.

Q.  You don't know the content of those searches either?

A.  No, I don't.

Q.  You don't know why those searches were picked?

A.  I do not.

Q.  OK.  We can take those down, and Mr. Shanz I'd like to ask you a few questions about Defense Exhibit 7002 as well.

A.  OK.

Q.  So to orient the jury, this is the summary chart you created relating to various Slack documents, right?

PB3RPER1                    Shanz - Cross

A.  Correct.

Q.  You determined that there were 17,187 Slack documents.  Do you see that?

A.  Yes, that's correct.

Q.  And that's because that's how many documents the defense presented to you, right?

A.  Correct.

Q.  Now, you counted Government 123 Slack exhibits, right?

A.  Correct.

Q.  You don't know the contents of these exhibits?

A.  Of the government exhibits?

Q.  Yes.

A.  No.

Q.  You don't know why they were selected, right?

A.  I do not.

Q.  And, again, you don't know what any of the Slack documents that weren't selected, do you?

A.  I do not.

Q.  And you don't know what any of the Slack channels mean on the column on the left, right?

A.  I do not.

        MR. FANG:  OK.  We can take that down.

Q.  Mr. Shanz I'll ask you a few questions about DX 7003 as well.

A.  OK.

PB3RPER1                    Shanz - Cross

Q. This is the summary chart that you made relating to certain tax payments, right?

A. Correct.

Q. By the way, this chart is just for James Peraire-Bueno, correct?

A. That's correct.

Q. The defense team never asked you to make any summary chart for Anton Peraire-Bueno's tax payments?

A. Correct.

Q. Didn't ask you to make any summary chart for Travis Chen's tax payments?

A. Correct.

Q. Didn't ask you to make a summary chart for Jad Elmourad's tax payments?

A. Correct.

Q. And you didn't see any actual tax payments that Anton Peraire-Bueno made in 2023 or 2024, correct?

A. That's correct.

Q. You didn't see any tax payments that Travis Chen made in 2023 or 2024, right?

A. That's correct.

Q. And the defense team didn't show you any tax payments made by Jad Elmourad in 2023 or 2024, right?

A. That's correct.

Q. Now, Mr. Shanz, just directing your attention to the column

PB3RPER1                    Shanz - Cross

that received from Birch Bark, do you see that?

A.  Yes.

Q.  I believe on Friday you said those were funds that James received from Birch Bark.  Do you remember that?

A.  Yes, that's correct.

Q.  So let's talk about the first row in Government Exhibit -- sorry -- Defense Exhibit 7003.  And your chart indicates that that information comes from DX 405, correct?

A.  The first row, yes, correct.

Q.  Yeah.  And on the second row, your chart indicates that the information comes from DX 406, right?

A.  Correct.

Q.  And those are James Peraire-Bueno's personal bank accounts, right?

A.  Correct.

Q.  Those aren't Birch Bark accounts?

A.  Correct, they're not.

Q.  And there's no reference to Birch Bark anywhere in Defense Exhibit 405 or 406, right?

A.  That's correct.

Q.  I just want to take to you the third row in Defense Exhibit 7003, and your chart says that information comes from DX 411, right?

A.  Correct.

            MR. FANG:  Ms. Kerest, if we can pull 7003 to the left

PB3RPER1                    Shanz - Cross

and DX 411 on the right, please.  And, Ms. Kerest, if we can zoom in on -- perfect.

Q.  Mr. Shanz, DX 411 is also James Peraire-Bueno's personal account, correct?

A.  Yes.

Q.  It's not a Birch Bark account, right?

A.  I'm sorry?

Q.  It's not a Birch Bark account to your knowledge?

A.  No.

MR. FANG:  OK.  So let's go to the second page, please, and if we can enlarge just the part with the text.

Q.  Mr. Shanz, there's no reference to Birch Bark anywhere on this page, correct?

A.  I'm just looking at it.

Q.  Now, directing your attention to the third row of Defense Exhibit 7003, you write that James Peraire-Bueno got 505,000 from Birch Bark, right?

A.  Yes.

Q.  But DX 411 on the right just says there's a transfer of funds from CXXX in deposits and credits, right?

A.  Repeat that again.

Q.  Sure.  Under deposits and credits, DX 411 just says there was a transfer of funds from CXXX7005, right?

A.  Correct.

Q.  Sitting here today, you don't know for sure that that is

Birch Bark, right?

A. I don't know for sure that that is Birch Bark, but Mr. Marx showed me a JPMorgan Chase statement of Birch Bark's where there was a 505,000 transaction on the same day. But to answer your question, no, I don't know.

Q. OK. Let's go to the fourth row in DX 7300 -- or 7003. The information there comes to DX 412, right?

A. Yes.

MR. FANG: Ms. Kerest, if we can take DX 411 down and put up DX 412.

Q. DX 412 also relates to James Peraire-Bueno's personal bank account, right?

A. Does this have a stamp that says DX 412 on it? I just want to make sure I'm looking at the same statement that is DX 412. This doesn't say DX 412, and I don't have it in front of me. So I don't want to say whether this is DX 412 because I don't see any identification that it is. So before I say anything, I want to make sure I'm speaking to the right document.

Q. OK. Why don't we take that document down for now. I'll ask you a few questions about what you said about DX 411. You said that Mr. Marx showed you documents indicating the 505,000 Birch Bark payment, right?

A. There was a JPMorgan statement for Birch Bark's account. I don't know exactly what exhibit number it was, but yes.

Q. Was it one of the exhibits he showed you on Friday?

A.   Yes.

          MR. FANG:  OK.  Let's go ahead and pull up DX 410.

Q.   Is this the --

A.   Again, this one doesn't have a stamp on it, a DX 410 stamp on it, so I'm hesitant to answer if this is DX 410 because I just don't know.

Q.   So why don't we come back to this one as well, and we can go ahead and take this down.

          Mr. Shanz, the defense team showed you a few other defense exhibits today, right?

A.   Yes.

Q.   And prior to your testimony, had you seen those exhibits before?

A.   I'm sorry.  What did you say at the beginning?

Q.   Prior to your testimony, have you seen those exhibits before?

A.   Yes.

Q.   Do you know what those exhibits mean?

A.   No.

Q.   Fair to say though that they are the defendants' messages with other people?

A.   Yes.

Q.   You didn't pick those exhibits, right?

A.   No.  Can you tell me exactly what exhibits you are referring to make sure I'm answering about the right exhibit

PB3RPER1                    Shanz - Cross

numbers.

Q. Sure. Those include Defense Exhibits 1206, 1041-Q, 1058, 1051.

A. Those are the messages?

Q. Correct.

A. Yes, yes.

Q. And you remember those were some of the messages that you and Mr. Marx read just now?

A. Yes.

Q. Again, that set of exhibits, you didn't pick those, right?

A. I did not.

Q. The defense team picked those exhibits to show you?

A. Yes.

Q. Fair to say they picked exhibits they thought would be helpful?

A. I guess that's fair to say, yeah.

Q. Now, just to be clear, I believe you said you were also asked to look at other communications as well, do you remember that?

A. Can you be more specific?

Q. Well, Mr. Shanz, in the course of preparing these summary charts as reviewed --

A. I'm sorry. I thought you were just talking about those few exhibits this morning. Sorry. In general, I have, yes.

Q. Now, did -- Mr. Shanz, did you see any communications

PB3RPER1                    Shanz - Cross

between the defendants and Israeli law enforcement?

A.  No.

Q.  Do you recall seeing any communications where the defendants reached out to U.S. law enforcement about any threats they received?

MR. MARX:  Objection, your Honor.  This is way beyond the scope of his examination.

MR. FANG:  Your Honor, I'm just asking if he is aware based on his testimony that he has reviewed.

MR. MARX:  He has no good faith basis to think he might have to answer these questions.

THE COURT:  He has already answered no, so let's move on.

Q.  Mr. Shanz, do you remember any communications where the defendants said they were worried about being robbed or kidnapped?

MR. MARX:  Objection, your Honor.

THE COURT:  Overruled.  You may answer that one.

A.  No, I have not seen that.

Q.  Mr. Shanz, the last thing you were shown on direct was a body-cam video, right?

A.  Correct.

Q.  And you said you reviewed the contents of the video on the flash drive?

A.  Yeah, I reviewed the video.

Q.  Your understanding is that what Mr. Marx played was just a snippet?

A.  Yes.

Q.  And you heard references to a warrant in the video, right?

A.  Yes.

Q.  Based on your 30 years as a paralegal, you know that warrants are issued by judges, correct?

A.  Yes.

Q.  Now, again, based on your review of the video, you know that law enforcement asked how many phones Anton Peraire-Bueno had, correct?

A.  Yes, that was one of the questions.

Q.  You know that he told them that he only had one phone, correct?

MR. MARX:  Objection, your Honor.  I think it's beyond the scope of the excerpt, and I just want to alert the government they may be opening the door to a vast number of other statements made during other parts of the video.

THE COURT:  Was this in the excerpt that was shown?

MR. FANG:  No, your Honor.

THE WITNESS:  I --

THE COURT:  Hold on.  Hold on.

The objection was sustained.

MR. FANG:  Your Honor, may we have a sidebar?

THE COURT:  Briefly.

(Continued on next page)

(At sidebar)

MR. FANG:  Given the portions that have been introduced in evidence as consciousness of innocence, and the fact that Mr. Peraire-Bueno was compliant with law enforcement, we believe it's appropriate to illicit testimony, given that Mr. Shanz has viewed the video, and as to the fact that Mr. Peraire-Bueno indicated that he only had one phone to law enforcement.  It's a fact that's in the video, and I think, you know, I'm not going to go through an extensive list of questions that detail things that aren't in the --

THE COURT:  My concern with this is that this part of the video was not shown, and you all knew this video was going to be shown and you did not have this portion of it shown.  So why are we asking him about this now?

MR. FANG:  Your Honor, I think Mr. Shanz said on direct that he has watched the entire video, so presumably he knows what was on the video.  It was a limited question of simply what else was on the video that the defense showed him.

THE COURT:  But part of that was at your request, so I don't want to suggest that they were only shown part of the video because that is what the defense chose to show when that was in part at your request.

MR. MARX:  I'd also mention, your Honor --

THE COURT:  So I do think to the extent you are asking -- I just wish this was an issue we would have addressed

at the forefront because I do think you have a point, Mr. Fang, about the statement, but I'll hear from Mr. Marx.

MR. MARX:  It's just that this question is misleading, and I'm not suggesting intentionally so.  The fact is Anton had a single phone that he was using at the time, which was on his desk.  It is true he possessed the second old phone that was turned off and stored away.  But I don't think it's reasonable to suggest that he was intentionally hiding from the government the existence of some old iPhone he was no longer using, which was still in his apartment which, by the way, he gave the agents access to and provided the password.

This whole line of questioning, which is beyond the scope of the snippet the government insisted on us using, is misleading, and I think will open the door to a whole host of things that happened during those interactions to show his compliance with the law and consciousness of innocence.  We're not trying to go there, but this is a misleading question.

THE COURT:  We're not going to go there.  Let's move on.

(Continued on next page)

(In open court)

THE COURT:  Mr. Fang, you may proceed.

MR. FANG:  Thank you, your Honor.

The government has no further questions at this time.

THE COURT:  Thank you, Mr. Fang.

Anything on redirect?

MR. MARX:  Just three questions, your Honor.

REDIRECT EXAMINATION

BY MR. MARX:

Q.  First, Mr. Shanz, in your past as a summary witness, were you asked to review the substance of the tens of thousands of Slack messages in this case?

A.  No.

Q.  Second, with regard to your summary chart of tax payments, 7003, does that summary fairly and accurately represent the tax payments that you made based on your review of both the Birch Bark Trading LLC bank statements and James's personal bank statements?

A.  Yes, it does.

Q.  My last question is, is it your understanding, having reviewed all those documents, all those bank records, that James was paying taxes on behalf of the group for the capital gains made by Birch Bark Trading?

MR. FANG:  Objection.  Lack of personal knowledge.

MR. MARX:  Based on his review of the bank records, is

PB3VPER2                     Falk - Direct

that his understanding.

A.   Based on my review, that was my understanding, yes.

          MR. MARX:  Thank you, your Honor.

          Nothing further for Mr. Shanz.

          THE COURT:  All right.

          Anything further for this witness?

          MR. FANG:  No, your Honor.

          THE COURT:  Mr. Shanz, you may step down.

          (Witness excused)

          THE COURT:  The defendants may call their next
witness.

          MR. LOOBY:  Your Honor, the defense called Dr. Brett
Hemenway Falk.

 BRETT HEMENWAY FALK,

     called as a witness by the Defendants,

     having been duly sworn, testified as follows:

          MR. LOOBY:  Your Honor, may I approach the witness and
the bench?

          THE COURT:  You may.

          Mr. Looby, you may proceed.

          MR. LOOBY:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. LOOBY:

Q.   Good morning, Professor Falk.

A.   Good morning.

Q.   What do you do for a living?

A.   I'm faculty in the computer science department at the University of Pennsylvania.

Q.   And, Professor Falk, if I could ask you to lean into the speaker of the microphone.

A.   Sorry.  Sure.

Q.   Thank you.

How long have you been at Penn?

A.   I started there in 2013, so about 12 and a half years.

Q.   And what is your title?

A.   I'm an adjunct assistant professor.

Q.   Where were you before Penn?

A.   I had a postdoc in the math department at the University of Michigan.

Q.   And what were you studying at the University of Michigan?

A.   There my research was on cryptography.

Q.   Professor Falk, what is cryptography?

A.   Well, cryptography is a broad field.  It's generally about privacy and security.  My background is in math; so I was designing algorithms for private and secure communication and computation.

Q.   And do you have a graduate degree in math?

A.   Yes, I do.

Q.   From where?

A.   I have a Ph.D. in math from UCLA; but although I was in the

math department, my research there was also focused on cryptography.

Q. What is your current area of research focus?

A. These days I primarily focus on blockchain technology; although I do still do a little bit of research on this sort of underlying cryptographic primitives.

Q. Does your research require you to spend a lot of time on Ethereum?

A. Yeah. So I spend a lot of time on Ethereum. I run to Ethereum validators in my office to collect data. I scraped millions of transactions from exchanges like Uniswap, from lending protocols like Aave. I've scraped transactions from all kinds of different blockchains. And then we look for interesting patterns and write papers about them.

Q. You anticipated my question. But what do you do with all that data that you're scraping from Ethereum?

A. Yeah, we -- we generally look at different things. Usually we start out by trying to, sort of, identify what's going on; and then look for -- basically, sometimes we have been looking a lot at different economic incentive mechanisms. So the blockchain space is kind of cool because all of the transactions are public and people are experimenting with a lot of different economic incentives to get people to do things. So economists are really interested in, sort of, how people respond to these incentives. So I write papers with people in

the business school about -- essentially about like the incentives in different blockchain protocols.

Q. And have you published these papers?

A. Yeah, I've published a number of papers on blockchain technology.

Q. As part of your work, Professor Falk, are you sometimes asked to speak on these areas of your research?

A. Yes. So I go to academic conferences, and I go to the ones that are focused on cryptography and on blockchains. So I give talks usually about the papers that I've written.

Q. Have you testified as an expert witness before?

A. I testified as an expert witness once before, but it was a civil trial, and it was an arbitration, so there was no jury.

Q. Without disclosing any confidential information, on what topics, broadly, did you testify in that case?

A. Yeah. So that was a case, there was a guy who was a Coinbase customer and he had an account on Coinbase. And he had bought some Aave tokens on Coinbase; he had sent them to his self-custody wallet. He had played around in DeFi for a little bit. And, in doing so, he had traded them for A Aave tokens, which is a different token. So Aave is A-A-V-E. There's another token that's lower case "a" Aave, three A's.

          And he had sent these A Aave tokens back to Coinbase; and Coinbase did not credit his account. And he was suing Coinbase to try to get those tokens back.

Q.   And on what topics was your testimony focused specifically?

A.   Yeah.  So Coinbase was saying it did not have the technical capability to send these tokens back to him.  And I was asked to testify about, essentially, how you would transfer a token like A Aave or any what are called these erc 20 tokens, these are standardized token formats.  So how you transfer tokens on Ethereum and what it would take to do that.

Q.   Professor Falk, have you worked as a consultant for companies on blockchain security issues?

A.   Yeah, I do a fair amount of consulting in the blockchain space, usually about cryptography and security.  So for companies that are designing some system that uses blockchain technology and they have to manage their keys or set up their security architecture, and I help them with that.

Q.   Professor Falk, do you teach any classes on blockchain technologies?

A.   Yeah.  So I teach a course exclusively on blockchains in the MCIT online program, it's the Masters and Commuters and Information Technology program in the engineering department at Penn.

Q.   What are some topics you cover in that course?

A.   So we started out broad and talk about blockchains in general, sort of, why they were created.  Consensus mechanisms.  And then we focus mostly on the Ethereum blockchain.  And so we learn about tokens on Ethereum and smart contracts on Ethereum

and exchanges like Uniswap.  And we look at MEV.  And then bridging from Ethereum to other blockchains.

Q.  So through your academic and other work, have you become familiar with Ethereum?

A.  Yes, I am very familiar with Ethereum.

Q.  And, Professor Falk, I'll just ask you to lean into your microphone a little bit and speak slowly for the benefit of the court reporters as well.  I've been counseled by them in that direction.

A.  Sure.

Q.  And it's to everybody's benefit.

And through your academic and other work, Professor Falk, have you become familiar with MEV?

A.  Yes, I have.

Q.  And through your academic and other work, have you become familiar with MEV-Boost?

A.  Yes, I'm familiar with MEV-Boost.

Q.  And through your academic and other work, have you become familiar with the issues relating to protocol design on decentralized blockchains?

A.  Yes.

MR. LOOBY:  Your Honor, I move to qualify Dr. Falk as an expert under Rule 702.

THE COURT:  Any objection?

MR. LEVANDER:  No, no new ones, your Honor.

PB3VPER2                    Falk - Direct

THE COURT:  Thank you.  It's granted.

Q.  Professor Falk, in your work as an expert witness, are you typically paid for your time?

A.  I have only done this once before, but, yes.

Q.  What is your hourly rate?

A.  I'm billing sort of what I bill in general crypto consulting, and in this case it's $800 an hour.

Q.  And about how many hours have you worked on this case?

A.  I think about 150.

Q.  Is your pay dependent on the outcome of the case?

A.  No, I'm just paid an hourly fee.  And there are no contingencies based on anything.

Q.  Is your pay dependent on the testimony that you give here today?

A.  No, my fee is just an hourly fee.

Q.  Broadly, Professor Falk, what were you asked to do in this case?

A.  So I was asked to give my opinions about the design of Ethereum and Ethereum block production, and the norms and the incentives in the Ethereum space.

Q.  And in coming to your opinions, did you have any meetings with the defense team?

A.  Yes, I met with defense counsel.

Q.  And what did you understand was the purpose of those meetings?

A.   One is to talk to me about what I was being asked to do here.  I have never testified in front of a jury before.  And I was asked to write disclosures.  And they said what I should say in a disclosure and, sort of, how I should structure that.  And to talk about the case in general.

Q.   You anticipated those questions, but did those meetings include reviewing a draft of that disclosure that the defense made to the government?

A.   Yeah.  So after I was asked to write this disclosure, I wrote a disclosure; and I walked through it with defense counsel.

Q.   And did defense counsel suggest any edits to your draft disclosure?

A.   Yeah, they suggested minor edits in helping me get things into a language that was more appropriate for a legal setting.

Q.   Did any of those edits change your opinions in any way?

A.   No, the opinions in the disclosure were my own opinions.

Q.   And in preparing for your testimony today, did you also meet with lawyers for the defense team?

A.   Yes, I did.

Q.   Did any of those meetings change the substance of your opinions in any way?

A.   No, these opinions are my own opinions.

Q.   And as part of your work in this case, did you review certain materials related to the case?

PB3VPER2                    Falk - Direct

A.  Yes, I did.

Q.  Could you let us know some categories of the materials that you reviewed.

A.  Yeah.  Well, most of the materials I reviewed were public. So initially I looked at the indictment, and then I spent some time -- I was already very familiar with Ethereum and MEV-Boost; but then I spent a lot of time, sort of, digging deeper into the code for Ethereum consensus clients and the documentation for MEV-Boost.  And I looked at the block in question and the transactions in question.  And these were all, sort of, public, because the blockchain is public, and this code is all open-source.

Q.  Were you present for parts of this trial here in the courtroom?

A.  Yeah, I came and I listened to part of Bert Miller's testimony.

Q.  Were you present for part of opening statements as well?

A.  Yeah, I read part of opening statements.

Q.  And did you review any trial transcripts of the proceedings in this trial?

A.  Yeah.  I didn't catch the end of Bert Miller's testimony, so I was given transcripts of the second part of Bert Miller's testimony.

Q.  In the disclosure that we talked about just now, was there a list of materials included that were relevant to your

opinions in this case?

A. Yeah. So the disclosure, sort of like an academic paper, had a lot of references and it cited various papers. And those were papers that I reviewed and relied on when I was writing my opinions.

Q. If a document appears on that list, are you vouching for its complete accuracy?

A. No, those are documents that I read and that I relied on, but they are not necessarily documents that I fully endorse in every possible way.

Q. So I take it that a document's appearance on that list doesn't mean you agree with every sentence in the document?

A. No, it does not.

Q. Okay. Did you ever discuss the substance of your testimony that you will give here today with James and Anton?

A. No, I did not.

Q. Did you ever discuss the substance of this case with any other defense witness?

A. No, I did not.

Q. Before your retention in connection with this matter, were you familiar with the trading strategy called omakase that occurred on April 2nd, 2023?

A. Yeah. I wasn't familiar with the name "omakase," but I was a researcher in the Ethereum space, and this was big news; so I heard about it immediately, I think probably from Bert Miller's

postmortem. So I knew about it and read about it in April 2023.

Q. And through your study of certain of the materials that you had mentioned before, did you come to form certain opinions about that strategy?

A. Yeah. So I had opinions about this strategy long before I was approached by defense counsel.

Q. And at a high level, what are some of the topics on which you've reached opinions related to this case?

A. Sort of on what happened and what the roles of the participants were, and what the norms and expectations were in the Ethereum space.

Q. And we'll go through some of those topics one at a time.

So we've been talking a lot about the Ethereum blockchain in this trial and the jurors are now practically experts themselves. So we can keep this limited to just the points that matter. And you can hold me to that, everyone.

And what are some primary features of the Ethereum blockchain?

A. So usually we talk about Ethereum as decentralized and permissionless. And it's a decentralized ledger.

Q. Let's break those down.

What does it mean for the Ethereum blockchain to be decentralized?

A. So it means that the software running Ethereum is not run

PB3VPER2                        Falk - Direct

on a single computer or even computers in like a single data center or in a single company; that it's run on computers that are spread out all over the world, run by different people.

Q. And is there a central authority that runs the Ethereum blockchain?

A. No, there's no central authority in the Ethereum blockchain; it's just a distributed system where anyone can run an Ethereum node.

Q. What does it mean for the Ethereum blockchain to be permissionless?

A. Yeah. So blockchains are often divided into two categories of permissioned and permissionless. And permissionless blockchains means that anyone can become a validator without asking permission from anyone. So Ethereum is permissionless because anyone can join.

Q. And what is a consequence of that feature of the Ethereum blockchain?

A. So because you don't know who the actors are in Ethereum, you generally cannot trust all of the people running these computers.

Q. How do you trade with somebody on Ethereum if you don't trust them?

A. Yeah. So there's a combination of essentially cryptographic and economic enforcement.

So one thing that's nice about Ethereum is that

Ethereum allows you to write smart contracts; and these are public and they are deterministic.

So if I wanted to trade with somebody, and I presumably don't know them, because you don't know most people on Ethereum, if I said I wanted to trade ETH for some other token, like USDC, if I sent them ETH, I would expect them to just run away with my ETH and give me nothing. And if they sent me USDC first, they would expect me to run away with the USDC and give them nothing.

So if we wanted to trade, we could write a smart contract that's on the Ethereum blockchain that waits for me to give it ETH and waits for my counterparty to give it USDC. And once it has both, it will make the swap for us. And if it only receives one, if only I send an ETH, then I can reclaim my ETH in a day or something.

And because the contract is completely public, we can both see how it works. And because it's deterministic, we know exactly that it's always going to work in the same way.

And so this, sort of, public and deterministic property allows me to trade with people that I don't know and don't necessarily trust.

Q.   Did you review certain slides in preparation for your testimony today?

A.   Yes, I did.

Q.   And do you know who created those slides?

A.   I believe defense counsel.

Q.   Were you given the chance to comment on them?

A.   Yes, I was.

          MR. LOOBY:  Joe, if you could please pull up for the witness, Court, and counsel only DX 5010.

Q.   And Professor Falk, it should be on your screen.  Also, every exhibit that we're looking at today is in that thin binder that I handed up.  So once you've had a chance to look at that, could you let me know if you recognize this document.

A.   Yes, I recognize it.

Q.   And what are these?

A.   This is a representation of the Ethereum blockchain.

Q.   Before the content, are these the slides that you had reviewed?

A.   Oh, sorry.  These are the slides, yes.

Q.   Okay.

          MR. LOOBY:  Your Honor, I move to publish DX 5010 as a demonstrative, and then we can defer discussion on its further admissibility, along with the other demonstratives.

          THE COURT:  Any objection?

          MR. LEVANDER:  No objection as a demonstrative.

          THE COURT:  All right.

          You may publish as a demonstrative.

          Mr. Looby, we are a little bit past 11:15.  Why don't we take our morning break now.

So we are going to take our mid-morning break.

My prior instructions apply:  Do not discuss this case with anyone, do not do any research on this case, do not read anything about this case, and please remember to keep an open mind.  I will see you back here around 11:30.

(Jury not present)

THE COURT:  Please be seated.

Dr. Falk, you may step down.

(Witness not present)

THE COURT:  Just briefly before we take our break, it occurs to me that this afternoon we should probably discuss all of the exhibits where there's disputes about whether they are demonstratives or going back to the jury.  So thank you, Mr. Looby, for that reminder.  So we'll discuss that this afternoon.

It would be helpful if you all have -- we've been keeping track, but just to make sure that it's accurate, that you all have that list as well, so that we can have a productive discussion about the exhibits that are at issue in terms of going back to the jury.

MS. TREFZ:  We'll try to confer with the government at lunch and make sure that we have the same list.

THE COURT:  Excellent.  And if disputes can be narrowed over lunch, that's even better.

MS. TREFZ:  Hope brings eternal.

THE COURT:  Yes.

Anything else for us to discuss now?

MR. LEVANDER:  Not right now, your Honor.

THE COURT:  Thank you.

Anything from the defense?

MS. TREFZ:  No, your Honor.

THE COURT:  All right.  Have a nice break.

(Recess)

THE COURT:  You may be seated.

We're going to bring out the jury.

(Jury present)

THE COURT:  Please be seated.

Let's bring Dr. Falk back down to the witness stand.

Mr. Looby, you may proceed.

MR. LOOBY:  Thank you.

Joe, if you could please pull up 5010 and go to the first slide.  And with the Court's permission, I would publish and then I will periodically be publishing slides throughout the discussion.

THE COURT:  All right.  This is a DX 5010?

MR. LOOBY:  Correct, for demonstrative purposes.

BY MR. LOOBY:

Q.  Professor Falk, what do you understand this to be a picture of this?

A.  This is a representation of the Ethereum blockchain.

PB3VPER2                    Falk - Direct

Q.   Is the concept of decentralization that you mentioned earlier captured here?

A.   Yeah.   So this is supposed to represent there are lots of individual nodes that are run on separate computers.   And each node connects to some other set of nodes, not to every other one, but to some subset.

