UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

Defendants. Trial

------------------------------x

New York, N.Y.
October 16, 2025
9:45 a.m.

Before:

HON. JESSICA G. L. CLARKE,

District Judge
- And A Jury -

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
Assistant United States Attorneys

FICK & MARX LLP
Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
-and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH

Also Present: Helena Kerest, Paralegal Specialist (USAO)
David Naguib, Paralegal Specialist (USAO)

(Trial resumed; jury not present)

THE COURT: Please be seated.

Good morning. We have a few things to take up this morning. We have a few issues with respect to Mr. Miller. I want to discuss briefly the letter that I received last night from the defense. And just get an overall status update.

So, let's start with -- actually, before we get there, Ms. Kudla, I understood yesterday, and perhaps it was because we only received 3500 materials, but can we receive all of the exhibits in one production?

MS. KUDLA: At 2:00 a.m., we texted that that would be something that was forthcoming today, your Honor. So later this evening, we will provide the Court with a complete new production that should be fairly, I would say, 99 percent complete for the rest of the trial, with some additional exhibits going forward.

THE COURT: Excellent. Thank you.

MS. KUDLA: Okay.

THE COURT: With respect to Mr. Miller, I know there are some issues anticipated with respect to cross-examination, but before we get there, there were a couple of issues that the defense raised in their letter and then yesterday that I don't believe the government responded to, and I'm not sure if that's just because those are not issues that you anticipate or they were just inadvertently missed. So I just wanted to cover

those, and then we'll get to the cross-examination-related issues.

The first was with respect to GX 5012BD, the document that indicates the slashing penalty. My understanding was that the defense had an opposition to Mr. Miller testifying with respect to that exhibit.

Does the government intend to use that exhibit with Mr. Miller?

MR. FANG: Yes, your Honor, the government does. That exhibit is a public blockchain explorer exhibit. It will illustrate exactly what Mr. Miller is going to be testifying that he personally learned in the course of the investigation. In particular — and we're about to get to this part of his direct, as well — Mr. Miller will say he led the investigation, he confirmed details of the investigation. He'll talk about who was involved in the investigation, and that what they had learned, essentially, is the parent and state roots being set to zero, and a subsequent block being submitted properly. And that's precisely what Government Exhibit 5012BD is going to show. It's a public document, and it's going to be in evidence. We're going to read a stipulation before and offer all of the blockchain series that are coming in.

THE COURT: All right.

To the extent he knew about this at the time of the investigation, then I think it's consistent with my prior order

that he can testify with respect to this exhibit, assuming that the government lays that foundation.

With respect to how defendants' validator code interacted on a technical basis was another issue that the defense raised. I don't recall the government's response to that.

MR. FANG: Certainly, your Honor.

Again, Mr. Miller has not seen the defendants' code, and so we don't plan to elicit testimony from Mr. Miller about how the defendants' code actually functioned. What he can testify to — again, the foundation is his participation personally in the investigation — is the effect that the code had. That's entirely proper for him to say because it is part of the investigation.

THE COURT: All right.

Mr. Looby?

MR. LOOBY: On that, the testimony that would be objectionable under this category would be speculative testimony as to how it actually worked, so how did the validator code fill out these fields, what did it do, in what order, those types of things. He doesn't know that, and he's told the government that he hasn't seen the particular code.

So, if he's going to talk about, this is what we learned, like, this was the end result of this, then that's different than explaining, well, this must have been how it

happened, because he's told the government he doesn't actually know, on a technical basis, how it happened. And that matters in this case.

THE COURT: Mr. Fang?

MS. KUDLA: Your Honor, those are all issues that Mr. Looby is able to cross Mr. Miller on in terms of the scope of his knowledge, what he saw or didn't see.

THE COURT: In other words, you're not planning to ask questions that cause him to speculate about what happened. It's focused more on the effect the code had, correct, and what happened in that sense?

MR. FANG: Yes, your Honor, what happened in the sense of the effect the code ultimately had based on his investigation. But Mr. Miller, we're not planning to elicit any testimony about, like, the logic of the defendants' code, for example, again, because he didn't see it.

THE COURT: All right.

MR. LOOBY: One final point, your Honor, is depending on the way that the questions are phrased, those questions might implicate the Court's order on the hypothetical questions in the motion *in limine* about kind of questions to gauge the materiality of any specific alleged false statement that was conveyed to this robot that he didn't control, that he didn't observe in realtime, and that he has never kind of seen the interface in which the alleged information was sent to this

relay.

THE COURT: Mr. Fang?

MR. FANG: Your Honor, Mr. Miller doesn't need to have literally seen the exploit happen in realtime to have a percipient knowledge of how it ultimately occurred. Again, based on --

THE COURT: That's fine. I think what Mr. Looby is saying is with respect to hypothetical questions that I already said, at this point, that you all had not established he could testify to. The same is not true of another witness, but with respect to Mr. Miller, questions about what he would have done differently, in other words, is not permissible here because he was not involved in the transactions at the time. He is looking at what happened from an after perspective.

I don't anticipate you are going to ask those questions, correct?

MR. FANG: That's correct, your Honor. He will testify to the facts as they exist in the universe.

THE COURT: All right.

And then the last argument that I have, that I don't believe the government addressed, was with respect to whether he can testify as to what the false signature communicated to the Ultrasound Relay, because the Ultrasound Relay is not implemented by Flashbots.

MR. FANG: We expect to elicit testimony from

Mr. Miller that the investigation was co-led by Ultrasound and Flashbots, and so they were working together on the investigation. And in the course of that investigation, Mr. Miller did learn what happened to the Ultrasound Relay and the fact that the Ultrasound Relay used a specific implementation of the Flashbots relay code that Mr. Miller testified to.

THE COURT: All right.

Mr. Looby?

MR. LOOBY: Yeah, we have some hearsay issues with that testimony, which is, as part of the investigation, I heard X, Y, or Z from the Ultrasound Relay about how this or that happened. I think, like, putting aside whether or not he has sufficient personal knowledge to testify to his investigation without it being a 702 issue, there is always the issue of the particular questions and information, and if he's just relaying information that he heard from elsewhere, then that's a separate problem.

THE COURT: Yes.

MR. FANG: Your Honor, it was a joint investigation. Mr. Miller will testify that he verified certain details of the investigation. He will talk about how the investigation also involved certain security researchers, and they had sort of a working document in which the findings were sort of being updated in realtime. And that includes the block header, it

includes what block it occurred on, it includes details of that investigation. We believe it's entirely proper for Mr. Miller to testify as to those aspects of the investigation.

THE COURT: All right. We'll see how it comes out.

I understand that there are some issues with respect to the cross-examination, Mr. Fang?

MR. FANG: Yes, your Honor.

Based on opening statements, as well as what we received a little past midnight in terms of defense exhibits they may seek to introduce affirmatively through Mr. Miller's cross, we understand that there will likely be a line of cross on Mr. Miller's prior statements and opinions regarding sandwich bots. The Court should preclude that line of questioning, for a few reasons.

I think, first of all, it's rank hearsay. It's all out-of-court statements made by people who are not subject to cross-examination. Even Mr. Miller's own statements, as reflected in those documents, is hearsay, as well. It's also irrelevant, your Honor, because Mr. Miller's personal views on sandwich trading is far afield of the scope of his direct. There's been no discussion, and there won't be any discussion, on Mr. Miller's direct examination about sandwich trading or sandwich attacks or its place in the Ethereum community.

We understand the defense's argument for admissibility to be that in one of the slides -- or in the video, I believe,

we had a reference to a bundle that includes buy/buy/sell, and that is a reference to sandwich trading. Mr. Miller never characterized that as sandwich trading. He also said, in direct, that that is not the only way a bundle can be formed. And, so, there's just no basis to cross Mr. Miller on his personal views on sandwich trading.

It also doesn't go to any matter at issue in this trial. It's not relevant at all to what the defendants knew or understood, to their intent. There's no foundation that the defendants even saw what Mr. Miller's personal opinions on this topic were. And allowing this line of questioning on Mr. Miller's own views on sandwich trading also implicate multiple 403 concerns.

First, it would lead to the misleading impression that his views are somewhat attributable to Flashbots as a company or even the Ethereum community writ large. And it would also devolve into a completely unrelated, time-wasting sideshow, because the government would necessarily have to adduce evidence of perhaps other opinions that Mr. Miller expressed to contextualize his views and to meet defendants' evidence.

So, there are multiple reasons why this line of questioning should not be allowed. It's not about what Mr. Miller thinks. Mr. Miller is here to testify as to how MEV-Boost works, what he found with respect to the exploit, and his communications with the defendants.

There are various exhibits that we understand may touch upon the sandwich trading issue. At this time, we don't sort of have a list of what those exhibits may be, but we anticipate that basically all of them are inadmissible hearsay and are just not relevant.

THE COURT: Thank you.

MR. LOOBY: Thank you, your Honor.

I believe we can deal with the hearsay issues for particular exhibits at issue. I don't know which exhibits Mr. Fang has this issue with, but we can kind of work that out on a break. I'm not sure I will introduce any exhibit for the purpose of focusing on sandwiching. So to the extent maybe there's a comment in there about sandwiching, I don't believe it's the reason it's on our list, which is an overinclusive list for the conversation we had in court of that now that we've seen the direct, here's the DX numbers that we may seek to introduce for reasons other than impeachment.

As for relevance, the Court has already ruled that the issue of sandwich trading, its mechanics, its place in the community, it's all relevant to people's understanding of the alleged exploit here, of the way that the system worked, of the way the incentives did or didn't protect certain behaviors. And, so, there's that issue — it's certainly relevant to the case under the Court's order — and then there's the separate issue of the scope of Mr. Miller's examination.

We believe that the demonstrative -- the demonstrative clearly showed a sandwich attack trade in action. It showed, like, a trade in the middle and two trades coming in together on either side and going into the block. And the purpose of that is to show that, you know, sandwiching -- to explain how a sandwich attack would get on the chain. The transactions that matter in this case — of course, that is why we are here explaining these things to the jury — are the sandwich attack trades. And so just because they didn't use that word with the witness doesn't mean that his testimony didn't cover that.

And --

THE COURT: I think he also referenced several times searchers looking for arbitrage opportunities, and so it was framed in that way. Perhaps sandwich attack was not used, but arbitrage opportunities, I recall being used numerous times.

I have less of an issue with the scope problem, but more of a concern with the relevance.

MR. LOOBY: So, I do think it's relevant for the reasons that we've described in the motions *in limine*. It's not a victim-blaming exercise. It is an explanation of the trading environment. So, Mr. Miller's testimony, although the government has purported to call him to testify just to the scope of his investigation, yesterday's direct didn't touch the investigation at all. It was just a tutorial on MEV-Boost and MEV, what MEV is. And sandwich attacking is one of the three

major categories of MEV, and it's one of the ways in which traders extract MEV in the system, and it's, in fact, the strategy that was employed by the alleged victims.

So, an explanation of how those trades worked is relevant to the materiality of the alleged misrepresentations. It's relevant to the defendants' intent in terms of whether or not these -- kind of understanding of what is the nature of the strategy, what are the nature of the counterstrategies that are out there, at a high level, just that they exist, and the idea, also, that this sandwich trading is permitted on Ethereum — we're not arguing that it's illegal or anything like that — but that it is a controversial practice, and this wouldn't be Mr. Miller's idiosyncratic views, this would be Mr. Miller testifying to the facts as they are in the community. And he is here testifying about, like, how these processes work, as a general matter.

And we believe that we should be able to contextualize that and explain, okay, one of the ways that people seem to extract MEV is sandwiching, and we won't dwell on it, but this will be a line of questioning about -- or we intend to have a line of questioning about, okay, so what does that mean so that the jury can understand the nature of the trades at issue, even if the government is conspicuously not using the word, even though everyone knows what that is. So, that's the relevance angle on that.

THE COURT: That seems relevant and permissible under my prior orders. I think the second question -- so, I have no concern with the line of questioning with respect to that, what sandwich attacks are.

And I think the second question that I just want to think a little bit more about is just his particular views of sandwich attacking within this community.

MR. LOOBY: Okay.

THE COURT: All right.

MR. FANG: Your Honor, just a few responses on the relevance point and the scope point, as well:

With respect to the scope, I think it's an overly narrow argument to say that, oh, well, because the government didn't use the talismanic words "sandwich trading," that's what we should be focusing on. As the Court recognized, Mr. Miller has talked about bundles writ large. He's said that's just an example of a bundle that can be included. He's not talking about sandwich trading in particular.

And, notably, with respect to Mr. Looby's relevance arguments, he mentions that sandwich trading is relevant to people's understanding, to the general trading environment. And all of that is very -- it's vague. There's no discernible reason why Mr. Miller, in particular, is the one to explain sandwiching. He may have certain views on it. That's also not relevant. And, ultimately, what the relevance argument from

the defense boils down to is that there are some pejorative aspect or pejorative perspective by the community on sandwich trading, and that's entirely improper to elicit from Mr. Miller.

THE COURT: All right.

I am going to permit you to explore sandwich trading generally with Mr. Miller, as I mentioned previously. The question I still have is whether he's going to be permitted to discuss his views of it more broadly.

So, I will get back to you on break.

Any other issues with respect to Mr. Miller?

MR. FANG: Your Honor, at the break, we anticipate having or raising certain issues regarding the defense exhibits that Mr. Looby may seek to introduce through cross. Our hope is that we can work out some of those issues and narrow the scope of the dispute before the Court.

THE COURT: Excellent.

With respect to Mr. Chen, let's just deal with that issue very briefly. I received the defense's letter with respect to him last night.

Ms. Kudla, do you want to address this? I don't think it requires --

MS. KUDLA: No.

THE COURT: -- opposition from you all.

MS. KUDLA: Yes, your Honor.

There's no proper basis to curtail a witness' ability to speak about their relevant knowledge and *mens rea* of the conduct. It is necessary for him to be able to explain his understanding of the conduct and, also, his remorse later on.

The case that the defense cites to is inapposite there. It's a Rule 29 motion with respect to a defendant. We're talking about, here, a witness taking the stand to talk about it.

I'm happy to explore further, but, also, I think they're going to explore the benefits of a nonprosecution agreement, and that was actually an opening statement. So his ability to explain why he feels like he needed a nonprosecution agreement is directly relevant.

THE COURT: Understood.

I see no basis to prohibit this testimony. The defense is free to impeach Mr. Chen with respect to any prior inconsistent statements and any biases that he may have, but I see no basis to exclude that testimony.

MS. KUDLA: Your Honor, one corollary point on this. For cross-examination, we will seek to preclude, or want to raise this issue with the Court now: Questions going to whether or not Mr. Chen knew his conduct was illegal at the time, we believe, should be precluded because there, it is calling for a legal conclusion of a lay witness. Whether or not you knew your conduct was specifically violating the law

does call for a legal conclusion, and, also, it's not the appropriate standard for which wire fraud is going to be defined to the jury, so, therefore, it's irrelevant.

So for both of those bases, certainly, it's fair game to be going at Mr. Chen — did you think you were doing anything wrong, did you think you were engaging in wrongful conduct at that time — but then to ask a lay witness did you think you were violating the law is a step going to a legal conclusion, for which we think should be precluded.

THE COURT: All right.

Ms. Trefz?

MS. TREFZ: On that issue, your Honor, I would just note that with respect to money laundering, the government's intention, it seems, is to put a whole bunch of evidence in that they should have known it was illegal, and one of the legal standards there is whether the defendants knew that they were participating in a felony. So, the fact that Mr. Chen, just like everybody else, did not have any sense that this was illegal at the time — we're not going to say it wasn't — and, therefore, it wasn't illegal — we don't think it was illegal — but we're not going to have him opine on the law. It's just what he thought, and that is fully in bounds, given the legal standard in this case, what the government intends to argue, and, also, there's the willfully issue that we've flagged before, which is, I know, for later.

THE COURT: Ms. Kudla?

MS. KUDLA: With respect to Ms. Trefz's point, Mr. Chen's *mens rea* after the exploit is significantly complicated by the fact that he was receiving advice from the defendants through counsel.

So, essentially, it was hearsay from counsel, being permitted through the defendants to Mr. Chen, saying that the conduct was aboveboard, and those communications have been removed from the government based on a privilege ground. So we cannot explore Mr. Chen's *mens rea* as to the legal advice that was providing the comfort, and we have chosen to remove this presence-of-counsel issue by not exploring that specifically with Mr. Chen.

So, now, for them to be able to, then, argue and ask him questions regarding whether or not he believed his conduct was illegal significantly prejudices the government because the reason much of his *mens rea* post exploit was being formulated through the comments being given to him by the defendants themselves, that were being filtered through counsel.

MS. TREFZ: I disagree with that as a factual reason. I don't think that's contained in the 3500, and it was -- and the government has no sense of what advice was being conveyed. We're not going to explore, necessarily, all of the reasons why and suggest that that is -- that anybody blessed anything that happened. That's not what we're going to suggest. I think

there are all sorts of other reasons why Mr. Chen thought that this conduct was not illegal. That's consistent with what everybody who was involved thought.

So, we think we should be able to explore it. At the very least, it sounds like we can explore whether he thought it was wrong, but if the government is then going to go, later on, and say, and they knew it was illegal, and that's the standard for money laundering, then that presents a problem for us.

THE COURT: All right. You can certainly ask questions about whether it was wrongful. I think there's no dispute with respect to that. I will give further thought on the illegality point.

All right. I think the jury is all here, so let's bring them out.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Good morning to you, all. Thank you, again, for being on time. I really appreciate it. We are going to continue with testimony today.

Mr. Fang.

MR. FANG: I believe Mr. Miller is in the courtroom.

THE COURT: Mr. Miller, please step down to the witness stand.

You may proceed.

ROBERT MILLER, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. FANG:

Q. Mr. Miller, before we pick back up, I just want to go over a couple of concepts that you testified about yesterday.

A. Okay.

MR. FANG: Ms. Kerest, can you please publish Government Exhibit 508, slide 11.

Q. Mr. Miller, to reorient the jury, what does this slide depict?

A. At a high level, this depicts different actors and some interactions between them in the MEV-Boost system.

Q. And what are some of these actors?

A. Searchers, builders, relays, and the validator.

Q. Are there people behind these different actors?

A. Yes; people or companies.
Q. And these interactions between these different actors, are there people behind those interactions?
A. Yes, ultimately.
Q. Now, you said yesterday that MEV-Boost allows the validator to outsource the building of the block to the block-builder.
What do you mean by "outsource"?
A. So the validator has two jobs in general. One is they order transactions in a block, where they build a block, and the second is they select a block for inclusion on the chain next — that's proposing a block. MEV-Boost allows them to outsource, and by that, I mean to delegate to another party, to enable another party, to order the transactions in a block on their behalf because these other parties are specialized and they're better at ordering transactions in a block than the validator is. So they make more money by doing so.
Q. Who makes more money?
A. The validator.
Q. And who is the other party?
A. The block builder.
Q. And so, just to be clear, under the MEV-Boost system, are those two different parties?
A. Yes.
Q. Does the MEV-Boost validator choose which builder it receives a block from?

A. No.
Q. Does the MEV-Boost validator have any role in choosing the contents of the block that the builder puts together?
A. It signs a header, but it doesn't see the contents of the block before it signs the header.
Q. So, what role, if any, does the MEV-Boost validator have in terms of selecting transactions to put in the block?
A. The MEV-Boost validator is outsourcing that role, so they don't play a role in choosing the transactions that go into a block.
Q. Remind us — what makes a validator a MEV-Boost validator?
A. They run the MEV-Boost software.
Q. And, again, how do they start interacting with the MEV-Boost ecosystem?
A. You would download MEV-Boost. So, people typically did that from our GitHub page, where we host code. And the first thing that you do is to register with relays along some information that's useful for relays and block filters, like where validators want to be paid, the address that they should be paid at.
Q. And, again, who introduced the concept of a relay?
A. Flashbots did.
Q. Is that essentially a MEV-Boost creation?
A. Yes. In this context, at least. Sometimes people -- relay is a general word, and so there are other relays, but they mean

different things in different contexts.
Q. But, here, and yesterday, when you were discussing the concept of relays, was that in reference specifically to a MEV-Boost relay?
A. Yes.
Q. Now, Mr. Miller, you also testified that the searcher submits bundles to builders that can be all or nothing.
What did you mean by all or nothing?
A. What I mean by that is that searchers submit these ordered lists of transactions, and each transaction needs to succeed, and if any transaction within the ordered list fails, none of the transactions are included.
There is a feature where you could say, hey, it's okay for this transaction to fail, but by default, that feature is not on. So by default, the intended behavior is all transactions specified in the ordered list need to succeed. If any of them fail, none of them are included.
Q. Again, who chooses what to put in the bundles?
A. The MEV searcher chooses what to put in the bundles.
Q. Who chooses the conditions, such as all or nothing?
A. Well, all or nothing is the default, and the MEV searcher would use a feature to specify if it was fine for one of their transactions to fail and still be included. I think that's what you meant.
Q. Well, in the MEV-Boost system, does the validator play any

role in choosing what goes in the bundles?
A. No.
Q. Can a searcher choose which builder to send bundles to?
A. Yes.
MR. FANG: Ms. Kerest, if we can please go to page 9.
Q. And, again, Mr. Miller, this is Government Exhibit 508, page 9.
A. Right.
Q. Can you remind the jury what happens at the validate signature step in the MEV-Boost system?
A. So, the validator has used MEV-Boost to get a block header from a relay, and they take that block header, they add a couple of other fields to it, and they create a signature. And that signature is them saying, I want to propose this specific block for my slot, and they return that back to the relay. Then the relay performs some checks to see, did the right validator sign this block, and is this what we would expect the signature to be.
Q. What do you mean when you say, is this what we would expect the signature to be?
A. As an example -- what's the right way to explain this?
If the validator returned something that wasn't a block header, as an example, the relay would not have anything to do because they weren't interacting with it in the way the relay expected.

Q. When you say when the relay expected, is that something that is according to the design of the MEV-Boost system?
A. Yes. So, there is a standardized programming interface for how relays receive signatures and signed block headers from validators, and it needs to have a certain shape, it needs to have certain fields. So the relay was validating this is of the shape that I expected to, and it's a signature over the fields that I expect.
Q. I think you testified just now that the MEV-Boost validator also adds a couple of fields.
Again, remind a jury what a couple of these fields are?
A. As an example, parent root, state root, I think the slot number is in there, too.
Q. I wanted to talk a little about the parent and state root. You testified that the parent and state roots have a particular meaning yesterday.
What did you mean by particular meaning?
A. What I mean by particular meaning is that the parent and state root are really specific things. There are functions and definitions for what they should be for a given block and a specific answer for what they should be for a specific block. There's sort of a right answer for that block, for what those fields should be.
Q. Is that right answer something that can be calculated?

