UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 293 (JGLC)

ANTON PERAIRE-BUENO,
JAMES PERAIRE-BUENO,

Defendants. Trial

------------------------------x

New York, N.Y.
October 17, 2025
9:50 a.m.

Before:

HON. JESSICA G. L. CLARKE,

District Judge
-and a jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DANIELLE M. KUDLA
JERRY J. FANG
BENJAMIN LEVANDER
RYAN NEES
Assistant United States Attorneys

FICK & MARX LLP
Attorneys for Defendant Anton Peraire-Bueno
WILLIAM FICK
DANIEL N. MARX

APPEARANCES (continued)

WILLIAMS & CONNOLLY LLP
Attorneys for Defendant James Peraire-Bueno
KATHERINE A. TREFZ
PATRICK LOOBY
IKENNA UGBOAJA
JOSEPH M. BAYERL
-and-
SHAPIRO ARATO BACH LLP
JONATHAN BACH

Also Present: Helena Kerest, Paralegal Specialist (USAO)
David Naguib, Paralegal Specialist (USAO)

(Trial resumed; jury not present)

THE COURT: Good morning. We have many issues to take up that I was hoping to take up before we bring the jury out. I'm going to issue a few just bottom-line rulings on some of the pending matters, then we will get to the discussion with respect to the disputed exhibits for Mr. Miller's cross-examination.

So with respect to Travis Chen, yesterday I overruled the defense's objection to Mr. Chen testifying about his present views about the legality or wrongfulness of the conduct at issue. But I am also rejecting the government's limitation that he should not be permitted to say that he did not think the conduct was criminal or illegal initially.

First, it is relevant to the money laundering charge, as explained by Ms. Trefz. And nothing prevents the government from explaining that Mr. Chen believed this because that's what defendants told him. I see no reason why the government would need to explore advice of counsel, which is not going to be referenced here by either side. That's the ruling with respect to Mr. Chen.

With respect to the summary charts, the summary charts at GX 506 and 507 are admissible as summary exhibits under Rule 1006.

With respect to experts in the courtroom, Mr. Madura is permitted to be present for parts of Mr. Chen's testimony

about the code.

All right. Let's now move to the exhibits at issue for cross-examination with respect to Mr. Miller.

Mr. Looby, do you have a sense of which exhibits might be coming up soon? I know we have a tech issue that we are trying to resolve before we bring the jury out. But if you have a sense of the ones that are likely to be coming up quickly, we could at least discuss those now, try and get the tech issue resolved, and bring the jury out so they are not spending all of their time in the jury room this morning.

MR. LOOBY: Yes.

Your Honor, I believe the first bullet on our letter is the category that will probably be before the break.

THE COURT: All right. So those are DX 304, 321-A, 328, and 309; is that correct?

MR. LOOBY: Correct, your Honor.

THE COURT: I read your response first, so why don't I hear from the government with their opposition to what the defense explained.

MR. FANG: Certainly, your Honor.

So there's a difference between what defense is regarding as admissibility for notice purposes and what the government has argued as introducing certain government exhibits for their probative value as to what the defendants knew or understood about Flashbots and MEV-Boost.

And in particular, the Court had admitted these certain government exhibits regarding the operation and design of MEV-Boost precisely because there was a foundation to believe that the defendants had actually seen these documents; namely, that these were documents that the defendants had themselves either saved in their electronic accounts or circulated on Slack. So that is --

THE COURT: But the defense's argument is that these documents contradict the testimony of Mr. Miller. So they're not for the truth, but for the purpose of contradicting what he testified to. Could they be admissible for that purpose?

MR. FANG: Theoretically, they could. But there's no contrary testimony by Mr. Miller that they've identified. So it appears to be two topics that they want to use these documents to impeach Mr. Miller.

The first is on transaction bundles not being secure beyond a slashing penalty. Mr. Miller, I don't believe, has testified to that on direct yet. So there's no basis to say that these documents are admissible for impeachment purposes because there's no contrary testimony to that.

THE COURT: All right. So if he testifies to that on cross, you are free to use this exhibit to contradict him; correct? Well, let me actually ask that of Mr. Fang first.

There's nothing improper about them doing that; correct?

MR. FANG: That's correct, your Honor.

THE COURT: All right.

MR. FANG: And as to Mr. Miller's testimony on the ethnicity of bundles, Mr. Miller has simply explained how the Builder API works; how ETH send bundle, which is the function that searchers use to submit bundles to builders, work as well under MEV-Boost.

There's nothing inconsistent with respect to the exhibits that the defendants are seeking to offer in that first bullet point, and I don't believe they've articulated any.

THE COURT: My understanding of their second argument is that it is relevant -- the effect on listener part is with respect to MEV-Boost users. What's your response to that?

MR. FANG: Well, MEV-Boost users generally -- I agree that, you know, documents that are made publicly may have effects on the public and users generally. But the defendants haven't articulated why a general user's understanding or knowledge of MEV-Boost is relevant to the issues in this case, which deal with the --

THE COURT: Doesn't that go to materiality?

MR. FANG: So, your Honor, it could potentially go to materiality. But there's no foundation for the fact that the defendants themselves have actually seen these documents. And what the defendants are trying to use these documents for is a proxy; essentially trying to use what other users may have

understood about MEV-Boost as a proxy for what they understood. And they are trying to say that, Oh, well, if a document is out there in the public and if a general user must have understood X about MEV-Boost, that means that the defendants must have understood the same.

THE COURT: Or a reasonable person. The flip side to that is a reasonable person on using the MEV-Boost system. I'm not articulating that in the correct way. But, essentially, the reasonable-person standard that is relevant to materiality, not just the defendants, but, here, what a reasonable person would believe is material in this system.

MR. FANG: I think that's fair, your Honor. Although I don't know that -- assuming that the defendants will be able to lay a foundation for Mr. Miller to testify as to what users generally would have understood.

THE COURT: I'll let Mr. Looby respond to that point.

MR. LOOBY: So that wouldn't be the foundation that we would be laying with Mr. Miller for these. And there are aspects of which these documents which are -- none of which are being admitted for the truth of the matter asserted, so these are just pure nonhearsay purposes.

There are aspects of the documents that contradict aspects of Mr. Miller's direct examination about the way that sandwich bundles essential go into the system and can never be unbundled.

But there are also aspects of these documents that we believe are consistent with some of the testimony that we elicited on cross yesterday, and that we expect Mr. Miller to further agree with today, about the fact that the validators can always propose a second block; and that this feature of the system, which Mr. Miller will establish through live testimony as true, these documents show that that fact was broadcast to the users through the MEV-Boost website.

And so these documents are not being used to prove that fact; they are being used to show that the fact that Mr. Miller is going to acknowledge on cross-examination was, in fact, disseminated by Flashbots. And the reason that matters is because, as your Honor observed, the materiality standard is an objective one. And how this system works and what risks there are for unbundling and how the slashing penalty does or doesn't disincentivize and protect those trades, that all goes to whether or not this alleged conduct was deceptive.

As of last night we have tripled the number of alleged misrepresentations that are at issue in this case; and they seem to cover, you know, the gamut of the whole MEV-Boost process. And so the public representations by MEV-Boost about how this works on a notice theory and a nonhearsay theory are admissible for the purposes of elucidating the materiality element. And, again, this is not -- when we objected to the government's use of it, it was to establish the way that the

system worked through the documents themselves.

But now we have Mr. Miller who has testified how it works. And if he agrees — and he has agreed in substance to this, like, known design constraint in the system, that the slashing penalty, which is one ETH, is essentially the security limit of the MEV-Boost system, the fact that that is something that Flashbots was openly telling people is certainly very crucial evidence of people's understanding of how this system could have worked and how their trades would have been handled in that. So we think it's like absolutely, you know, rock-bottom critical evidence of materiality in this case.

THE COURT: All right.

Go ahead, Mr. Fang.

MR. FANG: Your Honor, briefly on the last point.

Mr. Miller has not essentially agreed in substance that the one-ETH slashing penalty is essentially the security limit of the MEV-Boost system. What he said on direct is that validators can be slashed. One reason they can be slashed is for proposing two blocks, and the slashing penalty is one ETH, and approximately what the ballpark of what one ETH was. He never said anything about the extent to which that slashing penalty was sufficient or not, or how it related to economic incentives.

THE COURT: All right. If he agrees with you on -- with respect to your question on this, then there's no reason

to use the document to contradict him, which I assume you won't do. If he disagrees with you, you can contradict him using the document. So we will proceed in that way with respect to any documents that have -- that contradict any testimony he either gave on direct or will give on cross-examination. And with respect to documents that show MEV-Boost users' understanding, I agree that that is for a nonhearsay purpose and is admissible.

MR. LOOBY: Thank you, your Honor.

THE COURT: Anything else for us to take up now with respect to the documents likely to come up on cross-examination? I know there are many more, but anything we urgently need to take up now, Mr. Fang?

MR. FANG: Yes, your Honor, just briefly to put on the record the parties' agreement as to the procedure for refreshing and impeaching. And this is relevant to the tech issue.

The parties have agreed that as to documents that are -- or, rather, audio clips, the defendants will seek to refresh Mr. Miller's recollection first with the transcript; and, in the alternative, as a second line, they can ask Mr. Miller to put on headphones and listen to the audio and see if that refreshes his recollection.

Again, if that doesn't refresh his recollection, then that process stops. And if he denies, they can impeach only

with -- by playing the audio, only the statement that is contradictory to Mr. Miller's testimony.

THE COURT: All right. Thank you.

Did you all reach agreement with respect to the exchange of exhibits?

MS. KUDLA: We did, your Honor. So we've reached an agreement with respect to that. And the agreement is that the government has agreed that we will not show these exhibits to witnesses prior to them testifying. Defense is good with that. And then all other procedures remain in place as stated by the Court.

THE COURT: Excellent. Thank you.

All right. Why don't we -- we're going to try and deal with this tech issue now. So I believe Ms. Tran has told the jurors to sit tight for a little bit longer. So we'll take our break so we can try and deal with this tech issue, and then we'll bring them out as soon as that's resolved. All right?

(Recess)

THE COURT: Ms. Tran is going to bring out the jury.

(Jury present)

THE COURT: Good morning to you all. I hope you had a nice evening. And thank you all again for being here on time again today. And apologies for the slight delay; we had a little tech issue, but it's been resolved.

Thank you all. We appreciate it.

Moving forward with testimony.

Mr. Looby. And, Mr. Miller, you can step down to the witness stand.

ROBERT MILLER,

called as a witness by the Government,

having been previously duly sworn, testified as follows:

CROSS-EXAMINATION (continued)

BY MR. LOOBY:

Q. Good morning, Mr. Miller.
A. Good morning.
Q. You testified on direct examination that the relay accepts blocks from block builders, and it makes sure that those blocks are correct, and makes sure that they are profitable; is that accurate?
A. Generally.
Q. The Flashbots MEV-Boost relay does that; correct?
A. Correct.
Q. But not all relays do that; correct?
A. That is the job of a relay. At times relays will have bugs, and there are relays that have different features than the MEV-Boost relay does.
Q. And is one of those features called optimistic relaying, Mr. Miller?
A. Yes, that is one of those features.
Q. And this term refers to the process by which relays forward

blocks from the builder to the validator without first checking that the block is valid; is that correct?
A. You're getting right to it, Mr. Looby.
Yes, that is correct.
Q. And this approach is optimistic because it is based on the hope that the block is valid; correct?
A. What do you mean by "hope" in this context? Because optimistic relaying is a little nuanced.
Q. And we can jump right into the nuance.
In order for a builder to use an optimistic relay, the builder has to stake some ETH; correct?
A. That is my understanding of the feature of optimistic relaying, yes, or one part of that feature.
Q. And the optimistic relaying in that sense relies on economic incentives because the builder will be penalized if they send a bad block; correct?
A. That is correct. That's how that feature works in my understanding.
Q. And so if the builder sends an invalid block body to the relay, the relay can financially penalize the builder if the validator later uses that block; correct?
A. Yes, that's the idea behind the feature. They may also be penalized even if the validator doesn't use the block. I forget.
Q. Okay. And a relay that is programmed to operate

optimistically, it can accept blocks from the builder later in the proposing time slot; correct?
A. Yes.
Q. And those blocks later in the time slot, they are more likely to have higher MEV in them; correct?
A. Correct.
Q. And, thus, they have a higher chance of making it on the chain through the MEV-Boost system; correct?
A. I would agree with that.
Q. So it's in the builder's interest to connect with the relay who is engaging in optimistic relaying?
A. If you are confident in your ability to produce good blocks, yes.
Q. And I'm picking up in that answer that there is a chance that the block that the optimistic relay ultimately sends to the validator is invalid for some reason; correct?
A. Correct.
Q. And there have been times where invalid blocks have made it through the MEV-Boost system because the optimistic relay wasn't checking if they were valid; correct?
A. Correct.
Q. Mr. Miller, the Ultrasound Relay engages in optimistic relaying; correct?
A. Yes, that is correct.
Q. And because of the way optimistic relaying works, as we

just discussed, there was no guarantee that the Ultrasound Relay had simulated and verified that the block that it optimistically relayed to the Peraire-Buenos' validator was valid; correct?
A. That implicitly is making the assumption that the block was optimistically relayed, and I don't know if it was or not.
Q. But because the Ultrasound Relay has the optimistic relaying feature, there is a possibility that that feature was utilized with the block at issue in this case; correct?
A. There's a possibility that the block header that the relay gave the validator in question was using the optimistic relaying feature.
Q. And if that is the case, then the Ultrasound Relay would not have checked to see if the block was valid before sending it along to the Peraire-Buenos' validator; correct?
A. In what part of the process are you talking about? Because there's multiple points where they give blocks to the proposer.
Q. I am talking about before the relay sends the blinded block header to the validator.
A. Yes, there's the possibility that the relay did not check whether or not the block was correct if the builder in question was using optimistic relaying.
Q. Mr. Miller, yesterday you discussed on direct examination that a validator can ask a relay for the most profitable block header; correct?

A. Yes.
Q. And the validator does this by calling the get header end point on the Builder API; correct?
A. Yes.
Q. And the get header end point, that is public; correct?
A. Yes.
Q. So that means that anybody can call a relay's get header end point, and the relay will return a block header; correct?
A. That is correct.
Q. And there are situations in which a user who is not a validator might call a relay's get header end point; correct?
A. That is correct.
Q. For example, a builder might want to know what is the most competitive block in that moment; correct?
A. Correct.
Q. And one relay may call this end point to see if its blocks are competitive with another relay's blocks; correct?
A. Correct. I don't know if people were doing that in April of 2023; but, in general, I would agree.
Q. And when a user calls the get header end point, the user is simply collecting information; correct?
MR. FANG: Objection. Speculation.
THE COURT: Overruled. You may answer.
A. The question is when a user calls get header, they are simply collecting information?

Q. Correct.
A. That's the question?
Well, it depends. I'm not sure what the user is calling it for, but they are just getting information from the relay. I can't really speak to what the user is doing.
Q. And to be clear, when the user calls the get header end point, the relay doesn't know who is requesting the block header; correct?
A. Relays have started to develop capabilities to figure out who is requesting the block header. As an example, the validator may have registered with a certain IP address. And then you can check for the IP address of who's getting the header, so you could identify the validator that way. But I don't know when this practice started.
Q. So you don't know if that practice was in place in April of 2023?
A. I don't know.
Q. Now, Mr. Miller, on direct you talked about the digital signature that the validator uses in its interactions with the relay; correct?
A. Generally, yeah.
Q. And the relay cryptographically validates that the signature belongs to the correct validator; correct?
A. Yes, that's my understanding.
Q. The relay is making sure that the proposer is the correct

proposer for the slot; correct?
A. Yes.
Q. So, in other words, the relay is checking that the signature is for the right validator for the given slot who signed the block; correct?
A. Yes.
Q. And prior to April 3rd, 2023, once the relay verified that the signature was from the correct validator, it would then send the block with the full body to that validator; correct?
A. Yes.
Q. And the Peraire-Buenos' validator signature correctly identified their validator; correct?
A. Yes.
MR. FANG: Objection. Speculation.
THE COURT: Overruled. You may answer.
THE WITNESS: Thank you.
A. Yes.
Q. We know this because the relay released the block to the validator; correct?
A. That was a finding in the postmortem, yeah.
Q. And that would not have happened if the Peraire-Buenos' validator's signature had been invalid; correct?
MR. FANG: Objection. Form.
THE COURT: Overruled.
A. If their signature was not from the right validator, it

wouldn't have happened.
Q. Now, the fact that the Peraire-Buenos' signature correctly identified their validator made it possible for their validator to later be slashed; correct?
A. Let me think about the technical details one second.
I think so, yeah.
Q. And that's because the fact of the signature is on the public blockchain identifying who the validator was who signed that blinded block; correct?
A. Repeat the question for me one time.
Q. Yes. So --
A. Complicated question, right.
Q. I know it's a complicated question.
The fact that the Peraire-Buenos' signature correctly identified them, their validator made it possible to be slashed because that signature was publicly viewable on the blockchain; correct?
A. If you want to be very precise, I don't know that that's strictly true. Because the signature was not on chain before they got slashed, if you see what I mean. The signature was off chain. And you needed to take those, input it into the chain in order to slash them. And I think a very precise reading of your question, the answer would be no.
Q. But the signature was public even if it wasn't on the chain; correct?

A. Public in what sense? Like, I'm not sure that the first header that the validator gave was public.
Q. The way I --
A. The second one certainly was.
Q. So the Peraire-Buenos' validator was later slashed; correct?
A. Yes.
Q. And in order to accomplish that slashing, the validator who later proposed the block that included the slashing needed to include the signature of the Peraire-Buenos' validator; correct?
MR. FANG: Objection. Speculation.
THE COURT: Overruled.
A. Both signatures, yes.
Q. Correct.
Including the signature on the block that was ultimately not published to the blockchain; correct?
A. To be precise, the block header. Not too difficult, just trying to be precise. I'm sorry.
Q. I appreciate it.
Now, there is a field on the block header called fee recipient; correct?
A. I think so, yeah.
Q. And are you generally familiar with the function of that field?

A. Yes, I would say so.
Q. And that field is typically populated with the address of a wallet to receive validator fees; correct?
A. Correct.
Q. And those fees are the ones that the validator earns for proposing a block; correct?
A. Correct. There's some nuance with the block builder sometimes, so just setting that -- or putting a flag to that. But, generally, yes, I think this is correct.
Q. And is the nuance that the block builder gets paid first and then essentially reimburses the validator?
A. Yes. Sometimes the block builder will set the fee address to equal their own wallet, and then pay the validator's fee address in a separate transaction. That's the nuance.
Q. In your investigation into the April 2nd, 2023 event, you observed that this field was not populated with a valid wallet address to receive the fees; correct?
A. I don't remember.
Q. Mr. Miller, you have -- as we discussed yesterday, you have met with government attorneys over the past year or so on several occasion; correct?
A. Correct.
Q. And the first meeting of which occurred in 2023; correct?
A. Seems directionally correct, but I don't remember specific dates.

Q. And isn't it true that you told the government attorneys fee recipient :0x00000 and so on, also highly unusual because that is not a valid wallet address to receive fees. Is that true that you said that?
A. Don't remember exacts.
Q. Would it help you to look at a document to refresh your recollection as to whether you said that in the meeting with the government attorneys?
A. Sure.
MR. LOOBY: Joe, if you could please pull up for the witness, counsel, and Court only DX 3506-001.
Q. And, Mr. Miller, before you get started reading, this also would be in the smaller binder of the two, in case that is your preferred way of reviewing this. I think it's a multi-page document. And you are welcome to read the whole thing or we can direct you to the relevant portion.
A. Remind me the number of the exhibit.
Q. Yes. No problem. That is DX 3506-001.
A. Okay. I will take a second to read these notes.
Q. And just so you know where we're going, the relevant portion is at page 9.
A. Thank you.
(Pause)
A. Okay.
Q. All right. If you could please put the notebook away.

Mr. Miller, did reviewing that document refresh your recollection that you told the --

MR. LOOBY: Joe, can you pull it up on mine.

MR. FANG: And, your Honor, the government objects to any question that would read from a document that's not in evidence.

THE COURT: Correct. Rephrase your question.

Q. Does it refresh your recollection that you talked about the fee recipient field in the block header with the government during that meeting?

A. I had many meetings with the government. I don't remember exactly what I talked about at exactly what meeting. It makes sense to me that it might have come up.

Q. And sitting here today, do you remember that as part of your investigation, you observed that the fee recipient field was set to zeros?

A. I have a loose recollection that it's a part of the postmortem. I don't specifically remember this portion of the investigation.

Q. And if the fee recipient field is set to a string of zeros, the validator would not get paid any rewards or fees for proposing that block; correct?

A. That is correct.

Q. Now, Mr. Miller, MEV-Boost relies on certain trust assumptions between users; correct?

A. Yes.
Q. And Flashbots has publicized online the way in which these trust assumptions work; correct?
A. Probably, yeah.
Q. In 2022, Flashbots conducted a security audit of the MEV-Boost system; correct?
A. We had someone else conduct the security audit, but there was a security audit performed on MEV-Boost; correct.
Q. And this audit was done in advance of the event called The Merge that we discussed yesterday?
A. That seems likely to me, yeah.
Q. And the results of that audit were released to the community; correct?
A. Correct.
MR. LOOBY: Joe, if you could please pull up DX 304 for the witness, counsel, and the Court only.
Q. Mr. Miller, do you recognize this as the security audit for the MEV-Boost system?
A. It's been a while since I've looked at this, but I do. Generally, it looks like it.
MR. LOOBY: We move to admit DX 304.
THE COURT: Any objection?
MR. FANG: Yes, your Honor. Objection on hearsay purposes. And may we have a sidebar?
THE COURT: You may.

(At sidebar)

THE COURT: Isn't this the document I just ruled own?

MR. FANG: Yes, your Honor. We wanted to re-raise the issue with the Court because we do believe that this line of documents is not properly admitted for -- even for materiality purposes.

With respect to materiality — and we took a look back before the jury came out at the Court's instructions. The Court's instructions on materiality are materiality to a reasonable person. A reasonable person doesn't necessarily mean any MEV-Boost user. And, in any event, it is unclear how documents that Flashbots is generally making public are -- go to what a reasonable person would have understood. It's simply documents that Flashbots is putting out there generally. There's no indication as to how a reasonable person would have interpreted those specific documents. And Mr. Miller certainly is -- he can't speak to how a reasonable person who's seen this document would have interpreted that document.

So we would renew our objection to this entire line of exhibits coming in on the basis that it's hearsay. There's no hearsay exception here, and there is no nonhearsay purpose solely for notice. I think that would essentially transform every fraud case into a case where literally any random person could testify as to, like, how they viewed a particular document.

And so we think the disconnect here — just to put a finer point on it — is between, A, what Flashbots is putting out there; and, B, what someone would have interpreted that document to mean.

THE COURT: All right.

MR. LOOBY: So this document is a publicly available document that describes the way different trust assumptions work in the system that would have informed a reasonable person who was exposed to this information, and would have been aware of that. And this reasonable person would have -- it's not just a reasonable person dropped from the moon, it's a reasonable person in the circumstance of in the situation that the alleged victims would be. That's the stand-in. It's not their subjective materiality, it's an objective materiality. But it's a person generally who is using MEV-Boost. And these documents are publicly available to inform people of the functionality of that.

Now, we are not seeking to admit the document to show that this is the functionality; it is for the fact that this is how Flashbots described it. And Mr. Miller is going to confirm in live testimony today that that is, in fact, how it worked.

And so if the Court wanted to give an instruction that the document itself was being admitted for notice purposes, that would be fine. Because we expect that Mr. Miller is going to agree with every question that we ask him.

THE COURT: And notice to who?

MR. LOOBY: It is notice to a reasonable person who is a user of an MEV-Boost.

And so the materiality of the alleged scheme, including all of the alleged misrepresentations, turns on what people understood about how this system worked. That's why Mr. Miller is here, and that's why the government called him to testify, to explain to the jury how the system works so that they could argue that our actions were fraudulent.

But this information is important information that was publicly available that would be -- bear on what people understood how this system was to work and which risks were disclosed and which weren't. And this is all information that goes direct to the materiality element. And this is a nonhearsay purpose. And, yeah, I just think this is a classic nonhearsay purpose. Thank you.