Q.   What are the blue circles?

A.   So I believe these are meant to represent Ethereum validators, so validators who have staked money and are participating in the validator lottery.

Q.   And what are the gray circles?

A.   So on Ethereum, you can also run the validator software without staking.   And then you are never chosen to produce blocks, but you are participating in the protocol in that new blocks are sent to you once they've been created and mempool transactions are sent to you.

        So this is more what I do, since I'm interested in data collection.   So I run what here would be represented as these small gray nodes so that I can see mempool transactions when they come out, and I can grab blocks right when they come out, and I can look at historical blocks on my own computer.

Q.   You mentioned earlier the concept of a ledger.   What do you mean by that in this context?

A.   Yeah.   So blockchains are often called distributed ledgers.   And you can think of it as a ledger, as a list of transactions.

And really that's all Ethereum is, is a way of storing a list of transactions.

MR. LOOBY: Joe, if you could please go to page 2 of this exhibit.

Q. Professor Falk, what do you understand this to be a picture of?

A. So this is a representation of the blockchain itself.

Q. What is the box all the way on the left?

A. So on the left this is supposed to identify a block of transactions. So in the blockchain there's a chain of blocks that are in a linear order. And within each block there are transactions.

Q. And what is depicted to the right on the slide?

A. That's a screenshot from a block explorer. This is from Etherscan, which is the most popular block explorer. It's a website that allows you to view blockchain transactions. Because blockchain transactions are public, anybody can run a node and get these transactions. But it's sometimes hard to browse through them; so Etherscan makes nice pretty web pages that are automatically generated based on blockchain transactions.

Q. Can anybody go online and review these blockchain transactions?

A. Yeah. So Etherscan is public. It's really widely used in this space. It's sort of the first place you go if you want to

PB3VPER2                    Falk - Direct

look at a transaction, see what happened.

MR. LOOBY:  Joe, we can take this demonstrative counsel.

Q.  Professor Falk, who are the validators on Ethereum?

A.  So on Ethereum, because it's permissionless, anybody who stakes 32 ETH can become a validator.

Q.  What is the validator's role on Ethereum?

A.  So validators have two roles.  There's a lottery at every slot, so every 12 seconds one validator is chosen to be what's called like the slot leader or the block producer.  And they get to produce a block for that slot if they want.  And then the other validators are then called attesting validators; and their role is to come to consensus about the block that was produced by the slot leader.

Q.  Let's start with the proposing validator role.  Under the Ethereum protocol, how does the proposing validator decide what goes into a block?

A.  So the proposing validator has complete autonomy to decide; they can put any transactions they want in a block.  They can propose an empty block, they can propose no block at all, they can take transactions from wherever they want.

Q.  Why does Ethereum have this feature?

A.  This feature is not just part of Ethereum; this is true of pretty much every blockchain, of which there are dozens, if not hundreds.  That's because, sort of, at the time the blockchain

is designed, you don't know what transactions will be available or what incentives people might have. And so it would be basically impossible to come up with rules of saying, You have to put transactions in this order, when you have no idea who's going to be making the transactions and what transactions they are going to be, and what smart contracts are going to exist. So the system stays very flexible by saying, Every 12 seconds, we elect somebody; and they can put the transactions in that they want.

Q.   How does the ordering of transactions matter on Ethereum?

A.   So it matters in a lot of ways.

So in the early days of Ethereum, when there wasn't much MEV, it still mattered because you could think of suppose I have some account balance. If I have ten ETH and I sign a transaction to send ten ETH to you and ten ETH to you, I can't -- both of those transactions can't go through because I only have ten ETH. But they are both sort of valid; I do have ten ETH, and I signed both of them. So which one is valid and which one is going to be rejected? Well, the first one is valid; and the second one is going to be rejected. And the validator chooses which one is first and which one is second.

Q.   Is there another way in which transaction ordering matters on Ethereum?

A.   Yeah. So in this case we've heard a lot about MEV. And so MEV you can also think of like -- the simplest example of MEV

PB3VPER2                    Falk - Direct

is arbitrage. So you imagine there is a decentralized exchange, like Uniswap, that's at some point selling ETH below market prices. So here's this exchange. You could go and you could buy ETH. And you could make a profit by buying at this lower price and selling it high someplace else.

But it only has so much ETH.

So the first person who can come and buy it from this exchange is going to make that money. And the second person who comes is not. And everybody wants to make this free money from this arbitrage trade. And who gets to make the arbitrage trade, well, the validator is the one who gets to decide. They can make it themself or they can ask people to pay them for the right to make this arbitrage trade. But somebody has to decide, and in Ethereum it's the validator.

Q. Is that aspect of the validator's role profitable for the validator?

A. Yeah. So that's expected to be profitable. And MEV originally stood for "miner extractable value," when validators were called miners, because it was expected that that was a profit that would go to the block producer.

Q. Is this feature of the profit going to the block producer, is that ununique in Ethereum?

A. No, that's true in pretty much every blockchain. Almost every decentralized permissionless blockchain has this design, that the proposing validator gets complete autonomy of how to

choose the order of transactions.

Q. How does someone become a validator?

A. On Ethereum, you stake 32 ETH; and then you run some validator software.

Q. Can anybody stake the ETH and become a validator?

A. Yeah, so that's what we say it's permissionless. Anybody can stake 32 ETH; there's no identity checks or anything like that.

Q. Do you have to agree to any terms of use to become an Ethereum validator?

A. No, there are no terms of use; and there's no one who can even, sort of, present you with terms of use. It's a decentralized system.

Q. Do you have to promise to behave in any certain way to become an Ethereum validator?

A. No, there's no promises. And, again, there's no one who you could even reasonably make this promise to.

Q. Professor Falk, you mentioned a testing role validator role earlier. Just for clarification, what is that role?

A. Well, in Ethereum and in almost every blockchain, there's what's called a consensus mechanism. And this comes about because the proposing validator might propose one block, but they might propose two blocks. And if they propose two blocks, you only want to add one of those two blocks to the chain. And so the attesting validators, their role is to ensure that no

more than one block gets added to the chain. Because proposing validator might be incentivized to produce one block and send it to somebody, or produce a different block and send it to somebody else. And they could do this for their own motives. And you want to only add one block.

So the attesting validators are there to ensure that no more than one block is ever added to the chain in a given slot.

Q. Does the testing validator role implicitly recognize the validator might propose more than one block per slot?

A. Yeah. So the consensus mechanism — in this case, Ethereum's consensus mechanism, which is what the attesting validators are doing, right — is a huge area of research. It was kind of a core differentiating feature of all these blockchains of how they went to consensus.

But it's all predicated on the idea that the proposing validator might propose two blocks or three blocks or as many blocks as it wants; and you can never stop them from doing that. So you need a way of saying, If they propose multiple blocks, how do we select which one to add to the chain?

Q. Okay. So those are the two roles of the validator. And I want to talk a little bit about the mechanics of being a proposing validator.

MR. LOOBY: And it might be helpful if, Joe, you could please pull up 5010, but now at slide 3, and to publish that

for the jury.

These slides have some nifty animation, but in the interest of time, I'm just going to get to the state of the slide.

Q. Professor Falk, in general, what are some sources of transactions from which a validator could pull to construct a block.

A. Yeah. So this slide shows a few of them. There's the mempool; and this is essentially built into almost every Ethereum client. It's a public space where people gossip transactions around. Proposing validators can also create their own trades; they can sign transactions and put them in a block. Some proposing validators have deals with people to get proprietary order flow; they may either be buying transactions that they want to extract MEV from, or they may be getting paid to insert other people's transactions in specific places or, they can query a relay and ask for a block of transactions.

Q. Under the Ethereum protocol, does the validator who queries the relay have to use the block that the relay gives it?

A. No, not at all. The relay isn't even a core part of the Ethereum protocol. But even under normal operation of a relay, you would probably call multiple relays. And you can't -- you probably wouldn't use multiple blocks.

But, beyond that, the default Ethereum consensus client, so there's open-source software you can run. The most

popular software is called Lighthouse.  If you run lighthouse, it has a setting where you can build your own block from transactions in the mempool and query a relay.  And then the software compares which one is more profitable for you and publishes that one.

Q.  Professor Falk, we'll talk more about MEV-Boost in a bit.  But I have just a couple questions for you while this slide is up.

Do you understand this slide to be depicting the so-called MEV-Boost ecosystem?

A.  So the MEV-Boost ecosystem I guess is kind of vague and big.  But this is a relay probably as conceptualized by Flashbots, yeah.

Q.  And what do you understand this slide to generally be representing?

A.  So this is representing sort of how an Ethereum validator would get transactions, put them in a block, and sign that block and send it to attesting validators to get added to the chain.

Q.  Does the existence of MEV-Boost change the availability of these other sources of transactions for the validator in any way?

A.  No, not at all.  And as I was saying, sort of the default operation of a lot of validator clients is to basically look for transactions that are the most profitable either from the

mempool or from a relay or from anywhere else.

MR. LOOBY:  Joe, we can take that down.

Q.  We've used the word "Ethereum protocol" in our discussion this morning.  This might be a basic question, but what is the Ethereum protocol?

A.  Yeah.  So that's a broad question.  But, basically, the Ethereum protocol you can think of as the guidelines for how these different nodes can all communicate with each other. Remember there's, you know, probably millions of different computers, and they all have to send messages back and forth. And so sort of how you should structure these messages, what messages you should expect at certain times, and how to behave when you receive various messages.

Q.  Are these features of the protocol publicly available?

A.  Yeah.  So the entire Ethereum protocol is public.  All of the documentation is public.  And then there are a number of what we call, like, software clients, so just sort of off-the-shelf software that you can download if you want to run an Ethereum node.  And there's a handful of different open-source software clients.  You can just take them as is, or you can modify them.  Or because the protocol is open, if you want to take the time, you could write your own client, but it's complicated.

Q.  Does the Ethereum protocol set rules by which users must abide?

A.   No, there aren't really rules as such.  There's this software that you can run, and you can modify it if you want.

Q.   Do Ethereum users have to agree to follow the Ethereum protocol in order to use it?

A.   No, there's not any kind of agreement like that.  And there's, again, sort of, no way you could make that agreement.  There's no one you could agree to.

Q.   Professor Falk, there's also been talk in this trial about something called the Builder API.  Again, another broad question, but what is an API?

A.   Yeah.  So an API stands for application programming interface.  So you want to think of it as an interface.  If you have two computers and you want them to talk to each other, and you want to talk -- you want them to talk to each other automatically, if you have some application.

So like in my work, I use APIs all the time, which is suppose I want to grab some blockchain data; I want to get price data from some token.  There will be some server somewhere that has aggravated price data.  And they will have an API that I can read and say, Call this end point if you want this type of data.  And if you call this end point if you want this type of data, and I then write programs that can repeatedly call these APIs.

Q.   Is API documentation helpful to you in your work in that regard?

A.   Yeah.  I use it all the time because I want to know how I should query the data.  My computers are kind of brittle, and so I have to query in exactly the right way.  And then when I get a response of price data or whatever data I'm asking for, it's going to come back in some specific format.  And I need to know how to parse that format and read it and extract the useful stuff for myself.  So I read APIs all the time.

MR. LOOBY:  Joe, if you could please pull up DX 3219, which is in evidence.  And with the Court's permission, we would publish.

THE COURT:  You may.

Q.   Professor Falk, are you familiar with this document?

A.   Yes, I am.

Q.   What is it?

A.   So this is an archived version of the Builder API.

Q.   Do you see the sentence at the top, it's the first sentence in the document that says the API -- this API specification for external builder nodes.

A.   Yeah.

Q.   What does that tell you about the purpose of this document?

A.   Yeah.  So this is a little bit confusing, because this also serves as the Flashbots relay API.  If you go to the Flashbots website and you ask for the relay API, it takes you here.  But there's hope that in the future, you would not need a relay. People haven't figured out how to do that exactly.  But for

right now, the sort of Builder API is the relay API.  But it's how you would query information from the relay or from a builder in the future.

Q.  So when looking at this document, can we -- when we see the word "builder," can we just swap in the word "relay"?

A.  Yeah.  You can think of this as -- this is also currently serving as the relay API.  So you would go to this document. If you wanted to write a program to query a relay and get information back, you would use this as a reference.

MR. LOOBY:  Joe, if you could zoom out a little bit.

Q.  Professor Falk, I want to talk generally about the way that this document is structured.  Can you explain for us how it's structured?

A.  Yeah.  So you want to think of like the relay as a computer somewhere that's running; it's a server.  And you're going to want to make some queries to this server.  And you may want to query different things.  And the different areas here are called end points.  And so we see this, like, post button. This is what's called a post end point where you post some data to this end point and you get something back.  And usually a server will have lots and lots of different end points.

So, again, sort of in my work, I'm often interested in price data.  And they might have an end point to get price data for a specific token, or they might have an end point to get price data for a specific exchange.  So then I would get, you

know, all of the trades in the last hour from some exchange, or they might have an end point that allows me to get, you know, token information like who created it, but not price data. And they'd have end points for all these different things, where I could query different types of data from the same server.

Q. So on this document, is the teal box that says "post" and the information that immediately follows it, is that the end point?

A. Yeah. So that is what's called -- in this case it's the registration end point.

Q. Underneath that end point we see some text. What is that?

A. Yeah. So in these documentation, these are, sort of, auto-generated; they are software that, sort of, formats them all the same. So all the API documentation looks the same for Flashbots and for, you know, most of the price APIs I use.

So they have the end point name which shows you where you are asking for this data. Underneath, there's a little description of, sort of, why you would want to use this end point. So, again, sort of, with my example of price data, they might say, like, If you hit the token end point, it will say, you know, Get data about this token, you know, including creation time or something. And if I could have price end point, it might say, Get information about the hourly price of this.

So there's a description underneath that tells you why

you would want to query this end point.

Q. How is that information useful to you when you're using an API?

A. It's crucial, if I want to write some code, to query. I need to know, sort of, which end point I want to talk to.

MR. LOOBY: And, Joe, if you could please turn to the next page.

Q. Professor Falk, under the heading "Request Body" then we see a black box. Can you explain what we're looking at here.

A. Yeah. So, again, the point of this documentation is to tell you how to interact with this server somewhere. And so I need to make a request. In this case, I'm sending some data, and you've got to put it in exactly the right format. So this document will tell you exactly the format you should -- how you should format your data when you send it to this API.

MR. LOOBY: And, Joe, if you could scroll down to capture the next one. No, go up a little bit. Yeah. There we are. Thank you, Joe.

Q. Professor Falk, what is this portion of the document?

A. So after the request side, there's the response side, where it will tell you, Okay, here's the responses you should expect to get, and the exact format of the responses. Because you need to know how it's going to respond, how it's going to say -- you know, if you make a bad request, what it's going to say; if you make a good request, how it's going to structure

the information it's giving you back.

MR. LOOBY: Joe, if you could zoom out and go to page 3.

Q. Okay. Do you see the blue box that says "Get"?

A. Yeah. So this would be another end point on the relay or the builder. And so this is the end point you would query if you wanted to get an execution payload header from the relay.

Q. And does this portion of the document and the fields that follow, does it follow the same general format as the first end point that we looked at?

A. Yeah. So it has the end point, which is slash ETH v1 builder header, whatever. And this is very much like a URL. So if you look up like the address of some relay, if you go to, like, flashbotsrelay.flashbots.io, and then you add this thing at the end, ETH v1 builder, you go there with your website -- with your Internet Explorer or whatever browser you use, it will give you a response like this. Like it's just the address on the server.

And here we see the parameters that you have to put in. Here you see a slot number, a parent hash, and a public key. So these are the parameters you give to this end point.

MR. LOOBY: Joe, if you could scroll down.

It's tough to do.

Q. Professor Falk, do you see the black boxes with formatted messages here?

A.   Yeah.  And so here this shows the response type.  The first end point, the registration end point, the responses were kind of minimal; because if you register, you don't really get an interesting response.

But here you are asking for a block header.  And so it says here is exactly the format we will give you the header in. And so if I were writing a program to interact with a relay, I would need to know the exact format that I'm going to receive the header in.

MR. LOOBY:  Joe, if you could please zoom out and go to page 5.

Q.   Professor Falk, do you see the teal box that says "post"?

A.   Yup.  So this is another end point on the relay.

Q.   What does this one do?

A.   So, again, this is now where you can send a signed blinded block to the relay and, in response, get back the full payload, sort of the list of all transactions from the relay.

Q.   Is this something a validator can do?

A.   Yeah.  So a validator can call this end point if it wants, yes.

Q.   Does this portion of the document follow the same format as the other portions that we looked at?

A.   Yeah.  So it gives a brief description of sort of why you would call this end point; and then it spends a lot of time talking about, Here is the exact format, you make your request,

and here is the format you get your response in.

Q. And that written description immediately under the end point, does that impose any obligations on a validator?

A. No. I mean in this API documentation, these descriptions are meant to help you figure out which end point you're supposed to be calling.

Q. Professor Falk, the second sentence in that narrative portion says the builder is now able to unblind the transactions in execution payload header without the possibility of the validator modifying them. Do you see that?

A. Yes, I do.

Q. Again, what is the purpose of this narrative field?

A. That's really just, sort of, again, a description of what's happening here, like, why you would be calling this. But in this case, it's sort of a very, sort of, casual short description because it should say that the builder can unblind the transactions in the execution payload header. And if the validator proposes another block, they will be slashed.

Q. Are these instructions for the validator?

A. No, these are, sort of, hints to somebody who's writing code to interact with the relay about which end point they should query.

Q. Does this impose any obligations on the validator?

A. No, that's not how APIs work. The API documentation is there to help you figure out how to interact with this relay,

but it's not a terms of service or anything like that.

Q. And I think you hit on this before, but is this highlighted sentence, is it even a complete description of what a validator can or can't do after it signs the block from the relay?

A. It's not a complete description. But, again, these little descriptions here are not meant to be complete; they are sort of hints to somebody who is writing code about which end point to choose.

If you wanted to be very generous, you could say it's sort of accurate in the sense that once you sign an execution payload header, you can't unsign it. So you cannot modify that block; but, of course, you can always propose another one.

Q. And this little narrative description, does it contain that additional idea that you could always propose another block?

A. No, it does not.

Q. Is that surprising to you?

A. No, I mean that's not sort of within the scope of API documentation.

MR. LOOBY: Joe, you can pull that down.

Q. How are validators expected to behave on Ethereum?

A. It's generally expected that validators are profit maximizers; that they're validating in order to make money.

Q. Why is that the expectation for Ethereum validators?

A. Because there's not really another reason you would want to be a validator. I mean, that's how Ethereum was designed.

Q.   So I take is being a validator a form of economic activity?

A.   Yes, it is.

Q.   We've heard the term "honest validator" in this trial. Does "honesty" have a special meaning in this setting?

A.   Yes.  So before I worked in the blockchain space, I just did pure cryptography, and I designed a lot of, sort of, cryptographic protocols.

     And when you design a multi-party cryptographic protocol, and then you want to analyze its security, you want to divide the types of agents in this protocol into different categories for analysis.  And so we use terms like "honest" or sometimes it's synonymous with "altruistic."  You say, Some group will be honest or altruistic, and some group will be rational, and some group will be byzantine or malicious.  And these are, sort of, terms of art that you use when you are doing a mathematical analysis of cryptographic protocol.

Q.   Are these academic terms?

A.   Yeah.  So you'll find them in basically every academic paper about -- one place where I work is in secure multi-party computation; but you also find it in all of the rigorous analyses of different blockchain consensus protocols.

Q.   I want to walk through some of the different groupings of types of users that you mentioned.

     What would it mean to be an altruistic user of a blockchain technology?

A.   So the, sort of, honest or altruistic type is the one who's always going to blindly follow the, sort of, protocol as it's written, whether or not it's in their economic interest.

Q.   What would it mean to be a rational user of decentralized blockchain technology?

A.   So a rational type is someone who is profit maximizing, sort of, to contrast them to the honest or altruistic type.

Q.   I think you mentioned the third category had two different terms, malicious or byzantine; is that right?

A.   Yes.

Q.   Now, "byzantine," that's a strange one, at least to me.  Do you know why that term was used?

A.   Yeah.  So in one of the original papers that designed consensus mechanisms, they sort of came up with a thought experiment where you had a bunch of generals who were surrounding a city, and they were all trying to decide whether they are going to attack or not.  And this framework of this thought experiment was in Byzantium.  And so this paper got called The Byzantine General's Problem.  And somehow in computer science the name for people who can behave arbitrarily got called byzantine.  Sometimes we call it malicious, but often people will talk about byzantine actors.

Q.   And, again, these are all terms of art?

A.   Yeah.  So these things -- even "byzantine" has a sort of fairly rigorous technical meaning that cryptographers would

understand if you want to talk about a consensus protocol.

Q. Are these terms specific to Ethereum?

A. No, no. They came out long before Ethereum, and they're used, sort of, all through cryptography and decentralized systems.

Q. Is there an expectation that all actors in Ethereum will be of the honest type?

A. No, there's not. There never is in any of these decentralized protocols.

Q. What is the assumption?

A. The assumption is in Ethereum that most users will be of the rational type. But, again, these types are sort of abstract concepts that we use for analysis, that we want to prove something that Ethereum will behave in this way as long as no more than a third of the agents are of the byzantine type or something like that.

Q. Is it possible for an Ethereum validator to pose as a certain type of user?

A. I mean, user abstract types that we use for mathematical analyses, there's not really a way you can pose as one type or another.

Q. Do validators have to agree to be one type or another before becoming Ethereum validators?

A. No, that's not a concept that people use, and there's no way to do that.

Q.   Does this assumption of rationality factor into the design of Ethereum?

A.   Yeah.  So Ethereum is what we would call a cryptoeconomic protocol; it uses cryptography to enforce some things, and it uses economics to enforce some things.  And the core design of Ethereum is assuming that most of the agents there are economic or rational actors.

Q.   And are these assumptions of economic rationality, are they widely known and publicly discussed in this field?

A.   Yeah, they're very widely known.

Q.   Does honesty in this setting have anything to do with telling the truth?

A.   No, it's not about telling the truth; it's just a category of agent in an analysis.

Q.   Professor Falk, I'd like to ask you a little bit more about slashing that you had mentioned, economic incentives.  What is the slashing penalty on Ethereum?

A.   So on Ethereum, when you are the slot leader, when you've been chosen to propose a block, you have to sign that block, that way people know it came from you.  But there's nothing in a signature that prevents you from signing another block.  And so to disincentivize you from signing multiple blocks, Ethereum has a slashing penalty.  And when you sign two blocks, that's called equivocation; and you'll be slashed one ETH for doing that.

Q.   How does slashing work in practice?

A.   Well, slashing is kind of nice because it's something that's -- it's very easy to observe because I can -- if a validator signs two blocks, you have evidence that they signed two blocks.  You have two signatures.  And I can show that to anybody.  And so I don't have to say, Oh, I saw them sign two blocks and you trust me.  I can just present, Here are two blocks that are signed by them, and I can convince anybody that happened.  And, in particular, I can convince the blockchain itself.  So I can submit these two signatures to -- essentially to the blockchain itself, and there's a mechanism then that slashes some of their stake.

Q.   Is that mechanism part of the Ethereum protocol itself?

A.   Yeah, that's part of the core Ethereum protocol.

Q.   And does the Ethereum protocol prohibit validators from doing what you just defined as equivocation?

A.   No, there's no way to prohibit that.  So they impose this slashing penalty.

Q.   Is this ability of an Ethereum validator to equivocate a known feature of the Ethereum protocol?

A.   Yeah, it's widely known.  And the whole design of slashing and equivocation penalties is based on the idea that validators may be incentivized to slash -- I mean to equivocate.

Q.   And did anything about the slashing penalty change after omakase?

PB3VPER2                          Falk - Direct

A.   No, it did not.

Q.   How is the amount of slashing set?

A.   So that's essentially baked into the Ethereum protocol.

Q.   Could it be raised?

A.   It could be raised.  Ethereum has changed multiple times.

Q.   Has it been raised since April 2023?

A.   It has never been raised, no.

Q.   Is that one-ETH slashing penalty sufficient to discourage validator equivocation?

A.   Under most circumstances, it is.

Q.   In outlier cases, can that economic disincentive give way?

A.   Yeah.  If there's more money to be made by equivocating, then, of course, a rational validator would equivocate.

Q.   I want to ask you about MEV-Boost.  But before I do, does that term sometimes refer to different things?

A.   Yes.  So sometimes there's sort of the whole kind of MEV-Boost ecosystem that we talk about.  But there's also a specific MEV-Boost client software, and sometimes it refers just to the specific client software.

Q.   What type of user would run the MEV-Boost client software?

A.   That's designed for validators.

Q.   How does the MEV-Boost client software relate to the Ethereum protocol?

A.   So sometimes it's called like a sidecar.  So it is not an Ethereum validator client, you still have to run your Ethereum

validator client; and you can run this other piece of software next to your Ethereum validator client, and they can talk back and forth.

Q.  Do validators need to run the MEV-Boost client in order to interact with a relay?

A.  No.  We saw this Builder API, which is the relay API.  And the point of documentation like that is so that you could write your own software to connect to a relay.  The MEV-Boost client is pre-written software that connects to the relay for you, so you don't have to write anything if you don't want.  But the relay is open.  The API is -- the documentation is there for you to write your own code.  And lots of other people have done it.  I already mentioned that Lighthouse, which is a common Ethereum client, already has code built in to connect to a relay.

Q.  Do you know if the omakase validator used MEV-Boost?

A.  I believe they did not.

Q.  Turning to the MEV-Boost relay that you mentioned, is there something called the MEV-Boost relay?

A.  Yeah.  So there is a piece of software that's the, like, MEV-Boost relay code.  And then there's a specific relay that is running that software that Flashbots is running, it's called the MEV-Boost relay.

Q.  How does the relay, either Flashbots version or other versions, how does that relate to the Ethereum protocol?

A.   So that's outside the Ethereum protocol.  Anybody who wants to, can run a relay.  And the Flashbots code is open source; you can just download it and run it.  The relay specification is open; so if you don't like the Flashbots code, you can write your own code and run a relay.

Q.   Do you know if the Flashbots relay was even involved in the trades at issue in this case?

A.   I believe it was not.

          MR. LOOBY:  Joe, if you could pull up DX 5010, go back to page 3.  We got it.

Q.   Professor Falk, the box on the top right says "relay."  Is this referring to a specific type of relay?

A.   Yeah.  I assume it's a relay following, sort of, the Flashbots spec.

Q.   But is it necessarily the Flashbots relay?

A.   No, it could be any relay.

Q.   And there are multiple relays on the market?

A.   There are multiple competing relays.

Q.   And their software, can it be -- or their code, can it be customized?

A.   Yeah, it can easily be customized.

Q.   And we discussed this earlier, but a validator, it can call a relay for a block if it wants to?

A.   Yes, it can.

Q.   Once the validator calls the relay, does that limit the

possibility of taking transactions from the other sources on this chart?

A. No, not at all.

Q. Why would a validator query the relay in the first place?

A. In hopes of getting a block that would be more profitable for it than any block it could produce itself.

Q. If the relay's block is not the most profitable block for that validator, can the validator just make its own block?

A. Yeah, it can. And you would expect a rational validator to do that. And as I've mentioned, you know, the Lighthouse code does that for you by default.