A. Yes. The validator software calculates what those fields are automatically, typically.
Q. And who is supposed to input the parent and state roots?
A. The validator.
Q. Now, according to MEV-Boost's design, when does the validator fill in the parent and state?
A. The validator takes the block header that they receive from the relay, and they add in the parent and state root for the block.
Q. Do they do that before or after they submit the signed block header?
A. They do that after receiving the header from the relay and before submitting a signed header back to the relay.
Q. At this stage --
MR. FANG: And, Ms. Kerest, if we can please go to -- well, I think this slide is fine.
Q. Mr. Miller, at this stage in the process, does the validator see the transaction contents?
A. Not yet, no.
Q. Mr. Miller, does the relay need the right answer in the parent and state root to perform its function under the MEV-Boost system?
A. The relay's functions are, first, to make sure that the validator is providing a signature before it is revealing the block. And once that signature -- because it's looking for a

commitment from the validator that this is a block that's going to be included on the chain. Block builders only want their block contents in the transactions revealed in the case that there is that commitment. And, so, if there is not the correct parent or state root, that means that the commitment is not valid, of sorts, because that block cannot be included on the chain, those transactions actually can't be executed.
Q. Why can't those transactions be executed?
A. Since the parent and state root would not be correct, that means that the block couldn't be included on the Ethereum network.
Q. And, again, just remind the jury what the parent root is intended to convey.
A. It's a unique identifier of what the previous block is.
Q. And remind the jury what the state root is intended to convey.
A. The parent root, also — just to return to that — you can think of the -- it refers to the previous block. So the previous block is the parent, and this is the child block. That's why it's called parent root.
The state root is meant to convey a unique snapshot of Ethereum's state, so some information about Ethereum at a particular point, with a particular set of information.
MR. FANG: Ms. Kerest, we can take this down.
Q. Okay, Mr. Miller. Let's pick back up where we left off

yesterday afternoon.

MR. FANG: And, Ms. Kerest, if you can please pull up Government Exhibit 3219 again.

Q. Mr. Miller, we left off on page 5, the second sentence.

A. Starting -- you mean the one starting with "the builder is"?

Q. That's correct.

MR. FANG: Ms. Kerest, if you can highlight that second sentence again.

Q. Remind the jury why a validator can't modify the block after it has committed to the block.

A. When the validator creates a signature, they are creating a signature that's associated with a specific unique block. And if the validator were to modify the transactions in that block in any way, it would change the block, and there would be a different kind of unique identifier with the block. But the validator has already created a signature for a specific block, and in doing so, they have proposed a specific block, with a unique set of information, to be included on the chain. They can't take that back. That signature is out there. The relay has it now, the builder has it, the network has it. So there's no way for them to undo or modify that block after they have provided a signature for that specific unique block.

Q. To put a finer point on it, based on the way that MEV-Boost was designed and intended to operate, is a MEV-Boost validator

supposed to reorder a block that has been signed?

MR. MARX: Objection to the leading, your Honor.

THE COURT: Overruled.

You may answer.

THE WITNESS: That's not the intended behavior, no.

BY MR. FANG:

Q. And, again, based on MEV-Boost's intent or the way it was intended to operate and designed to operate, is a MEV-Boost validator supposed to add transactions to the block?

A. No.

Q. Is it supposed to remove transactions from the block?

A. No.

Q. What features of MEV-Boost's design were intended to prevent those kinds of modifications by a validator?

A. The question is, just to repeat it back so that helps my thinking, what features of MEV-Boost's design were intended to prevent those kind of modifications by a validator, right?

Q. Correct.

A. I think at the core of it is the commit-and-reveal scheme. By that, what I mean is that relays seek a commitment, a proposal, of a block from the validator before they reveal the block contents back to the validator.

MR. FANG: We can take this down. I'm sorry, let's put that exhibit back up. I think we're on page 5 of Government Exhibit 3219.

And let's call out the black box on this page.
Q. Mr. Miller, what is depicted in this black box?
A. This is what the information that the validator sends back to the relay when they are providing a signed block header, it looks like.
Q. And, again, are there people behind the validator and relay roles?
A. There are people behind the validator and relay roles.
Q. Do you see the reference to parent root?
MR. FANG: And, Ms. Kerest, I'll ask you to highlight that for Mr. Miller.
THE WITNESS: Yes.
BY MR. FANG:
Q. Do you see a reference to state root?
A. Yes.
Q. What is depicted here, generally, how a parent and state root looks?
A. Generally. This is an example. They generally look like this.
Q. Is the parent root the same or different for each block?
A. Different.
Q. Is the state root the same or different for each block?
A. Different.
Q. And, again, at this stage, when the validator is filling in these fields, can it see the transaction data in the block?

A. No.
Q. And when it sends back the signed block header, what is the validator signifying?
A. Their block proposal. So they're selecting this block for inclusion on the chain.
MR. FANG: Ms. Kerest, we can take this down.
Ms. Kerest, if we can display on the ELMO, just for Mr. Miller in particular --
Q. Mr. Miller, you should see on your screen what's been marked for identification as Defense Exhibit 5002.
Do you see that?
A. Yes.
Q. What is this document?
A. I'm not sure because I didn't make it, but it has a bunch of relevant concepts to MEV-Boost and Ethereum.
MR. FANG: May we publish Defense Exhibit 5002 to the jury, your Honor?
THE COURT: Any objection?
MR. LOOBY: Objection; foundation. He doesn't know the context in which it was created or by whom.
THE COURT: For the reasons previously stated, it's overruled.
Go ahead, Mr. Fang.
MR. FANG: Ms. Kerest, if we can publish Defense Exhibit 5002 to the jury.

(Defendants' Exhibit 5002 received in evidence)

BY MR. FANG:

Q. Mr. Miller, again, did you create this document?

A. No.

Q. Is this a Flashbots document?

A. No.

Q. Does this document accurately portray how blocks are proposed using MEV-Boost?

A. I wouldn't say so.

Q. So, let's just start with the different actors in the MEV-Boost system that you mentioned.

Is there any actor who's missing?

A. The block builder.

Q. Just remind the jury what role the block builder plays in the MEV-Boost system.

A. The validator outsources the ordering of transactions in a block to the block builder.

Q. When you say "the ordering of transactions," what do you mean by that?

A. Every block has a bunch of transactions, and you need to decide what transaction goes first, second, third, fourth, et cetera. So when I say ordering, I mean placing transactions in bundles, which are ordered lists of transactions, in a particular order, deciding who is first, second, you know, et cetera.

Q. Again, is that essentially building the block?
A. Yes.
Q. What role, if any, does a validator running MEV-Boost have with building a block?
A. They outsource the building of the block, so they're proposing the block only instead in MEV-Boost.
Q. So, starting with the top left box, do you see a reference to mempool, where my finger is pointing?
A. Yes.
Q. Is this box an accurate depiction of how blocks are built under MEV-Boost?
A. The validator, even though it's outsourcing ordering to a block builder, still has access to a mempool, so this box seems fine to me.
Q. But --
A. The mempool is inherently a public waiting room.
Q. When a validator uses MEV-Boost and outsources the block, does it have the ability to add transactions from the mempool?
A. No. So I wouldn't object to the box — mempool — being there, because the validator has a mempool, the mempool is public — it's kind of the point — but the validator in MEV-Boost does not use their mempool to build a block. They're outsourcing the building of a block to a specialized actor called the block builder.
Q. And, again, if the validator is running MEV-Boost, where

does it get the block from?
A. From the relay.
Q. Okay. So, let's pause here for a second.
MR. FANG: I'd like to mark this exhibit for identification as Government Exhibit 5002.
Q. So, Mr. Miller --
THE COURT: One moment.
MR. MARX: I believe your Honor already admitted the exhibit.
MR. LOOBY: Yes.
THE COURT: I believe I did, as well.
Is there a reason to mark it again?
MR. LOOBY: Yes, your Honor, there is, because I'm going to make certain markings on this exhibit.
THE COURT: Any objection to that, Mr. Looby?
MR. LOOBY: No objection.
THE COURT: All right.
BY MR. FANG:
Q. Mr. Miller, I'm going to cross out the line between the mempool and the validator.
Does that more accurately depict how blocks are proposed using MEV-Boost?
A. I would agree with that to the extent that the line is supposed to mean that the mempool is used in the building of the block by a validator because the validator is outsourcing

that job in MEV-Boost.
Q. So I'd like to direct your attention to the bottom left box, where it says "Own Trades."
Do you see that?
A. Yes.
Q. Is this box an accurate depiction of how blocks are built under MEV-Boost?
A. I don't really know. Part of the purpose of MEV-Boost is to prevent validators from needing to be very sophisticated, from needing to be a trading firm themselves, in order to be competitive. So, we do that by allowing them to outsource ordering and not, by extension, being able to get really good blocks by having other people build them and not needing to find trades themselves. So, generally, I think this box doesn't make sense either.
Q. So I'm also going to cross out the line between "Own Trades" and the validator.
Does that more accurately depict how MEV-Boost works?
A. Yes.
Q. Going to the bottom right box, where it says "Proprietary Order Flow," what do you understand "proprietary order flow" to mean?
A. To me, I understand this to mean MEV searchers and their bundles, so people who want transactions included in their specific orders, and it also refers to other users who want to

submit their transactions directly instead of to the block builder, as an example, instead of to the public mempool, where they have some need for privacy.

Q. Does a validator running MEV-Boost get trades directly from a proprietary order flow, as you've described it?

A. No.

Q. Why not?

A. Again, MEV-Boost was created to allow any validator, of any sophistication, whether you were, you know, just a casual user or staker of Ethereum, to receive the most valuable block possible by outsourcing block ordering to a specialized actor. The reason for that is that it's really challenging to figure out what the best ordering of transactions is, and it can also be challenging to develop relationships that you need in order to get people to send you sensitive transaction flow, which I think is what is meant by proprietary order flow here.

So the purpose of MEV-Boost was to allow people to outsource their ordering so another specialized actor could do those functions on behalf of validators and they wouldn't need to do that to be competitive themselves. And that would make the barriers to entry lower to be a competitive validator.

Q. And, again, what is this other party that the validator is outsourcing to?

A. The block builder.

Q. Again, is the block builder anywhere on this slide?

A. Not that I see.
Q. So I am going to cross out the line between proprietary order flow and validator.
Does that more accurately depict how blocks get proposed to the blockchain under MEV-Boost?
A. In my eyes, yes.
Q. Now, remind the jury, how does the MEV-Boost validator get a block to propose?
A. The MEV-Boost validator asks relays for a block header, and the relay is responsible for giving the validator the most profitable block header it has seen at that time.
Q. If a validator is using MEV-Boost, is it designed to alter the block that it receives?
A. That's not the intended behavior, no.
Q. Why not?
A. Why not? Because the point of MEV-Boost is to have validators outsourcing ordering to specialized actors, and to remove the need from any of these searchers, block builders, et cetera, from having to trust or think a lot about the validator and what they would do to the contents of the block. So you're supposed to keep the block contents private until it is committed to, and then you would be able to block. And the system relies on this assumption of privacy in order to have an efficient and fair market.
Q. Just to put a finer point on it, Mr. Miller, if a validator

can't see the transactions in a block, can it add to the block?
A. No.
Q. Why not?
A. Because you need to know what came -- what else is included in the block, to add something to a block. Without that knowledge, you might try to add something to a block, and it could be incorrect or an invalid transaction, as an example.
Q. Do you know all of this based on your experience developing MEV-Boost?
A. Yes. And my experience developing products for Ethereum.
MR. FANG: The government offers the corrected version of Defense Exhibit 5002 as Government Exhibit 5002.
MR. MARX: Object to the characterization, your Honor, but no objection to his marked-up copy of the exhibit.
THE COURT: All right.
It is admitted, without the characterization of that it is correct.
MR. MARX: Thank you, your Honor.
(Government's Exhibit 5002 received in evidence)
MR. FANG: We can take this down.
BY MR. FANG:
Q. Mr. Miller, I want to go back to a morning of early April 2023.
A. Okay.
Q. Can you remind the jury what you learned that morning

regarding MEV-Boost?
A. Can I remind the jury of what I learned that morning in early April 2023? Yes. So, I woke up, and I was told that there had been an incident with MEV-Boost, and people had lost a lot of money and I needed to get online urgently.
Q. Who were these people who were trying to get a hold of you?
A. People from Flashbots.
Q. Now, you mentioned yesterday that there was a bug in the system.
What did you mean by that?
A. We maintained this open source code base called MEV-Boost Relay, and we operated it in production, and other people had taken it and modified it and they ran it themselves. And in the MEV-Boost Relay code base, the relay, when it received a signed block header from the validator, was checking to see if the signed header came from the right validator and if it was correct in some ways, but not if the block header itself was valid and correct. And, so, in this particular case, the validator had set the parent root and state root to equal zero, which made the block invalid, it couldn't be included on the Ethereum chain, but the relay was not checking to see if the block itself was valid, it was just checking to see if the signature was correct as it expected.
So the relay then checked to see if the signature was valid, didn't see that the block header was valid, and it

revealed the block contents, although the block itself couldn't actually be included on the chain.

Q. So, we'll unpack all of that in a moment.

Was the bug -- did somebody take action with respect to the bug?

A. Yes.

Q. Was that the validator that you referred to?

A. Yes.

Q. At a high level, what, if anything, did Flashbots do in response to this incident?

A. We investigated the incident. We got together groups of people to talk about it, investigate it, figure out the root cause. We created an update to the code, where the bug was, in order to make sure it didn't happen again in the future. We worked with other relays in order to roll this out. And we investigated follow-on issues that we discovered in the course of addressing this incident. There were a couple of things.

Q. Mr. Miller, what role, if any, did you play in this response?

A. I oversaw the overall response.

Q. And who else was involved in this response?

A. People from Flashbots, so engineers, some of Flashbots' other leadership, there were members of the Ethereum Foundation, there were people from the Ultrasound Relay — that was the relay that actually had the bug exploited that

day — and there were prominent security researchers and white hats in the community that helped us find out the root cause and come up with a patch.

Q. You mentioned a couple of terms. First, you said "white hat."

What does a white hat mean?

MR. LOOBY: Objection; 701.

THE COURT: Overruled.

BY MR. FANG:

Q. As you --

A. Thank you.

MR. FANG: I'm happy to reask the question, your Honor?

THE COURT: You may.

BY MR. FANG:

Q. As you used the term "white hat," what does that mean?

A. I don't have a formal security background — I didn't go to school for this or anything like that — but I can speak as someone that has helped out in a bunch of white-hat rescues generally. I just want to give that prelude and context to calibrate my answer.

What I understand white hat to mean, in the context of crypto, is someone that tries to make use of bugs or vulnerabilities in software in order to save user funds in advance of an adversary doing so instead.

Q. You also mentioned "Ethereum Foundation."
What is that?
A. The Ethereum Foundation is a nonprofit foundation that created Ethereum itself and sees itself as a sort of steward of the overall space and helps to perform research on Ethereum, as well as set roadmaps, get people together, et cetera.
Q. Why did Flashbots loop in people from the Ethereum Foundation for this response?
A. There were people with the Ethereum Foundation that were involved with the Ultrasound Relay — that was the first thing. So, one, two people, in particular, from the Ethereum Foundation that day also worked with the Ultrasound Relay. I did both. And the other thing was that in the course of following up with this incident, we were worried that there were broader implications for the Ethereum network that it kind of caused us to think harder about. So, we wanted to talk to people who were more experts in Ethereum's consensus and deep matters of how it works in order to follow up and investigate on what might be further issues with Ethereum itself.
Q. Now, you mentioned Ultrasound, as well.
Can you just remind the jury why Ultrasound was looped in on this response?
A. Ultrasound was another MEV-Boost Relay. We knew them well and worked with them. And their relay was the relay that had actually had the bug and the exploit on that day. So they had

logs, they had data, things like that, that were relevant to understanding the incident.

Q. And did you personally confirm, at a high level, the details of the investigation?

A. Yes. So, when I had woken up, I believe that the engineers, security researchers, and Ethereum Foundation folks had already kind of figured out what the root cause was. I reviewed that with them and reviewed some of their work in order to verify my understanding of what the bug was that day and make sure that made sense to me.

Q. At a high level, what are some of the materials that you reviewed in the course of this investigation?

A. The block header itself, where the parent root and state root were set to equal zero; the code of MEV-Boost Relay code base; and some of the logs from the Ultrasound Relay are things that I remember; and a description that was compiled by engineers, security researchers, some of the people in the community as kind of step-by-step of what the incident was, too.

Q. Did Flashbots and the others who were involved in this response ultimately determine how this incident occurred?

MR. LOOBY: Objection; 802.

THE COURT: Rephrase your question.

BY MR. FANG:

Q. Mr. Miller, did you eventually determine how this exploit

occurred?
A. The Flashbots team and others did, yes.
Q. Were you a part of that group?
A. I reviewed their work, yeah.
Q. Okay. I want to direct your attention again to Government Exhibit 508.
MR. FANG: And let's go to slide 7.
Yes, thank you.
Q. Mr. Miller, using slide 7, can you explain to the jury what Flashbots learned about how the exploit or this incident occurred?
A. So where the slide is at, in the process of MEV-Boost here, is that the validator has asked for a block header from the relay. And the validator then takes this block header, and they add a couple of fields to it in order to sign it, to make their proposal for what block should be included on the chain. And in the incident that day, what the validator did was they set the parent root and the state root equal to zero, when the parent root and state root should actually be something else, since they have these particular meanings. That is where we are within the process on this slide.
Q. And, Mr. Miller, do you see a reference to a parent and state root in a block header on this slide?
A. Yes.
Q. Can you use your touch screen to blow it up in a box, or

just make some marking next to it?
A. I can certainly try. I don't know. It's my first time operating one of these.
Does that show for up for everybody?
Q. Mr. Miller, based on your participation in this investigation, what effect did setting the parent and state roots to zero have on the block header?
MR. LOOBY: Objection; 602, 701.
THE COURT: Overruled.
THE WITNESS: Should I answer?
THE COURT: You can answer.
THE WITNESS: I'm still learning the ropes, so I appreciate that.
What effect it had was that the block was now not a valid block. So, the relay received the signed block header, and it checked to see, did it come from the right party and does it generally have the shape that I expect, is it generally -- you know, does it have the right fields, so to speak, or does it have the right -- does it have a parent root, does it have a state root, but the relay was not checking to see was the parent root and state root correct.
So, the relay validated the signature and revealed the block contents back to the validator, but this meant that when the relay went to publish the block to the broader Ethereum network, that block was rejected since the parent root and

state root were not correct. So that block could not actually be included on the chain; it wasn't a valid proposal from the validator.
MR. FANG: Ms. Kerest, let's go to slide 8, please.
BY MR. FANG:
Q. Again, just to take a step back, what did the validator involved in the incident do at this step?
A. The validator set the parent root and state root to equal zero and signed the block header, and then provided it back to the relay.
Q. Again, what does signing a block header and sending a block header to the relay mean in the MEV-Boost context?
A. In the MEV-Boost context, that represents a block proposal. So it's the validator saying, this is the block that I am selecting for inclusion on the chain next.
MR. FANG: Let's go to slide 9, please.
Q. With respect to this early April incident, what did the relay do with respect to this invalid block header?
MR. LOOBY: Objection; 701, 602, 702.
MR. FANG: Your Honor, I'm happy to rephrase.
THE COURT: Yes.
BY MR. FANG:
Q. Mr. Miller, based on your participation in the investigation of this April 2023 incident, what did the relay do at this step with respect to the block header?

A. It validated the signature. It did not check to see if the block header was correct.
MR. FANG: Let's go to slide 10.
Q. Based on your participation in this investigation, what did the relay do at this step?
A. It returned the block body or the transactions in the block.
Q. And, again, based on your participation in the investigation, what did the perpetrators of the incident do next with this information?
A. They used the block body of the invalid block to construct a new block.
Q. When you say "the block body," what do you mean by that?
A. The transactions in the block.
Q. Based on your investigation, what, if anything, happened next, after they constructed the second block?
A. They constructed the second block, and they created a valid proposal for that block to be included on the chain. So that second block is, ultimately, what was included on the chain.
Q. Based on your participation in this investigation, did you learn what effect that valid second block had?
A. Yes.
But are you looking for an effect on something in particular?
Q. Well, what happened with respect to that -- well, let me

rephrase.

Earlier, you testified that this incident caused other users to lose money.

What users are you referring to?

A. There are bot operators that were submitting bundles of transactions to block builders — those users.

Q. What effect, if any, did this second valid block have on those users?

A. It caused them to lose millions of dollars.

MR. FANG: Ms. Kerest, we can take this down.

Q. Mr. Miller, has Flashbots had security vulnerabilities before?

A. Unfortunately, yes.

Q. And can you explain for the jury what a security vulnerability is?

A. A way that you can make a code -- or how I would define it — again, given I don't have a formal security background, but I'm generally aware — I would define a security vulnerability as a way that you can make a code base act in an unintended manner in order to harm users or make some money.

Q. Is your awareness based on your experience developing MEV-Boost?

A. Yes. And products for Ethereum.

Q. How would you characterize what happened in early April 2023?

MR. LOOBY: Objection; 701, 702.

THE COURT: Sustained.

BY MR. FANG:

Q. Mr. Miller, would you characterize the incident in early April 2023 as a security vulnerability, as you've defined it?

MR. MARX: Objection. Same objection and now leading.

THE COURT: Agreed. Sustained.

BY MR. FANG:

Q. Mr. Miller, what, if anything, was notable about this early April 2023 incident?

A. The scale, for one. It was a lot of money, 20, 25 million dollars, in that ballpark.

Q. Was there anything else?

A. There hadn't been an incident with validators in the MEV-Boost software in the past.

(Continued on next page)

BY MR. FANG:
Q. Now, did there come a time when Flashbots publicly disclosed its findings regarding this April 2023 incident?
A. Yes.
Q. Do you recall when this April 2023 incident occurred, the date?
A. Depends on your time zone. It's either April 2nd or April 3rd, I think.
Q. Do you know what the date would be in Eastern time?
A. I think April 2nd.
Q. When did Flashbots publicly disclose its findings regarding this April 2nd incident?
A. April 3rd or 4th.
Q. What involvement did you have in this public disclosure?
A. I wrote the public disclosure.
Q. I'd like to show you what's marked for identification as Government Exhibit 3302.
Mr. Miller, what is this document?
A. This is the postmortem — so the disclosure — that I wrote that details what happened on that day. And it also talks about a related issue that we found.
MR. FANG: I believe Government Exhibit 3302 is in evidence. May we publish this to the jury, your Honor.
MR. LOOBY: No objection other than -- nothing -- no new objections.