MR. FANG: Your Honor, Mr. Looby said "reasonable user of MEV-Boost." And that distinction is what we're drawing here.

THE COURT: I understand. I recall -- and I know there was some dispute with respect to it, but my proposed instructions, if I'm recalling correctly, did have some limitations with respect to who a reasonable person was in this circumstance. It was taken from the -- gosh.

MR. FANG: Eisenberg.

THE COURT: Eisenberg. Thank you. There was some objection with respect to that. But I recall -- it wasn't just any general reasonable person; it was a reasonable person, you know --

MS. KUDLA: Within the MEV-Boost system.

THE COURT: Within the MEV-Boost system.

MR. LOOBY: I just want to add, your Honor, that this particular document amongst the set was also one that was sent amongst the defendants in the same Slack chat as the other Flashbot documents that have been admitted for defendants' notice. So it's also admissible -- conditionally admissible for notice to the particular defendants as well; although that is not the only basis on which it moves, but that would be an independent ground as well.

MR. FANG: Your Honor, can I respond to that?

THE COURT: Well, I'm focused on the reasonable -- notice to a reasonable person part.

MS. KUDLA: Reasonable within the MEV-Boost system.

THE COURT: And I'll give a limiting instruction --

MS. KUDLA: Instruction to that effect.

And then I think what it is is opening the door also in the RTCs to an instruction regarding disclaimers and the effect of disclaimers do not negate fraud.

So I think that is where we are going with these -- with this line of inquiry here. What we will be heading

towards is that it has to be a reasonable person within the MEV-Boost system, because that's what is at issue here.

And then with effect, it is now opening the door on these boilerplate disclaimers for a request to charge that disclaimers do not negate fraud.

MR. LOOBY: That's a conversation for another day.

THE COURT: All right.

MR. FANG: Your Honor, could I just respond to the point that Mr. Looby raised on conditional admissibility?

THE COURT: I'm not going to admit it for that purpose. I'm going to admit it with respect to notice to a reasonable user of the MEV-Boost system -- or reasonable person using the MEV-Boost system. Is that --

MS. KUDLA: But my understanding, Mr. Looby, is you're only moving to admit the document if he denies it on the stand or --

MR. LOOBY: No.

MS. KUDLA: Okay.

THE COURT: No, it's just admissible for that limited purpose. You're going to move to admit. You can still make your objection to preserve it. I will give the limiting instruction.

MR. LOOBY: Thank you, your Honor.

MR. FANG: Thank you.

(Continued on next page)

(In open court)

MR. LOOBY: The defense moves to admit DX 304.

MR. FANG: We have the same objection, your Honor.

THE COURT: Thank you. The objection is overruled.

(Defendant's Exhibit 304 received in evidence)

THE COURT: The evidence that you are about to see is being admitted for a limited purpose. You must consider this evidence only for that limited purpose and no other. This document is not being admitted for the truth of what is stated in the document. And you may not consider it as evidence of what is stated in the document, but, instead, for the limited purpose of what effect this document and what notice it gives to a reasonable person using the MEV-Boost system.

Mr. Looby, you may proceed.

MR. LOOBY: Thank you.

And, Joe, if you could go down to the section of trust assumptions.

May we please publish it to the jury?

THE COURT: You may.

BY MR. LOOBY:

Q. Mr. Miller, do you see the heading "Trust Assumptions"?

A. I do see that heading.

Q. And the first sentence is: Proof of stake Ethereum roadmap presents a trustless proposer/builder separation protocol.

Correct?

A. Yes, I see that.
Q. And then it says: In the meantime, the current system will depend on trust assumptions of different actors. Correct?
A. Of the different actors, yes.
Q. And then there is a list of what the various users will assume, do you see that?
A. There's a list of a bunch of assumptions, yeah.
Q. Let's discuss some of those assumptions.
Under the MEV-Boost system, the validators have to trust the relays; correct?
A. Yes.
Q. The validators have to trust that relays will ultimately release the block to them; correct?
A. Correct.
Q. Validators have to trust that the relays will accurately state the value of the block to the validator; correct?
A. Yes, that's correct.
Q. Now, builders. The builders also have to trust the relays; correct?
A. Yes.
Q. For example, the builder trusts the relay to correctly inform the validator as to the potential payment for proposing that builder's block; correct?
A. Yes. But you're not reading off this, are you, or am I missing this?

Q. Not directly. Those are the categories.
A. Okay.
Q. And the builder is also trusting the relay not to reorder the transactions on the block; correct?
A. That is correct.
Q. Now, this list here, it doesn't include searchers; correct?
A. Sorry. I'm reading for references of searchers.
No, I don't see any reference to searchers.
Q. But searchers also have trust assumptions here that we've talked about yesterday, isn't that right?
A. Searchers have trust assumptions in the MEV-Boost system. But as we just established, they are not listed here.
Q. And so without reference to the document, searchers have to trust builders; correct?
A. Correct.
Q. The builder, in theory, could censor the searcher's transactions; correct?
A. In theory, yeah.
Q. And just at a high level, that means the builder could reject the searcher's transactions, correct?
A. Yes.
Q. And the builder also could unbundle bundles of transactions sent to it from the searcher; correct?
A. It's theoretically possible.
Q. It is the long-term economic incentives that typically keep

the builder from doing that; correct?
A. I would agree with that.
Q. Now, looking at this trust assumptions list here, it doesn't say that the relays trust the validator; correct?
A. It says relays assume validators will send periodically registration information. Arguable whether that's an assumption of trust or not.
Q. But you would agree that, as a general matter, relays do not trust validators with the contents of the block; correct?
A. In the MEV-Boost system, relays are not trusting validators with the contents of the block, yes. The relay has the contents of the block, the block body.
Q. And the builders don't have any trust assumptions with respect to the validators; correct?
A. Let me think about that for one second.
I think that is arguable, actually. I'm not sure that's correct.
Q. Looking at this trust assumptions document, there is no disclosed trust assumption that the builder has with respect to the validator; correct?
A. There's nothing on this document, that's correct.
Q. This document says that the builders will assume that the relays will not share their blocks with any other relayers and builders; correct?
A. Builders will assume relayers will not share their blocks

with other relayers or builders, I do see that, yes.
Q. And the builders assume that the relayers will verify the validator's commit to a specific blockhash; correct?
A. Yes. Correct.
Q. And the process that you described on direct examination by which the contents of the block, so the transactions in the block are not revealed to the validator until the validator signs the blinded block header, that process is necessary because nobody trusts the validator with that information; correct?
MR. FANG: Objection. Form.
THE COURT: Overruled.
A. That is one of the ideas behind the system, yes. Or it's necessary so to minimize trust, I think would be maybe how I would phrase it.
Q. Because the validator would be motivated to unbundle the transactions; correct?
MR. FANG: Objection. Speculation.
THE COURT: Rephrase your question.
Q. Mr. Miller, you are generally familiar with the economic incentives at issue in the MEV-Boost system; correct?
A. I would say so.
Q. And the validator, if it could see the order of transactions on the block, it could be motivated to reorder them; correct?

A. Yes.
Q. Now, you testified yesterday about the concept of an honest validator; correct?
A. Correct.
Q. And you were asked about what does an honest MEV-Boost validator mean; correct?
A. I think so, yeah.
Q. And you answered that it is a validator that signs one block or proposes one block and does it within the time window that's allocated. Is that accurate?
A. You have the transcript, not me. So I believe that I started that answer by giving the general kind of definition of what an honest validator was, and that's a specific instance of how you might deviate from -- sorry, that's a specific instance of honest behavior. That's my recollection.
Q. Yes. And that is essentially the applied definition in the context that we're talking about; correct?
A. Correct.
Q. Okay. And you were asked: What do you understand it to mean for an MEV-Boost validator to act dishonestly? Do you remember that?
A. Yes.
Q. And your answer included the following: That would mean a validator that is not taking the expected or intended behavior according to the specification. So specifically here proposing

two blocks in a slot.

Do you agree with that definition?

A. Are you asking if I said it or if I agree with the definition?

Q. Do you recall giving that answer yesterday?

A. Yes.

Q. Okay. Now, that definition of honesty, that's different than how that term might be used in everyday life; correct?

MR. FANG: Objection.

THE COURT: Ground.

MR. FANG: Form. Speculation.

THE COURT: Overruled.

A. Here, honesty is a term of art within the distributed systems setting. It is not honesty in the moral sense, but honesty as in is this actor doing what we might expect within a distributed system, according to how the mechanisms of the distributed system are set up to enable parties to work together. So I think that is the nuance that you're drawing.

Q. Yes. Thank you, Mr. Miller.

And you testified on direct about your role in designing MEV-Boost; correct?

A. I think so, yeah.

Q. At a high level, that's what you testified about.

A. Yup.

Q. And when designing a product like MEV-Boost --

MR. LOOBY: Joe, you can take this down. Thank you.
Q. When designing a product like MEV-Boost, you have to assume that self-motivated users in an adversarial environment like Ethereum will act rationally and not honestly, as you have defined the term; correct?
A. As a general principle, that is the setting in which we're creating products.
Q. And so, in other words, you can't assume that users will interact with a piece of technology only in the way the technology's creators intended; correct?
MR. FANG: Objection. Form.
THE COURT: Overruled.
A. Correct.
Q. In the Ethereum context, this fact requires a design principle called being MEV aware; correct?
A. Correct.
Q. And that means that designers have to take into account the MEV incentives that the protocol design creates; correct?
A. I would generally agree with that.
Q. And when designing the product, you would assume that people will try to capture the MEV if they can?
A. Generally, yes, I would agree with that.
Q. And it is important for you to build your product with that assumption in mind; correct?
A. I would agree with that, too.

Q. Mr. Miller, on direct examination, you mentioned the term "commit reveal scheme." Do you recall?
A. Yeah, I do.
Q. And that concept relates to the field of cryptoeconomics; is that right?
A. It's definitely used in cryptoeconomics, that is right.
Q. Now, cryptoeconomic solutions are a way for a decentralized system to use economic incentives to influence user behavior; correct?
A. In cryptography, yes, that's the crypto part of cryptoeconomic.
Q. Thank you, Mr. Miller.
And slashing penalties under the Ethereum protocol are a form of cryptoeconomic consequences; correct?
A. Yes, that is correct.
Q. And the MEV-Boost system relies in part on cryptoeconomic incentives; correct?
A. In part, yes.
Q. And one of the reasons why cryptoeconomics is challenging in the MEV ecosystem is because the distribution of the typical MEV awards in a block is very uneven, would you agree with that?
A. I would agree with that.
Q. Okay. And what that means is that the average value of a block going through the MEV-Boost system is somewhere between

.1 and .2 ETH; correct?
A. What time frame are you talking about?
Q. I believe that you testified -- well, so the relevant time period would be 2023 for this question. But I will rephrase the question for you, which is: The average value of a block going through the MEV-Boost system is generally a fraction of an ETH; is that correct?
A. Some fraction of an ETH. It varies by time.
Q. But there are a small number of blocks that have MEV that is worth much more; correct?
A. Yes, that is correct.
Q. And in those exceptional cases, there are incentives to deviate from the intended use; correct?
MR. FANG: Objection. Speculation.
THE COURT: Overruled.
A. As a matter of principles, things get more complicated when the numbers get really high, that's for sure.
Q. In fact, cryptoeconomics breaks down at these limits; correct?
MR. FANG: Objection. Speculation.
THE COURT: Overruled.
A. What do you mean by "breaks down" and what do you mean by "limits"?
Q. So the economic incentives in cryptoeconomics may be insufficient at these -- in these exceptional cases; correct?

MR. FANG: Objection. Foundation. Lack of personal knowledge.

THE COURT: Rephrase the question.

Q. Mr. Miller, you have stated publicly that it's very difficult, again, to reason about what happens at these limits. We think it's kind of inherent and cryptoeconomics can break down at these limits too; correct?

MR. FANG: Objection to reading from a document that's not in evidence.

THE COURT: Sustained.

Q. Mr. Miller, would you agree that cryptoeconomics can break down at these limits?

A. As a matter of general principle, yes.

(Continued on next page)

BY MR. LOOBY:
Q. Now, rather than assume anything about validator behavior, the MEV-Boost system sought to harness the economic incentives of the Ethereum protocol, correct?
A. Rather than assume anything about the validator's behavior, the MEV-Boost system sought to harness the economic incentives of the protocol; was that the question?
Q. Spot on, Mr. Miller.
A. Thank you.
I believe that the goal was to try to minimize trust. I don't know that we ever thought that we could completely get away with having no trust assumptions on the validator.
Q. The MEV-Boost system relies, in part, on the Ethereum slashing penalty that we discussed earlier, correct?
A. In part, yes.
Q. As we discussed, the validator has to provide a valid signature to the relay to see the contents of the block in the MEV-Boost system, correct?
A. Yes, that is true.
Q. And the relay will send that signed block out to other nodes in the network, correct?
A. Yes.
Q. So, if the validator wants to propose its own block for the same slot, it will have signed two blocks, correct?
A. You're specifically talking about the context where a

validator has already signed a header that has given it to -- given to the validator by the relay, right?
Q. That's right, that's the premise.
A. And then you're saying the validator could sign another header; that is the question?
Q. Yes.
A. Yes, the validator could sign another header, that's true.
Q. And in that circumstance, the validator will have, in effect, signed two blocks for one slot, correct?
A. Yes, that is correct.
Q. And the validator will get slashed for doing that?
A. Yes.
Q. But, as we discussed yesterday, there is no limitation on a validator's ability to equivocate to sign two blocks for a given slot at least once in that slot, correct?
A. Yes, there is no limit to the validator's ability to equivocate at least once. So they could sign two headers for a slot.
Q. And this fact, that the validator could always sign two blocks, it was publicly disclosed on Flashbots documents that were made available online, correct?
A. I don't exactly remember. It seems probable to me.

MR. LOOBY: Joe, if you could please pull up DX 321A for the witness, counsel, and the Court only.

THE WITNESS: Is this the small or the large binder?

BY MR. LOOBY:
Q. This is the large binder. And it's 321A, and it will be towards the front.
A. Okay.
(Pause)
A. Okay. Is there a part of this you want to talk about?
Q. First, I'm going to ask you a question, Mr. Miller, which is: Do you recognize this as a document that was made available on the Flashbots website?
A. Yes.
MR. LOOBY: Move to admit DX 321A.
THE COURT: Mr. Fang?
MR. FANG: Objection on hearsay grounds.
THE COURT: It's overruled.
It is admitted, and this document is also being admitted for a limited purpose. It is not admitted for the truth of what is stated in the document, but, instead, for notice to a reasonable person using the MEV-Boost system.
(Defendants' Exhibit 321A received in evidence)
MR. LOOBY: May we publish, your Honor?
THE COURT: You may.
BY MR. LOOBY:
Q. Now, the title of this document is "MEV-Boost In A Nutshell."
Do you see that?

A. I do see that, yeah.

MR. LOOBY: Joe, if you could please direct the witness' attention to page 5.

Q. Or, Mr. Miller, you can follow along in your binder.

A. Okay.

Q. There is a section for frequently asked questions.

Do you see that?

A. Yes.

Q. And one of the frequently asked questions is: I am a solo validator. Will I be able to run MEV-Boost?

Do you see that?

A. I do see that.

Q. The answer is to that question is yes, correct?

A. The answer is yes.

Q. And the answer elaborates that the most significant change for MEV in Ethereum's proof of stake is that with MEV-Boost, now validators can be permissionless.

Do you see that?

I don't think we have the right clip up.

A. You do not.

Q. But we will get there.

A. Yes, I see that.

Q. It goes on to say -- to describe the relay role, essentially; would you agree?

A. Yes, I would agree.

Q. Towards the bottom of that clip, which we might have to extend a little bit, there is the sentence that reads: Once the validator signs the header, the relay sends the block payload to the proposer. If at this moment the validator decides to propose a different block, they will have signed two blocks and will be slashed.
Do you see that, Mr. Miller?
A. I do see that, yeah.
Q. So this document, it revealed that the validator could decide to propose a different block, even after receiving and signing the block from the relay, correct?
A. I agree that's implicit in this document, yep.
MR. LOOBY: Joe, you can take that down.
And, Joe, if you could please pull back up DX 304, which is admitted in evidence.
And with the Court's permission, we would republish to the jury?
THE COURT: You may.
BY MR. LOOBY:
Q. Mr. Miller, this is the security audit that we were talking about before, correct?
A. Yes.
Q. If I could direct your attention to the Appendix A on page 4 of the document.
A. One second?

(Pause)

A. Okay.

Q. And Appendix A is proposing some improvements to the draft specification for MEV-Boost, correct?

A. It says that it is -- it's listing considerations for further refinement and improvements, yes.

Q. So, in other words, ways that the software could be improved before the merge, correct?

A. I don't know if this is in the context of before the merge, but in general, yes.

Q. If you want to just go back to the first page of the document, and there's a date on the top.

A. Yes.

Q. And that date is June 20, 2022?

A. Yes.

Q. So that's a few months before the merge, correct?

A. That is a few months before the merge. My caveat was that I don't know that the implication was that these things should be handled before the merge as opposed to generally. There's been no contention that the document was before the merge.

Does that nuance make sense?

Q. Fair.

To go back down to the Appendix A, specification improvements, it is noting that the audit was of the MEV-Boost software, correct?

A. Yes, that's correct.
Q. I know I've asked this before, but the MEV-Boost software, that is the piece of software that validators can use to interact with relays, correct?
A. Yes.
Q. And that is different than the MEV-Boost Relay code, correct?
A. Yes, that is true.
Q. And, here, it is saying that although the audit was of the MEV-Boost software, there were some security considerations that were discovered for either the builder or the relay software.
Do you see that?
A. Yes.
Q. I want to talk about the first one, which is called relayer assigned beacon block validation.
Do you see that?
A. I do see that.
Q. And the first sentence there is that, to be slashed, a validator would need to sign two competing blocks for the block of the slot they are in charge of producing, correct?
A. Correct, that's what it says.
Q. It's a mouthful.
And the second sentence proposes a change to the specification to make sure that the relay is checking the

correct slot and proposer index.

Do you see that?

A. Yes.

Q. And these are the fields that are needed to identify the validator to be slashed, correct?

A. I'm not sure what strictly is necessary to identify the validator to be slashed, actually.

Q. Was the relay code changed to check these values?

A. I don't know off the top of my head.

MR. LOOBY: Joe, you can take this one down.

And, Joe, if you could please pull up, for the witness, Court, and counsel only, DX 309.

Q. Mr. Miller, can you let me know once you have reviewed the document.

A. Yes, I will read it now.

(Pause)

A. Okay.

Q. Mr. Miller, do you recognize this as a page on the Flashbots website concerning MEV-Boost?

A. It is our docs, yes.

MR. LOOBY: Move to admit DX 309.

MR. FANG: Objection; hearsay.

THE COURT: Overruled. Again, this document is being admitted not for the truth of what is stated in the document, but for notice to a reasonable person using the MEV-Boost

system.

(Defendants' Exhibit 309 received in evidence)

MR. LOOBY: May we publish, your Honor?

THE COURT: You may.

BY MR. LOOBY:

Q. And, Mr. Miller, specifically, this is a FAQ section of the Flashbots docs, correct?

A. It looks like it, yeah.

Q. I want to draw your attention to the question midway down of what prevents block proposers from stealing MEV from submitted builders' blocks.

Do you see that?

A. I do see that.

Q. The answer to that question is slashing penalties, period, correct?

A. Well, there's a lot more that comes after that, too, but that's the first two words, yeah.

Q. And the answer goes on to say that once a proposer signs a block with a header, they are bound by this choice or risk being slashed due to equivocation, correct?

A. That is what the document says.

Q. Okay. And the document also says that, should a validator wish to steal MEV from a builder, they would need to sign a second block, including the exploited MEV, which would result in a slashing penalty.

Is that the correct reading?
A. That is what it says, yes.
Q. And this captures the same concept that we had discussed in the other document, correct?
A. Which document? I'm sorry.
Q. The MEV-Boost in a nutshell document that we reviewed about two documents ago.
A. Yes. I believe so.
Q. Now, the answer goes on to say that this penalty is significant enough to discourage this behavior, allowing the builder to reveal the blinded transactions without the possibility of the proposer tampering with them or stealing MEV.
Do you see that?
A. I do see that.
Q. But that's not always the case, correct?
A. It is -- well, I think it's always the case that they're "discouraged," being the operative word here, but the proposer may not be discouraged enough.
MR. LOOBY: Your Honor, now might be a time for the morning break.
THE COURT: That sounds good.
All right. It is 11:20. Please be back and ready to go in the jury room at 11:35. My prior instructions apply. Do not discuss this case with anyone. Do not do any research on

this case. Do not read anything about this case. And remember to keep an open mind.

I'll see you all in 15 minutes.

(Continued on next page)

(Jury not present)

THE COURT: Mr. Miller, you may step down.

THE WITNESS: Thank you.

(Witness temporarily excused)

THE COURT: Mr. Looby, are there additional exhibits that you anticipate coming up next that are at issue?

MR. LOOBY: Yes, your Honor.

THE COURT: And what are those exhibits?

MR. LOOBY: It's the 329 documents, with the --

THE COURT: 229?

MR. LOOBY: 229, yes.

THE COURT: All right. I'll actually hear again from the government first.

Mr. Fang?

MR. FANG: Thank you, your Honor.

THE COURT: Let's start with 229A and B.

MR. FANG: Yes, your Honor.

So, 229A and B are internal private Flashbots Slack messages. 229A concerns the initial investigation of this April 2, 2023 exploit, and 229B concerns communication strategy for the April 2nd, 2023 exploit.

As to 229 -- well, first of all, these are all hearsay documents. The defendants are not on these internal Flashbots messages, and so, by definition, they can't be admissible for their effects on the defendants.

To the extent that these documents — and, in particular, 229A — reflect the views or opinions of other individuals other than Mr. Miller, their personal views aren't relevant here. And it's not even clear that Mr. Miller has the ability or foundation to be able to testify as to what other people meant when they sent certain messages.

THE COURT: I couldn't find — and perhaps this is a question for Mr. Looby — to the extent it contradicts his specific testimony that this was a significant issue for Flashbots, are there particular statements in there from Mr. Miller, in particular?

MR. LOOBY: So, that would not be -- there are in some of them. That's not 229A or B. So, the relevance of 229A is, first, to establish the facts of when the investigation began and when the patch was fixed. The relevance of that is that it was a relatively quick fix, which would undermine the impression that was left by Mr. Miller's testimony that the exploit, the alleged exploit, was -- you know, the severity of it or the novelty of it or other implications.

And relating to that point, as well, is on page 4 of 229A, a Flashbots employee, in responding to -- they're communicating in realtime about kind of trying to figure out what happened, so this is all their present-sense impression, so that's one of the nonhearsay purposes. But the relevance is that this employee, Hasu, notes that the actions here exposed a

known design constraint in MEV-Boost that MEV is only secure up to the limit of the slashing limit.

THE COURT: Mr. Fang, can you respond to on the present-sense impression?

MR. FANG: Yes, your Honor.

These are present-sense impressions, but the present-sense impression only gets over the hearsay bar. It doesn't mean that what the people are saying is relevant whatsoever. And I would just note that -- and, sorry -- to the extent that the messages reflect realtime reactions to things, certainly that is necessarily some present-sense impression, but it's not a present-sense impression of necessarily --

THE COURT: Of the events.

MR. FANG: -- of the events that were actually happening. These are all sort of *post hoc* opinions as to what individual people may have thought happened as they were reasoning through it, but, again, as to the Hasu issue — and Hasu is a Flashbots employee, he's on this internal Flashbots communication — the defendants can't use Mr. Miller to introduce Hasu's hearsay statements. Those are out-of-court statements. If they wanted to call Hasu, they could have called him and asked him his view as to the exploit, and then he would be subject to cross-examination by the government. But the defendants chose not to do that. They can't now seek to use Mr. Miller to smuggle in a raft of hearsay statements,

that he can't explain the meaning of.

So, I think that addresses the Hasu point.

With respect --

THE COURT: I'll just state that I agree with you with respect to that, and that document, to the extent that was the purpose of it, is inadmissible for the reasons stated by Mr. Fang.

MR. FANG: And, your Honor, with respect to the, quote-unquote, severity or when the investigation started, there's no inconsistency with Mr. Miller's testimony. What Mr. Miller had said is that he oversaw the investigation writ large. He didn't say that he oversaw the investigation from the beginning or that he was the one who coded the patch, or anything like that.