Q. Does the validator opt into the MEV-Boost ecosystem when interacting with a relay?

A. No, there's no, sort of, way you opt into the MEV-Boost ecosystem; that's, sort of, a very vague concept anyway.

Q. Does the validator need to agree to any terms of use before interacting with the relay?

A. No, there's no terms of use to interact with a relay.

Q. Does the validator need to agree to do anything before interacting with the relay?

A. No, there are no agreements between the validator and the relay.

Q. Is there what's called a registration step though?

A. Yes, there is.

Q. What is the point of registration?

A.   Yeah.   So I've said that the point of querying a relay is to get some money.   How do you get money?   The block builder is going to pay you to take their block.   In order for them to pay you, they need to know what address to pay you at.   So before the builder builds a block, they have to know where you should get paid.   And the point of registration is for you to tell the relay and the relay to tell the builder where you want to get paid.

Q.   With whom does the validator register?

A.   The validator registers with the relay.

Q.   Does the validator register with MEV-Boost?

A.   No, the validator registers with a specific relay.   And if you want to register with more than one relay, you can.   But the relays don't talk to each other; there's no, like, overarching MEV-Boost that you can register with.

Q.   Does the validator register with Flashbots?

A.   No, the validator does not register with Flashbots; they register with individual relays.

          MR. LOOBY:   Joe, if you could please pull up 3219 again.   Everyone's favorite exhibit.   Go to page 2.

Q.   Professor Falk, is this the portion of the API document that we looked at before that relates to the registration step?

A.   Yeah.   So here we see the request body; so this is what you send to the relay when you want to register.

Q.   And in the black box underneath "Request Body," there are

different lines, the first one being fee recipient.  What are these?

A.   Yeah.  So this is saying what a validator would send to the relay.  And it has two parts; it has the message part and the signature part.  And the message has four subparts:  It has a fee recipient; so this is the address where the validator wants to get paid.  It has a gas limit.  And in Ethereum, transaction complexity is measured in a unit called gas.  And so every block has a gas size.  And so gas limit is saying, I don't want the relay to give me blocks that have more than this gas in it.  So I don't want blocks that are too big.  It's like an upper limit on the block size you are willing to get.  And there's a time stamp of, like, when you sent this request.  And then your public key.  "Pubkey" means like the public key of the validator who's sending this request.

Q.   Do these fields in this message body have something in common?

A.   Yeah.  So they are all just registering the validator preferences.

Q.   Is that preference for how the validator will get paid?

A.   Yeah.  So the key field here is the fee recipient of where the validator will get paid.  The gas limit is just a way of saying, Please don't send me enormous blocks.  The time stamp is just there so you can overwrite your preferences, right.  So I may register with a relay and then realize, actually, I want

to get paid somewhere else and I want to send again. How will the relay know which one is the new one? Well, the one with the later time stamp is newer. So the time stamp is just a way of overwriting your old preferences.

Q. Why does the relay need this information?

A. Because the relay needs to give your fee preferences to the builder, so the builder can insert a payment transaction into the blocks it builds.

Q. Is this registration message a commitment for the validator to call the relay later on?

A. No, not at all. And it's very natural to register with a relay and not call it again.

Q. Is the registration message here a commitment for the validator to do anything at all in the future?

A. No, it's not a commitment to do anything; it's just a way to express their preferences to a relay.

Q. Now, this portion of the API document, this end point, does it govern what a validator can do if it does decide to call the relay?

A. No, not at all. That's not the point of API documentation.

MR. LOOBY: Joe, if we could go to page 3.

Q. Professor Falk, how does a validator request a block from the relay?

A. Yeah. So they call this get header end point, which we see here.

PB3VPER2                       Falk - Direct

Q.   Is that the blue box that says "Get"?

A.   Yes, it is.

Q.   And does this "Get" box, does it tell you something about the purpose of this?

A.   Yeah.  So we saw the last one was called a post end point, and this is a get end point.  So you're really not sending it much information; it's really about getting information rather than sending information.

Q.   And does this end point tell a user about the format of a request that it should send?

A.   Yeah.  So it says, If you want to query this end point, you should put the slot number inside those curly braces; and the parent hash, so the previous block, the parent of the block you're interested in; and then the pubkey of the current validator -- the public key of the current validator, yeah.

Q.   Okay.  So a user could essentially copy and paste this address, populate some of those fields that are in parentheticals, and hit enter?

A.   Yeah.  So if you prefix this with the address of the relay you like, like, you know, flashbots-relay.flashbots.net, and then slash ETH V1 builder header, and then you put in a slot number and a parent hash and a pubkey and the slashes, you could go there with, you know, Firefox or Internet Explorer and you'd get a response.

Q.   Could I do it right now on my iPhone in this courtroom?

A.   You could do it right now with your iPhone.  You would have to know the current slot number, which I don't know off the top of my head; it changes every 12 seconds.

Q.   Is all of that information that you would have to input, is that publicly available information?

A.   Yeah, it's public information.  It would be hard to, sort of, type that in because you'd have to find the pubkey.  So it's meant to be called programmatically, but if you were fast, you could copy/paste it in and get it in your phone.

Q.   I assure you I am not the right person for that job.

So what does a relay do in response to the get header command?

A.   It sends back an execution payload header which -- in the format that's described below.

MR. LOOBY:  Joe, if you could go down.  Okay.

Q.   And Professor Falk, help orient us, where is the message that comes back from --

A.   So it's in this black box that says "example value."

Q.   Does the relay send this same information in this box to anybody who asks for it?

A.   Yeah.  So it will send information in this format to anybody who asks.  It will always respond in the same way, right.  It doesn't ask who you are or who's querying it.  This is an example response; so the actual parent hash will be different, but it will have a field called parent hash.  And

the actual fee recipient will be different, but it will respond in the same way no matter who calls it. It doesn't ask for identification in any way.

Q. Does calling the get header command for the relay convey any information to the relay?

A. No, not at all. I mean, just, I guess, that you are interested in what this header is. But --

Q. If the party calling the get header is the validator, does calling this end point commit the validator to do anything with respect to the block?

A. No, not at all. And we've talked about that there's a very standard workflow where you would call get header and not like the fee that's being proposed, and then never do anything with it.

And this would happen a lot if you called multiple relays and one of them has a higher fee than the other, then you would not continue on with the relay that offered you the lower fee.

And, similarly, if you built your own block and you could make more money that way, you would essentially discard this header after you saw that the fee was insufficient.

MR. LOOBY: All right. Joe, you can pull that down.

Q. And just to orient us where we are in the point of the process, where the validator has registered, the relay has been called, and it has returned a message in the format along the

lines of what we just saw, what is that message sometimes called that we were looking at?

A. The response?

Q. Yes.

A. Sorry, can you repeat the question?

Q. Yes. Does the response from the relay have a name?

A. For the get header?

Q. No, the message that comes back from get header.

A. It's sometimes called the blinded block header or -- yeah.

Q. And what is the purpose of the blinded block header?

A. So it gives some information about the -- about the block that the builder has built. But it's called blinded because it only has the hash, essentially, of all the transactions in the block; it doesn't include the actual transactions, it just includes like the fingerprint of the transactions.

Q. And what would happen if you didn't have the relay in this situation?

A. So Flashbots built this relay because it was understood that both the builder and the validator are trying to extract MEV. And if the builder just handed a block to the validator, that the validator would extract all the MEV for themself.

Q. And what's the relay's role in this process then?

A. So the relay's role is to ensure that before the validator sees the underlying transactions, they signed this block header. And that ensures that if they ever sign another block

header, they will be slashed.

Q. And how does the relay accomplish that role as a technical matter?

A. So it receives the full block from the builder, and then it passes the blinded block to the validator. The validator can sign that blinded block header if it wants. It then checks the signature to make sure that it's a valid signature. And then it releases the block body to the validator.

Q. And you mentioned the slashing. Is that the same economic incentive that we were talking about before?

A. Yeah. So Flashbots doesn't have its own incentives built in; it's piggybacking off of the Ethereum incentives. So that's the same slashing for equivocation in Ethereum.

Q. If a validator signs another block after signing the relay's block, will it be slashed?

A. Yes.

Q. Will that slashing penalty work to discourage the validator?

A. Yeah. In most cases, that's enough to discourage a rational validator from proposing a second block.

Q. Is that true in all cases?

A. No. If there's more MEV to be extracted by proposing a second block, you would expect an economically rational validator to do that.

Q. Now, just one point of clarification, Professor Falk. Our

PB3VPER2                         Falk - Direct

discussion of the relay's role thus far, has it concerned the relay as existed before April 2nd, 2023?

A.   Yes.

Q.   Did the relay's role change after April 2nd, 2023?

A.   Yes, it did.

Q.   How did it change?

A.   So Flashbots modified the relay to wait to return the block body until after they had sent the signed block header to some set of attesting validators and gotten a response.

Q.   And what did this change accomplish?

A.   So this meant that a group of attesting validators had already seen this signed block header.  And so they would be less likely to accept a second block that was signed by the validator.

Q.   Did this change make it impossible for the validator to equivocate and sign another block?

A.   No.  I mean, you can always sign as many things as you want.  If you're a validator, you have your signing key, you can sign as many blocks as you want.  This change made it less likely that this second block would be accepted by the other validators, but it doesn't prevent you from signing more.

Q.   Does that relate to the concept of economic incentives that we've been discussing?

A.   Yeah.  So now if you wanted to run a strategy like this, you have to take into account the fact that if you propose a

second block, you are going to get slashed with almost 100 percent probability; but your new block will only be added to the chain with a very low probability. And so now you have to weigh the low probability of some MEV gains against the, sort of, known probability of the slashing penalties.

Q. Now, going back to before April 2nd, 2023, was it the relay's role to publish a valid block to the network?

A. No, I think the incentive to publish the block is on the validator side because they're the one who stands to lose the most if the block is not published.

Q. And what is some evidence of that aspect of the relay's role?

A. The Ethereum incentives are designed to incentivize validators to publish blocks, and the relay is not supposed to be an economic actor.

Q. And remind the jury, who is ultimately responsible for publishing a block under the Ethereum protocol?

A. It's the validator.

Q. And was the relay's role publicly -- as you have just discussed it, was it publicly disclosed prior to April 2nd, 2023?

A. Yes, it was.

          MR. LOOBY: Joe, if you could please pull up DX 321-A, which is in evidence. With the Court's permission, we would publish.

THE COURT:  You may.

Q.  While we're on page 1, Professor Falk, do you recognize this document?

A.  Yes, this is an archived version of some Flashbots documentation.

MR. LOOBY:  And, Joe, if we could please go to page 6, I believe.  And, Joe, if you could highlight the sentence that starts with "Once," the two sentences there.

Q.  And, Professor Falk, will you read those two sentences for us?

A.  Yes.  So it says:  Once the validator signs the header, the relay sends the block payload to the proposer.  If at this moment the validator decides to propose a different block, they will have signed two blocks and will be slashed.

Q.  Is this paragraph talking about the relay's role prior to April 2nd, 2023?

A.  Yes, it is.

Q.  And what is it disclosing about that role?

A.  So it's describing that the role of the relay is to ensure that if the validator proposes a different block, then they will incur this slashing penalty.

Q.  Is the role of the relay to make it impossible for the validator to propose that second block?

A.  No, there's no way to make it impossible.  The validator can always propose another block.  And so this is designed to

impose some economic penalties for proposing a different block.

Q. Now, this fact that the validator could always sign another block, this is publicly disclosed information?

A. Yeah, so this is publicly disclosed information. It's also sort of known to everybody in the cryptography space who kind of knows how signatures work, that you can always sign more stuff.

MR. LOOBY: Joe, if you could pull this down.

And then please pull up DX 309, which is also in evidence. And with the Court's permission, we would publish.

THE COURT: You may.

Q. Professor Falk, do you recognize this document?

A. Yeah, this is an archived version of the Flashbots FAQ.

MR. LOOBY: And, Joe, if you could go down to the question: What prevents block proposers from stealing MEV from submitted builders' blocks?

Q. Professor Falk, do you see that question?

A. Yes, I do.

Q. And what's the answer to that question?

A. It says: Slashing penalties.

Q. Okay. Does this publicly disclose the relay's role as you and I have discussed it today?

A. Yes, it does.

Q. What exactly is it disclosing about the role?

A. It's explaining that the relay's role is to ensure that if

a validator proposes another block, that it will be slashed.

Q. And, again, how does the relay fulfill that role as a technical matter?

A. So it requires the validator to sign one block header before releasing the payload.

Q. And does that existence of the signature relate to the slashing penalties that we discussed?

A. Yeah. So Ethereum, in order to slash a validator, you can't rely on somebody's claim that they were slashed; you need evidence that they equivocated. And the evidence is two signatures.

So the relay has gotten one signature from the validator. And that means that if the validator proposes another block, there will be two signatures, and that's evidence of slashing -- evidence of equivocation.

Q. And I want to draw your attention to the last paragraph -- the last sentence of this paragraph here, which I'll read this time, which is: This penalty is significant enough to discourage this behavior, allowing the builder to reveal the blinded transactions without the possibility of the proposer tampering with them or stealing MEV.

Do you see that?

A. Yes, I do.

Q. And what concept is this sentence capturing?

A. This is capturing the economic incentives here. They are

talking about a validator who's weighing the economic penalty or the economic cost of being slashed against the economic gains of extracting more MEV.

Q.   And do you see the phrase here "stealing MEV"?  What is your understanding of how that's used there this context?

A.   Yeah.  So that's a pretty standard terminology that the MEV space is very competitive and it's mostly zero sum game.  And so when there are MEV opportunities and there are people fighting for it, usually one person says, I stole the MEV from somebody else.  So there's a victim trader that's going to get sandwiched.  Only one sandwich bot can sandwich them.  And one sandwich bot is going to steal that opportunity from the other.  Might say, like, if you're playing soccer, you steal the ball from somebody else because it's a competitive environment.

Q.   And in this sentence it says:  The penalty is significant enough to discourage this behavior.  What is "this behavior"?

A.   Equivocation; so publishing another block.

Q.   And, again, is that sentence accurate in all cases?

A.   No.  If the MEV opportunity outweighs the slashing penalty, then this slashing penalty is not enough to discourage the behavior.

Q.   And the sentence goes on to say:  Without the possibility of the proposer tampering with them.  Is that accurate?

A.   No.  So I mean -- well, it depends a little bit what you mean by "tampering."  So once a block is signed, you cannot

modify that block. Of course, you can sign a new block. Some people might call that tampering, but, sort of, literally you didn't tamper with the original block. It's still there. If you want to think could you publish a new block, of course, you can do that.

MR. LOOBY: Joe, you can take that down.

Q. Professor Falk, are you familiar with something called a commit-reveal scheme?

A. Yes, I am. Commit-reveal schemes are very common in cryptography.

Q. Broadly speaking, what is a commit-reveal scheme?

A. So commit-reveal schemes were designed to allow essentially untrusted people to engage in some kind of, like, economic activity together. The original paper was called, like, coin flipping over the phone.

But the idea was suppose you wanted to say, like, bet with somebody. Suppose you want to play, like, rock/paper/scissors with somebody. And if I throw scissors and you wait to see what I throw, then you're going to win every time.

And now, if you're on two separate computers, right, how can I send, sort of, my action and then, like, know that you're not going to wait for me, right? Whoever goes second is going to win this game.

So we need some way where I can essentially, say,

throw scissors, and I commit to this in a way that commits me to it, but is hiding it from you.

And after I've committed, so what I'm going to do is, like, I'm going to write down my throw on a piece of paper and put it an envelope, and I'll put it out there. And then you can decide, you know, I'm going to throw paper. And once you've thrown paper, now I can open my commitment and you can be sure that I didn't change my value, right. I didn't change my value. And now we can play this game.

And so these commit-reveal schemes are crucial in this area where we want to, sort of, you know, gamble or play some games. But people are, you know, anonymous and they are at a distance from each other.

Q. When used in the blockchain context, what type of commitment is involved in this situation?

A. Yeah. So a cryptographic commit is like a formal cryptographic primitive that has these properties that it should be hiding, so it should, like, hide my choice. And it should be binding; so it should bind me to this choice.

(Continued on next page)

PB3RPER3                    Falk - Direct

Q.   And when the word commitment is used in cryptography, does it typically have this special meaning?

A.   Yes, it does.

Q.   Does the MEV-Boost relay implement a commit reveal scheme in the cryptographic sense?

A.   No, it does not.

Q.   Why?

A.   Well, it's fundamentally very different.  In the commit reveal scheme, the person who commits is the one who later reveals.  And some people casually call the MEV-Boost relay kind of a commit reveal scheme because there's a point where the relay reveals the block body, so there's this sort of reveal step.  And beforehand there's the step of signing the block header, which you could think of as like committing yourself to being slashed if you published another block.  But that's not really how commit reveal schemes work in cryptography where the person who commits is also the person who reveals.

Q.   When used in cryptography is this commitment, can it be properly conceived of as a commitment to do something in the future?

A.   No.  So a commitment is like a commitment to a value, to say, I can't change this value, but in cryptography, you can never commit to sort of do something in the future.  That's like a human action.  There's no cryptographic mechanism to say

PB3RPER3                    Falk - Direct

I'm not going to do something in the future.

Q. In the context of the MEV-Boost relay and the validator, is the validator's commitment, so to speak, on the relay's block, does it prevent the validator from signing a different block?

A. No, not at all. So if you want to make this analogy to a commit reveal scheme and you want to say that this signature on the block header is a commitment, you cannot change that signature, so that's true. But it's not a cryptographic commitment because it's not hiding anything. And you can always sign something else. That's sort of the nature of digital signatures.

Q. In this context, has the validator committed to putting any particular block on the chain by signing it?

A. No.

Q. Why do we know that?

A. Because one is they just fundamentally have the ability to sign anything they want. Two is we just saw a bunch of Flashbots documentation, which described what would happen if they signed another thing, so we know Flashbots thought about this?

Q. In your answer now, what is the function of the validator's signature?

A. The validator's signature is to ensure that if they were to publish another block, they would get slashed.

Q. What function generally do digital signatures have in

Ethereum?

A. Yeah. So digital signatures are used all throughout Ethereum and through pretty much every other blockchain. You need them to know sort of where a message came from. As an Ethereum user, I want to make a transaction, I have to sign it, and that's so that everybody knows that it came from my account and that it wasn't tampered with along the way. If you change my transaction a little bit, then that signature won't be valid. And you'd know everybody along the way would want to change my transaction because if I sent a payment to somebody here, sent a payment to Patrick, pretty much everyone along the way would prefer that payment went to them. And if they tried to change that, that would make that signature invalid. So you need to know that signature has not been changed along the way.

And that goes for the validators too. When a validator proposes a block, they have to sign it, and that's when the other attesting validators know it came from the proposing validator. We would all like to propose a block because there's money in it. But I wasn't chosen as the slot leader because I didn't stake any ETH, and so I cannot sign a block. But if there were no signatures, of course, I would just propose all the blocks and take all the rewards.

Q. Does a validator's signature play a role in enforcing Ethereum's economic incentives?

A. Yes. So as I said before, like if a validator signs two

blocks, now there is sort of concrete evidence of equivocation, and you can write a little program.  And Ethereum has this built in, that when you see two valid signatures on two blocks at the same height, then you can slash that validator.

THE COURT:  Mr. Looby, we are right at 12:45.  Do you want to wrap up?

MR. LOOBY:  Yes.  Two more questions, your Honor.

THE COURT:  Thank you.

Q.  Does a validator's signature have to be valid in order for a slashing to occur?

A.  Yeah, absolutely.  Again, I could make an invalid signature on somebody else's behalf.  So in order for it to be actual evidence of equivocation, you need to know that both the signatures came from the proposing validator, so they both have to be valid signatures.

Q.  When a validator signs two blocks or more in one slot -- for a block in one slot, is one signature more valid than the other?

A.  No.  They are both just valid signatures.  Signatures are sort of binary.  They are either valid or they are not.

THE COURT:  Thank you, Mr. Looby.

We're going to take our lunch break.  It's about 12:45.  Please be back in the jury room and ready to go in an hour.  My former instructions apply.  Have a nice lunch, and I'll see you this afternoon.

(Jury not present)

THE COURT:  Please be seated.  Mr. Falk, you may step down.

Mr. Looby, about how long do you have for your direct?  How much longer?

MR. LOOBY:  Under an hour, your Honor.

THE COURT:  Thank you.  And Mr. Levander, do you have a sense of cross-examination?

MR. LEVANDER:  We'll try to figure it out at lunch, your Honor.

THE COURT:  All right.  Anything for us to discuss over lunch?

MS. TREFZ:  Not from us.

MR. LEVANDER:  Just to confirm, the plan is to allocute the defendants once Mr. Falk is done?

THE COURT:  Yes.  That's the plan.

MR. LEVANDER:  OK.  Thanks, your Honor.

THE COURT:  And you all over lunch are going to discuss the exhibits that were shown to the jury.  But no decision has been made about admitting them fully to go back to the jury, correct?

MS. TREFZ:  Yes, your Honor.

THE COURT:  And does the government anticipate any rebuttal case here?

MR. LEVANDER:  We don't know if the defendants are

PB3RPER3                    Falk - Direct

testifying yet, so we'll assess and get back to the Court.

THE COURT:  All right.  Have a nice lunch.  I will see you all in an hour.

(Recess)

(Continued on next page)

PB3RPER3

AFTERNOON SESSION

1:45 p.m.

(In open court; jury not present)

THE COURT: Please be seated. I understand that there's an issue to take up with an exhibit.

MR. FICK: I guess the issue was that while we understand the exhibits in evidence were passed out to the jury, the defense position is that they should be taken back because it's like having multiple copies for all the jurors gives undue weight for certain exhibits versus others. Even though they are going to get everything at the end, we don't think it's appropriate for them to keep holding on to certain exhibits by the government during government's examination.

THE COURT: Does the government have a position?

MR. LEVANDER: We're not going to oppose that.

THE COURT: We'll take them back. The only thing here is I told them they are allowed to take notes and to the extent they've taken notes on these documents -- in other words, is the issue them having this document at all or is the issue having it now? In other words, Ms. Tran can take them away now and we can just put them back in the jury room.

MR. FICK: So I geese I understand there's a complication in terms of notes they may have taken, but, again, we think that having 14 copies of only certain exhibits puts undue weight on those exhibits when they're deliberating, so we

PB3RPER3                    Falk- Direct

think that's problematic.

THE COURT:  All right.  I'll just take them back in that case.  And once we do that, we'll bring back out the jury.

Yes, Mr. Fang.

MR. FANG:  Your Honor, with respect to the Rule 107 point while we wait for the jury, the parties have a list of proposals and will be in the position to give the Court an answer at the end of the day.

THE COURT:  Excellent.  Thank you, Mr. Fang.

(Jury present)

THE COURT:  Please be seated.  I hope you all had a nice lunch.  We're going to continue with witness testimony.  Professor Falk can come back down to the witness stand.

Mr. Looby, you may proceed.

MR. LOOBY:  Thank you.  Joe, if you could kick things off for us by bringing up GX 319 and going to page 4.

BY MR. LOOBY:

Q.  Professor Falk, this is the builder API document that we were discussing earlier, and there was one question that I neglected to ask you, which is:  Do you see here the two fields parent hash and state root?

A.  Yeah.  So --

Q.  Are they -- so let me ask the question.  Are these two fields different than the parent root and the state root on the signed beacon block sent by the validator?

A.   Yes, they are different.  This is showing the response from the relay to the get header request.  So these are the parent hash and state root that are filled in by the builder and sent through the relay.  And then on the other side, so this is a block for the execution layer.  The validator is going to produce a block for the consensus layer, and that block will have a parent root and a state root that are different fields.

MR. LOOBY:  Thank you, Joe.  You can take that down.

Q.   Professor Falk, we talked about validators and relays, but who are some other players in the MEV-Boost ecosystem?

A.   So there are searchers and builders.

Q.   What's a searcher's role?

A.   Searchers are people who search the mempool and other sources of transactions looking for MEV opportunities.

Q.   What kind of an Ethereum user is a searcher?

A.   Searchers tend to be pretty sophisticated because searching is very competitive.

Q.   Are searchers engaged in MEV strategies?

A.   Yeah.  So that's the primary role of searchers is they come up with some MEV strategy, and we can think of like arbitrage. So if you have an idea that you want to make arbitrage profits, you can look for certain exchanges where you think there might be arbitrage opportunities.  And then you would write some bots that scan on different exchanges, and when a transaction comes, that transaction might change the price on one exchange, and

then your bot would automatically make transactions to buy at a low price and sell at a high price.

Q.  Mechanically how would a facilitator implement an arbitrage strategy like that?

A.  So an arbitrage strategy is sort of clean, that you say, I want to buy at a low price.  So if you notice a price discrepancy, I would buy at a low price and sell what I bought at a high price.  On Ethereum, I can put both of those into a single multi-step transaction, and sign it and send it to block builder.

Q.  And both the buy and sell trade in that strategy, do they belong to the searcher who is placing the trade?

A.  Yes.  So if I were building an arbitrage bot, I would be buying at a low price and I would be selling at a high price.  So they are both my trades, so I can put them into a multistep transaction in Ethereum because they are both mine.

Q.  So I think that answer gets at what I was going to ask you next, which is:  When we use the word transactions, in this context that can mean something that contains more than one trade?

A.  Yeah.  So on Ethereum, a transaction is sort of the fundamental building block, but a transaction may not be just one trade.  A transaction can be multi-steps.  And so I can program a smart contract to do a whole bunch of things in a row, and when I call that smart contract and ask it to do

something, that one transaction might execute a whole bunch of things.  It might say I want to borrow some ETH and then use that ETH to buy USDC and then use that USDC to buy some more ETH, and then I can use that ETH to repay the loan of the ETH I borrowed.  And I can do that all in one complicated transaction if I preprogrammed a smart contract to do that for me.

Q.  Is there a word for that type of multi-trade strategy within a single transaction?

A.  Yeah.  So Ethereum, a transaction, no matter how many steps it has, it either executes completely or fails.  It reverts is the terminology we use.  So if I make a multi-step trade and one part of it doesn't go through for some reason because I try to buy something that doesn't exist or I ask for a price that I can't get, the entire trade will fail.  And that's really nice because it means on Ethereum, I can do what's called riskless arbitrage.

In the real world, I try to buy low and sell high.  I might buy low and maybe the price has changed over here and I'm stuck with a thing I don't want.  But on Ethereum I can put these into a single transaction where I buy low and sell high.  If the sell fails, then the buy won't go through either.  That is because on Ethereum transactions are called atomic.  They are indivisible.

Q.  Maybe it's from the name itself, but how did atomic strategies get their name?

A.   This is from physics.  The idea that we're all built of molecules.  If you break the molecules down to atoms, at one point we thought atoms were sort of the smallest building block of matter, so we call transactions atomic when they can't be further subdivided.

Q.   What is another common MEV strategy that searchers can employ on Ethereum?

A.   So we talked a lot about sandwiching.  So sandwiching is another common strategy.

Q.   OK.  How does a sandwich attack work at a high level?

A.   Yeah.  So the idea of a sandwich attack is that any time somebody buys a token from an exchange, they push the price up. So a sandwich bot will search the mempool or some other source of transactions for a victim who is buying a token, and they will place a front-run trade to inflate the price before the buy, and then they'll let the victim buy to inflate the price a little more.  And the sandwich bot will back-run and sell the tokens they just bought, and they can sell them at a slightly inflated price because the victim in the middle inflated the price a little bit more.

Q.   And that victim trade in the middle, is that a trade that the sandwiching bot itself places on the Ethereum network?

A.   No.  So that trade is not from a sandwich bot.  That's a trade from some trader and some user, some other person.

Q.   Does the victim's trade belong to the sandwich bot?

PB3RPER3                    Falk- Direct

A.   No.  So the victim's trade is an Ethereum transaction that was signed by the victim, and the -- it's not from the sandwich bot.