THE COURT: Thank you. You may.
BY MR. FANG:
Q. Mr. Miller, in the first line -- well, why don't we start with just what the title of this document is.
What's the header?
A. "Postmortem: April 3rd, 2023 MEV-Boost relay incident and related timing issue."
Q. And do you see a reference to Bert Mate?
A. Yes.
Q. Who is Bert Mate?
A. That is me.
Q. First line, Mr. Miller, can you remind the jury what the Ultrasound Relay is.
A. The Ultrasound Relay was another MEV-Boost relay. They had taken the open source version of MEV-Boost relay that we've been talking about, Flashbots made, and modified it. And they were running it in production at the time of the incident.
MR. FANG: And if we can just blow up that first paragraph, please.
Q. Mr. Miller, do you see a reference to a malicious proposer?
A. Yes.
Q. What's a proposer again in the MEV-Boost context?
A. It refers to a validator that's only performing one of their two roles. So, again, validators build blocks or they have two jobs; generally, they can order transactions in a

block or build them, and then they select a block for inclusion in the chain we're proposing. So here you can think of that as synonymous with validator.

Q. And, again, in the MEV-Boost context, which role of the two was the validator playing?

A. Proposing.

Q. Why did you call this April 2nd or April 3rd, depending on time zone, incident an exploit by a malicious proposer?

MR. LOOBY: Objection. 701. ECF 177.

THE COURT: Overruled.

A. I called it an exploit because there was a bug in the software that caused an unintended behavior that caused users to lose a lot of money to the gain of the person that used the bug; to the gain of the person that set off the events of the day.

Q. When you say "unintended behavior" or "caused unintended behavior," what do you mean by that?

A. What I mean by that is that the unintended behavior here was that the relay was not checking to see if signed blocks that were returned to it by validators were correct. So the relay is supposed to look for a commitment from the validator before reviewing block contents. It wasn't looking to see if the commitment was valid.

And so here, the proposer got the relay to reveal the block contents when it really wasn't intended to work that way,

since the intention was to have a commitment to including a valid Ethereum block before the contents of those block were revealed.
Q. And how did they cause the relay to do that?
A. By setting the parent and state root equal to zero.
Q. When you say "vulnerability" in the second line —
MR. FANG: Ms. Kerest, if we can highlight that.
Q. — what is a vulnerability?
A. A bug in software. So it's a way to make the software do something that's not intended.
Q. And, again, what was the vulnerability here?
A. That the relay was not checking to see if the block header that had been signed by the validator was correct.
Q. Based on your investigation, was the block header actually correct?
A. It was not correct.
MR. LOOBY: Objection. 701.
THE COURT: Overruled.
Q. Based on your investigation, what effect did that incorrect block header have?
A. The relay did not check to see whether the block header was correct. So it returned the block body, the transactions in the block, to the proposer. And then the relay went to publish the block to send it off for consideration for inclusion on Ethereum. That block was not valid. So it was rejected by the

broader Ethereum Network because it wasn't a correct block.
Q. Now, I'd like to turn your attention to the third paragraph.
MR. FANG: Ms. Kerest, if you can just blow up the first sentence in that third paragraph starting with "MEV-Boost works."
Q. Mr. Miller, do you see a reference to commit and reveal scheme?
A. Yes.
Q. And, again, just remind the jury what you mean when you say that.
A. Commit and reveal schemes are processes that we use in the crypto industry, where one party is committing to something before the contents of something else are revealed.
So, here, the validator is committing to a particular block as what they are selecting for inclusion before the block body and its transactions are revealed.
MR. FANG: And we can take down this blowup.
Q. Mr. Miller, I don't believe I got an answer to a question that I previously asked, which is: Based on your investigation, was the block header that was initially used in this April 2nd incident correct?
MR. LOOBY: Same objection.
THE COURT: Overruled. You may answer.
THE WITNESS: Thank you.

A. It was not correct.
MR. FANG: We can take this down.
Q. Mr. Miller, can you remind the jury what a slot is.
A. A slot is a window of time for a validator to propose a block.
Q. How are slots usually identified?
A. Are you asking how validators are chosen for a slot or how they are identified, as in how you would tell one slot from another, if that makes sense, or what a slot looks like? What's the question?
Q. Totally fair. I'll rephrase.
How do you distinguish a slot from another slot?
A. Slots have numbers. There's a unique number per slot.
Q. Sitting here today, do you remember what slot the exploit occurred in?
A. I think 6137846.
Q. Are you sure?
A. Not 100 percent.
Q. Okay. That's fine.
A. But I kind of wanted to try it in case I'm right. My mom would be proud of me.
Q. Mr. Miller, was the slot number recorded in the postmortem that you wrote?
A. Yes.
Q. And was the slot number fresher in your memory when you

wrote that postmortem?
A. Yes.
Q. Does that postmortem accurately reflect your knowledge?
A. Yes.
MR. FANG: All right. Ms. Kerest, if we can pull up just on the witness's screen what's marked as Government Exhibit 3302-U.
Q. Mr. Miller, do you see that on your screen?
A. I see 3302-U, yeah.
Q. Is this the postmortem that you wrote?
A. Yes.
Q. I'd like to direct your attention to the ninth bullet point under "timeline."
MR. FANG: Ms. Kerest, if you can highlight that, please.
Q. Mr. Miller, does the bullet that's blown up accurately record the slot number that the exploit occurred in?
A. Yes.
MR. FANG: Your Honor, the government asks that Mr. Miller be permitted to read the ninth bullet point into the record as a past recollection recorded under Rule 803(5).
THE COURT: Any objection?
MR. LOOBY: No objection.
Q. Mr. Miller, please go ahead and just read the bullet.
A. "The attacker used the block to construct a block that

drained the sandwich bots and proposed it in slot 6137846."

I got it right.

MR. FANG: We can take this down.

Your Honor, at this time the government intends to read another stipulation.

THE COURT: Just to remind the jury what a stipulation is, a stipulation is an agreement where there's no dispute about certain facts. The parties may stipulate or agree to those facts. You must treat these facts as having been proven for the purpose of this case.

MR. FANG: Before I read the stip, the government offers Government Exhibit S-704, which is the stip I'm about to read.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-704 received in evidence)

MR. FANG: May we publish to the jury?

Oh, I think it's up. Okay.

Government Exhibit S-704 states: It is hereby stipulated and agreed by and between the parties through counsel that the records set forth in Government Exhibits 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through Q, 5006-A through Q, 5007-A through Q, 5008-A through H, 5009-A through H, 5010-A through D, 5011-A

through H, 5012-AA through BD, 5013-A through H, 5014-AA through AD, 5014-AF through DC, and 5015-A through H consists of true and correct copies of publicly available blockchain records from blockchain explorer websites containing data from and relating to the Ethereum blockchain.

On the second page: It is further stipulated and agreed that Government Exhibits 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through Q, 5006-A through Q, 5007-A through Q, and all of these exhibits mentioned in that paragraph that I've mentioned constitute authentic records of a regularly conducted activity made at the time by a person with knowledge and maintained in the regular course of that activity pursuant to Rules 803(6), 901, and 902 of the Federal Rules of Evidence; and that this stipulation may be received and admitted as an exhibit at trial.

At this time the government also offers the government exhibits set forth in paragraph 1 of stipulation Government Exhibit S-704.

THE COURT: Any objection?

MR. MARX: No objection, your Honor.

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibits S-704, 5001-A through Y, 5002-A through C, 5003-A through R, 5004-A through H, 5005-A through

Q, 5006-A through Q, 5007-A through Q, 5008-A through H, 5009-A through H, 5010-A through D, 5011-A through H, 5012-AA through BD, 5013-A through H, 5014-AA through AD, 5014-AF through DC, and 5015-A through H received in evidence)

MR. FANG: Your Honor, at this time I'm about to move on to a new topic, and so perhaps it would be appropriate for the mid-morning break.

THE COURT: Yes.

All right. We are going to take a break this morning. Please be back and ready to go at 11:35.

My prior instructions apply: Do not discuss this case with anyone, don't do any research on this case or read anything about it, don't post anything on any website or social media and, finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

(Jury not present)

MR. FANG: Your Honor, may the witness step down?

THE COURT: Yes.

(Witness not present)

THE COURT: Anything for us to discuss on this break?

MR. FANG: Your Honor, briefly to clarify one of the exhibits that was introduced yesterday. This is Government Exhibit 3204.

THE COURT: Yes.

MR. FANG: So that exhibit, at one of the final pretrial conferences the Court had ruled to be admissible as a MEV-Boost instruction. I believe I had conditionally or offered it subject to connection.

THE COURT: You did not. I have in my notes that you all noted it was preadmitted. And it was fully -- my understanding is that document was fully admitted.

MR. FANG: Yes, your Honor. It was unclear in the record from us going through the transcript, and so we just wanted to clarify the point that it was, in fact, received in evidence.

THE COURT: It was, in fact, received into evidence.

MR. FANG: Thank you, your Honor.

THE COURT: All right. Anything from the defense?

MR. LOOBY: No, your Honor.

MR. MARX: No, your Honor.

THE COURT: See you all in 15 minutes. Thank you.

(Recess)

THE COURT: We are bringing the jury back up.

(Jury present)

THE COURT: If you all in the back row are having difficulty seeing the witness, you all can move down one chair.

All right. Mr. Miller, you may come back down.

MR. FANG: Ms. Kerest, can you please publish what is in evidence as Government Exhibit 5012-BD. And if you can just

enlarge the part where the text appears.

BY MR. FANG:

Q. Mr. Miller, what is this document?

A. This document is a screenshot of a service called Beacon Chain.

Q. And as part of your work at Flashbots, are you familiar with Beacon Chain?

A. Generally, yeah.

Q. Generally, what does it contain?

A. Information about Ethereum's consensus layer.

Q. And does what is reflected in Government Exhibit 5012-BD reflect what your investigation of the April 2nd exploit found?

A. That's the exhibit we're looking at, right?

Q. Yes.

A. Yes, it does.

Q. So, again, based on your investigation of this exploit, is this -- strike that.

MR. FANG: Ms. Kerest, if you can enlarge header 1 slot and header 2 slot.

Q. Mr. Miller, do you see the same string of numbers following header 1 slot and header 2 slot?

A. Yes, I do.

Q. Is that the slot number that this exploit occurred in?

A. Yes.

MR. FANG: Ms. Kerest, if you can enlarge header 1,

state root; and header 1, parent root.
Q. Mr. Miller, can you remind the jury what Flashbots determined on how the exploit occurred?
A. The validator got a block header from the relay. And when it was adding the parent root and state root, it said it equaled to zero instead of what the expected values were.
MR. FANG: We can take the enlargement down.
Q. Mr. Miller, why is there a reference to header 1 and header 2?
MR. LOOBY: Objection. 701, ECF 177.
THE COURT: Sustained.
Q. Mr. Miller, what did your investigation reveal as to the number of blocks that were proposed in the exploit slot?
A. There were two proposed blocks. One of them was not correct.
Q. What do you mean when you say one of them was not correct?
A. One of them had the parent and state root equal to zero, and so it couldn't actually be included and executed on the Ethereum chain.
Q. What, if anything, did your investigation reveal as to whether the second block was correct?
A. It was correct. So that was included and executed on the Ethereum blockchain.
Q. Mr. Miller, does header 2 appear to relate to that second block?

MR. LOOBY: Objection. 701. ECF 177.
THE COURT: Overruled. You may answer.
A. Yes.
THE WITNESS: Thank you.
Q. And, Mr. Miller, what, if anything, happened to the validator based on your investigation?
A. When the validator proposes two blocks for a given slot, there's a financial penalty that we call slashing. So the proposer was slashed, which means they lost some money. They were penalized within the Ethereum system.
Q. What was the slashing penalty in April 2023?
A. One ETH.
Q. Before we take this down, Mr. Miller, based on your investigation, how did the block header fields for the two blocks differ?
A. The header fields for the first block have the parent and state root set to zero. So you see it on the screen, zero X and then many zeros. The header fields for the second header had the parent and the state root set to the fields that we would normally expect, the correct fields. So they are cryptographic hashes, and that means computers can make sense of this, but we can't. They are letters and numbers.
Q. And are those cryptographic hashes being sent to any particular party?
A. Can you anchor it in a specific context? There's multiple

things that I could --
Q. You mentioned that the parent and state roots are cryptographic hashes. Ultimately, are those hashes going to somebody?
A. Well, these are hashes that are meant to uniquely identify some information for the blocks. And they have a specific meaning in the Ethereum context.
The first are used by the relay -- they should be used by the relay to see is this block correct. But then, second, they are published to the broader Ethereum Network where computers on the network will check these hashes, see if they are what they expect them to be, to make sure that these are valid blocks within the Ethereum Network.
Q. Mr. Miller, I think a little bit earlier you said that the slashing penalty in April 2023 was one ETH. Do you have a ballpark as to how much that is in dollars?
A. A few thousand dollars in 2023.
MR. FANG: We can take this down.
Q. From your work at Flashbots, are you familiar with the term "honest validator"?
MR. LOOBY: Objection. 701. ECF 177.
THE COURT: Overruled.
A. Yes, generally.
Q. How do you use that term?
A. In cryptocurrency systems, we -- there are rules for how

the different computers in the network are supposed to interact and the different actions that actors must take and they should take. And to call an actor honest in the context of crypto is to say that they are performing the actions that they must and should take according to the specification.

So in this context, Ethereum has a specification that's set out for how validators must and should act. And "honest" means that they are doing the things that they should according to the specification.

Q. What does an honest MEV-Boost validator mean?

A. In the context of what we've been talking about, a validator that signs one block or proposes one block, rather, and does it within the time window that it's allocated.

Q. What do you understand it to mean for a MEV-Boost validator to act dishonestly?

A. Again, this refers back, I think, to the idea of honesty within cryptocurrency systems or distributed systems.

In this context, that would mean a validator that is not taking the expected or intended behavior according to the specification, so specifically here proposing two blocks in a slot.

Q. And just back up a little bit.

What is a distributed system at a high level?

A. It's been a while since I gave these definitions, so bear with me.

A distributed system at a high level is a general field of trying to make systems that don't rely on a single computer. So you distribute the system across many different computers instead of having a single party like a government or a bank or a tech company manage the whole thing.

Q. Does MEV-Boost operate in a distributed system?

A. Yes, Ethereum. Ethereum is a distributed system.

Q. What actions, if any, did Flashbots take regarding the validator involved in this April 2nd exploit?

A. We operated a relay. And we briefly implemented a blacklist at our relay for the validator in question. So that would prevent them from interacting with our relay.

Q. How common was it for Flashbots to blacklist validators?

A. It's the only time we've done that.

Q. And why did Flashbots blacklist the validator for the April 2nd exploit?

A. We were worried there were going to be follow-on incidents, essentially.

Q. What do you mean by "follow-on incidents"?

A. In the course of investigating the vulnerability that was exploited on April 2nd, we realized that there were related issues that a motivated attacker could make use of; they could exploit other bugs in the system, essentially. And so we were worried that since the attacker had successfully pulled you off one thing, they might do other things, since we were aware that

there were several other issues in the system that came about as a part of our investigation. So we took preemptive action to prevent their known validator identities from interacting with our relay to try to prevent them from attacking the system further.
Q. And is that the blacklist that you're referring to?
A. Yes.
Q. Remind the jury what actions, if any, Flashbots took to fix the actual vulnerability.
A. We created a patch that updated the code to prevent the bug from happening again. And we updated our relay and we worked with other relays to update their code too.
Q. At a high level, what did the patch do?
A. So it made sure that the relay successfully published a block to the Ethereum Network before returning it to the validator. And what that would mean is by successfully publishing a block, you know that it was correct, that it had all of the fields that it should, that the fields were correctly constructed, and then that block could actually be considered for inclusion on the network. And we did that before we returned the block body to the validator so we were sure that they gave us the correct block with the correctly constructed block header.
Q. And just explain to the jury or for the jury what a correctly constructed block header means.

A. Blocks on Ethereum have specific structure, specific fields, and those fields have specific values. And so here I mean a block that had the fields it should with the values that it should.

And in contrast, setting the parent root and the state root equal to zero were not the values that you should expect in those fields, and that caused the Ethereum Network to reject that block.

So a correctly constructed block here means a block header that has the fields that it should with the values it should that is accepted by the Ethereum Network.

Q. Where, if at all, did Flashbots make the patch accessible?

A. On our GitHub page, the code repository for MEV-Boost replay.

Q. And, again, is that publicly accessible?

A. Yes.

Q. Now, Mr. Miller, just shifting gears.

After the April 2nd exploit, did there come a time when the perpetrators of the exploit reached out to you?

A. Yes.

Q. Remind the jury how they identified themselves.

A. They identified themselves as Low Carb Crusader.

Q. Showing you what's marked for identification as Government Exhibit 3306. Mr. Miller, what is this document?

A. This is an email chain between the perpetrators as Low Carb

Crusader and myself, as well as two other people that they sent an email to.

MR. FANG: Government offers Government Exhibit 3306.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit 3306 received in evidence)

MR. FANG: May we publish for the jury?

THE COURT: You may.

Q. Okay. So, Mr. Miller, let's just orient the jury. What is the subject line of this email chain?

A. "Urgent. Block equivocation."

Q. And where does the earliest email, earliest-in-time email in this chain appear?

A. At the top.

Q. Who sent this first email?

A. Low Carb Crusader.

Q. And who were the recipients?

A. First, myself. Then this security researcher who's very well-known and respected in the space called Sam; Samczsun is the full name this refers to. That's sam@paradigm.xyz. Then myself, bert.c.miller@gmail.com. And finally, Justin Drake, who works at the Ethereum Foundation and was affiliated with the Ultrasound Relay. And I will add for context that Samczsun helped us investigate the incident originally.

Q. So, Mr. Miller, when was this first email sent?
A. April 21st, 2023.
Q. Approximately how long after the exploit was that?
A. Twenty-one minus two, so 19; 19 days approximately.
Q. At the time you received this email, did you know the identity of Low Carb Crusader?
A. No, I did not.

MR. FANG: Your Honor, at this time I'd like to read from another stipulation.

THE COURT: You may.

MR. FANG: It's marked as Government Exhibit S-708.

Before I read it, government offers Government Exhibit S-708.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-708 received in evidence)

MR. FANG: Publish that to the jury.

Government Exhibit S-708 states that: It is stipulated and agreed between the parties through counsel that Proton Mail is an end-to-end encrypted email service. End-to-end encryption ensures that only the sender and intended recipient can read a message, which makes the message content inaccessible by the email service provider or other third parties. Proton Mail is based in Switzerland.

The Proton Mail email address low.carb.crusader@proton.me was used and controlled by Anton Peraire-Bueno and James Peraire-Bueno.

On the second page: It is further stipulated and agreed that this stipulation may be received into evidence as a government exhibit at trial.

MR. FANG: Now, Ms. Kerest, let's go back to Government Exhibit 3306, that first email.

Q. I'd like to direct your attention to Low Carb Crusader statement "I am responsible for the equivocated block last week."

What is an equivocated block?

A. "Equivocation" refers to signing two blocks in a slot. So an equivocated block means a block that you first sign, and that would be the equivocated block, and then you signed something else after that. So this is referring, I believe, to the block that was signed with the parent root and state root equal to zero.

Q. And, again, just remind the jury, in each slot, how many blocks can be published?

A. There's only one block for a slot. In theory, you could publish multiple, that's why there is equivocation. But the protocol only has one block per slot.

Q. How many blocks can be actually published on chain for each slot?

A. Only one block can be included on chain per slot.
Q. What's the difference that you're drawing between including and publishing?
A. Well, in the incident, they published two blocks. One of them was just not valid, and the other one that was valid was actually included. I'm drawing the distinction between them publishing two blocks, which they can publish three, in theory, if they wanted. You should only publish one, that's the intended behavior of the protocol and what was actually included. You can only actually include one thing. You can theoretically publish multiple things, although you are penalized for doing that. Does that make sense?
(Continued on next page)

BY MR. FANG:
Q. Yes.
And is that intended behavior applicable to block proposal under MEV-Boost?
A. Yes.
Q. Was Low Carb Crusader's description of their actions as equivocation completely accurate to you?
A. It missed the important detail that one of the blocks was not just equivocated, but has the parent and state root set to zero.
Q. And why does that matter?
A. Because that caused the relay to act in a way that we didn't intend. The relay is intended to receive a commitment to a block that's going to be included on the chain, and only then reveal the block body in the transaction contents. So, to me, it was an important detail of the day, and block equivocation doesn't fully capture all of the events.
Q. I'd like to direct your attention to the next sentence. "I have a message about block equivocation that I think you would find useful."
Mr. Miller, when you received this email, what did you understand Low Carb Crusader to be saying?
A. What I understood was they were saying they had another way to pull off a similar incident as what had happened on April 2nd.

Q. So, do you see where they -- or Low Carb Crusader says, "I could send it to security@flashbots.net"?
A. Yes, I see that.
Q. What is security@flashbots.net?
A. We had a program where people could disclose security vulnerabilities or bugs in our software to us at an email called security@flashbots.net.
Q. When you say "security vulnerabilities," what do you mean by that?
A. Ways to get the software that we use in our products or our open source software, like MEV-Boost, to do things that they're not intended to.
Q. Does that also include other Flashbots software products?
A. Yes, it does.
Q. Would that include MEV-Boost's relay?
A. Yes.
Q. Do you see where Low Carb Crusader writes, "I am not looking for a bug bounty"?
A. I see that, yeah.
Q. What's a bug bounty?
A. A bug bounty refers to this practice of when you disclose a bug in software to the team that maintains that software, they will give you money in return, a bounty in return, for disclosing it. And it's meant to incentivize and reward people for responsibly disclosing bugs.

Q. Did Flashbots have a bug bounty?
A. Yes.
Q. In April 2023, how much could a user receive for disclosing a security vulnerability to Flashbots?
A. It depended on the code base. So we had different bug bounties, different tiers, for different products in open source code that we had, as I remember, but you could receive up to tens of thousands of dollars, I think, if it was something really critical and important that you disclosed.
Q. Would you consider the April 2nd exploit to be critical?
A. I think we would have classified it as critical, yeah.
Q. Why?
A. It undermined the relay's ability to do its job, which is to facilitate this commit and reveal, and it led to the loss of user funds.
Q. What was your understanding of what Low Carb Crusader was saying in this email?
A. First, they were responsible for the incident on April 2nd. Second, they had a way to pull off something similar that didn't rely on a software bug in the same way that April 2nd did. And, third, they were looking to disclose it to me, Justin Drake, and Samczsun. That's all I've got to say.
Q. And, Mr. Miller, by the way, do you have a Flashbots official email address?
A. Yes, I do.