The reason I mention that is, I think what defense is trying to get at is, there's a string of messages that Mr. Miller was not a part of — this is DX 229A — and this was before Mr. Miller woke up. And Mr. Miller had testified on direct, actually, that he woke up, he saw a whole bunch of messages from a bunch of different people at Flashbots, and then he got involved with the investigation. There's nothing to impeach him on because there's no inconsistency with DX 229A.

And if the defendants want to cross-examine Mr. Miller as to whether he was involved from the very beginning and he

denies it, sure, they can introduce that to impeach him, but he's not going to testify to that, and he hasn't testified to that on direct either.

With respect --

MR. LOOBY: Your Honor, may I just respond on this document?

THE COURT: Yes.

MR. LOOBY: I believe counsel has conceded that these are present-sense impressions. The overall document, also, is very likely a business record, and that would be a foundation that we believe Mr. Miller --

THE COURT: Their communications are a business record?

MR. LOOBY: Correct. That the Slack channels are a way in which records are maintained. Flashbots, they're used in the normal course of business. They're important to communicate events accurately in realtime. All of the 803(6) factors, we believe, would be satisfied. And, so, if those two hearsay hurdles are cleared, then the only question is 401. And this is a chat about the investigation, which is the subject of Mr. Miller's testimony. And in various respects, these chats either contradict or inform some of the testimony in ways that we would explore with Mr. Miller. It's not impeachment, it's not do you agree with this or not, although he may disagree with it, in which case the fact that he has a

disagreement with the way his colleagues in realtime noted their present-sense impression of what was happening. And the relevant event, really, is the investigation because that is the conduit through which Mr. Miller's testimony was framed.

MR. FANG: Your Honor, in response to the present-sense impression point, to clarify, the event is the actual exploit.

THE COURT: I think you, at first, said that it was a present-sense impression, but then it sounded like you were changing your mind, and I was agreeing with you with respect to that.

MR. FANG: Yes.

THE COURT: Because, right, the event is the exploit, and they're not giving their present-sense impression of the exploit because --

MR. FANG: Correct.

THE COURT: -- that happened in the past, correct?

MR. FANG: That's correct, that's correct.

With respect to the business records exception, these text messages are also not business records. The content that they're discussing is not routine, it's not admissible. It's a single one-off event. And defendants' view of the business records exception would essentially turn any email, any document, any communication into business records just because they discuss things that may relate to a company's business.

That's not what a business record is. So, for those reasons, the rest of DX 229A and B should also not come in.

THE COURT: I'm not seeing a basis, Mr. Looby, here.

So that's 229A and B.

229C?

MR. LOOBY: Yes.

THE COURT: Mr. Looby, what's the relevance of this document?

MR. LOOBY: So, this document is showing -- so the portion of this chat -- so they're all subsets of the same chat, which is the Flashbots internal chat, in which they are updating each other in realtime about what they're learning about the event.

And this chat features a comment from the head of policy for the company about how to shape the news coverage of the exploit and emphasizing that it should not be characterized as a flaw in Flashbots, and trying to distance themselves from the fallout from the flaw in the system design that they essentially designed. And this testimony, it contradicts or impeaches -- or this document impeaches Mr. Miller's view that there was an exploit or a bug in the code vulnerability. This shows that people at the company in realtime understood that there were design flaws with the system, and that they were seeking to distance themselves by putting out public relation statements saying that this is not a Flashbots problem,

essentially.

That would not be admitted for the truth of the matter. It would be admitted to show that Mr. Miller's point of view wasn't shared amongst everybody in the company, and that is important impeachment evidence for the jury to contextualize that.

D and E are admissible for a separate reason, which is, they show that Mr. Miller, at one point, said that he didn't think that the issue was anything to be extremely stressed about. And that, of course, directly contradicts the testimony that he gave that it was a very stressful and harrowing experience.

And E is similar. That is the view expressed -- similar view expressed by Hasu, who's another important employee of Flashbots, that receives multiple kind of thumbs-up votes.

THE COURT: Did Mr. Miller thumbs-up the statement?

MR. LOOBY: The document does not reveal that. And he may say on the stand that he disagrees. The point --

THE COURT: But are there statements by Mr. Miller in the document saying he personally didn't view the exploit as very serious and nothing to be stressed out about?

MR. LOOBY: 229D contains that statement from Mr. Miller. 229E is the statement, a similar statement, from Hasu. The point would still remain that if Mr. Miller was

to -- and, again, we'll see how this comes in, but if he were to -- if he is going to continue to frame it as it was a very serious event, the fact that other employees at Flashbots expressed their view that was contrary to his, without which one being true — they're neither for the truth — it's just that this was a unanimous view of the seriousness of the events within the Flashbots team.

THE COURT: Thank you.

Mr. Fang?

MR. FANG: Your Honor, just for starters, the defendants can't use another witness' statement to impeach Mr. Miller's statement. The rules of evidence are clear that a witness can only be impeached by their own prior inconsistent statement. So to the extent that other individuals had their personal views or their personal opinions as to the severity or the communication strategy — which, by the way, Mr. Miller wasn't involved in and never said he was involved in — they're entitled to call those people. Those witnesses are available to the defendants, as well. They chose not to. They could have elicited that testimony. And those witnesses could have been subject to cross-examination by the government.

But, again, the defendants can't use Mr. Miller to smuggle in a bunch of different statements by other people, out-of-court statements, that the defendants may find to be helpful to their case, under the guise of saying that it's

impeachment. It's plainly improper, and the Court should not permit it.

THE COURT: I agree with you.

So that applies to DX 229E, as I understand it.

But 229D, to the extent there is a contradiction between what he said on direct, which I agree that is what the testimony was, to the extent that there's a statement by Mr. Miller that contradicts what he stated on the stand, you can use that for impeachment.

MR. LOOBY: Thank you, your Honor.

MR. FANG: If counsel is able to direct the government to any such statement in 229D, we're happy to take a look, but based on our review of 229D and Mr. Miller's testimony, there's no inconsistency that would allow --

THE COURT: All right. We will take a very short break at some point here, so why don't you all confer with respect to that at that point.

On 229C, I don't see the relevance here. It seems far afield of what is at issue here. The Flashbots, how they're trying to spin the issue, whether it's a bug in the system or a design flaw, is not an issue that is relevant here. So I am going to exclude DX 229C.

You all will confer with respect to DX 229D.

229E is out.

And 229A and B are also out.

MR. LOOBY: And, your Honor, this will be very brief, but it's kind of on the same point, so I think it makes sense to address it now.

THE COURT: Yes.

MR. LOOBY: Which is DX 1101. So, this is an internal chat of Mr. Miller, Samczsun, and Justin Drake, and those are the three individuals that received the Low Carb Crusader email, and they are reacting in realtime to how to respond to the proposal in that email regarding the labeling of the event. And Mr. Miller testified on direct that he found the entire encounter vaguely threatening, and this chat shows Justin Drake, Samczsun, and Mr. Miller joking, using emojis and other types of things that would undermine that characterization.

THE COURT: I also found it difficult to find anything directly contradictory in that email, although, I admit, I didn't have a ton of time to review it. So to the extent -- you all should confer with respect to that, as well. Again, the same principles apply — to the extent Mr. Miller states anything that contradicts his prior testimony, you can use it; to the extent we're talking about other people making statements that contradict his testimony, that's not inbounds.

All right?

MR. LOOBY: Thank you, your Honor.

THE COURT: We'll take a short break. Thank you.

COUNSEL: Thank you, your Honor.

(Recess)

THE COURT: Please be seated.

Ms. Tran is going to bring out the jury.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Thank you, all. That break took a little longer than expected, but I appreciate your patience.

Do we have Mr. Miller?

Please step down, Mr. Miller.

Mr. Looby, you may proceed.

BY MR. LOOBY:

Q. Mr. Miller, on Wednesday, on direct examination, you testified about the programming interface that enabled searchers to submit bundles to miners, correct?

A. Yes.

Q. And that interface is called eth_sendBundle, correct?

A. Yes, eth, underscore, sendBundle.

MR. LOOBY: And, Joe, if you could please bring up Government Exhibit 3002A, which is in evidence.

And with the Court's permission, publish it for the jury?

THE COURT: You may.

BY MR. LOOBY:

Q. All right, Mr. Miller. I would like to direct your attention to page 2 of the document.

A. Can you bring it up on the screen? I don't have it. Or you can tell me which binder it is in. I can do that, too.

Q. Yes. I think it will be -- it should be on the screen now.

A. Yes, it's on the screen now.
Q. On direct examination, you explained that eth_sendBundle is an interface that Flashbots developed so that searchers can submit bundles to miners, correct?
A. Correct.
Q. And there is -- what is being shown on the document now is line 9 of the specification, correct?
A. Correct.
Q. And that line reads: Send a bundle of transactions to the miner. The bundle has to be executed at the beginning of the block (before any other transactions), with bundled transactions executed exactly in the same order as provided in the bundle.
Do you see that sentence?
A. Yes, I see that.
Q. Now, Mr. Fang had asked you about this particular sentence on direct examination, correct?
A. I think so. There's been a lot of questions. But I remember talking about the document.
Q. Fair.
Now, this specification describes the interface as it existed back in the pre-merge Ethereum, before MEV-Boost existed, correct?
A. Yes, this is pre-merge specification before MEV-Boost.
Q. Now, post-merge, there are no miners in the system,

correct?
A. Post-merge, there are no miners in the system.
Q. But you testified on direct that the core features of eth_sendBundle still applied in 2023, correct?
A. Yes.
Q. But the difference is that in 2023, eth_sendBundle was an interface for interactions between the searcher and the builder, correct?
A. Yes. Here, this is talking about sending bundles to miners, and in 2023, searchers sent bundles to block builders.
Q. In 2023, a builder is different from a validator, correct?
A. Yes, that is correct.
Q. So, when a searcher is using this eth_sendBundle interface, it is telling the builder what order it wants the certain transactions to be executed in, correct?
A. Broadly, yeah.
Q. Now, when a validator receives the execution payload from the relay, the validator can't be certain what the bundle boundaries are between transactions in a block, correct?
A. What do you mean by "bundle boundaries" here?
Q. I mean that when the validator receives the execution payload from the relay, the validator can't be certain which transactions were in a bundle submitted by the searcher, correct?
A. The payload or the payload header?

Q. The payload.
A. The validator cannot be certain which transactions were in a bundle from a searcher, that is true, yes.
Q. Now, Mr. Miller, you have explained that your role at Flashbots is as a steward, correct?
A. It's one of the titles that I have. I also lead the product and engineering team. I'm a board member.
Q. Part of your role is to advocate for Flashbots and its products?
A. I would say so.
Q. And another part of your role is to get to know sophisticated users, like searchers who are running MEV bots, correct?
A. Yes, that is correct.
Q. In fact, that's how you originally came to know James and Anton, correct?
A. Yeah.
Q. Now, Twitter, or X, as it's now called, is a social media website that is popular with cryptocurrency users, correct?
A. That is correct.
Q. And as part of your role as steward at Flashbots, do you use Twitter to engage with the public about Flashbots products?
A. Yes, either in my role as a steward or the person leading the project and engineering team — I'm not sure it matters — but I do use Twitter quite a bit.

Q. And you use your Twitter account to discuss interesting MEV strategies that you learn about, correct?
A. Yes, from time to time.
Q. You often post the details about types of strategies that different searchers use, correct?
A. Yes, I've been known to do that.
Q. Do you recall yesterday that we discussed sandwich bots and sandwich attacks?
A. We were discussing that yesterday.
Q. And would you say that based on your experience as a Flashbots steward, engaging with users on Twitter, that people like to see sandwichers getting beaten at their own game?
MR. FANG: Objection; foundation, personal knowledge, speculation. And the Court's prior ruling, as well.
THE COURT: Sustained based on my prior ruling.
BY MR. LOOBY:
Q. Now, Mr. Miller, I'd like to flash forward to the period of after April 3rd, 2023.
The events of April 3rd, 2023, it made you spot a bunch of different problems with the MEV-Boost Relay code, correct?
A. Yes, and Ethereum, as well.
Q. But you and your team didn't find all of them, correct?
A. Some of them were found by other teams we were working with, correct.

Q. And, in fact, the Peraire-Buenos disclosed a further one to you, correct?
A. That is correct.
Q. And you testified on direct examination about an email you received in April 2023 from an account called Low Carb Crusader, correct?
A. Yep, we were talking about that.
MR. LOOBY: And, Joe, if you could please pull up GX 3306, which is already in evidence.
And with the Court's permission, publish it to the jury?
THE COURT: You may publish.
BY MR. LOOBY:
Q. And starting with the email on the top, which is the earliest one in the chain here, Low Carb Crusader reaches out to you and says: I have a message about block equivocation I think you would find useful.
Do you see that?
A. I do see that.
Q. And then later that day, Low Carb Crusader wrote to you again, correct?
A. Perhaps you could go down in the email chain so I can be sure and we can just read.
(Pause)
Q. And after you've read through it, I'll ask you some

questions.
A. I'm sorry, I wasn't reading through it yet.
Q. And the relevant portion is on your screen, as well, if that's easier for you, but you are welcome to use the binder, as always.
A. Cheers. Thank you.
(Pause)
A. Okay. I have reread this message.
Q. And Low Carb wrote to you that it was sad -- it has saddened me to see the situation reported as a relay exploit, correct?
A. That's the first sentence, yes.
Q. And then Low Carb offered to disclose details of a second version of the strategy that was still possible, even after your previous modifications to the code, correct?
A. That is correct.
Q. And he asked that you refer to him using a more neutral name, like Low Carb Crusader, instead of something like Sandwich The Ripper, correct?
A. That is correct.
Q. And at the time, you thought that this request was interesting, correct?
A. I certainly thought it was interesting.
Q. And you thought this request was funny?
A. There is a sense of absurdity to it, is how I would

characterize it.
Q. Now, you respond on April 22nd asking if the strategy Low Carb had in mind was already covered by some other blog post. And I will have Joe help guide us to that portion.
Mr. Miller, do you see there that you are asking Low Carb Crusader whether or not the strategy is covered by a particular blog post that you are linking to in the email?
A. Yes.
Q. And Low Carb Crusader said that, you know, if you had already thought -- I'll wait until it pulls up. And Low Carb Crusader responds: This strategy is not covered in the blog post or any other writings I have seen.
Do you see that?
A. Yes, I do see that.
Q. And he says that if you find that this strategy does not work, then no further action is necessary, correct?
A. That is what the email says.
Q. And he says that he's disclosing it as a goodwill gesture, and only asking for the transparency requested in the previous email in return, correct?
A. That is the final sentence, yes.
Q. And you accepted Low Carb Crusader's proposal, correct?
A. I did accept it in the next email.
Q. In the further email in which Low Carb Crusader responds to you, he disclosed a -- or Low Carb disclosed a rather detailed

explanation of the strategy, correct?
A. If you say so, yes.
Q. And you determined that that strategy would have allowed the validator to do something similar to what happened on April 2nd?
A. I worked with some other people, and that was our determination, yes.
Q. And that strategy, if successful, could have made the validator a lot of money, potentially?
MR. FANG: Objection; speculation.
THE COURT: Overruled.
THE WITNESS: There is some nuance to that.
BY MR. LOOBY:
Q. If the strategy had been successful, the validator would have been able to extract MEV, correct?
A. Correct.
Q. Now, after your exchange with Low Carb Crusader, you wrote a further post that was published online, disclosing the strategy that Low Carb Crusader had shared with you, correct?
A. That is correct.
MR. LOOBY: Joe, if you could please pull up GX 3301, which is in evidence.
And with the Court's permission, publish to the jury?
THE COURT: You may publish.

BY MR. LOOBY:
Q. Mr. Miller, if I could direct your attention the first paragraph.
A. Sure.
Q. And in this paragraph, you are disclosing the way in which Low Carb Crusader's request and disclosure had come about, correct?
A. Let me read it.
Q. Take your time.
(Pause)
A. Okay. You want to repeat the question, if you don't mind?
Q. Yes.
So, in this first paragraph, you are disclosing the circumstances under which Low Carb Crusader had requested the change in the terminology for how they would be described, correct?
A. I agree with that, yeah.
Q. And you note that Low Carb Crusader, in return, disclosed details of a unique block equivocation strategy, correct?
A. Yes, that is in there.
Q. And, to your knowledge, that strategy was never used, correct?
A. That was what the disclosure found, yes.
Q. And Flashbots ultimately issued a patch to prevent this strategy, correct?

A. Yes. There's a mitigation section below that we can read, if that is of interest.
Q. I don't think we need to get into the details.
But, just generally, there was a mitigation procedure to fix the code, correct?
A. That's what I remember, yeah.
Q. On direct, you said that you thought what Low Carb Crusader did on April 2nd, 2023, was an exploit, correct?
A. That's how it's described in the postmortem.
Q. But the reaction in the Ethereum community was mixed, correct?
MR. FANG: Objection.
THE COURT: Sustained.
BY MR. LOOBY:
Q. Other sophisticated cryptocurrency users, they thought that Low Carb Crusader was a hero?
MR. FANG: Objection.
THE COURT: Sustained.
MR. LOOBY: Thank you, your Honor. No further questions for James Peraire-Bueno.
THE COURT: Thank you.
Mr. Marx?
MR. MARX: Thank you, your Honor.

CROSS-EXAMINATION
BY MR. MARX:
Q. Good morning, Mr. Miller.
A. Good morning -- Mr. Marx?
Q. Yes.
And we've never met before; is that right?
A. Not to my knowledge, no.
Q. Not to mine either. Well, thank you for coming back for a third day.
I want to take you back all the way to the beginning of your testimony with the video that you were shown early on in your direct examination.
Do you remember that?
A. I do remember being shown a video, yeah.
Q. And did you make that video?
A. I did not make the video.
Q. Do you know who did?
A. The government.
Q. And when Mr. Fang showed you the government's video, after he was done, he asked you whether it accurately described how MEV-Boost was designed to function as of April 2nd, 2023.
Do you remember that?
A. As a part of direct testimony or in general?
Q. Correct -- as part of your testimony, he asked you the question whether it accurately depicted how MEV-Boost was

supposed to operate as of April 2nd, 2023?
A. I've been asked a lot of questions that sounds about right, but I don't remember the specific wording and all of that.
Q. And I'm not really focusing on the specific wording, just that he asked you to vouch for its accuracy, and you answered, at a high level, yeah, it seemed accurate?
Is that --
A. It seems right, yeah.
Q. I want to come down from that high level for a second and talk to you about some of the details in that video and see what you have to say about them.
MR. MARX: Joe, could we pull up Government Exhibit 502, and we're going to do 502-13.
This is already in evidence, your Honor. May we publish it?
THE COURT: You may.
MR. MARX: Thank you.
BY MR. MARX:
Q. So starting at the beginning, Mr. Miller, this is an image of what's supposed to be the mempool; is that right?
A. That's what it looks like to me.
Q. Okay. And sometimes that's called the public memory pool; is that right?
A. You can call it that, yeah.
(Continued on next page)

BY MR. MARX:
Q. And in this image, as you understand it, for each blue dot in the mempool, there's a user of the Ethereum Network who has signed and submitted a transaction into the mempool; is that right?
A. They may not all be unique users, but I understood them to be transactions in the mempool, yeah.
Q. That some user may have put one in or may have put many in, but a user for each of these dots has signed and submitted these transactions into the mempool; is that right?
A. That was the inference that I made, yes.
Q. And after a user — just take one particular dot as an example. After a user has signed and submitted a transaction into the mempool, that transaction can't be changed, right?
A. There's a way that you can cancel transactions. I don't know if that nuance is what you are referring to.
Q. No. You can play with the nonce, is that what you're thinking?
A. To cancel a transaction, you don't play with the nonce.
Q. Okay. So there's a way to essentially put in another transaction to try to replace the one you already submitted, is that kind of a fair high-level summary?
A. Yes, those are some details.
Q. And the details, trust me, are not relevant to my questions. I'm just asking, the initial transaction that's

signed and submitted into the mempool, that initial transaction, even if it can somehow be canceled, can't be altered in any way by the user who signed it; is that right?
A. That sounds right to me, yeah. Once you provided a signature for a transaction, you can't modify/take back that signature, etc.
Q. And at this point in the video, and just staying with one dot as an example, the transaction hasn't yet been added to the blockchains; is that right?
A. No, it's in the public kind of waiting room that we call the mempool is my inference.
Q. Thank you. You anticipated my next question, which was that you called this sort of a version of a waiting room for transactions that have not yet landed on chain, is that fair?
A. That's how I've been referring to it, yeah.
Q. Okay. Thank you.
MR. MARX: Joe, could we now go to 5:02:24, please.
This is 24 seconds into the video.
Q. Now, in this next moment in the government's video, here, do you understand this to be representing that a searcher has taken one of these transactions out of the mempool and is now going to do something with it?
A. That was what I understood this to be showing, yes.
Q. And that searcher in this image, as you understand it, is a bot, right?

A. Yes, it's a person who's running some sort of program.
Q. When you say "a person," it's not like there's a person sitting at a computer picking out that transaction. Someone has coded a bot to do this function; is that right?
A. Right. Someone, a company — I guess people are behind companies too, but someone has created a program, we call those bots, that is performing this programmatically. It's not like you or I are sitting there and taking stuff out by hand or something of the sort.
Q. And that bot that's created does things automatically once you hit run, essentially, right?
A. Typically, that's how these things work, yes.
Q. And it does things very fast. I think yesterday you said sometimes even less than seconds.
A. Speed matters a lot, yeah.
Q. Some of these things happen in milliseconds?
A. Some of these things happen in milliseconds.
Q. Now, the blue dot here in this image, that's one of the -- we use the word "user." That's one of the user's transactions that was in the mempool, right?
A. I don't know.
Q. Well, is that how you understand this image?
A. I don't know. I don't think that there's a direct correlation between the dots before and here. You could understand it in multiple different ways. And this is only one

bit of the overall video, as well.
Q. Absolutely. I'm just showing you little bits at the time to make sure we all understand it.
But as you understand this image — and I know you didn't create the video — does the buy transaction here in this image belong to the searcher or is that something the searcher has taken in order to do something else with?
MR. FANG: Objection. Form.
THE COURT: Overruled.
A. My guess and inference, as the person that didn't make this video, so I am open-minded to being wrong about it, of course, is that this transaction is not from a user in the mempool, it's from the searcher instead.
Q. That the searcher just created this transaction?
A. That would be my guess, my inference.
Q. It's possible, however, for a searcher to pull a transaction out of the mempool and then do other things with that, is that also right?
A. Yes.
Q. Okay. So the searcher has those options; it can create its own or take another user's transaction from the mempool?
A. I would agree with that.
Q. Now, if the searcher takes someone else's transaction out of the mempool, does that person have any way to know that the searcher is doing that?

A. Not while it is happening typically. It is theoretically possible that they have a way of knowing, but it is not typical that they would know.
Q. And there's no sort of like typical mechanism in this system where the searcher reaches out to that user and says, Hey, I just took your transaction out of the mempool and I'm going to do something with it?
A. Not in the mempool, no.
MR. MARX: Joe, one second forward to 5:02:25, please.
Q. So here, in the video, these two new dots emerge out of the searcher. Do you understand this to be representing at this point, with this blue dot already in its possession, the searcher is creating two additional transactions?
A. You know what would be really helpful is if we could just watch the section of the video; because right now it's a little snapshot of a moment.
Q. Sure.
A. And it's a little hard to tell the context.
Q. Sure.
MR. MARX: Joe, can you just go to 5:02. And let's just watch from the start through this point in the video, around 25 seconds.
I was trying to spare everyone my inability to hit stop at the wrong time, but I'm happy to show you the video from the start, Mr. Miller.

A. I'll forgive you if you don't stop it at the right time.
Q. It will be Joe.
A. I won't forgive Joe. Joe is on the hook.
Q. Yes. Good luck to everyone.
(Video played)
A. Maybe you could play it five more seconds. This is kind of an awkward place to stop within the video.
Q. Fair enough. How about right there? Because I have some questions as it continues.
A. I think that's fair to stop at, yeah.
Q. Great. Okay.
So at this point, do you understand what we're seeing in the video — recognizing you didn't make it — as the searcher has taken a transaction from the mempool — that's the blue one we saw at the beginning, created two new green transactions — those are the other dots, and added those together in this three-transaction image?
A. Yes, it's a lot more clear in totality.
Q. And even though --
MR. MARX: And let's go to -- you can just hit "play" maybe, if we're already in the video. Let's go to second 31, but stop right at 31, Joe.
(Video played)
A. He's got it.
Q. Nailed it.