Q.   Are the series of transactions within a sandwich attack atomic?

A.   No, in Ethereum, you can only have a single transaction as the atomic unit, and you cannot make the transactions from different people atomic.  There's no way to bundle them together in Ethereum.

Q.   Is the concept in a bundle even a concept under the Ethereum protocol?

A.   So bundles are not a thing under Ethereum.  They're just transactions and a transaction is always originated by a single person.  You can't have a group of transactions from multiple people that are attached together in Ethereum.

Q.   What does a sandwich attacker do with its bundle once it has identified the transactions it wants to include?

A.   So Flashbots introduced the concept of a bundle, and so a searcher can create a bundle of transactions, like the front-run the victim and back-run.  And they can send them to a builder, and they can request that the builder put them in a block all consecutively.

        MR. LOOBY:  Joe, if we can please pull up GX 3002-A, which is in evidence, and with the Court's permission, publish it for the jury.

THE COURT:  You may.

Q.  Professor Falk, do you recognize this document?

A.  Yeah.  So this is a page from the Flashbots documentation GitHub.

Q.  What is this page relating to?

A.  This is relating to, I think, the MEV-Geth specification.

MR. LOOBY:  Let's go, Joe, if we can, to page 2 and focus on lines 9 through 17.  Excellent.  That's good enough.

Q.  Professor Falk, what are we looking at here?

A.  Yeah.  So I think we've heard before, but basically before Flashbots built MEV-Boost, when Ethereum was still proof of work, they had a product called MEV-Geth.  And MEV-Geth was a piece of software that an Ethereum miner could run.  And there MEV-Geth allows searchers to send bundles to the miner.

Q.  In MEV-Boost, who does the searcher send the bundles to?

A.  So when Ethereum moved to proof of stake and Flashbots created this MEV-Boost protocol, and now there's a separate notion of the builder and the searcher sends a bundle to the builder.

Q.  Does this transmission have a name?

A.  Yeah.  So the searcher would use this ETH send bundle request to send a bundle to the builder.

Q.  And do we see that ETH send bundle around line five?

A.  Yea.  So here we see a description of this ETH send bundle command that the searcher can use to send a bundle to a

builder.

Q. Now, this document that we're looking at, does it function like the API that we discussed this morning?

A. Yeah, so this is like the API documentation, which says, here is a description of why you would use ETH send bundle, and then here are the fields that you would send if you want to send to a builder, which a builder is just going to be some computer somewhere, so you have to send it in the format it's expecting. And here is exactly what it's expecting when you call this ETH send bundle command.

Q. And does this document tell us the information about what searcher conveys to the builder?

A. Yeah. Yes, it does.

Q. What is it telling us?

A. So here we see you send a list of transactions that you want in your bundle. You send a block number, which is the block number you want your bundle to land in. You put a minimum and maximum timestamp, which is like basically the timestamp of the block, so it's just a time window when you hope that these would land. And the final thing is just these reverting transactions, which to say, I want this bundle to land all together, and it's OK if some of them fail. Or you could say, I want all of them -- I only want them if they all execute together, or you can say, I'm OK if some subset of them fail, and you can specify that in the transactions.

Q.   Does all this information add up to the searcher's preferences regarding their bundle?

A.   Yeah.   So this is the command that the searcher uses to communicate their bundle preferences to the builder.

Q.   Does the builder have to honor those preferences from the searcher?

A.   No.   So what we've heard before is that the builder and the searcher have what's called a trusted relationship, so there's no cryptography that's protecting their interaction.   And it's basically reputation, so when you send -- when a searcher sends to a builder, the builder could, in principle, do whatever they want and unbundle and extract MEV for themself.   They do not do that because there are very few builders and they have a reputation.   And as soon as you started doing that, you would lose all your customers.   Searchers would stop sending to you if you unbundle their transactions, and so builders are incentivized not to do that because they want to protect their reputation.

Q.   How does that trust relationship between searchers and builders compare to the relationship between searchers and validators?

A.   So validators in Ethereum are considered untrusted.   There are over 1 million validators on Ethereum, and anyone can sign up to be a validator because it's a permission-less system. Right now there are two buildings who build over 85 percent or

so of blocks on Ethereum.  So they have a sort of long-term reputation to uphold.  If you are one of the two builders and somebody sends you a bundle and you start unbundling, you will lose all of your revenue.

Q.  Does this request from the searcher to the builder ever get conveyed to the validator?

A.  No.  So this never gets conveyed to the validator.  This is just a communication from the searcher to the builder, and there's no way for the builder to convey sort of bundle preferences to the validator.

Q.  Does this request from the searcher to the builder even get conveyed to the relay?

A.  No.  So when the relay is in place, we see the searcher sends a bundle to the builder.  The builder produces a block where there's no information about bundles, and they send that to the relay.  So the relay sees nothing about bundles, and the relay sends a block to the validator.  The validator also sees nothing about the underlying bundles.

Q.  Does the message get sent to anybody but the builder?

A.  No.  This is just a message from the searcher to the builder.

        MR. LOOBY:  Joe, if we could please take this down exhibit and pull up DX 5010, this time on page 4 of the slide to show.  There's more nifty animation, but we'll just get to the point.

Q.   Professor Falk, what does this show?

A.   This shows the sort of flow as transactions move from the mempool to searchers to builders to relays.

Q.   All right.  Let's start with the far left.  What's going on over here in that third of the diagram?

A.   So this is supposed to -- I sort of represent there are users who may be anybody.  They could be people or institutions or bots.  They send signed transactions to the mempool, and the transactions of the mempool are gossipped around between the Ethereum validators.  And then there are sandwich bots who sort of scan the mempool looking for arbitrage opportunities or sandwich opportunities.

Q.   And Professor Falk, each of the transactions that are floating in this mempool, they have a little thumbprint image on them.  What does that represent?

A.   In Ethereum, every transaction has to be signed by its creator.  That way everybody knows who originated that transaction, so every transaction in the mempool is signed.

Q.   Are all of these signed transactions in the mempool atomic as you have explained to the jury?

A.   Yeah.  So in Ethereum, every transaction is atomic.  Like that is the atomic unit.  There are no transactions that are not atomic, and there's no group of transactions that is atomic.  Like the transaction is the atomic unit, and it's the only atomic unit.

Q.   Moving to the middle, and we saw earlier there was an animation where this trio of transactions was taken out of the -- one of them was taken out of the mempool, and it was passed along this line, and now it's at the builder.  Just to orient us.

Professor Falk, do you see the dotted red line around the three transactions in that portion of the slide?

A.   Yes, I do.

Q.   And what does the dotted red line represent?

A.   That is, I think, supposed to represent a bundle; that the searcher put those three transactions together in a bundle when they sent them to the builder.

Q.   And each of those transactions in that bundle, they each have an individual thumbprint on them.  What does that represent?

A.   Every transaction in Ethereum always has to be digitally signed, so all of these three transactions are also digitally signed.

Q.   Is there a thumbprint on the bundle?

A.   No, because the bundle is not a transaction.  It's not a thing in the Ethereum.  There's no signature around the bundle as a whole.  There's just signatures on the individual transactions.

Q.   Now, going further to the right, now we're at the relay. The dotted line is gone.  Why?

A.   When the builder sends a block to the relay, there's no longer bundle information.  They just convey the block, and the block has transactions in it.  But there are no bundle boundaries that the relay can see.

Q.   Again, is this bundle atomic?

A.   This bundle is not atomic.  These transactions are the only atomic thing in Ethereum.

Q.   And I know the validator is not on this screen, but when the block with the three transactions, if it were to make it to the validator, would the validator be able to see the bundle?

A.   No, because the bundle is already gone by the time it gets to the relay, and the validator cannot see any bundles.

Q.   While we're on the topic of sandwich attacks, what is the nature of the trading environment on Ethereum?

A.   So MEV in general is extremely competitive.  There's a lot of money, and it's available to whoever is sort of the fastest at getting it.  And so it's super competitive and super adversarial.

Q.   What type of users are sandwich attackers?

A.   Sandwich attackers have to be very sophisticated.  You have to understand the type of transactions you can sandwich, and you have to write sandwich bot code that can quickly identify these transactions and very quickly make these trades automatically.

Q.   Is this big business?

PB3RPER3                        Falk- Direct

A.   Yeah, this is.  There's lots of money in MEV.  I think we've heard that on average there's maybe .1 ETH of MEV per block, and that's an average, but there's a block every 12 seconds.  So there's 3,600 blocks every 12 hours, and 72 blocks every single day, so that's 7,200 ETH of MEV to be extracted every day.  At prices of like $400,000 an ETH, it's like $2.8 million a day being extracted in MEV that's sort of available to whomever is able to capture it.

Q.   And that's every day?

A.   That's every day on average.

Q.   Can just anybody compete in the MEV space?

A.   So in principle anybody can compete.  Ethereum is permission-less.  Anybody can write code.  When I teach about MEV, all the students are, wow, this is great.  There's millions of dollars on the floor.  Let's all write MEV bots.  I usually try to discourage them because I mean, first in terms of sandwiching, it's not a sort of nice activity, but the space itself is also extremely competitive.  Most of my students, I think, couldn't write code that could be competitive in this space, and it's also very risky.  Sandwich bots usually lose money.

Q.   Have sandwich bots attacks inspired countered strategies on the Ethereum network?

A.   Yes.  Sandwich bots regularly attack each other, and they are attacked by other people competing for the same MEV

opportunities. This is a zero-sum game among some really highly sophisticated actors. So they're always trying to essentially take MEV opportunities from each other.

Q. Professor Falk, does the mempool have a nickname?

A. Yes. So a lot of people call the mempool a dark forest. There was like a really influential blog post by a researcher named Dan Robinson who said if you're in mempool, it's like a dark forest. And that comes from -- there was a Netflix show called the "Three Body Problem" that came from a series of the books. In the sci-fi books, the second book was called "The Dark Forest," and the idea being why like don't we see other sentient beings in space, and it's because there are these apex predators in space as soon as you identify yourself, you are immediately killed. And so everybody who has identified themself has been destroyed, and the mempool is kind of like that. Once you put your transaction there, you should expect to be torn apart.

Q. And what does that tell us about the MEV ecosystem on Ethereum?

A. It's extremely competitive and extremely adversarial.

Q. Does this competition for MEV happen out in the public view?

A. It's fairly public that the MEV pool itself is public, and although you can't see individual sandwicher's strategies, once a block lands on the blockchain, then we said all Ethereum

transactions are public. And so you can see all the successful sandwiches. It's not super easy to see all of the failed sandwiches. So, again, for a sandwich opportunity, there's probably lots of bots that are trying to sandwich it, and only one of them can. It's fairly complicated to see all the failures because those don't actually execute, but yeah, it's pretty public.

Q. Do participants in MEV strategies take actions to enhance their privacy?

A. Yeah. So in most trading environments, you don't want your competitors to kind of know too much about your strategy or your identity, and so it's pretty common for people in the blockchain space in general to try to hide their identity especially for active traders.

Q. What are some ways that they can do that?

A. So Ethereum itself is what we call pseudonymous. So your name is not associated with anything but your address is, and so you can take basic steps to hide your addresses. You can use multiple different addresses and keep rotating what addresses you use. For individuals in the space, a lot of people use pseudonyms because they don't want people on the street to know that they have lots of crypto because that would expose them to physical attacks. People come in, break into their house, and try to steal their crypto wallets. To try to hide your transactions, you can use mixing services that try to

mix your money; that you can sort of take one address which you've used a lot, and get yourself a clean address with your money in it that people don't know is associated with you.

Q. I want to ask you a little more about pseudonyms. Are those used by prominent members of the Ethereum community?

A. Yeah, they're pretty common. I think we heard from Bert Miller's testimony that he went by MEV Senpai. And I heard actually podcasts with MEV Senpai. I didn't know it was Bert Miller until I actually heard his testimony.

Q. How about Samczsun? Is that a known pseudonym in the space?

A. Samczsun, I think, Bert Miller talked about him too. He is a prominent security researcher, so he writes -- whenever there's some kind of security incident, he writes some story about it. I've read tons of stuff by Samczsun. I have seen Zoom talks. In a Zoom talk, he covers his face with like an anime avatar and uses a voice modulator, so I don't know who he is, but he is very well known in that crypto space as Samczsun.

Q. How about Zachxbt?

A. He is a Twitter influencer. I don't know his real name, but he is super influential on Twitter about crypto stuff. He is actually so influential, people created a bot that is called AIxbt that is supposed to mimic him, and the bot now has half a million Twitter followers. So the copycat has half a million, and the bot recommends crypto tokens all the time. I wanted to

PB3RPER3                    Falk- Direct

see if the bot was any good, so we scraped all of AIxbt's tweets and looked if his predictions were any good, and surprisingly they were pretty good.

Q. Professor Falk, the use of pseudonyms are not a way to guarantee anonymity, does it?

A. No, no. Pseudonyms are not a way to totally guarantee anonymity.

Q. We've been talking about Ethereum and MEV-Boost generally, and I'd like to ask you a few questions about omakase specifically. Are you familiar with the trading strategy with that name?

A. Yes, I am.

Q. In connection with omakase, we've heard testimony in this trial about allegedly bait transactions. Do you know what that term refers to in the context of this case?

A. Yes, I do.

Q. OK. And what are those?

A. So those are transactions that were created by the omakase bots. They were transit trades on Uniswap tools.

Q. And where were they when the sandwich bots encountered them?

A. They were in the public mempool.

Q. What information would be available to the bots when they encountered the trades there?

A. As I said, Ethereum is totally public, so the full

PB3RPER3                      Falk- Direct

transactions are just available.  Like there's everything about the transaction is in the transaction.  There's no other information.

Q.  How would a sandwich bot evaluate the transactions?

A.  So because Ethereum is deterministic, usually the way bots would evaluate transactions is they would simulate them to see what they do because that's easier than actually -- as a human, you can kind of read the code in a transaction if you wanted to.  If you want to do this automatically, it's hard to get a computer to read the code and tell you what it does.  It's easier to just run the transaction and see what effect it has.

There's lots of tools for simulating Ethereum transactions.  I use them all the time.  I have my students use them all the time.  As a sandwich bot, you can run a transaction and run it locally on your machine to see what effect it has.

Q.  And does that simulation process involve making assumptions?

A.  So a transaction doesn't execute alone.  It executes in the whole context of Ethereum.  And so when you make your stimulation environment, you have to guess what the environment is where you want to simulate this transaction.

Q.  So what is one thing a bot could make an assumption about when running a simulation?

A.  So you have to make -- given a transaction, I don't know

what block it's going to land in, and I don't know what -- say it's a transaction that trades on Uniswap. I don't necessarily know what the state of the Uniswap pool will be, how much money will be in the Uniswap pool at the time this transaction lands. And so I have to make some assumptions about what block it's going to land in and what are the state of other accounts it's going to interact with at that time.

Q. Can a bot run multiple simulations?

A. Yeah. You can run as many simulations as you want. Blocks happen every 12 seconds, and bots would typically run as many simulations as they can in the short time window that they have. Part of what makes this a competitive space is that you want to optimize your simulation environment so that you can simulate as much stuff as possible in the short time window you have.

Q. Will an Ethereum transaction behave exactly the same way if simulated under identical assumptions?

A. Yeah. As I said before, Ethereum is deterministic and this means like there's no randomness. There's nothing that can change. Ethereum transactions will always behave in the same way assuming that the things they are interacting with are in the same state as when they start.

Q. And is that true of the alleged bait transactions?

A. That's true of every Ethereum transaction, including the alleged bait transactions.

PB3RPER3                    Falk- Direct

Q. By the way, Professor Falk, do you know whether or not those alleged bait transactions were added to the blockchain?

A. Yes, they were.

Q. What does that tell us about them?

A. That they were valid Ethereum transactions. They were put in blocks on the blockchain.

Q. OK. Moving along, I'd like to ask about and this is a little specific, but some fields on the signed blinded beacon block that the validator sends to the relay, if that's all right with you?

A. Sure.

Q. OK. We've heard about the parent root and the state root field. What is the role of the parent root field?

A. So the parent root is to give -- in a blockchain, the preceding block is the parent block, and so that gives information about what is the previous block in the chain.

Q. What about the state root?

A. And so Ethereum you can think of as what's called a state machine. It has millions of accounts on it, and these accounts have different balances. They could be different user accounts. The state root is a little fingerprint of the entire state of the blockchain at that given time.

Q. Was the relay even checking these two fields on April 2, 2023?

A. No. The relay did not check these fields at all.

PB3RPER3                          Falk- Direct

Q.   What does that tell us about the relay's role in the MEV-Boost system?

A.   Well, we already saw documentation that said that the relay's role was to ensure that if a validator signed another block, that it would be slashed.  These fields are not checked when you check for equivocation penalties, and they're not checked by the relay because they had nothing to do with slashing or equivocation.

Q.   On April 2, 2023, was the relay checking the fields that were necessary to have a successful slashing?

A.   Yeah.  The relay was checking the fields that you needed to check if you wanted to get the validator slashed.

Q.   Does the Ethereum protocol say anything about what a validator must put in the parent and state root fields on the signed blinded beacon block?

A.   No, not at all.  The validators are given complete control to do whatever they want.  If they put various sort of mangled things in there, the other attesting validators will probably reject that block.  But as a validator, you are allowed to put anything you want there, and in particular, if you put stuff in there that the other protesting validators reject, that's equivalent to you just not producing a block at all.

Q.   Is there anything improper under the Ethereum protocol about a validator signing an invalid block?

A.   No.  There's nothing improper about that.

PB3RPER3                          Falk- Direct

Q.   Did the omakase validator sign the blinded beacon block header that it received from the relay?

A.   Yes, it did.

Q.   Was there a consequence for that?

A.   Well, that meant when they signed another block, they were slashed.

Q.   Was that signature by the omakase validator a promise not to publish another block to the chain?

A.   No.   That's not the way signatures work.   That signature was basically to ensure that this specific block header came from this specific validator.

Q.   Was the omakase validator's signature a representation regarding the accuracy of the parent and state root fields?

A.   No.   That's not the way cryptographic signatures work.   In Ethereum or pretty much anywhere else, the signature is an assurance that this message came from this validator.

Q.   Are you aware, Professor Falk, of allegations in this case that the bait transactions, so to speak, were not added in the sandwicher's proposed bundle order?

A.   Yes.

Q.   And was the block that the omakase validator received from the relay ever modified?

A.   Well, again, this comes down to the word "modify," but once you've signed a block, you cannot modify that block.   So in this case, the omakase validator produced a new block, but that

PB3RPER3                         Falk- Direct

original block is still there and that original signature is still on the original block.

Q. And is that action of proposing a new block consistent with the validator's role under the Ethereum protocol?

A. As we have discussed, the validator can assign multiple blocks if it wants to.

MR. LOOBY:  Joe, if you could please pull up GX 5012-AA, which is already in evidence, and with the Court's permission, we may publish.

THE COURT:  You may publish.

Q. Professor Falk, do you recognize this document?

A. Yes.  This is a screenshot of Etherscan, which is a public block explorer.

Q. What is it a screenshot of?

A. This is the block in question.  This is the block that landed on the chain.

Q. So is this the block that the omakase validator proposed?

A. Yes.  This is the block that the omakase validator proposed.

Q. Are the sandwich bot's trades on here?

A. Yes, there are.

Q. Can you identify some of those for us?

A. Yeah, I can.  This is a list of transactions.  It says there are 24 transactions totaled in this block.  The way this is displayed is the bottom ones execute first, so you think of

this as executing bottom up.  If you look at the top three here, those top three, the top one would be the sandwich bot back-run.  And then the transaction from the omakase validator, and then the sandwich bots front-run is the third one down.

Q.  OK.  And is there anything to demarcate the bundle preferences of the searcher on the block?

A.  No.  As we've said before, by the time the block gets to relay and then to the validator, there are no bundles there.  And Etherscan is just taking these blocks from the public Ethereum blockchain.  So there are no bundle delineators on Etherscan either because they are just not on the chain.

Q.  Let's start with the front-run trade, which I believe you said was the third one down in this sandwich bundle.  Did that front-run trade go through as coded by the sandwich bots?

A.  Well, in general, every transaction goes through as coded.  You can't change a transaction.  They all go through as coded, but, yeah, that one went through.  It bought from the pool just as the sandwich bots intended.

Q.  And same with the back-run transaction up above, did that go through as coded?

A.  So this also depends on what you mean by "go through."  We see that red exclamation point there.  That means the transaction reverted, so that means the transaction was put on the chain exactly as the originator, in this case the sandwich bot, intended.  But it means that the sandwich bot put in logic

into their transaction that they did not want to sell if they did not get a price that they liked, so they chose to revert their transaction rather than sell.

Q. Did anything the omakase validator do alter or modify either of these trades?

A. No. You can't modify other people's trades because they have a digital signature on them.

Q. With whom did the sandwich bot trade in the front-run trade?

A. We've heard these were all trades on Uniswap, and Uniswap is one of the most popular what we call decentralized exchanges. And the way Uniswap works is you trade with the pool that is called peer-to-pool model, as opposed to a peer-to-peer model, people trading with each other. Every trade with Uniswap, you trade with the pool of tokens that are held by Uniswap.

Q. Did the sandwich bots trade with the Peraire-Buenos?

A. No, they did not. They traded with the Uniswap pool.

MR. LOOBY: Joe, if you could pull that down, and instead pull up Government Exhibit 5012-AP, which is already in evidence. With the Court's permission, we will publish.

BY THE COURT: You may.

Q. Professor Falk, do you recognize this document?

A. Yes. This is an Etherscan page that shows the details of one of these transactions.

Q.   And zooming in, do you recognize this as either a front-run or a back-run transaction?

A.   This will be a front-run transaction.

Q.   How much -- well, what is this transaction for?

A.   So this is a trade on Uniswap V2 that trades ETH for this T token.

Q.   How much ETH is being traded?

A.   So here we can see they traded 2,766 ETH for 118 T tokens.

Q.   OK.  Beside the ETH in parentheses, we see a dollar amount. Do you see that?

A.   Yes, I do.

Q.   Is that dollar amount the value in 2023 or when this PDF was made?

A.   That's the current value amount or dollar amount when this PDF was made.  Etherscan sort of as a courtesy puts into parentheses the dollar amounts.

Q.   Did you look into the value of that amount ETH, 2,766.89 ETH, back in April of 2023 in preparation for your testimony today?

A.   Yes, I did.

Q.   And about how much was that amount of ETH worth?

A.   It was about $5 million worth of ETH.

Q.   Now, in this transaction is it the T token that the sandwich bot is purchasing?

A.   Yeah.  So the sandwich bot is using ETH to buy T tokens.

Q.   Did the sandwich bot purchase that T token from the Peraire-Buenos?

A.   No.  They purchased it from the Uniswap pool.

Q.   Did anything the Peraire-Bueno's do affect the price that the sandwich bot paid for those T tokens?

A.   No.  The Uniswap pool automatically calculates the price, and other people can't affect that.  So this trade went through with the pool, and the sandwich bot got the exact amount of T token that they expected.

Q.   Do you know approximately how much the sandwich bot stood to profit if the sandwich attack strategy had succeeded?

A.   I think it was about 600-some dollars.  But in general you can think that the sandwich trading is a zero-sum gain.  So all of the sandwich bot's profits come from the losses of the victim trader, and the victim trader's maximum loss is the total amount they're trading.  So you can never -- you can kind of get an upper bound on the sandwich bot's profit by the size of the victim trade.

          MR. LOOBY:  And, Joe, if we could take this down and pull up DX 5010 and go to page 5.

Q.   Professor Falk, what is this slide showing us?

A.   This slide shows the size of the sandwich bots front-run trade against the size of the victim trade, which is also essentially the amount of profit they could make.  Because if some sandwich had gone through, the victim trader would have

lost all of their money, their entire trade, which was about $676.

Q. I know that you have your Ph.D. in math, so I will ask you this. About how many times larger is that front-run trade in value than the potential profit?

A. So if we think of this as about $5 million, that's a five with six zeros. And if we think of it as $600, that's a six with two zeros, so that's like a four-zero difference. It's about 10,000 times bigger, but since five is less than six, it's a little less than that, so about 7,000 times bigger. So the sandwich bot was trading 7,000 times as much as they were expecting in profits.

Q. Did you do an analysis of the different amounts that the sandwich bot could have profited from this same sandwich attack using less money in the front-run?

A. Yes, I did.

MR. LOOBY: Joe, if you could turn to the next slide.

Q. And Professor Falk, big picture, what is this slide showing us?

A. As we've talked about before, you can simulate and you can simulate Ethereum transactions, and you can replay the blockchain in different orders if you want. So I do that a lot, so I was doing that here. You can put in a victim trade of the same amount and see what the profits would be at different front-runs or different sandwiches if they had gone

through in the block in question.

So on the left, we see the sandwich bots spend in reality, it was about $5 million, and their expected return if their sandwich had gone through, would be about $676.32. But --

Q. Professor Falk, looking at the Y axis here, does it jump from about $2,000 to about $5 million?

A. Yeah. This is sort of a problem with plotting, that if you just tried to plot this normally, the sandwich bots spend was so large that it couldn't see any of the other bars. So we had to make this kind of broken chart here. But you should imagine the sandwich bots bar being 7,000 times as tall as the blue bar.

Q. Let's move over one bar. What is this showing us?

A. So if you imagined a sandwich bot who had done a front-run trade but only front-run by .1 ETH, that would have cost them about $179 at current ETH prices. And using that much smaller sandwich, they would have extracted $676.17 from the victim. So they would have gotten 15 cents less in their return.

Q. And how does the amount that they put at risk in their front-run differ between that strategy on the left and immediately to the right?

A. Yeah. So in their actual trade, they traded thousands of times more. They traded their 2,700 ETH, and they could have traded .1 ETH and received approximately the same profit.

Q.  Well, it's a couple cents less, right?

A.  Yeah.  It's about 15 cents less.

Q.  And tell us about the other two bars on the right.

A.  So they could have sandwiched it even less with .01 ETH, so about 18 bucks worth of ETH.  And there they would have made almost $2 less profit, only $674.

Q.  Across the top of the chart, is there a red line?

A.  Yeah.  So that's representing at the time, there was 1 ETH slashing penalty, and at the time, ETH was about $1,800.  So this was the cost that a validator would have to pay if they wanted to produce another block.  And so here, this is sort of for reference that if a sandwich bot had only front-run by .1 ETH, that would be well under the slashing penalty, and validators would not be incentivized to produce another block because they would stand to lose much more in the slashing penalty than they could possibly gain from the sandwich bot.

Q.  And to be clear, Professor Falk, the strategy that the sandwich bots in this case ran, that's the one on the far left, right?

A.  Yes.  The sandwich bots ran this crazy strategy where I assume they just wrote their optimizer to optimize every penny of their returns sort of irregardless of how much it cost them.

        MR. LOOBY:  All right.  Joe, we can take this down.

Q.  Professor Falk, remind the jury again —— we'll let you get a sip of water —— what is an equivocation?

A.   An equivocation in Ethereum is when a validator signs two blocks at the same block height.

Q.   Did omakase involve an equivocation?

A.   Yes, it did.

Q.   What was the result of the omakase validator's equivocation?

A.   They were slashed.

Q.   Why does the Ethereum protocol disincentivize signing two blocks for the same slot?

A.   Because the Ethereum blockchain, you want to have one block at every slot, and so it's not good to have two blocks at the same slot.  Then the rest of the attesting validators have to kind of clean that up.

Q.   And will having two blocks for the same slot, does that pose problems for the Ethereum network?

A.   So if the chain actually forked, that would be a big problem.  The whole purpose of the consensus mechanism is to ensure that that doesn't happen, and that didn't happen here.