Q. Is the email address that you see here your professional business address?
A. That is my personal email, not my professional one.
Q. How common is it for you to learn of security vulnerabilities through your personal email?
A. Not common.
Q. What was your reaction to receiving this email?
A. It was surprising. There are many things about it that were strange to me, and it also worried me slightly.
Q. What was strange about it?
A. For one, somebody who had just pulled off a major exploit, used a major bug in software that we maintained, was now reaching out to us. That's strange. Why are they doing that?
For another, it's sent to three people — myself, Samczsun, and Justin Drake. I get why you might send it to me, because Flashbots maintained the open source relay. I can sort of make sense for Justin Drake, because he was the Ultrasound Relay guy. Samczsun doesn't work at Flashbots, he doesn't work at Ultrasound, he's not an Ethereum Foundation guy. Why is he on there? It's strange. Typically, you disclose security vulnerabilities to the party that maintains a particular repository, and then you allow them to decide who to involve, but they sent it to three people.
Third, they are looking to disclose something that clearly has important implications for us, but they're making

sure upfront to say that there's not a bug in the relay and they're not looking for a bug bounty. So, the whole thing is just on very strange terms. I hadn't experienced something like this before.

Q. Mr. Miller, again, can you just remind the jury who Samczsun is?

A. He is a very well respected security researcher and white hat in the Ethereum space, and he helped us in the initial response to the incident on April 2nd.

Q. You also testified that you were worried when you received this email.

Why was that?

A. Well, we had a motivated person that had pulled off an attack on one of the relays in the ecosystem on a code base that was based off a software that we maintained in the MEV-Boost Relay, and here is that person allegedly saying they have a message about a similar strategy and sort of implying that they could pull off the same thing, if they wanted, in a different way. And it was a huge headache, and it took a lot of time and effort to respond to the first incident, and so I was worried that they had knowledge on how to pull off something similar and that they might actually do this at some point in the future, because the whole thing was kind of strange. I don't know what their intentions or motivations were.

Q. I'd like to turn your attention past this email to Low Carb Crusader's next email on the second page.
MR. FANG: Ms. Kerest, if we can blow up the email at 6:19 p.m.
Q. Mr. Miller, just to be clear, did Low Carb Crusader disclose any vulnerability before you received this email?
A. No.
Q. Mr. Miller, can you read the first sentence, starting with "it has saddened."
A. "It has saddened me to see the situation reported as a 'relay exploit.'"
Q. What reporting did you understand Low Carb Crusader to be referring to?
A. Popular discourse around the incident and probably the postmortem that I wrote, as well.
Q. By the way, was the postmortem public?
A. Yes, it was.
Q. Where was it posted?
A. On a website that Flashbots maintains called the Flashbots forum or Flashbots Collective.
Q. Again, why did you refer to this incident as an exploit?
A. It was a bug in our software that caused the relay to do something that it wasn't intended to, and users lost money as a result.
Q. In the rest of the paragraph, that first paragraph, what

did you understand Low Carb Crusader to be saying?
A. In just the first paragraph?
Q. The first paragraph, yes.
A. In just the first paragraph, they are saying that the reporting — so, people who were discussing this or maybe even the report that I wrote, the postmortem — misses that there are ways that you could have achieved the same effect on April 2nd without making use of the exact bug that they did of setting the parent root and the state root equal to zero.
Q. Based on your participation in investigating this exploit, did Low Carb Crusader, in fact, conduct the exploit by making use of the bug in the relay?
A. Yes.
Q. What was your reaction to Low Carb Crusader's saying that the strategy was possible even without exploiting a bug?
A. It's complicated. And they had exploited the bug, so, in some ways, it -- I'm not exactly sure what they're trying to say by telling me that strategy would have been possible if they had not set the parent and state root equal to zero. And we became aware, in following up on the incident, of a number of follow-on issues where you could have pulled off similar things to similar effects without setting the parent and state root equal to zero. And so I knew that to be true, but, of course, my reaction was, you know, that is still a very important detail for the day.

Q. Did you know about these other potential strategies before April 2nd?
A. In general, there's a class of attacks in Ethereum that we would call equivocation attacks where proposers propose multiple different blocks, and I was generally aware of that before April 2nd, yes.
Q. Does an equivocation attack always involve the use of exploiting a bug?
A. No.
Q. Now, turning your attention to the next paragraph, starting with that first sentence "I am ready" --
A. You mean "I am ready"?
Q. Yes.

Mr. Miller, if you can just read the first sentence in that second paragraph that's being highlighted right now.
A. Okay.

"I am ready to describe the details that would make this strategy still possible today."
Q. What was your understanding of what Low Carb Crusader was offering to do?
A. They would disclose a way to pull off something that was substantially similar on April 2nd to me, Samczsun, and Justin Drake. In return, we needed to make the strategy and our mitigations for it public as soon as possible, we needed to refer to the relay exploit as a, quote-unquote, noncritical

part of the strategy and event of the day, and we needed to refer to them in a neutral way, like Low Carb Crusader, instead of a negative way, like relay exploiter.
Q. Do you agree that the relay exploit was a noncritical part of the strategy?
A. It is certainly possible that they could have pulled off a similar thing with an equivocation attack that didn't use the bug that it did. I cannot ignore, however, the fact that the bug was exploited on that day, and it was an important part of the incident on that day.
Q. And, again, why was it an important part of the incident?
A. Because it meant that the relay did not have an actual commitment from the validator when it was performing its part of the commit and reveal. So, the purpose of the relay, again, is to help the builder and the validator work together. The relay is supposed to keep the builder and its block contents, the transactions in the block, private until it gets a commitment from the validator. And, here, the commitment that the relay got from the validator was not a correct one, it wasn't something that could actually be included on the chain, and so the contents of the block were revealed even though there wasn't an actual commitment.
Q. Mr. Miller, do you see a reference, in the second line from the bottom, to "sandwich the ripper"?
A. Yes.

Q. What's your understanding of what "sandwich the ripper" refers to?
A. When the incident happened, there were a number of names that were thrown around for what to call the perpetrators of the incident, one of which at the time was sandwich the ripper.
Q. How did you view Low Carb Crusader's proposal?
A. I was worried, as the person who led the product engineering team at Flashbots and as a person who cared about Ethereum, that there would be more attacks. It took a lot of time and effort from us, it destabilized Ethereum, it was a big headache in general. And I thought it was a strange proposal, but there seemed to me, and to the people I had consulted on our team, to be a little downside to me agreeing to the proposal because I could always just state that this was the request on behalf of Low Carb Crusader, that they requested that I refer to them in a neutral way in return for disclosing these details, and people would read between the lines, effectively.
So if I agreed to the proposal, I would receive details of a strategy that might cause a big headache for me and my team and the rest of Ethereum, and I wanted to prevent that. And there wasn't all that much downside to me because I felt like it would be apparent to folks that would read on why I made the decisions that I did and agreed to the proposal.
Q. In your view, what was there to read between the lines?

MR. MARX: Objection, your Honor; speculation.

THE COURT: Sustained. Rephrase your question.

BY MR. FANG:

Q. Mr. Miller, when you said that people would be able to read between the lines, what did you mean by that?

A. That in disclosing the strategy that Low Carb Crusader gave me, if I said Low Carb Crusader has disclosed the strategy in return for being named Low Carb Crusader, then people would understand that I was doing that pragmatically and that I still viewed them as an attacker on the day of April 2nd. I was doing it out of pragmatism, to get a disclosure of a strategy that might cause us, our users, the Ethereum community, more headaches.

Q. Is that why you ultimately agreed to Low Carb Crusader's proposal?

A. Yes.

Q. Did there come a time when you actually did publicly disclose this alternate strategy?

A. Yes.

Q. And, to be clear, was the strategy ever used, to your knowledge?

A. Not to my knowledge.

Q. At this time, I'd like to show you what's marked for identification as Government Exhibit 3301.

MR. FANG: And we can take this exhibit down. Thank

you.
Q. Mr. Miller, what's this document?
A. This is the public disclosure that I wrote that had the details of the strategy that Low Carb Crusader revealed to me.
MR. FANG: The government offers Government Exhibit 3301.
THE COURT: Any objection?
MR. LOOBY: No objection.
THE COURT: It is admitted.
(Government's Exhibit 3301 received in evidence)
BY MR. FANG:
Q. Mr. Miller, I'd like to just show you the first page, and specifically that bolded line at the bottom of the first paragraph.
Can you read that?
A. "Flashbots relay logs confirm that the strategy was never used in production."
Q. What's a relay log?
A. There, it refers to information that we would store, or data that we stored, on how the relay that we operated as a product was operating — so useful information that would help us understand what it was doing at what time and how people were interacting with it.
Q. And, again, just to orient the jury, who wrote this document?

A. I wrote this document.
Q. What did you mean when you wrote "Flashbots relay logs confirm that the strategy was never used in production"?
A. My team looked at the logs for evidence that the strategy that Low Carb Crusader had disclosed to me and whether that strategy had actually ever been used, and we were not able to find any logs that it was used in our production relay. So, we could say with confidence that the strategy was never used in production, at least on the Flashbots relay.
Q. Just to be clear, is the strategy that you were disclosing a different strategy than what actually happened on April 2nd?
A. Yes.

MR. FANG: Take this down.

Your Honor, I'm about to move on to a separate topic, if now is an appropriate time to take a break for lunch?

THE COURT: For lunch? Yes, it's almost 12:30, so why don't we do that.

We'll take our break for lunch now, and we will return, please, you all be ready in the jury room at 1:30. Just a reminder again that my prior instructions apply. Do not discuss this case with anyone, don't do any research or read anything about it in the news, don't post anything about it on any website or social media, and remember to keep an open mind.

All right. I will see you all after lunch.

(Continued on next page)

(Jury not present)

THE COURT: Please be seated.

MR. FANG: Your Honor, may Mr. Miller step down?

THE COURT: Yes.

Mr. Miller, you can step down.

THE WITNESS: Thank you.

(Witness temporarily excused)

THE COURT: I have one issue I want to return to with respect to Mr. Miller's testimony and the likely topics of cross-examination with respect to his opinions on sandwich attacks.

Mr. Looby, where in the 3500 material is this opinion referenced? Do you have access to where that is?

MR. LOOBY: I don't. I can pull it up over lunch, I think, if you discuss in the 3500. Mr. Miller also has a large public profile on Twitter and other public-speaking engagements for Flashbots where he discusses sandwiching, which is, of course, a common occurrence in the Ethereum network. And so he has made statements about it that are explanatory and reveal that he understands how it works and how it fits into the ecosystem of the community generally, which would be the thrust of the questions, which would be, you know, there was a trade before, after, the middle trade trades at a less advantageous price, like all the basic things that we have informed your Honor that we'd like to elicit in our defense.

THE COURT: All right.

Again, I think that is appropriate. I think it's within the scope of direct, and I don't have those concerns. The issue is simply his personal opinions as to the concept of sandwich attacking more generally. My concern is that that's of minimal relevance and, in any event, would be outweighed by creating a waste of time for the jury.

So that is my concern with respect to that, but it would be helpful to just see, in particular, if there's something that you're referring to in the 3500 materials.

MR. LOOBY: Okay. I'll look for that. And we will craft our -- understanding the Court's ruling, we will craft our questions around the ruling.

Would it still be fair game to ask him that, you know, the victim of a sandwich trader wouldn't want to be the victim of a sandwich trade because of the economics of that and things like that?

THE COURT: I think that is fair.

MR. LOOBY: Okay.

THE COURT: Is there anything else for us to take up now?

MR. LOOBY: I do have one issue, your Honor --

THE COURT: Yes.

MR. LOOBY: -- which is, there was an objection before the honest validator answer that your Honor had overruled, and

I had made that objection on the grounds of 177. And Mr. Miller's answer there went on to elaborate on kind of the meaning of Ethereum protocols, that they're like rules, and that is the type of testimony that we believe in 177, as we explained in 177, is inadmissible even under your Honor's ruling. And so we would move to strike the testimony immediately following that objection.

MR. FANG: Your Honor, may I respond to a couple of points?

THE COURT: You may.

MR. FANG: The first is — and I will take those in reverse order — with respect to Mr. Miller's answer on Ethereum protocols, MEV-Boost works in conjunction with Ethereum. It operates on the Ethereum network. And so it can't possibly be the case that Mr. Miller can't comment as to what an honest validator means with respect to MEV-Boost, but not be able to contextualize it by making reference to Ethereum rules.

I believe Mr. Miller's answers were very narrowly circumscribed to what is appropriate under the Court's orders. He wasn't sort of opining writ large as to validators acting on Ethereum. The qualifying caveat to all of that is in the context of MEV-Boost. And particularly where the defendants have opened on Ethereum protocols and consensus being at issue, we think it's appropriate for Mr. Miller to -- or to elicit that testimony from Mr. Miller to adequately explain what he

means when a validator is acting honestly in the MEV-Boost context.

Your Honor, I'm happy to address the other point with respect to cross.

One moment?

(Pause)

MR. FANG: And, specifically, the propriety of crossing Mr. Miller on whether a victim of a sandwich trader would or wouldn't want to be victim of a sandwich trade, we think that is far afield, again, of Mr. Miller's testimony on direct. He can't possibly get in the minds of, quote-unquote, victims of sandwich traders and opine on their desires as to whether they want to be victims or not. That's entirely inappropriate ground. There is absolutely no foundation that Mr. Miller would be able to offer any competent testimony as to this line, and so we don't think it would be fair for defense to cross Mr. Miller on that.

MR. LOOBY: Briefly, your Honor, Mr. Miller's testimony was a tutorial on MEV extraction, on trading in this environment. It was a tutorial on how MEV-Boost fits into that. It's fairly within the scope to ask him questions about the particular trading strategies that are at issue in the case, which is the whole reason why his testimony is relevant to begin with. And, so, the economics of the trades and the way that this all worked, I don't know how we can conduct the

trial without exploring that with the person who came to tell the jury about how it all works.

THE COURT: I agree. I think that context is important.

Mr. Fang, to your point, I don't anticipate you will be asking questions like how would the victims feel — you know, victims of sandwich trading, I mean — you know, being the victim of a sandwich trade. I don't anticipate that that's going to be a question you are going to ask, but talking through the mechanics and economically what happens when a sandwich trade is conducted. I don't see anything improper with respect to that. I have ruled previously that you all can explore that context, and that's appropriate for the defense to do here.

MR. FANG: Understood, your Honor. So long as the scope of cross-examination is appropriately constrained to just the mechanics of sandwich trading, without getting sort of into whether the victims' trading strategy was desirable or not, we would have no objection there.

THE COURT: So his personal views about sandwich trading -- I do want to take a look at the 3500 material. So, to the extent you all can point me to what, in particular, you're referencing, I will take a look at that. But, right now, my view, again, unless and until I change my mind after having reviewed it, is that his personal opinions about

sandwich attacking is out; the mechanics of sandwich attacking generally is in; how victims of sandwich trading might feel is out. But, again, I don't anticipate that you were going to ask that in the first place, Mr. Looby.

MR. LOOBY: Thank you, your Honor.

THE COURT: Okay.

Anything else for us to discuss now?

MR. LEVANDER: Yes, your Honor.

I think the government would renew its request for sequestration of expert witnesses following -- I think we've gotten through the entire technical portion of Bert Miller's testimony. Professor Falk and Mr. Madura have been here since openings. I think they caught the parties' arguments. They've definitely caught all of the direct so far. I think that's everything that is appropriate for them to be here for. The cross of Miller, I think, has no bearing on the testimony that they'll give. And, certainly, once Travis Chen testifies, we'll be going through a lot of communications between the defendants and the coconspirators about what they were thinking, what they were doing. And the way that that would shape their testimony, I think, would actually be inappropriate and highly prejudicial here.

Rule 615 puts it within the discretion of the Court whether to sequester witnesses, and there's four narrow exceptions. The only relevant one here would be 615(c), which

is someone who's essential for the party to put on its case, meaning essential for them to be in the room at all times.

I think we're now past the point at which it is essential for Professor Falk and Mr. Madura to be in the courtroom sitting next to each other listening to every witness' testimony and cross-examination. In any event, it is the defense's burden to explain why it is essential for them to be in the courtroom while we are sitting here.

THE COURT: Thank you.

Mr. Looby?

MR. LOOBY: Yes.

The Court has already ruled that the witnesses could be here for the testimony at trial. I don't see any meaningful difference in terms of their instrumentality to the defense, which they are essential to the defense, between a cross-examination and a direct examination, when the cross-examination is going to explore the same technical topics that were explored on direct.

Then I will also note that for Mr. Chen, we anticipate and understand that the government is going to walk Mr. Chen through the alleged exploit code on almost like a line-by-line basis and talk about the way it functions, which, of course, overlaps with Mr. Madura's area of potential testimony, should there be a defense case, so he would be instrumental for that.

THE COURT: Mr. Levander?

MR. LEVANDER: Yes, your Honor.

So, Judge Liman gave an opinion about this in *United States v. Ray*, ruling in favor of keeping the experts in, but provides a helpful analysis. And there are six factors that serve as guides to inform a district court's exercise to discretion. The first is how critical is the sought-to-be-excluded witness' testimony. The second is whether that testimony is ordinarily subject to tailoring. The third is whether the testimony is likely to cover the same issues as other witnesses. The fourth is what order will the witnesses be called. The fifth is whether any potential for bias exists that could incline a person to tailor his testimony. And the sixth is whether the witness' presence is essential or simply desirable.

That whole discussion is at *United States v. Ray*, 589 F.Supp.3d 298, 300 to 302. And, again, the relevant witness was allowed to stay in the courtroom in that case, but I think it's a helpful description of the factors to consider.

I don't expect -- code will be discussed with Mr. Chen. I don't expect that direct to primarily consist of, or even really significantly consist of, in terms of the overall length, a going through of the code line by line.

The nature of Mr. Madura's testimony also is that he is the person being brought in to read this code and give his view of what it means. These are not rebuttal experts that are

here for some other expert's testimony. He has his view of the code, from his study of the code and his background in computer science, and the fact that he's going to be able to sit here as slacks between the defendants come up and tailor his testimony to, oh, the defendant said this thing, that doesn't go well with what I was going to say about the code here, I think is hugely problematic.

So I think there's a huge tailoring issue here with respect to Mr. Chen's testimony in particular. I don't see any basis for them to be in the room for anyone after Mr. Chen. And to the extent that your Honor would let them stay for the cross of Bert Miller, I think we would be okay with that, given that they've been here for the direct.

THE COURT: All right.

Mr. Fang, do you have a sense of how much longer you have for his direct?

MR. FANG: Your Honor, I think I can get through it in around 20 to 30 minutes.

THE COURT: All right.

Mr. Looby and Mr. Marx, to the extent you all are doing the cross-examination here, I assume that this is likely to last the rest of the day, into Friday; is that correct?

MR. LOOBY: That's right, your Honor.

MR. MARX: Yes, I think that's a fair guess.

THE COURT: All right.

It would be helpful for me to have letters with respect to this issue. So, I agree, it seems appropriate for the experts to remain for cross-examination, so it's unlikely that this is going to be an issue that we'll need to deal with until tomorrow, so it would be helpful to get letters from both sides by 8:00 p.m. tonight.

Anything else for us to discuss now?

MR. LOOBY: No, your Honor.

MR. MARX: No. Thank you, your Honor.

THE COURT: Thank you, all. Have a nice lunch.

(Luncheon recess)

A F T E R N O O N   S E S S I O N

1:40 P.M.

(Jury not present)

THE COURT: Just before we bring out the jury, I went back and looked at the transcript with respect to honest validator and that question-and-answer series.

So the question was: From your work at Flashbots, are you familiar with the term "honest validator"?

There's an objection to that which I overruled.

I think he can testify -- I overruled it because to the extent he's just testifying that he has familiarity with this term, I think that's appropriate for him to give that answer.

And then the next question was: How do you use that term?

And then he defined it from his perspective.

So I don't see anything improper about those questions and those answers.

Was there something -- you pointed to the use of the term "rule," but was that the only --

MR. LOOBY: Yes, there was a series of question and answers, it may have been four or five in a row, that led off from honest validator about, you know, certain protocols under Ethereum that people are, you know, expected to follow, like shoulds and musts and other things. I'm paraphrasing, of

course, from memory.

And I believe it was all on the same topic which the objection to the question of honest validator, which is an Ethereum protocol concept, which, under your Honor's ruling, you know, could be defined to the extent -- as we understand it, could be defined to the extent necessary to explain Mr. Miller's testimony about his investigation and Flashbots things specifically. And the line of questioning, because it was phrased in terms of -- although it was cabined by -- through his experience at Flashbots, the topic was about kind of the Ethereum protocol more broadly. And the questions thus elicited answers that we believe are out of bounds under the Court's ruling. So that's our rationale.

THE COURT: All right. Understood.

We can bring out the jury.

(Jury present)

THE COURT: I hope you all had a nice lunch. We're going to now continue with testimony.

And Mr. Miller can come back to the witness stand.

BY MR. FANG:

Q. Mr. Miller, after April 2023, did there come a time when Low Carb Crusader came back on your radar?

A. Yes.

Q. How so?

MR. LOOBY: Objection. 401. 403.

THE COURT: Overruled.
A. A couple months after the incident, as I remember, Low Carb Crusader on the blockchain staked a bunch of ETH. They wanted to run or they were running more validators, and that caught my attention.
Q. When you say "a bunch of ETH," what do you mean?
A. They had a lot of money. And they were staking, I believe, in the range of millions of dollars worth of the money that they had in order to run more Ethereum validators.
Q. How did you learn about that?
A. I was sent a tweet by someone on my team that detailed this and showed it on the blockchain, the Ethereum blockchain.
Q. What was your reaction to that?
A. That was surprising to me; and it made me worry that there might be further attacks and incidents in the future. Since Low Carb Crusader had used a validator in the past to attack the relay, perhaps they were gathering more validators to attack the relay again.
Q. I'd like to show you what's marked for identification as Government Exhibit 3307.
Mr. Miller, what is that document on your screen?
A. The document on the screen is me sending Low Carb Crusader an email.
MR. FANG: Government offers Government Exhibit 3307.
MR. LOOBY: Same objection.

THE COURT: Overruled.

It is admitted and you may publish.

(Government's Exhibit 3307 received in evidence)

MR. FANG: Thank you, your Honor.

Q. Mr. Miller, what's the date of this email?

A. June 29th, 2023.

Q. Approximately how long was that after the exploit?

A. A few months.

Q. What's the subject line of this email?

A. "Thanks for the disclosure."

Q. Who's the sender?

A. I am the sender.

Q. And who is the recipient?

A. Low Carb Crusader.

Q. Why did you send this email?

A. I had seen them stake ETH and to start out to run a lot of validators. And I was worried that they might take action against our relay or another relay in the ecosystem.