Okay. So now we're looking at the three trades, right: Green, blue, green; buy/buy/sell. Do you see that on your screen?
A. I do see buy/buy/sell, yeah.
Q. Now, if we assume — and I know you said it would be possible for a searcher to -- well, let's try this for a second. You said it would be possible for a searcher to have made all of these transactions; is that right?
A. I don't know that that was exactly what I said.
Q. Okay. Well, the original blue dot, you said the searcher could have made that; they didn't necessarily have to take that from the mempool, right?
A. I did say it was possible for them to have made that transaction, yeah.
Q. Okay. But can we agree at this point based on the video — and now that we watched it from the beginning again in context — seems pretty clear the blue buy was a transaction that belonged to someone else the searcher took out of the mempool?
A. Yeah. When you just have the blue dot alone, the context is not very clear. But I think we could agree with the inference that it came from the mempool now.
Q. Fair enough.
And there's been a lot of super-technical discussion over the past three days, so we're going back to basics here.

So now we have two transactions the searcher has created, and the one transaction that originally came from some other user in the mempool, all right, on the screen; is that right?
A. That's my inference, yup.
Q. And the first transaction at the top, the green buy, that's how a searcher, if it wanted to, would front-run the user's buy trade; is that right?
A. That's my inference, yes.
Q. Because the buy is saying, I want to do the same thing as the blue user, but I want to do it first.
A. That is my inference, yes.
Q. And in the bottom dot, the sell dot is how the searcher here in this scenario would back-run the other user who had put a transaction into the mempool; is that right?
A. That's how I understand it.
Q. Now, neither of us made the video. And at this point in the video, the green box that said "searcher" has disappeared from the screen. But would you agree with me at this point the searcher is doing all of this; the searcher is packaging together these three transactions into a bundle?
A. I think that was what was shown in general. I'm not sure where it is in the process; perhaps it's traveling to the block builder now. You'd have to go for a couple more seconds to see exactly where we are.

Q. Oh, we are going to get there.
A. I figured as much.
Q. But at this point we're in the searcher world, is that fair to say?
A. You would have to play the next five seconds. I don't know if we've crossed the boundary into the builder or not.
Q. Let's do it. Well, I think I'm going to -- I may have made a false promise. I'm going to stop just before then.
MR. MARX: But let's go to 34, Joe.
Q. I want to ask you one other question about this.
(Video played)
Q. Now, here in the video, the three transactions, the front run, the user's trade, and the back run have been put together, and the government has labeled that a bundle. Do you see that?
A. That's what we call these things.
Q. Okay. And this is, I think you testified, an example of a bundle; is that right?
A. It is an example of a bundle.
Q. But this particular sequence of transactions, this particular type of bundle, a buy/buy/sell, that's not just anyone bundle, that's a sandwich attack, right?
A. You could call it that.
Q. You'd call it that, wouldn't you?
A. Generally, yes.
Q. And in this bundle now that's been created by the searcher

who's a sandwich attacker, the green transactions belong to that sandwich attacker; but the blue transactions still belongs to the user who put it in the mempool, right?
A. Yes. It's still the user's transaction from the mempool. That hasn't changed.
Q. And in the jargon of the Ethereum Network, that blue user, who's now in the middle of this sandwich, is known as the victim of the sandwich attack; is that right?
MR. FANG: Objection.
THE COURT: Overruled. You may answer.
A. People will call it that, yes.
Q. And when Mr. Fang showed you this video and discussed this aspect of bundling, do you remember him using the word "sandwich"?
A. I wouldn't be surprised. I don't remember the particulars.
MR. MARX: Joe, could we go another couple seconds to 36, please.
(Video played)
Q. Okay. Now, in this part of the video, while the bundle is swooshing — and we don't have the audio, but there is a swoosh sound — this represents -- or tell me whether you understand it to represent that the bundle is now being sent from the searcher to the builder?
A. That is what I think I understood from this. You'd have to play it a few more seconds to see the block builder for me to

give you full confidence on that.
Q. Okay. We'll get there, I promise, in a second.
Now, just as a general matter, based on your knowledge of the MEV-Boost system — and we'll see it in the video in a second — the sandwich bot that created this bundle, you know, whatever the video shows, it doesn't send that bundle to the validator, right?
A. It does not send that bundle to the validator, that's correct.
Q. And it doesn't send it to the relay directly, right?
A. It doesn't send it to the relay directly.
Q. So at this point in the video, all we're really seeing is the interaction between the searcher bot and the builder; is that right?
A. That seems reasonable.
Q. And at this point in the video, the searcher has put together a bundle that it hopes the builder will include in a block that it builds that may eventually land up on chain; is that right?
A. The question is that at this point in the video, the searcher has put together a bundle that it hopes the builder will include on chain, that's the question?
Q. If I could be even a little more technical with you, Mr. Miller.
A. Okay.

Q. It hopes that the builder will include this bundle in the builder's block, and that that block will eventually end up on chain.
A. Yes.
Q. But there's no guarantee that the searcher will get what it hopes for, and that this bundle will end up in the builder's block, and that that block will end up on chain; isn't that right?
A. There is no guarantee.
MR. MARX: Could we go ahead to 41, please.
(Video played)
Q. So at this point, we're now seeing not just the sandwich attack bundle that came from that one searcher we started with, but now we're seeing bundles coming from many different places, and presumably those are from different searchers operating in this ecosystem. Is that what you understand this to be showing?
A. Seems like a fine inference.
Q. And one might look at this image and think that when these come into the builder, the only thing the builder is getting in order to create blocks are bundles from searchers; is that right?
A. If you understood all of these things to be bundles, then, yes.
Q. Well, let's just take a look. I mean, you can just kind of

quickly scan around the screen. As far as I can tell, there's one, two, three, four, five, six, seven groups of circles representing trades coming into the center; and as far as you understand it, based on the video we've watched so far, each of those is a bundle, right?
A. I think that's a reasonable assumption.
Q. And this doesn't show, for example, any individual trades coming in to the builder who might use those to make a block?
A. Not sure what the intent was, I didn't make it. But you could certainly read this as there were a bunch of bundles coming into a block.
Q. But it doesn't show that individual trades also might come into a block?
A. Can't speak for what it was intended to show.
Q. That wouldn't be fair. I'm not asking you to try to get in the mind of the person who made the video, because I know you said it was the government, but you don't know who made the video. I'm just asking what it shows.
Do you see anything representing here, as you understand this video, which you just said you only said was, at a high level, accurate, do you see anything here that suggests individual trades, things that are not bundles, come into this block-building process?
A. It looks like there are multiple bundles coming into the process; it doesn't look like there are any individual

transactions that's represented by a single circle.

MR. MARX: Let's keep going. Could you just go a couple of seconds until they all meet in the middle.

(Video played)

MR. MARX: Perfect.

Q. Now, Mr. Miller, do you understand at this point the video is showing we now have the block that the builder has assembled?

A. Yes.

Q. And if you just watch this video -- well, let me just ask you the question aside from the video for a second.

When a builder makes a block out of bundles, the builder doesn't have to use any particular bundle that it's got from a searcher, right?

A. It doesn't need to use any particular bundle, that's correct.

Q. And it certainly doesn't need to use every single bundle it receives from any searcher, right?

A. It doesn't need to use every single bundler, that's correct.

Q. The builder gets to choose what to put in the block that the builder creates?

A. The builder does get to choose what to put in the block.

Q. And that can include individual transactions taken directly out of the mempool without dealing with the searcher at all?

A. Correct.
Q. And those would be the blue dots we saw at the very beginning before they were the meat of a sandwich attack?
A. Some of them may not be within bundles from sandwich attacks, that's true. But they could make their way into the block anyway.
Q. And, now, from whatever the source the builder is working from, whatever source it's taking these little dots from, transactions, what it's trying to do is to maximize the value for the validator; is that right?
A. Generally, yeah.
Q. It's trying to find the block, the combination of transactions, that will produce the most MEV for the validator; is that right?
A. It is trying to find the block that produces the most value for the validator.
Q. Because that increases the chances that the builder will win this auction and get its block into the block that the validator ultimately proposes to the chain, is that fair to say?
A. I think that is fair to say.

MR. MARX: Could we go to 45, please. Just two more seconds.

(Video played)

Q. Now, here at this point in the video, whoever made it added

this label "proposed block," right. And I want to ask you about that, because I know you're very careful about the language, and it's important, because the details matter in this case.

But "proposing," that has a technical meaning in your world, in the MEV-Boost world and in the Ethereum Network; is that right?

A. Yes.

Q. And the validator who is randomly selected for a particular slot in the Ethereum process, that's the proposing validator; is that right?

A. You could call it the proposing validator, yes.

Q. And that's because they propose a new block to the blockchain; is that right?

A. Yes, they do propose a new block to the blockchain.

Q. And that step in the process — I know we're kind of jumping ahead. I'm not asking you based on the video only. But when the validator, the proposing validator, proposes a block to the blockchain, to the network, that's after all that interaction back and forth in the MEV-Boost system between the validator and the relay; is that right?

A. In the MEV-Boost system, that is right, yes.

Q. But at this point in the video, we've now got 45 seconds in, the relay hasn't even appeared yet; is that right? We haven't seen that yet?

A. I don't think so.
Q. So at this point, we have a builder who's assembled a block; is that right?
A. Yes.
Q. But it's not really accurate to call that a proposed block because in your world, where this language matters, the proposed block is the one that the validator sends out to the network; is that right?
A. If you're looking to the strict technical term, yes. The other way you could read it is this is the block for consideration from the builder or the block that they have created in the looser sense. But in a strict technical sense, this is not the proposed block that the validator would propose.
Q. Thank you. I appreciate that.
A. That's what I'm here for.
Q. Absolutely.
Let's shift gears for one second. I want to show you another diagram. This one is -- it was originally labeled DX 5002 and then relabeled GX 5002.
MR. MARX: Your Honor, it's in evidence. May we publish it?
THE COURT: You may.
MR. MARX: One moment, your Honor. You know what? I'm going to call an audible, Mr. Miller, and we're going to do

this the old-fashioned way. And we'll get back to the computer in a second.

Ms. Tran, do I need to press any buttons in order to switch to the Elmo?

THE DEPUTY CLERK: Just flip the camera.

MR. MARX: Flip the camera. There we go.

Okay. There we go.

THE COURT: And you may publish it.

MR. MARX: Testing my abilities here.

Joe, is that something you can help with? How do I show this to everybody?

THE COURT: It's published.

MR. MARX: Oh, okay. Thank you. Sorry.

BY MR. MARX:

Q. Great. All right.

Mr. Miller, can you now see what was originally labeled DX 5002 and was then relabeled Government Exhibit 5002?

A. Yes.

Q. And you testified yesterday that you didn't create this document; is that right?

A. I did testify that yesterday.

Q. And you also testified Flashbots didn't create this document?

A. Yes, I think so.

Q. Do you know who made this document?

A. Don't know.
Q. Do you know why they made the document?
A. Nope.
Q. Do you know what this document is meant to represent?
A. No.
Q. Were you in court with the rest of us on the first day of the trial during the defense's opening statements?
A. I was not in court.
Q. When was the first time that you saw this document?
A. The morning of the first day, I believe.
Q. The morning --
A. Yes.
Q. The morning just before you testified?
A. Yes.
Q. And who showed it to you?
A. The prosecution.
Q. So the prosecution, before you took the stand in this case, showed you this document and asked you a bunch of questions about it?
A. Yes.
Q. Now, I wasn't there at that meeting, so let's jump ahead to the afternoon when you were here with all of us testifying.

At that point, when Mr. Fang showed you this document, he asked you a few times if it accurately represents how blocks are proposed using MEV-Boost, do you remember that?

A. Correct.
Q. And I promise this is not a trick question, but does this document anywhere on it say "MEV-Boost"?
MR. FANG: Objection to the commentary and characterization.
THE COURT: Overruled. You may answer.
A. I don't see it saying "MEV-Boost."
Q. And do you know whether whoever made this document intended it to represent the MEV-Boost system?
A. I don't know what their intentions were.
Q. And you went through an exercise, do you recall, with Mr. Fang on your direct examination where he went through and drew these series of red X's on these documents as a way to signify it wouldn't accurately represent how the MEV-Boost system works; is that right?
A. We went through the document, he drew a bunch of X's, asked me a bunch of questions.
Q. I want to go back over some of that material and just make sure things are clear.
So let's put aside MEV-Boost for a moment, okay, and let's just talk about Ethereum.
In Ethereum, if you look at the middle of this document, there's something called a proposing validator, we were just talking about that a minute ago, right?
A. That's correct.

Q. And the validator is the one who proposes blocks to the network; is that right?
A. Yes.
Q. And that is what this appears to show with the validator, and then there's something, looks like a block, and it's headed down to the blockchain at the bottom. Is that what this appears to represent?
A. Not sure what the middle is, candidly. I don't know that I would call that a block.
Q. Okay. It may be a very nontechnical graphical representation of something, but so be it.
Now, you start with the proposing validator in the middle. And if we're just talking about Ethereum, right, the proposing validator chooses what to put in the block that it wants to propose to the network, right?
A. As a general matter, validators do have the job of ordering transactions in a block, that's right.
Q. Right. Because you said when you're not doing PBS, the validator in Ethereum is both building and proposing, right?
A. Those are their roles; they can outsource building using MEV-Boost, of course.
Q. Okay. We'll get to that in a second.
But if they haven't done that, as I said, leave MEV-Boost aside for a second, if we're just talking about Ethereum, one place that a proposing validator can get

transactions to build a block within the Ethereum Network is the mempool; is that right?
A. That is correct.
MR. MARX: So, Joe, would you mind pulling up -- getting rid of that red X and pulling up 5002-1.
Q. Okay. You see, Mr. Miller, that image now on your screen?
A. I see an image on my screen.
Q. Okay. That's the same image; we've just gotten rid of that red X between the proposing validator and the mempool, is that fair?
A. Same image, no X on the mempool at least.
Q. Let's get to the next one. We're going to go counter-clockwise. The next one says "own trades," right. So if you assume for me that that means the proposing validators own trades, trades the validator makes up itself, is that a source that the proposing validator can use to build blocks within the Ethereum system, putting MEV-Boost aside?
A. It is something they could use, yes. It's possible.
MR. MARX: Joe, could we get rid of that red X and pull up 5002-2.
MR. FANG: Your Honor, I'd just like to note for the record that what defense has pulled up as 5001-1 and 5002-2 don't, in fact, show those markings for identification.
THE COURT: The original document that -- well, actually, the original document had no red X's on it; you

remarked it after the X's were on it. Correct?

MR. FANG: That's correct, your Honor.

What the document shows that the government introduced yesterday with the three red X's is Government Exhibit 5002.

And I would just like the record to reflect that what defense is pulling up as 5001-1 and 5002-2 does not contain any indication that that's how those are marked for identification, nor have those exhibits been offered.

MR. MARX: Your Honor, I don't know this is necessarily for the jury, but during a break I'm happy to mark all of these as demonstratives with new numbers if the government wants.

THE COURT: We'll proceed in that way.

MR. FANG: Your Honor, we would ask that because those documents haven't been published or aren't in evidence, they shouldn't be published for the jury as well.

THE COURT: They may be published.

MR. MARX: Thank you, your Honor.

BY MR. MARX:

Q. So we're now down to the last of the red X's. This is the one between the proposing validator and proprietary order flow. And I know this one may be kind of the post complicated or subtle.

So I just want to kind of, at a high level, ask you whether if you were a validator, you know, with a large pool,

whether it would be possible to use proprietary order flow, private transactions, to create a block, say like LITO or something like that.
A. One point of clarification also as you had the exchange was the first time I saw this document might have been the previous day, too, not the morning of, but the previous day. As you understand, I've seen many documents.
Q. Yes.
A. And been asked many questions.
Q. Fair enough. I promise you that one-day difference won't make a difference to us here, but thank you.
A. I appreciate that. I just wanted to try to belabor in being precise.
Your question is if it is possible for a large pool like LITO to receive proprietary order flow, is that right?
Q. Yes.
A. Theoretically possible, yes.
MR. MARX: So, Joe, can we go to dash three and remove that red X.
Q. Mr. Miller, do you have that on your screen?
A. No red X's.
Q. Back to where we started. Gone full circle.
And now I want to ask you about MEV-Boost, which you mentioned when we started this bit of our conversation. Because here, the proposing validator at the center, right, if

you look to the top right, there's a dotted line that goes to a relay; is that right?
A. There is a dotted line that says "relay" at the end of it in a box.
Q. And in the MEV-Boost system, one thing a validator can do is to call a relay to get a block and use that method for building a block to propose to the network; is that right?
A. Yes, that's the typical behavior, too.
Q. Okay. So within the Ethereum system, a proposing validator can use a relay as a source of transactions, but it doesn't have to?
A. That wouldn't be the intended behavior of MEV-Boost. It is certainly possible.
Q. Okay. I'm sorry. I appreciate that. In my own mind, I went back to just thinking about Ethereum, right.
So the relationship between the proposing validator and the relay, that's about MEV-Boost; that sort of represents the MEV-Boost option, is that fair to say?
A. The relationship between the proposing validator and the relay represents MEV-Boost. That's at least one interaction within MEV-Boost, I agree with that, yeah.
Q. I'm glad you mentioned that. Because one of the things that Mr. Fang pointed out about this document to you is, in the MEV-Boost system, the actors -- there are more actors than just the proposing validator and a relay, right?

A. Correct.
Q. So, for example, in this document, if you wanted to be even more detailed about it, you could keep going out to the top right past the relay and add the builder; is that right?
A. And then searchers thereafter also.
Q. You could keep going, right?
A. Yeah.
Q. And, similarly, if you wanted to be super-detailed and add a lot more to this document, if you're talking about the Ethereum Network generally, you could draw a line from the proposing validator to the mempool and out to the users who put transactions into the mempool, right?
A. If you wanted to add that level of detail, that would be correct, I think.
Q. But none of those things are on this document, right?
A. None of those things are on this document.
Q. Now, the proposing validator here I think we already established has the option to use MEV-Boost if it wants, right?
A. Yes.
Q. But even if the proposing validator has gone to the process of downloading the MEV-Boost software, it doesn't necessarily have to use MEV-Boost and call a block from the relay, right?
A. Even if they downloaded the MEV-Boost software, they don't need to use MEV-Boost. That's not a requirement.
Q. And, similarly, even if that proposing validator has

registered with the MEV-Boost relay or registered with any relay, it doesn't need to use the MEV-Boost system to get a block, it can still use these other alternatives?
A. Correct.
Q. So just to summarize — if you give me one moment to shuffle my papers — would you agree with me, Mr. Miller, that the proposing validator has multiple sources of transactions that it can pull from?
A. In theory.
Q. And would you agree with me that one of those sources is transactions that are pending in what's called the public mempool?
A. Yes.
Q. And would you agree with me that one of those sources are private transaction requests from other users?
A. In theory. It is not standard, however.
Q. And would you agree with me that one of those sources is the validator's own transactions?
A. One of those sources are the validator's own transactions. Yes, the validator could include their own transactions in the block.
Q. And the last source that we've talked about so far today is that the validator can get transactions from one of the relays that operate on the Ethereum Network?
A. In theory, yes.

Q. It's up to the validator which one of those sources to choose?
A. It is possible in the Ethereum protocol.
Q. It's also possible in the Ethereum protocol for the validator to put nothing at all on the block, right?
A. I think you can include an empty -- I think you could create an empty block, not have any transactions at all, but I might be wrong on that detail.
Q. Well, it's certainly possible just to put a couple transactions on a block; is that right?
A. That is true, yeah, you can just put a couple.
Q. It's also possible to only put your own transactions in a block?
A. Certainly.
Q. Can also just put yours and your friend's in a block, right?
A. Sure.
Q. And it's also possible to put many, many transactions in the block the proposing validator creates?
A. Yes.

MR. MARX: Noticing the time, I think this would be a perfect point to take a break. I'm going to shift to a couple other topics, but I don't expect for this to go on very long.

THE COURT: Great. Thank you, Mr. Marx.

All right. We are going to take our break for lunch.

Please be back and ready to go in the jury room at around 1:50. It's 12:50 now. Thank you all for your attention. My prior instructions apply. See you soon.

(Jury not present)

THE COURT: Please be seated.

You may step down.

THE WITNESS: Thank you.

(Witness not present)

THE COURT: Anything for us to take up on this lunch break, Mr. Fang or Mr. Nees?

MR. NEES: Your Honor, I just wanted to put for the purposes for the record, in case this comes up next week, that each of the defendants were served with trial subpoenas in their capacities as officers of corporate entities Pine Needle and Birch Bark.

Other than that note for the record, I don't think the government has anything else before the break.

THE COURT: All right.

Ms. Trefz?

MS. TREFZ: I would just note that the trial subpoenas are actually two companies; they are not two, the defendants.

THE COURT: All right.

MR. NEES: That's right.

THE COURT: Anything from the defense?

MR. MARX: No, your Honor.

THE COURT: Mr. Marx, how much longer do you anticipate?

MR. MARX: I'm hoping maybe 15, 20 minutes, your Honor. I have a couple topics, but it's not very much.

THE COURT: All right.

And, Mr. Fang, I assume redirect?

MR. FANG: Yes, your Honor.

THE COURT: All right.

Do we think we'll finish with this witness today?

MR. FANG: Yes.

THE COURT: And move on to Mr. Chen.

MR. FANG: Correct, your Honor.

THE COURT: All right.

Great. I will see you all in an hour.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:50 PM

(In open court; jury not present; trial resumed)

THE COURT: Please be seated.

We're ready for the jury, Ms. Tran.

(Jury present)

THE COURT: Please be seated.

Hope you all had a nice lunch. We are going to continue with testimony.

Mr. Miller, you can step down.

Mr. Marx.

MR. MARX: Thank you, your Honor.

ROBERT MILLER,

CROSS-EXAMINATION CONTINUED

BY MR. MARX:

Q. Welcome back, Mr. Marx.

A. Welcome back yourself.

MR. MARX: Joe, if you wouldn't mind putting up on the screen for everyone Government Exhibit 3306, which is already in evidence.

THE COURT: You may publish.

MR. MARX: Thank you, your Honor.

THE WITNESS: 3306?

BY MR. MARX:

Q. Yes. It should come up on your screen in a minute.

A. Okay.
Q. Do you see that document, Mr. Miller?
A. I see it.
Q. This is the email that came in from Low Carb Crusader in April of 2023.
Do you remember that?
A. It's the first email, among some others, yep.
Q. And in your testimony, when Mr. Fang was asking you about this document, you commented that it was strange that this came into your personal email account.
Do you remember that?
A. Yes.
Q. But, at this point, your personal email address, that wasn't exactly a state secret; is that fair to say?
A. I wouldn't consider it a state secret, Mr. Marx, no.
Q. In fact, you have your own website, bertcmiller.com, right?
A. I do have my own website, bertcmiller.com.
Q. And back in the spring of 2023, you had your Gmail address on your website?
A. I don't know. It seems reasonable, though.
Q. Would it help you to take a look at the website back in 2023 to see that your personal email was on there?
A. Sure.
MR. MARX: May I approach, your Honor?
THE COURT: You may.

(Pause)

THE WITNESS: Okay.

BY MR. MARX:

Q. I have to take the document back from you, I'm sorry.

A. Okay.

I don't get to keep that one?

Q. No.

Having looked at the document now, Mr. Miller, do you remember whether or not you put your email address on your website?

A. My email is on my website, or was.

Q. So, fair to say it was pretty easy to find?

A. If you found my website, you would be able to find my email.

Q. And at that time, in the spring of 2023, you were, I think you testified on the first day of your direct, leading the adoption of MEV-Boost for Flashbots; is that right?