Q.   Did omakase pose a risk of a fork?

A.   No.  In this case, it didn't pose any risk of a fork because one of the blocks everyone knew was going to be rejected by the attesting validators.  So the whole sort of consensus process didn't really come even into play.  There was really only one block that was valid.

Q.   Did omakase pose any risk to Ethereum stability?

A.  No, not at all.

Q.  Did omakase violate any Ethereum protocol?

A.  No.

Q.  Was omakase consistent with the Ethereum protocol?

A.  Yeah, the Ethereum protocol assumes validators will act in their economic interest and the omakase validator did.

Q.  Did omakase fit into the competitive landscape for MEV strategies that exists on Ethereum?

A.  Yes, it did.

MR. LOOBY:  No further questions.

THE COURT:  Thank you, Mr. Looby.

Mr. Levander.

MR. LEVANDER:  May I approach, your Honor?

THE COURT:  You may.

Mr. Levander you may proceed

MR. LEVANDER:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LEVANDER:

Q.  Good afternoon, Professor Falk.

A.  Hi.

Q.  I want to talk about your day job.  One of things you do is write and publish articles?

A.  Yes.

Q.  You read articles written by other academics in your field?

A.  Yes, I do.

Q.  You read articles by important blockchain organizations like the Ethereum Foundation?

A.  Yes, I do.

Q.  Staying up to date with other researchers in your field is an important part of your job, correct?

A.  Yes, it is.

Q.  And if you are going to write about a topic, one of the things you do is see who else has written about it?

A.  Yeah.

Q.  One of the things you've researched and written about is stable coins like USDC and USDT, correct?

A.  Yes.

Q.  USDT a stable coin issued by Tether?

A.  Yes.

Q.  If I refer to it as Tether, you know what I'm referring to?

A.  Yes, I do.

Q.  Fair to say that Tether is a popular cryptocurrency?

A.  Yes, it is used by a lot of people.

Q.  It's largely traded?

A.  Yes, it is.

Q.  The total value of all the USDT in supply is over $100 billion?

A.  Yes, it is.

Q.  And there's billions of dollars of Tether traded every day?

A.  Yes, there is.

PB3RPER3                        Falk - Cross

Q.   Tether has existed for more than a decade, correct?

A.   Probably around that.  I don't know exactly when it was, but approximately.

Q.   Some crypto assets can't be locked or frozen, correct?

A.   Yes.  That's correct.

Q.   But stable coins such as USDC and USDT are controlled by smart contract and therefore can be frozen?

A.   Well, all the tokens on Ethereum other than ETH itself are controlled by smart contracts.

A.   And USDT and USDC are both tokens that can be frozen, correct?

A.   Yes, they are.

Q.   One method of freezing is called blacklisting, correct?

A.   Yes, it is.

Q.   And blacklisting involves a particular digital address being restricted from transferring tokens, correct?

A.   Yes.

Q.   A method for circumventing the blacklisting features of USDC and USDT is known as wrapping, correct?

A.   So wrap tokens exist all around.  If you wrap a token, then you've created a derivative token essentially, and that token may or may not have the blacklisting features of the underlying, yes.

Q.   So token wrapping can take many forms, you're saying?

A.   Yeah.  It's used very widely.

Q. But the basic idea is to use another smart contract as an intermediary, correct?

A. Yeah. It's usually used in bridging. If I have token -- if I have USDC on Ethereum and I want to move it to another blockchain like Solana, I cannot actually move it myself. So I can essentially walk it on one side and get somebody to make me a derivative asset, like a wrapped asset, on the other side.

Q. So Professor Falk, for example, to circumvent blacklisting, a user can deposit USDC or another token into in the MakerDAO protocol in exchange for Dai tokens?

MR. LOOBY: Objection on scope. I am not sure what this is about.

MR. LEVANDER: I only have a couple questions on this topic, your Honor.

THE COURT: All right. You may proceed, Mr. Levander.

Q. I'll repeat the question for you.

To circumvent blacklisting, a user can deposit USDC or another token into the MakerDAO protocol in exchange for Dai tokens?

A. So MakerDAO is a decentralized protocol, and it does allow you to mint these Dai tokens, and you can put all kinds of collateral up to minute them. It does allow you to put USDC up as collateral to mint Dai, that's correct.

Q. And if you do that, from the perspective of the USDC contract, the MakerDAO protocol looks like the owner of the

USDC, correct?

A. Yeah. So on the blockchain, MakerDAO now owns the USDC, and they have given you some Dai, which is the token they create.

Q. Blacklistings tokens like Tether is primarily used to address unwanted user behavior, correct?

A. Yeah, I think primarily.

Q. As of October 2023, which is just the last date you updated this on your GitHub page, less than 1,000 Tether accounts had ever been blacklisted?

A. If you say so. I did make a GitHub page, which, at the time, listed how many Tether accounts were blacklisted, but I don't remember how many.

MR. LEVANDER: Ms. Kerest, can you pull up Government Exhibit 8052 and go to page 3.

MR. LOOBY: Do you have paper copies of these?

MR. LEVANDER: It will be on the screen.

Q. I direct your attention to the second line underneath where it says "freezing." Can you take that down, Ms. Kerest, once the witness has a chance to read it?

A. Should I read the whole thing or just this line that says "freezing."

Q. You can read the section that says "freezing."

A. OK. Yeah, that's short.

Q. Does that refresh your recollection that as of 2023, less

than 1,000 Tether accounts had ever been blacklisted?

A.   Yep.

MR. LEVANDER:  Ms. Kerest, can you pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8027.

Q.   Professor Falk, this is an article titled "Equivocation Attacks in MEV-Boost and EPBS" by Francesco D'Amato and Mike Neuder that you relied on in formulating the opinions you've relied on in formulating your opinions you testified to in this case, correct?

A.   Looks like it.

Q.   And Professor D'Amato and Mike Neuder are both researchers with the Ethereum Foundation, correct?

A.   I actually don't know Francesco, but I know Mike Neuder, yeah.

Q.   And this article was published on Ethereum.org, correct?

A.   That's what it looks like.

Q.   Mike Neuder is a well-known researcher in your field?

A.   Yes, he is.

Q.   And Ethereum.org is the website maintained by the Ethereum Foundation and the Ethereum community, correct?

A.   Yes, it is.

Q.   The Ethereum Foundation is an important resource for information and research about the Ethereum blockchain?

A.   Yes, it is.

Q. On your own website, you have a link to the Ethereum.org website, correct?

A. That seems likely.

Q. You list the Ethereum.org website as a good resource for the Ethereum blockchain?

A. Yes, it is.

Q. No, towards the top right of this page, it says the article was dated April 18, 2023, correct?

A. Yep.

Q. On the first page of this article you relied on, there's a section titled "April 2 Unbundling Attack."  Did I read that that correctly?

MR. LOOBY:  Are we just reading from a document not in evidence?

MR. LEVANDER:  It's a document he relied on for his opinions.

THE COURT:  Are you about to move it into evidence?

MR. LEVANDER:  I'd be happy.  So actually, your Honor under, 803(18) I would read it and not admit it.  I think the foundation has been established that he has relied on this article and that the author is a well-known researcher in the field.

THE COURT:  All right.  You may do so.

MR. LEVANDER:  Thank you, your Honor.

Q. OK.  So on the first page, there's a second titled "April 2

Unbundling Attack."  Did I read that correctly?

A.  Yes.

Q.  And if you look at the first sentence of that section, according to article you relied from Mike Neuder of the Ethereum Foundation, during the April 2nd unbundling attack, a malicious proposer exploited the MEV-Boost relay to unbundle a sandwiching searcher's transactions for a profit of over $20 million USD.  Did I read that correctly?

A.  Yes.

MR. LEVANDER:  You can take that down.  Thank you.

Q.  You talked about how Ethereum's a proof of stake protocol, correct?

A.  Yes, it is.

Q.  Meaning that you stake ETH in order to become a validator, correct?

A.  Yes, you do.

Q.  So a validator could also be called a staker?

A.  Sometimes, yes.

Q.  Isn't it true that proof of stake enforces a subset of the protocol rules through the credible threat of destroying the capital owned by a misbehaving staker?

A.  That sounds reasonable.  It's kind of a complicated way of saying that.

Q.  And historically this credible threat has served as an effective deterrent, you'd say?

A. Are you trying to say that there haven't been many equivocation penalties?

Q. Sure.

A. Yeah. There have not been that many equivocation penalties, that's correct.

Q. But on April 2, 2023, an attacker referred to as the Low Carb Crusader exploited a piece of infrastructure in the Ethereum protocol?

A. As we have been talking about on April 2, 2023, there was an equivocation, yes.

Q. In particular by tricking a relay the attacker accessed private transaction data, which the attacker exploited to $20 million USD of MEV, correct?

A. That's not how I would say it. There was no private transaction data. There were the transactions that they were given by the relay when they signed the block header, which is exactly how the relay was designed to the function.

Q. And in Ethereum specification, this behavior violated the rules and thus was subject to a slashing penalty of 1 ETH or $6,200 U.S. dollars in today's prices levied against the attacker's stake?

A. I wouldn't say they violated the rules. The rules say that if you equivocate, you get slashed.

Q. Well, Professor Falk, other academics in your field disagree with your description on those last two answers, isn't

that right?

A. I'm sure some people disagree.

Q. You're aware that Professor Weinberg from Princeton University and Michael Neuder, who we've talked about, from the Ethereum Foundation, have written about this event saying that on April 2, 2023, the Low Carb Crusader exploited a piece of infrastructure in the Ethereum protocol by tricking a server facilitating the block building auction?

A. They might have said that.

Q. And you are aware that they wrote that by tricking the relay, the attacker accessed private transaction data, which they exploited to $20 million USD of MEV?

A. They may have written that.

Q. And you are aware that they wrote in the Ethereum specification this behavior violated the rules and thus was subject to a slashing penalty of 1 ETH levied against the attacker's stake?

A. They might have written that.

Q. Are you familiar with the article that I'm talking about?

A. No, I'm not.

Q. You said part of your job is to conduct your own research and read articles written by others, correct?

A. Yes, it is.

Q. And one thing you do about -- before writing about a topic is seeing who else has written about it?

A.   Yes.

Q.   It's your testimony that before you came to testify here about the events of April 2, 2023, you didn't read what Professor Weinberg and Michael Neuder had to say about the April 2, 2023, exploit?

A.   That's not my testimony.  My testimony is that I don't remember this sentence that you just said.

Q.   By the way, Professor Weinberg from Princeton University, you participated in a symposium hosted by him in February of 2022, correct?

A.   I don't know if it was hosted by him, but we've been to some of the cyber conferences together because we're both in the same space.

        MR. LEVANDER:  Ms. Kerest, can you please pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8021.

Q.   This is an article by Professor Weinberg from Princeton University and Michael Neuder of the Ethereum Foundation titled "Selfish Mining under General Stochastic Rewards."  Do you see that?

A.   Yes, I do.

        MR. LEVANDER:  And can we go to page 3, Ms. Kerest. And pull out where it says example two, that paragraph.

        MR. LOOBY:  Objection on I'm not sure why we're reading hearsay into the record.

PB3RPER3                          Falk - Cross

THE COURT:  Mr. Levander?

MR. LEVANDER:  I think we -- there's similar grounds under 803(18).  I'm happy to establish further foundation on this.

THE COURT:  Yes.

MR. LEVANDER:  Or I'm also happy to ask questions without reading from the document.

THE COURT:  Why don't you do that.

MR. LEVANDER:  OK.  You can take that down, Ms. Kerest.

Q.  I actually want to come back to your own academic work, Professor Falk.

A.  Sure.

Q.  You've never written an article about MEV-Boost, correct?

A.  No, I have not.

Q.  You've never mentioned MEV-Boost in an article?

A.  That seems possible.

Q.  You've never written an article about sandwich trading?

A.  I've never written an article about sandwich trading.

Q.  You've never mentioned sandwich trading or sandwich attacks in an article?

A.  That seems possible.

Q.  You've never operated a trading bot before?

A.  I've built arbitrage bots and I've -- but I've never operated them at any scale, no.

PB3RPER3                        Falk - Cross

Q.  You are not a professional cryptocurrency trader?

A.  No.  Cryptocurrency is very volatile, and it's very adversarial.  I'm an academic because it's a very stable place to be, and I don't kind of like the adversarial nature of the blockchain space.

Q.  You don't submit 10,000 transaction bundles a day?

A.  No, I do not.

Q.  You've never operated a builder, correct?

A.  I have built a builder that basically I ran my own note, and so I was collecting mempool transactions.  And I worked with some people in the computer sciences department who had what they thought was like a cool idea for packing transactions, so we ran a bunch of simulations with this builder.  But we didn't have any access to any private order flow, and it was clear we were outcompeted by the people who had a lot of relationships there.  So we never actually ran it in production, but we spent a few months building out the builder basically.

Q.  You've never operated a relay?

A.  I've never operated a replay.

Q.  You've never worked for Flashbots, correct?

A.  I have never worked for Flashbots.

Q.  And you've never overseen the creation of MEV-Boost?

A.  I did not oversee the creation of MEV-Boost.

Q.  You said you run two validators in your office, correct?

A.   Yeah.

Q.   Those are consensus notes, correct?

A.   Now after proof of stake, you have to run both the consensus client and the execution client, so it runs both.  I have two computers, and they both run both.

Q.   And in order to actually propose a block, you would also need to stake 32 ETH and run the validator client, correct?

A.   It's the same validator client, but I never staked.

Q.   So the validators that you operate don't build or propose any blocks, correct?

A.   So they don't build or propose any blocks, but it's the same client software.

Q.   There have been over 23 million blocks added to the Ethereum blockchain, correct?

A.   Yeah.  That sounds right.

Q.   You have not built or proposed a single one of them, correct?

A.   I have not built or proposed a single one of them.

Q.   And have you never interviewed the defendants themselves about the exploit, correct?

A.   I have never interviewed the defendants themselves.

Q.   So you said on direct that you were here for the start of the trial, correct?

A.   Yes.

Q.   And you listened to the opening statements?

A. Yeah. I came in part way through the opening statements, but yeah, I caught the end of the opening statements and the first part of Bert Miller's testimony.

Q. So you saw Bert Miller testify and be cross-examined?

A. I didn't see him be cross-examined. I got a transcript of that.

Q. You sat with Mr. Madura during Mr. Miller's testimony, correct?

A. So I met Mr. Madura for the first time when we both came to trial to see Bert Miller. I never met him before. We did sit in the same row, and he introduced himself to me, yes.

Q. The defense lawyers also sent you transcripts from the trial?

A. I think the only transcripts I saw were the transcripts of Bert Miller.

Q. You've been working with the defense closely throughout the trial?

A. I've worked with the defense throughout the trial, yeah.

Q. Before you wrote your expert disclosure for this case, defense counsel sent you a bunch of legal filings from this case, correct?

A. I think I mainly saw the public indictment.

MR. LEVANDER: Ms. Kerest, can you please pull up Government Exhibit 8001 and go to page 40 of that exhibit.

Q. So under the category of legal documents that you relied

PB3RPER3                          Falk - Cross

on, I'm counting --

MR. LOOBY:  Objection.  Reading hearsay into the record.

MR. LEVANDER:  I'm sorry.  You can take down that document.

Q.  Professor Falk, does that refresh your recollection that before you wrote your expert disclosure in this case, you relied on seven legal documents?

A.  You put that up very fast.  I did not have any chance to count.

MR. LEVANDER:  Ms. Kerest, can you please put that document back up.

Q.  Let me know when you're ready.

A.  So yes, I see these, and this -- I do remember.

MR. LEVANDER:  Ms. Kerest, can you take down the document before the witness answers, thank you.

A.  Is there a reason I can't see?

Q.  The Federal Rules of Evidence.

A.  OK.

Q.  I would love for it to still be up, but unfortunately it can't be.

A.  OK.

Q.  Does that refresh your recollection that there were seven legal documents that you relied on for your expert disclosure?

A.  Yeah.  I think that's copied out of my disclosure, yes.

PB3RPER3                          Falk - Cross

Q.  One of the things they sent you was a transcript of an oral
argument between the government and the defense?
A.  I think that's -- if it's an oral argument between the
government and Chris Hoffmeister, I don't really know who that
is, but yeah.
Q.  So you --
A.  I did see some interviews between the government and some
people, yes.
Q.  You were hired by the defense team back in May of this
year, is that correct?
A.  That sounds right, yes.
Q.  They interviewed you before hiring you?
A.  Yes.
Q.  You were hired through a consulting firm, right?
A.  Yes, Cornerstone Research.
Q.  You only recently started working with Cornerstone?
A.  This is the first time I've worked with Cornerstone.
Q.  You're paid for your work here for the defendants, correct?
A.  Yes, I am.
Q.  You are billing at a rate of $800 an hour, you said?
A.  Yes, I am.
Q.  You have worked approximately 150 hours on this case so
far?
A.  Approximately, yeah.
Q.  800 times 150 hours is $120,000.  Do I have that right,

Professor Falk?

A. Sounds right.

Q. And that's before the time you're billing for this trial?

A. That's what?

Q. That is before the time you are billing for your testimony today?

A. Yes.

Q. You are billing for your time right now, correct?

A. Yes, I am.

Q. Part of the time you spent working on this case involves calls and meetings with the defense lawyers, correct?

A. Yes. I have had calls and meetings with the defense lawyers.

Q. And one of the things you did in your meetings with the defense lawyers was prepare for your testimony, correct?

A. Yes.

Q. That included talking about questions that you'd be asked and answered today?

A. Yes. They would talk about questions they would ask me on direct, and they guessed about questions you might ask me on cross.

Q. And talking to them about the new things they wanted you to talk about since this trial started, correct?

A. As the trial has gone on and new topics have come up, they said they might want to ask me about new topics, yeah.

Q.  I want to come back to builders.

A.  Yes.

Q.  It's fair to say that the role of a builder is complex and lucrative?

A.  Yes, it is.

Q.  The role of a block builder requires sophistication?

A.  Yes.

Q.  Only two builders build over 85 percent of the blocks on Ethereum?

A.  Yes.

Q.  By contrast, Ethereum has over 1 million validators?

A.  That's correct.

Q.  If someone were a builder, they would probably know that, correct?

A.  You mean, could you be a builder by accident?

Q.  It's not the kind of thing that you wouldn't remember one way or the other?

A.  Yes.

Q.  I want to talk about your opinions on economic incentives. So you said slashing penalties set the economic incentives for validators, correct?

A.  Yes.

Q.  And slashing is the penalty for equivocation?

A.  Yes.

Q.  You are not a trained economist right, Professor Falk?

PB3RPER3                    Falk - Cross

A.  I am not a trained economist.  I work with an economist on top gain theory.

Q.  Let's talk about slashing.  Is it fair to say in proof of stake systems like Ethereum to become a validator, you need to stake tokens by locking them in a smart contract?

A.  Yes.  So proof of stakes means you are locking them up in a contract, yeah.

Q.  As of April 2023, that meant depositing to 32 ETH to be a validator, correct?

A.  That's correct.

Q.  That stake is held against a bond against the stake, correct?

A.  That's one thing.  The other thing you don't want anonymous people to flood the blockchain.  So even if you weren't worried about anything like equivocation, individuals would be incentivized to create as many validators as they want.  I could just spin up a million validators and then always win the validator lottery.  So you need some sort of rate limiting to prevent what are called civil attacks.  So by putting up 32 ETH, it means I can't just spin up as many validators as I have computers.

Q.  So it's a stake that is held as a bond against misbehavior, and it also prevents people from flooding the network?

A.  Yeah.

Q.  If a validator engages in proveable misbehavior, then their

stake can be confiscated, correct?

A. So if they engage in equivocation, then there's a slashing penalty, yeah.

Q. That's my next question. That's called being slashed?

A. Yes.

Q. And that's the penalty Ethereum imposed on the defendants after the exploit, correct?

A. Yes, and that was automatically done by the Ethereum protocol, yeah.

Q. So I think you testified there's this 1 ETH penalty associated with slashing, correct?

A. Yeah.

Q. When Mr. Looby asked you about slashing, you explained that that was the penalty?

A. Yes.

Q. And that slashing penalty hasn't changed since before the defendants' exploit, correct?

A. I think I said it hasn't increased. There's a recent Ethereum hard cork where it got a little more complicated but mostly it just decreased.

Q. Now, when it comes to Ethereum, the economic mechanisms economic incentives structure pays for honesty and punishes bad actors, correct?

A. I would say that -- I mean, what do you mean by "pays for honesty"?

PB3RPER3                    Falk - Cross

Q.   In terms of economic incentives, the consensus mechanisms economic incentives structure pays for honesty and punishes bad actors.

A.   How do you think it pays for honesty?

Q.   It rewards it being an honest validator?

A.   You get those rewards whenever you produce a block.

Q.   Well, you do know that proposing multiple blocks for the same slot is an action that often signifies malicious intent according to the Ethereum network website, correct?

A.   It might signify malicious intent, but it might not.

Q.   And slashing not only results in a financial penalty, but also the forceful removal of a validator from the network, right?

A.   Yeah.  So when you get slashed, you are ejected from the validator pool, and so you have to -- your stake is locked for a little bit.  So it basically prevents you from immediately reentering the validator lottery.  But because the lottery is permission-less, once your stake is unlocked, you have 31 ETH back, and if you put more ETH in, you can just rejoin the system.

Q.   So when Mr. Looby asked what the penalty for slashing was, you said 1 ETH financial penalty, but you didn't mention that it also results in the forceful removal of the validator from the network, correct?

A.   Yes.  So there's like an opportunity cost that this other

31 ETH is locked for some number, 30 days or something. And so if you want to think economically, there's an opportunity cost for not having that money and getting interest on it for a little bit, yeah.

MR. LEVANDER: Could we please pull up for the witness, the Court, and the parties what has been marked for identification as Government Exhibit 8023.

MR. LOOBY: If I could just get paper copies of these as well? I know I've seen them in the courtroom.

MR. LEVANDER: May I approach, your Honor? I have a copy for you as well.

THE COURT: You may.

Q. This is a page from Ethereum.org, which is the Ethereum website that you relied on, correct?

A. I have relied on Ethereum.org, yep.

Q. This page is titled "Proof of Stake Rewards and Penalties," correct?

A. Yep.

Q. You actually relied on this very page for your supplement disclosure in this case, correct?

A. That seems possible.

Q. Do you not recall?

A. I don't specifically recall.

MR. LEVANDER: Ms. Kerest, could you please pull up for the Court, the witness, and the parties what has been

marked as Government Exhibit 8002.  Go to page 6 and pull out footnotes 17 and 18.

Q.  And Professor Falk, take as much time as you need to and let me know when you are there.

A.  Just asking if I relied on this document?

Q.  I'm going to ask you once you are done reading to refresh your recollection that is a document that you relied on?

A.  Yes, I see it there.

MR. LEVANDER:  Take down the exhibit, please.  Thank you.

Q.  Does that refresh your recollection that this Proof of Stake Rewards and Penalties page is one that relied upon from your supplement disclosure?

A.  Yes.

MR. LEVANDER:  OK.  Could we please bring back up Government Exhibit 8023.

Q.  You've testified today about rewards and penalties in the Ethereum proof of stake system, correct?

A.  Yes.

Q.  And there is a document that you've relied on as part of your disclosure?

A.  Yes.

Q.  Directing your attention to the third paragraph, according to the Ethereum.org's page -- withdrawn.

MR. LOOBY:  Objection, 802 in any event.  This is not

a learning treatise.  This is a website.

MR. LEVANDER:  That he has established is a reliable authority and that he relied on for his disclosure.

MR. LOOBY:  It's just a page from a website that he cited in his disclosure.

MR. LEVANDER:  I'm happy to discuss it at the sidebar, and I'm also happy to move on and come back for the efficiency of everyone's time.

THE COURT:  Why don't we do that.

BY MR. LEVANDER:

Q.  Let's take up the topic of this sentence for a little longer.  So as we discussed, you say slashing penalties set the incentives for validator behavior, correct?

A.  Yes.

Q.  Now, you're a research assistant professor at the University of Pennsylvania, correct?

A.  Yes.

Q.  The university has a student handbook, correct?

A.  Yes.

Q.  The handbook has a code of student conduct?

A.  That seems right.

Q.  The code of student conduct describes a number of responsibilities of student citizenship?

A.  Probably.  I have never been a student at UPenn, so I haven't spent a lot of time with the handbook.  But --

Q.  Does it sound right that one of the responsibilities is compliance with the university's code of academic integrity?

A.  That seems pretty likely, yeah.

Q.  Another is not to engage in physical violence against another person?

A.  That seems like a reasonable thing to want.

Q.  Another is to refrain from stealing the property of the university or others?

A.  That seems pretty reasonable too, yeah.

Q.  And engaging in any of those acts can result in disciplinary action by the university, correct?

A.  Yes.

Q.  Among other sanctions, students can be suspended?

A.  That seems likely, yeah.

Q.  Students can be expelled?

A.  That seems likely, yeah.

Q.  I guess students could be forcibly removed from the network?

          MR. LOOBY:  Objection.

A.  Are you trying to make an analogy between expelling a student and expelling a validator?

Q.  Now, if one of your students tricks his roommate into sending him let's say $25 million, he could be disciplined by the university, correct?

          MR. LOOBY:  Objection.

PB3RPER3                    Falk - Cross

THE COURT:  Sustained.

Q.  Now, one of the forms of misbehavior that can get a validator slashed is equivocation, correct?

A.  Yes.

Q.  That's what the defendants here got slashed for?

A.  Yes.

Q.  Equivocation, you said, is signing two blocks within the same slot or block height, correct?

A.  Correct.

Q.  And malicious validators can fork the chain by equivocating?

A.  So we said, again, the consensus mechanism makes it actually very hard to fork the chain even if you equivocate. And in this case, there was no issue of a fork anyway because one of the blocks was invalid.

Q.  As a general matter, that type of behavior can destabilize the entire blockchain though?

A.  Yeah.  So blockchains were created partially to prevent these sort of the double spend attacks.

Q.  I want to talk about your opinions about pseudonymity.

A.  Yep.

Q.  Fair to say that while every transaction on the Ethereum blockchain is recorded and visible on the blockchain, that visibility extends only to the address involved?

A.  Yeah.  So you can see the address of every transaction, but

PB3RPER3                           Falk - Cross

you don't see like a human's name behind it.

Q.  And that's not a physical address like 500 Pearl Street; it's just a string of letters or numbers identifying a wallet or smart contract.

A.  Exactly.  It's a wallet address, not a physical address.

Q.  And although the blockchain records and displays the address it says received assets in a transaction, it does not record the identity of a person who controls those assets, correct?

A.  So it doesn't record the like physical identity.  It just records that this address is the controller because from the perspective of the blockchain, whoever can create signatures is the controller.

Q.  And that's what is known as pseudonymity, correct?

A.  We call that pseudonymity to distinguish it with anonymity where you're actually private.  As a cryptographer, we used to spend a lot of time thinking about privacy protocols.  And we think of pseudonymity as much weaker than anonymity because people can kind of see what is going on.  And there's companies like Chainalysis whose whole business is built on looking at public blockchain data and identifying who's who.

Q.  So you are saying that pseudonymity is less than full anonymity?

A.  Yeah.  So in the cryptography space, when you talk about anonymity, that's like actual privacy.  And if you build a

3133

PB3RPER3                    Falk - Cross

system that only has pseudonymity, that's like a lower bar of privacy, yeah.