And when the incident happened, it was a big headache for me. It was very stressful. So I sent them the email to see if I could preempt any action that they might be taking. It previously disclosed a strategy that could have done substantially the similar thing. Perhaps, instead of them carrying something out, they were willing to just disclose it to me again. So I wanted to open the door to see if that was

the case because that would save me a lot of time and stress, and perhaps our users also.
Q. And, Mr. Miller, remind the jury how you perceived the April 2023 emails from Low Carb Crusader.
A. In general?
Q. Yes, when you received those emails.
A. It was strange, that was first. And second, it was worrying to me because it was from a person that had proven that they were sophisticated, they were motivated, and they could pull off attacks on the relay, effectively telling me that they could do it again. So that worried me. It felt like an implicit threat in some ways.
Q. Mr. Miller, did you receive any response from Low Carb Crusader to this June 2023 email?
A. No.
Q. Did you have any communications with Low Carb Crusader after June 29th, 2023?
A. No.
MR. FANG: We can take this down.
Q. Mr. Miller, have you met Anton Peraire-Bueno and James Peraire-Bueno before?
A. Yes, I have.
Q. How did you meet them?
A. I was an MEV searcher in the early days of Flashbots, so I ran arbitrage bots. And I was talking in the Flashbots Discord

where they were also participants in the Discord; they also ran arbitrage bots. So I met them through the Flashbots Discord.
Q. And approximately when did you meet them?
A. Early 2021.
Q. Remind the jury what an MEV searcher is.
A. It's a special actor that searches for MEV. Put another way, they search for opportunities to make money by having the right transaction at the right place at the right time, like buying assets at a low price, selling them at a high price.
Q. Mr. Miller, how did you learn Anton and James Peraire-Bueno's names?
A. I don't exactly remember, but I have a loose recollection that we had a call with them. They were top users of Flashbots in the early days. They ran an arbitrage bot and they were quite good at it. So people from my team — myself included — scheduled a call with them to talk about MEV and the market.
And I believe in that call — but this is kind of loose, so appropriate caveats — that they showed up and revealed their names. I don't remember on purpose or not, but I think that's when I became aware of their actual names.
Q. How would you describe your relationship with Anton and James Peraire-Bueno?
A. I lead product and engineering at Flashbots for a company that makes infrastructure for MEV. So it's my job to know searchers, be friendly with them, to talk to them about the

market, to talk to them about their strategies, their needs, etc., to best inform what products and offerings we can make. So I talked to them frequently about MEV, about the market, about different things that are going on in crypto.

Q. How would you usually communicate with them?

A. Discord, so a messaging service.

MR. FANG: At this time the government would like to read another stipulation which is marked as Government Exhibit S-714.

THE COURT: You may.

MR. FANG: First, government offers Government Exhibit S-714.

THE COURT: Any objection?

MR. LOOBY: No objection.

THE COURT: It is admitted.

(Government's Exhibit S-714 received in evidence)

MR. FANG: Ms. Kerest, if you can publish that to the jury.

Government Exhibit S-714 states that: It is hereby stipulated and agreed between the parties through counsel that the government exhibits set forth in attachment A are true and correct copies of chat records maintained by Discord, Inc., an electronic communications provider, for the Discord accounts registered to user names snoopy6353#0, curiousrabbit#0, and deleted_user_3159d48c1bad.

The government exhibits set forth in attachment A were contained in records provided by Discord, Inc. in response to a search warrant. The chat participant field accurately identifies the Discord user names of the chat participants relating to each government exhibit as listed in attachment A. The date field accurately lists the date of each Discord chat listed in attachment A.

Government exhibits bearing the suffix "-A" or other letters consist of true and correct copies of attachments to the Discord chats associated with the government exhibit bearing the same number. The table below is a true and correct list of Discord account user names, the account user, the user's email address associated with each Discord account user name and the date each Discord account was created.

The Discord account associated with deleted_user_3159d48c1bad#0 included in the government exhibits set forth in Exhibit A was used by James Peraire-Bueno. The Discord account associated with display name Snoopy included in Government Exhibits 6010 and 6723 was used by James Peraire-Bueno.

It is further stipulated and agreed that this stipulation may be received into evidence as a government exhibit at trial.

If we can turn to attachment A, please.

The government exhibits covered by Government Exhibit

S-714 are Government Exhibits 3001, 3002, 3002-A, 3005, 3005-A, 3006, 3007, 3009, 3010, 3011, and 3012.

We can take this down.

BY MR. FANG:

Q. Mr. Miller, remind the jury what white hatting is.

A. Again, I've general knowledge, since I have helped with a bunch of white hat rescues, but I'm not a security expert, I don't have formal training in that, so this is general knowledge. Just a caveat.

But white hatting in the context of crypto means trying to make use of security vulnerabilities to rescue and give back user funds before an adversary could take them.

Q. And do white hat users typically act, in your experience, for profit?

A. There's a range of different ways that people do white hatting. The industry norm is to be effectively tipped ten percent of the money that you help save. But there are a bunch of people who just do it because they want to do some good or to help people out; there are some people that do it for profit.

Generally, the people who are really, really good are not doing it for profit because they could be making more money doing something else.

Q. Have you ever talked with Anton and James Peraire-Bueno about white hatting before April 2nd, 2023?

A. Yes, I think so.
Q. Why?
A. I helped with the Flashbots white hat group. And since people knew me as the head of product and engineering and a leader at Flashbots, they would turn to me if there were security incidents with their protocols, if they needed help rescuing users' funds.

So on one case I had asked the brothers to help me with a white hat rescue where I needed specialized technical infrastructure and knowledge that they had. In another case, there was a moment in the future where we knew that a lot of users would receive effectively money — we call it an air drop in crypto. There is a popular asset that was going to launch in the future, and you knew ahead of time which accounts would receive money.

There are a lot of people that turn to Flashbots and our white hat group for help because their passwords have been compromised. And they knew that a hacker had access to their password as well, so they turned to us to help make sure that when their money became available, they could be the party that would ultimately get that money instead of a hacker.

And pulling this off and sort of saving money in this way is very technically sophisticated. And so I turned to the brothers for advice and help on executing on this white hat rescue. There were a bunch of people who were looking for our

help in saving their money effectively.
Q. So, Mr. Miller, just shifting gears, did there come a time when you learned who allegedly conducted the April 2nd exploit?
A. When the indictment dropped.
Q. Is that the indictment in this case?
A. Yes.
Q. And what reaction, if any, did you have to learning the identity of the alleged exploiters?
MR. LOOBY: Objection. 401. 403.
THE COURT: Overruled. You may answer.
A. My first --
Q. Go ahead.
A. My first reaction was one of surprise. I did not expect the brothers to be the perpetrators. I was also disappointed because the brothers were young, they're very talented, they were very good at what they did. They didn't need the money. And it seemed like a very stupid thing, in my estimation, to do. At the very least, it's complicated. We are here today talking about it, right?
So I was disappointed in them because I felt like they did something very dumb that may greatly impact their future. And I felt deceived as well because in the course of all of this, they had not told me they were Low Carb Crusader, and not told me they had intended to do this. And I had talked to them after the incident as well.

Q. And just to clarify that last point, Mr. Miller, what communications after the exploit did you have with Anton and James Peraire-Bueno?
A. I had messaged them on Discord about the normal things that we talked about: The market, crypto, what's going on in MEV, their strategies, you know, etc.
Q. Did Anton Peraire-Bueno ever indicate to you that he was Low Carb Crusader?
A. No.
Q. Did James Peraire-Bueno?
A. No.
Q. Now, Mr. Miller, I'd like to show you what's marked as Government Exhibit 3010.
Are these messages that you had with the defendants?
A. They look like it, yeah.
Q. How do you know that?
A. Well, it has my Discord name at the top.
MR. FANG: Government offers Government Exhibit 3010.
THE COURT: Any objection?
MR. LOOBY: No objection.
THE COURT: It is admitted.
(Government's Exhibit 3010 received in evidence)
MR. FANG: Go ahead and publish that to the jury and show page 2.
Q. Mr. Miller, what is the date of these messages?

A. April 3rd, 2023.
Q. How long after the exploit was that?
A. Very recent; hours after.
Q. Do you see your user name in this thread?
A. Yes.
Q. And do you recognize the other user name that you currently see on this page?
A. The other user name being Curious Rabbit?
Q. Yes.
A. Yes.
Q. Turning your attention to page 2. Mr. Miller, do you remember -- well, first of all, do you see a third user at the bottom of the page, snoopy6353?
A. Yes.
Q. Who are snoopy6353 and Curious Rabbit?
A. James and Anton.
Q. Do you remember what you were asking them to do that day?
A. There had been a smart contract. Seemed like a puzzle to me, and I was asking them for help with capturing some MEV.
Q. Did this have anything to do with the April 2nd exploit?
A. No.
Q. Can you read the last four messages on this page, including the user name and then the content of the message?
A. So snoopy6353#0 says: Gm gm. Lots to wake up to. Uh re: Full blocks we couldn't have done it anyways, lmao. Have been

lazy and waiting for reth.
Q. When you saw these messages, what did you understand "gm gm" to be?
A. It stands for good morning in crypto.
Q. Is that a crypto-specific term?
A. I don't know. I think it started in crypto, but maybe it has exited crypto only. But it's certainly popular in crypto.
Q. And, again, what's the date on these messages?
A. April 3rd, 2023.
Q. Did either James or Anton Peraire-Bueno ever mention anything about the exploit the day before in these messages?
A. No. Well, here, Snoopy is saying: Lots to wake up to, which I assume is an inadvertent reference to the exploit. But it's not like they directly mentioned it to me or their involvement, if that's what the question is.
Q. Do you know one way or the other what he was referring to?
A. The only thing of note that I can remember happened that morning, so I assume that is what he is referring to. But, you know, I can't speak for him.
MR. FANG: Your Honor, can we have a brief sidebar?
THE COURT: You may.
MR. FANG: Thank you.
(Continued on next page)

(At sidebar)

MR. FANG: So I think it would be helpful to have a little bit of clarity as to the 20 or so exhibits that we understand the defendants may seek to affirmatively introduce during Mr. Miller's cross.

And so we're happy to take up the issue now, not in the presence of the jury. But it would be helpful for us to have some rulings on which exhibits the Court is inclined to admit or not.

MR. LOOBY: So we did disclose the exhibits that we may seek to admit. We're not sure which ones we're going to seek to admit. The government's purported reason for wanting them is to look at whether or not there were 106 issues, hearsay issues, or other things, that we weren't looking at exhibits on the fly. They've been prepping their witnesses with the exhibits, they've been doing other things with them in the time since we disclosed them.

I think it's not a productive use of the Court's time to have an intermission when the advanced disclosure was to allow them to formulate their objections. I defer to the Court's preference on how to handle these things as they come up, but it's a lot of exhibits. We're not sure which ones we'll offer. And it could really kind of set aside a large chunk of time.

MR. FANG: Your Honor, we think it would be even more

efficient to have extended arguments for each exhibit without knowing which out of the 20 may potentially come up in the course of cross.

THE COURT: Are you done with your direct?

MR. FANG: We are close to being done. There may be a couple questions we may want to ask, but I think we're essentially done.

THE COURT: All right. So, in light of that, do you have a sense of which exhibits you are certainly going to use?

MR. LOOBY: I have maybe a few that I could preview as like the ones that are more likely. I think, given where we are in the day, there is like a small chance that -- only a small chance we'll be introducing any at this point. But, yeah, I could identify a few if the Court wanted to have a more narrow discussion.

THE COURT: All right. If that's the case, if you're unlikely to use any exhibits with the witness at least today, why don't we get through as much of the cross as we can. Once we get to a point where we need to -- where you're likely to be introducing exhibits, assume that that's close to the end of the day, in any event, we'll take our break then. We can discuss the exhibits at issue and go from there.

How does that sound?

MR. LOOBY: And just to clarify, this group of exhibits is exclusive of cross exhibits, which we may use to

refresh, we may read into the record to impeach, we may use in that regard.

THE COURT: Understood.

MR. LOOBY: So I may use exhibits.

THE COURT: Understood.

MR. LOOBY: Okay.

MS. KUDLA: You're not allowed to use exhibits.

THE COURT: None.

All right. Understood.

(Continued on next page)

(In open court)

THE COURT: Mr. Fang, before you proceed, let me just let the jury know that from time to time it may be necessary for me to speak to the lawyers out of your hearing, as we just did right now.

The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Please do understand that while you are waiting, we are working. I will do what I can to limit the number and length of these conferences. And I would invite you, to the extent we have these conferences, to stand up and stretch if you would like to do that. And I may from time to time call a short recess if I believe there's a lengthy issue that we need to discuss.

Mr. Fang, you may proceed.

MR. FANG: Thank you.

BY MR. FANG:

Q. Ms. Kerest, before we take this exhibit down, Mr. Miller, I'd just like to direct your attention to the third message: "Full blocks we couldn't have done it anyways lmao."

Do you see that?

A. Yes.

Q. What was your understanding of what that message means?

A. What I think my understanding was is that they wouldn't have been able to construct a full block; they didn't have the capability to do so.
MR. FANG: We can take this down.
Q. Mr. Miller, do you also -- I want to go back to your testimony on white hatting. And just to be clear, in your experience, does a white hat typically involve the return of funds?
MR. LOOBY: Objection. 701. 702.
THE COURT: Overruled.
A. Yes.
Q. Now, Mr. Miller, I'd like to show you what's marked for identification as Defense Exhibit 1024.
Do you recognize this document?
A. Yes.
Q. What is it?
A. This is a screenshot of the GitHub page for MEV-Boost.
Q. Is that the same GitHub page that you mentioned earlier?
A. Yes, it is. Well, we talked about multiple, but I mentioned MEV-Boost's GitHub page at some point earlier.
MR. FANG: Government offers Defense Exhibit 1024.
THE COURT: Any objection?
MR. LOOBY: No objection.
THE COURT: This is admitted.
(Defendants' Exhibit 1024 received in evidence)

MR. FANG: Ms. Kerest, if you can display -- if you can publish that for the jury, and also display a section that says MIT. You may have to scroll down a couple pages. If you can just blow up the bottom portion of that page under readme.
Q. Mr. Miller, are you generally familiar with this language?
A. It's been a long time since I've read it, but I generally am familiar, yes.
Q. Did you draft this language?
A. No.
Q. Are you a lawyer?
A. I am not a lawyer.
Q. Do you see the reference to MIT license?
MR. FANG: And, Ms. Kerest, if we can just highlight that.
Q. What do you understand MIT license to refer to?
A. When you publish software, when you create software, you are creating intellectual property. And you have rights to those intellectual property.
So when -- this is my understanding: When other people want to use that intellectual property, you need to give them a license and tell them the conditions under which they can use that, such as to create their own version, to fork off, to modify and make changes to your intellectual property. So the MIT license is a popular license that is used in software engineering.

Q. Is it specific to MEV-Boost?
A. MEV-Boost appears to have the MIT license, but it is not a MEV-Boost-specific license.
Q. Is the language specific to Flashbots?
A. No.
Q. Sitting here today, do you know whether James and Anton Peraire-Bueno ever read this language?
A. I don't.
Q. And aside from people at Flashbots, do you know whether any other particular person or business ever read it?
A. Couldn't tell you. I don't know.
Q. Does this language change how MEV-Boost is supposed to work as you described it in your testimony?
MR. LOOBY: Objection. Foundation. Rule 702.
THE COURT: Sustained.
Q. What is the point of this license, Mr. Miller?
MR. LOOBY: Objection. Foundation. Rule 701. 702. 602.
THE COURT: Sustained.
Q. Mr. Miller, you testified that you've read this language in the past, right?
A. At some point.
Q. So what's your understanding of it based on having previously read it?
MR. LOOBY: Same objections.

THE COURT: Sustained.

MR. FANG: One moment, your Honor.

(Counsel conferred)

MR. FANG: No further questions.

THE COURT: Thank you, Mr. Fang.

Mr. Looby.

MR. LOOBY: Thank you, your Honor.

MR. MARX: Can we just take a moment to shift down?

THE COURT: You may.

THE WITNESS: If this is an appropriate time, do you mind if I use the rest room?

THE COURT: The witness has just indicated a bathroom break is needed. So why don't we take a 15-minute break.

You all should be ready and back in the jury room and ready to go at 2:30. My prior instructions apply.

(Jury not present)

THE COURT: Mr. Miller, you may step down.

THE WITNESS: Thank you.

(Witness not present)

THE COURT: Anything for us to take up now?

MS. KUDLA: Not from the government.

MR. LOOBY: No, other than I can hand up the binders and get that set up while we're on break.

THE COURT: Yes, why don't you do so.

MR. LOOBY: That's it, your Honor.

THE COURT: Thank you.

(Recess)

THE COURT: Ms. Tran, please bring out the jury.

(Jury present)

THE COURT: Mr. Looby.

MR. LOOBY: Thank you, your Honor.

And one housekeeping matter before I begin.

May I approach the bench to bring the hard copy binders to your Honor?

THE COURT: You may.

And, Mr. Miller, please step down.

CROSS-EXAMINATION

BY MR. LOOBY:

Q. Good afternoon, Mr. Miller.

A. Good afternoon.

Q. My name is Patrick Looby, and I represent James Peraire-Bueno.

We've never met before; is that correct?

A. We've never met before, Mr. Looby.

Q. And I'll be assisted today by my colleague Joseph Bayerl, who will be helping me with the exhibits. And I'm going to refer to him as "Joe" because that's how I know him.

MR. LOOBY: Joe, if we could start with Government Exhibit 3307, which is in evidence.

A. Will this also be on my screen or should I find this --

Q. Yes, Mr. Miller, it will be on your screen. Every document that I reference -- actually, this one will not be in your binder because it's a government exhibit. But, for the most part, the exhibits that I talk about today will be in the hard copy binders as well. And you're free to use either format that you would like and to take as much time to look at the documents.

A. Okay. Thanks for explaining that.

Q. Mr. Miller, you had testified on direct regarding this June 29th, 2023 email that you had sent to Low Carb Crusader --

THE COURT: Mr. Looby, should this document be published for the witness and the jury?

MR. LOOBY: Yes, it should be published for the witness and the jury, and it's previously admitted.

Q. You had testified on direct regarding this June 29th, 2023 email that you had sent to Low Carb Crusader; correct?

A. Yes.

Q. And you had explained how you had observed the validators that were at issue in the April 2nd event as staking some ETH; correct?

MR. FANG: Objection.

THE COURT: Overruled.

Had you finished the question, Mr. Looby?

MR. LOOBY: I'll restate it.

Q. And the context for this was that you had observed the

validators staking some ETH?
A. There was someone on my team that made a tweet that was observing the address, the entity behind the April 2nd incident staking ETH, yeah.
Q. And you testified that that gave you some concern, is that fair to say?
A. Yeah.
Q. But nothing ever occurred in relation to that staking; correct?
A. Not with the Flashbots relay or another relay that I know.
Q. So you're not aware of any other incident that you were concerned about?
A. No.
MR. LOOBY: Thank you, Joe. You can take that down.
I'd also like to quickly pull up Government Exhibit 3010, which is in evidence. And I would seek permission to publish that for the jury and the witness.
THE COURT: You may.
MR. LOOBY: If we could go to page 2.
Q. Mr. Miller, this was a chat that occurred between you and the Peraire-Buenos on April 3rd, 2023; correct?
A. Yes.
Q. And you had initiated the chat by reaching out to the Peraire-Buenos on Discord; correct?
A. Yes, that's what it appears.

Q. And you say that you think you found some MEV and you need their help to extract it; is that correct?
A. Yes.
Q. And "MEV" is maximal extractable value; correct?
A. Yup.
Q. And a bit later on, you say that there is 5.5 ETH worth of MEV that could be extracted.

MR. LOOBY: And, Joe, if you could highlight that portion.

Q. Do you see that, Mr. Miller?
A. Yes.
Q. And do you see the time stamp of your first message on April 3rd at the top of the chain at 11:27 a.m.?
A. Yes, GMT+0.
Q. And so this is in the morning of April 3rd; correct?
A. Yes.
Q. And this is the day after the events that you testified about on direct; correct?
A. Correct.
Q. And this is during the time when you and your team are addressing the issue and trying to figure out what happened; correct?
A. Depends on exactly what you mean by "during." There were starts and stops at times. So I don't know if this was a moment in which we had taken a break or something of the sort.

Q. You could have taken a break to send a message?
A. Yeah, seems feasible to me.
Q. And you are reaching out to the Peraire-Buenos regarding MEV opportunity during this time; correct?
A. Correct.
MR. LOOBY: Joe, if we could take that down.
Q. Now, Flashbots operates its own relay; correct?
A. Correct.
Q. And that relay is called the Flashbots MEV-Boost relay; correct?
A. Yes. We also just refer to it as the Flashbots relay sometimes. It's kind of interchangeable.
Q. And the Flashbots relay was active on April 2nd, 2023; correct?
A. Yes, it was active on April 2nd, 2023.
Q. And the Flashbots relay remains active today; correct?
A. Yes, it is also active today.
Q. And the relay for the block at issue in this case was not the Flashbots relay; correct?
A. Correct, it was not the Flashbots relay.
Q. And it was operated by a group called Ultrasound; correct?
A. Yeah.
Q. And Ultrasound and Flashbots, they are not the same entity; correct?
A. They are not the same entity.

Q. You don't work for Ultrasound?
A. I do not work for Ultrasound.
Q. You've never worked for Ultrasound?
A. I've never worked for Ultrasound.
Q. Flashbots does not maintain records for the Ultrasound Relay; correct?
A. No, we don't maintain records for the Ultrasound Relay.
The caveat to that may be that they might have shared records with us that might be in our Slack somewhere at some point. So it depends what you mean by "maintain records." And if that counts, just to provide a caveat.
Q. And you testified on direct about relay logs; correct?
A. Yes, I did.
Q. And you testified how at Flashbots, Flashbots has access to the relay logs for the Flashbots relay; correct?
A. That is correct.
Q. But Flashbots wouldn't have regular access to the relay logs for the Ultrasound Relay; correct?
A. We would not have regular access to the Ultrasound Relay's logs, right.
Q. You testified on direct that the Ultrasound Relay was running modified relay software; correct?
A. Yes, they took the MEV-Boost relay software, made modifications to it, and they were running that.
Q. And you can't verify exactly what was modified about the

Ultrasound Relay code; correct?
A. Correct. We were friendly with them and they were interested in contributing to the code base; and so they talked about their modifications with us. But it is true that I can't verify what they were running.
Q. And the Flashbots MEV-Boost relay code, that's open source; correct?
A. Yeah.
Q. Meaning anybody can go online and download it?
A. Yes.
Q. And anybody can go online, download it, and make modifications; correct?
A. Yes.
Q. And they can modify it to add additional features to their relay; correct?
A. Correct, they can.
Q. Now, to keep things clear, the MEV-Boost software that you discussed on direct, that is something different than the Flashbots MEV-Boost relay code; correct?
A. Yes, the MEV-Boost software is different from the Flashbots MEV-Boost relay software code.
Q. And MEV-Boost, the software, that is a program that validators can run to interact with relays; correct?
A. Yes, and it's typically what they do run.
Q. But an Ethereum validator can interact with relays without

running the MEV-Boost software; correct?
A. It's theoretically possible, yeah.
Q. And an Ethereum validator could create its own software to interact with the relay; correct?
A. Correct.
MR. LOOBY: Joe, if you could please pull up what is in evidence at Government Exhibit 508, page 11.
And I request permission to publish for the witness and the jury.
THE COURT: You may.
Q. Mr. Miller, do you recognize this slide as one that you had discussed on direct examination?
A. We've been talking about it a lot, yeah.
Q. It's getting familiar for the jury, too, I'm sure, by this point.
And I'd like to focus on the arrows in between the relay and the validator, and specifically the box there that says "MEV-Boost"; correct? Do you see that?
A. The box does say "MEV-Boost," yeah.
Q. And here, the term MEV-Boost, that's referring to the MEV-Boost software program, not the relay code; correct?
A. That's what I understand, yeah.
Q. But as we just discussed, validators do not have to run the MEV-Boost software to interact with the relay; correct?
A. It's not a requirement.