A. I had led the adoption for MEV-Boost for Flashbots. At that point, I don't know if we had ongoing efforts.

Q. But you were a pretty sort of prominent face publicly of the MEV-Boost adoption for Flashbots?

A. My mom thinks so, at least.

Q. Okay. Well, we're going to get back to your mom in one second.

The other two people who are on this email are

Justin Drake, right?
A. Yes.
Q. And you testified he's with the Ethereum Foundation and Ultrasound?
A. Yes.
Q. And Samczsun — we're going to talk about him in a minute, too — and he's at Paradigm; is that right?
A. Yes. As well as, I think, also considering himself an independent security researcher, too, but he is also at Paradigm.
Q. Here's the question that would make your mom proud; it might make you a little uncomfortable.
But you and Justin Drake and Samczsun, it's fair to say, are fairly prominent members of this community in the Ethereum world?
A. My mother taught me never to speak too highly of myself, but you might say that, sure.
Q. Thank you.
And in addition to your personal email, you also use a Proton email from time to time, right?
A. I believe I have a Proton email, or I have had a Proton email.
Q. Do you remember ever using that email to communicate with Snoopy and Curious Rabbit?
A. I don't remember.

MR. MARX: Joe, can we just skip to the next one, Government Exhibit 3307.

This is already also in evidence, your Honor. If we can publish?

THE COURT: You may publish.

MR. MARX: Thank you.

BY MR. MARX:

Q. So this document, Government Exhibit 3307, this is the email from you back to Low Carb Crusader, now in June of 2023.

Do you remember this document?

A. Correct.

Q. When you reached back out to Low Carb Crusader a few months later, you sent him an email from your Gmail account, right?

A. Yes.

Q. So you didn't use a Flashbots account?

A. Didn't use a Flashbots account.

Q. Or the security at Flashbots account?

A. I don't think I could send emails from security@flashbots.

MR. MARX: You can take that document down.

Q. Now, Mr. Miller, would you agree with me that when you saw the incident on April 2nd, 2023, that it seemed pretty obvious to you that something like this could happen?

A. The question is — to repeat it back to you — would I agree with you that when I saw the incident on April 2nd, it seemed pretty obvious to me that something like this could happen?

I think if it was obvious, we would have fixed the problem before we had one. No?
Q. I'm not allowed to answer any questions.
So, I guess let me just put it this way: Yes or no, would you agree with me that it was pretty obvious to you, once you saw this incident happen and conducted your investigation, that something like this would happen?
MR. FANG: Objection; asked and answered.
THE COURT: Overruled.
THE WITNESS: I think that once I knew the details, it was clear that something like this could happen.
BY MR. MARX:
Q. Would you also agree with me that, at that point, you thought there really weren't many people knowledgeable enough about consensus layer P2P and MEV to do what the Low Carb Crusaders had done?
A. I would agree with that, yeah.
Q. Would you also agree with me that the MEV-Boost industry is brutally competitive?
A. It's been characterized that way. Yeah, I would agree with that.
Q. Has it been characterized by you that way?
A. Almost certainly, it sounds like something I would say at some point.
Q. And would you also agree with me that searchers, relays,

and builders fight literally over milliseconds in this MEV-Boost world?
A. That's correct, yes. Speed really matters.
MR. MARX: Now, your Honor -- let me ask a couple of more questions first.
Q. I think we already established, Mr. Miller, that you're a Twitter user, an X user?
A. I am an X user, yeah.
Q. I'm going to ask you about when it was still Twitter, so I'm going to say Twitter.
But at the time, so say around 2023/2024, you were a fairly regular user of Twitter; is that fair to say?
A. Sure.
Q. And from time to time -- and you would post under the name @bertcmiller?
A. I would post under Bert C. Miller.
Q. And you wrote those tweets, right?
A. Yes.
Q. No one else was tweeting under @bertcmiller?
A. No one else was tweeting under @bertcmiller. Sometimes we might write tweets as the company or had people review things, especially when it was relevant to Flashbots, is one nuance for you.
Q. And under your @bertcmiller handle, you tweeted from time to time about the incident that's the center of this case; is

that right?
A. I believe that I tweeted about it, yes. I don't know if you would characterize it as time to time. I don't think there were that many tweets about it. But I have tweeted about it, yes.
Q. Sitting here today, are you able to testify fully and accurately about the tweet that you posted about the incident in this case on March 30th of 2024?
A. Maybe you could show me a tweet, if you're referring to something specific.
Q. Well, this is -- this may sound a little silly to you, but in the Ethereum world, there are rules that we need to follow, and so my first question is: Sitting here today, could you fully and accurately testify for the jury about the tweet you sent on March 30, 2024, about your thoughts about the incident in this case?
A. You know, Mr. Marx, I've sent thousands of tweets, and I don't remember all of them, and so if you are going to ask me about a specific one, and if I can fully and accurately testify about that, I think you're going to need to show me a document.
Q. I think that's probably right.
So, my next question is: When you sent that tweet, even though you couldn't fully and accurately describe its contents now, it's fair to say you would have wanted it to be accurate, right?

A. I don't know that I would agree with the characterization, because I don't know what tweet you're talking about.
Q. Well, if you were to post something about your thoughts about this incident, you would want it to accurately reflect your thoughts about the incident; is that fair to say?
A. I think I endeavor to be accurate in my tweets, that is correct.

MR. MARX: Your Honor, at this time, I would offer Defense Exhibit 1025 into evidence. I can -- well, let me just ask the witness whether he recognizes it.
Q. Mr. Miller, do you recognize the document --

THE COURT: One moment, Mr. Marx.

Mr. Fang?

MR. FANG: Your Honor, we object on the basis that there's been no failure of memory as of right now, and for improper prior recorded recollection.

THE COURT: Mr. Marx?

MR. MARX: So I'm happy to answer that question here, your Honor, or at sidebar, whatever your preference is.

THE COURT: Why don't we do a brief sidebar.

MR. MARX: Sure.

(Continued on next page)

(At sidebar)

MR. MARX: So I'm not attempting to refresh the witness' recollection. So, two things: Number one, this tweet, which is a March 30, 2024 tweet memorializing Mr. Miller's thoughts and reflections on this incident of what this case is about, is relevant because over the defense's objection, the government admitted yesterday, elicited testimony at some length, that Mr. Miller, in the weeks and months after this incident, thought that my clients and Mr. Looby's clients were dumb and stupid, that he was disappointed, that he was surprised that all this had happened. He was allowed to testify over defense objections to his thoughts and feelings about this incident.

This tweet, which was published publicly less than 12 months later, is a further reflection and a further indication of his *post hoc* thoughts and feelings about the incident. He's already confirmed that he can't remember exactly what he said in this tweet, but he tweets regularly, those are his words, and they record his thoughts about this incident at the time, which he's not in a position to relay to the jury.

So there are a couple of things.

I think, under Rule 805 -- 803(5), this comes in as a past recollection recorded. It's very clearly a -- it's almost like a diary entry. It's recording his thoughts about this at

the time, it tends to be accurate and for public consumption, and it would be admissible under that rule, the last sentence of the rule. At a minimum, what the rule says is the relevant parts of it can be read into the record even if the document itself is not admissible. But they opened the door wide open to this, Judge, by getting into that line of questioning over our objection, and this document is now admissible as a hearsay exception to rebut that testimony.

It essentially says, and the parts I would read are, this was obvious to him, once he saw it, that this could happen, and only people who were smart enough about the system would have figured it out. That was his reflection, which is very different from saying this was -- our guys were dumb and stupid and this was surprising.

THE COURT: What is the date of this again?

MR. MARX: March --

MR. FANG: It's in March.

MR. MARX: March 30, 2024. It's a little less than a year later.

MS. KUDLA: So, a couple of points here.

First of all, Mr. Marx mischaracterizes the testimony. The testimony was about what was your reaction to finding out the identity of these individuals. He testified that he thought that this was a stupid thing to do because they didn't need the money and they were incredibly smart.

THE COURT: Yes.

MS. KUDLA: He was not testifying to the fact that the people who committed this crime were stupid or that it was an unsophisticated hack.

So, Mr. Marx's purported use of this document, in the first instance, is not directly related to what has been going on here at a time, I would note, with this document that he still doesn't even know the identity of the perpetrators.

So it's apples and oranges on trying to compare why it's needed.

Second, under the hearsay exception that he's using, 803(5), a recollection recorded is available after an unsuccessful attempt to refresh recollection. He has not tried to refresh his recollection; instead, he's trying to get in this document. And I would also note that under 803(5), a recollection recorded is not admissible unless offered by the adverse party, which is us, the government, and we're not offering this. So I think (a) number one, it's irrelevant because it's not going to the point that he's trying to make; (b) he has not properly refreshed this witness' recollection; and (c) even if he had failed at one and two, refreshed his recollection, it still is not admissible. It can only be read into evidence and not admissible as an exhibit.

So, for a multitude of reasons, this line of questioning should be shut down.

MR. MARX: I agree, at a minimum, it gets read into the record under that rule, even if the document itself isn't admissible, but he has said -- this is different from refreshing recollection. That's not what we're doing here. That allows him to testify based on his own memory after seeing something. This is about whether the document, either orally or in writing, comes in, and the requirements are that the witness made an accurate accounting of his thoughts about something at the time, it was intended to be accurate, and he can no longer fully and accurately recount that for the jury.

So he has, in a sense, a diary entry --

THE COURT: He's saying that he doesn't remember what he tweeted. He didn't say that he doesn't remember how he felt at that time. Aren't those two different things?

MR. MARX: No, no, because I want the jury to know what he tweeted, which he cannot now fully and accurately recount for the jury.

MR. LEVANDER: Your Honor has the rule correct. What he wants to show the jury is not allowed under 803(5). The issue is whether it's on a matter the witness once knew about, but now cannot recall well enough to testify fully and accurately. And the exploit and his feelings thereon are things that he remembers well and has testified fully and accurately on. His recollection of the record is irrelevant under 803(5).

MR. MARX: Respectfully, I think his testimony so far today was that he doesn't remember feeling that it was obvious at the time, which is exactly what he writes in the tweet. So he does not fully remember, and so, at a minimum, it comes in for -- it would come in for impeachment on that piece of it, but this is -- the matter is his views. The government explored in depth, over our objection, his views about this incident, and it was not, respectfully, to Ms. Kudla's characterization. It was not just about the revelation of our clients' identities, it was extensively about his thoughts about the entire exploit, and how he felt when he woke up that morning, and how worried he was, and how they were running around in the war room trying to deal with a patch.

It was much more extensive than that, and we objected to it. The Court allowed it; it's in now. We need to be able to rebut that with evidence from this witness that he thought it was obvious this would happen and it was because smart people were going to figure this out.

MR. FANG: Your Honor, just a few points in response:

This tweet occurred more than a year after. So it's not --

MR. MARX: It's not accurate.

MR. FANG: It occurred in 2024, right?

THE COURT: March of 2024.

MR. MARX: Less than a year after.

MR. FANG: Less than a year — 11 months.

MR. MARX: Okay.

MR. FANG: The point is, it doesn't reflect his recorded recollection in something that was made near or at the time of his knowledge. And what the defendants are trying to do is smuggle in, again, a bunch of inadmissible hearsay from 11 months after as to what Mr. Miller was writing in a tweet. Again, he's already testified as to his reactions to the incident, which is the key event in question here. He didn't say that --

MS. KUDLA: I also have the transcripts of exactly what he said. So, it is not, to Mr. Marx's point, it was asked: In what reaction, if any, did you have to learning the identity of the alleged exploiters.

MR. MARX: I was referring to that and other parts of the testimony.

MS. KUDLA: My first reaction was one of surprise. I did not expect the brothers to be the perpetrators. I was also disappointed because the brothers were young. They're very talented. They were very good at what they did. They didn't need the money, and it seemed like a very stupid thing to do, in my estimation, to do. At the very least, it's complicated. We are here today talking about it, right? So as disappointed -- and then because I felt like they did something very dumb, and they greatly impacted their future, and I felt

deceived as well, in the course of all of this, that they did not tell me that they were Low Carb Crusader and told me that they had intended to do this, and talked to them after the incident, as well.

The testimony related to his reaction as to the identity of the brothers, not whether or not he thought the attack was obvious in any way and that this was a very easy thing to figure out, which is the point that Mr. Marx is --

THE COURT: I don't recall testimony that you're referring to, Mr. Marx.

MR. MARX: In that, I agree, that portion of the testimony related to the revelation of the identity. But there was other testimony about the morning — you woke up, you saw those text messages, and how worried he was about it, how big a deal he thought about this, why this was such a crisis for Flashbots. All his testimony about his feelings was brought in over defense objection.

THE COURT: But what in here contradicts that?

MR. MARX: Because he says now, thinking about it, it was obvious this would have happened, it was not a big surprise. And I just want to be clear — so the record is clear in the event your Honor rules against us and says we can't admit it, notwithstanding what the government has put in in this case — the point is not that he's creating a diary of his thoughts in April of 2023 when he tweets in March of 2024. The

point is, in March of 2024, he made public statements about his then feelings and thoughts about this incident, after everything had passed, all the other -- the investigation, you know, the other staking, the patches that were made, all the work that was done, and by the following spring, he has certain thoughts and feelings about this case that he records, that he can no longer accurately fully and accurately recount for the jury, but he recorded them accurately then, and there's no question they were his thoughts.

And so the rule says, in that situation, we're entitled to let the jury know, as of March 2024 — and I can characterize it that way; I'm not going to say this is how he felt in April of 2023 — but by then, when he tweeted this, this was his thinking about the incident.

MS. KUDLA: Which is irrelevant because the events in question and Mr. Miller's public description of this as an exploit and something that had caused serious harm to the system is what is motivating under the movement of money for the money laundering charge.

MR. LOOBY: But why is the relevant time period just his immediate reaction? His thoughts -- he's here testifying today in 2025 --

MS. KUDLA: He has not testified inconsistently. The question --

MR. LOOBY: It's not about --

THE COURT: One at a time, one at a time.

Ms. Kudla, go ahead.

MS. KUDLA: The most appropriate question would be: In hindsight, did this attack appear as something that was obvious to you? And if he says no to that, then you may have a basis to confront him with a prior statement, but, once again, Mr. Miller's own interpretation of this, after the vast majority of the events in question in this indictment have occurred, is irrelevant.

THE COURT: I think I agree with you, Ms. Kudla, with respect to the question that would be appropriate here. And I believe, Mr. Marx, you asked that already, and you got an answer.

So, I also don't -- I think this has been established.

MR. MARX: Okay. So I understand your Honor to say it's fair game to impeach him with this document?

THE COURT: But he has not contradicted that statement because he already answered -- my recollection is he already answered that it was obvious, correct?

MR. FANG: Your Honor, if I may, just a couple of points.

THE COURT: Yes, you may.

MR. FANG: Mr. Miller has been reviewing the document this entire time, and we'd just ask that Ms. Tran maybe tell him to not --

MR. MARX: He's a reader.
MR. FANG: -- review the document first.
THE COURT: I think let's move on. Let's move on.
MR. MARX: As long as the objection is preserved.
THE COURT: It's preserved.
(Continued on next page)

(In open court)

BY MR. MARX:

Q. I apologize for the delay, Mr. Miller.

Picking up where we left off, with regard to this interaction between you and Low Carb Crusader, Mr. Fang asked you whether Low Carb Crusader had ever revealed its identity to you.

Do you remember that?

A. Yes.

Q. Did you ever ask them who they were?

A. I didn't ask them who they were.

Q. And is it common for people in the crypto community to use pseudonyms?

A. Yes.

MR. FANG: Objection.

THE COURT: Overruled.

BY MR. MARX:

Q. In fact, the first person to tweet about the incident in this case on April 2nd, 2023, was someone who goes by the name Punk #3155; is that right?

A. It could be.

Q. Well, in fact, in the postmortem document, Government Exhibit 3302, you actually thanked Punk #3155 as the person who first discovered this event, right?

A. If you're going to refer to an exhibit, could you bring it

up, please?

MR. MARX: May I approach, your Honor?

THE COURT: You may.

MR. MARX: So the record is clear, I'm showing Mr. Miller an unredacted copy, only for Mr. Miller. This is the dash U copy.

(Pause)

THE WITNESS: I do see the --

BY MR. MARX:

Q. I'm sorry, again, I have to follow the rules.

If you've had a chance to look at that, I'll take it back from you, and I'll ask you: Having looked at the document, Mr. Miller, do you remember thanking someone named Punk #3155?

A. Yes. At the bottom of the document, I thank --

MR. FANG: Objection, your Honor; the document isn't in evidence.

THE COURT: That was an appropriately asked question. Why don't you --

BY MR. MARX:

Q. Without reference to the document, Mr. Miller, do you remember thanking Punk #3155?

A. Yes.

Q. Do you also remember thanking Samczsun?

A. Yes.

Q. And Samczsun isn't a person's real name; is that right?
A. I think it's their pseudonym, but I actually don't know. I don't think it's their real name. That would kind of defeat the purpose.
Q. It's probably a pseudonym, but who knows, really, right?
A. That's true.
Q. And Samczsun, when this person uses that name publicly, writes it all as one word, Samczsun, no spaces, right?
A. I think so, yes.
Q. And when the alleged victims in this case reached out to, among other people, you and Justin Drake and others, they also used a pseudonym, right?
A. That is correct.
Q. In fact, in some of those Telegram chats, they went as capital D, lower case D, lower case D, lower case D, lower case D, ampersand, capital A; is that right?
A. I don't remember.
Q. But you remember they didn't use their real names?
A. I do remember they didn't use their real names, that's correct.
Q. And from time to time, you've also used pseudonyms within the crypto community?
A. I have also used pseudonyms.
Q. There was a time early on when you went by MEV Intern?
A. Yes.

Q. And then later, you turned that into MEV Senpai; is that right — s-e-n-p-a-i, I believe?
A. Yes.
Q. And what's a senpai?
A. It's a playful term for someone that's skilled.
Q. So this is kind of like a little joke, right, to have a pseudonym, you started out as the intern, and you became someone who was skilled; is that fair to say?
MR. FANG: Objection; relevance.
THE COURT: Overruled.
THE WITNESS: I'm sorry, can you repeat the question?
BY MR. MARX:
Q. You were just using the names, the pseudonyms, in discussions in this community, as kind of a playful joke, you went from an intern to someone who's skilled and knowledgeable?
A. Yes.
Q. And so that's kind of like calling yourself, say, Snoopy or Curious Rabbit or something like that?
MR. FANG: Objection.
THE COURT: Overruled.
You may answer.
THE WITNESS: You could say so.
MR. MARX: Thank you, Mr. Miller.
I have no further questions, your Honor.
THE COURT: Thank you.

Mr. Fang.

REDIRECT EXAMINATION

BY MR. FANG:

Q. Mr. Miller, on cross, you were asked a bunch of questions on what roles validators have in the Ethereum protocol.

Do you remember?

A. I remember I was asked questions about what role validators have on the Ethereum network.

Q. Just remind the jury, what roles does an Ethereum validator generally have?

A. The two roles are to order transactions within a block, first — we call that block building — and, second, to select a block for inclusion on the network — that's block-proposing.

Q. Is the role of a validator different if it's using MEV-Boost?

A. Yes. If it's using MEV-Boost, it is outsourcing the block ordering to a specialized market of block builders.

Q. Does that mean that the MEV-Boost validator is giving the building role up to another party?

A. Yes. When using MEV-Boost, you give it up to another party, effectively.

Q. And, essentially, does that mean that the MEV-Boost validator is not involved in building the block?

MR. MARX: Objection to the leading, your Honor.

THE COURT: Overruled.

You may answer.

THE WITNESS: Thank you.

Yes.

BY MR. FANG:

Q. Under MEV-Boost, fair to say that block builders and proposers are different parties?

A. Yes.

Q. To be clear, was the April 2nd exploit that we've been talking about conducted by a MEV-Boost validator?

MR. MARX: Objection, your Honor, to the leading.

THE COURT: Start asking some nonleading questions here.

BY MR. FANG:

Q. Mr. Miller, was the April 2nd exploit conducted by a MEV-Boost validator or a general Ethereum validator?

MR. MARX: Objection, your Honor; same question.

THE COURT: Overruled.

THE WITNESS: Was the April 2nd exploit conducted by a MEV-boost validator or a general Ethereum validator; that's the question, correct?

Q. Yes.

A. Well, the validator was interacting with MEV-Boost relays. It's calling a bunch of standardized interfaces that you use within the MEV-Boost ecosystem, and it's also an Ethereum validator. A caveat here is that it is also true that it's not

clear what software the validator was running, whether or not they were running MEV-Boost specifically. So, those are a couple of data points. I think you could say that they're a MEV-Boost validator since they're using MEV-Boost relays and standardized endpoints within the MEV-Boost ecosystem. At the same time, it's unclear if they were using actual MEV-Boost software, if that nuance makes sense.

Q. Understood, Mr. Miller.

Just based on your investigation, is it fair to say that the MEV-Boost validator was operating within the MEV-Boost ecosystem?

MR. LOOBY: Objection; leading.

THE COURT: Sustained.

BY MR. FANG:

Q. Mr. Miller, I'll move on and show Government Exhibit 5002.

Mr. Miller, do you remember being asked questions about this chart?

A. We marked it up; yep.

Q. And by "marked it up," are you referring to the Xs that appear on this chart?

A. Yes, after you asked me questions about it.

Q. Do you remember on cross-examination how Mr. Marx also asked you questions and removed certain Xs?

A. Yes. I do remember.

Q. When he removed those, was it your understanding that he

was discussing Ethereum generally versus the MEV-Boost ecosystem?
A. I think his point was that if you anchored this in Ethereum generally, then you could interpret it differently, and so it was my understanding he was talking about Ethereum generally and not MEV-Boost.
Q. And, Mr. Miller, if a validator is not using MEV-Boost, would it get transactions from the relay?
A. No.
Q. And, again, did the April 2nd exploit happen on just the Ethereum network generally or involving the MEV-Boost ecosystem?
A. It involved the MEV-Boost ecosystem. It interacted with MEV-Boost relays, block builders, you know, standardized endpoints within the MEV-Boost system, et cetera.
Q. And, again, you testified, I believe, that a MEV-Boost validator just proposes a block, right?
MR. LOOBY: Objection; leading.
THE WITNESS: Correct.
MR. FANG: Your Honor --
THE COURT: Are you just asking that to move on to a new topic?
MR. FANG: Yes, your Honor. The question --
THE COURT: It's fine.
Overruled.

MR. FANG: Thank you, your Honor.
THE WITNESS: Maybe you could restate the question?
BY MR. FANG:
Q. Mr. Miller, you testified, I believe, that a MEV-Boost validator just proposes a block, right?
A. Yes. They outsource the ordering of transactions in a block to a block builder, so they're reduced to their one role of proposing.
Q. And where does a MEV-Boost validator get the block from?
A. From relays.
Q. Now, on cross, you were also asked a bunch of questions about how economic incentives on Ethereum enable users to trust each other.
Do you remember that?
A. The question is, on cross, I was asked about economic incentives enabling Ethereum users to trust each other and if I remember that, right?
Q. Yes.
A. After three days of testimony, I have to repeat things a little bit to make sure I'm understanding, so please bear with me.
Q. Understood.
A. Generally, yeah, we talked about those things.
Q. And, Mr. Miller, does MEV-Boost also have design features to enable the different MEV-Boost actors to trust each other?

A. MEV-Boost is designed to try to get parties to work together in contexts where they may not normally trust each other, so the builder is able to work with the validator because both of them mutually trust the relay, as an example. That's one way I can interpret your question to be correct.
Q. Are there any other features that enable, say, the validator and the relay to trust each other?
A. The validator and the relay? Well, the validator checks to see that the -- sorry, the relay checks to see that the validator has given them a commitment, as an example, and that helps them work together.
Q. Remind the jury what a commitment is in this context?
A. Here, what I'm talking about is the block proposal from the validator, so it's them choosing a particular block, creating a signature associated with that block to select it for inclusion on the chain, and we call that a commitment because it is backed by economic incentives.
Q. How does that commitment relate to the reveal part of the commit-reveal framework that we've been discussing?
A. It relates to the commit-reveal framework because it is the thing that the relay is looking for from the validator before revealing the block body or the transaction contents in a block. So that is the commitment in the commit-reveal scheme here.
Q. And, again, Mr. Miller, who makes that commitment?