Q. So regardless, pseudonymity is still a challenge for dealing with bad actors in crypto space, correct?

A. Pseudonymity can be a challenge, yeah.

Q. It can make it difficult to detect market manipulation and fraud, correct?

A. It doesn't make it -- well, some market manipulation is very easy to see because a lot of market manipulation, you kind of don't care about who is doing the trades, just the fact that they are happening. So I've written papers about wash trading where people try to trade tokens back and forth to inflate their value. We don't make any attempt to figure who is trading these tokens back and forth, just that it's sort of illegitimate, sort of it's wash trading. It's not people who want these token. It's just used to inflate the price, so those kind of things you can see without knowing who is doing the trading.

(Continued on next page)

PB3VPER4                    Falk - Cross

BY MR. LEVANDER:

Q.  So just to be clear, yes or no, pseudonymity can make it difficult to detect market manipulation and fraud?

A.  Sure, yeah.  Sometimes it can.

Q.  That's actually a key challenge for policymakers in the crypto space; correct?

A.  Yeah, that's a challenge.  There's always a tension -- I work in cryptography, and there's always a big tension between, sort of, privacy and law enforcement.

THE COURT:  Mr. Levander, we're at 3:15.  Do you want to ask -- is now a good time for a break or a few more questions?

MR. LEVANDER:  It's a great time, your Honor.

THE COURT:  All right.

We are going to take our afternoon break.  It's 3:15 now.  Please be back and ready to go in the jury room at 3:30.  My prior instructions apply.  Thank you.

(Jury not present)

THE COURT:  Professor Falk, you may step down.

(Witness not present)

THE COURT:  All right.  Let's take up the issue with GX 8023.

Mr. Looby, I understand your position that this is not a learned treatise, but is it not akin to one, to an authoritative text in this industry?

MR. LOOBY:  I don't think the foundation for that has been laid.  I think it was cited in the disclosure.  And I think on direct it's that these items, to the extent they are cited in the disclosure, are relevant to the expert forming his opinions.  But he is not vouching for the accuracy or the particular wording of any particular one nor of its authoritative status.

And I think we just kind of blew right past a lot of the foundation for these.  One of them was like a scholarly article which felt a little bit different in category.  But if we're just going to be pulling up websites -- which, by the way, like, we have not gotten any advanced notice or printed copies of them, so we're seeing them for the first time on our screens, then our objection is that the foundation hasn't been laid for that.

And so I think, just like this is a portion of the website on the Ethereum web page, it's just meant for a general audience as well; it's not one which even descends to the level of particularity of the scientific opinions or expertise that the expert in this case has.  So I just think it's a misleading use of those texts as well.

MS. TREFZ:  Can I just add one more thing just on the point that Mr. Looby was making about notice?

We played the game when it was our turn to provide notice for stuff on cross.  If Mr. Levander wants to actually

introduce documents, especially on something like a learned treatise, which has a hearsay exception that we would want the chance to review, we expect the courtesy of notice for that. We're happy to work with him; we're not trying to -- as you can tell, we're not trying to interrupt his flow. But I do think that's the kind of thing where we should be given that. And if there are more that he wants to put in, he should give them all of us on this break so that we can -- or give all of them to us on this break so that we can look at them.

Because, you know, at least for the ones that came in, they weren't even documents that Professor Falk had had the chance to, you know, review in advance. And as far as we can tell, it flashed on the screen real quick, and he was asked a couple of foundational questions about the individual authors, but it was kind of -- it was a little quick, given that we don't have the actual documents and haven't had the chance to kind of consider it and whether it's appropriate for introduction here.

So we would ask for that courtesy, which is the same courtesy we gave to them. And also for that one we would ask for the opportunity -- the academic article that did come in, we'd ask for the opportunity to review it and revisit it with the Court. We are trying not to make motions for reconsideration with the Court or anything like that, but just given how quick it happened and the fact that we didn't -- and

Mr. Levander refused to give us a printed copy at the time and said, You can see it on the screen, we would ask for the opportunity to do that.

MR. LOOBY: Just one further note. On the Weinberg, article it was Professor Falk's testimony that he didn't -- like, he didn't recall ever seeing this, and it wasn't cited in his disclosure. So it also didn't meet the hearsay exception for that either, which is why I objected on the grounds that he was just reading hearsay into the record.

THE COURT: Understood.

Mr. Levander?

MR. LEVANDER: Sure.

So the first article was properly admitted as an article that he -- sorry not -- and that word is actually very important. None of this has been admitted. The government is not offering any of this for admission. 803(18) contemplates that something can be read into evidence without being admitted into evidence.

I will note briefly, your Honor, in response to the discussion of the government's providing false exhibits in advance, I'm not intending to offer any exhibits through this cross. I also think that there are no further exhibits that I plan to pull up with this witness that are not cited in his own disclosure or already in evidence. I'm happy to not go back to the 8023, which is the one that we were discussing when we took

this break. I did not read from the Weinberg article; we took it down before reading from it.

So I think that the Nooter article was very clearly properly read from under 803(18). There is not a hard-and-fast rule that it needs to be from, like, a medical journal. In fact, the Second Circuit has explicitly held that things like videotapes and other documents can be read from or played under -- or transcript can be read from under 803(18), as long as a proper foundation that the expert has relied on it and that the author and/or publication is itself reliable.

All of that was established here.

What's been done has been proper. There is nothing that I think I'm doing going forward that is not a document that's cited in his disclosure or already in evidence. And we're not planning to offer anything into evidence through him, unless obviously there is a prior inconsistent statement.

THE COURT: All right. Thank you, Mr. Levander.

And you said you're not going back to 8023.

MR. LEVANDER: I'm happy not to go back to 8023.

MR. LOOBY: So this is a website with no author. And so I think it really defies the exception. So if there are more like this, we will have the same problem. But just putting that --

THE COURT: Thank you, Mr. Looby.

All right. If there are more that you've cited that

you intend to bring up, why don't you just let the defense know, even if it's already in his disclosure, so that to the extent issues can be anticipated here, I can deal with them as they come up.

And then how much longer do you anticipate for your cross?

MR. LEVANDER:  Not much longer, your Honor.  I would just ask for an extra five minutes on this break to give me time to comb through and see what's coming so that I can properly provide it to the defense.

THE COURT:  Thank you, Mr. Levander.  We'll do that.

All right.  I will see you all back at 3:35.

(Recess)

THE COURT:  Mr. Levander, did we address the exhibits issue?

MR. LEVANDER:  Yes, we gave hard copies of the exhibits already shown.  There's nothing further that we're definitely using.  If there is, it will either be something that's been on the government's exhibit list since before trial or if it comes up we'll have a paper copy ready.

THE COURT:  Thank you.

(Jury present)

THE COURT:  Professor Falk, can come back down to the witness stand.

Mr. Levander, you may proceed.

MR. LEVANDER: Thank, you your Honor.

BY MR. LEVANDER:

Q. Professor Falk, before validators can receive any bids from relays, they need to set up MEV-Boost; correct?

A. No, they don't.

MR. LEVANDER: Ms. Kerest, could you please pull up Government Exhibit 8001 at 43.

Q. Professor Falk, do you see that you cited a document -- withdrawn.

MR. LEVANDER: Can you actually take that down for a moment, Ms. Kerest.

Q. Now, Professor Falk, one of the sources that you cited in this case was a page called "Relay Fundamentals" from the Flashbots website; correct?

A. That seems likely.

Q. Do you not recall?

A. Not specifically.

MR. LEVANDER: Mr. Kerest, can you please pull up Government Exhibit 8001 and go to page 43. Could you pull out for the witness the last bullet under Flashbots.

A. I see it.

MR. LEVANDER: You can take that down, Ms. Kerest. Thank you.

Q. Does that refresh your recollection that you relied on a page called "Relay Fundamentals" from Flashbots?

A.   Yes.

Q.   And you base your testimony on reliable sources; correct?

A.   I did rely on these.  I considered these sources when I made my disclosures and my testimony, yeah.

          MR. LEVANDER:  Okay.  So I'd like to show the Court, the parties, and the witness what's been marked for identification as Government Exhibit 8013, and I do have a paper copy.

          MR. LOOBY:  Thank you, Mr. Levander.

          MR. LEVANDER:  Would your Honor like a paper copy as well?

          THE COURT:  Yes, please.

Q.   Directing your attention to the third paragraph.

A.   Yup.

          MR. LOOBY:  Objection.  802.

          MR. LEVANDER:  This is impeachment, your Honor.

          The document that he relied on says the opposite of what he just testified to.

          MR. LOOBY:  He hasn't been confronted with this statement.  Anyway, you can ask your question.

          THE COURT:  All right.  Why don't you ask your question.

BY MR. LEVANDER:

Q.   Have you seen the document that you relied on addresses the question that --

MR. LOOBY:  This is not a document that's authored by the witness.

THE COURT:  Why don't you ask the question first and then you can make your objection, Mr. Looby.

Q.  Okay.  First of all, this is a document that you relied on for your testimony today; correct?

A.  Yup.

Q.  And it's from Flashbots' page?

A.  Yup.

Q.  And it describes Flashbots' product MEV-Boost?

A.  Yup.

Q.  And it's called "Relay Fundamentals"?

A.  Yes.

Q.  It has a section called "What is a relay"?

A.  Yes.

Q.  You testified that before validators can receive any bids from relays, they do not need to set up MEV-Boost; correct?

A.  If by "MEV-Boost" you mean the MEV-Boost client, that's correct.

Q.  Do you see that the page that you relied on from Flashbots says that before validators can receive any bids from relays --

MR. LOOBY:  Objection.  802.  It's not improper -- it's not proper impeachment.

THE COURT:  Sustained.

MR. LEVANDER:  You can take down that document,

Ms. Kerest.

Q.  I want to talk about your opinions about validators using MEV-Boost.

Actually, before we do that, so the jury is already familiar with Etherscan.  But, Professor Falk, fair to say that Etherscan is not the only publicly available blockchain explorer?

A.  That's right.  There are many.

Q.  Some blockchain explorers have additional features?

A.  So they try to differentiate themselves by adding extra information, yes.

Q.  Are you familiar with the Falcon blockchain explorer?

A.  No, I'm not.

Q.  Are you familiar with blockchain explorers that allow you to simulate how a transaction would execute if it occurred in a different block or in a different position in the same block?

A.  I'm not familiar with those.  I use -- basically, I use mostly Foundry, which is not a website; it's like software that you run and it gives you a lot more control.  So I don't really ever use the, sort of, easy public ones.

Q.  Would it be fair to say that MEV searchers, including sandwich bots, scan thousands of transactions in the mempool looking for profitable trading opportunities each day?

A.  Yes.

Q.  Or each block?

PB3VPER4                    Falk - Cross

A.   Yup.

Q.   And those trading bots typically simulate potential trading strategies, meaning they execute the transactions locally in a test environment to see how the mempool transactions would behave under certain conditions?

A.   Yes, that's my understanding of how most sandwich bots behave.

Q.   So, for example, a sandwich bot could simulate how a mempool transaction would execute as part of a sandwich submitted by that bot to see if the mempool transaction presents a profitable trading opportunity?

A.   They certainly could do that, yes.

Q.   And a mempool transaction will always behave in the same way under the same conditions; correct?

A.   Yes.

Q.   And a mempool transaction can also be programmed to behave one way under certain conditions and another way under different conditions?

A.   Yes.  All transactions could be programmed to behave differently under different conditions, that's correct.

Q.   One thing a mempool transaction can be programmed to do is check the balance of a token in a particular bot's account; correct?

A.   Yes.  You can program a contract to check balances, yes.

Q.   And a mempool transaction can be programmed to act one way

if the balance of that token is greater than a certain amount, and a different way if the balance is less than that amount; correct?

A.   Yes.

Q.   Now, you said that you have tools that you can use to simulate transactions; correct?

A.   Yes.

Q.   So, for example, you could take the bait transactions that the defendants switched out of the block and simulate how those transactions would have executed in the relays block; correct?

A.   Yes.

Q.   You haven't simulated how the bait transactions would have executed in the exploit block, have you?

A.   I believe I did.

Q.   You did?

A.   Yeah.

Q.   So you know that the bait transactions would have executed differently in the middle of the sandwiches proposed for that block; correct?

A.   Yes.

Q.   You said this is your second time testifying as a paid witness; correct?

A.   Yes, this is my second time testifying.

Q.   At $8 an hour, $120,000 since May, it's fair to say you want to get hired to be a witness in other cases too, right?

A.   I don't know.  This has been a lot more time than I bargained for.  And my family is not super excited that I'm in New York a lot.  So I'm not so sure about that.

Q.   Fair enough.

One of the things you did have to do for this case is list all of your prior testimony in your disclosure; correct?

A.   Yes.

Q.   And you disclosed that you testified once previously; correct?

A.   Yeah.

Q.   That was in the arbitration that we talked about?

A.   Yes.

Q.   At a high level, an arbitration is basically a trial; but instead of a judge and a jury, it's a panel of arbitrators?

A.   I don't think there is even a panel.  I think it was just the judge.

Q.   It was just the one arbitrator in that case?

A.   Yeah, I think so.

Q.   In the expert disclosure that you signed and approved for this case, you said that you had testified subject to a nondisclosure agreement in the area of platform coding of an unsupported token for the claimant in a matter pending in an arbitration; correct?

A.   That seems likely.

Q.   You didn't disclose the name of the case that you testified

in; correct?

A.   I don't know.  I -- probably not, if they asked me not to.

Q.   And you said that it was still pending in your expert disclosure; correct?

A.   What do you mean still pending?  The case had long resolved.

Q.   But in your expert disclosure you said that it was still pending; correct?

A.   I don't know.  If I did, that was a mistake.  That case was years ago.

Q.   Do you not recall or do you not know?

A.   Is there a difference?

Q.   Technically, yes.  It's something you never knew or something you currently don't remember, what you said in your expert disclosure?

A.   Presumably I knew at one point, so I don't remember now.

Q.   All right.

          MR. LEVANDER:  Ms. Kerest, could you please pull up Government Exhibit 8001 and go to page 39.

A.   Yup.  I see that.

          MR. LEVANDER:  You can take that down, Ms. Kerest.

Q.   Does that refresh your recollection that in your expert disclosure you said that the matter was pending?

A.   Yes.

Q.   And, in fact, as I think you just said, the arbitration you

testified in was finished by the summer of 2022; correct?

A.   Around that time probably, yeah.

Q.   And both the case and your participation in it were public by November of 2022; correct?

A.   I don't know how public they were.  I got that text when I was asked to disclose previous things.  I emailed the lawyers that I had asked -- to ask me to testify then.  And I said, What am I supposed to say here?  And they emailed me back, and I copy/pasted it.  Since I'm not a lawyer, that seemed pretty reasonable.

Q.   The final arbitration decision was filed publicly with a court in California by November 2022; correct?

A.   I never looked up, but if you say so, I believe it.

Q.   Did the defense in this case provide you with a copy of that final arbitration decision?

A.   For this case, yes.

Q.   Okay.  So in the copy of that arbitration decision that the defense lawyers in this case provided you, did you see that it had been publicly filed by November of 2022?

A.   I don't remember the date, but I saw that it had been publicly filed, yes.

Q.   Now, in that prior testimony of yours, the prior case you were involved in, your client lost; correct?

A.   That's correct.  Although Coinbase had said they were unable to transfer these tokens back.  And after they won the

case they immediately changed their platform and made it so they could transfer the tokens back. So I think the lawyers considered it sort of a win because even though they claim they couldn't, they actually did.

Q. The arbitrators in the case -- or the arbitrator, rather, specifically found that part of your testimony was not persuasive; correct?

A. Yeah. So in that case I was asked to testify about how tokens work and how Coinbase could send them back. And I did that.

There was also a part of the case where there was some confusion about the documentation. This was about these Aave tokens. And Coinbase had a page that said, We support Aave. And that meant they supported Aave tokens, but they did not support the A Aave tokens. And I was asked if I thought that was a little bit confusing, that they supported Aave.

Q. Professor Falk, with regard to that part of your testimony, the arbitrator specifically found that your testimony was not persuasive; correct?

A. So, yeah, I believe the arbitrator said that when I said that this part of the documentation was confusing, that she did not think that that was persuasive.

Q. And the arbitrator specifically said that you lacked foundation with regard to your credentials to render such opinion testimony, and what basis you had for reaching the

opinion conclusions offered; correct?

A.   That sounds like something.  So I did not have a basis for being an expert in the documentation of this, like, the advertising of Aave -- of Coinbase.  So Coinbase had an advertisement that said, We support Aave.  I said that was confusing.  She said that that was not in my purview.  But all of the testimony around tokens and how tokens work and how you transfer tokens, I don't think she had any issue with.

Q.   So specifically the court credited your definition of what a private key is.  But the court specifically found that your testimony was not persuasive and lacked foundation with regard to the other issue; correct?  Yes or no?

A.   It was about this very specific issue about whether I thought the Coinbase advertisement that they supported Aave was confusing.

Q.   You testified earlier that you haven't interviewed the defendants about the exploit; correct?

A.   That's correct.

Q.   You weren't there with the defendants when they wrote their omakase validator code?

A.   I was not.

Q.   You weren't a participant in their Slack or Signal messages?

A.   I was not.

Q.   And you weren't there when they executed that code on April

2nd?

A.  I was not.

MR. LEVANDER:  Can I have one moment, your Honor?

THE COURT:  You may.

(Counsel conferred)

MR. LEVANDER:  No further questions, your Honor.

THE COURT:  Thank you, Mr. Levander.

Mr. Looby, any redirect?

MR. LOOBY:  Just a few questions, your Honor.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MR. LOOBY:

Q.  Professor Falk, on cross-examination, were you asked about some websites and articles that you did not author?

A.  Yes, I was.

Q.  And were some of those websites or articles in your disclosure?

A.  Yes, they were.

Q.  And were some of those websites or articles not in your disclosure?

A.  I think most of them were in the disclosure.  I don't remember if any were not.

Q.  For the ones that were in your disclosure, does the fact that you cited it in the disclosure signify that you agree with every sentence in the article?

A. No, it does not.

Q. For example, if an article or a website referred to something as an attack, but you cited that article or website in your disclosure, were you agreeing that that is a correct terminology for something?

A. No.

Q. How did you use these sources that were cited in your disclosure?

A. Well, these sources all had pieces of information that were interesting or relevant. But by citing them does not mean that I agree with every sentence or every word choice in the document.

MR. LOOBY: No further questions.

THE COURT: Thank you, Mr. Looby.

Anything further with this witness?

MR. LEVANDER: No, your Honor.

THE COURT: Thank you.

Professor Falk, you may step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Counsel, does it remain the plan to end for the day?

MS. TREFZ: We should at least take a brief break, your Honor, and let us confirm.

THE COURT: All right.

MS. TREFZ: I think we will know within three minutes whether we should break for the day. I just would like to make sure that I'm doing my job.

THE COURT: All right. We are going to take a five-minute break. My prior instructions apply: Do not discuss this case with anyone, do not do any research on this case, and remember to deep an open mind.

(Jury not present)

THE COURT: Please be seated.

All right. Why don't you all talk a few minutes. I'll come back out and we'll talk when I'm back out.

MS. TREFZ: Thank you, your Honor.

(Recess)

THE COURT: Ms. Trefz.

MS. TREFZ: Your Honor, the defense intends to rest. I assume we should do that in front of the jury, but I also know that the Court needs -- probably needs to give a colloquy.

THE COURT: Yes.

Ms. Tran, why don't we do the colloquy -- we could do the colloquy now, bring out the jury, you all can rest, and then we will break for the day. How does that sound?

MS. TREFZ: That's fine. Whatever the Court wants.

THE COURT: All right. And does the government know at this point if they intend to put on any rebuttal case?

MS. KUDLA: Your Honor, I think we just need the

evening to review the transcripts and we'll know tomorrow morning. But if we do, it would be very brief and we could proceed to closings tomorrow.

MS. TREFZ: Who would it be if it were tomorrow? We have not received notice.

MS. KUDLA: Your Honor, I think at this point in time we'd be potentially considering Agent Cleverly.

THE COURT: All right.

MS. KUDLA: But any testimony I would like to note would be very short; so we could still proceed to closing.

MS. TREFZ: It's our view, your Honor, that they should have been ready for this. We told them yesterday that we would be -- that this would likely happen, and they still have 30 minutes before the day is supposed to end. It's a little frustrating.

THE COURT: All right. Why don't we -- I'll allocute the defendants and we'll go from there.

MS. KUDLA: Thank you your Honor.

THE COURT: All right.

Ms. Trefz, has your client decided not to testify?

MS. TREFZ: He has, your Honor.

THE COURT: All right.

James Peraire-Bueno, your attorney has informed me that you have chosen not to testify; is that correct?

DEFENDANT JAMES PERAIRE-BUENO: Yes, it is.

THE COURT: Ms. Tran, can you please place Mr. James Peraire-Bueno under oath.

(Defendant James Peraire-Bueno sworn)

THE DEPUTY CLERK: Please state your full name for the record, spelling out your full name slowly.

DEFENDANT JAMES PERAIRE-BUENO: James Peraire-Bueno. J-A-M-E-S, P-E-R-A-I-R-E, dash, B-U-E-N-O.

THE DEPUTY CLERK: Thank you. Please be seated.

THE COURT: You can be seated for this, Mr. Peraire-Bueno.

I want to ask you a few questions to make sure you understand that the decision of whether or not you should testify at this trial is a decision for you, and you alone, to make. Obviously it's important that you discuss that decision with your attorneys before you make a final decision. But just as the decision about whether or not to proceed to trial or enter a plea of guilty is a decision for you to make, it is also true that the decision whether to testify at your own trial is a decision for you to make, not a decision for your lawyers to make for you.

Do you understand what I just said to you?

DEFENDANT JAMES PERAIRE-BUENO: I do.

THE COURT: Do you understand that you have a right to consult with your attorneys about any issue that arises at this trial?

DEFENDANT JAMES PERAIRE-BUENO:  I do.

THE COURT:  Without telling me what you discussed, have you consulted with your attorney — again, just yes or no — about the decision whether to testify on your own behalf at this trial?

DEFENDANT JAMES PERAIRE-BUENO:  I have.

THE COURT:  And after those consultations, did you make a decision whether or not to testify at this trial?

DEFENDANT JAMES PERAIRE-BUENO:  I did make a decision.

THE COURT:  And what is your decision, are you going to testify or not?

DEFENDANT JAMES PERAIRE-BUENO:  I will not.

THE COURT:  You understand that's a decision for you, and you alone, to make?

DEFENDANT JAMES PERAIRE-BUENO:  I do.

THE COURT:  All right.

Does the government have any additional questions that I should ask?

MS. KUDLA:  No, your Honor.

THE COURT:  All right.

And, defense counsel, any additional questions?

MS. TREFZ:  No, your Honor.

THE COURT:  And, Ms. Trefz, just to confirm, you did, in fact, have discussions with your client?

MS. TREFZ:  Yes, your Honor.

THE COURT: Thank you.

Mr. Marx or Mr. Looby, has your -- I'm sorry. Mr. Marx or Mr. Fick, apologies, has your client, Anton Peraire-Bueno, decided not to testify?

MR. MARX: Yes, your Honor.

THE COURT: All right.

And Anton Peraire-Bueno, your attorney has informed me that you have chosen not to testify; is that correct?

You may remain seated.

DEFENDANT ANTON PERAIRE-BUENO: Yes, your Honor.

THE COURT: All right. Thank you.

Ms. Tran, please place Anton Peraire-Bueno under oath.

(Defendant Anton Peraire-Bueno sworn)

THE DEPUTY CLERK: Please state your full name for the record, spelling out your full name slowly.

DEFENDANT ANTON PERAIRE-BUENO: Anton Peraire-Bueno, A-N-T-O-N, P-E-R-A-I-R-E, dash, B-U-E-N-O.

THE DEPUTY CLERK: Thank you. Please be seated.

THE COURT: And again, Anton, I'm going to ask you a few questions to make sure that you understand that the decision of whether or not you should testify at this trial is a decision for you, and you alone, to make.

Again, it's important that you discuss this decision with your attorney before you make a final decision. But just as the decision about whether or not to proceed to trial or

enter a plea of guilty, it is a decision for you to make. It is also true that the decision to testify at your own trial is a decision for you to make, not a decision for your lawyers to make. Do you understand that?

DEFENDANT ANTON PERAIRE-BUENO: I do.

THE COURT: Do you understand that you have a right to consult with your attorneys about any issue that arises at this trial?

DEFENDANT ANTON PERAIRE-BUENO: I do.

THE COURT: Without telling me what you discussed, have you consulted with your attorneys — again, just yes or no — about your decision not to testify at this trial?

DEFENDANT ANTON PERAIRE-BUENO: Yes.

THE COURT: And after these consultation, did you make a decision whether or not to testify at this trial?

DEFENDANT ANTON PERAIRE-BUENO: Yes.

THE COURT: What was your -- what is your decision?

DEFENDANT ANTON PERAIRE-BUENO: I will not testify.

THE COURT: And you understand that's a decision for you, and you alone, to make?

DEFENDANT ANTON PERAIRE-BUENO: Yes.

THE COURT: Counsel, any further questions?

MS. KUDLA: None from the government, your Honor.

MR. MARX: No, thank you, your Honor.

THE COURT: Mr. Marx, did you, in fact, have

discussions with your client about this issue?

MR. MARX:  Yes, we did.

THE COURT:  All right.  Thank you.

Let's bring out the jury.

MS. TREFZ:  Your Honor, for the record, we will each say that we rest, just so it's clean on the record.

THE COURT:  Sure.  Thank you.

(Jury present)

THE COURT:  Does the defense have any further witnesses?

MS. TREFZ:  Your Honor, on behalf of James Peraire-Bueno, the defense rests.

MR. MARX:  And on behalf of Anton Peraire-Bueno, the defense rests, your Honor.  Thank you.

THE COURT:  Thank you.

All right.  We are going to end for the day.  My hope is that we will soon — hopefully as early as tomorrow — get to the final jury instructions and closings.  So the good news is we are, in fact, a little bit ahead of schedule.

So we are going to end for the day.  My prior instructions apply:  Do not discuss this case with anyone, do not read anything about this case, do not do any research on this case, and remember to still keep an open mind.  Thank you.

(Jury not present)

THE COURT:  Please be seated.

Ms. Kudla, I know that you said that the scope of the agent's testimony -- well, that the agent testifying would be dependent on what you all -- what occurred today.

What is the anticipated scope of this agent's testimony?

MS. KUDLA: Your Honor, I think it would be very, very limited. And I think what we want to do is just confer as a team. And we can probably submit a letter later tonight to provide guidance to the Court at what times we think closings could begin. It certainly is not something that we anticipate requiring lengthy testimony. I think we want to, before we rest affirmatively, we just want to make sure that we review the record and come to a final conclusion.

THE COURT: All right. I'm trying to understand, based on what was heard today, what this agent could possibly be testifying about, which, just guessing, would be related to the arrest video, which I think has been very narrowed in terms of what might be relevant as to this agent.

Is that what you are thinking about here?

MS. KUDLA: That is, your Honor. And I think we just want to have a moment to confirm and be able to review as a team. We can certainly -- but as we noted, it would be very narrow in scope. It's not something -- but I think we want to just be able to meet and be able to confer on that.

THE COURT: All right.

MS. TREFZ: Again, Ms. Kudla hasn't been here for most of the day, but that video came in in the first 20 minutes of the day today, and it has been a long day since then. A lot of time, including multiple breaks, presumably with the opportunity for them to discuss amongst themselves.

I don't mean to be -- harp on it a little bit, but we asked for this -- we asked for a disclosure as to potential rebuttal witnesses yesterday. They declined to provide it. We gave them notice yesterday that we were likely to rest today.

And so I just would reiterate this seems like a decision that they should be able to make right now and have had plenty of time all day to do that while we were here working.