Q. And you do not know whether the Peraire-Buenos were running a modified version of MEV-Boost on April 2nd, 2023?
A. Let me repeat the question back to you so I'm sure I understand. You asked: You do not know whether the brothers were running a modified version of MEV-Boost on April 2nd; is that right?
Q. That's right.
But let me actually try to ask you a different question, which is: You don't know whether the Peraire-Buenos were running -- even running MEV-Boost on April 2nd, 2023; correct?
A. I think you can infer that they weren't running MEV-Boost, because MEV-Boost typically won't set the parent and state root in the way that that day happened, or the parent and state root wouldn't be set to zero. So I think you can infer that they were not running MEV-Boost, but I can't affirmatively tell you exactly what they were running.
Q. And you do not know how many relays the Peraire-Buenos' validator interacted with on April 2nd, 2023; correct?
A. I don't know.
Q. And on direct examination, you had said that the Peraire-Buenos' strategy involved having their validator fill out some fields on the blinded beacon block with certain values, is that generally accurate?
A. Generally, yeah.

Q. And you don't know how the Peraire-Buenos' software did or did not populate those fields; correct?
A. That is true. You can observe the block headers that they published that day, but I don't know what the software did.
Q. And Flashbots ran a builder for a period of time; correct?
A. Yes, we did.
Q. But the Flashbots builder was not the builder who handled the transactions at issue in this case; correct?
A. Well, it wasn't the builder that produced the block at issue where the parent and state root ended up being set to zero. But we may have received the same transactions at our builder, just to draw a nuance. Certainly our builder did not produce the same block. We could have received the same transaction, I don't remember.
Q. So sitting here today, you do not know if your builder received the block at issue?
A. Our builder doesn't receive blocks, so I can tell you that for sure. But I don't know whether or not our builder received the transactions at issue.
Q. Thank you for the clarification.
A. Of course.
Q. You do not know what software the builder OS -- well, let me start. The builder at issue is sometimes referred to as OS69 -- OX69?
A. I know what you're talking about. We actually call it

builder OX69 or builder 69. So I don't think I've ever heard OX69, but I know generally what you're speaking of.
Q. I prefer to refer to it as OX69 rather than builder 69. And you'll understand what I mean when I say that; correct?
A. Yes.
Q. You do not know what software that builder was running on April 2nd, 2023; correct?
A. Correct.
Q. And it could have been running modified software as well; correct?
A. Most certainly was.
Q. On direct examination, you talked a bit about the Ethereum protocol; correct?
A. I did.
Q. And you talked about the Ethereum consensus mechanism; correct?
A. Yeah, a bit.
Q. Broadly speaking, that's the part of the protocol that concerns how Ethereum users reach agreement on the validity of transactions and the order of blocks on the chain; correct?
MR. FANG: Objection.
THE COURT: Overruled. You may answer.
A. Yes. I am not a -- not formally trained in consensus mechanisms or something like that, so I don't have a super sharp answer for you. But your description of a consensus

mechanism sounds broadly right to me.
Q. And I'm picking up from your comment that you don't hold yourself out as an expert on the Ethereum protocol; correct?
A. On Ethereum generally I think I'm an expert; but consensus is an art in a field of its own that's specific with a lot of nuances. People go to school for this, people make careers out of being consensus people specifically. And I don't hold myself as an expert in consensus.
Does the nuance make sense to you?
Q. It does. I have one clarifying question for you.
The consensus concept, that covers how users like validators add blocks to the chain; correct?
A. That's one part of consensus, certainly.
Q. And another part of the consensus mechanism are things like slashing penalties; correct?
A. Correct.
Q. Now, other people at Flashbots handled issues relating to the Ethereum consensus specifications; correct?
A. Yeah, generally other people would do that.
Q. I'd like to discuss just a few basis principles relating to the blockchain in Ethereum so that we have a similar vocabulary for our discussion. Is that all right?
A. Sounds great.
Q. Okay. Well, first, at its most basic level, a blockchain is a digital ledger that records transactions; correct?

A. Seems consistent, yeah.
Q. And Ethereum is what is called a decentralized blockchain?
A. Yes.
Q. In a decentralized blockchain, there is no central point of authority with control over the chain; correct?
A. That's the idea, yeah.
Q. The network is instead made up of thousands of independent computers around the world called nodes; correct?
A. Yeah.
Q. It is often said that Ethereum is permissionless; is that correct?
MR. FANG: Objection.
THE COURT: Overruled. You may answer.
A. Yes, that is often said.
Q. That means that anybody can access Ethereum; correct?
A. Yeah, that's the idea.
Q. And that means that anybody can place a transaction on Ethereum; correct?
A. Correct.
Q. And anybody can create a validator as well, right?
A. Yeah. There are rules for creating a validator. So you need to stake 32 ETHs. Not everybody has that is one nuance.
Same thing for transactions. Also there are rules for what transactions are valid or not. But given you follow the protocol rules, then, yes.

Q. And we'll talk about the steps of becoming a validator a little bit on. But my question was a little bit more simple, which is that anybody can become a validator; correct?
A. Yeah, in theory.
Q. And it's often said that Ethereum is trustless or trust-minimizing; correct?
MR. FANG: Objection.
THE COURT: Overruled. You may answer.
A. Yes.
Q. These terms mean that, at least in theory, users don't need to know one another to interact on Ethereum; correct?
A. Yes, at least in theory, that's the goal.
Q. And users don't need to place trust in a central authority, right?
A. That's the goal.
Q. Now, we talked a little bit earlier about the term "consensus mechanism." That process is sometimes referred to as determining the canonical chain; correct?
A. Yeah. You know your stuff.
Q. Thank you, Mr. Miller. It's been a learning experience for me, as I hope it is for the jury as well.
In other words, just to help everybody's understanding in the room, it is the process of determining the version of the blockchain that all the users can agree is the true and correct version of the chain.

A. I would agree with that.
Q. And that mechanism, it's very important to the functioning of a decentralized blockchain; correct?
A. Yes, very important.
Q. Because without it, people wouldn't know what transactions were recorded in the chain; correct?
A. Yes.
Q. And they wouldn't know in what order; correct?
A. Correct.
Q. And that could result in confusion; correct?
A. Yeah.
Q. Now, this might seem simple, but I think it's worth repeating. The agreement on the state of the blockchain is the consensus in the term "consensus mechanism"; correct?
A. Yes.
Q. And I believe on direct you testified that Ethereum currently has what's called a proof-of-stake consensus mechanism?
A. I think I did, yeah. Said a lot of things, so...
Q. Through that mechanism, users called validators are randomly selected to propose a block during a given time slot; correct?
A. Correct.
Q. For that slot, under the Ethereum protocol, the validator can add any block to the chain that it wants.

A. That is its prerogative as a validator in its role of proposing.
Q. And that prerogative includes the right to determine the final order of transactions in the block that it proposes as well; correct?
A. It's one of the jobs of a validator, to order transactions in a block, yeah.
Q. Now, the validator has that role to add a block only during a given time slot; correct?
A. During their slot.
Q. Yeah. And the slot on Ethereum, it lasts for 12 seconds?
A. Yeah.
Q. So this process of a validator adding a block to the blockchain, it happens pretty quick; is that correct?
A. Depends on if you think 12 seconds is a long time or a short time. In our industry, sometimes milliseconds matter. And so I'm not sure, if you ask our engineers, they would say that's a short period of time. But certainly for a regular person it is.
Q. Thank you, Mr. Miller.
Now, there's a separate group of validators that review the block that the proposing validator proposes to add to the chain; is that right?
A. Yes, that is right.
Q. And these other validators, their role is to check to see

that the block is valid and they vote on it; correct?
MR. FANG: Objection.
THE COURT: Overruled.
A. Yes. And their related role is also to check the time in which the proposer has proposed a block too.
Q. But one of their roles in voting is to check that the transactions are valid; correct?
A. Yes, that's a part of making sure that the block overall is valid.
Q. And those voting validators, they will reject a block if it has invalid transactions in it; correct?
MR. FANG: Objection.
Your Honor, could counsel clarify as to whether this line of questioning relates to Ethereum generally or MEV-Boost.
THE COURT: Rephrase your question with that in mind.
Q. I believe the answer to that is that this question would be the same regardless. And so I will ask the question that testing validators will reject a block if it has invalid transactions; correct?
A. Yes.
Q. And that is true whether or not the block has been proposed using the MEV-Boost system; correct?
A. Yes.
Q. That's just a general way that the consensus mechanism on Ethereum works; correct?

A. Yes. The Ethereum consensus mechanism will reject invalid blocks of any kind, whether or not they originate from MEV-Boost or not.
Q. Because MEV-Boost doesn't have its own consensus mechanism; correct?
A. MEV-Boost works off of Ethereum, so it doesn't have its own.
Q. After the vote by the voting validators, the block goes final; correct?
A. Could you repeat the question? I'm not sure I heard the first part.
Q. Sure. At some point after the voting validators approve the block, the block goes final; correct?
A. "The block goes final" is not a term of art that I understand. But I think I generally know what you mean. Are you talking about block finalization?
Q. I am, Mr. Miller. And thank you.
There is a step where the block becomes final that is referred to as block finalization; correct?
A. Yes.
Q. And at that point it is added to the blockchain; correct?
A. This gets into Ethereum's consensus. So there -- you're testing the limits of my knowledge here, so this is fun.
Blocks are confirmed and included on the Ethereum chain. And there's a point at which in the future they

finalize batches of blocks that have previously been confirmed is my understanding. So I would include -- or I would consider a block included on the chain before it is finalized. But there is some level of security and assurance that you get when finalization happens. Does that make sense, the nuance that I'm drawing?
Q. That does make sense.
And on these and other topics, I'm trying to keep it digestible, but I appreciate your attention to detail.
And one consequence of the block going final is that the transactions within it, they can't be modified; correct?
A. You get the highest level of certainty over the transactions not being modified because the blocks have the highest level of Ethereum's security, so to speak. Again, there's nuances where I would consider blocks that have been confirmed and voted on by Ethereum validators before already included. And it's very unusual for ordering to be altered at that point too.
Q. And if something were to happen to those transactions after that point, it would be something that could be publicly seen on the blockchain; correct?
A. After what point?
Q. After the block goes final, if there is a scenario where the transactions could be changed, that would be evident on the blockchain; correct?

A. Well, I don't know that the question makes sense. Because block finalization, my understanding is that then the transactions -- the blocks can't be modified at all, that's kind of why they call it finalization. So this is the limits of my knowledge. Maybe it's possible in the Ethereum consensus protocol, but I'm not even sure that that is possible.

Q. Now, Mr. Miller, running an Ethereum validator is an economic activity; correct?

A. Yes. You make money, it costs money, so it makes sense to call it that to me.

Q. And Ethereum validators are motivated to make money?

MR. FANG: Objection.

THE COURT: Overruled.

A. Generally, there are people who run them, you know, as alterius; they are not necessarily in it for the money, they do it because they want to support the Ethereum Network. But generally people are motivated by making money.

Q. And Ethereum utilizes economic incentives to influence validator behavior; correct?

A. Yes, as a matter of principle.

Q. Ethereum validators, they can earn rewards for adding blocks to the blockchain; correct?

A. Correct.

Q. And other users, they can pay validators to have their transactions placed on the block that the validator is going to

propose; correct?
A. Correct. Yeah, those are transaction fees.
Q. Now, there is a separate way that validators can make money called MEV; correct?
A. Yes.
Q. And we'll talk more about MEV in a bit.
Together, these positive economic incentives, they encourage validators to take certain actions; correct?
A. Correct.
Q. They do so by making it profitable to be a validator?
A. Generally, yeah.
Q. Ethereum also utilizes economic penalties to influence validator behavior; correct?
A. Correct.
Q. And as you mentioned earlier, validators must stake 32 ETH for the right to become a validator; correct?
A. Correct.
Q. The value of ETH, it fluctuates on a daily basis; is that right?
A. Yes.
Q. But I believe you testified yesterday that, in the ballpark, 32 ETH was tens of thousands of dollars in April of 2023. Does that sound correct?
A. I think so, yeah.
Q. Now, that staked ETH -- actually, so just to be clear, ETH

is a form of cryptocurrency; correct?
A. Yes.
Q. And it's the native cryptocurrency on Ethereum?
A. Yes.
Q. Hence the name.
A. Yes.
Q. And that ETH, it can be confiscated or slashed in preset amounts based on certain validator behaviors; correct?
A. I don't know about the use of the word "confiscated." That kind of implies to me that someone is taking it, someone else is gaining it, like there's the ETH police force or something like that. And that doesn't resonate with me. I'm not sure that's correct. The rest of your statement I agree with.
Q. But you would agree that the validator would lose the slashed ETH; correct?
A. Yes.
Q. Okay. And the staking and slashing features, these are necessary because there is no way of verifying who is a validator on Ethereum; correct?
MR. FANG: Objection. Foundation. Speculation.
THE COURT: Response, Mr. Looby?
MR. LOOBY: I can show the witness a document to see if he knows the answer.
THE COURT: All right.
Q. Now, Mr. Miller, beside you in the smaller binder is a set

of materials. One of them is labeled DX 3506-001.
A. Sorry, DX 3506-001?
Q. Correct. It should be the first tab.
A. Okay.
Q. And, Mr. Miller, before your testimony today, you had met with the government on several occasions; correct?
A. Yes.
Q. And you had been asked and answered questions about the facts of this case; correct?
A. Generally.
Q. And do you recall attending a meeting on December 21, 2023 with the government prosecutors in this case?
A. It seems possible to me. I don't recall specific instances or specific dates, but that ballpark makes sense to me.
Q. Mr. Miller, if you could look at --
MR. LOOBY: And, Joe, to see if we can pull up this so we can do a zoom-in for the witness.
MR. FANG: Your Honor, we object on the basis that it's unclear whether this is being shown to refresh.
THE COURT: What's the purpose of this, Mr. Looby?
MR. LOOBY: To refresh the recollection that Mr. Miller --
THE COURT: I don't recall that that was -- I don't recall that that was the basis for the objection, for the lack of foundation; is that correct?

MR. FANG: Correct, your Honor. There's been no failure of memory as to the fact.

THE COURT: Understood. That was not what I understood to be the basis for your objection.

So, Mr. Looby, you should lay additional foundation with respect to his knowledge, not memory.

BY MR. LOOBY:

Q. All right. So, Mr. Miller, you're generally familiar with the slashing and staking process that we've been discussing here today?

A. At a high level, yeah.

Q. And you had discussed that process on direct examination as well?

A. Yes.

Q. And are you generally familiar with the way that the Ethereum protocol uses economic incentives to guide validator behavior?

MR. FANG: Your Honor, objection. The document is still before the witness.

THE COURT: I don't see it.

MR. FANG: He has a binder.

THE COURT: Oh, he has it open. All right.

Mr. Miller, you can shut the binder and just put it right next to you.

THE WITNESS: Okay.

A. Can you repeat the question.
Q. Yes, Mr. Miller.
You are familiar with the way that the Ethereum Network utilizes economic incentives to influence validator behavior; correct?
A. Generally, yeah.
Q. The staking and slashing features of the Ethereum protocol, they are necessary because there is no way of verifying who is a validator; correct?
A. A validator has a cryptographic identity, so they have kind of a -- I don't know how to put it in a simple way. They have a mathematical identity that they are associated with. That doesn't change. But certainly you can't always put a face and a name, a real name, to that cryptographic identity, yeah.
Q. Thank you.
And the network can't assume that a validator will fulfill its role correctly; correct?
A. Correct.
Q. Now, one way a validator can have their staked ETH slashed is for signing multiple blocks for a given slot; correct?
A. Correct.
Q. And signing multiple blocks for a single slot is called equivocation; correct?
A. Yes.
Q. The Ethereum protocol, it penalizes equivocation by

validators through slashing; correct?
A. Correct.
Q. But aside from those penalties, under the Ethereum protocol, there is no limitation on the validator's ability to equivocate; correct?
A. You mean the number of times they can equivocate, their ability to equivocate?
Q. Their ability to equivocate at least once in a given slot.
A. There's no limitation, yes.
Q. And in April 2023, a validator would be slashed one ETH if they equivocated; correct?
A. That's what I remember, a validator in question being slashed, yeah.
Q. And what would you get -- what would you estimate the value of one ETH would be in 2023?
A. A few thousand dollars.
Q. Now, the size of the slashing penalty, that is something that's set by the Ethereum protocol; correct?
A. Correct.
Q. And the amount of the slashing penalty, it could be changed by amending the protocol; correct?
A. Correct.
Q. And there is a process by which the Ethereum protocol can be amended, right?
A. Correct.

Q. Since April 2nd, 2023, the protocol has not been amended to increase the magnitude of the slashing penalty; correct?
A. I don't know. I don't think so. But I don't have full certainty.
Q. Now, there are many, many validators operating on Ethereum; correct?
A. Many, many, yeah.
Q. There are approximately one million validators active on Ethereum today?
A. Seems right. I don't know.
Q. But you would expect at least 500,000 who are active?
A. Yes. I remember when MEV-Boost launched, it was approximately 400,000. So at least 500,000 now makes rational sense to me, but I don't know the exact number.
Q. Now, you testified on direct that there was a prior version of Ethereum where the role of proposing blocks was done by a user called a miner; correct?
A. Yeah. Correct.
Q. And that is the role that is currently performed by validators; correct?
A. Yes.
Q. Without getting into the weeds of this topic, because I know they are weedsy, the moment where this role changed is called the merge; is that right?
A. That is right, yeah.

Q. And that change occurred in September 2022; correct?
A. Sounds right, yeah.
Q. And that effectively created the role of the validator; correct?
A. Yes, as it is in proof of stake.
Q. So that occurred just a few months before the events at issue in this case; is that right?
A. April to September, yeah.
Q. Now, back in the old Ethereum, there were about 20 or so miners who together contributed the majority of the blocks in the blockchain; is that correct?
A. Yeah, seems right. It was pretty concentrated.
Q. And --

THE COURT: Mr. Looby, because we took a break earlier today, I just want to give the jurors a chance to stand up and stretch, because we won't have another opportunity to do another break. So if you all want to stand up and stretch, you should feel free to do so. I will do so as well.

Thank you for the indulgence.

Mr. Looby, you may proceed.

MR. LOOBY: Of course, your Honor.

BY MR. LOOBY:

Q. And, Mr. Miller, you are familiar with the concept of miners through your work at Flashbots; correct?
A. Yes, I am familiar with miners.

Q. Because you have worked at Flashbots since before the merge; correct?
A. Correct.
Q. Okay. And back in the old Ethereum, there were about 20 miners who together contributed the majority of blocks on the blockchain; correct?
A. That seems right. It was pretty concentrated, so you might even be able to lower the number. But I don't know the exact number. And it depends on what you mean by majority, if it's 50 percent, 75 percent. But that seems right.
Q. It was a relatively small number of miners contributing a large proportion of the blocks on the chain; correct?
A. Yes, that is correct.
Q. And that's in contrast to Ethereum today, where there are many, many validators who are proposing blocks; correct?
A. Yes.
Q. And the miners were generally run by established firms; is that correct?
A. Yes, generally.
Q. And other users, they knew who the miners were, right?
A. What do you mean by "other users" here? Because I don't think every Ethereum user would know who the miner was.
Q. Let me rephrase that. Thank you, Mr. Miller.
Sophisticated users of the Ethereum Network would know who the miners were; correct?

A. I think they could know who miners were. I don't think they all knew who miners were.
Q. It would be possible to find out who the miners were if you cared to know; correct?
A. Yes.
Q. Now, pre-merge, if a searcher submitted a bundle of transactions directly to a miner, there was a risk the Ethereum miner might unbundle the transactions; is that correct?
A. There was that risk, yeah.
Q. But since there were only around 20 Ethereum miners that contributed most of the blocks as we discussed, the searchers could generally assume that the miners wouldn't do that, right?
A. It did happen. So I think searchers took precautions to do so; and you needed to be aware of the possibility of doing so.
Q. But for the majority of bundles that were submitted, that didn't occur, correct, during this time period; correct?
A. For the majority of bundles that were submitted, that did not occur.
Q. And if the miner started unbundling, the searchers would probably stop sending the bundles to them; correct?
MR. FANG: Objection. Speculation. Relevance.
THE COURT: Sustained as to speculation.
Q. If a miner unbundled transactions, it might risk losing future opportunities to make money; correct?
MR. FANG: Same objection.

THE COURT: Sustained.

Q. Mr. Miller, you are familiar with the economic incentives that were at play in the pre-merge Ethereum; correct?

A. Generally.

Q. And that includes the economic incentives that would have motivated miner behavior; correct?

A. Generally.

Q. And that includes the economic incentives that may have discouraged miners from unbundling as a general matter; correct?

A. As a general matter.

Q. And a miner who unbundled, they would risk losing future opportunities to make money; correct?

MR. FANG: Objection. Relevance.

THE COURT: Overruled.

A. Yes, I think you could say so.

Q. Because the searchers wouldn't continue sending the bundles to the miner; correct?

A. Typically, searchers sent bundles to Flashbots, and Flashbots sent bundles on to miners. And so searchers did not dictate where their bundles went exactly.

Q. Mr. Miller, we were discussing earlier how you had met with government attorneys in this case on several occasions; correct?

A. Correct.

Q. And you met with them in June of 2025; is that correct?
A. Seems right. I don't remember specific dates.
Q. And you told them in that meeting that the searchers generally could trust that the miners weren't going to make -- take MEV or trade on private bundles sent to miners, but there were still no guarantees. Do you recall?
A. Don't recall that specifically. Are you looking at a specific document that I should pull up?
Q. Yes, that is in your small binder again. And also, Joe will pull it up on your screen as well. And that's DX 3506-004.