A. The validator is making that commitment.
Q. Is that a validator that's using MEV-Boost?
A. Yes.
Q. And is this feature of the MEV-Boost software hiding the transaction contents until the validator signs to commit something that Flashbots publicized?
A. Yes.
Q. Remind the jury — who fills in the parent and state roots in the signed block header that we've been talking about that goes from the validator to the relay?
A. The validator fills in that information.
Q. Does the builder fill that information in?
A. Not the parent root and the state root, no.
Q. Mr. Miller, you were also asked various questions on cross about the Ethereum slashing penalty.
Do you remember that?
A. Yes, I do remember.
Q. And I believe you had also testified that a validator can be slashed for proposing two blocks.
Do you remember that?
A. Yes.
Q. Fair to say that the concern for proposing two blocks is that a validator can steal MEV?
MR. MARX: Leading again, your Honor.
MR. FANG: Your Honor, it's redirect, and these

questions are designed to appropriately narrow the scope of Mr. Miller's testimony.

THE COURT: You may answer.

THE WITNESS: Can you repeat the question for me?

BY MR. FANG:

Q. Certainly.

Mr. Miller, is it fair to say that a concern from proposing two blocks is that a validator could steal MEV?

A. Yes, a concern from proposing two blocks is that validators could steal MEV.

Q. By the way, I believe you were also asked questions about MEV-stealing on cross-examination.

Do you remember that?

A. We touched on that and related concepts, yes.

Q. Just very briefly, can you explain to the jury what MEV-stealing means?

A. What I think this would typically refer to is the idea that someone out there has created a valuable transaction, something that's going to make them money. As an example, you found a great trade, somewhere you can buy assets at a low price, sell them at a high price, but if you -- if that trade is publicly known, then someone might copy your trade and send it in themselves because they could make money instead of you.

Q. And, Mr. Miller, just remind the jury — what is the Ethereum slash amount?

A. In April 2023, it was one ETH. I'm not exactly sure what it is right now, though.

Q. Based on your knowledge working at Flashbots, can you remind the jury how much MEV is generated by the average block?

A. These days, something like a hundredth of an ETH, I think.

Q. Was that the case in 2023, as well?

A. I don't remember. It was probably a little bit higher. ETH has not been as popular as of late.

Q. Now, is it fair to say, though, that in the typical case, the slash amount exceeds the amount of MEV that can be stolen?

MR. MARX: Objection, your Honor; continued leading.

MR. FANG: Your Honor, again, the questions are intended to try and have an efficient and tailored presentation.

MR. MARX: It's redirect examination.

THE COURT: Why don't you rephrase your question.

BY MR. FANG:

Q. Mr. Miller, how does the slash amount generally compare to the amount of MEV that can be stolen from a block?

A. Generally, the slashing amount is larger than the amount of MEV in a block.

Q. Based on your experience at Flashbots, what's your understanding of why the slashing penalty is higher than the average amount of MEV that can be generated by a block?

A. Well -- so slashing penalty is set as a part of the

Ethereum protocol, in general, to discourage validators from signing two blocks, right? And I actually don't know why it is one ETH specifically. It's an interesting question. It certainly does discourage proposers from signing two blocks to steal MEV because the MEV value for the average block is lower than one ETH, but I'm not sure those things are actually related to each other. I don't know why it's one ETH necessarily.

Q. Mr. Miller, on cross, you were also shown a number of Flashbots public documents regarding MEV-Boost.

Do you remember that?

A. Yes.

Q. So let's start with Defense Exhibit 304.

MR. FANG: If, Ms. Kerest, you can pull that up.

Q. Mr. Miller, is this the MEV-Boost security assessment from June 2022?

A. Yes, it looks like it.

THE COURT: Mr. Fang, do you intend for this document to be published to the jury?

MR. FANG: Yes. Apologies.

If we could go ahead and publish that to the jury?

THE COURT: You may.

BY MR. FANG:

Q. So, again, Mr. Miller, is this the MEV-Boost security assessment from June 2022?

A. Yes.
Q. And is this document available to MEV-Boost users?
A. It's public, so MEV-Boost users could find it.
Q. I want to focus on page 1, specifically the section that says "Validator Clients."
MR. FANG: And, Ms. Kerest, if you can enlarge that, please. It's the third bullet point.
Q. That states: Validators register themselves to relayers through MEV-Boost, ask for specific block headers of the slots they propose, and sign the block header so that the builder can unblind the block contents, to include these contents on the proposed block.
Mr. Miller, is this consistent with the commit-and-reveal procedure that you outlined to the jury?
A. Yes. So the commit is asking for a specific block header for the slot they will propose in signing that, and then the reveal is unblinding the block contents, to include these contents on the proposed block.
Q. Was that commit-and-reveal procedure in place in April 2023?
A. Yes.
MR. FANG: Ms. Kerest, if you can please go to the page on trust assumptions.
Q. Mr. Miller, do you also remember being asked various questions about trust assumptions?

A. Yes, I remember this.
Q. Do you also remember that this document was admitted for its notice to MEV-Boost users generally?
A. Sorry, repeat the question for me one more time?
Q. Is this document available to MEV-Boost users generally? Just remind the jury.
A. Yes.
Q. Is there any discussion in this section or in the audit report, generally, that a validator may change a parent and state root to zero?
A. I would have to reread the security audit, but I don't think so. It's certainly not in this section.
Q. Is there any discussion, to your recollection, regarding a validator sending false data fields?
A. No, not to my recollection.
Q. Is there any discussion -- strike that.
MR. FANG: We can go ahead and take this down.
Q. Mr. Miller, I'd like to show you what's marked for identification as Government Exhibit 3202.
MR. FANG: Just for the witness, the Court, and counsel.
Q. Mr. Miller, is this another publicly available document that Flashbots made available to MEV-Boost users?
A. Yes. It's a document on our blog.
MR. FANG: The government offers Government

Exhibit 3202.

THE COURT: Any objection?

MR. LOOBY: Objection; if admitted, it should be for the same purpose as the similar documents on cross.

THE COURT: All right. I will admit it for a limited purpose. Again, this document is not being admitted for the truth of what is stated in the document, but for notice to a reasonable person using the MEV-Boost system.

(Government's Exhibit 3202 received in evidence)

MR. FANG: Let's publish to the jury.

Ms. Kerest, if you can just call out the first three paragraphs.

And if you can highlight the sentence that says: The solution is a technique called proposer-builder separation, in which validators can outsource the building of blocks to specialized parties called block builders.

BY MR. FANG:

Q. And, here, Mr. Miller, proposer is just a validator, right?

A. In the proof-of-stake context, yes.

MR. FANG: We can go ahead and take this down.

Q. Mr. Miller, on cross, you were asked some questions about Flashbots operating as a block builder, right?

A. I think so, yeah.

Q. And as a block builder, does Flashbots receive transaction bundles from cryptocurrency traders?

A. Yes, we do.

Q. Would it be technically feasible to unbundle those transactions?

A. It would be technically feasible for us to unbundle those transactions, yes -- well, in the past, yes; now, no longer, actually — one nuance.

Q. Well, in the past, has Flashbots ever unbundled transactions?

MR. MARX: Objection; relevance.

THE COURT: Sustained.

BY MR. FANG:

Q. Mr. Miller, yesterday, on cross, you were asked a bunch of questions about MEV trading strategies, as well.

Do you remember that?

A. I think so, yeah.

Q. Do you remember being asked on cross whether an exploit could be considered a part of MEV extraction?

A. Yes, I remember that exchange.

Q. Do you remember testifying that exploits sometimes involve a lot of money, so it makes sense to consider exploits a part of MEV?

A. I said something to that effect; the exact words might change. I'm not sure, but something to that effect, yes.

Q. Do you remember what you meant by that?

A. Well, so the academic definition of MEV is the maximum

amount of value that you could extract if you had control over transaction ordering. So, it doesn't say anything about -- so just in the abstract, right, out of any possible transaction could you include in order to make money? Exploits are often ways that attackers make quite a bit of money, and so by the strict academic definition of MEV as the maximum in a value that you could make from transaction ordering, it makes sense to include exploits within that definition.

It doesn't say anything about sort of the desirability or what people should do, but it is a sort of academic definition, if that makes sense.

Q. Sure.

Would you consider the April 2nd exploit just a trading strategy?

A. I think that misses -- no, I wouldn't.

Q. Why not?

A. It misses a broader part of the picture and other events from April 2nd that were, in my opinion, material to the incident.

Q. What do you mean by that?

A. Well, there was a bug in the MEV-Boost Relay that needed to be triggered that caused unintended use, and none of that has anything to do with cryptocurrency trading.

Q. Mr. Miller, do you also remember being asked questions about an alternative strategy that Low Carb Crusader disclosed

after the April 2nd exploit?
A. Yes, I think so.
Q. Remind the jury — was that strategy ever used?
A. We looked at our logs for the Flashbots relay, and we found no evidence of it being used.
Q. Did the alternative strategy disclosed by Low Carb Crusader involve the use of any zeros in parent and state roots?
A. No.
Q. Now, Mr. Miller — just remind the jury — how did you find out about the April 2nd exploit?
A. I woke up in the morning, and I had texts from a bunch of people telling me there had been an incident, some money had been lost, and I needed to get online urgently.
Q. Ultimately, was Flashbots leadership involved in this response?
A. Yes, including me.
Q. Remind the jury — was Ethereum Foundation?
A. Yes.
Q. Were there security researchers, as well?
A. Yes.
Q. Prior to April 2nd, 2023, how often was Flashbots leadership all involved in a response?
A. Very rarely, very rarely.

MR. FANG: I'd like to publish Government Exhibit 3306 in evidence?

THE COURT: You may.

BY MR. MARX:

Q. Mr. Miller, I believe on cross you were asked if the email that you received from Low Carb Crusader was funny.

Do you remember that?

A. They asked me something to that effect, yeah.

Q. I believe you said that it had a certain absurdity to it, right?

A. That is correct.

Q. Why did you say that?

A. Let me think for a second to see if I can put it in a concise way.

(Pause)

A. I think it felt it had a feeling of absurdity, to me, because the whole situation feels a little unreal. I mean, even this moment, right now, feels a little unreal. But certainly reading that email feels a little unreal. It was software that I had helped develop, somehow people had lost tens of millions of dollars from it, and now I was being anonymously communicated with by somebody going by a cartoonish name Low Carb Crusader. That feels a little surreal, a little absurd, to me.

MR. FANG: Ms. Kerest, if we can go a couple of pages into this document where there's an email that says: I'm disclosing it as a goodwill gesture.

Perfect.

And, Ms. Kerest, if you can blow up that middle email for the jury.

Q. Mr. Miller, do you remember being asked questions on cross about this email?

A. I think so, yeah.

Q. Okay. So just to pause on this section, had the exploiters just made millions of dollars from the exploit?

A. Yes. Well, a couple of weeks before, but, yeah.

Q. And to continue, do you see where it says, and only asking for the transparency requested in the previous email?

A. Yes.

Q. At this time, did you know the identity of this Proton mail account's user?

A. Not the real names.

Q. Did the Proton mail user ever reveal their identity?

A. No.

Q. And the same month, in April 2023, were you also in communication with Anton and James Peraire-Bueno using their known user names?

A. Yes.

Q. Did they ever take responsibility for the exploit using their known user names?

A. No.

Q. Now, Mr. Miller, I just want to show you, very briefly,

Government Exhibit 3208.

Is this a document that Flashbots made publicly available regarding how MEV-Boost works?

A. Yes. It has some information about how MEV-Boost works, and it was publicly available on our docs website.

MR. FANG: The government offers Government Exhibit 3208.

MR. LOOBY: The same position on the purpose for admission.

THE COURT: Again, it will be admitted. It is admitted for a limited purpose — not for the truth of the document, but for notice to a reasonable person using the MEV-Boost system.

(Government's Exhibit 3208 received in evidence)

BY MR. FANG:

Q. Mr. Miller, just very briefly, was this a document that was available to MEV-Boost users in April 2023?

A. Yes.

MR. FANG: Okay. We can take this down.

Q. You said on cross that — switching gears — you said on cross that there were at least 400,000 validators on Ethereum in April 2023.

Do you remember that?

A. Yes.

Q. Just remind the jury — what percentage of validators were

using MEV-Boost in April 2023?
A. 95 percent.
Q. And, again, how many times has Flashbots ever blacklisted a validator?
A. Only once.
Q. Which validator was that?
A. The validators that were controlled by the perpetrator of the April 2nd incident.
MR. FANG: Just a moment, your Honor?
(Pause)
MR. FANG: No further questions, your Honor.
THE COURT: Anything further with this witness?
MR. LOOBY: None for James Peraire-Bueno.
MR. MARX: And nothing for Anton Peraire-Bueno. Thank you, your Honor.
THE COURT: Thank you, Mr. Miller. You can step down.
(Witness excused)
THE COURT: Is now a good time for a break?
MS. KUDLA: I think so, your Honor.
THE COURT: All right.
We are going to take our afternoon break now. My prior instructions apply. Do not discuss this case with anyone. Don't do any research. Don't read anything about this case. And please keep an open mind.
I'll see you all in 15 minutes.

(Jury not present)

THE COURT: Please be seated.

Anything for us to take up now?

MS. KUDLA: No, your Honor.

THE COURT: Anything from defense?

MR. MARX: No. Thank you, your Honor.

MR. LOOBY: Just one note, your Honor, which is: We did just want to note for the record regarding last night's filing regarding the scheme to defraud instruction. There will be, of course, opportunities to discuss that in the future in due time, but we did want to just note our position that we believe this is a significant event in the case, that a lot of these -- the fears that we had all along have been articulating about being unclear about what the government's theories were, and the drift from the indictment theories seem to, in our view, have come to fruition, and there may need to be supplemental expert disclosures and other litigation surrounding that. We just wanted to note that because of the timing of last night's filing.

(Continued on next page)

THE COURT: All right. I hope we are not in a position of dealing with supplemental expert disclosures and additional briefing.

Ms. Kudla.

MS. KUDLA: Your Honor, the indictment was clear as to all aspects of the evidence that is coming in. We have made voluminous Rule 16 discovery, voluminous 3500 discovery. All of these topics are included within that material. There is no surprise or deviation from the allegations in this case or the scheme to defraud as alleged.

MR. LOOBY: Your Honor, there's quite a few surprising developments in last night's filing, including the allegation that one of the alleged misrepresentations is pretending to be an honest validator, which is, of course, not an allegation contained in the indictment and appears to be a theory that the government has discovered in the past couple weeks alone in its 3500 material with its witnesses and which Mr. Miller was permitted to testify to as a definition of a term as part of his testimony just to be able to explain for the jury, you know, the context around his limited testimony about his personal experience involved in the investigation.

And now we have learned that it's an additional independent alleged misrepresentation, the materiality of which the jury will be asked to evaluate at the close of the case. And so that's just one example.

And so we respectfully -- we disagree. We think that several of these alleged misrepresentations are new; in fact, several of them, it's very unclear, even having sat through three days of trial testimony, what they even are getting at or what they mean. And so we are just going to be evaluating that. And I just -- you know, I wanted to take the moment just to note that for the record so that it didn't go unremarked upon, considering how important we think it is.

THE COURT: All right.

Mr. Looby, do you have a sense of when it would be appropriate for me to take this issue up? Because I don't want to leave it to the last minute, but I don't know that we need to deal with it this second.

MR. LOOBY: That's right, your Honor. I mean, I think ultimately it could be dealt with at the charge conference as well. Maybe there would be, like, letter briefing in advance of the charge conference on just this issue, and then we can deal with the rest of it and just, you know, have the charge conference itself. We're open to a number of different ways. We just wanted to let the Court know that that is -- as the Court, no doubt, understands, it's a big issue in the jury instructions and we just wanted to make that noted.

THE COURT: Understood.

And perhaps it makes sense to just discuss briefly my thoughts about the timing for that charge conference.

I was thinking --

MS. KUDLA: Your Honor, irrespective, while you're looking at the calendar for the charge conference, in light of what Mr. Looby is raising, we would like to have him brief this sooner rather than later. So we would request a briefing schedule of Monday, with an opportunity for the government to respond early next week. We believe that these issues can be swiftly dealt with, and that way when we're proceeding into the charge conference and also as we proceed through testimony, there's clarity for the parties.

THE COURT: All right. Mr. Looby, how about a Monday filing for you all and a Wednesday filing for the government?

MR. LOOBY: That works for us, your Honor.

THE COURT: All right.

In terms of the timing for the charge conference, I was actually thinking that Halloween might be a good day, unironically, to do this charge conference and perhaps give the jury a little bit of a break while we work. I also will need to leave at a decent hour to get home to my own trick-or-treater. But I was thinking that we could have a little bit of a shorter day that day in terms of testimony, use some of the time for the charge conference, and then hopefully end a little bit early on the 31st.

Any thoughts with respect to that, Ms. Kudla?

MS. KUDLA: I refuse to do it unless Mr. Looby comes

in costume. But, other than that, I believe that that would be appropriate. I assume that the question will be where we are in the case-in-chief at that point in time. We anticipate certainly being done, as of now, I think by the 28th, giving a little bit of a buffer, and then it would be the defense's case.

But I think the proposal is appropriate for now with some flexibility if we need to change, and then defer to the defense for the remarks there. And I think it might be helpful to get the Court's thoughts on October 24th testimony as well, in light of one of the juror's medical appointments.

THE COURT: Yes. And it sounded like we won't know the time of that appointment, unfortunately, until the 23rd. So we're just going to have to -- I'll let the jury know maybe middle of next week that there may be some scheduling changes during the week, and that I'll keep them as updated as I can on that schedule, and then we'll get a sense of that appointment and work around it.

Mr. Looby.

MR. LOOBY: The Halloween charge conference sounds like it will be a scary delight.

THE COURT: All right.

All right. I think we might have worked entirely through the break, but let's try and take five minutes.

(Recess)

THE COURT: Ms. Tran, please bring out the jury.

MS. KUDLA: Your Honor, while they're bringing in the jury, we wanted to let you know that government and defense counsel for this upcoming witness, we conferred about exhibits. There's no objections, so that should run smoothly.

THE COURT: Excellent. Thank you.

(Jury present)

THE COURT: The government may call its next witness.

MS. KUDLA: Thank you, your Honor.

The government calls Mr. Travis Chen.

TRAVIS CHEN,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state your full name for the record, spelling out your last name slowly.

THE WITNESS: Travis Chen, C-H-E-N.

THE DEPUTY CLERK: Thank you. Please be seated.

DIRECT EXAMINATION

BY MS. KUDLA:

Q. Good afternoon, Mr. Chen.

How old are you?

A. Twenty-eight.

Q. What's your educational background?

A. I'm a BS and MS in computer science.

Q. And where did you receive your computer science degrees?

A. From Stanford.
Q. Where is Stanford University located?
A. In California.
Q. What year did you receive your master's degree in computer science?
A. 2019.
Q. Mr. Chen, where do you live now?
A. I live in Philadelphia.
Q. And what do you do for a living?
A. I work on data for the 76ers.
Q. What are your responsibilities as a data analyst for the 76ers?
A. I build player evaluation models and analyze data.
Q. How long have you held this position?
A. For about two years.
Q. Where did you work prior to the 76ers?
A. I worked for 18Decimal.
Q. Now, Mr. Chen, what is 18Decimal?
A. It was a cryptocurrency trading company.
Q. Which cryptocurrency?
A. It is a form of digital currency transacted on the blockchain.
Q. Mr. Chen, who did you work for at 18Decimal?
A. I worked with James and Anton.
Q. What were their last names?

A. Peraire-Bueno.
Q. How long did you work for Anton and James?
A. Just under two years.
Q. And do you recognize Mr. Peraire-Bueno in the courtroom today, Anton?
A. Yes.
Q. Can you please describe an article of clothing that he may be wearing?
A. He has like a pink tie.
MR. MARX: May the record reflect he's been identified.
MS. KUDLA: Okay.
Q. And do you recognize Mr. James Peraire-Bueno in the courtroom here today?
A. Yes.
Q. And can you identify Mr. James Peraire-Bueno by an article of clothing he may be wearing?
A. He has glasses and a white shirt.
Q. Okay.
MS. KUDLA: May the record reflect that the witness has identified the defendants.
THE COURT: Yes.
Q. Mr. Chen, when were you hired?
A. Approximately end of 2021.
Q. Who hired you?

A. James and Anton and Fabiano.
Q. Who's Fabiano?
A. He was another partner at the company at the time.
Q. How long did Fabiano remain at 18Decimal?
A. I think he left some time close to the summer of 2022.
Q. When Fabiano left, who did you report to?
A. James and Anton.
Q. Who decided your salary at 18Decimal?
A. James and Anton.
Q. Who had the authority, Mr. Chen, to terminate your employment?
A. James and Anton.
Q. While you were employed by the defendants, who did you report to during that time?
A. James and Anton.
Q. And can you -- Mr. Chen, can you speak up a little bit into the microphone.
A. Yes.
Q. Thank you.
What was Anton's role at 18Decimal?
A. I saw him as a manager, but I believe his official title is president.
Q. And what about James's role at 18Decimal?
A. Something similar.
Q. Were there anyone above Anton or James at 18Decimal?

A. Not that I was aware of.
Q. And, Mr. Chen, don't worry, you don't have to be right in the microphone every time. I apologize about creating that.
What was your position at the company?
A. My title was quantitative trader.
Q. And what were your responsibilities as a quantitative trader at 18Decimal?
A. I worked on developing the software that we use to transact on the blockchain.
Q. So when you say you worked on developing the software, what exactly does that mean?
A. Things such as improving the speed of our programs, the identifying new trading opportunities, and tasks such as that.
Q. Did that involve coding?
A. Yes.
Q. Now, how would you trade on the blockchain? What were you using?
A. In general, we transacted on Ethereum, Arbitron and, yeah, we used blockchain transactions.
Q. And were these trading transactions that were conducted by trading bots or were they conducted by you personally?
A. Generally by trading bots.
Q. And what is involved in writing code for trading bots, Mr. Chen?
A. You write code that identifies trading opportunities and

then you execute on it.
Q. And what were you making the trading bots execute on with respect to your computer code?
A. Generally speaking, good trading opportunities. Yeah.
Q. What were you trying to do with the trading bots?
A. Generally speaking, we were trying to acquire tokens for a lower price than we ended up selling them for.
Q. And, ultimately, what was the hope of that trading strategy?
A. To be profitable and make money.
Q. Now, prior to your work at 18Decimal, Mr. Chen, had you ever worked in cryptocurrency before?
A. Not at a company.
Q. How would you compare your experience in cryptocurrency trading compared to James?
A. I would say he was more experienced at the time I joined.
Q. How about compared to Anton's experience?
A. I would say the same.
Q. Now, who had primary authority over 18Decimal's trading strategies?
A. Generally, James and Anton.
Q. Now, Mr. Chen, in the context of your work with the defendants, were you familiar with the term "omakase"?
A. Yes.
Q. What did omakase do?

A. Omakase was an operation that profited at the expense of sandwich bots.
Q. In the most simple terms for now, how did omakase profit at the expense of sandwich bots?
A. We facilitated -- or sandwich bots submitted bundles that we as validators received and put in dump transactions into and profited.
Q. When you say "sandwich bots," who operates sandwich bots?
A. Other MEV traders.
Q. What did you do with respect to omakase?
A. I was a developer on it.
Q. And as a developer on it, what specifically were you doing?
A. I was writing code for it.
Q. Did you do that alone or did you do it with other people?
A. I did it with other people.
Q. Who are the other people?
A. James, Anton, and Jad.
Q. We'll come back to Jad later today. But when did you, Anton, James, and Jad execute omakase?
A. April 2nd, 2023.
Q. Did you have discussions with the defendants about omakase prior to April 2nd, 2023?
A. Yes.
Q. When did those discussions begin, Mr. Chen?
A. I believe at the end of 2022.

Q. After your involvement in omakase, did there come a point in time when you were contacted by law enforcement?
A. Yes.
Q. And what did you learn?
A. I learned that the IRS was interested in speaking to me, and that an indictment had been dropped against James and Anton.
Q. What did you decide to do with regards to the investigation, Mr. Chen?
A. I retained counsel and decided to cooperate with the government.
Q. Are you testifying here today pursuant to an agreement with the government?
A. Yes.
Q. What is that agreement called, Mr. Chen?
A. The agreement is called a nonprosecution agreement.
MS. KUDLA: Mr. Naguib, can you please show for the witness what is marked for identification as Government Exhibit 201. And can you --
Q. Well, first, let me ask you, Mr. Chen, do you recognize this document?
A. Yes.
Q. What is it?
A. It is a copy of a nonprosecution agreement.
MS. KUDLA: Mr. Naguib, can you please turn to page 4.