THE COURT: Ms. Kudla, is it possible for you all to confer? We are going to come back at 4:30 to discuss the jury instructions and all that. Is it possible for you all to confer now and have an answer on this?

MR. LEVANDER: Your Honor, first, I just want to briefly respond on the last point, which is that we tried to get information about whether the defendants were going to be testifying. Obviously they were supposed to disclose that information pursuant to the road rules, but had no obligation to do so. We didn't know until five minutes ago that there wasn't going to be one or two more very lengthy witnesses in this case.

And it remains our right to put on a rebuttal case and our burden to prove the evidence beyond a reasonable doubt.

That being said, I think if you -- maybe if we start a little bit after 4:30, it would be -- let us confer, and we'll try to get the Court an answer so that there's some level of certainty.

THE COURT: All right.

MR. FICK: I would just say that all the litigation around the video was designed to sort of put the issues out there and circumscribe it. And if they are going to, sort of, expand the record on that, I think that's going to likely open the door to more of the video, and that's fraud. I think it's all foreseeable and not appropriate rebuttal, but we'll wait to see what they say.

THE COURT: All right.

Why don't we come back at 4:40. How does that sound?

MR. LEVANDER: That's fine. Thank you, your Honor.

THE COURT: All right. I will see you back then.

(Recess)

(Continued on next page)

THE COURT: Please be seated.

All right. Does the government have an answer on a rebuttal case?

MR. FANG: Yes, your Honor, and we appreciate the Court giving us an opportunity to confer. Although there were certain facts that were referenced in the government's letter from yesterday that we, I guess, would have planned to elicit or were thinking about eliciting, I think ultimately the government does not intend to present a rebuttal case. On that score, given that it seems like we may be moving to summations in very short order, I think it would be helpful if the Court is able to provide any clarity with respect to the anticipated schedule for summations.

THE COURT: Yes. How long do you all anticipate for your closing?

MR. FANG: Your Honor, with respect to the government's primary or principal summations, it's difficult to say, but I think given a case of this nature and complexity, it's likely that I think we can expect that the government's principal summation may take most of the morning. I think that's sort of the best estimate.

THE COURT: All right. And does the defense have any sense of yours?

MS. TREFZ: Well, ours is going to be responsive to theirs. I was frankly not anticipating it taking most of the

PB3RPER5

morning, but now that I've heard that, I would say we probably need about the same amount of time. It is a complex case so that's not, I guess, terribly surprising. I don't know if Mr. Fang is going to be giving it or somebody else. But from our perspective, our main request is we would like all of the closings to start and finish on the same day, including any rebuttal, because we don't -- perhaps that's obvious to everybody, but that's our main request.

And we do think that, especially if the length of the initial closing is most of the morning, we believe that the rebuttal, frankly, in any event but especially if that's how long it is, should be quite short, especially because we won't have the opportunity to do it again. So I don't know if the -- to respond. So I don't know if the individuals who are doing closing are here or not, but it would be good to, I think, understand if that's what the government has in mind or --

THE COURT: Does this sound reasonable? If I start reading jury instructions at 10:00, it takes an hour to go through those. Hopefully it won't take that long, but we have a lot of them, so it might. And the government's summation perhaps from 11:00 until 1:00. We take our lunch break from 1:00 to 2:00. The defense from 2:00 to 4:30 and then any rebuttal from 4:00 to 4:30. How does that schedule generally sound?

MS. TREFZ: I think your Honor said defense 2:00 to

PB3RPER5

4:30.

THE COURT:  2:00 to 4:00.  I see what you're saying.
That would make it equal time.

MS. TREFZ:  We will, as we have been doing, work
together, and we will not be presenting two closings covering
the same topics.  We will do it together in a way that is
sufficient, but we would like about equal time to the
government, and we would be concerned about them having the
whole night to plan some rebuttal.

THE COURT:  All right.  In that case, we could go to
5:00.  So 11:00 to 1:00, 1:00 to 2:00 break, 2:00 to 4:30, 4:30
to 5:00.  How does that sound to the government?

MR. FANG:  Your Honor, I'm not going to be giving the
principal summation, so, again, I'm hesitant to sort of commit
to a specific time slot, but I think maybe --

THE COURT:  Who is giving it?

MR. FANG:  Ms. Kudla?

THE COURT:  Will she be back this evening?

MR. FANG:  I don't expect so, your Honor.

THE COURT:  All right.  Why don't you all try and
contact her just to get this finalized.  I just want us to all
be on the same page about tomorrow, and that way we're not
running into an issue where folks aren't done and we need to go
into the second day, which I think nobody wants.

MR. FANG:  Understood, your Honor.

PB3RPER5

THE COURT: Let's move along to the jury instructions.

Mr. Fang, is there something else you would like to raise before then?

MR. FANG: We wanted to raise one additional housekeeping point, and we promised your Honor we'd get back to the Court on the Rule 107 issue.

THE COURT: Yes.

MR. FANG: And the parties have discussed and have consented or have agreed that the following exhibits may go back to the jury under Rule 107(b)., and, again, these were all exhibits that the Court had allowed the parties to publish to the jury under Rule 107(a) as illustrative aids. List is as follows: Government Exhibit 19, 502, 503, 504, 508, 3913 through 3920, 3924 through 3934, and Defense Exhibits 5009 and 5010. And the government is happy to handle the process of loading all the exhibits on the laptop.

THE COURT: Great. Are there any exhibits that remain in dispute in that case?

MS. TREFZ: Shockingly no.

MR. FANG: I don't believe so either, your Honor.

THE COURT: Thank you. So you all will, tonight, have a list of all the exhibits that are going on the flash drive. You all will confer with the defense to make sure that those are the appropriate exhibits to be on that flash drive. You all will let me know what those exhibits are just so that I can

PB3RPER5

cross check?

MR. FANG: Yes, your Honor.

THE COURT: All right. Now on to jury instructions.

Mr. Looby?

MR. LOOBY: One other housekeeping matter, which is now that the record is closed, defendants' renew their Rule 29 motion without waiver that the evidence was insufficient on every element on every count at the end of the government's case, and we submit that the same was true at the end of all evidence as well.

MR. MARX: And I join Mr. Looby's motion.

THE COURT: Thank you, Mr. Marx.

OK. Now, we're on to jury instructions. So where we left off with the money laundering knowledge that transaction was meant to conceal. My plan is to add both the defense and government's proposed additions at the end so the language that starts with "keep in mind that the government must prove that the purpose..." that language. So it has both the defense's proposed language and the government's proposed language, but I know that the defense said that they have one proposed change to the government's language.

MR. UGBOAJA: That's right. Thank you, your Honor. In the final sentence of the government's proposed language, we would just propose changing "you may find that such concealment of the proceeds was the purpose of the transaction" to "you may

but are not required to find that such concealment, etc., was the purpose of the transaction."

THE COURT: Any objection to that?

MR. FANG: Your Honor, we don't think that language is necessary, but don't feel strongly about it.

THE COURT: Thank you, Mr. Fang. I will include that.

So then the last sentence, just to be clear, will read: "If, however, you find that the defendant knew or intended that the effect of the transaction would be to conceal or disguise the nature, location, source, ownership, or control of the proceeds, you may but are not required to find that such concealment of the nature, location, source, ownership, or control of the proceeds was the purpose of the transaction."

MR. UGBOAJA: That sounds good, your Honor.

THE COURT: All right. Anything further with this instruction?

MR. FANG: Yes, your Honor. I think the government had also proposed two additional sentences before the discussion.

THE COURT: Yes. So I'm going to add the sentence that "the government need not prove that the intent to conceal or disguise was the only or even primary purpose of the defendant as long as it was the intent of the defendant." I'm adding that one and not the second one that you proposed, and I'm adding both of the proposals at the end.

Going back to one prior proposal that Mr. Looby had with respect to language about the exploit, what is that proposed language? And are you proposing that that goes in the rules and protocols instruction?

MR. LOOBY: Yes. Your Honor will have observed that we did not propose the language that we had promised, and that's because we're withdrawing that request. When it came time to put pen to paper, we realized we actually don't even agree that exploit is relevant here, so it was hard for us to argue what it could be permissibly used for. So we withdraw that request.

THE COURT: All right. Thank you, Mr. Looby.

MR. FANG: Your Honor, with apologies, to go back to the money laundering knowledge of the transaction was meant to conceal. With respect to -- I just want to be clear with respect to the Court's reference to not adding the second language that the government proposed. Your Honor, is that a reference to the government need not show that the defendants intended to conceal with respect to any particular third party?

THE COURT: Yes.

MR. FANG: And may the government be heard further on that point as well?

THE COURT: Yes.

MR. FANG: So we do believe that that language is accurate and also amply warranted in this case in particular

because of the testimony elicited that the defendants and coconspirators were looking to conceal the sort of source or nature of the funds from the sandwichers but not with respect to law enforcement. And so we do think it's an accurate statement of law that the purpose of the concealment is concealment from not like with respect to any particular third party, such as the government, like that is just not something that needs to be shown there. And so the government would propose that the Court also include that language, which is a single sentence addition, to the Court's existing charge.

THE COURT: Anything from the defense?

MR. UGBOAJA: We still maintain that is unnecessary, your Honor. This is bespoke instruction that the government is offering, and it would only be warranted if we ever made an argument that the defendants' intent to conceal from third parties would be insufficient as a matter of law to satisfy this element, or that this element was only satisfied -- is not satisfied if the defendant did not have an intent to conceal from law enforcement. We haven't made that argument.

The argument we've made and the evidence we've presented is that there was no intent to conceal at all. So I don't know what the factual predicate is for the government to propose language.

THE COURT: Mr. Fang?

MR. FANG: Your Honor, just a couple points in

response. I don't hear Mr. Ugboaja to be disputing the legal accuracy of the government's proposed language. And, in fact, with respect to the case law that *United States v. Harris*, that's the Second Circuit case the government quoted last time, the Second Circuit had affirmed a money laundering conviction on the basis that funds were being moved around to conceal them from victim banks. And so it is an accurate statement of law, and we do believe that such an instruction is warranted here, again, based on the evidence that has been elicited during Travis Chen's testimony. I think it's appropriate for the Court to correct any misimpression that may have flowed from that testimony.

THE COURT: Thank you. I do think that that instruction is necessary here for the reasons stated by Mr. Fang. Are you proposing that I add that to the end of the first paragraph after "the government need not prove" or where are you proposing to add that sentence?

MR. FANG: Your Honor, I think at the end of the first paragraph would be appropriate.

THE COURT: All right. I will add, "the government also need not show that the defendants intended to conceal with respect to any particular third party." Is that the language?

MR. FANG: Yes, your Honor.

THE COURT: All right. We are down now to venue. Are there any objections to the venue instruction? Any from the

PB3RPER5

government?

MR. FANG: None from the government. Although after the substantive charges, the government actually had a few proposed stand-alone instructions as well, if now would be an appropriate time to address those.

THE COURT: Why don't we just go through the rest and then we'll go through those.

MR. FANG: Certainly, your Honor.

THE COURT: Any from the defense on venue?

MR. UGBOAJA: Yes, your Honor. We instruct that venue is proper of any act in furtherance of each charge occurred in the Southern District of New York because we believe it's overboard. It doesn't capture two important but related principles in the case law on venue. The first is venue is proper only where an essential conduct of the offense took place, and the second is acts that are nearly preparatory to the offense are insufficient for venue.

For wire fraud, the essential conduct element is not the scheme to defraud but the actual transmission of the wires themselves. And not just any transmission of a wire in furtherance of the scheme, but only wires that are essential conduct underlying the charged offense. So we recognize that the Court's proposed instruction on venue is pretty standard in the Southern District. But we would just point your Honor to a very recent decision from the Fourth Circuit in *United States*

*v. Mosby*, and that is 143 F.4th 264, where a jury instruction with very similar language was ruled to be overbroad because it sweeps in potentially preparatory conduct.

And it's not entirely obvious in our case here that venue was actually proper in this direct because Ms. Chen testified that James was in Seattle and Anton was in Boston during the alleged scheme to defraud. And Mr. Yakira testified that the servers where Savannah runs its bots were located in Ireland, Virginia, and Tokyo. Mr. Chen also testified that he was located in Manhattan during a December 2022 initial meeting with the Peraire-Buenos, but a jury could very easily consider that to be preparatory conduct.

So my purpose in mentioning this isn't to contest venue at this juncture, but the point is it's up to the jury to decide when the scheme to defraud began and when it ended and what conduct is part of that scheme. And I don't see how they would be able to do that accurately if the jury instructions give them no hint at all that they're supposed to distinguish between essential conduct and preparatory conduct.

THE COURT: Thank you.

MR. FANG: Your Honor, the wire in furtherance of the scheme is itself an essential element of a wire fraud charge, and so there's no sort of legal authority for -- and I haven't taken a look at the Fourth Circuit case and so I can't purport to know what that says, but there's no requirement that the

PB3RPER5

jury sort of parse out which wires are essential conduct and which are sort of merely preparatory because, again, the fact of wire itself is an essential element of a wire fraud charge.

And moreover, your Honor, the Court's formulation is legally accurate. It's something that the Second Circuit has said is "the appropriate standard." That's *United States v. Odunaike*, 273 F. App'x 58, at pin cite 60 (2d Cir. 2008). The Court says the appropriate standard as stated by the Court is "whether it is more likely than not that the crime or any act in furtherance of the crime occurred in the district." So we think that the Court's charge is legally accurate. We don't think any changes are necessary, and it's something that the Second Circuit has said is the appropriate standard.

MR. UGBOAJA: So your Honor might recall that one of the grounds on which Judge Subramanian granted in the Rule 29 motion in *United States v. Eisenberg* was that there was a lack of venue as to the wire fraud charge. And I will just quote a portion of the legal standard that he stated in that case, and the cite, by the way, is 784 F. Supp. 3d. 579. The Court stated, at page 612, that "venue in wire fraud cases lies where a wire in furtherance of the scheme begins its course, continues or ends." And then later on in the subsequent paragraph, the Court states, "but those wires still must be essential conduct underlying the charged offense."

It is not the case that any wire in furtherance of the

PB3RPER5

scheme to defraud is a sufficient basis for venue. It might be that that satisfies the interstate wire element of the charge, but the question is whether it's part of the essential conduct that could satisfy venue in this district.

THE COURT: All right. I'm not inclined at this juncture to change this instruction, but I will give it further thought.

Anything on presence of counsel from the government?

MR. FANG: No, your Honor.

THE COURT: Anything from the defense?

MR. LOOBY: Yes, your Honor. So we object to the instruction in its entirety, and with the Court's indulgence, just a few comments about why that's the case. So this instruction is given where a defendant puts presence of counsel at issue and argues that the presence of counsel is relevant to their intent. In other words, that the retention or involvement of counsel bears on a good-faith defense even if the defendant could not or did not choose to rely on the advice of counsel defense. The law permits this kind of presence of counsel argument in limited fashion, but here we haven't argued that at all.

For this reason, the instruction is not necessary, and I think it's kind of worthwhile recalling while we got here, which is that in the motions *in limine*, the government moved to preclude any mention of counsel whatsoever on the grounds that

if we had just used the word "lawyer," it would be somehow like a backdoor presence of counsel argument, and the government asserted that is *per se* and permissible under the rules.

In our response, we observe that, in fact, the government's own cases shows this is just a Rule 403 balancing test; that there is something called presence of counsel; that that evidence can be relevant to intent. And we said, we're not sure if that will come up here, and we said there's maybe two ways in which it could one and one is to contextualize the Google searches, which lined up with the time of the defendants' meeting with counsel, and the other is to contextualization allegations of shell companies by bringing in evidence that these companies were set up by lawyers. But we said we're not really sure. That's going to be the government's decision.

But what we rejected is the idea that any mention that there were lawyers involved somehow puts the presence of counsel argument at issue. We observed that the fact that lawyers were hired, both by the alleged victims and by the defendants, was just going to be part of the case. It's impossible to sanitize that evidence because the defendants and the alleged victims communicated with each other through lawyers, and that's just relevant evidence. And our prediction there bore fruit because the government is the party that put in all of the lawyer evidence in this case. We did not.

We even at times agreed to call lawyers "representatives" rather than using the word "lawyer." At every step along the way, we protested the government's injection of lawyer evidence into this case. When the government did succeed in getting lawyer evidence into the case, to be sure, we may have asked a question or two on cross-examination to contextualize that evidence, but in no way we were the party that made this part of the case.

And why this is relevant is that this instruction is effectively a curative instruction. It's a limiting instruction that is available in cases where a defendant is running a presence of counsel defense, which, to be sure, under the law they can do, but we're not doing here. But this is a bad instruction for a defendant, and we submit that it can't be the case that we can affirmatively throughout, from the very beginning, say that we're not sure if we're going to do this; we don't want to necessarily run this defense. And then to affirmatively not do that, and then have the government put in evidence of lawyers, and then the end result being that we're stuck with the instruction.

This is the cost of doing a presence of counsel defense, and the government at one point mid-trial had handed up examples of language that they had wanted as a curative instruction. And the cases that they cited there were the *Javice* case and the *Gillier* case. And both of these were cases

where the court conceived the instruction as a limiting instruction as a compromise to be made between the defense's insistence on injecting these issues into the case and the government's concern that the jury would be concerned about advice of counsel. Here there's no compromise to be made. There's no impression left to be corrected. We submit that this instruction should not be given.

THE COURT: All right. Any response?

MR. NEES: Your Honor, to take a long step back to when the government originally submitted its letter on presence of counsel issues, your Honor will recall that that letter was not a request from the government for a presence of counsel instruction. That letter was a request from the government for outright preclusion of this so-called presence of counsel defense. I call it a so-called presence of counsel defense because it's not really a thing. If you Westlaw search presence of counsel, I think there are six or seven results that come up in this district and one of them is your Honor's decision pretrial about presence of counsel.

And so the government's position was always this is categorically an inappropriate kind of argument, and therefore, the government felt very strongly from the get-go that it should be outright precluded, and it should be outright precluded because it couldn't be solved with a curative instruction or an instruction in the final charge, but rather

had to come out entirely because it was a way of subverting the long established traditional advice of counsel defense.

And so Mr. Looby, I don't disagree with this idea that this is somehow the remedy for making a presence of counsel defense. In fact, this is just a very standard instruction to remind the jury that to the extent that you hear even stray evidence over the course of trial about lawyers, it just clarifies for the jury what you should and should not consider those instructions for.

This is not a quote/unquote curative instruction. I think curative instructions are better understood as instructions your Honor would give mid-trial in order to clarify the record or to correct an error that's occurring. An instruction in a final charge is rather just to set forth what I think is a quite uncontroversial proposition of law that here lawyers have been mentioned. There's no doubt about that. We obviously have worked together repeatedly and with the Court to ensure that that is as constrained as possible.

And I think the government is happy to report that I think that that has largely succeeded, and that those issues have been generally avoided. I think it is not accurate to suggest that the government somehow adduced before defense counsel even the stray references that did -- that were made to presence of counsel. The first one that came up was when Mr. Chen was on cross-examination, and I'm sure your Honor

remembers when he sort of immediately started answering a question about lawyers and the advice that he had been given.

That was in response to a question from Ms. Trefz. That was the first reference to the MoFo letter that later came up in Mr. Yakira's testimony. So it's just not factually accurate to suggest that this was an instruction of the government's making. It came up through defense counsel. But in any event, I think the point here is there's no doubting the fact that occasionally lawyers have come up in this trial. This is a legally accurate instruction. It has nothing to do with whether or not there was a presence of counsel defense so-called mounted in the course of the trial. Rather it simply states an, I think, uncontroversial proposition that the jury should simply consider references to lawyers for the purposes they're supposed to consider them for, which is however it came up and not because the defendants were following the ordinance.

MR. LOOBY: I know the hour is late, so I'll be exceedingly brief. One is that the reference to the MoFo letter is a reference to the alleged victims' lawyers, not our lawyers. And I don't recall the precise question and answer, but I doubt that the question and answer was intended to elicit evidence of lawyers because we were really careful about that. I think the record speaks for itself on that.

And then on whether or not this is just a standard instruction or a limiting instructions, I will note that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

handout that the government handed up to the Court — and forgive me that I don't remember which day of the trial it was — it has on the title proposed limiting instruction on advice of counsel, and it contains the same language that that they have asked for in the charge as well.

And then the sources for that include the Bankman-Fried case, which, of course, this issue was pre-litigated. How can the defendant inject this evidence into the case in a way that would not be misleading, and the court ultimately excluded under Rule 403 a large chunk of it but let some of it, and essentially this was the instruction that was the result.

THE COURT: Mr. Looby, are there parts of this that you would not object to? In other words, if it's the first sentence and the last sentence?

MR. LOOBY: So the last sentence is the worst part, your Honor.

THE COURT: Right.

MR. LOOBY: Because the last sentence is the one that, in our view, suggests that either such defense exists in the law, which, of course, the jury doesn't know even about and that we're not advancing, and that we couldn't, as a factual matter, take advantage of that if we had chosen to. Like whether or not you pursue an advice of counsel defense is a choice you make, and the fact that we didn't hear in no way

signifies that we didn't or couldn't or it's just a choice that the lawyers make. So that last sentence, at minimum, that should come out.

And then I think the first two sentences are unobjectionable in this instruction. So I think that if that's all it said, then our concerns would be mostly allayed.

MR. NEES: I think we've got the same response to that, that the last sentence in particular is, first of all, factually accurate. The defense is not claiming that the defendants' conduct was lawful because of good-faith reliance on advice of counsel. It doesn't suggest that the defendants couldn't have met that defense if they did want to claim it. It just says that they're not claiming it. And the idea that like the jury shouldn't be told that this defense exists is not inappropriate. I mean, these are legal instructions, and so there's nothing wrong with alluding to that fact. And simply stating a factual claim rather than a legal claim that that is not the claim being made here is completely appropriate.

MR. LOOBY: Of course, the insanity defense is available but we haven't run that either. And so just mentioning that there are defenses out there that the defendants haven't taken advantage of, I think, is a strange thing for an instruction to do unless there's a reason for it, which is that there's a misimpression they need to correct.

MR. NEES: Obviously, your Honor, all of the

instructions are not meant to correct misimpressions. Again, curative instructions at the middle of trial and the fact that the government sought a previous curative instruction says nothing about whether or not it's appropriate to provide an accurate assessment of law at the end of trial. And I think there's obviously no question that lawyers have come up many times in this trial. I can see that insanity has not come up in this trial, but clearly there's a factual basis here to provide this instruction.

THE COURT: I'll give this one further instruction.

MR. MARX: I'll just add, as the attorney making the closing argument on behalf of Anton, and I think for Ms. Trefz as well, we will not be making any argument about the presence or reliance of counsel, that counsel blessed anything in this case in any way. So I don't see why this is relevant to what the jury is going to have to decide.

THE COURT: All right. Let's move on to income taxes. I think this was already agreed to.

MR. LIGTENBERG: We have a proposal to add a sentence just to balance out the instruction.

THE COURT: I think this was your instruction.

MR. LIGTENBERG: Well, regardless, we are proposing adding a sentence because I think right now the instruction, it carries sort of something that is defendant friendly, which is evidence that somebody filed taxes can be considered in

determining their intent, but it doesn't sort of include the sort of balanced more government friendly proposition. So we would just propose adding for balance the sentence at the end, "The fact that a defendant paid taxes on the profits of an alleged scheme does not on its own prove that the defendant lacked the requisite intent."

THE COURT: Any objection to that?

MR. LOOBY: We don't think it's necessary, but it's not a hill that we're going to die on.

THE COURT: All right. I will add that language. Are there any objections from closing arguments on?

And just a reminder, I'm adding, as the second to last instruction on cell phones, that "from this point forward during your deliberations, you are not to have your cell phones on. You must give your phone to the court security officer, and it will be returned to you when you are discharged for the day when you conclude deliberations." So that's the language I'm going to add on cell phones. But any there objections from closing statements on?

MR. FANG: There is no objection to the cell phone language. And with respect to closing arguments, we have a proposal, and I'm happy to hand it to the Court and to defense as well.

MR. FANG: All right. And lest your Honor see a whole wall of text, I'm happy to just explain. There are eight

numbered stand-alone instructions, so to speak, and the language that the government would propose adding is on -- is number eight. And we would propose adding that in both the juror's section on page 76.

I'll note, your Honor, just sort of to put a pin in it, the instructions numbered one to seven are the government's proposed stand-alone instructions that we would propose to be added at the end of the substantive charges. Those are the language that the government had proposed in connection with the parties RTC filings. I sort of just pulled them into a separate Word document, but it's all language that has already been included in the RTCs.

With respect to number eight though, we do think it's important to instruct the jurors on issues of sympathy and prejudice and to specifically make sure that those points are in there; namely, that they're not to decide the case based on sympathy or prejudice but solely on the evidence in this case. And there is sort of a factual predicate for both, your Honor.

I think, first with respect to sympathy, obviously the jury has seen the body-cam video, and I think it's appropriate to instruct the jury that to the extent that that video was played to suggest any sort of sympathy, that that should not enter into their considerations. And then with respect to prejudice, your Honor, I think not only the body-cam video but I believe there was some testimony elicited through

Mr. Hoffmeister that: HSI is the investigative arm of ICE, is that right? And if you look at the DHS structure, you go DHS and ICE and then HSI. It's quite frankly not clear to me what the relevance of ICE is at all.

THE COURT: I do recall that question. I also recall that you all did not object to that question, but I do remember that. There is already an instruction under oath of jurors that says all of this already. It's perhaps not as long as what you all have proposed, but it is there. There's also references in other places about punishment and that that's not to be part of their consideration. So I don't see a need to give a longer oath of jurors instruction, and what is given is what I have viewed in other instructions as well. So I'm not going to change that one.

Let's go to the after the substantive charges, and I'll just also say with respect to the video, I also already gave a limiting instruction with respect to the video on what the purpose is for them to consider that video for. So I think it's been covered between these instructions and the limiting instruction.

MR. FANG: Understood, your Honor.

THE COURT: But let's go to conscious avoidance.

MR. LOOBY: Yes. And could I just be heard very briefly before we get into each of one of these, which is to the extent that these are issues that have already been

included in the RTCs and not included in your Honor's proposal? Our understanding is at the charge conference, we are fighting over inches, not yards. And to the extent this is just the same language that the Court already considered and rejected, I don't know if it makes sense to walk through them all. We just note the hour. And we also have one or two housekeeping preservation notes that we would similarly do at the end. And our proposal would be if your Honor wants to hear from us on them, we are here to do that. But that's kind of our proposal for how to go forward through these because I think it could take a long time.

THE COURT: I agree and I did consider each of these and did not include them.

MR. FANG: Your Honor, I think the difference though is with respect to the proposal of the RTCs and where we are now, it's a very different landscape, and we haven't sort of sought to include every single jury instruction that we had initially proposed. And we're happy to sort of pick the few that we think are absolutely the most warranted based on the evidence that has come out in this case and the need and, as defense counsel also recognizes, to correct any potential misimpressions.

So there are a few, your Honor, that I'm happy to discuss, again, understanding the late hour, and I'm happy to be brief with respect to the reasons. But we do think that

there are some that are absolutely warranted based on the evidence.

THE COURT: And which ones are those?

MR. FANG: Your Honor, I think with respect to the victim misconduct and victim -- the victim misconduct and victim negligence, that's actually not included in what I handed up, your Honor, but we just wanted to make sure and confirm that the Court was inclined to propose that charge. It was something that we discussed on Friday, and I think that there was some colloquy about moving that language from the scheme to defraud section to a stand-alone instruction perhaps after rules and protocols.