MR. LOOBY: And, Joe, this is for the witness only and the Court and counsel.

Q. And the relevant portion, although you can take your time to familiarize yourself with the document overall, I will draw your attention to page 3 when you have a moment.
A. Okay. I'll take a moment to read the nine pages.

(Pause)

(Continued on next page)

BY MR. LOOBY:
A. Okay, I've skimmed through the document. I didn't read it all in depth, but I skimmed through a bunch of it.
You wanted to bring my attention specifically to page 3, if I recall?
Q. Yes, to page 3.
MR. LOOBY: And, Joe, could you highlight the relevant paragraph.
MR. FANG: Your Honor, we object to this whole line of questioning as improper impeachment, to the extent that that's what he's doing.
THE COURT: I didn't interpret this as impeachment.
You're refreshing his recollection?
MR. LOOBY: That's correct, your Honor.
THE WITNESS: Sorry, is there a question?
BY MR. LOOBY:
Q. Can you read the highlighted paragraph to yourself.
(Pause)
A. Okay.
MR. LOOBY: Joe, if you could take the document down.
Q. Does that refresh your recollection that you spoke with government prosecutors about miner -- the incentives regarding miners in the pre-merge Ethereum?
A. I remember talking to the government about it generally, but I don't remember the specific things that I said.

Q. Do you recall saying that because the firms were known, the miners generally -- the searchers could generally rely on trust that the miners would not unbundle?

MR. FANG: Objection; the witness hasn't stated that his recollection has been refreshed.

THE COURT: Mr. Looby, you can ask if his recollection has been refreshed, and we'll go from there.

BY MR. LOOBY:

Q. Has your recollection been refreshed regarding this topic of discussion with the prosecutors at this meeting?

A. I remember talking about that topic. I don't remember the specific things that I said.

Q. Now, in the post-merge Ethereum, there are too many validators for users to assume that validators will not unbundle transactions, correct?

A. Also, should I close the binder?

Q. Oh, yes, sorry. I didn't see that you had it open. Thank you, Mr. Miller.

A. No, that's okay.

So you're asking, in the post-merge Ethereum, there are too many validators for users to assume that validators will not unbundle transactions, correct?

Q. Correct.

A. Yes, correct.

Q. And this is sometimes referred to as the concept that

searchers can't trust the validators; is that right?
A. Yes, I would say that.
Q. Now, Mr. Miller, you testified on direct about proposer-builder separation.
Do you recall that?
A. I don't mean to be difficult. We talked about proposing and building. I don't think that term has been introduced, but we generally talked about the ideas behind that, yeah.
Q. Well, proposer-builder separation is a concept whereby the role of the block proposer and the block builder on Ethereum would be split across two different users, correct?
A. Correct, yeah.
Q. And proposer-builder separation is sometimes referred to as PBS; is that right?
A. That is right, yeah.
Q. Can we refer to it that way today?
A. If that's what you would like, yeah.
Q. Now, under the Ethereum protocol, the validator currently is assigned the role of block builder and block proposer, correct?
A. Those are the two roles of the validator, yeah.
Q. And they're both assigned to the validator under the Ethereum protocol, correct?
A. Yeah, as of today.
Q. Under PBS, a separate user called a builder would do the

first part; it would pick the transactions to include in a potential block and in what order to put them, correct?
A. Yes. The block builder would be responsible for ordering transactions in a block under PBS.
Q. Under PBS, the proposer or validator's role would be limited to proposing a block to be added to the blockchain, correct?
A. That is correct.
Q. Now, PBS is not yet part of the Ethereum protocol, correct?
A. MEV-Boost is software that enables PBS, although we have not added PBS natively into the Ethereum protocol itself. You need the extra MEV-Boost software and a bunch of extra software beyond Ethereum itself. There's the idea that we talk about sometimes of enshrining PBS, which is to say, taking this thing that exists today with MEV-Boost and enshrining it into Ethereum. So, it's kind of semantics, but it depends on exactly what you mean by PBS. I think, generally, we say we have PBS in Ethereum today.
Q. But PBS has not yet been enshrined in the protocol, as you've just explained that term, correct?
A. It hasn't been enshrined in the protocol.
Q. And there have been proposals for PBS to become enshrined in the protocol, correct?
A. Yes.
Q. And those PBS enshrinement proposals, they've never been

adopted, correct?
A. I think one might be scheduled for inclusion now, depending on what you mean adopted, but they're not live right now.
Q. The protocol has never been amended to enshrine the PBS concepts, correct?
A. I agree with that, yeah.
Q. Picking up on something that you said in your answer earlier, the MEV-Boost software, it was conceived of as an initial step before PBS could be enshrined in the protocol, correct?
A. Yes.
Q. In other words, it's a temporary solution that could be in place until PBS is enshrined?
A. I agree with that, yeah.
Q. And the MEV-Boost software runs alongside the Ethereum like -- the Ethereum protocol like a sidecar; is that correct?
A. We do call it a sidecar, yeah.
Q. And you are familiar with the technical meaning of that term?
A. If you use it, it would make sense to me. I don't know that I could give you a very precise definition of it.
Q. Generally speaking, would you agree it is a program that runs alongside another application, without modifying that application's code?
A. It might change how the other application works because

maybe you hit a different path in the code. That's one nuance.
Q. But the underlying code of the application on which the sidecar is running wouldn't need to be modified for the sidecar to be operational, correct?
A. The underlying code would stay the same. It might just operate differently now that you have the sidecar.
Q. The role of the relay that you discussed on direct, that, similarly, too, was seen as a temporary solution, correct?
A. Correct.
Q. Eventually, if PBS is made part of the Ethereum protocol, the relay wouldn't even be needed; is that right?
MR. FANG: Objection; speculation.
THE COURT: Overruled.
You may answer.
THE WITNESS: That is the goal. We have learned, since setting that out as a goal, that it is complicated and the relay might stay around anyway, but it is certainly the goal to remove the need for the relay.
BY MR. LOOBY:
Q. So, I'd like to discuss some of the users relevant to MEV-Boost software, starting with the searchers.
Searchers, they are sophisticated users, correct?
A. Yes.
Q. And searchers scan the mempool using MEV bots, correct?
A. You could say so, yeah.

Q. These MEV bots, they run computer programs to automatically determine attractive profit opportunities, correct?
A. You could say so, yeah.
Q. If an MEV bot is not designed correctly, it can lead to imprudent trades and losses, correct?
MR. FANG: Objection; speculation.
THE COURT: Rephrase your question.
MR. LOOBY: I can lay a foundation, as well.
THE COURT: Yes.
BY MR. LOOBY:
Q. So, you have observed instances where an MEV bot made bad trades and threw away millions of dollars, correct?
A. It depends on what you mean by bad trades here.
Q. Let me rephrase that.
You have observed instances where an MEV bot went off the rails and threw away millions, correct?
MR. FANG: Objection to the form.
THE COURT: Overruled.
THE WITNESS: It sounds like you're referring to something specific.
BY MR. LOOBY:
Q. Would it help you to see a document to refresh your recollection?
A. Sure.
MR. LOOBY: Joe, if you could please pull up DX 1008

for the witness and counsel and the Court only.

THE WITNESS: Is this in my large binder?

BY MR. LOOBY:

Q. It's in the large binder. It's a shorter document, so you might find the screen adequate, but you are welcome to also look at the hard copy, as well. It's up to you.

MR. FANG: Your Honor, there's no failure of memory, and there's no relevance, and we're happy to discuss it at sidebar, if the Court would like.

THE COURT: Why don't we do so.

(Continued on next page)

(At sidebar)

MR. FANG: I'm happy to start.

Our objection is sort of twofold. The first is the witness has not indicated failure of memory, so there's no foundation to refresh his recollection. At most, Mr. Looby established -- he's asked a question, Mr. Miller has said it sounds like you're referring to something, but he didn't say that he doesn't recall any particular thing such that his recollection would need to be refreshed. I think from -- we also have a relevance objection, as well, on the basis that all this document and Mr. Miller's personal views on sandwich bots, (a) that is not relevant to the matters at issue in this case, and, also, it adverts to the victim negligence and blaming that your Honor has already precluded. So we have concerns about sort of, like, constantly showing Mr. Miller certain documents when there's no proper basis, there's no foundation that has been laid, for his recollection to be refreshed or for potential impeachment, which is what we had understood defense was doing before.

MR. LOOBY: Well, Mr. Miller indicated that he did not recall the comment that is referred to in the document, and it is appropriate to ask a witness, who is not able to recall something, if seeing a document would --

THE COURT: It's not that clear to me that he said he didn't recall. He just said, as Mr. Fang said, that it sounds

like you're referring to something.

MR. LOOBY: Okay.

THE COURT: And I don't believe he said I don't remember -- you know, that was the response I heard, as well. So I don't think it's been established that his recollection specifically needs to be refreshed.

In terms of the relevance of this line of questioning, it doesn't seem to me that you are getting, yet, into his opinions on sandwich trading.

MR. LOOBY: Right. And this is not about a sandwich -- this tweet is not about a sandwich trading bot, it's just about an MEV bot. The relevance is that these bots are automated, and that they perform trades without human intervention, and that things can go wrong.

MS. KUDLA: But, your Honor, the point on this that we're saying is it goes to victim negligence, as well. The idea that the traders are engaging in trades for which they, therefore, have caused the loss themselves goes to the idea that they're negligent in their actions. So that's where we feel like this is getting close to what the jury instructions will preclude them to think about, and also the ruling on the motions *in limine* precluding argument regarding that a victim is to blame for the negligent actions.

THE COURT: There's a fine line here, and it's a difficult one to draw, but I do think, and I've already said,

they can talk about the nature of the trading environment. This, to me, falls closer to that, as opposed to directly calling any conduct negligent. So I'm going to allow it just because it's close.

MS. KUDLA: Okay.

MR. LOOBY: I would just add that the government emphasized, with Mr. Miller on direct, that there are human beings behind each of these bots, and we need to be able to contextualize how, on a trade-by-trade basis, that's actually not the case, that these are automated bots.

THE COURT: All right. So, with respect to this exhibit, though, I think we'll --

MR. LOOBY: Reask the question?

THE COURT: Yes. Thank you.

MS. KUDLA: Thank you.

(Continued on next page)

(In open court)

THE COURT: Thank you, all, for your patience.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you.

BY MR. LOOBY:

Q. Mr. Miller, without looking at your binder, do you recall publicly commenting on an instance where a MEV bot went off the rails and made bad trades and threw away millions of dollars?

A. I've heard about a lot of MEV-related things. It does not seem out of the realm of possibility. I would not be able to tell you the specifics off the top of my head.

Q. And would it help to recall the specifics to look at a document?

A. That would help me, if you want to ask me about those specifics.

Q. Thank you.

So, Mr. Miller, if you could please consult your binder at DX 1008. And it's also on the screen, but, Mr. Miller, again, it's a multipage document, and you are free to review it in its entirety, if you would like.

A. Okay. I'm going to review the whole thing.

(Pause)

A. Okay. I've had a chance to review it.

Q. Does that refresh your recollection that you had publicly commented on an instance where you observed that an MEV bot

went off the rails, and that caused it to make extremely bad trades and throw away millions of dollars?
A. Yes.
Q. And it's possible for an MEV bot to do this because the bots are preprogrammed to operate without human intervention, correct?
A. Generally, yes.
MR. LOOBY: Thank you, Joe.
Q. Now, searchers don't use the MEV-Boost software when they scan the mempool for profit opportunities, correct?
A. Searchers do not use MEV-Boost to search the mempool for opportunities, that's right.
Q. Searchers don't use the MEV-Boost software at all; is that correct?
A. It depends on what you mean by use. They certainly rely on MEV-Boost infrastructure to land their transactions.
Q. But a searcher doesn't run the MEV-Boost software in order to scan the mempool, correct?
A. That is correct, yeah.
Q. And a searcher does not run the MEV-Boost software to select a potential bundle of transactions to send to the builder, correct?
A. That is correct, yeah.
Q. Okay. We mentioned the term a couple of times, but now I want to talk a little bit more about MEV.

MEV, again, it is maximal extractible value, correct?
A. Yes. That's MEV.
Q. And MEV is the value that could result from a transaction ordering on a blockchain, correct?
A. Yes.
Q. And you can think of MEV as one way that traders on Ethereum make money, correct?
A. It is one way that traders on Ethereum make money, it's not only trading, so that's a subset, but, yes, that is one way that traders make money on Ethereum, certainly.
Q. And MEV does not come from Flashbots, correct?
A. Restate the question for me, because that could mean multiple things.
Q. Sure.
MEV is a feature of a decentralized system, like Ethereum, correct?
A. Yes.
Q. Somebody in that system gets to decide the order of transactions on the block, correct?
A. There are some systems where they're probabilistic, but, in general, the ordering is decided somehow.
Q. And on Ethereum, it's not probabilistic, it is the proof of stake consensus mechanism that we discussed earlier, correct?
A. Yes, that's correct.
Q. And that person gets to extract the MEV, correct?

A. It depends exactly what you mean by extract. The idea behind MEV-Boost is that the validator, who has these two roles of building and proposing, they may not have the sophistication necessary to extract MEV themselves, so they outsource that to somebody else who has that sophistication. So, it really depends on what you mean by extract there.

Q. Well, the MEV is downstream of the ability to place orders -- to control the order of transactions on the block, correct?

MR. FANG: Objection to form.

THE COURT: Overruled.

You can answer.

THE WITNESS: Thank you.

Yes, I would agree with that.

BY MR. LOOBY:

Q. Now, there are three main types of MEV strategies; is that right?

A. You'd have to list them out for me to agree with you or not.

Q. Arbitrage, liquidations, and sandwiching; is that correct?

A. Yes. There's other stuff. It's sort of unclear how large that other stuff can be relative, but, in general, I would agree, yeah.

Q. Are you referring to the long-tail MEV strategies when you say other stuff?

A. Yes, or it might be -- some people consider nonatomic arbitrage a different category. I haven't talked to you enough to understand exactly what you mean by arbitrage, so...
Q. Well, let's start with arbitrage, then.
Arbitrage, generally, is the process of buying an asset in one market and selling it in another for a higher price to profit from the price difference, correct?
A. Yeah, I would agree with that.
Q. And on Ethereum, there are a number of decentralized exchanges where users can make trades, correct?
A. Correct.
Q. And differences in the prices of crypto assets across these different exchanges can lead to arbitrage opportunities, right?
A. Yeah, that is right.
Q. MEV bots that seek arbitrage opportunities are preprogrammed to seek out trades that profit in this way, correct?
A. You said MEV bots that seek out arbitrage opportunities are preprogrammed to seek out trades in this way; that's your question?
Q. Yes.
A. Yes, I agree with that.
Q. And these are sometimes called arb bots?
A. Yes, that's the shorthand.
Q. The next major category of MEV is called liquidations; is

that right?
A. Mm-hmm.
Q. I'm not going to ask you any questions about --
THE COURT: Just to clarify, was that a yes to that last question?
THE WITNESS: That was a yes.
BY MR. LOOBY:
Q. I will skip to the third major category of MEV opportunities, which is called sandwiching, correct?
A. Yes.
Q. And this strategy is often called sandwich attacks?
A. People do commonly refer to it as sandwich attacks, yeah.
Q. And sandwich attacks are not the same thing as arbitrage, correct?
A. They are not the same thing as arbitrage.
Q. And searchers who engage in sandwich attacks, they do so through MEV bots, correct?
A. Yes.
Q. And these are sometimes referred to as sandwich bots, correct?
A. Yep, that's correct.
Q. A sandwich bot will identify a transaction that is pending in the mempool, and then it places trades around it in a bundle, correct?
A. Yes, like a sandwich. That's why it's called a sandwich

bot.
Q. That's very clever.
First, the first piece of bread is the front run trade?
A. Yes.
Q. And then in the middle of the sandwich is the middle trade that the bot found in the mempool, correct?
A. Generally, yeah.
Q. And next comes the back run, or the sell trade, correct?
A. Yes.
Q. And each of these three trades in the sandwich bundle are actually trades with something called a liquidity pool, correct?
A. Yes.
Q. So, the sandwich bot and the other trader who placed the trade whose trade is in the middle of the sandwich, they're not trading with one another, correct?
A. I haven't thought about this in a little bit, but I feel like it's a little nuanced. I'm not sure if I should get involved in nuance with the jury, but I think you could think the -- you might be able to think of them as trading with one another because they're both trading against the same liquidity pool. So, in some way, they are trading -- they're trading from the same source of liquidity, the first trade affects it, then the middle trade, their trade, executes, and it's affected

by the first one. The first person puts assets in, the second person is affected by it -- I'd have to think about it a little bit, but I don't know that's the most precise thing. I'm also not sure it entirely matters.
Q. Each trade individually trades with the liquidity pool, correct?
A. Yes.
Q. A result of a sandwich attack is that the trade in the middle, it executes at a more disadvantageous price than it otherwise would have, correct?
A. That is true, yes.
Q. The middle trade is sometimes referred to as the sandwich attack's victim; is that correct?
MR. FANG: Objection.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MR. LOOBY:
Q. Now, I want to clarify, not all searchers are sandwichers, correct?
A. That is true, not all searchers are sandwichers.
Q. Just a subset of searchers engage in sandwich attacks, correct?
A. Yes, that is correct.
Q. And you testified on direct that you have acted as a searcher before, correct?

A. That is correct.
Q. You were focused on arbitrage opportunities, right?
A. Generally, yeah.
Q. But you have built a sandwich bot before, correct?
A. I prototyped it, yep.
Q. But you've never operated it to perform a sandwich attack, correct?
A. No. As the person responsible for Flashbots' products and engineering, I wanted to better understand the market, but I never operated a sandwich bot for profit.
Q. Why not?
A. I wanted to stick to arbitrage.
Q. Why?
A. I don't remember the exact reasons.
Q. Now, sandwich attacks are not prohibited in Ethereum, correct?
A. They're not prohibited in Ethereum.
Q. Sandwich attacking is just part of the MEV landscape, correct?
A. Yes.
Q. And the size of the MEV market is billions of dollars, correct?
MR. FANG: Objection; speculation, foundation.
THE COURT: Lay a foundation with respect to that.
BY MR. LOOBY:

Q. Mr. Miller, as part of your responsibilities at Flashbots, have you taken it upon yourself to become knowledgeable of the MEV market?
A. I would think so.
Q. So you are familiar, in a general sense, with the amount of money that is available in that market for MEV extraction?
A. Yes. I don't know if I would be able to cite to you very specific statistics and certain time frames, but I have a feeling for it, sure.
Q. Would you agree that it is billions, in the billions of dollars?
A. I don't know, I don't know. It depends. This is -- it depends on the scope of the market, too.
Are you just talking about Ethereum?
Q. I am talking about Ethereum.
A. It depends on the year. I think there are years where it has crossed over a billion dollars, yes, but I don't know what it is most recently.
Q. MEV opportunities, they can be worth many, many times the block reward or other incentives provided under the Ethereum protocol, correct?
A. Yes.
Q. And MEV bots can make billions of dollars in a single transaction, correct?
A. That has happened before.

Q. MEV extraction on Ethereum, it occurs in a really adversarial environment, correct?
A. Generally, crypto is a very adversarial environment, that's true.
Q. And the searchers compete with one another for the MEV opportunities, correct?
A. That's true.
Q. When there is a source of MEV, you can assume that users are going to go find it and try to extract it, correct?
A. I think eventually, yeah.
Q. This competition for MEV on Ethereum has been called the MEV game?
A. I'm not sure I know. It doesn't sound wrong to me, but I don't think it's super commonly used.
Q. You have referred to it as the MEV game before?
A. I don't know.
Q. Do you not recall, sitting here today, whether you have referred to it as the MEV game before?
A. I don't recall.
Q. Would seeing a document help refresh your recollection?
A. Sure.
Q. Mr. Miller, this document is going to be in the manila folder that should have accompanied the binders up there.
A. I've got two binders, but I don't have a manila folder, unless it's hiding in a binder.

Q. I can give it to you.

MR. LOOBY: Your Honor, with your permission, may I approach?

THE COURT: You may approach.

THE WITNESS: Thank you.

BY MR. LOOBY:

Q. Now, Mr. Miller, in your role as a Flashbots steward, you will occasionally make public comments from time to time about topics, including MEV, correct?

A. Yes, that's true.

Q. In May of 2021, did you give a talk entitled "How To Make $1 Million Per Month"?

A. Maybe. I don't know. I remember doing something along those lines, which was intentionally provocative, but I don't know that that was the exact title of the talk.

Q. Do you recall saying, at this talk, that people are playing these really complex games and they're constantly evolving --

THE COURT: Mr. Looby, Mr. Looby.

MR. FANG: Your Honor, we object to the reading from a document that is not in evidence and only being used to refresh.

THE COURT: Agreed.

BY MR. LOOBY:

Q. Mr. Miller, if you could take a look at the document in your folder titled 4000B.

4001B.
A. 4001 -- 4001B?
Q. Correct.
A. Okay.
Q. And please just read that single paragraph to yourself.
(Pause)
A. Okay.
Q. And, Mr. Miller, you can put that document to the side.
Does that refresh your recollection that you discussed publicly the MEV games?
A. Not really, no.
Q. Would you agree that the MEV strategies are very complex?
A. Yes.
Q. And MEV strategies are constantly evolving?
A. That is also true.
Q. And sandwich bots have encouraged counterstrategies, correct?
A. What do you mean by "counterstrategies"?
Q. Strategies that attempt to thwart sandwich attacks, correct?
A. Are you talking about a general effort, or are you talking about other MEV strategies?
Q. I'm talking about -- without using specific examples, but just there is a phenomenon on Ethereum where sandwich attacks have encouraged strategies to thwart them, correct?

A. Well, as an example, Flashbots has been trying to make products that prevent sandwich attacks.

Is this what you're referring to?

Q. I am referring to other traders developing strategies to thwart sandwich attacks.

A. It depends on what you mean by thwart in this context.

Q. Other strategies to capture the MEV that sandwich attackers are after, would you agree that there have been counterstrategies in the Ethereum network in that regard?

A. I think definitionally, by the way that you framed the question that there are other MEV searchers attempting to capture the opportunities that sandwich bots are after, that would imply that they are sandwich bots themselves. They're competing for the same opportunities with sandwich bots. And then it doesn't make sense, to me, to call those a counterstrategy. So the question doesn't entirely make sense to me.

Q. But you are generally aware of countersandwiching strategies on Ethereum, correct?

MR. FANG: Objection; asked and answered.

THE COURT: Sustained.