Q. Did you sign this agreement, Mr. Chen?
A. Yes.
Q. Okay.
MS. KUDLA: The government moves to admit Government Exhibit 201.
THE COURT: Any objection?
MS. TREFZ: No objection.
THE COURT: It is admitted.
(Government's Exhibit 201 received in evidence)
MS. KUDLA: Your Honor, may we publish?
THE COURT: You may publish.
Q. Mr. Chen, what is your understanding of your obligations under this agreement?
A. My understanding of my obligations is to state nothing but the truth to the best of my abilities, and to cooperate to the best of my abilities with the government in this case.
Q. Mr. Chen, can you commit any additional crimes?
A. No.
Q. Do you have to meet with the government if asked?
A. Yes.
Q. And is there a forfeiture component to this agreement?
A. Yes.
Q. What is that forfeiture component?
A. I had to give $2.4 million to the government.
Q. And what did that $2.4 million come from?

A. My proceeds from omakase.

MS. KUDLA: Now, let's call out paragraph 1.

Q. If you meet your obligations under the agreement, what will the government do for you, Mr. Chen?

A. The government will not prosecute me for the crimes listed.

Q. And specifically, what crimes does this agreement cover?

A. Wire fraud, money laundering, and personal drug use.

Q. What was your participation in the wire fraud for the omakase?

A. My participation in omakase was as a software developer.

Q. And what was your participate in the concealment of money from omakase?

A. My participation in off-ramping omakase was signing off on certain transactions and participating in discussions.

MS. KUDLA: You can take this down, Mr. Naguib.

Q. When you met with the government, what were you required to do with respect to any prior bad conduct you had?

A. To disclose it.

Q. And if you lie here today while testifying, what is your understanding to what will happen to that agreement?

A. It no longer applies.

Q. And if you lie today, Mr. Chen, can you be prosecuted for perjury?

A. Yes.

Q. Does the outcome of this trial have any effect on your

nonprosecution agreement?
A. No.
Q. So I want to switch gears for a moment, Mr. Chen. And before we turn to omakase, I want to ask you a few more questions about your job at 18Decimal.
Are you familiar with the term MEV Bot?
A. Yes.
Q. How did you become familiar with that term, Mr. Chen?
A. I believe I encountered it on the internet when I was learning about crypto.
Q. Now, when you worked at 18Decimal, did the defendants operate MEV Bots?
A. Yes.
Q. And what does the term MEV stand for?
A. Maximum extractable value or minor extractable value.
Q. In plain English, what does that mean?
A. I understand it to be the value you can extract from transactions and transaction ordering on the blockchain.
Q. And let's start from a basic piece: What is a block?
A. A block is a set of transactions you are adding to a blockchain.
Q. And where does a block get published?
A. Where does it -- it gets published to the blockchain.
Q. And very briefly, what's the blockchain?
A. The blockchain --

Q. These guys are experts in it by now, but go for it. What is the blockchain?
A. The blockchain is a ledger of transactions that have happened in the history of the particular blockchain.
Q. And what do MEV Bots do?
A. MEV Bots try to make profit by submitting and ordering transactions.
Q. Now, did you write computer code for MEV Bots at 18Decimal?
A. Yes.
Q. And at the most basic level, what did you want those MEV Bots to do when you were writing code?
A. I wanted them to identify profitable opportunities and execute on them.
Q. And if that happened, what would be the result for you and the defendants?
A. To make profit.
Q. Now, focusing on the code, did anyone review the code that you would draft, Mr. Chen?
A. Yes.
Q. Who would do that?
A. James, Anton, and Fabiano.
Q. And prior to omakase, what was the name of 18Decimal's main trading strategy?
A. A broad category of atomic arbitrage.
Q. And in general terms, describe how atomic arbitrage worked.

A. In general terms, within a single transaction, you are trying to buy a cryptocurrency at a lower price than you're selling it for.
Q. Where did you live while you were working for the defendants?
A. I lived in Manhattan, New York.
Q. And where were the defendants located?
A. I believe Anton was located in Boston. James was living in Boston; then I believe he moved to Seattle.
Q. How did you typically communicate with the defendants?
A. Through Slack and Google Meets.
Q. And what's Slack?
A. Slack is a messaging platform that companies use.
Q. And could you communicate with Slack on your computer?
A. Yes.
Q. How about your phone?
A. Yes.
Q. Now, you mentioned Google Meets. What's Google Meets?
A. Google Meets is a videoconferencing technology.
Q. And maybe put the microphone just a little bit closer. We'll try to find a happy medium.
Okay. Did you ever meet the defendants in person, Mr. Chen?
A. Yes.
Q. Approximately how many times did you meet Anton in person?

A. If I have to guess, on the order of ten to 20.
Q. Over how long?
A. Like two and a half years or so.
Q. And what about James?
A. Probably on the order of five to ten.
Q. Now, during your conversations with the defendants, did their educational backgrounds ever come up?
A. Yes.
Q. What did Anton say about where he went to school?
A. Anton went to MIT.
Q. And what did Anton say he studied at MIT?
A. I believe computer science.
Q. And what about James, where did he go to school?
A. MIT.
Q. Just to be clear, what is MIT?
A. The Massachusetts Institute of Technology.
Q. And what did James say that he had studied?
A. I believe aeronautics and astronautics and math.
Q. Now, was there any type of familial relationship between Anton and James?
A. Yes.
Q. What was that?
A. They are brothers.
Q. Who is older, Anton or James?
A. James.

Q. Now, Mr. Chen, when did you first learn about omakase?
A. At the end of 2022.
Q. Who introduced it to you?
A. James and Anton.
Q. How did that happen?
A. We had a meeting.
Q. And where were you located for this meeting?
A. I was in New York.
Q. Where in New York?
A. In Manhattan.
Q. Now, where were Anton and James for the meeting?
A. I'm not sure.
Q. Were they with you here in New York?
A. No.

MS. KUDLA: Mr. Naguib, can you please show the witness what's marked for identification as Government Exhibit 3605 and 3605-A.

Q. Do you see that on your screen?
A. Yeah.
Q. Okay. Mr. Chen, what are these exhibits?
A. This is a Google Meet invite to that meeting.

MS. KUDLA: The government offers Government Exhibit 3605 and 3605-A.

THE COURT: Any objection?

MS. TREFZ: No objection.

THE COURT: They are admitted.

(Government's Exhibits 3605, 3605-A received in evidence)

THE COURT: You may publish.

MS. KUDLA: Thank you, your Honor.

Mr. Naguib, can we please call out 3605-A, the top heading, the basically top third of the document.

Q. So now that the jury can see it, Mr. Chen, who organized this meeting?
A. Anton.
Q. And where do we see that?
A. The organizer heading.
Q. And who was invited to attend this meeting?
A. Anton, Jad, James, and myself.
Q. What was the date of this first omakase meeting?
A. December 29th.
Q. Of what year?
A. 2022.
Q. And what is the subject line for the meeting?
A. "Exotic MEV discussion."
Q. Now, let's focus on Jad for a moment.

Who is Jad?
A. He was another coworker of ours.
Q. Now, did you have any discussions with Jad regarding his educational background?

A. Jad went to MIT as well.
Q. Do you know what Jad studied?
A. I believe aeronautics and astronautics engineering.
Q. Now, in general, what was discussed at the exotic MEV meeting?
A. In general, omakase was introduced.
Q. Who led the meeting?
A. James and Anton.
Q. And who described the omakase plan to the group during that meeting?
A. James and Anton.
Q. Mr. Chen, did you take any notes while you were attending this meeting?
A. Yes.
Q. Why did you take notes?
A. To have something to reference after the meeting and if I had any follow-up questions.
Q. And, generally, whose statements were you writing down while you were taking those notes?
A. Some combination of James, Anton, and any notes I had or follow-ups I wanted to ask.
MS. KUDLA: Mr. Naguib, can you please show the witness what's marked for identification as Government Exhibit 4101.
Q. Mr. Chen, do you recognize this document?

A. Yes.
Q. What is it?
A. It's the meeting notes.
MS. KUDLA: The government offers Government Exhibit 4101.
THE COURT: Any objection?
MS. TREFZ: No objection.
THE COURT: It is admitted.
(Government's Exhibit 4101 received in evidence)
THE COURT: You may publish.
MS. KUDLA: Thank you, your Honor.
Mr. Naguib, can we publish for the jury. And let's call out the top third of this document.
Q. Mr. Chen, what's the date of these meeting notes?
A. December 29th, 2022.
MS. KUDLA: Mr. Naguib, can you please highlight the first paragraph, "new MEV shit."
Q. Mr. Chen, what was that referring to?
A. That was referring to omakase.
Q. And who was speaking while you were taking notes describing omakase?
A. James or Anton.
MS. KUDLA: Now, can we please highlight, Mr. Naguib, "new addresses tell nobody outside of people working on it."
Q. Mr. Chen, during the meeting, what, if any, instructions

were given about sharing omakase with others?
A. To keep it internal to the group working on it.
Q. And who gave these instructions?
A. James or Anton.
Q. Now, who were the people working on omakase?
A. James, Jad, Anton, and myself.
Q. Was there anyone else who also participated?
A. Jaume to a limited extent.
Q. Who is Jaume?
A. James and Anton's dad.
Q. Did you have any discussions with the defendants about where Jaume worked?
A. He worked at MIT.
Q. And what department?
A. Aeronautics/astronautics.
Q. Were there any other employees working for the defendants at this time, Mr. Chen?
A. Chris was the name of a contractor that was working for 18Decimal.
Q. Mr. Chen, did you ever talk to Chris about omakase?
A. No.
Q. Why not?
A. Because we were to keep it internal to the people working on it.
Q. Mr. Chen, did there ever come a time where you referenced

omakase in Chris's presence?
A. Yes.
Q. When did that occur?
A. May or June of 2023.
Q. Was that before or after the execution of omakase?
A. After.
Q. And what happened?
A. I was reminded that we should keep it internal to the people working on it.
Q. Who gave you that reminder?
A. I believe Anton.
Q. Where were you guys?
A. We were in Madeira, Portugal.
Q. And who was present?
A. James, Jad, Anton, myself, and Jaume and Chris.
Q. Now, turning back to atomic arbitrage for the moment, how, if at all, did the defendants' disclosure instructions for omakase differ from atomic arbitrage?
A. I think for atomic arbitrage it was a bit more implicit that we wouldn't disclose any novel strategy we had. He was a bit more explicit.
Q. Have you ever received an express directive for atomic arbitrage to not tell anyone not working on that project?
A. Not that I recall.
Q. Now, focusing on the December 2022 omakase meeting,

Mr. Chen, in general terms, how did Anton and James describe omakase?
A. They described it as a strategy we could use to profit at the expense of sandwich traders using the features at Proposer-Builder Separation.
Q. And, in particular, what software implemented Proposer-Builder Separation?
A. MEV-Boost.
Q. What are sandwich traders?
A. They are a type of MEV trader that profits by front-running users, meaning noticing a user is going to make a certain trade, and basically copying that trade ahead of that user. And then letting the user increase or, you know, change the price a bit more, and then closing out the trade on the other end.
Q. Why is it called a sandwich trade?
A. Because visually it looks like one of their trades front-running a user, and then one of their trades back-running a user; so the structure, it looks like a sandwich.
Q. When you worked for the defendants, did you ever come across something called a trading bundle?
A. Yes.
Q. And what's a trading bundle, Mr. Chen?
A. You can submit a bundle of transactions that you want to appear to what's known as a block builder and hope that it

appears on the block.
Q. Now, using the trades A, B, and C as an example, can you describe how a trading bundle works.
A. So a sandwich bundle would look something like buy Shiba coin, bump up its price a lot, a user buys a little more Shiba coin, increasing the price a little bit more, and then selling Shiba coin at this increased price.
Q. You sort of anticipated my next question, but are sandwich trades a kind of trading bundle transaction?
A. Yes.
Q. Now, is the timing of cryptocurrency trades in sandwich trading important?
A. Can you repeat the question?
Q. Certainly. Is the timing of these trades in sandwich bundles important?
A. Do you mean ordering?
Q. Yes.
A. Sandwich traders want to execute trades in the order outlined to profit.
Q. Why?
A. Because that particular sequence of trades is profitable for them.

MS. KUDLA: Now, Mr. Naguib, can you please highlight "bigger concern is we don't want targets on our back look into contract, etc."

Q. Mr. Chen, what did you understand the defendants to mean when they said that they "don't want targets on our back looking into the contract"?
A. I understood it to mean that sandwich traders might be upset and we'd have a target on our back if we profited at their expense.
MS. KUDLA: Mr. Naguib, please highlight now "how does Flashbots feel about it."
Q. What was Flashbots?
A. Flashbots was a company that built software for the Ethereum blockchain.
Q. How was Flashbots relevant to the omakase plan?
A. They maintained an open source implementation of MEV-Boost that some of the relays and other parties used or used similar versions of.
Q. Why was MEV-Boost important to the omakase plan?
A. It was going to be the mechanism by which we receive sandwich bundles.
Q. Who traded through MEV-Boost?
A. Many parties, including the sandwichers.
Q. Did the targets of your operation trade through MEV-Boost?
A. Yes.
Q. Now --
A. Or I guess they submitted to builders, who then sent bundles to the MEV-Boost relay.

MS. KUDLA: So can we highlight now, Mr. Naguib, "how does Flashbots currently work, post merge MEV-Boost."

Q. During this meeting, Mr. Chen, did the defendants describe how MEV-Boost worked?

A. At a high level, yes.

MS. KUDLA: And, Mr. Naguib, can you now please highlight the following: "How does this work?"

And then please scroll up a little bit. "Searchers submit to block builders."

Q. During the meeting, who did the defendants say the searchers are or who are searchers?

A. Searchers are MEV searchers, meaning people that try to profit through their transactions on the blockchain.

Q. And what do searchers submit to block builders?

A. Either individual transactions or bundles.

Q. Now, in the omakase plan, who were the searchers that you and the defendants were going to target?

A. The sandwich traders.

Q. Now, according to the defendants, who would these sandwich traders submit their trading bundles to?

A. Block builders.

MS. KUDLA: And, Mr. Naguib, can you please highlight "block builders produce blocks that have us as the bait."

Q. Come back to the bait in a moment, but let's focus for the moment how MEV-Boost operates for now.

According to the defendants, what is the role of the block builder in the MEV-Boost system?
A. The role of the block builder is to produce blocks.
Q. And what does the block builder use, Mr. Chen, to build a block?
A. They can use a variety of sources. These include the bundles that searchers send them, individual mempool of transactions, private order flow, their own transactions, and potentially other sources.
Q. For the block builder going back to the traded bundle that you described for us for a sandwich trade, trade A, B, and C, what does the block builder do with this type of bundle?
A. In the most common use case, they choose to include the bundle or not in the block they construct. And then forward that block along to the MEV-Boost relay.
Q. And just to orient us here, at this point in time, Mr. Chen, are these trading bundles, are they proposed trades or are they executed trades?
A. They are proposed trades.
Q. And when does a cryptocurrency trade get executed?
A. A cryptocurrency trade gets executed once the block gets propagated to other nodes in the network and it gets accepted as the next block.
Q. Now, once trades are added to the blockchain, to your knowledge, Mr. Chen, can they be changed?

A. Once a block containing trades is accepted as the next block, it cannot be changed.
MS. KUDLA: Now, Mr. Naguib, please highlight "send blocks to the relay."
And highlight "validators tell the relay I'm ready to produce a block."
And then please highlight "important note. Validators never see these blocks."
And finally, highlight "relay returns to validator the header. Sign this block."
Q. Now, Mr. Chen, according to the defendants, who did the block builders send the proposed blocks to?
A. They sent proposed blocks to the relay under the MEV-Boost system.
Q. And what does the relay do under the MEV-Boost system?
A. The relay exposes a block header to validators, and conditional on the validators signing that block header, then releases the full block to the validator.
Q. We'll break it down for a second.
You mentioned the header. What type of information is contained in the header?
A. The block header generally contains metadata about the block, which does not include the particular transactions.
Q. Now, what was the role of the validator using the MEV-Boost system?

A. The role of the validator was to propagate the block after signing the block header and receiving the full block.
Q. Now, according to the defendants, in the MEV-Boost system, does a validator see these proposed trading bundles before signing for the block?
A. Not before signing the block header.
MS. KUDLA: Mr. Naguib, can you please now highlight "validator to sign it. Propagate it."
Q. What does it mean to propagate it?
A. To propagate a block means to send a proposed copy of the block to other nodes in the network that attest to whether that's a block they want to be included as the next block.
Q. And what do you mean "other nodes in the network"?
A. Ethereum is a decentralized network, meaning that it runs on many computers across the world. And these computers are known as nodes.
Q. And what happens when these -- the validator, after signing to get the proposed block, what happens when they propagate this to the nodes?
A. Sorry, could you repeat the question?
Q. Certainly.
After the validator receives the proposed block and propagates it to the nodes, what happens?
A. If the nodes accept that block, then it becomes the -- what's known as the canonical block or the next block.

Q. Mr. Chen, what does that mean for the trader who submitted the proposed trade?
A. If that trade got included in the block that the validator ended up sending, then that trade would execute.
MS. KUDLA: Mr. Naguib, please highlight now "when we submit the signature, they return to us the full block."
Q. Now, once again, while you were taking notes, who were the people describing how MEV-Boost worked to you?
A. James or Anton.
Q. And according to the defendants, when are the full block contents revealed to the validator?
A. After signing the block header.
Q. And, Mr. Chen, here your notes refer to "us." What did "us" mean?
A. "Us" meant the four of us as the validator operators.
Q. Okay. And in the omakase plan, did you and the defendants operate as a block builder, relay, or validator?
A. We were a validator.
Q. And who made the decision to operate as a validator?
A. I think the group or James and Anton.
Q. Now, why did you want to operate as a validator?
A. Because it was one of the ways that we could receive the block and propagate the version that we wanted.
Q. What would be in the block that you would receive, Mr. Chen?

A. The sandwich bundles.
Q. And why was it important to get the sandwich traders' bundles back?
A. Because we are going to add in a dump transaction and propagate that version of the block.
Q. What effect did adding in the dump transaction to your proposed block as a validator do?
A. It enabled us to profit at the senator's expense.
Q. Whose money were you taking at that moment?
A. It was money the senators had traded.
Q. Where did that money go?
A. They traded one cryptocurrency for another into what's known as a liquidity pool. And then we traded on that same liquidity pool to receive the crypto they had traded away.
Q. Where did the money end up, Mr. Chen?
A. The money ended up in our cryptocurrency addresses that executed the dump transactions.
Q. How long did that take?
A. It took the length of one block, which is approximately 12 seconds.
Q. Did you want that to occur?
A. Yes.
MS. KUDLA: Now, let's highlight -- oh, it's there.
Q. "We submit the signature, they return the full block to us."

Who's the "they" that's being referred to in these notes?
A. I believe the relay.
Q. And according to the defendants, when did the relay give you the full block that would contain your target's trading bundles?
A. When we submit a signature of the block header.
Q. Now, in the omakase plan, according to the defendants, what was giving you access to the sandwich traders' transactions?
A. The fact that we signed the block header and then received the full block.
Q. Prior to omakase, did you and the defendants ever use MEV-Boost as part of your own atomic arbitrage trading strategy?
A. We submitted atomic bundles to block builders who then used -- submitted to MEV-Boost relay.
Q. And when you and the defendants submitted bundled transactions using MEV-Boost, Mr. Chen, what did you typically expect would occur?
A. In the most common use cases, either our bundle would not appear or it would appear in the order that we sent it.
Q. So they would land on chain in order or not at all?
A. Most commonly, yes.
Q. And why did you have that expectation, Mr. Chen?
A. Some combination of empirical evidence and documentation.

Q. When you say "empirical evidence," is that the result of trading bundles that you submitted and could observe on chain?
A. Yes.
Q. And when you say "documentation," what type of documentation?
A. The documentation of how the block Builder API specs worked, meaning the documentation for the block builders basically.
Q. And based on that evidence, did the trading bundles typically land as intended or not at all?
A. Yes.
Q. Okay. Now, after the defendants described the plan for omakase to you at this meeting, did you personally, Mr. Chen, take any additional steps to learn about the MEV-Boost software?
A. I believe that I Googled around and read internet sources on how some of it worked.
Q. In addition to the -- what are some of the internet sources that you reviewed, Mr. Chen?
A. Write-ups on the MEV-Boost system, some of the source code, the Flashbots documentation, stuff like that.
Q. Now, when you said -- focusing on the MEV-Boost source code for a moment, where was that located?
A. That was located on a GitHub repository that was on GitHub.com.

BY MS. KUDLA:
Q. And who operated that GitHub repository?
A. I believe Flashbots was the contributor to it.
Q. Just briefly, what's GitHub?
A. GitHub is a website or just software service that lets you store versions of code.
Q. Mr. Chen, in front of you, there are a number of flash drives, but can you find the flash drive labeled Government Exhibit 502 for a moment.
A. Yes, I have it.
Q. Okay.
And what is Government Exhibit 502?
A. 502 shows a depiction of an example of common-use cases of the MEV-Boost architecture.
Q. And who made the video?
A. I'm not sure. Or the government.
Q. Well, did you make it?
A. No.
Q. But have you reviewed that exhibit prior to your testimony here today?
A. Yes.
Q. Were you able to comment on that video prior to your testimony here today?
A. Yes.
Q. Now, does it fairly and accurately describe, at a high

level, how MEV-Boost system operates in a most typical fashion?
A. Yes, in the most common-use case.
MS. KUDLA: Your Honor, may we publish Government Exhibit 502? It's already in evidence at this time.
THE COURT: You may.
MS. KUDLA: Mr. Naguib, let's please play seconds zero through sixteen.
(Video played)
BY MS. KUDLA:
Q. What's shown on the screen, Mr. Chen?
A. It is a visual depiction of what's known as the mempool.
Q. What's the mempool?
A. The mempool is a set of possible pending transactions that could be added to the blockchain.
Q. Just to be clear, we're talking about cryptocurrency transactions, right?
A. Yes.
Q. Help us out here — what do the circles represent?
A. The circles represent individual transactions.
Q. Now, are the pending trades in the mempool publicly visible, or are they private at this time?
A. The mempool is public.
Q. Who submits a pending cryptocurrency trade to the mempool?
A. Anybody can submit a pending trade to the mempool if they -- yeah, anybody can.

MS. KUDLA: Mr. Naguib, please play 16 through 20.

(Video played)

Q. Who are searchers, shown here?

A. Searchers are the bots that are looking for transactions that, for example, might alter the price of some cryptocurrency and they can use to profit.

Q. Are they humans operating these bots?

A. Humans generally develop these bots, yes.

Q. Based on your experience working for 18Decimal, what type of trades are these researchers looking for in the mempool?

A. Generally speaking, trades that change the price of some token.

MS. KUDLA: Now, Mr. Naguib, can we please play 20 through 31.

(Video played)

Q. Now, what did this searcher do here? What was demonstrated?

MS. TREFZ: Your Honor, I just wanted to note our continuing objection under ECF 136.

THE COURT: Overruled.

You may answer.

THE WITNESS: This is a particular sandwich bundle. This is a sandwich MEV researcher identified a user by transaction that they're choosing to front run with a buy transaction, and then closing out that bundle with a sell

transaction.

BY MS. KUDLA:

Q. Based on your participation in omakase, why are the sandwich traders choosing to bundle in this case?

A. Because it would be presumably profitable for them.

MS. KUDLA: Mr. Naguib, please play 31 to 43.

(Video played)

Q. Whereby does the sandwich trader send these proposed bundles?

A. The sandwich trader, in this depiction, sends this bundle to a block builder.

Q. What -- based on how it was described to you at the omakase meeting, in your participation in omakase, what does the MEV-Boost block builder do here?

A. The block builder tries to build a block, which can include bundles, mempool transactions, and other sources. In this particular depiction, the builder chooses to include the sandwich bundle.

Q. Where do we see the sandwich bundle that we just looked at?

A. In the slightly lighter hue of green and blue.

Q. Right here?

A. Yeah.

MS. KUDLA: Now, Mr. Naguib, please play 43 to 1:06.