I believe that defense had indicated that they were going to propose some language regarding what the purposes that sandwich trading could be considered for. We haven't seen that language yet. But, again, just to be clear, with respect to the victim conduct and victim misconduct charge, your Honor noted on Friday that this was language that the Court had indicated that it was inclined to provide, just not sort of during Mr. Yakira's testimony. But our understanding was that the Court was going to include that within request to charge.

THE COURT: I was planning to. I don't think we agreed on a spot where that was going to go. There's reference to negligence already under reasonable person under scheme to defraud. Does it make sense to discuss misconduct there?

PB3RPER5

MR. FANG: Your Honor, that's where the government had initially proposed it, but we're also open to, as I believe Mr. Looby suggested, putting it after rules and protocols. I think that that would also be appropriate just as long as that language is in there.

THE COURT: Mr. Looby, do you have a preference?

MR. LOOBY: I don't have a preference on the place. I will confess that I'm not sure exactly what language we're talking about anymore.

THE COURT: The government proposed a limiting instruction at various points, but it was brought up again before Mr. Yakira's testimony about victim conduct.

MR. LOOBY: Right.

THE COURT: And I was considering giving it. I never ended up giving it, but I don't think there was any question that it was an accurate statement of the law. And it's not yet reflected already in the instructions. So the negligence and misconduct piece sort of go hand in hand, so I think it could go under the reasonable person instruction there, and it could be: "A person may be a victim of fraud even if they weren't themselves engaged in misconduct." I don't know that that -- yes, I think that that could go right there.

MR. LOOBY: I think that sentence would be fine, and I think that spot is as good as anywhere else.

MR. FANG: Your Honor, I believe we had provided sort

PB3RPER5

of what the Court had ruled would be the language of the charge.  I'm just taking a second to pull it up again.

(Continued on next page)

MR. FANG: And if your Honor is looking at the loose-leaf handout that the government provided on Friday and emailed on Friday, it is on page -- it's on page 2, and it starts with page 38. I'm happy to --

THE COURT: I know I have it, but I seem to have misplaced it, so give me one moment.

MR. FANG: Your Honor, let me see if I can find a spare hard copy as well.

THE COURT: All right.

MR. FANG: Your Honor, I'm also happy to just read --

THE COURT: I have it. Thank you.

MR. FANG: So it's on page 2 of the document with the header page 38. Or I may be looking at an older version, but it should start with: You have also heard evidence that the alleged victims in this case engaged in certain trading strategies, including sandwich trades. And then it goes on to say: Whether or not you personally approve of the victims' trading strategies is not relevant to your consideration on the charges against the defendants. It is not a defense to wire fraud that the alleged victims were themselves blameworthy or deserved to be defrauded. Individuals may be victims of fraud even if they themselves engage in misconduct or were negligent. And we believe that that language is essentially the language that the government handed up to the Court during trial as amended by the Court during one of the breaks.

THE COURT: Mr. Looby?

MR. LOOBY: I think the last sentence really captures everything the jury needs to know about this. I mean, frankly, I'm a little bit baffled about why the government would want the Court to be -- have it saying so much about the blameworthiness potentially of the sandwich traders. But I think the first couple sentences are not responsive to any -- I mean, none of them are responsive to any arguments that the defendants have made or will make regarding whether or not fraud is justified based on the victims' conduct. And so I think overall it's not necessary.

And then, again, wherever the instructions kind of err into making categorical statements about what is or isn't relevant, you know, gives me concern because, of course, sandwich trading, the mechanics, and how it fits into the ecosystem are highly relevant to the jury's evaluation of this case. Now, their personal approval of it is not, and I agree with that. But I think overall this is a lot of verbiage that, you know, I think could just get the job done with the last sentence. That would be our position.

THE COURT: Mr. Fang.

MR. FANG: Your Honor, we believe that the instruction as we understand the Court approved is entirely appropriate here. I think, for example, again, the defendants put on a tweet today saying that -- or suggesting that the defendants

PB3VPER6

had delivered justice and did nothing wrong -- or this based user did nothing wrong. And we think that's sort of been something that has come up repeatedly at trial. And I think it's important for the language that the Court, to our understanding, has already approved to be provided to the jury so the jury can properly understand how to evaluate the evidence.

THE COURT: All right. I'm going to include the instruction, and I'll include it in scheme to defraud after -- I'll just make it a separate paragraph after when I say: A reasonable person.

All right. Mr. Fang, of the instructions, the other instructions that you just handed up, which ones are the ones that you are focused on?

MR. FANG: Yes, your Honor. I think there are at least a couple. One is what we call the uncalled witnesses equally available, it's No. 4.

THE COURT: I had some concerns about whether the unidentified victims are equally available to both sides. These are people whose identity you all didn't -- you all did not know. I don't know if there's a way for you all to figure out the identity of those individuals. But certainly the defense had no ability to call those people because they didn't know who they were. And so that was my concern with that instruction.

PB3VPER6

MR. FANG: I understand, your Honor.

But it also goes not only to the victims — which, again, the government still hasn't identified — but also to other parties that the jury has heard reference to were, in some cases, multiple references like Ultrasound or Justin Drake or Samczsun. And I think it's important to instruct --

THE COURT: Samczsun is a pseudonym.

MR. FANG: Right. I don't think anyone -- I don't think Sam knows who Sam is either.

So but, your Honor, I think the broader point is that there's sort of a constellation of different witnesses that could have been called, may not have been called. But the point is that given the references to, for example, Justin Drake or the builder, whoever the case may be, it's important to give this instruction. And, again, it's a legally accurate instruction; it's an instruction that is fairly routinely given in criminal trials in this district, and we do think that there is a factual basis here.

THE COURT: Mr. Looby.

MR. LOOBY: Yeah. I think our concern is twofold, one of which is the one your Honor mentioned, which is the defendants that I think -- I mean, there's no proof that those are equally available to us. And as your Honor reasoned, I think that wouldn't obviously be the case. We don't have the tools and resources like the government does to identify them.

We don't know what steps they took. But as far as it goes with respect to their identity, we're fully in the dark.

The other issue is that there were other witnesses like, you know, the representative for Ultrasound, for example. These are companies and entities that are, you know, overseas. The government has different -- also different abilities to find and get people to come testify in this courthouse from all around the world that, you know, is frequently done here that we don't as criminal defendants.

And so I think while this, you know, instruction is kind of boilerplate in a lot of cases, here it's particularly problematic, especially when we think the fact that these witnesses didn't come in to testify is very important for the jury to understand and to evaluate the credibility of the government's case and whether or not they met their burden. And then to be suggested that these people were equally available to us I think is factually inaccurate and would mislead.

MR. LIGTENBERG: Your Honor, just to chime in, since we're all bouncing around.

This case, this charge, as far as I know, is standard boilerplate, as defense counsel said. It's certainly been given in every case that I've ever tried. And if it were enough to not give this instruction, that you say, Well, the government, because of subpoena power or whatever abilities,

has a better chance to find such-and-such a witness, you could never give this instruction because that is always going to be the case.

They have tools like, I think, Rule 15 subpoenas, other ways to try to get them. But if the power of the government to find witnesses alone meant this instruction was inappropriate, we'd never give this instruction and, as a matter of fact, it is routinely, routinely given.

THE COURT: All right. I'll give it some more thought. I'll give it some more thought.

All right. Mr. Fang.

MR. FANG: Your Honor, I think No. 5, use of evidence obtained in searches, is also entirely warranted here. And same with No. 6. And 6, again, is particular investigative techniques not required. Again, both of these are standard instructions that are given.

THE COURT: The reason I didn't include 6 was I don't recall there being reference to certain investigative techniques in any extensive way in this case, but perhaps I'm misremembering.

MR. FANG: Your Honor, I guess the part that is probably the most important from the government's perspective is a statement that the government is not on trial. And I think that if the Court is inclined to just include the-government-is-not-on-trial language, which is an entirely

uncontroversial proposition, it's legally accurate, the government is, in fact, not on trial. And if the Court wants to include just that sentence in the use-of-evidence-obtained-in-searches section, the government would be amenable to that as well.

But I think given the way that the evidence has come in with respect to, you know, again, the body cam, the suggestions of tampering with the phones or the chain of custody of the phones, I think that's one reason why it's proper to give that charge.

I think, additionally, the jury has seen in stipulations between the parties that there was a fair amount of evidence that was obtained through searches. And so I think, again, this language is fairly anodyne; it's boilerplate language. But it's important to let the jury know that regardless of what their feelings are with respect to law enforcement searches, that is not a basis for their decision-making here. It's not, you know, something that they should be considering.

MR. NEES: Your Honor, can I just add one small point to this, which is that this instruction is typically given in the context of searches or of -- you know, juries like to know why is there no DNA evidence, or why is there no fingerprint evidence, or whatever. And so this is what that instruction is typically meant to do.

And I hear the Court's point about, you know, whether or not there's like a factual predicate for this instruction. But I think this instruction, setting it alongside the instruction about uncalled witnesses being equally available, casts light on why these two instructions are so necessary.

And particularly, to just return a moment to the uncalled witnesses thing, both of these instructions are getting at the same point, which is that should the government have had to have done particular things to prove its case. You know, not only, like, should it have had to get a warrant for DNA and compare it to this person or that person, but should the government had to have gotten an MLAT and gone through a legal process with another country in order to try to compel the testimony of a particular witness and force them to come over to the United States or force them to do a deposition abroad. Those are, suffice it to say, sometimes, at minimum, extremely difficult things for the government to do, and frequently entirely impossible things for the government to do.

And these issues are not just like boilerplate instruction — they are, in fact, boilerplate instructions that are legally accurate, but they are instructions that matter to this case because precisely for the reasons Mr. Looby has said, which is that the defense thinks that these are important; and that they want to be able to argue and, in fact, already argued in openings that you haven't even heard from these other

victims. Why are these other victims not before you? Why is this person from the Ethereum Foundation, who's overseas, is not before you? They want the jury to draw inferences from those arguments. And it's precisely because those arguments are going to be made, expressly said that they are going to make those arguments, that this instruction is necessary.

I think it would be an extraordinary legal proposition to suggest that what this instruction on uncalled witnesses, or even thinking about it in terms of particular investigative techniques, is that somehow for them to be equally available, the government has to exhaust every possible legal means. That is not what these instructions say. I'm not aware of any court ever interpreting it in that way. And I think because these arguments are being made, and particularly in light of the fact that they are such uncontroversial legal propositions, they really need to be given by the Court.

THE COURT: All right.

MR. LOOBY: Just very briefly, which is it does seem like we are marching through all of them.

THE COURT: I think maybe three are out.

MR. LOOBY: Maybe. We'll see about that.

But, yeah, I'm starting to -- I've already said my piece about uncalled witnesses, and I think for the reasons already stated that's our position there.

On the particular investigative techniques not

required, again, I don't see how this was an issue in the case. And certainly there's no confusion that the government is on trial. The Peraire-Buenos are on trial, and their liberty is at stake, and everybody understands that. And so if that's the only sentence they want from No. 6, I don't think it's necessary because the Court's instructions make that point clear throughout.

And then on the evidence -- use of evidence obtained in searches, your Honor already gave the limiting instruction that the parties all agree that the searches here were conducted lawfully, which is actually a much stronger instruction than this one, but, of course, was given in the context of the particular evidence at issue.

Putting aside the video of the arrest, there's really been no argument or any other type of issue about the, like, images from the phone. I know we had motions practice behind the scenes, but the jury didn't see those things. And so I would say that the use of evidence obtained in searches is unnecessary, especially in light of the Court's instruction to the jury this morning.

THE COURT: Thank you, Mr. Looby.

Mr. Fang.

MR. FANG: Your Honor, just very briefly.

With respect to the particular investigative-techniques-not-required instruction, I think if that's the

defense's position, the government believes that that entire charge would be appropriate here. And I think, again, there's been a lot of, sort of, evidence that's put before the jury as to, Well, look, the government only, you know, showed you 0.08 percent of the Google searches or the Slacks or whatever the case may be. There has been a lot of suggestion of, you know, like, the way that the government showed you this evidence or the way that the government has proven its case is -- you know, it ignores like 99.9 percent of like whatever the searches are.

I think, all that to say, your Honor, given the emphasis that's been placed on that with the defense summary witness, it would be necessary and appropriate here for the Court to include the entirety of the particular investigative techniques instruction.

THE COURT: All right.

I will give that further thought.

Anything else for us to discuss?

MR. FANG: Your Honor, I had one sentence that I neglected to add in the Word document, but hopefully it's straightforward enough.

It's basically language about mistake of law not being a defense. I don't think anyone --

THE COURT: Is this a separate instruction or are we talking about an instruction to add to something that is already proposed?

MR. FANG: Your Honor, I think initially I had envisioned it as somewhat of a stand-alone. But if it's just going to be one sentence, maybe it makes more sense to include that within the mens rea instructions as to money laundering and wire fraud as well.

I think the sentence that I would propose, your Honor, is: Ignorance of the law is no defense to purposeful and intentional action. And that is a direct quote from United States v. Gregg, 612 F.2d 43, pincite 51 (2d Cir. 1979). The full quote is, actually: It is well-settled that ignorance of the law, but we're proposing just to start with "ignorance of the law."

Again, it's a legally accurate instruction. I think it's warranted here, especially when the jury is going to be evaluating questions of did the defendants understand that what they were doing was in violation of, you know, any particular statute that they were searching, for example, or that they had discussed in Slacks. I think it's appropriate for the Court to add that instruction. Again, it's a fairly uncontroversial --

THE COURT: I don't think it's necessary for any of the wire fraud-related charges because it's just there's no reference to that. To the extent --

MR. FANG: That's fine, your Honor, if you're including it in money laundering.

THE COURT: Well, that's what I want to hear argument

with respect to from the defense.

MR. LOOBY: Yeah. I'm concerned about this because we have not seen this before in a money laundering charge. And I think it would be very confusing because, well, like mistake of law in the, like, sense that I take it, this Gregg case used it is probably not a mistake to the, like, broader offense of money laundering. Knowledge of whether or not your conduct was illegal and whether the proceeds did constitute either the proceeds of specified unlawful activity under element two or the proceeds of felonious unlawful activity in element three, the defendants' knowledge of that is what the jury is going to be deciding.

And whether or not the government is going to be arguing that these searches show that, like, we somehow knew that we had violated these very statutes, and so I'm a little bit just scratching my head about how that addition could be squared with -- or not engender jury confusion about what are essentially jury arguments that we should be entitled to make about whether or not this evidence does show knowledge of basically unlawful activity.

And so, you know, without an example of this ever having been given in a money laundering charge, we would request that the Court reject it on the eve of closing.

THE COURT: All right.

Anything else for us to discuss?

PB3VPER6

MR. NEES: I just want to better understand the Court's suggestion that this instruction wouldn't apply in the wire fraud context.

THE COURT: Because there's no instruction about knowledge of the law in the wire fraud context.

MR. NEES: Understood.

I think the government's position would be that notwithstanding the fact that the legal standard is properly stated in the wire fraud context, that, nonetheless, there have been repeated arguments over the course -- both in openings and during cross-examination that the defendants didn't know what they were doing violated the law.

And the government objected on many of those occasions as a misstatement of the applicable standard in this case. And that's true for both the wire fraud and the money laundering.

And in light of those arguments, particularly, frankly, just like this is a case about cryptocurrency and wire fraud, right. And it is no surprise to anyone who's been watching this trial that a very key argument on the defense side is, Well, how could anyone know in this new context, given the novelty of trading in a cryptocurrency environment in which there are no, you know, express promises or no one signs any contracts, and it's unclear exactly what supports a set of expectations — and this is on the wire fraud point, a set of expectations about what would be material to a trader or not.

PB3VPER6

I think for those reasons, it's particularly important that the jury understand this very, very basic principle, which is that ignorance of the law is not a defense; and that because that is, I think, an undisputed legal proposition, there's a strong factual basis to give it in both counts.

MR. LOOBY:  Just very briefly your Honor.

The government has basically won two issues in this case that make this not an issue for the jury instructions, which is, they got the definition of "willfully" that they wanted for the wire fraud.

THE COURT:  They did.  You all did, Mr. Nees.  You're giving me a face.  You did.

MR. LOOBY:  Yeah.

And they also precluded us from introducing evidence about a lack of regulation and like prior enforcement.  And they precluded us from mentioning salmonella explicitly and doing a lot of things about, you know, whether or not the absence of enforcement or the novelty of this space in terms of how it's enforced by law enforcement like would or wouldn't influence the defendants' intent.  We submit that that's powerful evidence.  It wasn't permitted for us -- for it to be -- to come in.  And, as a result, there's really no basis for there to be any confusion to be corrected by.

And, you know, of course, like, again, with the money laundering offense, like, that's all about -- like, the

PB3VPER6

comments that they made about whether or not we knew what we were doing was illegal, that that's an element of the offense. And so, like, whether or not we were mistaken about whether or not, like, the omakase strategy was fraudulent or not, that's a defense to wire fraud. And so it's not a mistake of -- to money laundering. So I just think that this instruction could potentially be erroneous and I'm concerned about it.

THE COURT: All right.

I'm not going to include that sentence.

Anything else?

MR. LOOBY: We have our two, like, housekeeping matters as well, but Mr. Fang is up now.

MR. FANG: Your Honor, just briefly with respect to conscious avoidance. It's sort of a long instruction, but that is the same instruction that the government had proposed in the RTCs. Again, we submit it's warranted based on the evidence that the defendants have elicited, suggesting that they were sort of -- they could have taken additional follow-up steps, but they didn't.

And just to give a couple examples, your Honor, with respect to Coinbase, the defendants, you know, didn't reach out to Coinbase about off-ramping or prohibited uses. And they didn't sort of, like, ask the follow-up questions there.

Another example, as another factual predicate, is with respect to the Tether freeze, where, after defendants reached

PB3VPER6

out to Tether, Tether reached out about the funds and suggested that they reach out to Israeli law enforcement, for example. And defendants never, sort of, reached out subsequently to Israeli law enforcement about the frozen funds. Again, that's September 2023.

And so here, the basis for a conscious avoidance charge is that there is an assertion by the defendants of the lack of some specific aspect of knowledge, namely, sort of, the nature or -- well, the nature of the funds. And there is an appropriate factual predicate here for a conscious avoidance charge.

And so it's entirely appropriate here because a rational juror could conclude that the defendant was aware of a high probability of the fact in dispute, namely, the nature of the funds and, sort of, consciously avoided confirming that fact. That's sort of the precise reason why a conscious avoidance charge here is appropriate.

MS. TREFZ:  I hope they are not going to say they never reached out to Coinbase, because their witness testified that they did.  But whatever.

MR. LOOBY:  Mr. Ugboaja is going to handle this.

MR. UGBOAJA:  I'll just say this is not an instruction given in the ordinary course.  There's a legal standard that the government has to meet.  They have to establish a factual foundation that a rational juror may reach the conclusion

PB3VPER6

beyond a reasonable doubt that the defendant was aware of a high probability of the fact of dispute and consciously avoided confirming that fact.

From what I've heard from Mr. Fang, it seems the government's only evidence of that are instances in which the trial evidence shows the Peraire-Buenos did reach out to Coinbase and did reach out to Tether and did reach out to TRM. How those are instances of consciously avoiding something, finding out that their conduct constituted wire fraud, is something that I don't quite understand. So I don't think they've identified a sufficient factual basis for this instruction.

THE COURT: All right.

MR. LOOBY: And I would just add that there's obviously no allegation that the Peraire-Buenos — or no credible one — that they were unaware of some fact about the omakase strategy that would have shed light on whether or not their conduct was or was not legal. That's just not the way this record is.

THE COURT: All right.

I'm not inclined to include that instruction for the reasons stated by the defense, but I will make a final decision tonight.

Anything else for us to discuss?

MR. LOOBY: Yes. So our two items, your Honor, were —

and this is on page 25 of the joint request to charge at 154. And we had proposed language from the Supreme Court case in Loughrin regarding the implicit causation element of the wire fraud charges. We saw that it was not in the scheme to defraud element. I think it could go there or anywhere. But unless your Honor wants to have a discussion about that, we can rest on our papers at 154 and preserve that.

THE COURT: All right. Yes.

MR. LOOBY: And then one more along those lines, which is that we had the enforceable property right request. And that was also an ECF 154, and for the same reasons.

THE COURT: Thank you, Mr. Looby.

All right. Just to be clear about the instructions and what is going to the jury, so they will have the unannotated version of the final instructions. I will mark — and you all will get — a copy of the final annotated instructions. But those are just for you all. And what the jury gets is an unannotated version. They'll also each get a verdict form; but, again, I will instruct them that they only fill out and sign one.

Anything else for us to discuss now?

MR. NEES: Your Honor, I think the only last thing that the government wanted to raise was the possibility of doing closings first and then charging the jury. We haven't had an opportunity to confer with defense counsel on this, so I

PB3VPER6

don't know what their views would be. But that's generally the practice that we've seen. I think there are reasons from just a logistical and scheduling perspective why that may make sense, and we just wanted to propose that possibility to your Honor.

THE COURT: This is something that I've adopted from another judge in this district who does it in this way. I think it's more helpful to the jury to hear the instructions first and then go to closings, so that's why I do it that way. I'm not inclined to change it for this trial.

MS. TREFZ: I just wanted to check in on whether they had an answer on the timing issue just so that we can do our planning.

THE COURT: Yes. And I realize I gave that proposed timing with literally no breaks for anyone, so -- other than lunch. So it might not be the most well-thought-out plan, I have to say. So if we add in a ten-minute break here or there.

But from the government, was there any objection to trying to fit everything we can in tomorrow?

MR. NEES: No, your Honor.

THE COURT: All right.

So why don't we just plan on two hours --

MR. LIGTENBERG: I'm just throwing this out there while we're spitballing. Another possibility would be — I've seen this done before — if their time is short, to try to keep

PB3VPER6

it fair, you could have the government close, one defense counsel close that day, and then stop there. And then the next day have the other defense closing, followed by a rebuttal.

THE COURT: Ms. Trefz.

MS. TREFZ: I mean, if we run out of time, sure. But I think we'd prefer to just have everything finished so that they've got the full day Wednesday and Thursday, if they need it, to deliberate before we've told them the end, that it was the last day that they had to be here.

I don't know if the jurors will be able to -- will be fine with, you know, staying until 5:30 or something, instead of just building in those breaks that your Honor suggested. I am not totally clear on that.

But, long story short, we'll do whatever the Court thinks is best, as long as -- but we hoped that everything could be done in one day. We think this was still only a two-and-a-half-week case or so, it's not like it was -- or maybe it was a three-week case ultimately. But it's not like it was a four-month case or something like that.

THE COURT: Yes.

MR. FANG: Your Honor, just briefly.

I would echo my colleague Mr. Ligtenberg's suggestion as well. I think it's just going to be way too much to try to squeeze in one day, given the charge, the need for breaks, the fact of, you know, four jury addresses that could be fairly

extensive in this case.

And, you know, I think the fact that it may have been a two-and-a-half-week trial versus a four-month trial is sort of neither here nor there; it's marginally relevant.

But I think the broader point is obviously the government has the burden of proof here, and I think we need to make sure that we have sufficient time to present argument to the jury in the same way that the defense sort of has a constitutional right to present that argument to the jury as well. And so if it means just splitting up the four jury addresses and having the ability for breaks, for example, I think that's probably the more prudent approach here, your Honor.

THE COURT: Here's what I'm going to do, assuming there's no objection: I'm going to ask Ms. Tran to check in with all the jurors to see if they can stay until 5 tomorrow or a little bit beyond that. Each side will have two and a half hours for their closings. The government can break that up how they choose to break that up.

The goal of trying to fit everything in tomorrow, which I think is to everyone's benefit, including the jurors', who I think would prefer to hear everything in one day and then start their deliberations on Wednesday.

Any objection to me doing that?

MS. TREFZ: No objection to it, your Honor.

The only thing that we would request is that although the government can presumably break up its time in some way, we would object to them breaking it up in a way that effectively splits their closing in half. We believe that the rebuttal should be limited to 30 minutes or so or less, because we won't get a chance to respond again and we're worried about sandbagging in this particular case.

THE COURT: All right.

Does the government have a response to that? And also, any objection to Ms. Tran reaching out to the jurors about staying a bit late?

MR. FANG: Your Honor, just one brief moment.

MR. LOOBY: While we wait for that, your Honor, I just wanted to flag that we will be filing a very brief letter brief tonight. We're at the end here, so this is probably hopefully our last one relating to topics that we think would be improper for the government to explore in closing.

We're loathed to object during a closing argument, and so this is just meant to front where we see some of the lines. And we could take that up at 9:30, to the extent your Honor would be interested in doing that. That's the purpose of that.

THE COURT: Thank you, Mr. Looby.

MR. FANG: Your Honor, if it's possible for the government to have three hours, and we would certainly have no objection to defense having a combined three hours.

I think the parties should just have the same amount of time. And I think to make sure that we have sufficient time to present our arguments to the jury, I think the government would ask for three hours.

MS. TREFZ: Sounds like we won't be doing it all in one day then. So on that, ultimately, we defer to the Court. But, you know, so I guess we defer to the Court.

We obviously would like equal time. As Mr. Marx suggests, that one approach would be to give the jury the charge, let the government open, we will do our -- let them do the first part of their closing, we will do our closing the next day, both of them, and then they can do their rebuttal. If that's fine, then that's fine with us.

THE COURT: It's just such a waste of a day.

MS. TREFZ: I'm with you, your Honor.

THE COURT: We can do short breaks and a short lunch. I want to get everything in. So if you all really need three hours, you know, please let me know that tonight in an email. I know you're still conferring with Ms. Kudla. So let me know if that's going to be the case, and we'll go from there. But we cannot have a half day tomorrow, that's just a waste of their time.

MR. FANG: We understand, your Honor. We'll endeavor to get the Court and defense counsel an answer as soon as we can.

MS. TREFZ: I would just put on the record, it's frustrating for us that Ms. Kudla is not here to just talk about this issue with everybody, and Mr. Levander. We've been sitting here patiently. If she's the one that needs to be consulted, she should be here in the courtroom with everybody else.

THE COURT: All right. Why don't you all send an email tonight about the plan.

Give me one moment.

MR. MARX: Your Honor, respectfully, could we get a deadline for the email, given the frequency of midnight filings in this case? Because if we're going to close tomorrow, we'd like to know what's happening.

THE COURT: Can you do that in an hour, Mr. Fang?

MR. FANG: Yes, your Honor.

THE COURT: All right. So by 7.

Anything else for us to discuss now?

MR. FANG: No, your Honor.

MS. TREFZ: No.

THE COURT: All right. Thank you, all.

I will see you tomorrow.

(Adjourned to November 4, 2025 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 PETER SHANZ

Direct By Mr. Marx . . . . . . . . . . . . . . .2969

Cross By Mr. Fang  . . . . . . . . . . . . . . .2983

Redirect By Mr. Marx . . . . . . . . . . . . . .3005

 BRETT HEMENWAY FALK

Direct By Mr. Looby  . . . . . . . . . . . . . .3006

Cross By Mr. Levander  . . . . . . . . . . . . .3105

Redirect By Mr. Looby  . . . . . . . . . . . . .3151

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 DX 1206  . . . . . . . . . . . . . . . . . . . .2970

 1041-Q   . . . . . . . . . . . . . . . . . . .2972

 226   . . . . . . . . . . . . . . . . . . . . .2972

 403   . . . . . . . . . . . . . . . . . . . . .2974

 231   . . . . . . . . . . . . . . . . . . . . .2975

 1058    . . . . . . . . . . . . . . . . . . . .2977

 1051    . . . . . . . . . . . . . . . . . . . .2979