BY MR. LOOBY:

Q. Now, in addition to those three MEV strategies that we talked about — arbitrage, liquidations, and sandwiching — there is a fourth category that has been called long-tail MEV,

correct?
A. That is true.
Q. And you have described these strategies in public writings as bespoke MEV strategies?
A. I don't specifically remember that, but I wouldn't be surprised.
Q. If you had written that, what would you have meant by bespoke?
MR. FANG: Objection; speculation.
THE COURT: Sustained.
BY MR. LOOBY:
Q. These long-tail MEV strategies, they are less obvious than arbitrage and sandwiching, correct?
A. Yes. Definitionally, long tail means they're less common, less obvious.
Q. And to capture these long-tail MEV strategies, you need to study the protocols, correct?
A. Yes. Because there needs to be something that, you know, allows you to make money by having a transaction in the right place, so you need to study something in order to capture that, I think I would agree with that.
Q. To capture these long-tail MEV opportunities, you need to be looking where other people aren't looking, correct?
A. I don't know if that's definitionally true. Two people might be looking at the same uncommon opportunity.

Q. But if it was commonly known, you would expect that the MEV opportunity would be sought out and obtained, correct?
A. Well, I mean, I don't mean to be difficult, so I'm sorry about that, but I think, either way, you're sort of implying people are seeking them out and finding them. It's just a matter of the scale of whether it's a few people or a lot of people.
Q. But, generally, these are more obscure strategies, correct?
A. Yes.
Q. Less popular, correct?
A. Yes.
Q. And some of these strategies might be characterized as exploits?
A. It depends on your definition of MEV and your definition of exploits.
Q. You have publicly stated that exploits are equal to MEV extraction, correct?
A. Since MEV is the value that you can make from having the right transaction at the right place at the right time, and exploits oftentimes involve a lot of money, it makes sense to consider exploits a part of MEV.
Q. Now, in addition to searchers, there are separate users relevant to MEV-Boost called builders, correct?
A. Yes.
Q. And a searcher can send a proposed bundle of transactions

to a builder, correct?
A. Yes.
Q. And the builders accept the proposed bundles from multiple searchers, correct?
A. Yes.
Q. And we talked about this earlier, but Flashbots at one point operated a builder, correct?
A. Flashbots did operate a builder.
Q. In theory, anyone could make one, correct?
A. In theory, yes.
Q. And use their own custom version of code to do so, correct?
A. Yes. Anyone could make one, use their own custom version of code.
Q. And there are only a few builders that are active on Ethereum, correct?
A. It's not a very large number; yeah.
Q. The searcher who passes their proposed bundle off to a builder is competing against other searchers, correct?
A. The searcher who passes their proposed bundle off to a builder is competing against other searchers, yes.
Q. And the builder will, in effect, run an auction to see which searcher is willing to pay the most to have their bundle in the block that the builder constructs, correct?
A. Yes, that is true.
Q. In other words, a searcher who has selected a bundle of

transactions is not guaranteed that the bundle will ultimately land on the blockchain, correct?
A. Yes, a searcher does not have a guarantee that their bundle will land on the chain when they send it to a builder.
Q. And the builders are also competing with other builders to propose the most profitable block in a given slot, correct?
A. Yeah, that is true.
Q. And the more profitable the block, the more money the builder stands to make, correct?
A. Yes. In general.
Q. Now, as part of its interaction with the builder, the searcher will express a preference for what transactions to include in the block and in what order, correct?
A. Yes.
Q. But nothing in the Ethereum protocol says that any bundle must go through in the order the searcher prefers, correct?
A. That is true. Bundles are an idea and a feature that we developed on top of the Ethereum protocol, but it is not native to the Ethereum protocol itself.
Q. That's another way of saying that the concept of a bundle of transactions isn't part of the Ethereum protocol, correct?
A. Yes.
Q. Rather, the way it works is that the builder separately guarantees the order of transactions to the searcher, correct?
A. Could you phrase that a different way for me?

Q. Yes.

So in PBS or in MEV-Boost, the builder is guaranteeing the order of transactions to the searcher, correct?

A. By guaranteeing the order of certain transactions to the searcher, you mean guaranteeing them the order of their bundle; is that right?

Q. That's what I'm asking, yes.

A. Okay.

That is true.

Q. And the builders guarantee to the searcher, it's not cryptographic, it's based on incentives, correct?

A. Yes.

Q. The builder has the ability to unbundle the bundle that is sent from the searcher, correct?

A. Theoretically, yes.

Q. But if a builder did unbundle, the searcher would not want to use that builder again, correct?

A. That is correct, yeah.

Q. And the builder would then, in effect, lose a customer, correct?

A. Yes, that is true.

Q. In the --

A. Probably many customers, since people talk, they observe, this has happened. So, not just one customer, one nuance. Sorry.

Q. And people talk, and they would be able to identify who that builder was, correct?
A. Generally, yeah, I think so.
Q. And as we discussed earlier, there are only a couple of builders, correct?
MR. FANG: Objection.
THE COURT: Overruled.
You may answer.
THE WITNESS: Yes. There aren't that many.
BY MR. LOOBY:
Q. But these economic incentives, they generally keep builders from unbundling?
A. Generally, yes.
Q. Even with these incentives, Flashbots has advised that it is important for searchers to choose builders that they trust, correct?
A. That is true.
Q. And that trust is more important the more money the searcher's strategy puts at risk, correct?
A. I would agree with that.
Q. And this risk might inhibit searchers from even trying certain strategies, correct?
A. That seems theoretically possible, yeah.
Q. You have publicly wondered, or stated that you wondered, about what kind of strategies would be unlocked if there was a

truly trustless and private building infrastructure, correct?
A. I don't specifically remember, but that seems like something I might wonder in public, yeah.
Q. It's a thought that you have wondered?
A. I don't specifically recall the instance, but it's in the general area of the stuff that I have wondered in the past.
Q. And the reason the searchers might hold back on some of these strategies is that they're not willing to trust the builder or other users to take their MEV opportunity, correct?
A. Okay, that was a complicated sentence. Can you repeat that back to me?
Q. Yeah.
So the reason the searchers may not engage in some of the strategies that you've wondered about is that it would put their MEV strategy at risk from being copied, essentially?
A. Copied or some other way that you might have a negative impact if the builder did something adverse, yes.
Q. Now, we've been talking about the role that builders play in the process for adding blocks to the chain. And just to confirm, builders don't actually run the MEV-Boost software, correct?
A. Validators run the MEV-Boost software; builders do not.
Q. I'd like to ask some questions about relays.
Yesterday, you testified that for a validator to get a block from a relay, the validator first needs to register with

the relay; is that correct?
A. Yeah.
MR. LOOBY: Okay. Joe, if we could please pull up what is in evidence as GX 3219, which was admitted yesterday.
And with the Court's permission, I would publish it for --
THE COURT: You may publish.
BY MR. LOOBY:
Q. Now, Mr. Miller, do you recall discussing this document with the government on direct examination?
A. Yes, I do.
Q. And these are the Builder API specifications, correct?
A. Correct.
Q. I'm going to draw your attention to the first page, next to the word, the big bolded word, "Builder." It says, "Set of endpoints to interact with an external block builder."
Do you see that?
A. Mm-hmm, I do.
Q. What's an endpoint?
A. A particular computer address that you can interact with in a standardized way. I don't know the formal definition, but that gets the idea across, I think.
Q. And in this context, that address is what a validator's client software would call in order to register their relay, correct?

A. Sorry, what address?
Q. The endpoint.
A. Yes. This is the endpoint that a validator would call to register a relayer. In this context, it's talking about block builder, but I gave you the nuance of the differences before, I think.
Q. Do you see on the screen the colored icon "Post"?
A. Yes.
Q. And then to the right of that are some backslash addresses, it seems, or like a folder structure.
Do you see that?
A. I do see that.
Q. And then it says, "Register or update a validator's block building preferences."
Do you see that?
A. Yep.
Q. And below that is another sentence that says essentially the same thing, and then adds, "and gas limit."
Do you see that?
A. Well, it says, "Register a validator's preferred fee recipient and gas limit." It's slightly different.
Q. It's slightly different.
MR. LOOBY: If we could go to the next page, Joe, that I would like to highlight.
Q. Is this an example of the information that the validator

provides to the relay in the registration step?
A. It seems like it, yeah.
Q. So, the first piece of data there on that first line — I know it's a little bit small — it says the word fee recipient address, correct?
A. Correct.
Q. And I believe you previously said that builders pay validators if the validator proposes the builder's block under MEV-Boost, correct?
A. Yes.
Q. And the relay will use the data in the fee recipient field here to tell the builder where to send the payment to the validator in that instance, correct?
A. The relay will use the data and the fee recipient field here to tell the builder where to send the payment to the validator, yes, that's correct.
Q. The next line item is "Gas limit."
Do you see that?
A. Yes.
Q. In this field, the validator is telling the relay the maximum size of the block it will accept; is that correct?
A. It depends on exactly what you mean by size. There's multiple things size could mean.
Q. Well, what information is the gas limit field relevant to?
A. Every transaction on Ethereum takes up a certain amount of

computing power, it takes up a certain amount of effort from a computer to process it. And the gas limit is the maximum amount of computing power, so to speak, or effort, that can be put into this block.
Q. Thank you.
The next field is "Timestamp."
Do you see that?
A. Yes.
Q. And that is a field that allows the relay to keep track of all the registrations it has received from the validator, correct?
A. I would have to go back and look. I don't remember exactly.
Q. The next field is "Pub Key."
Do you see that?
A. Yes.
Q. And that stands for public key?
A. Yes.
Q. And that's a value that relays and builders can use to identify a validator, correct?
A. That seems right.
Q. And the last field is called a signature.
Do you see that?
A. I do see that.
Q. And this is an example of a cryptographic signature that

you have discussed in your testimony, correct?
A. That is an example of a cryptographic signature, yes.
Q. What that signature is doing here is establishing that the right validator sent this information, and that the information hasn't been changed since it was sent to the relay, correct?
A. It is establishing that -- yes, I agree with that.
Q. And it's possible to register with a relay and to never ask the relay for a block header, correct?
A. That is possible, yeah. Unusual, but possible.
Q. So, there is nothing in this registration message that requires a validator to accept a block from a relay, correct?
A. Correct, yes.

MR. LOOBY: Joe, you can take that document down. I'm going to move on.

THE COURT: Mr. Looby, if you are moving on, we are very close to 4:30., so now might be a good time to wrap up?

MR. LOOBY: Yes, that's appropriate.

THE COURT: All right.

Thank you, all, for your attention today. A reminder to please be here on time, as you all have been doing, so that we can get started at 10:00 in the morning. Please remember that my prior instructions apply. Do not discuss this case with anyone. Don't do any research on this case. Don't read any press about this case. And, finally, remember to keep an open mind. Thank you.

(Jury not present)

THE COURT: Please be seated.

Mr. Miller, you may step down.

THE WITNESS: What do I do with these?

THE COURT: You can leave those there.

(Witness temporarily excused)

THE COURT: Why don't we also take our break now. I know there are additional issues for us to discuss, but why don't we do that after a 15-minute break.

MR. FANG: Yes, your Honor.

MR. MARX: Thank you, your Honor.

(Recess)

THE COURT: We have a few issues to take up. We're discussing the exhibits that the defense is likely to use on cross with respect to Mr. Miller.

MR. FICK: There's sort of a predicate issue also.

As the Court will recall yesterday, with some reluctance and trepidation, the defense agreed that we would endeavor, to the best of our ability, to provide in advance exhibits might use affirmatively as part of the case on the cross. Somewhat to our consternation today, we got 3500 material around the lunch break, suggesting the government had discussed some of those disclosed exhibits with the witness and then actually introduced one of them in the direct, which is sort of precisely the reason why we were so reluctant to go

this route in the first place.

If that's the way this is going to happen, we have to come up with something else. We want the trial to go smoothly, but we should not be in a position where the government is using our advance cross disclosure with the witness to our detriment.

THE COURT: Mr. Fang?

MR. FANG: Your Honor, there is nothing improper about introducing a document to which defendants have no objection and questioning the witness about that document. I think the government could well have just called Mr. Miller in rebuttal and shown him the document, but for efficiency reasons, there are reasons — and it's entirely proper — for the government to ask the witness about a document, even if it's a document marked by the defense.

MR. FICK: The issue isn't that we marked it. The issue is that we disclosed it as something we were likely to use on cross. Again, I have to say, this is the first trial, at left personally, where I have ever disclosed a cross exhibit before I did the cross. And we want to make the trial to go smoothly, but we can't be in a position where preemptively the government is modifying its direct and pre-preparing for the cross because we've agreed sort of to disclose the stuff early.

So we either respectfully would request an order from the Court that that they not do that with their witnesses, or

we will politely, I think, say that we can't make that advance disclosure.

A related point — this is I think more standard — we would of course ask that the government to not speak to its witness while the cross is pending.

THE COURT: Yes. I assume there's no objection with respect to that.

MR. FANG: Certainly. The government doesn't object to not speaking with Mr. Miller while he is on cross-examination.

But I just want to be clear in response to what Mr. Fick said: These exhibits, as we understand, are not ones that are solely being used for cross or for impeachment. These are exhibits that we understand the defendants are affirmatively seeking to introduce into evidence. And, again, there's nothing improper about the government doing so with respect to an exhibit that the defense has no objection to as to admissibility.

MR. FICK: Again, we've predisclosed exhibits we may introduce, if we have a case, and may use on cross; and as a courtesy to speed things up, we've actually identified the specific cross where we think it's likely we would use it. Again, it's, I suggest, not proper for the government to then preprepare its witness to deal with those documents.

MR. FANG: Your Honor, if I could just respond

briefly: The situation is the same or similar to us giving our direct exhibits 48 hours in advance, as well. There is no requirement that we do so. We're agreeing to do so as a courtesy, and we're doing it to make sure that the trial goes smoothly. And that's the point of these earlier disclosures on both sides.

MR. FICK: I don't want to belabor the point. But direct and cross are different. The government has a burden; we don't. We don't have to put on a case. I think any predisclosure of cross material is extraordinary, and so if that's going to be, in our view, misused by the government, then we're going to be in a position where we can't do that.

THE COURT: I don't know that I can compel them, right, to disclose these exhibits earlier. So are you all willing to agree, other than -- I think to the extent you can already anticipate that certain -- I guess that's why this is a little bit difficult, because there may be some exhibits that they could anticipate you are going to use with a witness, and it would be unfair for them not to be able to show that to a witness in advance.

So there's a little bit of a difficult line here, Mr. Fick.

MR. FICK: Your Honor, I think the correlation between stuff we just gave them, 3500 material, during the break, they're talking about it today, and then out it pops during the

direct at the very end, I mean, it puts us in a very difficult position and sort of undermines potentially what we intended to do with the cross.

MR. FANG: I don't know what difficult position Mr. Fick is referring to. He is still able -- or the defendants are both still able to cross Mr. Miller with respect to that document. It's already in evidence.

THE COURT: My concern, though, to Mr. Fick's point, is, I don't know that I can compel them, if they're going to not abide by the document exchange, whether I'm permitted to compel them to do it in any event.

MR. FANG: Your Honor, I think while that may be true, I think the effect of that would be more delays, because we would then need additional time to review what are potentially very lengthy documents, to make sure that we don't have any objections, to properly evaluate them.

THE COURT: It's not clear to me how I would police this, in any event, because I do think -- to the extent they happen to have already shown some of these exhibits to witnesses, I see no problem with that. Right, Mr. Fick?

MR. FICK: If it's an affirmative defense exhibit that's been disclosed, sure. It's just a little bit of -- you know, it comes to a finer point, though, when we say the night before, okay, here's what we're going to use potentially on cross affirmatively tomorrow, to the best of what we can

conjecture now based on what we've seen of the direct and what we think is going to happen — of course we might have a few — to then have targeted discussion with the witness of those things like moments before the direct testimony, and then have documents recently produced suddenly used in the direct, that's just -- it causes us some consternation.

Look, having the government itself — having the lawyers — have access and review things, fine — then they'll know what we're dealing with on cross — but it crosses a line for them to then in the last moments start trying to use that with their witnesses. It's sort of two different things.

THE COURT: You all should confer with respect to this and see if you can reach an agreement, and we'll talk about it tomorrow.

MS. KUDLA: Your Honor, we'll confer with the defense to reach an agreement, so that way, it's out of the Court's hands.

THE COURT: Thank you.

MR. FICK: Just to be clear, I do trust, at least, the principle about talking while the cross is pending isn't acceptable?

THE COURT: Yes, the government has already confirmed that.

MR. FANG: And, your Honor, with respect to the documents, I'm happy to address that now as well with the

Court.

THE COURT: Yes, with respect to Mr. Miller?

MR. FANG: Yes, your Honor.

So the defense and the government have conferred, and we would propose taking it up with the Court tomorrow morning. We understand that the defendants intend to provide a narrower list of such documents sometime tonight. So our expectation is that there will be a narrower scope of a dispute for the Court.

THE COURT: It would be helpful if I could get have some sense of what those disputes are tonight so that I'm prepared to rule in the morning.

Is that possible, for you all to get letters in tonight and a sense of what these narrowed disputes are?

MR. FANG: I think from our perspective, it depends on when defendants are able to provide some sort of a smaller subset. Based on my discussions with Mr. Looby, I understand that they are endeavoring to do so by 8:00 p.m.

THE COURT: All right.

Mr. Looby?

MR. LOOBY: Yes. And we will endeavor to get the list to them by that point.

I'm a little bit concerned about letter motion practice after that, with other preparation that needs to get done, but if that's the Court's preference then, we'll --

THE COURT: I don't want to be going past 10:00 a.m.

tomorrow morning to deal with these objections and then I don't have time to sort of think about them before ruling and we're taking up a bunch of time in the morning when we could be hearing testimony. So that is my concern.

But why don't you all do what you can to confer with respect to these, to the narrowed list of exhibits that are in dispute. To the extent you all, even if it's very early tomorrow morning, can submit something that outlines what the disputes are, to give me a chance to review it, and we can discuss it at 9:30 tomorrow.

MR. LOOBY: Thank you, your Honor.

MR. FANG: That works for the government. Thank you, your Honor.

THE COURT: All right.

Go ahead, Mr. Fang.

MR. FANG: Your Honor, I'm sorry, one additional point: Just for the Court's planning purposes, based on my discussions with defense counsel, we understand that the cross for Mr. Miller will likely conclude sometime in the afternoon sessions.

THE COURT: And so that Mr. Chen will be up after that?

MR. FANG: It's conceivable that he may start testifying tomorrow.

THE COURT: All right.

MR. FANG: We don't know.

MS. KUDLA: Your Honor, if I may --

THE COURT: You may.

MS. KUDLA: -- it would just be helpful for everyone's planning purposes to start getting some clarity on tomorrow's schedule.

Mr. Chen certainly will be the next witness. I think we would inquire from defense counsel how much longer they anticipate on cross-examination so we can prepare redirect and know kind of where we're leading into for next week, if we could get some sense on that.

THE COURT: Mr. Looby?

MR. LOOBY: Yes. And Mr. Fang and I conferred, and I gave my best estimate, which is that I think it is possible that, with cross and redirect, that that will take the majority of the day tomorrow, but I think that Mr. Chen could likely testify or begin testifying in the afternoon. That was my best guess. And then I represented that we would, after conferring, update the Court, update the government, with our best estimate.

MS. KUDLA: So with that in mind, your Honor, to provide some predictability to the Court as to where we are in anticipated schedule, if Mr. Chen takes the stand tomorrow but late afternoon, I think we will certainly exchange exhibits with defense counsel tonight, so, that way, those evidentiary

issues could come up. It would be helpful -- I think the point that we raised this morning was regarding *mens rea* as to the questions regarding legality specifically. It seems like that might be one where it would be helpful if we have some clarity before he begins his direct as to that portion, but it might come later in the direct, so that could be Monday.

And then I would say, in terms of the pace of trial right now, we're slightly behind schedule but not too much; so I'd say we anticipated Mr. Chen probably taking the stand tomorrow morning, so running about maybe a half day behind. But we wanted to keep the Court updated in terms of that.

THE COURT: Thank you.

And then with respect to the summary exhibit issue, do you have a sense of when that is likely to come up?

MS. KUDLA: That would be early next week. But I think in terms of a ruling from the Court, in light of the fact that we would be preparing these witnesses over the weekend as well and it would be dependent on the Court's ruling to the extent that any type of ruling might be coming before the weekend, it might be helpful with respect to the summary charts.

THE COURT: All right.

MS. KUDLA: And then on the list of items to file tonight, we have the 615, the Rule 615 motion. And I think that that is it, unless I'm missing something.

THE COURT: And whenever you can with respect to the narrowed exhibits with respect to Mr. Miller?

MS. KUDLA: Correct. And then the other item that the government will be filing, as your Honor requested, the scheme to defraud language and instructions by the 16th — you were looking for the government's proposed language for that section — we'll anticipate filing that later tonight as well.

THE COURT: Thank you.

Mr. Marx?

MR. MARX: Your Honor, I just wanted to let the Court know that after Mr. Looby is done, I do intend to cross Mr. Miller. I expect it will be much briefer than both the direct and the primary cross. And Mr. Looby and I are working together to try to minimize any overlap, but an hour or less probably. But I just wanted to make sure that was on the Court's mind.

THE COURT: Understood. Thank you.

MR. MARX: Thank you.

THE COURT: Anything else for us to discuss now?

MR. FANG: No, your Honor.

THE COURT: From the defense?

MR. LOOBY: No.

THE COURT: All right. I will see you all tomorrow.

(Adjourned to October 17, 2025, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

ROBERT MILLER

Direct By Mr. Fang . . . . . . . . . . . . . . . 237

Cross By Mr. Looby . . . . . . . . . . . . . . . 335

GOVERNMENT EXHIBITS

Exhibit No. Received

5002 . . . . . . . . . . . . . . . . . . . . 255

S-704 . . . . . . . . . . . . . . . . . . . . 274

S-704, 5001-A through Y, 5002-A through . . . 275
C, 5003-A through R, 5004-A
through H, 5005-A through Q,
5006-A through Q, 5007-A
through Q, 5008-A through H,
5009-A through H, 5010-A
through D, 5011-A through H,
5012-AA through BD, 5013-A
through H, 5014-AA through AD,
5014-AF through DC, and 5015-A
through H

3306 . . . . . . . . . . . . . . . . . . . . 286

S-708 . . . . . . . . . . . . . . . . . . . . 287

3301 . . . . . . . . . . . . . . . . . . . . 301

3307 . . . . . . . . . . . . . . . . . . . . 316

S-714 . . . . . . . . . . . . . . . . . . . . 319

3010 . . . . . . . . . . . . . . . . . . . . 324

DEFENDANT EXHIBITS

Exhibit No. Received

5002 . . . . . . . . . . . . . . . . . . . . 249

1024 . . . . . . . . . . . . . . . . . . . . 331