(Video played)

Q. Mr. Chen, who does the block header send this proposed

block to?
A. They send it to the relay.
Q. What does the relay do?
A. The relay holds it and exposes the block header.
Q. When does the relay expose the block header?
A. After receiving the block.
Q. Who does that relay send the block header to?
A. If the validator requests it, then the relay would send the block header to the validator.
Q. And how does the validator communicate with the MEV-Boost Relay?
A. Programmatically via an API caller code.
Q. What API call or code is being used to communicate with the MEV-Boost Relay?
A. I believe the endpoint is called -- actually, I don't recall, but, yeah, a particular endpoint that the MEV-Boost software implements.
MS. KUDLA: Mr. Naguib, can we put the video back up for a second.
Q. And while Mr. Naguib puts the video back up, before sending the block header to the relay, does the relay have the full transaction, trader transactions, from the block builder?
A. The relay does.
Q. Does the relay expose them at that time to the validator?
A. At first, they only expose the header.

MS. KUDLA: Mr. Naguib, can you please play 1:06 to 1:11.

(Video played)

Q. You mentioned the header.

What's shown on the screen here?

A. It is a -- maybe forward to where it gets -- it's a depiction of a block header.

MS. KUDLA: Mr. Naguib, can you please play 1:11 to 1:16, please.

Q. Now, in the block -- does this block header, Mr. Chen, at this point in time, contain the list of transactions in the proposed block?

A. The header does not contain a list of transactions.

Q. What does the relay do with the list of transactions?

A. It does what's called blinding. It only reveals the metadata.

Q. Who does the relay blind these transactions from?

A. The validator.

Q. And why is it important in the MEV-Boost system to blind them from the validator?

A. So that the validator receives the full list of transactions only after signing the header.

Q. Why is that important?

A. To maintain proposer-builder separation, meaning that the validator can only receive the full list of transactions if

they've signed for the block header.
Q. What does the signature do?
A. It means one of two things; either that block that they signed is going to be the next block on the blockchain, or if it's not, then it can be used as grounds for slashing.
Q. What's a slashing?
A. A slashing is a disincentive on the Ethereum blockchain, where if, for example, a validator submits two blocks or signs two blocks, then they get a financial penalty.
MS. KUDLA: Let's play 1:16 to 1:26.
(Video played)
Q. Mr. Chen, who does the relay send this block header to now?
A. The relay sends this block header to the validator.
MS. KUDLA: And let's play 1:26 to 1:32.
(Video played)
Q. What does the MEV-Boost validator do when it receives a block header from the relay?
A. It signs it.
Q. How does the MEV-Boost validator sign for the block, Mr. Chen?
A. It adds the field called signature, which is calculated based on the other data in the block.
Q. In particular, what data do we see shown in this block?
A. The data shown is parent and state roots, and those are a subset of the fields used to generate the signature.

Q. Who inputs the parent and state root?
A. I believe it's given in the block header.
Q. How does the parent and state root get introduced to the signature, if at all?
A. The signature is, in part, derived from the parent and state root.
MS. KUDLA: Mr. Naguib, can we put the video back up for a moment. Sorry, I think when I touch the screen, it's causing the problem.
Q. Mr. Chen, please hold for one moment while we put this back up. I paused at 1:32.
What is a parent root?
A. I believe it's the hash of the previous block.
Q. And what is a state root?
A. I believe it's the hash of the state of the blockchain overall in some capacity.
Q. Does each block on the blockchain have a unique parent root?
A. Yes.
Q. And what about a unique state root?
A. Yes.
MS. KUDLA: So let's play 1:33 to 1:42.
(Video played)
Q. Who does the MEV-Boost validator send the signed block header to?

A. They send it back to the relay.
Q. And what does the relay do when it gets this signed block header?
A. The relay unblinds the transactions, meaning it reveals the transactions.
Q. Now, using the MEV-Boost system, can a validator receive this transaction data, Mr. Chen, without the signed header?
A. Not without a signed header.
Q. What is the purpose of making the MEV-Boost validator sign for the block before getting the transaction data?
A. What I mentioned, that if they signed for it, then either it becomes the next block or it can be used as proof in a slashing claim.
MS. KUDLA: Now let's play 1:42 to 1:52.
(Video played)
MS. KUDLA: So let's pause for a moment.
BY MS. KUDLA:
Q. Let's focus on the relay first, at the top, before we move to the validator.
What does the relay do next, after receiving the signed block header, Mr. Chen?
A. The relay propagates it.
Q. Who does it propagate it to?
A. Other nodes on the network.
Q. Where do we see the other nodes on the network in this

video?
A. They are depicted in green dots.
Q. What happens at that point -- what do the consensus nodes do with this proposed block data?
A. They either accept it or don't, and if two-thirds of the nodes that were chosen to attest or approve the next block choose to accept it, then it becomes the next block.
Q. Now, what happens when it becomes the next block? What happens to the trades inside that block?
A. All the transactions get executed.
Q. What happens if the nodes reject it?
A. Then it does not become the next block.
Q. What happens to the trades inside that block?
A. They don't happen.
Q. Now, focusing on the validator — let's turn our focus down — what does the MEV-Boost validator do when it receives the proposed block with the transaction data from the relay?
A. In this depiction, they also propagate the block.
Q. Now, in the most common operation of MEV-Boost system, does the relay and validator send the same or a different signal to the consensus nodes?
A. In the most common-use case, they are sending the same block.
Q. In the operation that you just outlined — that you just outlined — does a validator even need to send a signal to the

consensus nodes?
A. If the relay is peered with other nodes in the network and correctly sending out the block, they don't need to.
Q. Why not?
A. If the relay is doing the job of propagating the block, then, in theory, the validator doesn't have to.
MS. KUDLA: Now, Mr. Naguib, please play 1:52 to 2:09.
(Video played)
Q. Mr. Chen, what just happened to the proposed block that we've been watching go through the system using MEV-Boost?
A. In this depiction, the proposed block got accepted and executed on the blockchain.
Q. This proposed block that we watched go all the way through, does it include those sandwich trader bundles that we looked at at the beginning?
A. This depicted block does include the sandwich bundle.
Q. And where do we see it?
A. On the right-hand side, in the neon green.
Q. As a result, how did these trades get executed on the blockchain?
A. They get executed as the buy/buy/sell.
Q. Now, what, if anything, does a validator get for validating a block in this manner?
A. The validator gets block rewards or validator fees.
Q. What is a -- in dollar amounts, what's the approximate

amount that a validator would receive?
A. I believe in the range of, like, 70 to a hundred dollars.
Q. Now, Mr. Chen, is the process we just watched in Government Exhibit 502 generally consistent with how the defendants described how MEV-Boost operates in the ordinary course at the omakase meeting?
A. Yeah, it would be an example of a common-use case of MEV-Boost.
Q. And is that how that was -- how MEV-Boost works when we looked at the nodes, is this consistent with how that was described?
A. Yes.
Q. I wanted to turn back to the December 29, 2022 meeting, Mr. Chen.
MS. KUDLA: Mr. Naguib, can we please publish what's in evidence as Government Exhibit 4101.
Q. Let's go back to that December 29th meeting.
MS. KUDLA: Can you please place, Mr. Naguib -- let's put 1 and 2 together so we can see -- and, Mr. Naguib, can you please highlight now bait, the bait, unblinding the block, the search, the propagation.
Q. Before we get to what these steps mean, Mr. Chen, what is this list with respect to the omakase plan?
A. These were a list of possible steps we were going to use with omakase.

Q. And who outlined these steps for the omakase plan at the December 29, 2022 meeting?
A. James or Anton.
(Video played)
Q. Mr. Chen, who does the relay send this block header to now?
A. The relay sends this block header to the validator.
MS. KUDLA: And let's play 1:26 to 1:32.
(Video played)
Q. What does the MEV-Boost validator do when it receives a block header from the relay?
A. It signs it.
Q. How does the MEV-Boost validator sign for the block, Mr. Chen?
A. It adds the field called signature, which is calculated based on the other data in the block.
Q. In what particular, what data do we see shown in this block?
A. The data shown is parent/state roots, and those are a subset of the fields used to generate the signature.
Q. Who inputs the parent and state root?
A. I believe it's given in the block header.
Q. How does the parent and state root get introduced to the signature, if at all?
A. The signature is, in part, derived from the parent and state root.

MS. KUDLA: Mr. Naguib, can we put the video back up for a moment. Sorry, I think when I touch the screen, it's causing the problem.

Q. Mr. Chen, please hold for one moment while we put this back up. I paused at 1:32.

What is a parent root?

A. I believe it's the hash of the previous block.

Q. And what is a state root?

A. I believe it's the hash of the state of the blockchain overall in some capacity.

Q. Does each block on the blockchain have a unique parent root?

A. Yes.

Q. And what about a unique state root?

A. Yes.

MS. KUDLA: So let's play 1:33 to 1:42.

(Video played)

Q. What does the MEV-Boost validator send the signed block header to?

A. They send it back to the relay.

Q. And what does the relay do when it gets this signed block header?

A. The relay unblinds the transactions, meaning it reveals the transactions.

Q. Now, using the MEV-Boost system, can a validator receive

this transaction data, Mr. Chen, without the signed header?
A. Not without a signed header.
Q. What is the purpose of making the MEV-Boost validator sign for the block before getting the transaction data?
A. What I mentioned, that if they signed for it, then either it becomes the next block or it can be used as proof in a slashing claim.
MS. KUDLA: Now let's play 1:42 to 1:52.
(Video played)
Q. So let's pause for a moment. Let's focus on the relay first, at the top, before we move to the validator.
What does the relay do next, after receiving the signed block header, Mr. Chen?
A. The relay propagates it.
Q. What does it propagate it to?
A. Other nodes on the network.
Q. Where do we see the other nodes on the network in this video?
A. They are depicted in green dots.
Q. What happens at that point -- what do the consensus nodes do with this proposed block data?
A. They either accept it or don't; and if two-thirds of the nodes that were chosen to attest or approve the next block choose to accept it, then it becomes the next block.
Q. Now, what happens when it becomes the net block? What

happens to the trades inside that block?
A. All the transactions get executed.
Q. What happens if the nodes reject it?
A. Then it does not become the next block.
Q. What happens to the trades inside that block?
A. They don't happen.
Q. Now, focusing on the validator — let's turn our focus down — what does the MEV-Boost validator do when it receives the proposed block with the transaction data from the relay?
A. In this depiction, they also propagate the block.
Q. Now, in the most common operation of MEV-Boost system, does the relay validator send the same or different signal to the consensus nodes?
A. In the most-common-use case, they are sending the same block.
Q. In the operation that you just outlined — that you just outlined — does a validator even need to send a signal to the consensus nodes?
A. If the relay is peered with other nodes in the network and correctly sending out the block, they don't need to.
Q. Why not?
A. If the relay is doing the job of propagating the block, then, in theory, the validator doesn't have to.

MS. KUDLA: Now, Mr. Naguib, please play 1:52 to 2:09.

(Video played)

Q. Mr. Chen, what just happened to the proposed block that we've been watching go through the system using MEV-Boost?
A. In this depiction, the proposed block got accepted and executed on the blockchain.
Q. Does this proposed block that we watched go all the way through? Does it include those sandwich trader bundles that we looked at at the beginning?
A. This depicted block does include the sandwich bundle.
Q. And where do we see it?
A. On the right-hand side, in the neon green.
Q. As a result, how did these trades get executed on the blockchain?
A. They get executed as the buy/buy/sell.
Q. Now, what, if anything, does a validator get for validating a block in this manner?
A. The validator gets block rewards or validator fees.
Q. In dollar amounts, what's the approximate amount that a validator would receive?
A. I believe in the range of, like, 70 to a hundred dollars.
Q. Now, Mr. Chen, is the process we just watched in Government Exhibit 502 generally consistent with how the defendants described how MEV-Boost operates in the ordinary course, at the omakase meeting?
A. Yeah, it would be an example of a common-use case of MEV-Boost.

Q. And is that how that was -- how MEV-Boost works when we looked at the nodes? Is this consistent with how that was described?
A. Yes.
Q. I wanted to turn back to the December 29, 2022, meeting, Mr. Chen.
MS. KUDLA: Mr. Naguib, can we please publish what's in evidence as Government Exhibit 4101.
Q. Let's go back to that December 29th meeting.
MS. KUDLA: Can you please place -- Mr. Naguib, let's put 1 and 2 together so we can see. And, Mr. Naguib, can you please highlight now bait, the bait; unblinding; the block; the search; the propagation.
Q. Before we get to what these steps mean, Mr. Chen, what is this list with respect to the omakase plan?
A. These were a list of possible steps we were going to use with omakase.
Q. And who outlined these steps for the omakase plan at the December 29, 2022 meeting?
A. James or Anton.
Q. Prior to this first omakase meeting, had you ever heard the defendants discuss these steps before?
A. No. Omakase was introduced on this day.
Q. If successfully executed, Mr. Chen, what was the goal of this plan?

A. To profit at the expense of sandwich bots.
Q. In particular, when you say profit, what were you hoping to get from them?
A. Cryptocurrency.
Q. And, in fact, how much did you get?
A. We ended up getting around 25 million in the units at that -- of April 2nd.
Q. Let's start with bait -- the defendants say is bait in step one of the plan.
MS. KUDLA: Mr. Naguib, can you please highlight in pink now "figure out correct bait systemically to get them to trade."
Q. What was the bait, Mr. Chen?
A. These were the trigger transactions we sent to get the sandwich bots to submit sandwich bundles, including those transactions.
Q. And who introduced the term "bait" at this meeting?
A. James or Anton.
Q. And what was the purpose of the bait?
A. To get the sandwich bots to submit a bundle including them.
Q. Now, why did you need your targets to propose particular trading bundles?
A. Because we wanted to construct -- we wanted to add the dump transactions to those bundles.
Q. Now, what is a dump transaction?

A. In the context of omakase, it's a transaction that sells a particular token.
Q. In particular, how did the dump relate to the bait?
A. It would sell the token that the bait transaction was buying.
Q. So we're going to get into the mechanics of this probably on Monday, but for now, what was the purpose of the dump?
A. To effectively get ahead of the sandwicher sell transaction and profit at the sandwicher's expense.
Q. Now, how did you identify which traders you wanted to target with respect to omakase?
A. In general, the sandwichers that were risking a lot of cryptocurrency in their bundles.
Q. Well, why were those the particular traders that you were interested in the most?
A. Because there was the largest profit opportunity from those particular sandwichers.
Q. With respect to those, what relationship, if any, was there between the expected profits of omakase and your targets?
A. We would be able to profit the amount that they risked in a sandwich bundle, which, in the case of the sandwichers, on the day of omakase, was most of their balance.
Q. And what were you putting into the mempool to cause them to trade?
A. The trigger transactions.

Q. Does that refer to the bait, Mr. Chen?
A. Yes; they're the same.
Q. Now, we'll talk about the bait, also the mechanics of that, later. But what steps did you take to figure out the correct bait systematically to get these traders to trade?
A. We looked at historical transactions that the sandwichers had sandwiched, and we performed live testing of possible transactions as well.
Q. When did you conduct these tests, Mr. Chen?
A. Approximately February to March of 2023.
Q. And why were you testing the bait?
A. To increase the probability that it would work when we went live with the strategy.
Q. And, Mr. Chen, on April 2nd, 2023, how many bait trades did you and the defendants submit to the mempool?
A. Eight.
Q. And who were they designed to target?
A. The sandwich bots.
Q. And how many trading bundles did your targets execute on April 2nd, 2023?
A. They submitted a sandwich eighth sandwich bundles.
Q. Mr. Chen, of those eight bait transactions that you put in, did all eight trigger the targets to submit the bundles?
A. Yes.
Q. What was your success rate?

A. Eight for eight, or hundred percent on that day.
Q. Let's turn to step two, unblinding the block.
What did it mean to unblind the block?
A. Unblinding the block was the process that we described, which is signing a block header and then getting the full contents of the block.
Q. Now, whose trading bundles did you and the defendants want to get by unblinding the block?
A. The sandwicher's.
Q. And based on the execution of the omakase plan, what did the target's trading bundles contain?
A. The trading bundles contained the buy/buy/sell transactions that we were looking at.
Q. And what was the middle buy?
A. Those are our trigger transactions.
Q. And what did you and the defendants do with those bait transactions?
A. We inserted dump transactions in lieu of those bait transactions.
Q. Could you switch out the bait and dump transactions without unblinding the block?
A. Not to my knowledge.
Q. Why not?
A. Because unblinding the block is what gave us the transactions.

MS. KUDLA: Mr. Naguib, please highlight now "Need to set up an MEV-Boost validator that has the relay unblinding the block to us."
Q. Why did you and the defendants need to set up a MEV-Boost validator?
A. A MEV-Boost validator is a validator that interacts with the MEV-Boost Relay, and that was where the sandwich bundles were going to get submitted. So that's why we were going to be MEV-Boost validators.
Q. Did anyone set up the MEV-Boost validator for omakase?
A. Yes.
Q. Who did that?
A. I believe James, Anton, or Jad.
Q. Based on your participation in omakase, how did you and the defendants become a MEV-Boost validator?
A. We -- I believe it required a like a software -- like a call to register your validator with that relay. And then, on your block, you basically just ask the block to give you the block header.
Q. Now, this action that you're talking about, Mr. Chen, is that specific to the MEV-Boost system?
A. Yes.
Q. Did you have to register your MEV-Boost validator?
A. Yes.
Q. And how did you do that?

A. You do it programmatically with code, I think. There was an endpoint, similar to like a website, that you click on functionally programmatically that lets you register to that relay.

Q. And, once again, are these MEV-Boost relays?

A. Yes.

Q. Now, if you did not register with the MEV-Boost Relay, would you and the defendants have expected to have access to your target's trading bundles?

A. We -- not to my knowledge.

Q. If you and the defendants did not register with this MEV-Boost Relay, would you and the defendants have been in a position to switch out the bait and the dump transactions?

A. Not to my knowledge.

Q. Now, when you registered this omakase validator, Mr. Chen, did you and the defendants intend to publish the block given to you by the relay?

A. We, as the validator, did not intend to publish the block that was unblinded originally.

Q. Instead, what did you and the defendants intend to do?

A. We intended to propagate a version of the block that had our dump transactions rather than the trigger transactions.

Q. And on April 2nd, 2023, how did you and the defendants get access to the target's trading bundles using the omakase validator?

A. We signed the block header with particular parent and state root values of zero, and then received the full block.
Q. When you said you signed the block header with parent and state root values set to zero, who set those values to zero?
A. Us, via our code.
Q. And why did you -- was the parent and state root value supposed to be set to zero?
A. Those were incorrect values, as defined by what I said previously.
Q. Why did you and the defendants enter incorrect data to the block header?
A. Because we wanted that block to get rejected by the network.
Q. Why did you want that block to get rejected by the network?
A. Because we wanted our block to get accepted by the network.
Q. Let's break it down for a moment.
The block that you wanted to get rejected by the network, what did it contain?
A. It contained the buy/buy/sell sandwich bundle, which included trigger transactions.
Q. Why did you not want that one to get published to the blockchain?
A. Because we had a more profitable block.
Q. And what block did you want to profit from?
A. We wanted the block that contained the dump transactions to

get propagated.
Q. What effect did setting the parent and state roots to zero have for the block header?
A. It would get rejected by the other nodes in the network.
Q. How did you first learn, Mr. Chen, that you could submit incorrect data to the MEV-Boost Relay and still receive the transaction data?
A. I believe in one of our team discussions -- yeah, that was explained to me.
THE COURT: Ms. Kudla, we're right at 4:30. Why don't you try and --
MS. KUDLA: Yes, I'll wrap up here. If I could just have a couple more questions and finish up?
THE COURT: You may.
BY MS. KUDLA:
Q. Who told you for the first time about this incorrect data issue?
A. James or Anton.
Q. In the coding terms, how would you describe what you're talking about here, where the code gave you the transaction data when you set the parent and state roots to incorrect data?
A. A bug.
Q. Now, what is a bug, Mr. Chen?
A. Something a piece of code overlooks in its implementation.
Q. And what happens with it?

A. In this particular case?
Q. Yes.
A. We are able to take advantage of the fact that it did not check the parent and state roots.
Q. And who made the decision to use this incorrect data as a way to unblind the block on April 2nd, 2023?
A. James or Anton.
MS. KUDLA: I'll just ask these last final questions, and then we can call it a day, your Honor.
Q. Prior to executing omakase, Mr. Chen, did you tell anyone that you knew the relay would give the full transaction data even if you submitted this incorrect data?
A. Only people on the team.
Q. Why didn't you tell anyone outside the team?
A. Because we were keeping discussion of omakase internal to the team.
Q. What were you worried about, if you told people about this bug?
A. Perhaps they would put out a patch or fix it, and our strategy would not work.
Q. Who would potentially put out a patch or fix the bug?
A. Potentially, Flashbots.
Q. And, to your knowledge, did Flashbots ever fix the MEV-Boost Relay code issue after omakase?
A. They put out a fix of that particular issue.

Q. How long did that take?
A. About 24 hours.

MS. KUDLA: Your Honor, I think now would be a good stopping point for the day.

THE COURT: All right. Thank you.

All right. I will see you all on Monday. I hope you have a nice weekend. Please remember that my prior instructions apply. Do not talk to anyone about the case. Do not do any research on this case. Do not read anything about it in the news. And remember to keep an open mind.

And I will see you all bright and early on Monday. Thank you, all, for your attention this week.

(Continued on next page)

(Jury not present)

THE COURT: Please be seated.

Mr. Chen, you may step down.

(Witness temporarily excused)

THE COURT: I just want to briefly discuss the schedule and then any other issues to take up.

Ms. Kudla, do you have a sense of how long this witness is likely to go?

MS. KUDLA: Your Honor, if you'd give me one minute for my own calculations, I'll be able to figure that out --

THE COURT: Sure.

MS. KUDLA: -- I think.

(Pause)

MS. KUDLA: I would estimate probably another three hours on direct.

THE COURT: All right.

From the defense, how long do you anticipate for cross-examination?

MS. TREFZ: I'm not sure of the exact timing, but I doubt there would be another witness on Monday.

THE COURT: All right.

And who is the next witness up, Ms. Kudla?

MS. KUDLA: Your Honor, I think that is still in flux at this moment, but we'll certainly let defense counsel over the weekend know at that point in time. We're trying to

coordinate with witness availability.

THE COURT: All right. I'll check in on that on Monday.

Anything else for us to discuss now?

From the government?

MS. KUDLA: Your Honor, nothing from the government.

THE COURT: Thank you.

From the defense? Ms. Trefz?

MS. TREFZ: We only wanted to flag one thing, your Honor, which is: We understand the Court's ruling on Salmonella, and we wanted to just flag for the Court that in order to preserve our record, our intention is, with respect to particular witnesses where we expect that to be an important issue for those witnesses, we would intend to file a proffer of what we would have shown if we were allowed to speak about Salmonella in the way that we would like.

I wanted to make sure that the Court knows we are not asking for reconsideration; that is simply for preservation purposes.

THE COURT: Understood. Thank you, Ms. Trefz.

MS. TREFZ: Thank you.

THE COURT: Anything else to discuss now, Mr. Marx, Mr. Fick?

MR. FICK: No, your Honor.

MR. BAYERL: All right. Thank you. Have a nice

weekend, you all. See you on Monday.

(Adjourned to October 20, 2025, at 10:00 a.m.)

INDEX OF EXAMINATION


Examination of: Page

ROBERT MILLER

Cross By Mr. Looby . . . . . . . . . . . . . . . 428

Cross By Mr. Marx . . . . . . . . . . . . . . . 491

Redirect By Mr. Fang . . . . . . . . . . . . . . 546

TRAVIS CHEN

Direct By Ms. Kudla . . . . . . . . . . . . . . 571


GOVERNMENT EXHIBITS


Exhibit No. Received

3202 . . . . . . . . . . . . . . . . . . . 558

3208 . . . . . . . . . . . . . . . . . . . 564

201 . . . . . . . . . . . . . . . . . . . . 579

3605, 3605-A . . . . . . . . . . . . . . . . 586

4101 . . . . . . . . . . . . . . . . . . . 588


DEFENDANT EXHIBITS


Exhibit No. Received

304 . . . . . . . . . . . . . . . . . . . . 446

321A . . . . . . . . . . . . . . . . . . . 459

309 . . . . . . . . . . . . . . . . . . . . 465